**REQUESTING RULING NO LATER THAN OCTOBER 26, 2026**

No. 26-60806

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

NAACP, *et al.*,
*Plaintiffs/Appellees*,

*and*

UNITED STATES OF AMERICA, acting on behalf of Lee M. Zeldin as Administrator of the U.S. Environmental Protection Agency,
*Movant-Appellant*,

v.

X.AI CORP., *et al.*,
*Defendants*.

---

Appeal from the United States District Court for the Northern District of Mississippi, No. 3:26-cv-00074 (Hon. Debra M. Brown)

---

# THE UNITED STATES' URGENT MOTION FOR A STAY OF DISTRICT COURT PROCEEDINGS PENDING APPEAL

---


STANLEY E. WOODWARD, JR.
*Associate Attorney General*
MICHAEL WEISBUCH
*Deputy Associate Attorney General*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ANDREW M. DARLINGTON
*Counsel*
*Energy & Natural Resources Division*


October 9, 2026

(*Counsel continued on inside cover*)

KYLE GLYNN
JOHN HOUSTON SHANER
*Attorneys*
Energy & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 532-3156
john.shaner@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

No. 26-60806
*NAACP, et al.*
*v.*
*X.AI Corp., et al.*

Under Circuit Rule 28.2.1, Movant-Appellant is a governmental party that need not furnish a certificate of interested persons.

/s/ J. Houston Shaner
J. Houston Shaner

*Counsel for Movant-Appellant United States of America*

## TABLE OF CONTENTS


INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................3

A. The Clean Air Act ........................................................................3

B. The Grok Government Model and Colossus 2 Facility ........................4

C. The Proceedings Below.....................................................................5

ARGUMENT .............................................................................................8

I. The United States is likely to succeed on appeal. ..........................................10

A. The district court's effective denial of intervention is immediately appealable. ...........................................................................10

B. The United States has a right to intervene. ........................................12

II. The United States will be irreparably harmed absent a stay. ........................18

A. Statutory right .....................................................................................18

B. National security...................................................................................18

C. Constitutional injury .............................................................................20

III. The balance of equities and public interest support a stay. ...........................20

CONCLUSION ..........................................................................................21

## TABLE OF AUTHORITIES

### Cases

*Ams. United for Separation of Church & State v. City of Grand Rapids*,
922 F.2d 303 (6th Cir. 1990) .......... 10, 11

*Ass'n of Irritated Residents v. EPA*,
494 F.3d 1027 (D.C. Cir. 2007) .......... 14

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) .......... 17

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023) .......... 18

*DeOtte v. State*,
20 F.4th 1055 (5th Cir. 2021) .......... 13

*Dep't of the Navy v. Egan*,
484 U.S. 518 (1988) .......... 19

*Dubois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) .......... 16

*Edwards v. City of Houston*,
78 F.3d 983 (5th Cir. 1996) .......... 10

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) .......... 3, 15

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990) .......... 21

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) .......... 14, 15, 17

*Farina v. Mission Inv. Tr.*,
615 F.2d 1068 (5th Cir. 1980) .......... 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 15, 16, 17

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) .......... 3, 15, 16

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989) ........................................................................................ 14

*Hamker v. Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985) ............................................................................ 14, 15

*Heaton v. Monogram Credit Card Bank of Ga.*,
297 F.3d 416 (5th Cir. 2002) ............................................................................ 11-12

*In re Fort Worth Chamber of Com.*,
100 F.4th 528 (5th Cir. 2024) ............................................................................ 11

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ........................................................................................ 16

*Marbury v. Madison*,
1 Cranch 137, 166 (1803) ................................................................................ 16

*Nat'l Parks Conservation Ass'n, Inc. v. TVA*,
502 F.3d 1316 (11th Cir. 2007) ........................................................................ 3, 4, 14

*Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres.*,
609 U.S. —, 2026 WL 2564318 (2026) .......................................................... 19, 21

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 10, 20

*Norman v. Apache Corp.*,
19 F.3d 1017 (5th Cir. 1994) ............................................................................ 10

*Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*,
147 F.4th 560 (5th Cir. 2025) ............................................................................ 3

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) ............................................................................ 13

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................................................................ 9, 16

*Students Engaged in Advancing Tex. v. Paxton*,
177 F.4th 665 (5th Cir. 2026) ............................................................................ 20

*Trump v. United States*,
603 U.S. 593 (2026) ........................................................................................ 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................................................ 17, 21

*Trump v. California*,
609 U.S. —, 2026 WL 2473573 (2026) .......................................................... 20

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................................................... 20

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........................................................................ 16

*United States v. CITGO Petroleum Corp.*,
801 F.3d 477 (5th Cir. 2015) .................................................................. 3

*United States v. Metro. St. Louis Sewer Dist.*,
569 F.3d 829 (8th Cir. 2009) .................................................................. 13

*United States v. Texas*,
97 F.4th 268 (5th Cir. 2024) ................................................................... 10

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) ................................................................. 13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................................... 20, 21

**Statutes**

28 U.S.C. § 1291 ....................................................................................10

31 U.S.C. § 3730(b)(2)............................................................................13

31 U.S.C. § 3730(c)(2)(A) .......................................................................13

42 U.S.C. § 7413(a)(1)...............................................................................3

42 U.S.C. § 7413(b) ...................................................................................3

42 U.S.C. § 7413(c) ...................................................................................3

42 U.S.C. § 7604 ........................................................................................3

42 U.S.C. § 7604(a) ........................................................................................16

42 U.S.C. § 7604(b)(1)(A) ................................................................................14

42 U.S.C. § 7604(c)(2) .......................................................1,4, 8, 12, 15, 18

42 U.S.C. § 7604(c)(3) ......................................................................................15

**Rules**

Fed. R. Civ. P. 12(b) ........................................................................................14

Fed. R. Civ. P. 24(a)(1) ......................................................................................12

Fed. R. Civ. P. 24(c) .......................................................................................7, 12

**Other Authorities**

Art. II, § 1, cl. 1 ..........................................................................................9, 16

Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025) ..................................19

## INTRODUCTION

X.AI Corp. built a self-powered supercomputing facility in Mississippi. This facility, called "Colossus 2," supports superintelligence (SI) models of paramount importance to the United States military. Plaintiffs, unhappy with this facility, sued these companies under the Clean Air Act's citizen-suit provision, seeking monetary penalties payable to the federal Treasury and an injunction to shut down the facility's temporary power source.

Exercising its unequivocal, unqualified ability to intervene "as a matter of right at any time" in such an "action," 42 U.S.C. § 7604(c)(2), the United States moved below to intervene and dismiss Plaintiffs' suit. Yet the district court has refused to even *rule* on that motion. All the while, the court has steadfastly excluded the United States from all proceedings. That includes status conferences where the court has discussed the United States' motion, and indeed has informed the parties of its intent to deny that motion (someday) and move forward with critical preliminary-injunction proceedings in October. In light of these actions, the United States requested that the district court rule on its intervention motion by September 10, 2026. The court has still not ruled. And in turn, it has effectively denied the United States's attempt to intervene, because a motion to intervene held in perpetual limbo is as useful as a motion that was not filed at all.

The United States now appeals that effective denial and moves this Court to stay proceedings below pending appeal. A stay is warranted under the *Nken* factors. First, the United States is likely to succeed on appeal because it has an unequivocal statutory right to intervene. Second, the United States will suffer significant irreparable harm absent relief. Among much else, the United States relies meaningfully on the Colossus 2 supercomputer and has a major national-security interest in its continued operation—and with that, has an overwhelming interest in participating in any preliminary-injunction proceedings that may put the immediate-term fate of that infrastructure at risk. Third, a stay is plainly in the public interest given the constitutional and national-security implications of an injunction.

The United States thus requests a stay of all proceedings below so that the Nation's intervention right is not rendered illusory: It is neither fair nor appropriate for proceedings to continue below—where Plaintiffs are relying on a citizen-suit provision, no less—while the United States is wrongly sidelined. The United States also requests a ruling no later than October 26 to ensure that any stay would come before preliminary-injunction proceedings commence. Plaintiffs oppose this motion. Defendants consent.

## BACKGROUND

### A. The Clean Air Act

The Clean Air Act empowers EPA to issue national air-quality standards. *Port Arthur Cmty. Action Network v. Tex. Comm'n on Env't Quality*, 147 F.4th 560, 562 (5th Cir. 2025). Enforcement under the Act is primarily a job for the state and federal governments. *See United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 480 n.2 (5th Cir. 2015). For example, the Act authorizes EPA to issue compliance orders, impose administrative penalties, and commence civil actions. *See* 42 U.S.C. § 7413(a)(1). In such actions, EPA may seek injunctions and per-day civil monetary penalties payable to the U.S. Treasury. *Id.* § 7413(b). The Act also carries criminal penalties. *Id.* § 7413(c).

That said, "the Clean Air Act allows citizens to file actions to enforce its provisions" under certain conditions. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 467 (6th Cir. 2004); *see also* 42 U.S.C. § 7604. Among other requirements, the citizen-plaintiff must provide written notice to EPA, the state, and the alleged violator at least sixty days before filing suit. *Ellis*, 390 F.3d at 467. And the citizen-plaintiff may not sue if EPA or the state is already "diligently prosecuting the violation." *Id.* These restrictions ensure that private plaintiffs "supplement," but do not "supplant[,] governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987). That's because citizen-plaintiffs "do not represent the public

at large in the same way the government does when it brings suit." *Nat'l Parks Conservation Ass'n, Inc. v. TVA*, 502 F.3d 1316, 1327 (11th Cir. 2007).

To protect federal enforcement prerogatives, "the Administrator, if not a party, may intervene as a matter of right at any time in the proceeding." 42 U.S.C. § 7604(c)(2). The Act puts no limitations on this right.

### B. The Grok Government Model and Colossus 2 Facility

The American military relies on advanced SI systems to support functions from combat operations to personnel management. *See* Ex. 1 ¶¶ 5-6. These systems provide a crucial "technological advantage" over our adversaries. *Id.* ¶ 9. For example, SI platforms enabled U.S. forces to prosecute 2,000 targets in the opening hours of Operation Epic Fury. *Id.* ¶ 6. This advantage requires enormous scale; SI usage across the Department of War's Top-Secret network "is roughly equivalent to 1.5 billion words or up to 6 million pages of text being processed" each day. *Id.*

Only a handful of companies can provide the size, sophistication, and security the military requires. *Id.* ¶ 4. One of these is X.AI, which provides a version of its flagship "Grok" model tailored to federal government specifications. *Id.* ¶ 5. This "Grok Gov Model" directly supports "vital national security missions, including targeting, intelligence, readiness, and recruitment." *Id.*

Large-scale, sophisticated SI models need large, sophisticated computing infrastructure. *Id.* ¶ 7. For X.AI and its Grok models, a key piece of that

infrastructure is the "Colossus 2" site in Southaven, Mississippi. *Id.* ¶¶ 3, 7. This facility uses its enormous computing power to train and upgrade Grok, "including the Grok Gov Model," thus allowing the military to "keep pace with [its] adversaries." *Id.* ¶ 7. The facility's "massive scale" also provides the military with "strategic computing reserves" when "critical surge capacity" is needed, as in the event of conflict. *Id.* ¶¶ 8-9. Thus, facilities like Colossus 2 are a "matter of paramount national security" as "foundational to our modern defense posture as traditional munitions production." *Id.*

Like other computing infrastructure, the Colossus 2 facility requires "a stable energy supply." *Id.* ¶ 7. To that end, MZX Tech LLC, an X.AI affiliate, purchased the site of a former power plant in Southaven. *See id.* ¶ 3; Ex. 2 ¶¶ 127-28. MZX approached the state regulator with plans for a gas-fired power plant at the site, for which MZX would seek a Clean Air Act permit; the state approved that permit earlier this year. *See* Ex. 3 at 1. "Until the permanent turbines can be constructed, [Mississippi] has provided written authorization for xAI to use a number of trailer-mounted gas turbines to temporarily power the facility." *Id.*

### C. The Proceedings Below

Plaintiffs filed this suit alleging that Defendants' temporary turbines were installed without a Clean Air Act permit. *See* Ex. 2 ¶¶ 230-46. Plaintiffs sought to enjoin operation of those turbines and impose civil penalties up to $124,426 per day,

per violation, among other relief. *See id.* at 42. Plaintiffs sought a preliminary injunction shortly thereafter. *See* Ex. 4 at 1.

Defendants moved to extend the time to respond and indicated their intent to seek dismissal. *See* Ex. 5 at 1-2. On May 13, the court issued notice of a telephonic status conference for 4:00 p.m., with call-in information to be sent to counsel by email. *See* Ex. 6. That same day, the United States filed a notice of possible intervention. *See* Ex. 7 at 1-2.

One week later, the court extended Defendants' response to June 15, instructed them to file any motion to dismiss by the same date, instructed the United States to intervene by the same date, and set a hearing on the injunction motion for late August. *See* Ex. 8. The United States moved to intervene as a plaintiff on June 15. *See* Ex. 9 at 1. The motion explained that the complaint should be dismissed because the United States, in the exercise of its enforcement discretion, has determined that the action is inconsistent with federal policy, national security, and the public interest. *See id.* at 8. Given that view, the United States did not attach a separate complaint.

The court held another telephonic status conference on June 29, 2026. The court denied the United States's request for access to the conference, although the court discussed Plaintiffs' "procedural concerns" about the government's

intervention motion. Ex. 10. The court also suggested early to mid-September for a hearing on the injunction motion. *See id.*

On July 1, Plaintiffs moved to strike the United States' intervention motion, alleging two technical defects: (1) omission of a formal statement that the United States intervened on behalf of the EPA Administrator and (2) omission of a complaint attached to the motion, *see* Fed. R. Civ. P. 24(c). *See* Ex. 11 at 1. In response, the United States cured the alleged defects by refiling its motion with amended language clarifying its intervention on the Administrator's behalf. *See* Ex. 12. But the United States did not attach a complaint to the amended motion because its substantive position on that issue remained the same, namely, that the United States' intervention-and-dismissal right embodied in the Clean Air Act is compelled by Article II, and Rule 24(c)'s requirements must be understood in that context. *See* Ex. 13.

The district court held a third telephonic status conference on August 5. *See* Ex. 14. Again, the court denied the United States' request to join the conference.

On August 24, the court held a fourth telephonic status conference. Even though the United States was not present, the court stated its intent to deny Defendants' motion to dismiss, to deny Plaintiffs' motion to strike, and "to deny the United States' motion to intervene." Ex. 15 at 5:10-12. The court then indicated those rulings meant "that there will indeed be a hearing on the plaintiff's motion for

a preliminary injunction" "in October." *Id.* at 5:16-18, 6:1-4. This hearing has not yet been scheduled, but it could occur on October 26 or 27, when counsel for other parties have told the district court that they are available. *See* Ex. 16. The court also said it expected to issue written rulings on the pending motions. *See* Ex. 15 at 5:13.

Given these developments, the United States moved the court to enter a written order on its intervention motion by September 10. Ex. 17. The court has not yet ruled, but, after the government filed its motion citing the transcript of the August 24 conference, the court restricted release of that transcript to counsel of record because that "conference concerned case management and planning matters." Ex. 18. The United States moved to obtain transcripts for the remaining conferences; the court has not ruled on that request. *See* Ex. 19.

On September 21, the United States moved the district court to stay proceedings pending appeal. That motion is fully briefed. No rulings have issued on the stay motion, the intervention motion, or the motion for a written order.

## ARGUMENT

The Clean Air Act vests the United States EPA with authority "to intervene as a matter of right at any time" in a citizen suit. 42 U.S.C. § 7604(c)(2). That plain text should have made this a straightforward case: By its inescapable terms, the United States is allowed to intervene in a citizen suit that seeks to block a superintelligence facility vital to military readiness.

Here, the district court has told the parties—in a status conference where the United States was excluded from participating—that it plans to deny the United States's motion to intervene. But it still has not done so, despite the United States's request for a ruling by September 10. And it has not previewed how it plans to get around Section 7604's text. Even so, it has pledged to hold a critical preliminary-injunction hearing before the end of October, the result of which may be to shut down the Colossus 2 facility for the duration of litigation.

That is untenable, in no small part because having a private party wield a citizen-suit provision against the federal government's wishes and view of the public interest presents severe constitutional problems. The Constitution vests the Executive Branch with the "executive Power"—"all of it." *Seila Law LLC v. CFPB*, 591 U.S. 197, 203-04 (2020) (quoting Art. II, § 1, cl. 1). This includes the "quintessentially executive power" to enforce federal law. *Id.* at 219. In light of those fundamental principles, the Act's intervention provision carries with it the power of the United States to intervene and dismiss a citizen suit it finds against the public interest. But this motion concerns whether the United States may exercise its right to intervene to even make that argument before the district court. Whether through delay or denial, the court below has answered no. That is manifestly wrong. A stay is warranted, so that the United States's intervention right in this case is not rendered meaningless.

## I. The United States is likely to succeed on appeal.

The Court should stay further district court proceedings pending this appeal under the traditional *Nken* factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024). The United States is likely to succeed on the merits; it is suffering irreparable harm; and the public interest strongly favors a stay of district court proceedings.

### A. The district court's effective denial of intervention is immediately appealable.

This Court has jurisdiction because a "denial of a motion to intervene of right is an appealable final order under 28 U.S.C. § 1291." *Edwards v. City of Houston*, 78 F.3d 983, 992 (5th Cir. 1996). A motion's denial may be implied for purposes of appeal where subsequent proceedings are "inconsistent with" the relief requested. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). Denial of the United States' motion here is apparent from several facts.

First, the district court has not issued a ruling on a motion fully briefed since July. Nor has it done so despite the United States' request for a ruling by September 10. Nor has the court given any reason to believe that it will do so in a timeframe meaningful to this case. That "[d]elaying" of the United States' motion "is tantamount to denying it." *Ams. United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990).

Second, the effect of the court's inaction has been to exclude the United States' participation in other proceedings. That has been most obviously true for the three status conferences from which it has barred the United States. That exclusion is in no way consistent with the United States' right to intervene.

Most importantly, the district court seems firmly committed to holding the preliminary-injunction hearing without the United States, and soon. *See, e.g.*, Ex. 15 at 6:1-4 ("[T]o set a firm date that will not be subject to any changes . . . the preliminary injunction hearing will be set for a date in October."); *see also id.* at 5:15-16. That hearing carries potentially enormous consequences for national security. *See supra* pp. 4-5. The "court's inaction" in the face of such consequences "amounts to an 'effective' denial" of the United States' right to intervene. *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 533 (5th Cir. 2024).

And the circumstantial evidence of denial is almost beside the point, because the court definitively stated from the bench that intervention will not be granted. *See* Ex. 15 at 5:11-12. That is just like another effective-denial case, where the district court "ma[d]e clear" at the status conference "that it did not favor the intervention motion on the merits." *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 421 (5th Cir. 2002). "In these circumstances," then, "the court's action effectively denied the [United States'] motion to intervene." *Id.*

The district court cannot achieve that denial while also avoiding appellate review of its decision. For that reason, the United State is likely to succeed on this jurisdictional issue.

**B. The United States has a right to intervene.**

The United States is also likely to prove its entitlement to intervene. A court shall grant intervention when a party has "an unconditional right to intervene." Fed. R. Civ. P. 24(a)(1). The Clean Air Act unconditionally empowers the United States, on behalf of the Administrator, to "intervene as a matter of right at any time in the proceeding." 42 U.S.C. § 7604(c)(2). That should end the matter.

Neither of the two possible bases for rejecting intervention withstand scrutiny.

**1.** Plaintiffs moved to strike the United States' motion based on noncompliance with Rule 24(c), which requires that an intervention motion "be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Plaintiffs interpreted this rule to require a "complaint" or "answer" filed with the motion, regardless of the circumstances. Ex. 11 at 1. But that makes no sense.

Because the United States is moving *to dismiss the suit*, it has no reason to file a complaint (by definition) nor an answer (since it is not a defendant). Plaintiffs' position is the exact sort of "excessively technical" reading of Rule 24 this Court has rejected. *Farina v. Mission Inv. Tr.*, 615 F.2d 1068, 1074-75 (5th Cir. 1980) ("a

motion to remove" sufficed); *see, e.g.*, *DeOtte v. State*, 20 F.4th 1055, 1067 n.2 (5th Cir. 2021) (no formal "pleading" required under this Court's "permissive approach").

The appropriate filing here is a motion to dismiss, "because it provides sufficient notice to the court and the parties of [the United States'] interests." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009). That makes this case much like *qui tam* suits under the False Claims Act. That statute authorizes the government to intervene and dismiss the suit, *see* 31 U.S.C. § 3730(b)(2), (c)(2)(A), and the government exercises that right by filing a motion to dismiss or notice of dismissal, *see, e.g.*, U.S. Mot. to Intervene & Dismiss, *U.S. ex rel. Jackson v. Ventavia Rsch. Grp., LLC*, No. 1:21-cv-8 (E.D. Tex. Mar. 12, 2024), ECF No. 137. Any other outcome would trample the United States' statutory and constitutional right to intervene and dismiss a citizen suit. *Cf. Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (Article II concerns assuaged by Executive's "significant control" over *qui tam* suits).

**2.** The other conceivable argument for denial of intervention is "futility." *United States v. Texas*, 181 F.4th 548, 553-54 (5th Cir. 2026). As *Texas* holds, intervention can be denied as futile if the intervenor's merits argument would fail as a matter of law under "the standards of Rule 12(b)." *Id.* Here, however, the district court cannot deny intervention on futility grounds because the United States is

correct on the merits. The citizen-suit provision, correctly interpreted based on statutory and constitutional grounds, authorizes the United States to intervene *and dismiss* a citizen suit. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 375 n.32 (5th Cir. 2024) (Jones, J., dissenting).

That interpretation flows from the Clean Air Act's text, structure, and allocation of enforcement authority. "Primary enforcement responsibility under the Act lies with the states and the Administrator." *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 395 (5th Cir. 1985) (construing the Clean Water Act). The Clean Air Act's "enforcement provisions grant EPA broad enforcement authority and discretion, authorizing the agency to choose among various methods to penalize violators and achieve compliance." *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1036 (D.C. Cir. 2007).

The citizen-suit provision erects guardrails to protect this discretion. Chief among these is the mandate to give sixty days' notice to the Administrator, 42 U.S.C. § 7604(b)(1)(A), a requirement "strictly construed," *Nat'l Parks Conservation Ass'n*, 502 F.3d at 1328-30. Pre-suit notice "allows Government agencies to take responsibility for enforc[ement], thus obviating the need for citizen suits." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989). The Act then bolsters that pre-suit notice requirement with post-suit and pre-settlement notice to the government. *See* 42 U.S.C. § 7604(c)(2), (c)(3).

These notice protections "strongly indicate[] that it is the Administrator who is of central importance in the enforcement of the Act," not the citizen-plaintiff. *Hamker*, 756 F.2d at 395 (emphasis added). And it is specifically the Administrator's enforcement *discretion* that notice protects. *See Ellis*, 390 F.3d at 475 (citing *Gwaltney*, 484 U.S. at 60-61). If the Administrator opts to pursue enforcement, for example, the statute prevents "second-guessing of the EPA's assessment of an appropriate remedy," including those remedies "that the government chose to forgo." *Id.* at 475, 476 (cleaned up). No one doubts that this limit empowers the government "to foreclose a citizen suit" by right. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000).

The same limit applies even if the government declines enforcement. Indeed, the right of intervention is most meaningful precisely when "the Executive Branch *opposes* a particular citizen suit." *Id.* (emphasis added). Otherwise, the government's diligent prosecution of an enforcement action would already preclude that suit. *See Hamker*, 756 F.2d at 396.

These statutory protections all point towards one conclusion: "the statute authorizes citizen suits only with the consent of governing authorities." *ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting). Proceeding over that opposition converts "the citizens' role from interstitial to" surely "intrusive," G*waltney*, 484 U.S. at 61, by "enabling citizens to commandeer the federal enforcement

machinery," *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987). Here, the United States has determined that the civil action is not in the public interest. And so must the district court, as "the courts have 'no power to control [the President's] discretion' when he acts pursuant to the powers invested exclusively in him by the Constitution." *Trump v. United States*, 603 U.S. 593, 607 (2026) (quoting *Marbury v. Madison*, 1 Cranch 137, 166 (1803)).

Reading the Clean Air Act to include a right to intervene and dismiss is compelled by the "serious constitutional doubts" raised by any other reading. *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). "The Constitution vests '[t]he executive Power' in a 'President of the United States of America' and instructs that he 'take Care that the Laws be faithfully executed.' Art. II, §§ 1, 3." *Trump v. Slaughter*, 146 S. Ct. 2283, 2292-93 (2026). The discretion to enforce federal law, such as by seeking to enforce a permit or to seek civil penalties, is a "quintessential[]" exercise of executive power. *Seila Law*, 591 U.S. at 219. In contrast, allowing private plaintiffs to seek penalties "vastly disproportionate" to their injuries (and "payable entirely to the United States Treasury") is "constitutionally bizarre." *Laidlaw*, 528 U.S. at 202, 209-10 (Scalia, J., dissenting). That's because "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429

(2021). This constitutional concern is aggravated here by the United States' lack of consent, making this case wholly different than one in which "the Government supports Plaintiffs' suit." *ExxonMobil*, 123 F.4th at 343 (Davis, J., concurring).

*       *       *

At bottom, the district court's exclusion of the United States raises "[d]ifficult and fundamental questions" about "whether exactions of public fines by private litigants," and whether other law-enforcement actions by private litigants, intrude on "the responsibilities committed to the Executive by Article II." *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring). Because the Court should "construe the statute to avoid such problems," *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023), the United States' position is that when it opposes suit as a matter of its enforcement discretion, the citizen-suit provision should be construed to grant the United States a statutory right to dismissal.

These questions will be fully briefed at the appropriate time. For now, it suffices that the United States has shown it is likely to succeed on appeal because the district court improperly denied intervention and insisted on continuing forward with preliminary-injunction proceedings without confronting the serious issues the United States has raised.

## II. The United States will be irreparably harmed absent a stay.

The United States faces three injuries if the district court is allowed to proceed during this appeal. Each justifies a stay.

### A. Statutory right

Congress gave the Administrator a clear, unqualified right to intervene in Clean Air Act citizen suits. *See* 42 U.S.C. § 7604(c)(2). The district court has effectively extinguished that right of participation by refusing to allow intervention while insisting on barreling forward with preliminary-injunction proceedings. "Absent [a] stay of district court proceedings," the United States's statutory right "would be largely nullified." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 742-43 (2023).

### B. National security

The United States also has strong national-security interests in these proceedings, as explained by the Department of War's Chief Digital and Artificial Intelligence Officer. Ex. 1 ¶¶ 1-2. Yet the district court is proceeding towards (and perhaps weeks away from) a hearing on whether to enjoin operation of the Colossus 2 facility.

Enjoining Colossus 2 would "directly threaten[] our ongoing national security interests." Ex. 1 ¶ 3. The military uses SI models, every day, "to support vital national security missions, including targeting, intelligence, readiness, and

recruitment." *Id.* ¶¶ 5-6. This is enabled by X.AI's Grok Gov Model, which "offers features unique to xAI that are found in no other frontier AI [or SI] model." *Id.* ¶ 5-6. The military also "relies on xAI as a primary classified compute infrastructure provider." *Id.* ¶ 8. That service is as central to the military's "modern defense posture as traditional munitions production." *Id.* Colossus 2 is thus not merely "commercial infrastructure" but a "strategic" resource "vital to maintaining our technological advantage against adversaries." Ex. 1 ¶ 9. The President himself has confirmed the import of this advantage. Exec. Order No. 14179 § 2, 90 Fed. Reg. 8741 (Jan. 23, 2025).

Plaintiffs seek to cut power to this strategic resource, leaving the military's SI tools "severely impacted." *Id.* ¶ 10. Plaintiffs would also ensure X.AI cannot "train and develop future, improved versions of Grok" that help the United States stay ahead of its enemies. *Id.* ¶ 7.

The Executive's judgment on these military matters deserves the "utmost deference." *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (cleaned up). Here, that judgment establishes irreparable harm. *See Nat'l Park Serv. v. Nat'l Tr. for Hist. Pres.*, 609 U.S. —, 2026 WL 2564318, at *3 (2026) (affidavits proved "national security and other harms").

### C. Constitutional injury

Finally, the United States' intervention motion represents an exercise of the Executive Branch's constitutional enforcement prerogatives. Interference with those prerogatives by a coordinate branch of government constitutes irreparable harm justifying interim relief. *Trump v. CASA, Inc.*, 606 U.S. 831, 859-60 (2025); *see Trump v. California*, 609 U.S. —, 2026 WL 2473573, at *4 (2026) (finding irreparable harm from injunction against "implement[ing] the President's enforcement priorities").

## III. The balance of equities and public interest support a stay.

When a movant "satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken*, 556 U.S. at 435. These factors "merge when an injunction affects" the government. *Students Engaged in Advancing Tex. v. Paxton*, 177 F.4th 665, 673 (5th Cir. 2026). A stay is in the public interest for the same reasons the ongoing proceedings would harm the United States.

First, this Court owes "great deference" to the Department of War's views on "the relative importance of a particular military interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Here, the Department's view is clear: "[P]reserving xAI's current data center capacity is a matter of *paramount* national

security." Ex. 1 ¶ 8 (emphasis added). That "plainly outweighs the interests advanced by the plaintiffs." *Winter*, 555 U.S. at 26.

Second, the Constitution entrusts the Executive Branch, not private plaintiffs, with protecting the public through enforcement of federal law. *TransUnion LLC*, 549 U.S. at 429. The Executive's views are thus the presumptive guide to the public interest in enforcement. *Id.*; *see EPA v. City of Green Forest*, 921 F.2d 1394, 1404 (8th Cir. 1990) ("The EPA is charged with enforcing the [Act] on behalf of all citizens."). And, of course, the public has a compelling interest in preventing intrusion on "the activities of a coordinate branch." *Nat'l Tr. for Hist. Pres.*, 2026 WL 2564318, at *3.

## CONCLUSION

For these reasons, the Court should stay proceedings below until this appeal concludes.

Respectfully submitted,

/s/ John Houston Shaner
STANLEY E. WOODWARD, JR.
*Associate Attorney General*
*U.S. Department of Justice*

MICHAEL WEISBUCH
*Deputy Associate Attorney General*

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

ANDREW M. DARLINGTON
*Counsel*

KYLE GLYNN
JOHN HOUSTON SHANER
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 532-3156
john.shaner@usdoj.gov

October 9, 2026
DJ # 90-5-2-1-13350

## CERTIFICATE OF COMPLIANCE

Per Federal Rule of Appellate Procedure 27(d)(2)(A), this motion contains 4,758 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

Per the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Per Circuit Rule 27.3.2, a ruling is necessary on or before October 26, 2026, and counsel has notified the clerk by telephone on the day of filing of the intent to file and the date by which action is required.

/s/ J. Houston Shaner
J. Houston Shaner

*Counsel for Movant-Appellant*
*United States of America*

## CERTIFICATE OF SERVICE

I certify that, on October 9, 2026, I electronically filed the foregoing motion with the Clerk of Court for the United States Court of Appeals using the court's CM-ECF system. Use of CM-ECF will serve registered case participants.

/s/ J. Houston Shaner
J. Houston Shaner

*Counsel for Movant-Appellant*
*United States of America*

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>X.AI CORP, ET AL.,<br><br>Defendants. | 26 Civ. 74 (DMB) |

**DECLARATION OF CAMERON STANLEY**

I, Cameron Stanley, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Chief Digital and Artificial Intelligence Officer (CDAO) for the U.S. Department of War (DoW). I have held this position since January 7, 2026. I am responsible for leading the acceleration of DoW's adoption of data, analytics, and artificial intelligence (AI) to generate decision advantage for the Warfighter. As such, I oversee the Department-wide integration of digital capabilities and shifting the organization to rapid, disciplined operational delivery. Prior to this role, I served as National Security Transformation Lead for Amazon Web Services; Chief Data Officer of the Undersecretary of Defense for Intelligence and Security; as well as Chief of the Department's Algorithmic Warfare Cross Functional Team, also known as "Project Maven."

2. I submit this declaration in support of the United States' motion to intervene in this civil action. Its purpose is to explain DoW's and the United States' cognizable interests relating to the subject matter of this case, along with how its disposition will likely harm those interests, especially if intervention is denied. The statements that follow are based on my personal knowledge, as well as information provided to me in the course of my official duties.

3. The plaintiffs in this civil action seek to enjoin xAI's use of temporary gas-fired turbines at its Stanton Road site that powers the nearby "Colossus 2" data center or supercomputer—xAI uses the Colossus 2 supercomputer to train and upgrade its Grok models, including ones used by DoW. For the reasons described below, this action directly threatens our ongoing national security interests.

4. xAI's Grok represents one of only four proprietary state-of-the-art ("frontier") AI models currently capable of supporting national security applications. Furthermore, xAI remains one of just three enterprise providers equipped to sustain mission-critical operations across Secret and Top-Secret classified networks for the foreseeable future due to the enormous resources required for initial certification.

5. DoW currently relies on derivatives of xAI's commercial offerings known as the Grok Gov Model. This model is tuned specifically for United States government specifications and provides critical support to both business enterprise activities and military operations. For example, it is deployed in Maven Smart Systems ("MSS") to support vital national security missions, including targeting, intelligence, readiness, and recruitment. Furthermore, it has tailored functionality to support military planning workflows, report synthesis and generation, predictive analytics for logistics and sustainment, red-teaming analysis of adversary positioning, personnel management, and medical supply lines. The Grok Gov Model offers features unique to xAI that are found in no other frontier AI model.

6. To further illustrate the uses of the Grok Gov Model within DoW, MSS frontier workflows enabled U.S. forces to deploy over 2,000 munitions to 2,000 distinct targets within 96 hours during Operation Epic Fury, a testament to the greatly increased operational efficiency made possible by the Grok Gov Model. More generally, MSS users consume almost 2 billion

tokens, the units used to purchase usage of a frontier AI model, on DoW's Top-Secret network every day, which is a critical national security capability for intelligence and operational workflows across the globe. This immense amount of AI usage is roughly equivalent to 1.5 billion words or up to 6 million pages of text being processed by the technology.

7. The Grok Gov Model is foundationally based on commercial Grok architecture. Consequently, the essential language training processes required to build and perfect the models for DoW use require robust commercial infrastructure, as well as a stable energy supply for that infrastructure. If there is a reduction in the infrastructure available to xAI, such as requested by Plaintiffs in this action, then the Grok Gov Model would be impacted to a similar extent as the commercially available Grok models. In particular, if Colossus 2 is shut down because it cannot rely on power from the Stanton Road site, xAI would lose capacity to train and develop future, improved versions of Grok. And if xAI is hindered from continuing to improve and upgrade Grok, including the Grok Gov Model, DoW's ability to meet its national security mission and keep pace with adversaries will be impaired.

8. In the event of armed conflict or other exigent circumstances affecting national security, DoW projects there is a significant likelihood of an immediate and substantial escalation in AI inference demands for Grok Gov Models. The commercial data centers such as Colossus 2 operated by xAI are well-positioned to provide this critical surge capacity needed to sustain wide-ranging national security operations under rigorous conditions because they have the requisite size and capabilities that few other enterprise providers possess. Therefore, preserving xAI's current data center capacity is a matter of paramount national security.

9. Moreover, the Department relies on xAI as a primary classified compute infrastructure provider. The critical ability to field its data facilities at massive scale is as

foundational to our modern defense posture as traditional munitions production. Any impediment to commercial data center operations severely diminishes xAI's innate capacity to adequately support current operations, as well as any potential future operations, thereby compromising DoW's strategic computing reserves. In the modern theater of operations, data center inference capacity must be recognized not merely as commercial infrastructure, but as a long-term strategic tool vital to maintaining our technological advantage against adversaries. In addition, the limited competition between frontier model vendors would likely lead to an unsustainable increase in cost to DoW and thus the American taxpayers if DoW were forced to seek alternative vendors.

10. If Grok Gov Model cannot be deployed, refined, and upgraded across the DoW due to either limitations in energy supply or limited reserve compute capability, such as those requested by Plaintiffs in this matter, the many tools deployed by military and civilian personnel alike which rely on Grok Gov Models would be severely impacted.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.

EXECUTED this 15th day of June, 2026 in Arlington, VA.

Cameron Stanley
Chief Digital and Artificial Intelligence Officer
U.S. Department of War

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and MISSISSIPPI STATE CONFERENCE OF THE NAACP**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **Civil Case No.** 3:26-cv-74-MPM-JMV |

## COMPLAINT

Plaintiffs the National Association for the Advancement of Colored People ("NAACP") and the NAACP Mississippi State Conference (collectively, the "Plaintiffs") hereby file this Complaint against Defendants xAI Corp. and MZX Tech LLC (collectively, the "Defendants") and state the following:

## I. INTRODUCTION

1. "Move fast and break things" is the unofficial motto of the tech industry. As the motto promises, artificial intelligence company Defendant X.AI Corp. ("xAI") and its subsidiaries broke Clean Air Act requirements that protect public health when rushing to build gas power plants for their "Colossus" data centers in the greater Memphis area.

2. xAI even boasts on its website about the speed of construction "outpacing every estimate." Indeed, xAI and its subsidiaries have tried to outrun the Clean Air Act by repeatedly building gas power plants for these data centers—in communities in the greater Memphis area with significant Black populations—without obtaining mandatory permits.

3. Failure to get a permit has serious public health consequences. Power plants like these emit significant amounts of dangerous pollutants that are harmful to human health. Accordingly, Congress specified that permits for new major pollution sources require implementation of the best available pollution controls.

4. And yet, between August and December 2025, Defendants xAI and its wholly owned subsidiary MZX Tech LLC ("MZX Tech") installed and began operating twenty-seven polluting gas turbines (the "Colossus Gas Plant") in Southaven, Mississippi, which is in DeSoto County, without an air permit or regard for the health and safety of people living nearby.

5. Tens of thousands of people, including members of Plaintiffs NAACP and NAACP Mississippi State Conference ("NAACP MS"), live, worship, study and work in the homes, churches, and schools that immediately surround the Colossus Gas Plant, and hundreds of thousands more live in the greater Memphis area. A much larger share of this population is Black than that of the country's population as a whole.

6. Defendants' Colossus Gas Plant powers xAI's nearby Colossus 2 data center, which in turn powers the chatbot "Grok."

7. The Colossus Gas Plant emits significant amounts of harmful pollutants, including nitrogen oxides ("$NO_x$") and formaldehyde, which are tied to increases in asthma, respiratory diseases, heart problems, and certain cancers in persons exposed to them. These emissions do not stop at the Mississippi state line; Tennessee residents are also exposed.

8. Together, the twenty-seven unpermitted turbines have the potential to emit over 1,700 tons of smog-forming $NO_x$, likely making the Colossus Gas Plant the largest industrial source of $NO_x$ in the greater Memphis area.

9. A Clean Air Act permit for a pollution source as large as the Colossus Gas Plant would require determination of the best available control technology ("BACT") to reduce emissions, and then application of those controls during the entirety of the plant's operation. Had Defendants obtained a permit, they would have been held to this standard. By simply not applying for—or receiving—a permit, xAI and MZX Tech have avoided subjecting these twenty-seven unpermitted turbines to a BACT determination.

10. This is not the first time that, in their rush to build and power data centers in the greater Memphis area, xAI and one of its wholly owned subsidiaries have constructed and operated gas turbines without Clean Air Act permits.

11. About a year ago, fewer than ten miles away from the Colossus Gas Plant in Northern Mississippi's Southaven, the nearby historically and majority Black community in Memphis's Boxtown neighborhood fought back against unpermitted air pollution from turbines powering xAI's Colossus 1 data center. Now xAI is planning a third data center ("Colossus 3") even closer to the Colossus Gas Plant.

12. The NAACP and NAACP MS believe that no one is above the law, and the NAACP and NAACP MS seek declaratory and injunctive relief ordering xAI and MZX Tech to: cease operating the Colossus Gas Plant unless and until they obtain the required permits; to apply the necessary pollution controls; and to pay appropriate civil penalties for each day of violation.

13. Absent an appropriate order from this Court, xAI and MZX Tech will continue to emit illegal air pollution as described in this Complaint, which will continue to harm members of the NAACP and NAACP MS.

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over the Clean Air Act claims set forth in this Complaint against Defendants pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

15. On February 13, 2026, in compliance with 42 U.S.C. § 7604(b) and 40 C.F.R. § 54.2, Plaintiffs provided notice of the Clean Air Act violations specified in this Complaint by sending a letter to Defendants, the State of Mississippi, and the Administrator of EPA. *See* Exhibit A, Letter from Patrick Anderson, S. Env't Law Ctr., et al., to Elon Musk, xAI, RE: Notice of Intent to Sue for Violations of the Clean Air Act at the Gas Turbines Power Plant Located at 2875 Stanton Road South, Southaven, MS, that Powers xAI's Colossus II Data Center (Feb. 13, 2026).

16. This Court is authorized to award the requested declaratory and injunctive relief and apply any appropriate civil penalties. 42 U.S.C. § 7604 (Clean Air Act); 28 U.S.C. §§ 2201-02; and 28 U.S.C. § 1355.

17. Venue is proper in the Northern District of Mississippi because the source of the violations alleged herein is located within this judicial district. 42 U.S.C. § 7604(c); 28 U.S.C. § 1391(b).

## III. PARTIES

### *Plaintiffs*

18. Plaintiffs NAACP and NAACP MS are non-profit organizations with members who live, work, worship, matriculate, and/or recreate near the Colossus Gas Plant and are adversely impacted by illegal air pollution from the facility.

19. Plaintiff NAACP MS is a subsidiary organization of the NAACP.

20. NAACP MS consists of 112 units, which include branches, college chapters, and youth councils, and a revolving membership of over 12,000 members across the state, including over 140 members in DeSoto County, Mississippi.

21. NAACP MS has been active since the 1940s and has been on the frontline of all the major battles of the civil rights movement in Mississippi since that time, conducting work aimed at securing equal rights under the law for all citizens of the state.

22. Clean air is of paramount importance to the health and well-being of the members of NAACP MS, and it has an established history of environmental justice advocacy across Mississippi.

23. NAACP MS is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

24. Founded in 1909, Plaintiff NAACP is the nation's oldest and largest civil rights organization. It is a non-profit with units throughout the country, including state conferences, local branches, college chapters, and youth councils.

25. Membership in a state conference, branch, or other unit constitutes membership in the national NAACP.

26. The NAACP's principal objectives are to ensure the political, educational, social, and economic equality of all citizens; to eliminate racial prejudice; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state, and local laws securing civil rights; and to inform the public of the continued adverse effects of racial discrimination.

27. The NAACP recognizes that environmental and climate issues are civil rights issues. The NAACP's work involves fighting the disproportionate risks faced by Black and

frontline communities to risks from pollution exposure, including through the NAACP's Center for Environmental and Climate Justice.

28. The NAACP has members in most states, including Mississippi.

29. In addition to NAACP's Mississippi members who live near the Colossus Gas Plant, NAACP has over 2,500 members just in Shelby County, which includes Memphis and communities just across the state line from the gas turbines in Southaven.

30. Plaintiff NAACP is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

31. The NAACP and NAACP MS have members who breathe in pollution from the Colossus Gas Plant, and they are concerned about the effects of those unpermitted emissions on their health, the health of their families, their ability to safely spend time outdoors in their neighborhoods, and their property values.

32. Since learning about the unpermitted turbines, members have changed their behavior to avoid exposure, including by spending less time outdoors than they otherwise would and inviting friends and family with health vulnerabilities over less than they would like.

33. For example, a registered nurse who rents a home less than one mile from the turbines is a member of NAACP and the NAACP MS. She is a young Black woman, and she breathes pollutants from the turbines daily, including when she is outdoors watering plants, sitting on her patio or in her garage, and going for walks in her neighborhood. At her home, she can hear the turbines operating whether she is indoors or outside, particularly at night. She also encounters pollution from the turbines when volunteering with her church and with the NAACP in the south Memphis area, handing out care bags at local soup kitchens and engaging in door-to-door evangelism.

34. This member is concerned about how her regular exposure to pollution from the turbines will affect her body and health, increasing the risk that she will develop respiratory illnesses like asthma or lung disease. Those concerns limit her ability to enjoy her time at home and in her community the way she otherwise would. This spring, she has suffered from seasonal allergies, which she knows can be exacerbated by exposure to air pollution. She has also had to wear earplugs at night to prevent the noise from the turbines from interrupting her sleep.

35. If the Colossus Gas Plant reduced or ceased its unlawful air pollution, this member's health concerns would be reduced and she would more enjoy her time outdoors at her home and in her neighborhood, as well as when volunteering and evangelizing throughout south Memphis.

36. As another example, spouses who own a home approximately five-and-a-half miles from the turbines are also both members of NAACP and the NAACP MS. They are both Black and middle aged, and their outdoor lifestyle exposes them to pollution from the turbines on a regular basis, including when they are working in their Wi-Fi enabled outdoor gazebo, tending their garden, walking their dog in the neighborhood, and dining outside.

37. These members worry about the effects of that added exposure to pollution on their health. They are particularly concerned about how it could contribute to one spouse's respiratory issues, which have led to previous hospitalizations.

38. These members have deep roots in the south Memphis area and are concerned about the health of other family members who live near the Colossus Gas Plant, especially given the pollution that their loved ones were already exposed to from xAI's first gas-fired power plant, which operates just across the border in Shelby County, Tennessee. Their concerns are

most acute for family members uniquely vulnerable to negative health effects from pollution, like their young nieces and nephews, and one spouse's mother, who is a lifelong asthmatic.

39. These members' concerns interfere with their ability to enjoy the outdoor spaces they have cultivated at their home and the outdoor culture that they consider to be part of life in their Southaven community. Since learning about the turbines, they have second-guessed how much time they should spend outside. They have tried to limit their exposure, including using their gazebo less often than they would have liked. They host family members less because of fear for their health. When they do have family visit, they feel compelled to stay indoors, even though their preference would be to entertain outside. Their health concerns have even made them talk about whether they should move away from the turbines' location, even though they otherwise had no intention of ever moving from their home, which has been in their family for more than 20 years.

40. If the Colossus Gas Plant reduced or ceased its unlawful air pollution, these members' health concerns would be reduced, they would more enjoy their time outdoors at home and in their community neighborhood, and they would be more inclined to host family members at their home.

41. Another member of the NAACP and NAACP MS lives on a three-acre lot approximately 5 miles from the turbines with his wife and daughter, when she is home from college. Currently retired, he spends most of his time working outside on his own property and the adjoining three acres his brother owns.

42. This member, who is also Black, worries that exposure to pollution from the turbines will worsen his health by aggravating pre-existing conditions that can be exacerbated by

fumes and smoke. These concerns limit his ability to enjoy the time he spends outdoors the way he otherwise would.

43. In addition to concerns for his own health, this member is also very concerned about the health of his family, friends, and fellow community members. He is aware that many in Mississippi lack adequate healthcare, and he is extremely concerned about the health of others in his community declining because of exposure to more pollution from the turbines.

44. If the Colossus Gas Plant reduced or ceased its unlawful air pollution, this member's health concerns for himself and others would be reduced and he would more enjoy his time outdoors.

***Defendants***

45. Defendant MZX Tech is a limited liability company incorporated in the state of Wyoming and with a principal place of business in Texas.

46. MZX Tech is the owner of the property located at 2875 Stanton Road South in Southaven, Mississippi.

47. MZX Tech owns and operates the Colossus Gas Plant located at 2875 Stanton Road South in Southaven, Mississippi.

48. MZX Tech is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

49. MZX Tech is a wholly owned subsidiary of xAI.

50. Defendant X.AI Corporation is incorporated in the state of Nevada with a principal place of business in California, doing business as xAI.

51. On information and belief, xAI was acquired by SpaceX in the first quarter of 2026, and is now a wholly owned subsidiary of SpaceX.

52. xAI is an operator of the Colossus Gas Plant.

53. xAI is a "person" within the meaning of 42 U.S.C. §§ 7602(e) and 7604(a).

54. At all times relevant to the Complaint, Defendants owned and/or operated the Colossus Gas Plant.

## IV. STATUTORY FRAMEWORK

55. The Clean Air Act is a broad remedial statute that Congress enacted to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population." 42 U.S.C. § 7401(b)(1).

### A. Criteria Pollutants

56. The Clean Air Act requires the Environmental Protection Agency ("EPA") to regulate emissions of air pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §§ 7408, 7409.

57. These are referred to as "criteria pollutants," and include $NO_x$, fine particulate matter ("$PM_{2.5}$"), carbon monoxide ("CO"), and ozone. 40 C.F.R. §§ 50 *et. seq*.

58. EPA sets National Ambient Air Quality Standards ("NAAQS") to limit concentrations of criteria pollutants to levels "requisite to protect the public health." 42 U.S.C. § 7409(b)(1).

59. Each state, in turn, must develop a State Implementation Plan ("SIP") setting forth how the NAAQS will be achieved and maintained within the state.

60. SIPs must be submitted to and approved by the EPA. 42 U.S.C. § 7407(a).

61. Once approved by EPA, a SIP is federally enforceable under the Clean Air Act. *See* 42 U.S.C. §§ 7413, 7604.

62. EPA has approved the Mississippi SIP. *See* 40 C.F.R. § 52.1270(c) – Table 1.

63. The Clean Air Act includes permitting requirements for stationary sources of criteria pollutants.

64. Sources that are subject to New Source Performance Standards ("NSPS") under Section 111, 42 U.S.C. § 7411, of the Clean Air Act are stationary sources. 42 U.S.C. § 7550(10); *see also* 40 C.F.R. § 1068.30.

65. NSPS are federally enforceable, technology-based emission standards that apply to stationary sources for controlling criteria pollutants. These standards set the floor for emissions controls on certain types of sources.

66. Stationary combustion turbines with a heat input of 10 MMBtu/hr or greater are subject to a NSPS under Section 111 of the Clean Air Act. *See* 40 C.F.R. Pt. 60, Subpart KKKK ("NSPS KKKK").

67. NSPS KKKK defines "stationary" in the context of gas combustion turbines to mean "the combustion turbine is not self-propelled or intended to be propelled while performing its function. It may, however, be mounted on a vehicle for portability." 40 C.F.R. § 60.4420.

### 1. *New Source Review and Prevention of Significant Deterioration Programs*

68. Congress amended the Clean Air Act in 1977 to create the New Source Review program.

69. The central premise of New Source Review is that no one can build or expand a major source of air pollution without getting a permit and applying the best possible pollution controls.

70. As part of the New Source Review program, the Clean Air Act requires that each SIP include a permit program to regulate the construction of any new major stationary source of air pollution. 42 U.S.C. § 7410(a)(2).

71. The Clean Air Act and its regulations include two sets of provisions governing construction of major new sources, which, together, are referred to as New Source Review: the Prevention of Significant Deterioration ("PSD") program, which applies to areas in attainment with air quality standards (i.e., the NAAQS); and the Nonattainment New Source Review program, which applies to areas out of attainment with air quality standards. 42 U.S.C. §§ 7470-7492.

72. The PSD program applies in this case because the Colossus Gas Plant is located in DeSoto County, Mississippi, which is designated as an area in attainment with federal air quality standards.

73. The key purposes of the PSD program are to "protect public health and welfare," and to assure that any increase in air pollution, and a state's decision to permit it, "is made only after careful evaluation of all the consequences of such a decision and after adequate procedural opportunities for informed public participation in the decisionmaking process." 42 U.S.C. § 7470(1), (3), (5).

74. Mississippi's SIP incorporates the federal PSD regulations at 40 C.F.R. § 52.21. 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) (adopting and incorporating the Prevention of Significant Deterioration regulations, 40 C.F.R. § 52.21, as of December 27, 2023, as official regulations of Mississippi and enforceable as such).

75. The PSD program prohibits the construction of a "major emitting facility" unless "a permit has been issued for such proposed facility." 42 U.S.C. § 7475(a)(1); 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2) (2013); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024).

76. A "major emitting facility," as relevant here, is any source "with the potential to emit two hundred and fifty tons per year or more of any air pollutant." 42 U.S.C. § 7479(1).

EPA regulations implementing the PSD program defines a "major stationary source" as one that "emits, or has the potential to emit, 250 tons per year or more of a regulated NSR pollutant." 40 C.F.R. § 51.166(b)(1)(i); *see also* 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024).

77. The term "regulated NSR pollutant" includes, among other things, any pollutant for which a NAAQS has been promulgated. 40 C.F.R. § 52.21(b)(50)(i).

78. $NO_x$ is a regulated NSR pollutant.

79. EPA has established a NAAQS for $NO_x$. 40 C.F.R. § 50.11.

80. The NAAQS for $NO_x$ is measured using as an indicator $NO_2$, one of the primary components of $NO_x$. 40 C.F.R. § 50.11.

81. $NO_x$ is a key precursor for ozone. 40 C.F.R. § 52.21(b)(50)(i)(B)(1).

82. EPA has established a NAAQS for ozone. 40 C.F.R.§§ 50.9; 50.10; 50.15.

83. A major source for $NO_x$ emissions is also a major source for ozone. 40 C.F.R. § 52.21(b)(1)(ii).

84. $NO_x$ is also a key precursor to fine particulate matter, or $PM_{2.5.}$ 40 C.F.R. § 52.21(b)(50)(i)(B)(3).

85. EPA has established a NAAQS for $PM_{2.5}$. 40 C.F.R. § 50.18, 50.20, 50.23.

86. CO is a regulated NSR pollutant.

87. EPA has established a NAAQS for CO. 40 C.F.R. § 50.8.

88. No PSD permit may be issued unless the owner or operator of the facility can demonstrate through air modeling that its construction or operation will not cause or contribute to air pollution in excess of the NAAQS. 42 U.S.C. § 7475(a)(3); *see also* 40 C.F.R. § 51.166(k)(1).

89. Pursuant to the Mississippi SIP, new major stationary sources in areas with concentrations of criteria pollutants in excess of the NAAQS, regardless of the area's attainment designation status, must obtain emissions offsets prior to construction. 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 (D) (4) (2013).

90. The Mississippi SIP provides that information about applications for permits to construct a new major stationary source must be made available to the public for review and comment. 11 Pt. 2 Ch. 2 Miss. Code R. 2.4 A, C (2013).

91. PSD permits also must impose emission limits that reflect the maximum degree of reduction achievable through the use of stringent pollution controls on an ongoing basis. In attainment areas, this standard is known as BACT. 42 U.S.C. § 7475(a)(4) (prohibiting construction of a major emitting facility unless it is subject to BACT, among other requirements); *see also* 40 C.F.R. §§ 51.166(b)(12), (j)(2).

92. The Clean Air Act defines BACT as "an emission limitation based on the maximum degree of reduction of each pollutant . . . which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility." 42 U.S.C. § 7479(3).

93. An emission limitation "limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis" during the operation of a source. 42 U.S.C. § 7602(k).

94. After construction, a permitted facility must continuously comply with the emissions limits established as BACT.

### 2. *Mississippi SIP Requirements for Preconstruction and Operating Permits for Stationary Sources*

95. Pursuant to the federally-enforceable Mississippi SIP, new stationary sources of criteria pollutants—whether above or below the major source threshold of the New Source

Review Program—must obtain permits to construct prior to construction and operation unless specific, enumerated exemptions apply. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013).

96. Specifically, subsection D of Rule 2.13 includes fifteen categorical exclusions for the requirement to obtain a permit to construct and operate, such as exclusions for "recreational heaters" and equipment used to prepare food for retail sale. 11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (2013).

97. Subsection D of Rule 2.13 does not identify a categorical exclusion based on duration, i.e., for "temporary" use.

98. Subsection D of Rule 2.13 exempts "[m]obile sources," which are regulated separately from stationary sources under the federal Clean Air Act. *See* 40 C.F.R. §§ 85.501 – 85.2401 ("Control of Air Pollution from Mobile Sources").

99. The Clean Air Act uses the term "[m]obile sources" to refer to motor vehicles and similar sources of air pollution that operate while in motion, such as passenger cars, trucks, and motorcycles, as well as trains, airplanes, and construction equipment.

100. "Stationary source" is defined in the Mississippi SIP as "any building, structure, facility, or installation which emits or may emit a regulated air pollutant." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013).

101. Pursuant to the Mississippi SIP, applicants for permits to construct must specify in their application the rate of air emission reasonably anticipated from operation of their proposed source. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (8) (2013).

102. In the final permit to construct, the Mississippi Permit Board either approves and incorporates the applicant's stated emissions rate or sets a more stringent one based on Clean Air

Act requirements. In either case, the rate in the permit to construct becomes the limitation on the source's operation. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (10) (2013).

103. A permit applicant may only begin operations after providing a certification of construction to the Mississippi Permit Board, and it may only do so under the terms of its permit to construct until the application to operate is due. 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (1), (4) (2013); *see also* 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (5) (2013) (regarding applications for operational permits).

104. Eventual issuance of any permit from the Mississippi Permit Board "does not release the permittee from liability for constructing or operating air emissions equipment in violation of any applicable statute, rule or regulation of state or federal environmental authorities." 11 Miss. Admin. Code, Pt. 2, R. 2.2 B (7) (2013).

**B. Hazardous Air Pollutants**

105. Section 112 of the Clean Air Act requires EPA to issue emissions standards for categories of stationary sources and a list of approximately 190 hazardous air pollutants (or "HAPs") determined by Congress and EPA to be particularly harmful to human health even in very limited concentrations. 42 U.S.C. § 7412.

106. For each pollutant, Section 112 requires EPA to identify the sources of—and set emissions standards for—the pollutants. 42 U.S.C. §§ 7412(a)(6), (b).

107. Formaldehyde is classified under the Clean Air Act as a HAP. 42 U.S.C. § 7412(b)(1).

108. In this part of the Clean Air Act, a "major source" is one that emits or has the potential to emit at least 10 tons per year of any single hazardous air pollutant or 25 tons per year

of total aggregate hazardous air pollutant emissions. 42 U.S.C. § 7412(a)(1); *see also* 40 C.F.R. § 63.2.

109. Under Section 112 of the Clean Air Act, "no person may construct or reconstruct any major source of hazardous air pollutants unless the [EPA] Administrator (or the State) determines that the maximum achievable control technology emissions limitation . . . for new sources will be met." 42 U.S.C. § 7412(g)(2)(B); *see also* 40 C.F.R. § 63.5(b)(3)(i).

110. Likewise, a source must submit an "application for approval of construction" prior to commencing construction of a new major source of hazardous air pollutants. 40 C.F.R. § 63.5(d)(1)(i).

111. Sources may also satisfy the foregoing requirements by obtaining state-level preconstruction approval if it is sufficiently similar to the federal requirements. 40 C.F.R. § 63.5(f).

112. Most major sources of HAPs are subject to EPA standards known as National Emission Standards for Hazardous Air Pollutants ("NESHAPs"). Each NESHAP is specific to a particular kind of air pollution source and establishes limits for each listed hazardous air pollutant emitted by the relevant kind of source, as well as related monitoring, recordkeeping, and reporting requirements. 42 U.S.C. § 7412(d)(1)-(3).

113. EPA has identified stationary combustion turbines as a substantial source of hazardous air pollutants such as formaldehyde, toluene, benzene, and acetaldehyde, and it has promulgated a NESHAP—40 C.F.R. Part 63, Subpart YYYY—for these turbines. 40 C.F.R. §§ 63.6080–63.6175.

114. Subpart YYYY defines stationary combustion turbines subject to the standard as such: "[s]tationary means that the combustion turbine is not self propelled or intended to be propelled while performing its function." 40 C.F.R. § 63.6175.

115. Operators of stationary combustion turbines subject to NESHAP Subpart YYYY are required to install control equipment (typically catalytic oxidation systems) and comply with other requirements in order to reduce hazardous air pollutants, including formaldehyde.

116. Subpart YYYY requires turbines to comply with a maximum achievable control technology emission limit for formaldehyde emissions, to conduct initial and periodic emissions testing, to continuously monitor operations, to make various reports and notifications, and to undertake recordkeeping. *See* 40 C.F.R. § 63.6100; Table 1 to Subpart YYYY; *see also* 40 C.F.R. §§ 63.6110, 63.6115, 63.6125(a)–(b), 63.6145, 63.6150, 63.6155, 63.6160.

**C. Citizen Suit Enforcement Provisions**

117. The Clean Air Act's citizen suit provision authorizes citizens to sue for violations of an "emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1).

118. The statute defines "emission standard or limitation under this chapter" in part as any standard established "under any applicable State implementation plan approved by the [EPA]" and "any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4).

119. The statute provides that an "emission standard or limitation under this chapter" also includes an "emission limitation, standard of performance or emission standard." 42 U.S.C. § 7604(f)(1).

120. The requirement to limit emissions to levels that are achievable when utilizing Best Available Control Technology is an "emission limitation," "standard of performance," and

an "emission standard" which is set forth under the Clean Air Act and adopted and incorporated into the federally approved Mississippi SIP. 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) (adopting and incorporating by reference federal PSD program regulations, including BACT requirements).

121. An "emission standard or limitation under this chapter" is further defined to include "any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise)." 42 U.S.C. § 7604(f)(3). Section 7412 sets out requirements for major sources of hazardous air pollutants.

122. The Clean Air Act authorizes citizens to sue "any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I (relating to significant deterioration of air quality)." 42 U.S.C. § 7604(a)(3). This provision provides for citizen enforcement of failure to obtain a PSD permit.

123. An action under Section 304, subsection (a)(1), may proceed after a 60-day notice period, unless the EPA or State "has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order" whose violation has been alleged. 42 U.S.C. § 7604(b)(1).

124. An action under subsection (a)(3), for a claim of construction of a major emitting facility without a PSD permit may proceed immediately, without a notice period.

125. In a citizen suit, federal district courts may enforce emission standards or limitations, and apply appropriate civil penalties for each day of violation. 42 U.S.C. §§ 7604(a), 7413(b).

126. Federal regulations provide that a penalty of $124,426 per day of violation may be imposed. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

## V. FACTUAL BACKGROUND

### A. xAI and MZX Tech Construct the Colossus Gas Plant in Southaven, Mississippi

127. The Colossus Gas Plant is located in Mississippi's DeSoto County at 2875 Stanton Road South, Southaven.

128. MZX Tech acquired the Colossus Gas Plant property located at 2875 Stanton Road South in Southaven, Mississippi in July 2025.

129. At all times relevant to this Complaint, MZX Tech was the owner and an operator of the Colossus Gas Plant.

130. At all times relevant to this Complaint, xAI was an operator of the Colossus Gas Plant based on its involvement in managing, directing, or conducting operations and decision-making related to pollution for the Colossus Gas Plant.

131. For instance, a senior employee of xAI was responsible for decision-making about environmental compliance at the Colossus Gas Plant and communicated with the state regulatory agency about operations at the Colossus Gas Plant.

132. In July 2025, Brent Mayo, holding himself out as a representative of "XAI," informed the Mississippi Department of Environmental Quality ("MDEQ") of "our plans to build energy resources at our property in DeSoto County," using combustion turbines. Exhibit B-1, Email from Brent Mayo, xAI, to Jaricus Whitlock and Chris Wells, MISS. DEP'T OF ENV'T QUALITY, RE: Determination on Portable Gas-Fired Combustion Turbines (July 25, 2025).

133. On July 29, 2025, MDEQ responded to Brent Mayo, addressing the agency's letter to him as Vice President of Operations of "xAI." Exhibit B-2, Letter from Jaricus Whitlock, MISS. DEP'T OF ENV'T QUALITY, to Brent Mayo, xAI, RE: Determination on Portable Gas-Fired Combustion Turbines (July 29, 2025).

134. Brent Mayo is xAI's Vice President of Operations.

135. In addition to his role(s) at xAI, Brent Mayo is also a responsible corporate officer and an authorized signatory of MZX Tech, as those terms are defined by Mississippi regulations. For example:

a. In accordance with the provisions of 11 Miss. Admin. Code Pt. 2, R. 2.1. C (24). and/or 11 Miss. Admin. Code Pt. 2, R. 6.1. A (26), the Chief Financial Officer for MZX Tech designated Brent Mayo as an Authorized Signatory to sign air regulatory documents.

b. In response to an email sent on behalf of MDEQ concerning a stormwater permit for 2875 Stanton Road South, Brent Mayo is identified as "a responsible corporate officer" of MZX Tech.

136. Following Brent Mayo's correspondence with Jaricus Whitlock of MDEQ in July 2025, emails between consultant Trinity Consultants and MDEQ demonstrate that xAI and MZX Tech installed various types of turbines at the Colossus Gas Plant between August 1 and December 18, 2025. Exhibit C, Email Correspondence between Trinity Consultants and MDEQ.

137. For example:

a. On August 18, 2025, Trinity Consultants confirmed to MDEQ that three SMT-130s were onsite. Ex. C-1.

b. Around that time, Trinity Consultants told MDEQ that the plan was to eventually increase to six SMT-130s and ten TM2500s. Ex. C-1.

c. By September 6, 2025, the plan grew to encompass seventeen total gas-fired combustion turbines: ten TM2500s and seven SMT-130s. Ex. C-2.

d. On September 6, 2025, Trinity Consultants represented that selective catalytic reduction ("SCR") system construction was complete on six of the seven SMT-130 units. Ex. C-2.

e. On September 10, 2025, Trinity Consultants reported that an additional turbine, an M35, would be brought onsite, increasing the total to eighteen gas-fired combustion turbines (ten TM2500s, seven SMT-130s, and one M35) with a combined total output of 400.5 megawatts ("MW"). Ex. C-3.

f. On November 5, 2025, Trinity Consultants informed MDEQ, "[a]ll Solar units are operating with SCR and oxidation catalyst. All TM2500's are operating with demin [demineralized] water." Ex. C-4.

g. On November 25, 2025, Trinity Consultants provided MDEQ, for each of the first eighteen turbines, with the first date the turbine was onsite, starting with three turbines on August 1, 2025. Ex. C-5.

h. On December 11, 2025, Trinity Consultants informed MDEQ that nine additional gas-fired combustion turbines would be brought onsite by December 18, bringing the total number turbines to twenty-seven. Ex. C-6.

i. As of December 11, 2025, Trinity Consultants represented that the first 18 gas-fired combustion turbines were operational, and that the additional nine turbines would not operate until the SMT 130s were outfitted with SCR and the TM 2500s were outfitted with water injection. Ex. C-6.

138. As of October 31, 2025, aerial photographs confirm that there were eighteen gas-fired combustion turbines onsite.



*Figure 1. Aerial Photo of Colossus Gas Plant (Oct. 31, 2025; Steve Jones/SouthWings), Ex. D-12.*

139. Thermal imaging captured on October 31, 2025 demonstrates that at least nine of those eighteen gas-fired combustion turbines were operating at the time, including five of the SMT-130 turbines (circular smoke stacks) and four of the TM2500 turbines (rectangular smoke stacks).



*Figure 2. Thermal Camera Image of Colossus Gas Plant (Oct. 31, 2025; Steve Jones/SouthWings), Ex. D-13.*

140. As of January 3, 2026, there were at least twenty-seven gas-fired combustion turbines onsite. Exhibit D, Aerial Images of Colossus Gas Plant.

141. Satellite photographs also have confirmed that at least twenty-seven gas-fired combustion turbines continued to be onsite on February 9, 2026, March 3, 2026, and April 7, 2026. Exhibits D-9 through D-11.




*Figure 3. Satellite image of xAI's Colossus Gas Plant (lower left quadrant), the Colossus 2 data center (top center building with "MACROHARD" on its roof), and the Colossus 3 data center (center, south adjacent to Colossus 2) (Apr. 7, 2026), Ex. D-11.*



*Figure 4. Close-up satellite image of Colossus Gas Plant showing twenty-seven gas-fired combustion turbines (Apr. 7, 2026), Ex. D-11.*

142. Upon information and belief, the xAI Colossus Gas Plant consists of the following turbines:

a. fourteen SMT-130s;

b. one M35;

c. four Gen 6 TM 2500s;

d. five Gen 7 TM 2500s;

e. three Gen 8 TM 2500s.

143. These turbines have a combined generating capacity of at least 495 MW. *See* Ex. C-6. Specifically:

a. each of the SMT-130s has a generating capacity of 13 MW;

b. the M35 has a generating capacity of 25 MW;

c. each of the Gen 6 TM 2500s has a generating capacity of 22 MW;

d. each of the Gen 7 TM 2500s has a generating capacity of 25 MW;

e. each of the Gen 8 TM 2500s has a generating capacity of 25 MW.

144. Each of these twenty-seven gas-fired combustion turbines has a heat input greater than 10 MMBtu/h.

145. Selective catalytic reduction, which has the potential to control for smog-forming pollution, is only installed on the SMT-130 turbines.

146. Selective catalytic reduction is recognizable on turbines because on a turbine, selective catalytic reduction includes a large, boxy exhaust duct and a stack that releases emissions.

147. The stacks constructed on the SMT-130s are at least the height of an approximately three-story building.

148. It takes time to install selective catalytic reduction on combustion turbines.

149. For example, as of January 8, 2026, selective catalytic reduction was not fully installed on the SMT-130 turbines that Trinity Consultants represented would be onsite as of December 18, 2025.

150. The larger TM2500 turbines and M35 turbine do not have selective catalytic reduction.

151. According to emails from Trinity Consultants to MDEQ, the TM 2500 turbines and M35 turbine have water injection systems. Ex. C-4.

152. Water injection control systems would include piping along the exterior of the turbine and parallel to fuel lines, flow meters, pumps, valves, water treatment equipment, and storage tank(s).

153. Additional construction work that has been implemented at the Colossus Gas Plant includes, but is not limited to:

a. Laying concrete pads as support for the twenty-seven turbines;

b. Installing selective catalytic reduction;

c. Installing at least ten transformers between turbine rows;

d. Installing electrical lines;

e. Installing gas supply lines;

f. Installing water injection lines; and

g. Erecting two white buildings which, upon information and belief are switch houses.

154. Concrete pads are used to support turbines.

155. As compared to alternatives, such as gravel or timber mats, concrete pads are more expensive, longer term, and less prone to weather damage.

156. The extent of construction at the Colossus Gas Plant indicates that existing infrastructure will be part of the power source long term.



*Figure 5. Image of xAI's Colossus Gas Plant (March 28, 2026; Brad Zweerink/Earthjustice).*

**B. The Colossus Gas Plant's Emissions are Harmful**

157. The emissions from the Colossus Gas Plant include $NO_x$, CO, formaldehyde, and $PM_{2.5}$.

158. On information and belief, and using conservative estimates, collectively, these twenty-seven gas-fired combustion turbines have the potential to emit the following:

a. Approximately 1,700 tons of $NO_x$ per year;

b. Approximately 19 tons of formaldehyde per year;

c. Approximately 580 tons of CO per year;

d. Approximately 180 tons of fine particulate matter, or $PM_{2.5}$ per year.

159. $NO_x$ reacts with other chemicals, including volatile organic compounds, in the air to form both particulate matter and ozone, and it is a primary cause of smog.

160. Ozone exposure has been linked to aggravation of lung diseases such as asthma, emphysema, and chronic bronchitis, and can increase the frequency of asthma attacks and lung infections such as making the lungs more susceptible to infection.

161. $NO_2$, a significant component of the $NO_x$ emitted by turbines, can irritate airways in the human respiratory system and can lead, in the short term, to respiratory symptoms (such as coughing, wheezing or difficulty breathing), hospital admissions and visits to emergency rooms.

162. Longer exposures to elevated concentrations of $NO_2$ may contribute to the development of asthma and potentially increase susceptibility to respiratory infections.

163. Particulate matter is a form of air pollution that consists of microscopic solids and liquids.

164. Particulate matter exposure through inhalation can impact human lungs and hearts.

165. Particulate matter exposure has been linked to premature death in people with heart or lung disease; nonfatal heart attacks; aggravated asthma; decreased lung function; and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing.

166. Carbon monoxide can adversely affect health, participate in atmospheric chemical reactions that result in formation of ozone air pollution, and contribute to climate change.

167. Formaldehyde can cause irritation to human respiratory tracts and eyes and has been identified as a human carcinogen by the Department of Health and Human Services.

### C. The Colossus Gas Plant's Harmful Emissions Pollute Communities with Existing Air Pollution Problems.

168. The Colossus Gas Plant in Southaven, Mississippi, is one of the largest industrial sources of $NO_x$ in the Memphis Metropolitan Statistical Area, an area that includes and

surrounds Memphis and all of Mississippi's DeSoto County, spans eleven counties and portions of three states, and is home to more than one million residents.

169. Approximately 39 percent of the population in Southaven is Black, and more than 50 percent of the population of the neighboring town of Horn Lake, Mississippi is Black.

170. South Memphis, which is part of the airshed impacted by the Colossus Gas Plant, is also home to multiple historically Black communities, including Boxtown.

171. Children, pregnant people, seniors, people with pre-existing health conditions, Black people and other people of color are more vulnerable to negative health effects from air pollution.

172. The area surrounding the Colossus Gas Plant already suffers from high levels of ozone.

173. The past several years of ambient air monitoring data in DeSoto County and Memphis show that concentrations of ground-level ozone exceed the applicable federal air quality standard for ozone (the NAAQS).

174. The number of high ozone days in DeSoto County has been increasing since 2019.

175. In 2024, both DeSoto County and neighboring Shelby County, Tennessee received an "F" for their ozone pollution from the American Lung Association.

176. Memphis has been deemed an asthma capital of the nation by the Asthma and Allergy Foundation of America due to high rates of emergency room visits and deaths from asthma.

177. Within just three miles of the Colossus Gas Plant, children attend school at nine different elementary, middle, and high schools.

178. At least ten congregations attend church within the same three-mile radius from the facility.

### D. Defendants Did Not Seek—and Do Not Have—Any Clean Air Act Permit for the Colossus Gas Plant.

179. The twenty-seven turbines at the Colossus Gas Plant are stationary sources not subject to any exception under the Clean Air Act or the Mississippi SIP.

180. Neither xAI nor MZX Tech applied for a PSD permit pursuant to the Clean Air Act prior to installing and beginning to operate the twenty-seven unpermitted gas-fired combustion turbines at the Stanton Road location.

181. Neither xAI nor MZX Tech applied for a Permit to Construct pursuant to the Mississippi SIP prior to installing and beginning to operate the twenty-seven unpermitted gas-fired combustion turbines at the Stanton Road location.

182. Neither xAI nor MZX Tech applied for a Clean Air Act Title V or State Permit to Operate the twenty-seven unpermitted gas-fired combustion turbines at the Stanton Road location.

183. If applied to the turbines that lack selective catalytic reduction, BACT-level controls could reduce $NO_x$ emissions, for example, by approximately 90 percent or more.

184. On information and belief, neither xAI nor MZX Tech has obtained emissions offsets to reduce the Colossus Gas Plant's emissions.

185. Instead, in a July 25, 2025 email to MDEQ, xAI told the state agency that, in its view, installing and operating the turbines without permits was "allowed." Exhibit B-1.

186. In a July 29, 2025 letter response to xAI, MDEQ agreed that the turbines were "exempt" from permitting requirements based on two criteria: (1) that the turbines remain "'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer)" and (2) that the

turbines at 2875 Stanton Road South, Southaven, Mississippi remain on-site for less than twelve months. Exhibit B-2.

187. MDEQ lacks authority to exempt stationary sources that are otherwise subject to permitting requirements under the federal Clean Air Act and Mississippi SIP.

188. The Clean Air Act treats turbines affixed to portable units as stationary sources and not as mobile sources. *See, e.g.*, 40 C.F.R. § 60.4420.

189. The Mississippi SIP has no exception to permitting requirements for sources that operate on-site for less than twelve months.

190. Because the gas turbines at issue in this case are stationary sources of air pollution not subject to any exclusions under Rule 2.13 of the Mississippi SIP, their construction and operation without permitting by the Mississippi Permit Board violated the Clean Air Act.

191. Neither the EPA Administrator nor the State is diligently prosecuting a civil action against xAI or MZX Tech for violations of emissions standards at the Colossus Gas Plant.

### E. The Colossus Gas Plant is Part of xAI's Data Center Footprint in the Memphis Area




*Figure 6. GIS map depicting the location of and distances between the Colossus Gas Plant and the Colossus 1 data center, Colossus 2 data center, and Colossus 3 data center.*

192. There are at least three xAI-affiliated data centers in the greater Memphis area.

193. The Colossus 1 data center is located at 3231 Paul R. Lowry Road in Memphis, Tennessee, beside the historically Black community of Boxtown.

194. xAI and/or its wholly owned subsidiaries and affiliates own and operate the Colossus 1 data center.

195. CTC Property LLC, a wholly owned subsidiary of xAI, began leasing property at 3231 Paul R. Lowry Road on March 22, 2024.

196. As of August 2024, sixteen gas turbines—located at 3231 Paul R. Lowry Road with a total generating capacity of approximately 105 MW and a collective potential to emit hundreds of tons of $NO_x$ per year—powered Colossus 1.

197. Neither xAI nor CTC Property LLC applied for or received any air permits prior to constructing and beginning to operate these sixteen gas turbines.

198. On information and belief, xAI and CTC Property LLC continued to add gas turbines to the Colossus 1 facility through March 31, 2025, at which point they had installed thirty-five turbines for a total generating capacity of 421.4 MW.

199. Since learning about the Colossus 1 facility around 2024, neighbors and community groups in the greater Memphis area have raised concerns about the turbines' harmful emissions, as well as the lack of transparency and accountability from xAI, CTC Property LLC, and regulators.

200. NAACP and its members, among groups such as Young, Gifted, and Green, Memphis Community Against Pollution, and Protect Our Aquifer, held and attended numerous large public meetings and town hall events, wrote hundreds of letters and public comments, and repeatedly called for action to stop the operation of the unpermitted turbines and advocated for broader reduction in harmful pollution in southwest Memphis—an area long over-burdened by industrial emitters.

201. At one meeting attended by NAACP members, Brent Mayo said xAI would be "copying and pasting" what the company did at Colossus 1.

202. With this comment, and despite clear community opposition, xAI indicated it would again rely on unpermitted turbines to supply power to future data centers.

203. Ultimately, CTC Property LLC obtained a permit for a different configuration of gas turbines, including SMT-130s, at the Colossus 1 facility.

204. The permit for CTC Property LLC's gas turbines at the Colossus 1 includes an emissions limit of 87 tons per year of $NO_x$.




*Figure 7. Close-up GIS map depicting the location of and distances between the Colossus Gas Plant and the Colossus 1 data center, Colossus 2 data center, and Colossus 3 data center.*

205. xAI and/or its wholly-owned subsidiaries and affiliates own and operate the Colossus 2 data center.

206. The Colossus 2 data center is located at 5420 Tulane Road in Whitehaven, Memphis, Tennessee.

207. On information and belief, the Colossus 2 property was acquired by xAI in March 2025.

208. The Colossus 2 data center is about 1 mile away from the Colossus Gas Plant.

209. The Colossus Gas Plant supplies power to xAI's Colossus 2 data center.

210. xAI directed or managed the Colossus Gas Plant to begin providing power to Colossus 2 on a very fast timeline, which included directing the workings of the Gas Plant and the speed of acquiring and constructing the pollution-emitting turbine units.

211. After xAI and MZX Tech began constructing the Colossus Gas Plant, MZX Tech sought a permit from MDEQ for a *different* gas plant to be built at the 2875 Stanton Road South location in Southaven, Mississippi.

212. Email correspondence about the permit application between employees of the U.S. EPA and MDEQ, refers to the "rush to get this permit finalized" and a "directive from my upper management" to turn the permit application around quickly.

213. Following the rushed process, MDEQ issued MZX Tech a permit that would cover a gas plant with forty-one turbines onsite, with a 1200 MW generating capacity, and a permitted emissions limit of 423.39 tons per year of $NO_x$.

214. In contrast, the twenty-seven unpermitted turbines at the Colossus Gas Plant have a combined generating capacity of 495 MW and the potential to emit approximately 1,700 tons per year of $NO_x$.

215. None of the twenty-seven turbines at the Colossus Gas Plant are subject to the permit.

216. The permitted gas plant is comprised of entirely different makes and models of turbines.

217. xAI and/or its wholly-owned subsidiaries and affiliates own the Colossus 3 data center.

218. The Colossus 3 data center is located at 2400 Stateline Road West, Southaven, Mississippi.

219. Colossus 3 is about 0.8 miles away from the Colossus Gas Plant.

220. xAI has not publicly stated how it will provide power to the Colossus 3 data center.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Construction and operation of a stationary source without a permit)

221. The preceding paragraphs are realleged and incorporated herein by reference.

222. The Colossus Gas Plant is a new stationary source of regulated air pollutants within the meaning of the Mississippi SIP. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013).

223. The Colossus Gas Plant is not subject to any exemptions to stationary source permitting requirements under the Mississippi SIP or the Clean Air Act.

224. Neither xAI nor MZX Tech obtained a permit to construct prior to beginning construction of the Colossus Gas Plant on or about August 1, 2025, and they still have not obtained one for the twenty-seven gas-fired combustion turbines.

225. Neither xAI nor MZX Tech submitted a certification of construction before beginning to operate the Colossus Gas Plant on or before October 2025 and they still have not submitted one.

226. Neither xAI nor MZX Tech applied for or obtained an operating permit for the Colossus Gas Plant since beginning operations on or before October 2025.

227. xAI and MZX Tech have constructed and operated, and continue to operate, a new stationary source without a permit to construct, certification of construction, or an operating permit, in violation of the Mississippi SIP and the Clean Air Act. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (1)-(2), (5)-(6) (2013)

228. Unless restrained by an Order of this Court, these violations and similar violations of the Clean Air Act will continue.

229. As provided in Section 113(b) of the Clean Air Act, MZX Tech and xAI are subject to injunctive relief and civil penalties of up to $124,426 per day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**SECOND CLAIM FOR RELIEF**

**(Construction and Operation without a PSD Permit or BACT)**

230. The preceding paragraphs are realleged and incorporated herein by reference.

231. Under the Clean Air Act, and as incorporated in the Mississippi SIP, no "major" source of criteria pollutants may be constructed without obtaining a PSD permit, making certain requisite showings about how the facility will contribute to air pollution in the area, and utilizing stringent pollution controls (BACT).

232. xAI and MZX Tech's Colossus Gas Plant is a stationary source.

233. xAI and MZX Tech's Colossus Gas Plant is a major source because it has the potential to emit $NO_x$ in an amount far greater than 250 tons per year.

234. A major source of $NO_x$ emissions is also a major source for ozone.

235. xAI and MZX Tech's Colossus Gas Plant is a major source because it has the potential to emit CO in an amount far greater than 250 tons per year.

236. The Colossus Gas Plant may also be a major source of other regulated pollutants.

237. MZX Tech owns the Colossus Gas Plant.

238. xAI and MZX Tech constructed, operated, and continue to operate their Colossus Gas Plant without a PSD Permit.

239. xAI and MZX Tech began operation of the Colossus Gas Plant without undergoing a BACT determination in contravention of the requirements of the PSD program.

240. None of the twenty-seven turbines at the Colossus Gas Plant were subject to a BACT analysis.

241. Upon information and belief, for at least thirteen of the turbines at the Colossus Gas Plant, xAI and MZX Tech failed to install and operate technology that would satisfy BACT for the control of $NO_x$ emissions in compliance with PSD regulations.

242. Upon information and belief, xAI and MZX Tech failed to install and operate BACT for the control of carbon monoxides emissions in compliance with BACT limitations at the Colossus Gas Plant.

243. None of xAI and MZX Tech's purported voluntary use of controls at the Colossus Gas Plant are equivalent to a federally enforceable requirement to operate the turbines with BACT continuously.

244. xAI and MZX Tech's construction and operation of the Colossus Gas Plant, a major emitting source, violated and continues to violate the PSD provisions and BACT requirements of the Clean Air Act and the Mississippi SIP. 42 U.S.C. § 7475(a)(1); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024); 42 U.S.C. § 7475(a)(4).

245. Unless restrained by an Order of this Court, these violations and similar violations of the Clean Air Act will continue.

246. As provided in Section 113(b) of the Clean Air Act, xAI and MZX Tech are subject to injunctive relief and civil penalties of up to $124,426 per day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

**THIRD CLAIM FOR RELIEF**

**(Construction and Operation of a Major Source of HAPs)**

247. The preceding paragraphs are realleged and incorporated herein by reference.

248. xAI and MZX Tech's Colossus Gas Plant has the potential to emit formaldehyde, a hazardous air pollutant, in an amount greater than 10 tons per year.

249. xAI and MZX Tech's Colossus Gas Plant is therefore a major source of hazardous air pollutants, without accounting for other hazardous air pollutants that it may emit.

250. xAI and MZX Tech's Colossus Gas Plant is subject to NESHAP Subpart YYYY.

251. xAI and MZX Tech's Colossus Gas Plant has failed to comply with NESHAP Subpart YYYY, including: failing to achieve maximum achievable control technology emissions limits; failing to conduct initial and periodic emissions testing; failing to continuously monitor operations; failing to make the required reports and notifications; and failing to undertake required recordkeeping. 40 C.F.R. §§ 63.6080–63.6175.

252. None of xAI and MZX Tech's purported voluntary use of controls at the Colossus Gas Plant are equivalent to a legal requirement to operate the turbines in compliance with NESHAP Subpart YYYY.

253. xAI and MZX Tech have violated and continue to violate NESHAP Subpart YYYY.

254. Unless restrained by an Order of this Court, these violations and similar violations of the Clean Air Act will continue.

255. As provided in Section 113(b) of the Clean Air Act, xAI and MZX Tech are subject to injunctive relief and civil penalties of up to $124,426 per day of violation. 42 U.S.C. § 7413(b); 40 C.F.R. § 19.4.

## VII. PRAYER FOR RELIEF

Plaintiffs NAACP and NAACP MS respectfully request that the Court:

a) declare that Defendants have violated the Clean Air Act, its implementing regulations, and the Mississippi SIP;

b) permanently enjoin Defendants from operating the Colossus Gas Plant, including operating any of the twenty-seven gas-fired combustion turbines onsite, except in accordance with the Clean Air Act and all applicable regulatory requirements;

c) order Defendants to install and operate the best available control technology at the Colossus Gas Plant;

d) order Defendants to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Clean Air Act alleged above;

e) assess a civil penalty against Defendants of up to $124,426 per day per violation;

f) award Plaintiffs their costs and attorneys' fees of this action, as provided by 42 U.S.C. 7604(d); and,

g) grant such other relief as the Court deems just and proper.

Dated: April 14, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
Mississippi State Conference of the NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice Forthcoming)*
Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice Forthcoming)*
Earthjustice
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice Forthcoming)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice Forthcoming)*
Earthjustice
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

Ben Grillot (DC Bar. No. 982114)
*(Pro Hac Vice Forthcoming)*
Southern Environmental Law Center
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice Forthcoming)*
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice Forthcoming)*
Southern Environmental Law Center
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

# EXHIBIT 3

# State of Mississippi

**TATE REEVES**
Governor

May 29, 2026

The Honorable Todd Blanche
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

The Honorable Lee M. Zeldin
Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

Dear Acting Attorney General Blanche and Administrator Zeldin:

I write on behalf of the State of Mississippi to express the State's deep concerns relating to litigation recently commenced by the National Association for the Advancement of Colored People ("NAACP") against xAI. The NAACP is seeking judicial intervention to force xAI to immediately shut down temporary gas turbines currently powering its data center located on the border of Mississippi and Tennessee. This litigation threatens both a landmark private investment in the State and cooperative Federalism, as well as endangers national security and America's leadership in the emerging frontier of artificial intelligence ("AI"). The State urges you to take immediate action to intervene and protect these vital state and national interests.

By way of background, xAI is building in Southaven, Mississippi, one of the largest and most powerful AI training clusters in the world, which is pivotal to national security and advancing the frontier of AI. The project represents a $20 billion investment in Mississippi and has created thousands of construction jobs and will create hundreds of high-paying permanent jobs. To power the site, xAI is constructing a self-generating power facility in Southaven. This will ensure that those living in the area do not face electricity rate hikes from surging demand, consistent with xAI's Rate Reduction Pledge. In March 2026, the Mississippi Department of Environmental Quality ("MDEQ") approved xAI's permits under the Clean Air Act to construct several permanent gas turbines at the site. Until the permanent turbines can be constructed, MDEQ has provided written authorization for xAI to use of a number of trailer-mounted gas turbines to temporarily power the facility. MDEQ has determined that such temporary gas turbines are "mobile sources" not subject to the Clean Air Act's permitting requirements.

Through the subject litigation, the NAACP is seeking to materially slow or outright stop the largest private investment in Mississippi's history--an investment that already has created thousands of construction jobs and will create hundreds of long-term high paying jobs. Any injunctive relief granted by the Court would create an immediate and substantial disruption to the State's economy, particularly in North Mississippi.

Post Office Box 139, Jackson, Mississippi 39205 • Phone (601)359-3150 • Fax (601) 359-3741

Moreover, the litigation attempts to disrupt the Clean Air Act's delicate balance of cooperative Federalism. One of the Clean Air Act's defining features is that states have primary authority for implementing and enforcing the national ambient air quality standards established by the Environmental Protection Agency ("EPA"). Pursuant to this authority, MDEQ—the agency that administers Mississippi's air quality plan—exercised its discretion and advised xAI that the temporary, trailer-mounted gas turbines are exempt from the permitting requirements for stationary sources. The subject litigation seeks to improperly substitute the judgement of the NAACP in place of the judgement of MDEQ, the expert agency.

Finally, the lawsuit poses a serious threat to both America's national security and global leadership in the frontier of AI models. As has been recently reported, the xAI data center in question has vital contracts with the War Department. Moreover, as President Trump has repeatedly recognized, ensuring that the United States remains at the forefront of AI development is essential to countering America's strategic competitors and protecting our economic and security interests. Facilities like the one that xAI is developing in Mississippi play a critical role in sustaining America's global leadership and preventing our adversaries—particularly China—from closing the technology gap.

Given these considerations, I strongly urge you to take all necessary steps to intervene in this litigation to support xAI and oppose the NAACP's request for injunctive relief that threatens the continued operation of the data center. Prompt intervention will not only protect national security interests and support the President's policy on advancing AI but also reaffirm cooperative Federalism and protect a transformative $20 billion investment in Mississippi. Thank you for your consideration of this request.

Sincerely,

Tate Reeves
Governor

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-MPM-JMV** |

# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**Oral Argument Requested Per L.R. 7(b)(6)(A)**

xAI is assembling an array of data centers in neighborhoods with significant Black populations around Memphis. These "Colossus" data centers need electricity—a lot of it. To help power their artificial intelligence ambitions, Defendants xAI and its wholly-owned subsidiary MZX Tech built the Colossus Gas Plant in Southaven, Mississippi. Sited in an area where Plaintiffs NAACP and NAACP MS's members live, work, study, play, attend church—breathe—the companies built their Gas Plant without the permits or pollution controls mandated by the Clean Air Act. To prevent further health harms to Plaintiffs' members and frontline communities, this Court should enter an injunction barring Defendants from operating their Colossus Gas Plant without the necessary permits and pollution controls.

Defendants bought their Southaven property in July 2025. Within three months, they had a network of 18 gas turbines—but they had no Clean Air Act permits or pollution limits.[1]

[1] *See* Public Records Collection, Ex. A. (Al-Zhyri Decl.) attaching Ex. A-3 (Deed); Ex. A-11 (Nov. 5, 2025 Trinity Update); Ex. A-10 (Nov. 25, 2025 Trinity Update); Ex. A-13 (Dec. 11, 2025 Trinity Update).

By February 2026, Defendants had built out the Colossus Gas Plant to include 27 turbines.[2] Still no permits, pollution limits, or emissions monitoring.

In mid-February, NAACP and NAACP MS sent a notice of intent to sue under the Clean Air Act to the Defendants and relevant state and federal governmental actors detailing their concerns and describing the longstanding legal requirements that Defendants had sidestepped.[3]

Rather than address the urgent public health issues posed by their Colossus Gas Plant, Defendants added six *more* gas turbines by April 14, bringing the total up to 33 turbines.[4] This six-unit expansion would require an air pollution permit all by itself. But *still* no permit, no pollution limits, no emissions monitoring.

The Clean Air Act's permitting requirements are not mere paperwork exercises. The law requires operators to assess how a facility's pollution will affect air quality *before* it is constructed, and to implement the necessary pollution controls to prevent air quality deterioration before it happens. *See* 42 U.S.C. §§ 7475(a)(3), (a)(4). And the Clean Air Act imposes important accountability requirements: preconstruction permits that set enforceable emissions limits, *id.* § (a)(1), and emissions monitoring to ensure that pollution can be tracked and contained. *Id.* § (a)(7). xAI and MZX Tech did none of that.

Defendants' impatience is paid for by NAACP and NAACP MS members who live near the Colossus Gas Plant. Members are now losing sleep, spending less time in gardens, hosting family less often, and worrying about the pollution aggravating their respiratory conditions.[5]

---

[2] *See* Engineering Analysis, Ex. H (Laufenberg Decl.) ¶ 5 & fig. 1.

[3] *See* Ex. A-21 (Notice of Intent).

[4] *See* Ex. H (Laufenberg Decl.) ¶ 25 & fig. 9.

[5] *See* Ex. B (A. Millsap Decl.); Ex. C (T. Millsap Decl.); Ex. D (Norvell Decl.); Ex. E (Sheard Decl.); Ex. F (T. Thornton Decl.); Ex. G (Tipton Decl.).

Members are deeply concerned about what this pollution does to their and their loved ones' health. And understandably so. Exposure to this pollution increases risks of asthma attacks and heart disease in their frontline communities.[6] And, while the *sort* of consequences posed by the Gas Plant's pollution are frightening, their *scale* is staggering. Its unpermitted potential emissions of $NO_x$ dwarf every other industrial source of $NO_x$ pollution in the area[7]:




Defendants' excuses for shirking their Clean Air Act obligations do not withstand scrutiny. Defendants will claim the Gas Plant doesn't need a "stationary source" air pollution permit because it is just a collection of "mobile sources." It's not. Each turbine can power a neighborhood and together they can power a city. Each is more than 100 feet long and 200,000 pounds, settled on concrete pads, ducted to stacks, wired to transformers, and piped to water and

[6] *See* Public Health Review, Ex. I (Suh Decl.) ¶¶ 23, 24, 37, 45.

[7] *See* EPA, 2020 National Emissions Inventory Data, https://www.epa.gov/air-emissions-inventories/2020-national-emissions-inventory-nei-data [https://perma.cc/6KHX-LWN2] (data for blue bars, all of which represent permitted facilities); Ex. A-25 (PSD Air Permit for MZX fleet); Ex. A-2 (Shelby County's Colossus 1 Permit for CTC fleet); Ex. H (Laufenberg Decl.) ¶ 31.

gas supplies. EPA regulates these as *stationary* gas and combustion turbines. *See* 40 C.F.R. Part 60, Subpart KKKK, and, together, they span an area more than twice that of the school down the street. There is nothing "mobile" about the Colossus Gas Plant.

Defendants may argue that they intend their sprawling Gas Plant to be only "temporary." But intentions aren't grounds for an exemption. The Clean Air Act imposes strict liability on violators, and neither the Act nor Mississippi's air regulations excuse operators from using pollution controls so long as they claim they'll pollute just for a little while.

Defendants may also point to a permit they have for the construction of a 41-turbine gas plant at the Southaven site. But that permit is for a facility the Defendants have not yet built, and it requires pollution controls Defendants have no obligation to install on the current turbine fleet. The facility Defendants are running *right now* has no permit, pollution limits, or monitoring.

The Clean Air Act's requirements are fundamentally protective and preventative. Though they may not like this—it won't come as a surprise to Defendants. Indeed, xAI's co-founder and owner Elon Musk complained in June of 2024 that "[e]nvironmental regulations are, in my view, largely terrible . . . . [Y]ou have to get permission in advance, as opposed to, say, paying a penalty if you do something wrong."[8] Here, xAI and MZX Tech have done—and continue to do— something wrong. And Defendants' violations irreparably harm the wellbeing of Black NAACP and NAACP MS members. Any notion that those harms can be paid for *later* treats the health and welfare of Plaintiffs' members as if it were just one more natural resource the companies can buy and exploit in pursuit of their business goals.

Accordingly, the Court should issue an injunction prohibiting operation of the Defendants' Colossus Gas Plant until they have obtained the necessary permits and implemented

---

[8] *See* A Conversation with Elon Musk [https://perma.cc/R9GC-L8AW ] (at 16:28).

the necessary pollution controls to prevent further harm to Plaintiffs' members in the area.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing and all associated attachments with the Clerk of the Court using the ECF system on counsel of record that have registered their appearance there, and I hereby certify that I have mailed by United States Postal Service the documents to the following non-ECF participant, as well as emailed courtesy copies of these materials to their business email address:

Carroll Wade McGuffey III
TROUTMAN PEPPER LOCKE
600 Peachtree Street, NE
Suite 3000
Atlanta, GA 30308
mack.mcguffey@troutman.com

*Counsel for Defendants*

/s/ *Elias L. Quinn*

ELIAS L. QUINN

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | | |
|---|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE, | ) | |
| Plaintiffs, | ) | Case No. 3:26-cv-00074-DMB-JMV |
| v. | ) | |
| X.AI and MZX TECH LLC, | ) | |
| Defendants. | ) | |

**MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to Rule 6 of the Federal Rules of Civil Procedure, Defendants xAI and MZX Tech LLC move the Court for an order granting a short extension of time from May 20, 2026 to June 15, 2026 to file a response in opposition to Plaintiffs' May 6, 2026, Motion for a Preliminary Injunction. [Dkt. # 20]. **Defendants further move the Court to shorten the time for Plaintiffs to respond to this Motion to 5:00 p.m. Central Thursday, May 14, 2026 as Defendants need to know when their response to the Motion for Preliminary Injunction will be due and a response in the ordinary course would be beyond the current deadline to respond to the Motion for a Preliminary Injunction.**

As grounds for this motion, xAI and MZX state as follows:

First, Plaintiffs' motion for a preliminary injunction seeks the extraordinary relief of an order enjoining the continued operation of certain critical power generation equipment at a property owned by MZX that has been providing power to nearby data centers since August 2025. Those data centers are the "brain" of cutting-edge artificial intelligence and other computing tools

used by the U.S. government and millions of users worldwide, every day. Plaintiffs supported their motion with 38 exhibits that approach 500 pages in aggregate. Those exhibits include two declarations speaking to numerous highly technical topics, including the nature and characteristics of the temporary power generating equipment Plaintiffs allege is operating on Defendants' property, the efficacy of various potential emission control technologies, the potential rate of air emissions from the equipment, and potential human health and welfare impacts.

Plaintiffs' pleadings and supporting information make clear that they have been aware of the operations at MZX's facility since at least September 2025, and thus have had almost eight months to analyze the issues and prepare their pleadings, declarations, and exhibits. Defendants disagree vigorously with Plaintiffs' arguments, including the central factual and legal points asserted in their briefs and declarations as the basis for the relief sought. But this Court's default rules would limit Defendants to 14 days to respond to that motion. Defendants need a reasonable period of time in which to analyze Plaintiffs' filings and to prepare responsive materials, including declarations from individuals knowledgeable about operations at the facility in question, and the various other highly technical issues raised by Plaintiffs. Defendants respectfully submit that a modest extension is reasonable, to ensure that this Court has an adequately developed record to resolve the issues presented in Plaintiffs' motion.

Second, xAI and MZX intend to file a motion to dismiss. The arguments to be included in that motion to dismiss will relate directly to Plaintiffs' lack of likelihood of success on the merits and are thus relevant and important to both the opposition to Plaintiffs' Motion for a Preliminary Injunction and Defendants' planned motion to dismiss. If granted, the Motion to Dismiss would moot Plaintiffs' Motion for a Preliminary Injunction.

Third, because Defendants cooperated with Plaintiffs and waived the requirement of service, their response to the Complaint is due June 15. As noted, Plaintiff's Complaint [Dkt. #1] and Motion for a Preliminary Injunction [Dkt. # 20], and the attachments to the same, make clear that Plaintiffs have been aware of the alleged basis for this lawsuit – MZX's temporary use of mobile power sources to support nearby data centers – since at least September 18, 2025.[1] [Dkt. #20-10 and 20-11]. Given the timing of Plaintiffs' submissions (waiting seven months to file their complaint, and three additional weeks before moving for a preliminary injunction) relative to the known use of temporary power generation at the facility, Defendants respectfully submit that a short extension is warranted and appropriate to allow Defendants to align their motion to dismiss arguments with their opposition to any preliminary injunctive relief. The requested extension of time is reasonable and warranted.

Finally, as Defendants will explain in their forthcoming briefs, the issues and claims in this case touch on sensitive national security concerns and core constitutional questions. Those arguments and others will be raised in Defendants' motion to dismiss and opposition to Plaintiffs' motion for a preliminary injunction. This case is of critical importance not only to the parties to this case but to a much broader audience. A modest extension of time will help fully illuminate

---

[1] The documents Plaintiffs received on September 18, 2025 show that, before deploying or using any of the equipment in question in the State of Mississippi, MZX consulted with the Mississippi Department of Environmental Quality ("MDEQ") on July 25, 2025 seeking guidance on whether it could lawfully use temporary turbines at the location in question, prior to receiving a permit for construction. [Dkt. # 20-6]. MDEQ responded on July 29, 2025 informing Defendants that the temporary turbines in question are exempt from stationary source permitting requirements under the Clean Air Act and Mississippi law, so long as certain conditions are observed. [Dkt. #20-7]. On August 21, 2025, MZX applied for a permit to construct permanent turbines. [Dkt. #20-9]. MDEQ granted MZX a permit on March 11, 2026. Thus, contrary to Plaintiffs' bald assertions, MZX has consistently consulted with MDEQ in advance of the conduct in question, and has fully complied with its guidance.

all of the relevant issues so that the Court has the benefit of an adequately developed record, including presentation of all relevant facts and law, before ruling on Plaintiffs' motion for a preliminary injunction.

Wherefore, Defendants move the Court for an extension of time from May 20, 2026 to June 15, 2026 to respond in opposition to Plaintiffs' Motion for Preliminary Injunction **and to shorten the time for Plaintiffs to respond to this Motion to Thursday, May 14, 2026 at 5:00 p.m. Central**.

**BUTLER SNOW LLP**

By: s/ Daniel W. Van Horn
DANIEL W. VAN HORN (102105)
P. RYAN BECKETT (99524)

Attorneys for Defendant x.Ai and MZX Tech LLC

Daniel W. Van Horn, Esq.
BUTLER SNOW LLP
6075 Poplar Ave., Ste. 500
Memphis, TN 38119
(901) 680-7200
(901) 680-7201 (fax)
danny.vanhorn@butlersnow.com

P. Ryan Beckett, Esq.
BUTLER SNOW LLP
1020 Highland Colony Parkway, Ste. 1400
Ridgeland, MS 39157
(601) 985-4000
(601) 985-4500 (fax)
ryan.beckett@butlersnow.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this pleading has been served via the Court's CM/ECF system, this the 11th day of May upon:

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsout.net
Phone: 601-894-4323

Mary Rock (IL Bar No. 6332240)
*(Pro Hae Vice)*
Elias L. Quinn (CO Bar No. 42159)
*(Pro Hae Vice)* - Lead Counsel
EARTHJUSTICE
D..C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hae Vice)*
Rebecca Ramirez (TX Bai· No. 24126749)
*(Pro Hae Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hae Vice)* - Lead Counsel
Southern Environmental Law Center
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hae Vice)*
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hae Vice)*
Southern Environmental Law Center
119 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

By: s/ Daniel W. Van Horn
DANIEL W. VAN HORN (MS 102105)

**CERTIFICATE OF CONSULTATION OF COUNSEL**

On Friday, May 8, Attorney Danny Van Horn called and spoke with Attorney Carroll Rhodes. Attorney Rhodes responded that he had no issue with the requested extension noting that it was customary practice in this District but that he would need Attorney Van Horn to consult with Attorney Eli Quinn before any final decisions could be reached.

On Friday, May 8, Attorney Van Horn placed a phone call to Attorney Quinn and sent him an email consulting on this motion. Attorney Quinn responded on Saturday, May 9, 2026 reporting that Plaintiffs would let us know their positions on Monday, May 11.

On Monday, May 11, Attorney Quinn reported that they would oppose this motion as they claim the need for immediate relief (despite waiting more than eight months after learning of the use of the temporary turbines). Attorney Quinn in a separate email then consulted asking if Defendants would agree to a briefing schedule (should the Court grant Defendants' motion) with Plaintiffs' response to Defendants Motion to Dismiss and Opposition to Preliminary Injunction due July 10 and Defendants' reply brief due July 17. Defendants generally do not oppose Plaintiffs having until July 10 to respond to Defendants' Motion to Dismiss but believe under these circumstances that their proposed seven days to reply is unreasonable and would request the ability to work with the Court and opposing counsel to come up with a comprehensive briefing schedule that is fair to all sides.

By: s/ Daniel W. Van Horn
DANIEL W. VAN HORN (MS 102105)

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**NATIONAL ASSOCIATION FOR THE THE ADVANCEMENT OF COLORED PEOPLE and MISSISSIPPI STATE CONFERENCE of the NAACP** — **PLAINTIFFS**

**V.** — **NO. 3:26-CV-74-DMB-JMV**

**X.AI CORP. and MZX TECH LLC** — **DEFENDANTS**

**NOTICE**

TAKE NOTICE that a proceeding in this case has been SET as follows:

---

Date and Time

**May 13, 2026
4:00 p.m.**

---

Type of Proceeding

**TELEPHONIC STATUS CONFERENCE
BEFORE CHIEF U. S. DISTRICT JUDGE DEBRA M. BROWN**

**CALL-IN INFORMATION WILL BE PROVIDED TO COUNSEL BY E-MAIL**

---

DANIEL B. MCHUGH, Clerk of Court

By: /s/LaToya L. Davis
LaToya L. Davis, Courtroom Deputy

Date: May 13, 2026

Electronic notice only to:
All Counsel of Record

Questions should be directed to Judge_Brown@msnd.uscourts.gov

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

| | | |
|---|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 3:26-cv-00074-DMB-JMV |
| X.AI and MZX TECH LLC, | ) | |
| Defendants. | ) | |

**NOTICE OF UNITED STATES' EVALUATION OF POSSIBLE INTERVENTION OR AMICUS PARTICIPATION AND SUPPORT FOR DEFENDANTS' REQUEST FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [DOC. 20]**

The United States provides notice that it is evaluating possible intervention or amicus participation in this lawsuit. To facilitate that evaluation, the United States respectfully requests that the Court grant Defendants' motion for extension of time to respond to Plaintiffs' preliminary injunction motion, *see* Doc. 27, and allow the United States until June 29, 2026, to file any response to Plaintiffs' motion for preliminary injunction and to Defendants' anticipated motion to dismiss. If the United States determines not to intervene or otherwise participate at this stage, it will notify the Court accordingly by June 29, 2026.

Plaintiffs' citizen enforcement suit under 42 U.S.C. § 7604 alleges that Defendants' operation of temporary power generators serving nearby data centers violates the Clean Air Act. This case concerns the interpretation and application of the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, as well as other legal and policy questions as to which the United States has a substantial interest, including its priorities with respect to promotion of artificial intelligence

infrastructure. As set forth in Executive Order 14179 titled "Removing Barriers to American Leadership in Artificial Intelligence," it is the policy of the United States to sustain and enhance America's global AI dominance in order to promote human flourishing, economic competitiveness, and national security. 90 Fed. Reg. 8741 (Jan. 23, 2025).

Under the Clean Air Act, the United States Department of Justice (DOJ) and EPA must be served a copy of any citizen suit complaint. 42 U.S.C. § 7604(c)(3). Notice provides the United States an opportunity to intervene where a ruling or decree would be inconsistent with the government's enforcement program. *See* S. Rep. No. 50 at 28, 99th Cong. 1st Sess. (1985).

Plaintiffs filed this action on April 14, 2026. A copy of their complaint has not yet been received by the unit within DOJ's Environment and Natural Resources Division that processes citizen suits, and DOJ only recently became aware of this lawsuit by other means. On May 6, 2026, Plaintiffs filed a motion for preliminary injunction, asking this Court to take the extraordinary step of enjoining before judgment the continued operation of certain temporary power generation equipment at a property owned by MZX in DeSoto County, Mississippi, that has been serving nearby data centers since August 2025.

The United States has now begun evaluating this suit for possible intervention or amicus participation. Pursuant to 42 U.S.C. § 7604(c)(2), the United States "may intervene as a matter of right at any time in the proceeding." Determining whether to intervene requires extensive coordination within DOJ and EPA, among other agencies, including but not limited to analyzing the complaint and the practical implications of this lawsuit.

To enable the United States to undertake this evaluation, the United States supports Defendants' request for an extension of time to June 15, 2026, to respond to Plaintiffs'

preliminary injunction. By that same date, Defendant has also indicated it will file a motion to dismiss. The United States therefore requests that the Court allow the United States until June 29, 2026, to file any responses to Plaintiffs and Defendants' motions. If the United States determines not to intervene or otherwise participate in the briefing of these motions, it will notify the Court accordingly by June 29, 2026.

Respectfully submitted,

/s/ *Adam R.F. Gustafson*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 616-3088
Email: adam.gustafson@usdoj.gov

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** | **PLAINTIFFS** |
| **V.** | **NO. 3:26-CV-74-DMB-JMV** |
| **X.AI CORP.; and MZX TECH LLC** | **DEFENDANTS** |

**ORDER**

On May 6, 2026, the plaintiffs filed a motion for a preliminary injunction. Doc. #20. The Court held a telephonic status conference on May 13 to discuss briefing on the preliminary injunction motion and the defendants' anticipated motion to dismiss. Pursuant to that discussion and the jointly proposed schedule submitted to the Court by e-mail:

1. The defendants may respond to the preliminary injunction motion no later than June 15, 2026; and the plaintiffs may reply no later than July 10, 2026.
2. The defendants may file a motion to dismiss no later than June 15, 2026. If the defendants file a motion to dismiss, the plaintiffs may respond no later than July 10, 2026; and the defendants may reply no later than July 24, 2026.
3. If the United States decides to participate in this case, any intervention papers, substantive motions, and/or amicus briefs by the United States must be filed no later than June 15, 2026. Any response to such filings is due no later than July 10, 2026; and the United States may reply no later than July 24, 2026.
4. A hearing on the motion for preliminary injunction will be set for August 24–25,

2026.[1]

Given the briefing schedule above, the defendants' motion for an extension to respond to the preliminary injunction motion [27] is **DENIED as moot**.

**SO ORDERED**, this 20th day of May, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**

[1] August 24–25 is the only hearing date option that the parties provided to the Court. The parties are advised that the Court has a criminal trial set to begin August 24, 2026. If that criminal trial does indeed proceed, it will take priority over the preliminary injunction hearing. So, the parties are encouraged to discuss other mutually available dates for the hearing and provide them to the Court.

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiff,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'**
**MOTION FOR INTERVENTION AND DISMISSAL**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 2

A. Legal background .......... 2

B. Factual background .......... 5

C. Procedural background .......... 6

ARGUMENT .......... 7

I. The United States is entitled to intervene in this Clean Air Act citizen suit. .......... 7

II. Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action. .......... 8

A. The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo. .......... 10

B. Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act. .......... 17

CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Cases** Pages(s)

*Alaska Dep't of Env't Conservation v. EPA.*,
540 U.S. 461 (2004) .......... 3, 4, 21

*Appalachian Power Co. v. EPA.*,
249 F.3d 1032 (D.C. Cir. 2001) .......... 2

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*,
299 F.3d 1007 (9th Cir. 2002) .......... 16

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (5th Cir. 2003) .......... 2

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) .......... 17

*Citizens for Clean Power v. Indian River Power, LLC*,
636 F. Supp. 2d 351 (D. Del. 2009) .......... 14

*Citizens for Resp. & Ethics in Wash. v. FEC*,
602 U.S. 406 (2024) .......... 17

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) .......... 22

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) .......... 18

*Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*,
718 F.2d 1341 (5th Cir. 1983) .......... 10

*Dubois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) .......... 11

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) .......... 4, 14, 19

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) .......... 4, 11, 14, 16

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) .......... 11, 16, 19, 20

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990) .......... 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 13, 17, 18, 19, 20

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) .......... 4, 11, 12, 14, 16

*Hamker v. Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985) .......... 11, 13

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equipment Inc.*,
434 F.3d 320 (5th Cir. 2005) .......... 8

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 9, 12, 14

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) .......... 18, 22

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 17

*Karr v. Hefner*,
475 F.3d 1192 (10th Cir. 2007) .......... 14, 15

*Marcaida v. Rascoe*,
569 F.2d 828 (5th Cir. 1978) .......... 10

*Merrick v. Diageo Ams. Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) .......... 4

*Montgomery Env't Coal. v. Costle*,
646 F.2d 595 (D.C. Cir. 1981) .......... 4

*NRDC, Inc. v. Train*,
510 F.2d 692 (D.C. Cir. 1974) .......... 12

*Residents of Gordon Plaza, Inc. v. Cantrell*,
25 F.4th 288 (5th Cir. 2022) .......... 4

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) .......... 20, 21

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 18, 19, 23

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 23

*Stringer v. Town of Jonesboro*,
986 F.3d 502 (5th Cir. 2021) .......... 14

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.*,
973 F.2d 1320 (7th Cir. 1992) .......... 15, 17

*Tex. Workforce Comm'n v. U.S. Dep't of Educ.*,
973 F.3d 383 (5th Cir. 2020) .......... 12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 22

*Trump v. United States*,
603 U.S. 593 (2024) .......... 18

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 8, 9, 24

*United States v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) .......... 11

*United States v. Ford Motor*,
814 F.2d 1099 (6th Cir. 1987) .......... 3

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 17

*United States v. Jones*,
109 U.S. 513 (1883) .......... 21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 3

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 3

**Statutes**

15 U.S.C. § 15 .......... 22

15 U.S.C. § 15(a) .......... 22

16 U.S.C. § 1540(g) .......... 4

31 U.S.C. § 3730 .......... 20

31 U.S.C. § 3730(c)(2)(A) .......... 20

33 U.S.C. § 1365 .......... 4

42 U.S.C. § 2000e-5(f) .......... 22

42 U.S.C. § 2000e-5(g)(1) .......... 22

42 U.S.C. § 6972 .......... 4

42 U.S.C. § 7401 *et seq.* .......... 2

42 U.S.C. § 7401(a)(3) .......... 21

42 U.S.C. § 7408 .......... 2

42 U.S.C. § 7409 .......... 2

42 U.S.C. § 7410 .......... 2

42 U.S.C. § 7410(a) .......... 21

42 U.S.C. § 7410(a)(1) .......... 3

42 U.S.C. § 7410(a)(2)(C) .......... 3

42 U.S.C. § 7410(k) .......... 21

42 U.S.C. § 7412 .......... 3

42 U.S.C. § 7412(i)(1) .......... 3

42 U.S.C. § 7412(*l*)(1) .......... 4

42 U.S.C. § 7412(*l*)(7) .......... 4

42 U.S.C. § 7413 .......... 3

42 U.S.C. § 7413(a) .......... 4

42 U.S.C. § 7413(a)(1) .......... 4

42 U.S.C. § 7413(a)(1)-(3) .......... 11

42 U.S.C. § 7413(b) ........ 4, 11

42 U.S.C. § 7413(c) ........ 4

42 U.S.C. § 7414 ........ 3

42 U.S.C. §§ 7470-7492 ........ 3

42 U.S.C. § 7477 ........ 4

42 U.S.C. § 7604 ........ 4, 8

42 U.S.C. § 7604(a) ........ 5

42 U.S.C. § 7604(a)(1)-(3) ........ 5

42 U.S.C. § 7604(a)(3) ........ 5

42 U.S.C. § 7604(b)(1) ........ 13

42 U.S.C. § 7604(b)(1)(A) ........ 5

42 U.S.C. § 7604(b)(1)(B) ........ 5, 22

42 U.S.C. § 7604(c)(2) ........ 1, 5, 7, 10

42 U.S.C. § 7604(c)(3) ........ 5, 13

42 U.S.C. § 7604(g) ........ 23

42 U.S.C. § 7604(g)(1) ........ 5

42 U.S.C. § 7604(g)(2) ........ 23

42 U.S.C. § 9659 ........ 4

**Rules**

Fed. R. Civ. P. 24(a) ........ 8

Fed. R. Civ. P. 24(a)(1) ........ 1

Fed. R. Civ. P. 41(a) ........ 22

Fed. R. Civ. P. 41(a)(1)(A)(i) ........ 1

Fed. R. Civ. P. 41(a)(1) ........ 8

**Regulations**

40 C.F.R. §§ 63.6080–63.6175 ........ 3

11 Miss. Admin. Code Pt. 2, R. 2.1 (2024) ........ 2

11 Miss. Admin. Code Pt. 2, R. 5.2 (2024) ........ 2

**Other Authorities**

U.S. Constitution, Art. II, § 1 Cl. 1 & § 3 ........ 17, 18

S. Rep. No. 91-1196 (1970) ........ 15, 16

131 Cong. Rec. 6738 (1985) ........ 13

*Declaring a National Energy Emergency*
Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) ........ 8

*Removing Barriers to American Leadership in Artificial Intelligence*
Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025) ........ 8

Michael S. Greve, *The Private Enforcement of Environmental Law*,
65 Tulane L. Rev. 339 (1990) ........ 20

# INTRODUCTION

Through a citizen suit under the Clean Air Act, Plaintiffs NAACP and NAACP Mississippi State Conference (collectively, NAACP) seek to enforce federal law by obtaining civil penalties payable solely to the United States Treasury. In doing so, the NAACP threatens American national, economic, and energy security by seeking to shut off the power supply for artificial-intelligence innovation that supports the Department of War's military operations.

The power to execute federal law, however, belongs to the Executive Branch. Accordingly, the Clean Air Act affords the United States primacy over citizen-enforcers when it comes to enforcement discretion—as Article II of the Constitution mandates. The United States thus moves to intervene in this Clean Air Act citizen suit as a plaintiff to inform the Court of the government's objection to this suit and request dismissal, pursuant to Rules 24(a)(1) and 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure.

There is no question the United States is entitled to intervene. A court shall grant intervention when a party has "an unconditional right to intervene," Fed. R. Civ. P. 24(a)(1), and the Clean Air Act mandates that the United States "may intervene as a matter of right at any time" in a citizen suit, 42 U.S.C. § 7604(c)(2).

The United States is equally entitled to dismiss this case. The NAACP may not pursue this Clean Air Act enforcement action over the United States' objection. The United States' statutory right to intervention encompasses the right to dismiss this case because, relative to citizen-enforcers like the NAACP, the statute affords the United States primacy over when and how the statute should be enforced. Article II of the Constitution also counsels in favor of that construction of the Clean Air Act by vesting the power to seek civil penalties on behalf of the United

States conclusively and preclusively in the Executive Branch. That includes the discretion to decide when such an enforcement action is unwarranted or inconsistent with federal enforcement priorities, and an interpretation that undermines that discretion would raise serious Article II concerns.

Accordingly, this Court should allow the United States to intervene as a plaintiff and then dismiss this case.

## BACKGROUND

### A. Legal background

The Clean Air Act sets out a comprehensive program for regulating emissions of air pollutants. *See* 42 U.S.C. § 7401 *et seq*. The United States, through the Environmental Protection Agency (EPA), exercises broad powers to administer the Act. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). States likewise perform a coordinate role. *Id.* To start, we briefly describe the complex Clean Air Act programs that the NAACP seeks to enforce in this lawsuit. *See* Dkt. No. 1 at 38-42. We next describe the statute's enforcement mechanisms.

**1.** The NAACP's claims (*id.* at 38-41) relate to national ambient air-quality standards that EPA adopts as needed to protect public health and welfare. 42 U.S.C. §§ 7408, 7409. States adopt implementation plans (referred to as SIPs) to maintain EPA's standards within their borders, subject to EPA approval and oversight authority. *Id.* § 7410. SIPs may also "be revised at the EPA's insistence if found to be inadequate to ensure maintenance of the [national standards] or public health." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001).

Mississippi has an EPA-approved SIP that includes provisions to carry out the Clean Air Act's prevention of significant deterioration (PSD) program. *See* 11 Miss. Admin. Code Pt. 2,

Rs. 2.1, 5.2 (2024). The SIP and PSD programs require various permits before building or modifying certain stationary emission sources, plus monitoring as necessary to ensure continued compliance. *Id.* Rs. 2.1(D), 2.5(D); 42 U.S.C. §§ 7470-7492; *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308-09 (2014) (describing the PSD program).

The NAACP also alleges (Dkt. No. 1 at 41-42) violations of the Act's regulatory program for hazardous pollutants, which targets certain emissions that can be toxic to human health. 42 U.S.C. § 7412; *see West Virginia v. EPA*, 597 U.S. 697, 707-08 (2022) (describing that program). The hazardous-pollutant program, similar to the SIP and PSD programs, requires federal or state approval before building new major sources of the covered pollutants. 42 U.S.C. § 7412(i)(1). For certain stationary combustion turbines regulated under this program, EPA regulations set out emission limits and, again, impose monitoring, reporting, and recordkeeping requirements to ensure compliance. 40 C.F.R. §§ 63.6080-63.6175.

**2.** Investigating and enforcing compliance with these regulatory programs is the work of the federal and state regulators. As for state enforcement, under the statute's cooperative-federalism scheme, SIPs must provide for enforcement, including as to the modification or construction of new stationary sources. 42 U.S.C. § 7410(a)(1), (2)(C). "Although it is clear that the Clean Air Act contemplates very significant participation in air pollution control by state air pollution control agencies, it is equally clear that the final authority is vested in [EPA]." *United States v. Ford Motor Co.*, 814 F.2d 1099, 1102 (6th Cir. 1987). That is because the United States retains "broad oversight" and independent enforcement authority. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 468, 485 (2004) (*ADEC*); *see*, *e.g.*, 42 U.S.C. §§ 7413, 7414 (outlining federal investigative and enforcement powers).

For example, EPA has independent authority to enforce SIP requirements, such as through administrative orders, prescribing an administrative penalty, or filing a civil enforcement action for civil penalties or injunctive relief. 42 U.S.C. § 7413(a)(1), (b). EPA has similar authority when it "finds that a State is not complying with a [Clean Air Act] requirement governing construction of a pollutant source." *ADEC*, 540 U.S. at 468 (citing 42 U.S.C. § 7413(a)). Section 7477, "[d]irected specifically to the PSD program," provides that EPA can "take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction" of noncompliant facilities. *Id.* at 468-69 (quoting 42 U.S.C. § 7477). In addition to these provisions, the statute specifically reserves federal enforcement authority regarding hazardous pollutants, even where states have their own implementation program for such pollutants (which, again, must be EPA approved). 42 U.S.C. § 7412(*l*)(1), (7). Certain statutory violations also carry federal criminal sanctions. *Id.* § 7413(c).

To "supplement rather than to supplant" federal and state enforcement discretion, the Clean Air Act also includes a "citizen suit" provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987); 42 U.S.C. § 7604.[1] This provision enlists the aid of so-called "private attorneys general" to enforce the statute where government authorities purportedly "fail" to exercise enforcement responsibility. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461,

---

[1] Other major federal environmental laws with citizen-suit provisions include the Clean Water Act, 33 U.S.C. § 1365, Endangered Species Act, 16 U.S.C. § 1540(g), Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and Comprehensive Environmental Response, Compensation, and Liability Act, *id.* § 9659, among others. Those provisions are similar to the Clean Air Act's, so precedent and context regarding other environmental citizen-suit provisions are "persuasive" here. *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act"); *see*, *e.g.*, *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 301 (5th Cir. 2022); *Montgomery Env't Coal. v. Costle*, 646 F.2d 595, 597 (D.C. Cir. 1981).

475-77 (6th Cir. 2004) (explaining Clean Air Act citizen suits' "interstitial" enforcement role). Private parties may "commence a civil action" to enforce the Act in three circumstances: (1) against persons for violations of emissions standards or limits, (2) against EPA for alleged failures to perform nondiscretionary duties, and (3) against persons for violations of permitting requirements. 42 U.S.C. § 7604(a)(1)-(3). In actions against private parties under subsections (a)(1) and (3), a court may order civil penalties payable to the United States Treasury, an injunction requiring compliance, or both. *Id.* § 7604(a), (g)(1).

Given private citizens' secondary enforcement role, the citizen-suit provision includes several procedural constraints designed to protect federal enforcement and policy interests. Upon filing *any* citizen suit, for example, the citizen "shall serve a copy of the complaint" on the U.S. Attorney General and EPA. *Id.* § 7604(c)(3). "[I]f not a party," the United States "may intervene as a matter of right at any time in the proceeding." *Id.* § 7604(c)(2). For subsection (a)(1) actions, specifically, the citizen must notify EPA, the relevant state, and the alleged violator 60 days before filing suit. *Id.* § 7604(b)(1)(A). EPA (or a state) may preclude the citizen's intended enforcement action by filing its own and "diligently prosecuting" that action. *Id.* § 7604(b)(1)(B).

**B. Factual background**

This case concerns how Defendants xAI and MZX Tech LLC (collectively, xAI) use temporary, gas-fired turbines to power data centers that support the Grok artificial-intelligence platform. Dkt. No. 1 ¶ 6; Dkt. No. 52 at 4-6. The Mississippi Department of Environmental Quality determined that the State's SIP did not require Clean Air Act permits for the turbines that help power Grok. Dkt. No. 1-2 at 5.

Grok's continued operation and availability "is a matter of paramount national security" for the reasons detailed in the attached declaration of Cameron Stanley, the Department of War's Chief Digital and Artificial Intelligence Officer (CDAO). Ex. A ¶ 8. Grok is "one of only four proprietary state-of-the-art" AI models that can support "national security applications," and "one of just three" suitable to support "mission-critical operations across Secret and Top-Secret classified networks." *Id.* ¶ 4. The Department specifically relies on xAI's "Grok Gov Model," which offers features "found in no other frontier AI model." *Id.* ¶ 5. For example, during Operation Epic Fury, Grok (through the Department's Maven Smart Systems) "enabled U.S. forces to deploy over 2,000 munitions to 2,000 distinct targets within 96 hours . . . , a testament to the greatly increased operational efficiency made possible by the Grok Gov Model." *Id.* ¶ 6. "If Grok Gov Model cannot be deployed, refined, and upgraded" across the Department to support future operations, "due to either limitations in energy supply or limited reserve compute capability, such as those requested by [the NAACP] in this matter," that would "severely impact[]" "many tools" used by the Department's military and civilian personnel. *Id.* ¶ 10.

The State of Mississippi has similarly determined that continued operation of xAI's data centers and turbines serves the State's interests. Ex. B. If the NAACP successfully shuts down xAI's turbines through this civil enforcement action, the State explained, that "would create an immediate and substantial disruption to the State's economy" and "disrupt the Clean Air Act's delicate balance of cooperative Federalism." *Id.*

### C. Procedural background

The NAACP filed this Clean Air Act citizen suit on April 14, 2026. Dkt. No. 1. The complaint alleges that xAI is violating Mississippi's SIP, the PSD program, and EPA's hazardous-pollutant regulations because the gas-fired turbines lack certain permits and approvals, and

are allegedly not complying with emissions limits, employing certain pollution controls, or monitoring, reporting, and keeping records as necessary to ensure continued compliance. *E.g.*, *id.* ¶¶ 103, 112, 116, 226-227, 231, 251. Although the state agency determined that the SIP does not require permits for the turbines and has declined any enforcement, the NAACP disagrees with that determination. *Id.* ¶¶ 179-191. As relief, the NAACP seeks steep civil penalties—payable to the United States treasury—of $124,426 per day of violation, plus injunctive relief ordering xAI to stop operating its turbines "unless and until [xAI] obtain[s] the required permits," employ certain pollution controls allegedly mandated by the Clean Air Act, and take other mitigating measures. *Id.* ¶ 12; *id.* at 42.

On May 6, 2026, the NAACP moved to preliminarily enjoin xAI from operating the turbines that power xAI's data centers. Dkt. No. 20; *see also* Dkt. Nos. 51, 52. On May 13, 2026, the Court held a status conference. Dkt. No. 36. Prior to the status conference, the United States filed a notice informing the Court that the United States "is evaluating possible intervention or amicus participation in this lawsuit." Dkt. No. 35 at 1. As a result, the Court entered a briefing schedule ordering (1) xAI to respond to the preliminary injunction motion and to file any motion to dismiss by June 15, 2026, and (2) the United States to file any intervention or substantive motion also by June 15. Dkt. No. 40. On May 26, 2026, the Court scheduled an evidentiary hearing on the NAACP's preliminary-injunction motion for August 24, 2026. Dkt. No. 42.

## ARGUMENT

### I. The United States is entitled to intervene in this Clean Air Act citizen suit.

The Clean Air Act provides that the United States "may intervene as a matter of right at any time" in a citizen-suit proceeding. 42 U.S.C. § 7604(c)(2). This motion also complies with

the Court's deadline for filing an intervention motion. Dkt. No. 40. Thus, under both section 7604 and Federal Rule of Civil Procedure 24(a), the United States is entitled to intervene.

## II. Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action.

The United States moves to dismiss the NAACP's complaint and is entitled to do so under Federal Rule of Civil Procedure 41(a)(1). That rule provides an "absolute right" to dismiss this action because xAI has not yet filed an answer or motion for summary judgment. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 324 (5th Cir. 2005); *cf. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).

In its prosecutorial discretion, the United States, through the Department of Justice, has determined that dismissal of this civil enforcement action accords with federal policy, national security, and the public interest. Pertinent federal policies include the President's determination that expansion of our energy infrastructure is "an immediate and pressing priority" for our national and economic security. Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025). The President has also determined that "[i]t is the policy of the United States to sustain and enhance America's global AI dominance in order to promote human flourishing, economic competitiveness, and national security." Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025). Similarly, the President's June 5, 2026, National Security Presidential Memorandum explained that "[p]revious administrations imposed undue bureaucracy that hampered the pace of AI adoption, fostered dangerous dependencies on single vendors, and made it challenging for our warfighters

to adopt the most advanced technologies." NSPM-11 (https://perma.cc/TV5X-F3VU). And supporting the Nation's artificial-intelligence capabilities is a pillar of the EPA Administrator's "Powering the Great American Comeback" initiative.[2]

The claims pressed and the relief sought by the NAACP's complaint threaten artificial-intelligence innovation, plus the energy needed to power it. The NAACP's attempt to cut off the power that supports Grok also threatens national security because, for the reasons expressed in CDAO Stanley's declaration, Grok provides critical support for the Department of War's military operations. Ex. A. For its part, the State of Mississippi—the Clean Air Act's other primary enforcer on this case's facts—agrees with the United States' determination that the NAACP's attempted enforcement is unwarranted and opposes this citizen suit. Ex. B.

To be clear, the United States' reasons for *why* the NAACP's attempted enforcement action is irreconcilable with federal policy do not dictate whether this Court should dismiss this case. Where "Rule 41 entitles the movant to a dismissal," a "district court has no adjudicatory role." *Polansky*, 599 U.S. at 436 n.4. In this context—where the United States is dismissing an enforcement action—reviewing the government's reasons for dismissal would also be inconsistent with the principle that federal "decisions to refuse enforcement" are "unsuitab[le]" for judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The dispositive point is that the United States seeks to exercise its preclusive enforcement discretion to dismiss this lawsuit in its entirety.

---

[2] *See* EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative (Feb. 4, 2025) (https://perma.cc/B8RX-YS3F). EPA has also reiterated that "enforcement activities must properly consider Executive Orders." Memorandum from the Acting Assistant Administrator, EPA Office of Enforcement and Compliance Assurance (Dec. 5, 2025) (https://perma.cc/PVM3-RSLM).

Nor does it make any difference whether NAACP objects to dismissal. The United States' express and unconditional right to intervene in this citizen suit necessarily includes the right to unilaterally dismiss the case in its entirety. That is true for two reasons. First, permitting the NAACP to pursue this Clean Air Act enforcement action seeking civil monetary penalties payable exclusively to the United States over the United States' objection is irreconcilable with the statute's assignment of enforcement authority. Second, interpreting the Clean Air Act to allow the enforcement action to proceed over the United States' objection would give rise to significant questions under the Vesting and Take Care Clauses in Article II of the Constitution. By contrast, interpreting the United States' intervention right as including the right to dismiss would avoid grave doubts about the citizen-suit provision's constitutionality.

### A. The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo.

The United States' statutory "right" to intervene "at any time" in citizen suits includes the right to dismissal. 42 U.S.C. § 7604(c)(2). When a party intervenes as a matter of right, it is afforded the status of an original party. *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978). That status, in turn, means that the United States' statutory intervention right necessarily encompasses other procedural rights that are inherent in "fully" litigating a matter. *Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*, 718 F.2d 1341, 1350-51 (5th Cir. 1983). In the specific context at issue here—where the Clean Air Act entitles the United States to intervene so that the government can protect federal policy interests from private enforcers' conflicting interests—the United States' procedural rights must be interpreted to include the right to dismiss the citizen suit.

The Clean Air Act's structure and allocation of enforcement authority confirm that interpretation. Nothing in the statute suggests that Congress, when enacting the citizen-suit provision, deputized citizens to "commandeer the federal enforcement machinery," especially where the United States has determined that a citizen's suit would not serve the public interest. *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987) (rejecting view that citizen-suit provisions' purpose is to "giv[e] the 'little guy' access to enforcement power of the federal government" (citation omitted)). Instead, statutory structure and precedent establish that the United States' enforcement prerogatives supersede those of citizen-enforcers. That means "the statute authorizes citizen suits only with the consent of governing authorities." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 375 n.32 (5th Cir. 2024) (en banc) (Jones, J., dissenting). And citizens may not seek relief that government enforcers deliberately choose "to forgo." *Gwaltney*, 484 U.S. at 61.

**1.** The Clean Air Act vests "primary enforcement authority" in the United States, along with state regulators—not private parties. *Env't Conservation Org.*, 529 F.3d at 528 (discussing the Clean Water Act's materially similar division of authority); *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 288-89 (3d Cir. 2013) ("primary enforcers"). The United States enjoys wide discretion in deciding how aggressively to induce statutory compliance in light of its policy priorities—whether, for example, issuing an EPA administrative compliance order, displacing state implementation decisions found to be inadequate, or filing a civil action for civil penalties and injunctive relief. 42 U.S.C. § 7413(a)(1)-(3), (b); *see Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 395 (5th Cir. 1985) (interpreting materially similar Clean

Water Act provisions to conclude that the federal government "plays the central role" in "enforcement"). And, as outlined above (pp. 2-4), the United States retains independent oversight and enforcement authority even as the statute also provides for state participation.

This discretion allows the United States to tailor remedies to the particular facts and achieve the desired level of deterrence. The federal government's decisions not to enforce "often involve[] a complicated balancing of a number of factors which are peculiarly within its expertise," such as how "the particular enforcement action" "best fits the [government]'s overall policies." *Heckler*, 470 U.S. at 831. Allowing this citizen suit to proceed over the United States' objection would enable citizen-enforcers to marshal federal enforcement machinery—complete with penalties payable to the United States Treasury—without regard for the suit's impacts on federal interests and its implications beyond this case.

Congress did not contemplate that result. Where, as here, the United States has determined a citizen's attempted civil enforcement action is inconsistent with federal policy and the public interest, the United States' primary enforcement role entitles it to dismissal. Any contrary interpretation of the citizen-suit provision would allow citizens to curtail the United States' considered enforcement discretion and transform "citizens' role from interstitial" to "intrusive." *Gwaltney*, 484 U.S. at 61. Declining to dismiss this action would also render ineffective the express procedural constraints Congress enacted to protect against "the obvious danger [of] unlimited public actions" and confine citizen suits to their interstitial, secondary role. *NRDC, Inc. v. Train*, 510 F.2d 692, 700 (D.C. Cir. 1974); *see Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (an "interpretation that furthers rather than obstructs the [text]'s purpose should be favored").

Those constraints include the United States' unconditional right to notice of any citizen-suit complaint upon filing, its right to 60-days' notice before filing any complaint alleging violations of emission standards or limitations, and its entitlement to intervene "as a matter of right at any time." 42 U.S.C. § 7604(b)(1), (c)(2), (3). Congress even provided an additional notice-and-intervention mechanism when there is a proposed consent judgment between private parties and alleged violators, forbidding a court from adopting such a judgment without affording the United States an opportunity to review it. *Id.* § 7604(c)(3). This set of notice-and-intervention requirements "strongly indicates" that federal officials are "of central importance in the enforcement of the Act" and "highlights their primary role." *Hamker*, 756 F.2d at 395-96. In fact, the requirements were designed in part for the precise situation here—to facilitate the United States' opposition to citizen suits that are inconsistent with federal policy. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000) ("if the Executive Branch opposes a particular citizen suit," the United States may intervene to "bring the Government's views to the attention of the court"); 131 Cong. Rec. 6738 (1985) (service of a citizen-suit complaint on the United States protects the government's ability to "point out to a court where some ruling or decree would be inconsistent with the government's enforcement program"). Through this motion, the United States does just that.

Reinforcing the federal government's preeminent enforcement discretion, Congress expressly envisioned that the United States could preclude citizen-enforcement actions. Section 7604(b)(1) allows the United States, upon receiving 60-days' notice of a subsection (a)(1) citizen suit, to displace any planned citizen action by filing a federal civil action and "diligently prosecuting" that action. The "diligent prosecution" bar allows the United States to chart its own course in enforcement, including in circumstances where the United States determines that a pre-

citizen suit settlement agreement is appropriate. *See Karr v. Hefner*, 475 F.3d 1192, 1194-95, 1197-98 (10th Cir. 2007); *Citizens for Clean Power v. Indian River Power, LLC*, 636 F. Supp. 2d 351, 354-58 (D. Del. 2009). Any other interpretation would grossly intrude on core prosecutorial functions of the Executive Branch, as explained below. *Infra* Part II.B. Thus, the diligent-prosecution bar reinforces, rather than divests, the United States' inherent discretion to decide the statute should not be enforced in a particular case. *Cf. Heckler*, 470 U.S. at 831-32. Like the notice-and-intervention provisions, the diligent-prosecution bar "confirm[s] the supplemental role of citizen suits." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 506 (5th Cir. 2021).

**2.** Numerous courts have recognized that the federal government's enforcement prerogatives carry the day over citizens' contrary enforcement preferences. In *Gwaltney*, for example, the Supreme Court stressed the "danger" of allowing citizens to supplant federal enforcement decisions in the materially similar Clean Water Act context: "Suppose that the [EPA] Administrator identified a violator" of the statute and "issued a compliance order," but "agreed not to assess or otherwise seek civil penalties." 484 U.S. at 60-61. Allowing citizens to seek the relief that the United States "chose to forgo," the Court explained, would "curtail[] considerably" the government's "discretion to enforce the Act in the public interest." *Id.* at 61.

Following *Gwaltney*'s lead, the Fifth Circuit and other courts have stressed the primacy of the United States' enforcement discretion when citizen enforcers seek remedies beyond what the government deems proper. *See*, *e.g.*, *Env't Conservation Org.*, 529 F.3d at 528 (concluding that citizen suit was moot because, after it was filed, EPA induced compliance, and allowing the citizens to seek additional relief "would effectively cede primary enforcement authority" to citizens); *Ellis*, 390 F.3d at 477 (reasoning that citizens' desired relief, "more stringent" than what EPA obtained, would inappropriately "second-guess[]" EPA's "assessment of an appropriate

remedy"); *EPA v. City of Green Forest*, 921 F.2d 1394, 1403 (8th Cir. 1990) (concluding that consent decree "in a later-filed EPA action" precluded "citizens' claims brought prior to [the] government action"); *Karr*, 475 F.3d at 1197 (emphasizing how diligent prosecution need not "be far-reaching or zealous," "[n]or must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff"); *cf. Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (rejecting argument that the United States does not diligently prosecute an action where "it does not sue the persons, or use the theories, the private plaintiff prefers" because that argument "would strip EPA of the control the [Resource Conservation and Recovery Act] provides").

The intrusion of allowing this action to proceed over the United States' objection would be no less significant. If anything, the intrusion would be more pronounced than the circumstances that the Supreme Court considered in *Gwaltney* and those addressed by other courts. Here, the United States does not simply prefer less stringent enforcement than the private enforcers. Rather, the United States has determined that *no* relief sought by this civil enforcement action—for any civil penalty or any type of injunctive relief to shutdown xAI's turbines—is consistent with federal policy and the public interest. To the contrary, any such relief would be highly detrimental to both. *See* pp. 8-9. Allowing the NAACP to substitute its enforcement decision—that subjecting xAI to civil litigation to impose civil penalties and an injunction to shut down the turbines *is* warranted—impermissibly overrides the government's discretion to decide when and how enforcing the Clean Air Act against a particular defendant for a particular activity is contrary to the public interest. *Cf.* S. Rep. No. 91-1196, at 37 (1970) (stressing that Clean Air Act citizen suits should not yield "inconsistent" federal policy).

Accordingly, any suggestion that this suit should go forward *because* the federal and state governments are declining to enforce gets things backwards. *See* Dkt. No. 52 at 13 (citing a description of citizen suits' "purpose" from *Association to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1011-12 (9th Cir. 2002)). The Clean Air Act's citizen-suit provision does not allow private enforcement in each and every case where governmental actors decline to enforce. *See* S. Rep. No. 91-1196, at 37 (recognizing there may be situations where "the agency had not initiated abatement proceedings" but "courts would be expected to consider [the citizen suit] against the background of the agency action" and order "dismissal"). Citizen suits "are proper only 'if the Federal, State, and local agencies *fail* to exercise their enforcement responsibility.'" *Env't Conservation Org.*, 529 F.3d at 528 (emphasis added) (quoting *Gwaltney*, 484 U.S. at 60).

Here, the United States is not "fail[ing]" to exercise its enforcement responsibility. Instead, the United States has considered this civil-enforcement action in light of Executive Branch policy, found the action contrary to the public interest, and intervened to inform the Court of that determination. Even more, the Clean Air Act's statutory process was carried out: the State of Mississippi reviewed xAI's notice last year in light of its own SIP's permitting provisions and agrees with the United States' enforcement determination. Ex. B. Because citizens are "not permitted to upset the primary enforcement role" of the United States, *Env't Conservation Org.*, 529 F.3d at 531, the United States' determination is controlling, *see ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).

* * *

In short, the Clean Air Act's citizen-suit provision "belongs to a genre common to environmental laws under which citizen suits serve as goads to both the EPA and polluters without

displacing the federal agency as the principal enforcer." *Heritage Grp.*, 973 F.2d at 1324. Allowing this action to proceed over the United States' objection would essentially cede principal enforcement authority to the NAACP. The Clean Air Act does not contemplate, let alone require, that result. The citizen-suit provision's authorization for federal intervention must be interpreted to include the right to dismiss the case.

### B. Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act.

Article II commits Executive enforcement power to the President: "The executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 1 Cl. 1 & § 3. But interpreting the Clean Air Act to authorize citizen enforcement actions that seek civil penalties payable to the United States over the United States' objection would "deprive[]" the United States of "discretion to decide that a given violation" (assuming any occurred) "should not be the object of suit at all." *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting). That would be "constitutionally bizarre." *Id.* Because interpreting the Clean Air Act's federal-intervention right to entitle the United States to dismissal is consistent with the statute's structure and avoids that serious Article II concern, that interpretation should be favored.

When a statute and the Constitution "brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). To that end, the "well-established" canon of constitutional avoidance counsels that courts should not adopt a statutory interpretation—even if "otherwise acceptable"—that "would raise serious constitutional problems." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc) (citation omitted), *aff'd*, 602 U.S. 406 (2024). In other words, courts must "shun" interpretations that raise "serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

The constitutional concerns with allowing the suit to proceed over the United States' objection are significant. Under Article II, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, §§ 1, 3). The President's power to faithfully execute the law includes "[t]he Presidential power of prosecutorial discretion" and, in turn, the "*unilateral* power[]" "not to seek charges against violators of a federal law." *In re Aiken County*, 725 F.3d 255, 262-64 (D.C. Cir. 2013) (Kavanaugh, J.). And because "prosecutorial decisionmaking" is a "special province of the Executive Branch," it "implicates conclusive and preclusive" authority, *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (marks omitted), regarding both criminal and "[c]ivil enforcement actions," *Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 888 (D.C. Cir. 2021). Indeed, "[l]ike the decision not to prosecute in criminal cases," "[c]ivil enforcement actions are presumptively committed to the agency's discretion" and cannot be second-guessed by courts, much less private citizens. *Id.*

In light of Article II's commitment of federal enforcement power to the Executive, several Supreme Court Justices have identified "[d]ifficult and fundamental questions" about whether citizen-suit provisions impermissibly transfer Executive enforcement discretion to private parties. *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring); *see also id.* at 209-10 (Scalia, J., joined by Thomas, J., dissenting); *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). So too have many Fifth Circuit judges. In a case brought under

the Clean Air Act's citizen-suit provision, Judge Jones—joined by seven other judges—recognized citizen suits' "potential to usurp the Executive Branch's principal prosecutorial responsibility." *ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).[3]

The NAACP's civil enforcement action illustrates why those concerns are well founded. "As a starting point, it is well to remember that the Clean Air Act primarily serves public, not private, interests," and thus "[c]itizens acting as 'private attorneys general' . . . seek relief not on their own behalf but on behalf of society as a whole." *Ellis*, 390 F.3d at 477. Permitting the NAACP to seek civil penalties payable to the United States on terms to which the United States objects raises serious concerns under Article II. Punishing unlawful conduct through civil penalties payable to the Treasury on behalf of the United States is "a quintessentially executive power." *Seila Law*, 591 U.S. at 219. The NAACP's complaint asks this Court to impose staggering penalties necessarily payable to the Treasury—relief that does not meaningfully differ from a civil enforcement action brought on behalf of the United States, and that bears only the most attenuated relationship, if any, to the plaintiff's own asserted injuries. Dkt. No. 1 ¶¶ 229, 246, 255. It is highly doubtful that the NAACP's attempted "exaction[] of public fines" over federal opposition is "permissible in view of the responsibilities committed to the Executive by Article II." *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring).[4]

---

[3] Judge Davis, joined by six other judges, disagreed that the *ExxonMobil* citizen suit posed an Article II concern for "three main reasons": (1) the Clean Air Act "sets clear limits . . . to ensure that [citizens] do not overstep their role," (2) the United States "support[ed]" the citizen suit, and (3) Congress desired citizen enforcement. *See* 123 F.4th at 342-44. The second key factor—the United States' support—is absent here.

[4] This Court, of course, is bound by *Laidlaw*'s holding that civil penalties payable to the U.S. Treasury can redress private injuries by deterring future violations, but the United States expressly preserves the argument for future appellate proceedings that that holding was incorrect for the reasons stated in Justice Scalia's dissent. In the interim, this Court need not and should not exacerbate that error by extending *Laidlaw*'s flawed reasoning on a question of Article III redressability into the distinct context of Article II.

There is no Founding-era evidence showing a history or tradition of citizens exercising this type of enforcement power. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752-53 (5th Cir. 2001) (en banc) (explaining how Founding-era acceptance of qui tam actions was "certainly a touchstone illuminating" their consistency with Article II (marks and citation omitted)). That is because civil penalties payable only to the United States Treasury "do[] not provide a mechanism for individual relief in any traditional sense," even assuming those penalties indirectly provide "some incidental benefit to the plaintiff." *Laidlaw*, 528 U.S. at 204, 209 (Scalia, J., dissenting); *see also ExxonMobil*, 123 F.4th at 396 n.3 (Oldham, J., dissenting) (highlighting similar concerns as to the Clean Air Act). The "traditional business of Anglo-American courts is relief specifically tailored to the plaintiff's injury," but a civil penalty is "a public fine diverted to a private interest." *Laidlaw*, 528 U.S. at 204, 209-10 (Scalia, J., dissenting). Allowing the NAACP to seek those penalties "without meaningful public control" is thus tantamount to making the organization "a self-appointed mini-EPA." *Id.* at 209-10; *see also* Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tulane L. Rev. 339, 349-50 (1990) (explaining how the "independence" of environmental citizen-enforcers is unique).[5]

Indeed, while the Clean Air Act sharply increased federal authority in the field, air-pollution regulation and enforcement was traditionally the primary responsibility of state and local

[5] *Riley*'s conclusion that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law" does not undermine the United States' position here. 252 F.3d at 753. *Riley* made that statement in upholding the False Claims Act's qui tam provisions, which allow private plaintiffs (called "relators") to pursue actions for fraudulent claims in the United States' name and share in any monetary recovery. *See* 31 U.S.C. § 3730. Clean Air Act citizen suits lack the historic pedigree that was critical to the Fifth Circuit's analysis. *See Riley*, 252 F.3d at 752; U.S. Intervenor Br. at 22-30, *United States ex rel. Taylor v. Healthcare Assocs. of Tex. LLC*, No. 25-10842 (5th Cir. Mar. 23, 2026). The False Claims Act also expressly retains the United States' ability to "assume control" over qui tam litigation, such as "the unilateral power to dismiss an action." *Riley*, 252 F.3d at 753; 31 U.S.C. § 3730(c)(2)(A).

governments. 42 U.S.C. § 7401(a)(3). To the extent the Clean Air Act's scheme of cooperative-federalism relies on state enforcement, the federal government, "from the time of its establishment," "has been in the habit of using, with the consent of the states, their officers, tribunals, and institutions as its agents." *United States v. Jones*, 109 U.S. 513, 519 (1883). The statute also includes detailed control mechanisms that preserve Executive oversight authority and enforcement discretion. *See*, *e.g.*, 42 U.S.C. § 7410(a), (k) (providing for EPA approval of SIPs); *ADEC*, 540 U.S. at 469 (holding that EPA may "act to block construction" of a new facility "permitted by [a state agency]"). But the Clean Air Act's private-attorney-general model is different in kind and it lacks the historic tradition that supports the constitutionality of cooperative-federalism.

Dismissal is necessary regardless of the fact that the NAACP seeks not just civil penalties but also injunctive relief—shutting down the data centers' power source until xAI obtains government permits and approval that Mississippi says it does not need. Dkt. No. 1 at 42. For the reasons explained above, the citizen-suit provision's authorization of civil penalties payable to the Treasury independently warrants interpreting the provision to allow the United States a right to dismissal. Because interpreting the statute to include a right of dismissal entitles the United States to dismiss *the entire action*, there is no plausible basis to distinguish a citizen suit that seeks only penalties from one that seeks penalties and injunctive relief. That means the NAACP's request for injunctive relief in addition to penalties does not save its complaint from dismissal.

Interpreting the Clean Air Act to provide the control mechanism that the United States invokes here—the ability to dismiss the citizen suit—would avoid these serious Article II concerns. *Cf. Riley*, 252 F.3d at 753 (citing the Executive's "significant amount of control over [qui tam] litigation" as a factor supporting its constitutionality). Conversely, allowing this citizen suit

to proceed unchecked by federal control would impermissibly intrude on Executive Branch prerogatives, including the ability to align the enforcement of federal law with broader public interests, as ultimately determined by the President.

Without the right of dismissal under Rule 41(a) here, the only way that the Executive could preclude the citizen suit is by "diligently prosecuting" its own enforcement action. *See* 42 U.S.C. § 7604(b)(1)(B). But that would only exacerbate the Article II violation by stripping the Executive Branch of discretion to determine that *no* enforcement action is the proper course. *See Citizens for Resp. & Ethics*, 993 F.3d at 888 (stressing that such civil-enforcement decisions lie with the Executive). Requiring the Executive to diligently prosecute the action to dispose of it would violate Article II because "Congress may not *mandate* that the President prosecute a certain kind of offense or offender," *Aiken Cnty.*, 725 F.3d at 263, and "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" lies with "the Executive Branch," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

The United States does not dispute that Congress has the power to authorize private parties who have suffered Article III injury to sue to enforce certain federal statutes. *See*, *e.g.*, *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' . . . antidiscrimination statutes[.]"). Private suits under such provisions, like Title VII of the Civil Rights Act and the antitrust laws, generally do not raise Article II concerns even if Congress created the private right of action for the purpose of supplementing government enforcement actions. *See*, *e.g.*, 42 U.S.C. § 2000e-5(f); 15 U.S.C. § 15. But traditional private rights of action ordinarily provide some form of highly personalized relief, like a mechanism to compensate monetary harms that the plaintiff personally suffered. *See*, *e.g.*, 42 U.S.C. § 2000e-5(g)(1) (Civil Rights Act, providing for reinstatement and backpay); 15 U.S.C. § 15(a) (Clayton

Act, providing that "person[s] who shall be injured in his business or property" can recover treble "damages by him sustained").

The differences between other statutes' private rights of action (for more individualized relief) and Clean Air Act citizen suits that do not compensate any specific injury to the citizen-plaintiff heighten the Article II concerns as to citizen suits. Unlike private rights of action in statutes like the Civil Rights Act and the Clayton Act, the Clean Air Act does not provide for compensatory monetary relief. *See* 42 U.S.C. § 7604(g). It instead authorizes private citizens to pursue monetary penalties generally payable only to the Treasury—again, a quintessentially executive power that "vindicat[es] the rule of law" rather than compensating any personal monetary harm. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998); *see also Seila Law*, 591 U.S. at 219.[6]

For all those reasons, the best interpretation of the Clean Air Act—which ensures the Executive Branch retains its primacy over the enforcement of federal law—is also necessary to avoid grave constitutional problems with the statute's citizen-suit provisions. The Constitution, the Clean Air Act, and precedent all point to the same conclusion: the NAACP cannot wrestle enforcement responsibility away from the Executive Branch.

[6] The citizen-suit provision contains a limited exception to the general rule that penalty proceeds are payable to the Treasury—no more than $100,000 may be used to fund "beneficial mitigation projects" that "enhance the public health or the environment." *See* 42 U.S.C. § 7604(g)(2). So, even when that exception applies, penalties do not compensate monetary harms personal to citizen-enforcers. The NAACP also seeks civil penalties far exceeding $100,000. *See*, *e.g.*, Dkt. No. 1 at 42.

## CONCLUSION

For the foregoing reasons, the United States moves to intervene as a matter of right and respectfully requests that this Court dismiss the case. While the Court's role in acting on this filing is limited, *see Polansky*, 599 U.S. at 436 n.4, the United States stands ready to present oral argument if oral argument would assist the Court's review.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

June 15, 2026
DJ 90-5-2-1-13350

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**CIVIL MINUTES - GENERAL**

No. 3:26-cv-74

National Association for the Advancement of Colored People, et al. v. X.AI Corp., et al.

Place Held: Greenville, Mississippi

Date & Time Began: June 29, 2026, 1:32 p.m.
Date & Time Ended: June 29, 2026, 3:15 p.m.

TOTAL TIME: 1 hour, 43 minutes

---

HONORABLE DEBRA M. BROWN, CHIEF U.S. DISTRICT JUDGE, PRESIDING

LaToya L. Davis
Courtroom Deputy

Brenda Blackburn
Official Court Reporter

FOR THE PLAINTIFFS:
Elias Quinn
Benjamin Grillot
Carroll Rhodes
Rebecca Ramirez
Patrick Anderson
Elizabeth Putfark
Mary Rock

FOR THE DEFENDANTS:
Daniel Van Horn
Keri Herrington
Patrick Traylor
Michael Buschbacher
Jeremy Marwell

---

Proceedings: Telephonic Status Conference

Remarks: Conference held. Plaintiffs' deadline to respond to motion to seal extended to July 2. Parties must determine no later than July 1 if agreement can be reached regarding documents sought to be sealed and notify Court of such on July 2. State's motion to file amicus brief to be granted without opposition. Plaintiffs may raise their procedural concerns regarding United States' motion to intervene/dismiss by filing motion to strike no later than July 1; United States may respond no later than July 7. Using August 7 as potential date for pre-hearing status conference, parties must propose deadline for their prior exchange of witness lists, exhibit lists, and all exhibits; and deadline for submitting to Court their witness lists, exhibit lists, exhibits, and any objections to same. Parties must advise Court if September 4, 10, 11, and 18 are feasible optional hearing dates.

---

DANIEL B. MCHUGH, Clerk of Court

By: /s/LaToya L. Davis
LaToya L. Davis, Courtroom Deputy

# EXHIBIT 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE UNITED STATES' FILING AS PROCEDURALLY DEFICIENT**

In its "Motion for Intervention and Dismissal," the United States asks that this Court allow it "to intervene as a plaintiff and then dismiss this case." *See* Dkt. No. 58. The United States' motion is procedurally deficient for at least two reasons. First, the right to intervention cited in their papers was granted by Congress to the Environmental Protection Agency ("EPA"), which is not mentioned anywhere in the Department of Justice's filings. Second, intervening as a plaintiff requires filing a complaint and articulating a claim against the defendants. Fed. R. Civ. P. 24(c). Defendants did not do that here. Plaintiffs provided the United States the opportunity to correct these deficiencies with its filings. Counsel for the United States advised, "[w]e stand by our filings."[1] As such, Plaintiffs ask this Court, pursuant to Federal Rule of Civil Procedure 12(f)(2), to strike the United States' motion and associated memorandum in support (Dkt. Nos. 54 & 55) as procedurally deficient. Should the United States be given the opportunity to file

[1] *See* June 25, 2026 Email from Andrew Darlington (DOJ) to Elias Quinn (Earthjustice), Re: NAACP v. xAI – United States' Intervention Effort" (Ex. 1).

papers correcting these deficiencies, Plaintiffs ask that the United States' intervention effort not delay resolution of the Parties' timely motions.

**ARGUMENT**

According to its filings, the United States seeks to intervene as of right in this litigation under statutory right conferred by the Clean Air Act. The United States may have a path to participate in this lawsuit, but it has not provided a basis for its participation. The Department of Justice neither qualifies for the statutory right to intervene that it cited, nor satisfies the basic requirements for intervention set forth in the Federal Rules of Civil Procedure in its filings.

The United States proclaims (in Dkt. No. 59 at 2) that it enjoys a statutory right to intervene pursuant to 42 U.S.C. § 7604(c)(2). That provision of the Clean Air Act says that, "[i]n any action under this section, *the Administrator* [of EPA], if not a party, may intervene as a matter of right at any time in the proceeding." *Id.* (emphasis added). But there is no indication in the United States' motion or supporting memorandum that EPA or the Administrator have asked to intervene in this matter.[2] Here, counsel appear on behalf of the United States both in the docket and in the signature blocks of their filings, but do not list EPA or the Administrator. And when asked by news reporters, "[t]he Environmental Protection Agency . . . referred questions on the case to the Justice Department, saying it is not a party in the dispute."[3] The Department of

---

[2] While the Department of Justice often represents EPA in federal court, Congress's Clean Air Act recognized separate roles for the two agencies. *See* 42 U.S.C. § 7605 ("Representation in litigation"). The agencies also have a long history of implementing their distinct duties in litigation, from EPA's referral of litigation requests to DOJ, through the Administrator's concurrence in any settlement to which EPA is a party. *See* 42 Fed. Reg. 48942 (Sep. 26, 1977) (Memorandum of Understanding Between Department of Justice and Environmental Protection Agency).

[3] Matthew Daly & Bernard Condon, *In Boost to Musk, Justice Department Seeks to Dismiss Air Pollution Lawsuit Against xAI Data Center*, Associated Press (June 16, 2026), https://perma.cc/XT3M-WMXE.

Justice is thus endeavoring to intervene under a statutory right afforded to EPA's Administrator without the participation of that agency. *Contra* 42 U.S.C. § 7604(c)(2).

In any event, the Department of Justice's intervention effort falls short of what the Federal Rules of Civil Procedure require. To intervene as a party to the case, the United States must file a "pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). In doing so, it must provide "a short and plain claim showing the pleader is entitled to the relief," and a clear demand for relief. Fed. R. Civ. P. 8(a)(2), (a)(3). In the past—even the recent past—the Department of Justice has satisfied this requirement by filing a complaint in intervention on behalf of the EPA Administrator when it has sought to intervene as a plaintiff.[4] No such complaint was filed here. Courts resolve cases and controversies; the United States hasn't identified one it is a part of yet. While federal pleadings need not be "excessively technical," *Farina v. Mission Investment Trust*, 615 F.2d 1068, 1074 (5th Cir. 1980), without a pleading setting forth any claim—or, indeed, any justiciable interest—against the Defendants, the United States motion fails to satisfy the "Basic Rules." Fed. R. Civ. P. 8; *see also McVey v. Johnson* (*In re SBMC Healthcare LLC*), 519 B. R. 172, 184-85 (S. D. Tex. 2014) (motion to intervene "woefully inadequate" where it was not accompanied by a well-pled complaint and the motion "did not even allege causes of action against defendants").

---

[4] *See, e.g.*, Unopposed Motion to Intervene by United States of America, *Lower Susquehanna Riverkeeper Association v. Hanover Foods Corporation,* No. 21-cv-1600-JPW (M.D. Pa. Sept. 30, 2025), ECF No. 90 (moving to intervene in a suit brought under 33 U.S.C. § 1365(a) "on behalf of the U.S. Environmental Protection Agency" and attaching a "proposed Complaint in Intervention"); Mot. for Leave to Intervene, *Fisher v. Perma-Fix of Dayton, Inc.*, No. 04-cv-0418-CHG (S.D. Ohio May 19, 2006), ECF No. 38 (same, in a suit brought under Section 7604(a)); *see also* Mot. to Intervene, *Cruise Line Int'l Ass'n v. Suganuma*, No. 25-cv-00367-JAO (D. Haw. Nov. 21, 2025), ECF No. 69 (moving to intervene aligned with plaintiffs in a constitutional challenge to a state law and attaching a proposed Complaint in Intervention alleging claims).

Importantly, the Federal Rules require *each* purported party to articulate a claim or defense. As the United States told the Supreme Court not long ago: "A 'pleading that states a claim for relief must contain' a statement of the claim showing that 'the pleader'—not some other person—'is entitled to relief.'" U.S. Petition for Certiorari at 16, *Kane County v. United States*, Case No. 20-96 (Sup. Ct. July 24, 2020) (quoting Fed. R. Civ. P. 8(a)(2)). Plaintiffs agree. But the United States has not articulated a claim for relief against Defendants, nor offered any explanation for why it can evade this black-letter requirement in this instance. Indeed, as the United States further argued in its recent cert petition:

> Rule 24 provides that a putative intervenor's "motion to intervene * * * must * * * be accompanied by a pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). That mandatory language ("must") makes it "incumbent" upon a person desiring intervention both to file an appropriate "motion" to intervene and specify "'the claim or defense for which [it seeks] intervention.'" *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 548 n.9 (1986) (quoting Rule 24(c)). A putative intervenor therefore has "no right to participate in the proceedings * * * without first filing an appropriate motion or pleading setting forth the claim or defense that he desire[s] to assert." *Id.* at 548.

*See id.* at 15–16; *see also Shevlin v. Schewe*, 809 F.2d 447, 450 (7th Cir. 1987) (affirming a judgment over a putative intervenor's objection where it "failed to file any pleading on a timely basis as required by the rule"). By its own practices, then, the Department of Justice has "no right to participate in [these] proceedings" without first fixing its failure to set forth a claim or defense for which intervention is sought.

The Department of Justice's failure under the Rules impedes Plaintiffs' ability to meaningfully assess and plan for its potential participation in this case. Put aside for the moment the substance of the United States' argument, namely that the United States as *one* party can unilaterally and "voluntarily" dismiss all the claims of *another* party by citing to Federal Rule of

Civil Procedure 41.[5] The United States has yet to establish the basis by which it could be admitted as a party in the first instance, and so has failed to satisfy the first premise of its own (deeply flawed) argument. If this Court were to grant the United States' current request to intervene but deny its request to dismiss the case, there would be no statement of dispute between the United States and Defendant for this Court to adjudicate.

It's possible that the United States could correct its pleadings in other ways and pursue other bases for intervention in this case. First, the United States could seek intervention as a defendant rather than as a plaintiff. Since it declared "no relief" was appropriate from Defendants (Dkt. No. 59 at 15), the United States—by its own admission—has no "collision of interests" with the Defendants. *Indianapolis v. Chase Nat'l Bank of N.Y.*, 314 U.S. 63, 69 (1941). And, tellingly, during the Court's July 29 status conference, counsel for the Defendants sought the opportunity to file a response to this very motion in support of the United States' intervention.

Courts have long examined a party's proper alignment when policing procedural gamesmanship. For example, when reviewing whether parties appearing to create diversity jurisdiction are truly opposed, the Supreme Court explained:

> Diversity jurisdiction cannot be conferred upon the federal courts by the parties' own determination of who are plaintiffs and who defendants. It is our duty, as it is that of the lower federal courts, to look beyond the pleadings, and arrange the parties according to their sides in the dispute. Litigation is the pursuit of practical ends, not a game of chess.

314 U.S. 63, 69 (1941); *see also Griffin v. Lee*, 621 F.3d 380, 388 (5th Cir. 2010). Here, the United States transparently seeks plaintiff-status in this case in order to make use of a plaintiffs-

---

[5] This motion aims only to highlight the procedural infirmities of United States' motion to intervene. The substantive failures of the Governments' arguments regarding the operation of Rule 41 will be addressed in Plaintiffs opposition to the United States' motion to dismiss, due July 10 pursuant to this Court's Order. (Dkt. No. 40).

only tool: Rule 41 dismissal. The United States' attempt to intervene a plaintiff in this case is a chess move; it is not the pursuit of practical ends in a dispute with a party on the opposite side of the "v."

Alternatively, the United States could pursue limited party status pursuant to 28 U.S.C. § 2403, which allows the United States to intervene in matters involving the constitutionality of federal statutes "for the presentation of evidence" and for "argument on the question of constitutionality." But it has not sought to do so here. And, of course, intervention under that provision would limit the United States' participation as a party "to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality." 28 U.S.C. § 2403(a). *Accord Ruotolo v. Ruotolo*, 572 F.2d 336, 340 (1st Cir. 1978) (Section 2403 intervention did not give the United States a "justiciable issue" in the proceeding such that it could pursue the litigation after the original parties had settled).

Finally, if the United States cannot identify claims or defenses it seeks to present in this action and protect as a party, the United States could file its legal arguments as amicus curiae.

The United States can likely establish *some* basis on which it may participate in this case to *some* extent. But the United States' filing is inscrutable, seeking "Plaintiff" status, aligning with Defendants' arguments, and flatly refusing to pinpoint any controversy to be adjudicated. Whatever role it aims to play here—as Plaintiff (with a complaint supported by EPA), as Defendant (with a stated defense to the claims or interest in the relief sought), as a party limited to addressing a constitutional question, or as amicus—the United States must clarify the basis for and scope of its proposed participation in this case.

As such, Plaintiffs ask that this Court strike the United States' Motion to Intervene and Dismiss as well as its memorandum in support (Dkt. Nos. 54 & 55).

Dated: July 1, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiff,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**THE UNITED STATES' AMENDED MOTION
<u>FOR INTERVENTION AND DISMISSAL</u>**

The United States of America, acting on behalf of the Administrator of the U.S. Environmental Protection Agency, Lee M. Zeldin (together, the United States), respectfully moves to intervene as of right as a plaintiff and to dismiss this case. For the reasons explained in the accompanying Memorandum in Support, the Court should grant intervention to the United States and dismiss this private citizen lawsuit in full with prejudice.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

July 7, 2026

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiff,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 1

STANDARD OF REVIEW ........ 2

ARGUMENT ........ 3

I. The United States can intervene as of right under the citizen-suit provision. ........ 4

II. The United States may intervene without a complaint in intervention and, in any event, any technical noncompliance with Rule 24(c) should be excused. ........ 4

CONCLUSION ........ 12

## TABLE OF AUTHORITIES

**Cases** Pages(s)

*Aransas Project v. Shaw*,
2010 WL 2522415 (S.D. Tex. June 17, 2010) ....7

*Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*,
306 F.2d 862 (5th Cir. 1962) ....3

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
966 F.2d 470 (9th Cir. 1992) ....6

*City of Bangor v. Citizens Commc'ns Co.*,
532 F.3d 70 (1st Cir. 2008) ....6

*DeOtte v. State*,
20 F.4th 1055 (5th Cir. 2021) ....5

*Doctors Hosp. 1997 LP v. Beazley Ins.*,
2009 WL 3719482 (S.D. Tex. Nov. 3, 2009) ....7

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) (en banc) ....1, 4, 5, 9

*Farina v. Mission Inv. Tr.*,
615 F.2d 1068 (5th Cir. 1980) ....5

*Frazier v. Luther*,
2025 WL 2918830 (N.D. Miss. Oct. 14, 2025) ....3

*Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....1, 4, 5, 9

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) ....2

*In re SBMC Healthcare, LLC*,
519 B.R. 172 (S.D. Tex. 2014) ....10

*In re Toyota Hybrid Brake Litig.*,
2020 WL 6161495 (E.D. Tex. Oct. 21, 2020) ....7

*Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd.*,
722 F.2d 126 (5th Cir. 1983) ....6

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
677 F.2d 1045 (5th Cir. 1982)....................2

*Kane County v. United States*,
928 F.3d 877 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 1283 (2021)....................10, 11

*Massachusetts v. Microsoft Corp.*,
373 F.3d 1199 (D.C. Cir. 2004)....................7, 12

*Missouri v. U.S. Food & Drug Admin.*,
2025 WL 1223581 (N.D. Tex. Apr. 28, 2025)....................7

*Moore v. United Prop. & Cas. Ins. Co.*,
2026 WL 1753492 (E.D. La. June 17, 2026)....................7

*Newby v. Enron Corp.*,
443 F.3d 416 (5th Cir. 2006)....................10

*Peaje Invs. LLC v. Garcia-Padilla*,
845 F.3d 505 (1st Cir. 2017)....................5, 7, 9

*Providence Baptist Church v. Hillandale Comm., Ltd.*,
425 F.3d 309 (6th Cir. 2005)....................7

*Shevlin v. Schewe*,
809 F.2d 447 (7th Cir. 1987)....................9

*United States v. Coney*,
689 F.3d 365 (5th Cir. 2012)....................3

*United States v. Louisiana*,
543 F.2d 1125 (5th Cir. 1976)....................6

*United States v. Metro. St. Louis Sewer Dist.*,
569 F.3d 829 (8th Cir. 2009)....................6

**Statutes**

28 U.S.C. § 517....................10

28 U.S.C. § 2403(a)....................10

42 U.S.C. § 7401 *et seq*....................2

42 U.S.C. § 7604....................2

42 U.S.C. § 7604(c)(2) .......... 2, 4, 5

42 U.S.C. § 7604(c)(3) .......... 2

**Rules**

Fed. R. Civ. P. 8 .......... 7

Fed. R. Civ. P. 8(d) .......... 5

Fed. R. Civ. P. 12(f) .......... 3, 8

Fed. R. Civ. P. 24(a)(2) .......... 11

**Other Authorities**

C. Wright & A. Miller, 5C Fed. Prac. & Proc. Civ. § 1380 (3d ed. Apr. 2026 update) .......... 2

## INTRODUCTION

"[I]f the Executive Branch opposes a particular citizen suit" under the Clean Air Act, it may "intervene" and "bring the Government's views to the attention of the court." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000); *see Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 344 (5th Cir. 2024) (en banc) (Davis, J., concurring). That is what the Executive Branch has done in this case. Plaintiffs NAACP and NAACP Mississippi State Conference (NAACP) pursue a Clean Air Act citizen suit that threatens the country's national security and welfare. Dkt. No. 59 at 5-6, 8-9. The United States intervened to bring to the attention of this Court its view that this citizen suit should be dismissed. *Id*. at 1-2. The Clean Air Act and Article II afford the United States' Executive Branch primacy over enforcement of federal law relative to citizens. *Id.*

The NAACP moves to strike the United States' intervention filings pursuant to Federal Rule of Civil Procedure 12(f)(2). Dkt. Nos. 82, 83. The NAACP's motion should be denied. The NAACP's motion falls woefully short of the high bar for striking filings. Even worse, it bucks binding precedent in hopes of implementing its own environmental-enforcement goals using the Clean Air Act.

## BACKGROUND

The Clean Air Act provides for federal regulation, with state cooperation, in the field of interstate emissions. *See* 42 U.S.C. § 7401 *et seq.* As detailed in the United States' Memorandum in Support of Intervention and Dismissal, the U.S. Environmental Protection Agency (EPA) has broad power to administer and enforce the Act. Dkt. No. 59 at 2-4. The Act also contains a "citizen suit" provision to "supplement rather than to supplant" government enforcement. Dkt.

No. 59 at 4-5 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987)). The citizen-suit provision, 42 U.S.C. § 7604, enables the federal government to intervene in any citizen suit to protect the interests of the United States. Section 7604(c)(2) provides that, "[i]n any action under this section, the Administrator, if not a party, may intervene as a matter of right at any time in the proceeding." 42 U.S.C. § 7604(c)(2). Even at the point of resolution, the federal "Government" may intervene regarding proposed consent judgments in citizen suits where "the United States is not a party." *Id.* § 7604(c)(3). *Gwaltney* concerned the Clean Water Act and cases regarding that statute are, as explained in the United States' Memorandum in Support of Intervention and Dismissal, equally applicable in the Clean Air Act context here. Dkt. No. 59 at 4 n.1.

The NAACP filed this Clean Air Act citizen suit on April 14, 2026. Dkt. No. 1. On the same day that the defendants filed their Motion to Dismiss and their Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, Dkt. Nos. 54, 55, 60, 61, the United States filed its Motion for Intervention and Dismissal with a Memorandum in Support, Dkt. Nos. 58, 59. On July 1, 2026, the NAACP moved to strike the United States' intervention filings in their entirety under Rule 12(f)(2). Dkt. No. 82 (motion); Dkt. No. 83 (memorandum in support). The United States now, acting on behalf of the Administrator of the U.S. Environmental Protection Agency, Lee M. Zeldin (together, the United States), separately files an Amended Motion and Memorandum in Support of Intervention and Dismissal, and responds here to Plaintiffs' motion to strike.

## STANDARD OF REVIEW

Motions to strike are "disfavored." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982); C. Wright & A. Miller, 5C Fed. Prac. &

Proc. Civ. § 1380 (3d ed. Apr. 2026 update) (compiling cases). Rule 12(f) allows striking in limited circumstances—"[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Redundant" refers to "needless repetition," "[i]mmaterial" matter has "no possible bearing upon the subject matter of the litigation," "[i]mpertinent" matter does "not pertain . . . to the issues in question," and "scandalous" matter "improperly casts a derogatory light on someone." *Frazier v. Luther*, 2025 WL 2918830, at *2 (N.D. Miss. Oct. 14, 2025) (citation omitted).

As the text implies, Rule 12(f) sets a "high bar." *Id.* Striking a filing "is a drastic remedy to be resorted to only when required for the purposes of justice." *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868 (5th Cir. 1962) (marks omitted); *see also United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012). Motions to strike should be granted "only when the pleading to be stricken has no possible relation to the controversy." *Augustus*, 306 F.2d at 868. The movant must also "show[] prejudicial harm" caused by the material proposed to be stricken. *Id.*

## ARGUMENT

The NAACP falls far short of the high bar to justify striking the United States' intervention filings by ignoring binding precedent establishing the United States' right to intervene. The NAACP offers two supposed justifications for striking the United States' intervention filings. First, the NAACP contends that "the Clean Air Act grants a right of intervention to 'the Administrator' of the [EPA]." But the United States has filed an Amended Motion to Intervene that nullifies this contention. Second, the NAACP argues that the United States' intervention motion must be "accompanied by a complaint" to satisfy Rule 24(c)'s requirement for notice and pleading, but the United States' intervention is procedurally proper.

## I. The United States can intervene as of right under the citizen-suit provision.

The United States has filed its Amended Motion for Intervention and Dismissal in which it is acting on behalf of the Administrator of the EPA. The Amended Motion dispenses with Plaintiffs' contention that the United States may not intervene pursuant to 42 U.S.C. § 7604(c)(2), Dkt. No. 82 at 1. The United States properly moves by amendment to intervene under the Clean Air Act. As discussed further below, the United States can properly present the views of the Executive Branch, including under the Clean Air Act. *See Laidlaw*, 528 U.S. at 188 n.4.

## II. The United States may intervene without a complaint in intervention and, in any event, any technical noncompliance with Rule 24(c) should be excused.

Next, the Clean Air Act and Federal Rules of Civil Procedure enable the United States to intervene as necessary to exercise the Executive Branch's preclusive enforcement discretion to dismiss this case—without filing a complaint in intervention.

**A.** As an initial matter, the Clean Air Act enables the Federal government to "intervene" to "bring the Government's views to the attention of the court" when "the Executive Branch opposes a particular citizen suit." *Laidlaw*, 528 U.S. at 188 n.4; *see ExxonMobil*, 123 F.4th at 344 (Davis, J., concurring). This right is unconditional—the United States may intervene "as a matter of right *at any time* in the proceeding." 42 U.S.C. § 7604(c)(2) (emphasis added). This unconditional intervention right facilitates the United States' ability to deny consent for citizens' attempted enforcement of federal law, given that the Clean Air Act "authorizes citizen suits only with the consent of governing authorities." *ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting). And the statute speaks of no specific procedural requirements or prerequisites to intervene and deny consent for a citizen suit, much less any requirement that the government file a

complaint upon intervention (which would make no sense if the government does not wish to assert any claim). Congress' intentions are thus clear: the United States' opposition to a citizen suit enables it to intervene without filing a complaint of its own. Any requirement that the United States file a complaint in a citizen suit that it *opposes* would deprive it of its ability to determine no enforcement is warranted and deny consent for the suit.

Accordingly, Rule 24(c)'s "[n]otice and [p]leading" requirement, insofar is it requires typical plaintiff-intervenors to submit a complaint in intervention, does not qualify the United States' section 7604(c)(2) intervention right. 42 U.S.C. 7604(c)(2); *Laidlaw*, 528 U.S. at 188 n.4. But, even assuming that Rule 24(c) does, the United States' currently filed intervention motion and memorandum in support, and the amended filings, satisfy Rule 24(c). Dkt. Nos. 58, 59. The majority of "circuits . . . have eschewed overly technical readings of Rule 24(c)." *Peaje Invs. LLC v. Garcia-Padilla*, 845 F.3d 505, 515-16 (1st Cir. 2017). The Fifth Circuit is one of them—it applies a "permissive interpretation" of Rule 24(c). *DeOtte v. State*, 20 F.4th 1055, 1067 n.2 (5th Cir. 2021). That permissive interpretation tracks Rule 8's general rules of pleading, under which "[n]o technical form is required." Fed. R. Civ. P. 8(d).

Under the permissive interpretation, Rule 24(c) allows for intervention even where there is no formal intervention motion or "pleading" as specified in Rule 24(c). For example, in *Farina v. Mission Investors Trust*, the Fifth Circuit concluded that the Federal Deposit Insurance Corporation was a party although it only filed "a motion to remove," rather than "a motion to intervene[] as specified in Rule 24(c)." 615 F.2d 1068, 1075 (5th Cir. 1980). In *DeOtte*, the Fifth Circuit *reversed* a district court for denying intervention to the State of Nevada although Nevada filed no technical "pleading"; Nevada filed opposition memoranda to motions for summary judgment and injunctive relief. 20 F.4th at 1067 n.2, 1070 (noting the absence of a technical pleading

but concluding that "Nevada should have been granted intervention as of right"); *see* Dkt. No. 62, Case No. 4:18-cv-825 (N.D. Tex. May 24, 2019). And consider *United States v. Louisiana*, where the intervenor NAACP's "detailed, scholarly memoranda of law" accompanying its motion to intervene sufficiently apprised the district court of the grounds for intervention and the motion was denied on other grounds. 543 F.2d 1125, 1128 & n.4 (5th Cir. 1976). The Fifth Circuit is even "lenient in hearing the appeals of parties" that did not comply with Rule 24(c). *Int'l Marine Towing, Inc. v. S. Leasing Partners, Ltd.*, 722 F.2d 126, 129 (5th Cir. 1983).

Binding precedent thus establishes that the United States' intervention filings—which explain the government's reasons for intervention and request for dismissal—suffice for Rule 24(c) purposes. What matters under Rule 24(c) is that the intervenor affords the original parties sufficient notice of the grounds for intervention and the arguments to be raised. *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009) (a "statement of interest satisfie[d] Rule 24(c)"); *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992) (where the movant-intervenor simply sought relief from a protective order); *City of Bangor v. Citizens Commc'ns Co.*, 532 F.3d 70, 95 n.11 (1st Cir. 2008) (no abuse of discretion in the district court's "decision to elevate substance over form"). There can be no dispute here that the United States' Motion to Intervene and Dismiss, together with the Memorandum in Support, provide sufficient notice. The United States' intervention filings detail at length the government's statutory basis for intervention, the national security and general welfare interests that it seeks to protect, its request of the Court to dismiss this case, and its legal arguments in support of that request, along with two exhibits supporting the United States' decision to intervene and dismiss. Dkt. No. 59 at 5-24.

For the same reasons, even assuming that the NAACP has shown technical noncompliance with Rule 24(c), that is not a basis to strike (or even deny) the United States' intervention filings. Where intervention filings afford the original parties sufficient notice, "procedural defects in connection with intervention motions," like failures to attach formal pleadings, "should generally be excused." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1236 n.19 (D.C. Cir. 2004). So, in *Providence Baptist Church v. Hillandale Comm., Ltd.*, for example, the Sixth Circuit "conclude[d] that the district court abused its discretion in rejecting [a] motion to intervene on the basis that it failed to attach a pleading." 425 F.3d 309, 314-15 (6th Cir. 2005). Notwithstanding the lack of a pleading, "the parties [we]re clearly on notice as to [the intervenor]'s position and arguments," and "[t]he district court's exacting application of Rule 24(c) [wa]s not in accord with the jurisprudence of a majority of the Circuits" (including the Fifth Circuit). *Id.* The First Circuit similarly reversed a district court's "overly technical reading of Rule 24(c)" in *Peaje Investments* because the intervenor's brief in "opposition" to lifting a stay, "setting forth [the intervenor's] position," was sufficient. 845 F.3d at 515-16.[1]

---

[1] District courts within the Fifth Circuit are in accord. *E.g.*, *Aransas Project v. Shaw*, 2010 WL 2522415, at *7-8 (S.D. Tex. June 17, 2010) (granting intervention where the intervenor "intend[ed] to file" a dismissal motion because, while the intervenor did "not formally compl[y] with Rule 24(c)," it "presented the interests it seeks to protect, and clearly indicates its position in this litigation"); *Missouri v. U.S. Food & Drug Admin.*, 2025 WL 1223581, at *2 n.1 (N.D. Tex. Apr. 28, 2025) (declining to deny intervention based on failure to "produce a 'pleading'" because "[t]he Fifth Circuit is lenient on this technical requirement because of Federal Rule of Civil Procedure 8(d)(1) and 8(e), which require courts to abstain from requiring technical forms of pleadings or motions and instead construe them 'as to do justice'" (quoting Fed. R. Civ. P. 8)); *In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495, at *11 (E.D. Tex. Oct. 21, 2020) (considering intervention motion on its merits although it was not accompanied by a pleading, applying "the lenient approach taken by other courts in the Fifth Circuit"); *Moore v. United Prop. & Cas. Ins. Co.*, 2026 WL 1753492, at *1 n.4 (E.D. La. June 17, 2026) (granting intervention where the "intervenor put the parties on notice of his grounds for intervention," despite not doing so through a pleading (cleaned up)); *Doctors Hosp. 1997 v. Beazley Ins.*, 2009 WL 3719482, at *4 (S.D. Tex. Nov. 3, 2009) ("allow[ing] intervention without an express pleading," given the "obviousness" of the intervenor's interest).

The NAACP cannot credibly claim that it lacks sufficient notice of the United States' position and arguments here. The United States has identified in detail the "basis for and scope of its proposed participation in this case." Dkt. No. 83 at 6. Accordingly, technical compliance with Rule 24(c) or not, this Court should decline to strike the United States' intervention filings.

**B.** The NAACP's counterargument—that Rule 24(c) requires the United States to file a complaint pursuing claims against the defendants—fails. Dkt. No. 83 at 3-6. The NAACP elevates form over substance in defiance of longstanding Fifth Circuit precedent permissively applying Rule 24(c) to raise the United States' burden beyond what the Rules and binding interpretations require.

At the outset, the NAACP tries to have it both ways. It simultaneously invokes Rule 12(f) to strike the United States' intervention filings, while also arguing that those filings do not satisfy Rule 24(c)'s requirement for "notice and pleading." But Rule 12(f), by its express terms, allows a court to strike material "from a pleading." Fed. R. Civ. P. 12(f). The NAACP declines to explain why the term "pleading" in Rule 12(f) should be ignored for purposes of its motion to strike but gives an overly technical interpretation to assess whether the United States may intervene consistent with Rule 24(c). Indeed, any suggestion that "pleading" should be interpreted hyperliterally in Rule 24(c) would flout Fifth Circuit precedent.

The NAACP musters no authority to support its belief that a motion to intervene as a plaintiff, without a complaint in intervention, is a basis to strike the United States' intervention filings under Rule 12(f). All the NAACP offers is a nonbinding Seventh Circuit case, a bankruptcy case, and a 2020 Supreme Court certiorari petition filed by the United States. Dkt. No. 83 at 3-4. Not only are these authorities insufficient to overcome the binding precedent that sup-

ports the United States' intervention. *See* Argument § II.A. Each case also involved circumstances that are wholly irrelevant to the circumstances here. *See Peaje Investments*, 845 F.3d at 515 (Rule 24(c) must be construed in light of a case's "unique procedural context").

First, the NAACP's only circuit-level authority—*Shevlin v. Schewe*, 809 F.2d 447, 450 (7th Cir. 1987); *see* Dkt. No. 83 at 4. *Shevlin* did not concern a motion to strike intervention filings for failure to attach a complaint. Nor did it even concern a *denial* of an intervention motion. *Contra id.* (suggesting that *Shevlin* involved a "putative" intervenor). *Shevlin* concerned a party that the district court "*allowed*" to intervene—without having filed a "pleading"—after the original parties litigated a preliminary injunction. 809 F.2d at 449-50 (emphasis added). The original parties then moved to dismiss the action based on a settlement, and the intervenor submitted a "memorandum opposing the settlement and dismissal." *Id.* The Seventh Circuit affirmed over the intervenor's objection because, once the original parties settled, there were no claims left for the district court to adjudicate. *Id.*

*Shevlin*'s procedural posture makes it inapposite here. The United States has not asserted that this case must proceed without claims for this Court to adjudicate; it has asserted that this case must *end* because the NAACP's claims must be dismissed. Moreover, *Shevlin* itself explained that it "[d]id not advocate a strict interpretation" of Rule 24(c) "in all circumstances"—recognizing that Rule 24(c) must be viewed in the context of the specific case. *Id.* at 450. As already explained, in the specific context at issue here, the Supreme Court and seven Fifth Circuit judges have endorsed the Executive Branch's right to "intervene" to "bring its views" in opposition to a citizen suit "to the attention of the court." *Laidlaw*, 528 U.S. at 188 n.4; *ExxonMobil*, 123 F.4th at 344 (Davis, J., concurring). Neither the Supreme Court nor the Fifth Circuit has held, as the NAACP would have it, that the United States is relegated to an "amicus curiae"

when it informs a court of its opposition to a citizen suit. Dkt. No. 83 at 6. And neither court suggested that the United States is limited to the intervention right in 28 U.S.C. § 2403(a). *Id.*[2]

The NAACP's remaining authorities are equally unpersuasive. Dkt. No. 83 at 3-4. The bankruptcy case—*In re SBMC Healthcare, LLC*—mischaracterized Fifth Circuit precedent, which has not interpreted Rule 24(c) to disallow intervention anytime a party intervenes without attaching a complaint. 519 B.R. 172, 185 (S.D. Tex. 2014). All that leaves is the NAACP's misguided reliance on the United States' petition for certiorari in *Kane County v. United States*. Dkt. No. 83 at 4 (citing U.S. Pet. for Certiorari, No. 20-96 (S. Ct. July 2020) (hereafter, *Kane County* Petition)). The NAACP wrongly believes that the petition shows the United States is contradicting "its own practices" by intervening without filing a complaint in this case. Dkt. No. 83 at 4.[3]

*Kane County* concerned a county's lawsuit against the United States under the Quiet Title Act, 28 U.S.C. § 2409a, claiming that the county held title to certain rights-of-way for various public roads. *Kane County v. United States*, 928 F.3d 877, 882 (10th Cir. 2019), *cert. denied*, 141 S. Ct. 1283 (2021). Environmental groups sought intervention under Rule 24(a)(2), which

[2] The NAACP's concession that section 2403(a) provides an independent statutory basis for the United States' intervention without filing a pleading (Dkt. No. 83 at 6) is itself enough to deny the motion to strike. In addition to section 2403(a), "any officer of the Department of Justice" may "attend to the interest of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517.

[3] Relatedly, the NAACP offers a footnote that cites cases where the United States intervened in citizen suits and filed complaints. Dkt. No. 83 at 3 n.4. It fails to acknowledge, however, that the United States filed complaints in those actions because it agreed with the citizens' determinations that enforcement of federal law was *warranted*. The Executive Branch has made the opposite determination here. Dkt. No. 59 at 9. That does not mean the United States must intervene as a defendant rather than as a plaintiff for there to be a "case[] or controvers[y]" for this Court to adjudicate, as the NAACP argues in conclusory fashion. Dkt. No. 83 at 3, 5-6 (invoking irrelevant principles of diversity jurisdiction); *cf. Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006) ("there is no Article III requirement that intervenors have standing in a *pending* case").

allows intervention as of right by anyone who, among other requirements, "claims an interest relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2). The Tenth Circuit concluded that the putative intervenors' "environmental concern"—their desire to prevent harms from increased traffic on the roads—was an "interest" within the meaning of Rule 24(a)(2). *Kane County*, 928 F.3d at 892. The United States then sought certiorari on whether that specific "environmental concern" was an "interest" within the meaning of the rule. *Kane County* Pet. at I.

Those circumstances make *Kane County* wholly irrelevant to whether this Court should strike the United States' intervention filings for lack of a complaint in intervention. For one, the United States has not asserted a mere "interest" justifying intervention under Rule 24(a)(2) (though it obviously has such an interest); it has asserted the government's "unconditional right to intervene by a federal statute" pursuant to Rule 24(a)(1). *See* Dkt. No. 59 at 1. Second, insofar as the United States' petition addressed Rule 24(c), it interpreted how the rule applied in the specific context of *Kane County*—whether an intervenor's environmental concern justified intervention in a dispute about who owned title to certain lands. *See Kane County* Pet. at 14-16; U.S. Reply Br. at 2, *United States v. Kane County*, No. 20-96 (S. Ct. Nov. 2020). Rule 24(c)'s requirement for notice and pleading must likewise be construed in the specific context here, where, consistent with Article II, the government's right to intervention in Clean Air Act citizen suits necessarily includes the right to dismiss the citizen suit. Dkt. No. 59 at 8-23. It would be absurd to require a complaint in intervention in this specific context where the statutory intervention right includes a right to dismissal. In fact, not once does the NAACP specify "what type" of

complaint the United States could "have filed in a case such as this" where it opposes any Clean Air Act enforcement. *Microsoft Corp.*, 373 F.3d at 1236 n.19.[4]

## CONCLUSION

For the foregoing reasons, the NAACP's motion to strike (Dkt. No. 82) should be denied.

---

[4] The NAACP suggests that Rule 41 is not the correct procedural mechanism for dismissing this citizen suit, but it disclaims any request that the United States' intervention filings be stricken on that basis. Dkt. No. 83 at 4-5 & n.5. Regardless, Rule 41 is the proper mechanism for the United States to dismiss a citizen suit upon intervention.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

July 7, 2026

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**CIVIL MINUTES - GENERAL**

No. 3:26-cv-74

National Association for the Advancement of Colored People, et al. v. X.AI Corp., et al.

Place Held: Greenville, Mississippi

Date & Time Began: August 5, 2026, 3:34 p.m.
Date & Time Ended: August 5, 2026, 4:06 p.m.

TOTAL TIME: 32 minutes

---

HONORABLE DEBRA M. BROWN, CHIEF U.S. DISTRICT JUDGE, PRESIDING

LaToya L. Davis
Courtroom Deputy

Brenda Blackburn
Official Court Reporter

FOR THE PLAINTIFFS:
Benjamin Grillot
Carroll Rhodes
Rebecca Ramirez
Elizabeth Putfark
Mary Rock
Lauren Godshall
Patrick Anderson

FOR THE DEFENDANTS:
Daniel Van Horn
Keri Herrington
Patrick Beckett
Michael Buschbacher
Patrick Traylor

---

Proceedings: Telephonic Status Conference

Remarks: Conference held. Tentative August 7 pre-hearing conference will not be held.

---

DANIEL B. MCHUGH, Clerk of Court

By: /s/LaToya L. Davis
LaToya L. Davis, Courtroom Deputy

# EXHIBIT 15

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ET AL — PLAINTIFFS

VS. — NO. 3:26-CV-74

X.AI CORPORATION ET AL,
MZX TECH, LLC — DEFENDANTS

TELEPHONIC STATUS CONFERENCE HEARING

BEFORE HONORABLE DEBRA M. BROWN
CHIEF UNITED STATES DISTRICT JUDGE

Greenville, Mississippi

August 24, 2026

APPEARANCES NOTED HEREIN

Court Reporter: BRENDA D. BLACKBURN, RPR, CCR #1087
FEDERAL OFFICIAL COURT REPORTER
305 Main Street
Greenville, Mississippi 38701

APPEARANCES

FOR THE PLAINTIFFS:

BENJAMIN GRILLOT - PHV, ESQUIRE
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave NW, Suite 600
Washington, DC 20001

CARROLL EDWARD RHODES, ESQUIRE
CARROLL E. RHODES, ATTORNEY
Post Office Box 588
Hazlehurst, MS 39083-0588

ELIAS L. QUINN - PHV, ESQUIRE
MARY K. ROCK - PHV, ESQUIRE
EARTHJUSTICE
1250 I Street
Washington, DC 20005

ELIZABETH PUTFARK - PHV, ESQUIRE
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Ste 400
Charlottesville, VA 22902

LAUREN E. GODSHALL - PHV, ESQUIRE
REBECCA RAMIREZ - PHV, ESQUIRE
EARTHJUSTICE GULF REGION
845 Texas Avenue, Suite 200
Houston, TX 77002

PATRICK ANDERSON - PHV, ESQUIRE
SOUTHERN ENVIRONMENTAL LAW CENTER
10 10th Street, Ste 1050
Atlanta, GA 30307

APPEARANCES

FOR THE DEFENDANTS:

CHRISTOPHER V. POPOV - PHV, ESQUIRE
VINSON & ELKINS
845 Texas Avenue, Suite 4700
Houston, TX 77002

DANIEL WARREN VAN HORN, ESQUIRE
BUTLER SNOW
6075 Poplar Avenue, Suite 500
Memphis, TN 38119

JAMES R. CONDE - PHV, ESQUIRE
BOYDEN GRAY PLLC
800 Connecticut Avenue NW, Suite 900
Washington, DC 20006

JEREMY CHARLES MARWELL - PHV, ESQUIRE
PATRICK D. TRAYLOR - PHV, ESQUIRE
VINSON & ELKINS
2200 Pennsylvania Avenue, NW, Suite 500 W
Washington, DC 20037

MICHAEL B. BUSCHBACHER - PHV, ESQUIRE
BOYDEN GRAY PLLC
800 Connecticut Avenue NW, Suite 900
Washington, DC 20006

PATRICK RYAN BECKETT, ESQUIRE
BUTLER SNOW LLP
P. O. Box 6010
Ridgeland, MS 39158-6010

KERI ELIZABETH HERRINGTON, ESQUIRE
BUTLER SNOW LLP
1020 Highland Colony Pkwy, Ste 1400
Ridgeland, MS 39157-2139

(Convened: 3:04 p.m.)

**THE COURT:** Good afternoon everyone. This is Judge Brown. This is a status conference in NAACP versus X.AI, 3:26-CV-74.

With regard to everyone on the call, some of you I'm not sure that it was clearly heard as to who was on the call. So before we get off the call, I'm going to have you all confirm who was on the call with my courtroom deputy before we conclude. But I do want to go ahead and proceed right now.

As usual, because we have a large number of persons on the call, if you speak, you must identify yourself. To facilitate things during this call, I'm going to ask you to wait until you are called upon before you speak. Given the large number of attorneys, any future conferences will likely be set by Zoom or some form of video to allow you to raise your hand, or so that I can recognize anyone who speaks and see who is speaking without you having to remember to identify yourself. Otherwise, I would think that it helps all-around for you to do that.

I want to start by just going through a few topics, and then I will, of course, allow you-all to comment and ask questions. But I want to get through this as efficiently as possible.

I mentioned to you-all earlier that I wanted the

opportunity to consider the pending motions to the extent their outcome would influence how this case proceeds. And I wanted to be able to do that without continuous additional or supplemental filings with respect to the preliminary injunction motion.

Having considered the motions, and very much appreciate the opportunity to consider the motions, I want to first advise you-all how I intend to rule pending my issuance of opinions on the motions.

I intend to deny the defendant's motion to dismiss. I intend to deny the plaintiff's motion to strike. And I intend to deny the United States' motion to intervene. Written opinions will be issued on those motions. But, again, I wanted to give you-all an idea about the rulings for purposes of us proceeding with the preliminary injunction hearing. Those rulings mean, of course, that there will indeed be a hearing on the plaintiff's motion for a preliminary injunction.

So our next topic will, of course, be the hearing date. The August 24th setting, which was set for today, was continued until further notice. There were optional dates in September that I mentioned to you-all. I did receive some feedback, if I recall correctly, from you-all about those September date options. Those optional September dates, however, are generally no longer available for the

Court. In the effort to set a firm date that will not be subject to any changes on the Court's schedule, the preliminary injunction hearing will be set for a date in October. I will provide you-all not necessarily with options but let you know the dates that the Court cannot proceed in October, and then you-all can get together amongst yourselves and with any potential witnesses you want to call and try to come up with a date that works for everyone. So, we'll come back to that topic. But I wanted to let you-all know as it now stands that your preliminary injunction hearing will not take place in September, but we will strive to find a mutually available date in October.

With respect to the hearing structure and format, the structure and format that was proposed by you-all as set forth in Mr. Marwell's email is generally acceptable to me. The understanding that the hearing will address only the preliminary injunction motion is correct. Regarding objections, I've come to the conclusion that I think it's best for you-all to plan as if each side will be allowed to present the evidence that they wish to the extent that that evidence had been shared with the opposing side. Now, that does not mean that the Court will consider all of it. But as with any bench hearing, it will allow those matters to be put in the record and to have the record preserved in that respect to the extent that any party at any point in time

wants to address on appeal, or for reconsideration, or for any other reason anything that the Court allowed, and anything that the Court disallowed or did not consider with respect to an ultimate ruling on a preliminary injunction motion.

The email did ask about whether or not evidence can be admitted or referenced by matters that are already on the docket. That is acceptable to me, as long as it is acceptable to you-all. So, evidence can be admitted by incorporation to matters that have already been filed on the docket. Just make sure that it is clearly referenced during the hearing so that there will be no confusion about what is asked to be admitted, and certainly what I do indeed admit or don't admit for purposes of the hearing.

Now, this whole issue of amended documents -- and I do acknowledge that Mr. Marwell's email did say that these matters could and still can, I will say, be taken up at a prehearing conference. The email mentioned about me taking under advisement the question of when and whether the parties would be allowed to place amended documents on the docket. Frankly, I'm still considering that. But I think that in allowing you-all to present whatever evidence you want at the preliminary injunction hearing, that those matters could still be considered for purposes of the motion. And to the extent that they would be exhibits or

anything else, I'm thinking that would probably be, and the way that I best prefer, that we deal with amended documents. As I mentioned before, at some point the record on what the Court considers for purposes of the preliminary injunction motion, it just will have to be closed at some point without these continuous supplemental or amended documents. So, although while I'm still pondering that, I believe that that is the way that I will prefer for you-all to deal with that. Again, I'm still thinking about it, but just wanted to mention it for purposes of your email.

Regarding the objections that I just mentioned, I think that subject to anything being changed about it in a prehearing conference that I can deal with objections on the back end. Again, my thought is that will allow you-all to put forth the evidence you want to put forth and then let me decide whether or not I'm going to consider it. The record will be made in full in that respect and it -- well, it could be more advantageous for you-all to prepare for the hearing knowing how the Court may rule on the objections. At this point, without knowing fully everything that will be provided that may not have already been mentioned in the submissions on the motions, I just don't want to limit anyone in that respect or the Court's consideration about that at this point to the extent that something during the hearing may change any prehearing ruling on the objections.

I do want to speak with you-all as well about -- well, let me take up the issue of protective order first. I'm fine with that if you-all have some type of agreed protective order that you want to submit with regard to matters that are anticipated to be admitted at the hearing or at least offered at the hearing. I would just need to see it, but I am certainly amenable to it.

One thing I had on my list of things to speak with you-all about is related to that topic. I have had requests from reporters to be present during the hearing. And in that respect, I realize that there could be and probably will be some evidentiary matters that the parties will offer that they are requesting that either to be sealed or at least access to them to be restricted. But I did want to mention to you-all and ask your opinion about how you want to handle that.

Mr. Marwell's email mentioned about sealing a portion of the hearing. And I'm not saying that that is not something the Court wouldn't consider. But I do not intend on the front end to completely close the hearing. How we deal with that will certainly have to be planned, of course. You-all will need to let the Court know when you plan to present something that may be subject to either a protective order or is something that you've been allowed to submit either as a completely sealed matter or as a restricted

access matter. So that is something that we will all have to navigate as we proceed through this. Because I certainly am not going to exclude reporters from the courtroom. But I will want everyone to be on the same page about how we're going to deal with those restricted and/or sealed matters. I'm aware, of course, of some of them. But to the extent there may be additional things that have not been presented to the Court and that the Court has not had the opportunity to rule on with regard to whether or not the matter will be sealed or restricted, that is what we will have to navigate primarily more than anything.

I think the last thing that Mr. Marwell mentioned in his email was about the United States' participation. I have indicated to you-all that I intend to deny the United States's motion to intervene. I'm sure word of that will get back to the United States counsel, because I have not allowed them to participate in any status conferences unless and until I actually allow intervention. Because at this point I intend to deny the motion to intervene, then the issue of the United States' participation is not something that I believe needs to be addressed for purposes of the preliminary injunctions here.

All right. I think those are all of the topics that I wanted to cover. So, now I want to see, and I want to call upon each side and perhaps each counsel to the

extent that it seems that in some of these past conferences we've had the same attorneys generally speak on behalf of the plaintiffs and on behalf of the defendants. So I'm going to start with counsel for the plaintiffs. Whoever wants to speak up first, that is fine. But identify yourself first so that I will know who is speaking, and then you may make any comments or ask any questions that you wish. Before we leave one topic or another, if defendants need to respond, that's fine. We can do that. But I do want this to be orderly. And as I said before, what I will try to do when we have future conferences is either set them by Zoom, or by video in some form such that we won't have this issue with me having to call upon you-all. Because, if nothing else, I do understand that attorneys want to speak when they would like to speak.

But for purposes of where we are now, let me first ask the plaintiffs' attorneys, do you have any comments or questions that you would like to address to anything that the Court has just mentioned?

**MR. QUINN:** Good afternoon, Your Honor. This is Elias Quinn on behalf of plaintiffs. Thank you very much for the clarification and the many comments, I think, setting out an orderly process. You've addressed many of my questions already.

The first one that comes to mind is with regards to

that last topic you just mentioned, the United States' opportunity to participate. I understand that Your Honor intends to deny the motion to intervene. I, of course, don't know the full landscape of the reasoning or holding there. But I'm curious as to do you anticipate the United States having the opportunity to refile or correct? I just wanted to make sure that was considered in the timing, or if I understand that. I heard you suggest that there wouldn't be need to consider the United States' participation. I wanted to just make sure I understood that point.

**THE COURT:** If you're asking whether or not once the Court issues a written ruling denying the motion whether or not I will allow the United States to try again essentially, is that your question, Mr. Quinn?

**MR. QUINN:** That is essentially my question, Your Honor. Thank you.

**THE COURT:** I don't know if I could answer that at this point. To the extent that you were asking for purposes of whether or not any new or reurged or revised motion by the United States would affect the date of the preliminary injunction hearing, it would be my hope to avoid that occurrence. I don't --

**MR. QUINN:** Thank you, Your Honor. That --

**THE COURT:** Oh. Just a second, if you don't mind. I'm trying to think ahead as well. I don't know at this

point whether or not I would tell the United States that you can't refile or, you know, try some other approach to intervene. I don't know if I can answer that question at this point. My intent, however, is to not delay this firm date that we are going to arrive at in October, the preliminary injunction hearing. So I think that that probably doesn't fully answer your question. But I hope that it is responsive to some degree.

**MR. QUINN:** Thank you, Your Honor. Elias Quinn again. That does answer my question. My -- it was mainly a concern about timing. If you would like to provide others with the opportunity -- other parties or defendants with the opportunity to speak on that matter? Otherwise, I have another question.

**THE COURT:** Let's just stay with you asking and speaking on behalf of the plaintiffs at this point, and we can certainly double back. But please go ahead, Mr. Quinn.

**MR. QUINN:** All right. Thank you.

Thank you. I need clarification on the -- the amended motion's process, just to make sure that I understand. My understanding is that the things or evidence that has already been docketed will be considered properly before the Court for consideration of the motion and any new evidence or topics of amendment would be raised, as long as they were shared between the parties, at the hearing with

any objections presented at the hearing and to be resolved following the hearing but no -- nothing new would be docketed on the matter at this time. Is that correct?

**THE COURT:** Generally, yes. That is correct.

**MR. QUINN:** Okay.

**THE COURT:** I've realized that the defendants provided by mail to chambers some amended documents. Declaration, and some additional documents. And, yes, I did tell you-all that I did not want them filed on the docket at this point. And what I mentioned earlier is for -- is to allow, however, so long as those documents -- any amended documents, including the ones that were submitted to the Court by email by the defendants, you will -- the defendants would be allowed to present those during the preliminary injunction hearing. But I want all of you-all to be mindful of, as I said before, this record on the submissions has to close at some point. Allowing them to be presented during the preliminary injunction hearing is to preserve the record and to the extent -- and I don't know this for sure at this point -- but to the extent the information is purely supplemental, meaning, or amended for the purpose of saying something else happened after this particular date, that I want to provide to the Court as opposed to I need to provide this to the Court because as of the date that the documents were filed on the record, they were incorrect, and I want to

distinguish between those two different things. And let me make sure I'm clear about that. If something has already been filed on the record and as of the date that it was filed, it was incorrect, that's one thing. It is another thing to want to provide an update to the Court about events that have happened after the date of the submissions that have already been filed on the docket.

So ultimately, what I'm saying is if there are updates that don't have to have anything to do with correcting representations that were provided to the Court as of the date those representations were filed on the docket, then they can be presented during the preliminary injunction hearing. They will be part of the record in that respect. And I'm thinking, as I speak, I may need to give you-all a cutoff date for even providing things to the other side. Because you-all are going to have to prepare for this hearing. And I think that probably would be prudent to do at this point. For instance, I don't want it to be a situation where you-all are the day before receiving new information. One side receiving new information from another side that the other side hasn't had the opportunity to prepare for.

I think I probably have gone off on a tangent with respect to your question, Mr. Quinn. But I wanted to distinguish between those two things I was talking about,

either updating the Court with information and not trying to correct information as represented as of the date that it was provided to the Court. That's one thing. Any update will be allowed to be presented at the preliminary injunction hearing. And I think you-all probably need to get together and decide what's a good cutoff date for that. And if you can't decide, then I'll decide. Because I don't want anyone to be caught offguard with anything presented, you know, the day before or at least some period before the hearing where the other side doesn't have the opportunity to prepare for it and prepared to address it.

And I think I may have answered your question, Mr. Quinn. And if I wasn't clear before, if things are already on the docket, there's no need for you to reintroduce that matter. You can refer to it and introduce it and ask for it to be introduced by reference to it on the docket. If that will save anyone paper and all of that, is where I'm going. That was my intent of that comment.

But, Mr. Quinn, did I answer that question clearly? Maybe not.

**MR. QUINN:** Yes, Your Honor, I -- and then some. I think I understand the process now. And I'm sure that counsel for defendants and us could get together and elect an appropriate cutoff date for updated information.

**THE COURT:** All right.

Now, if there is some update information, you can continue to submit it to chambers. It really came down to whether or not I wanted you to go ahead and file it on the docket at this point. But I would like to know if you-all are providing updated information to each other. You might as well keep me in the loop on that, so that, again, I will know what's being passed between you.

All right, Mr. Quinn, anything else?

**MR. QUINN:** Those were the two pressing questions. I may think of something else. But I'm happy to turn it over at this point. Thank you, Your Honor.

**THE COURT:** All right. On the defendants' side, I think either Mr. Van Horn and/or Mr. Beckett have been speaking for the most part, and Mr. Traylor. So, let me turn it over to the defendants for questions, comments, anything you'd like to raise.

**MR. VAN HORN:** Your Honor, this is --

**UNIDENTIFIED SPEAKER:** Good afternoon, Your Honor.

**MR. VAN HORN:** -- Danny Van Horn from Butler Snow. I think Mr. Traylor or Mr. Popov will handle the questions for the defendant.

**THE COURT:** Okay, who is that just speaking right now?

**MR. VAN HORN:** This is Danny --

**UNIDENTIFIED SPEAKER:** Your Honor, this is --

**MR. VAN HORN:** -- Van Horn.

**THE COURT:** Mr. Traylor --

**MR. VAN HORN:** Thank you, Your Honor, this is --

**THE COURT:** I'm sorry.

**MR. VAN HORN:** -- Danny Van Horn. I'm sorry, Your Honor. I'm sorry.

**THE COURT:** Okay. That was Mr. Van Horn who just spoke; correct?

**MR. VAN HORN:** It was, to introduce Mr. Traylor or Mr. Popov to give the defendants' questions.

**THE COURT:** And the person who just said that very thing, that was Mr. Van Horn?

**MR. VAN HORN:** Yes, ma'am.

**THE COURT:** Okay. So, Mr. Traylor, or Mister-- well, let me just -- let me not even call upon. Assuming Mr. Van Horn's presentation about who was going to speak next is accurate, please do so and identify yourself first.

**MR. POPOV:** Thank you, Your Honor. Good afternoon. This is Chris Popov. I'm with Vinson and Elkins here on behalf of the defendants X.AI Corporation and MZX Tech. I'm a new name for you. This is my first live appearance on the case.

Thank you to Judge Virden for signing my *pro hac* application last week, and for your chambers in processing

my ECF registration. I just wanted to confirm for the record that I have made proper notice appearance, and I'm a new -- new lawyer in the case for the defendants.

I appreciate all of the information Your Honor gave. I think that answers most of the questions that we joined wanting to ask. I certainly agree that we will be able to work out with opposing counsel a timeline for exchange of information, any supplemental or updated information in advance of the hearing, and we will submit to chambers any updates that we exchange with the other side so Your Honor is clear on what the record looks like.

One question I have is when Your Honor looks at dates for us in October, are you anticipating giving us a date for the preliminary injunction hearing and for a prehearing conference?

**THE COURT:** Yes.

**MR. VAN HORN:** Okay, great.

And then my only other question, Your Honor, is we heard your comments about sealing the courtroom, and we certainly would not ask or anticipate that the entirety of this hearing would need to be sealed. Is it a fair -- is it a fair takeaway of your comment that you want the parties to work together on segregating any aspects of the presentation that would need to be sealed and perhaps put those at the back end of the presentation so that the majority of the

hearing could be live and open to the public?

**THE COURT:** I think that would be prudent. If we follow what is in Mr. Marwell's email about who presents first and that type of thing, you -- and I'll just leave it up to you-all -- it may be that the plaintiff's presentation they may want to do that and go ahead and put all of their information into the record as far as the hearing is concerned and ask their witnesses questions that they have and that type of thing as opposed to us just waiting until the end to bring in everybody's sealed and restricted matters. You-all think a little bit more about that, and I will too. And same thing for the defendants. You know, you may not want your presentation interrupted if it means that we -- that you're not going to be able to present everything during your turn, or we're having to move everything to the end. It's difficult for me to say what is the best way to do that at this point, only because I'm not -- I'm not entirely sure of everything that the parties want to submit. If you-all would coordinate, then, with one another. Again, because if it's something you agree to, I'm sure I would not have any issue with that so long as you-all agree. If it ends up that we have all public stuff presented first by both sides, and then we close the courtroom after that time and restrict the record after that time, then that's fine, too. If you-all agree how to proceed with that, I don't

believe it will be a problem. I wanted to mention it because of the reasons that I have been receiving inquiries from the media. And I know that there are certain things that have already been put into the record with restricted access. So I just want everyone to start thinking about logistically how we were going to make that work, such that anything that the Court has already ordered will be sealed or restricted and may in the future order to be sealed or restricted will be respected.

**MR. POPOV:** Understood, Your Honor. And we'll work together to try to come up with something that is workable. And I think we all understand the big picture where you're going. You're not sealing the whole hearing. You want us to work together in a way that's sensible so that we can admit this information without excluding everybody from the entirety of the hearing. And we'll work on a proposal to that extent.

**THE COURT:** Thank you.

**MR. POPOV:** Final question, Your Honor. You mentioned that there would be forthcoming written rulings on the motions that you announced an oral decision on today. Does Your Honor anticipate issuing those orders -- those written orders in advance of the TI hearing so that we have the benefit of any legal findings or conclusions that the Court has made in the lead-up to the preliminary injunction?

**THE COURT:** That is a good question. I don't know if I could answer it at this point, just because there are other things going on in other cases that may preclude that or not. I do understand that those rulings would assist you-all with a preliminary injunction hearing. My first threshold with respect to them was -- and the reason I wanted to let you-all know about them, because as we talked about before, depending on how I ruled on some of them in the first instance could have determined whether or not we were even going to have this preliminary injunction hearing. So, now that I've gotten past that first threshold as far as my review of them is concerned, the written ruling -- the written opinions, rather, I mean, I could actually issue a simple order, you know, consistent with what I've told you-all on the phone, it's really the reasons for it that is going to explain the ruling. And I realize that will be helpful. I cannot make any promises at this point, just given my schedule, if those will be issued prior to the preliminary injunction hearing. And, again, I do realize that they will assist you-all in your preparations. If I'm able to do that, I will. And if not, we will just have to proceed.

**MR. POPOV:** Understood. Thank you, Your Honor. And, obviously, the point was not to rush the Court. It's just that so that we prepare our remarks and our

presentations in a way that is most useful to you and is not rearguing things that you have already decided, for example, with respect to the motion to dismiss. So, that would be helpful for us. But we certainly understand that we are not the only case on the docket.

**THE COURT:** I will tell you that if those written opinions are not out before the preliminary injunction hearing, perhaps at the pretrial conference, I can discuss with you-all certain matters that would help your plan -- your plans for the presentations at the preliminary injunction hearing. And that probably is a more viable option at this point. But, again, it's hard to -- I don't want to tell you-all something that just may not happen. But I could probably at this prehearing conference provide you some guidance.

**MR. POPOV:** Thank you very much, Your Honor. Those are all the questions I have.

**THE COURT:** We're still soliciting -- well, maybe that's not a good word. Well, I'm offering an opportunity for defense counsel to make comments; ask questions. Are there anymore questions and comments from defense counsel? It won't be the last time you have to ask a question. Because, if you don't at this point, I'm going to go back to the plaintiffs, and then I will come back to you. But right now --

**MR. TRAYLOR:** Well, Your Honor --

**THE COURT:** -- anything further from defense counsel?

**MR. TRAYLOR:** Your Honor, this is Patrick Traylor. Nothing from me.

**THE COURT:** Okay. I'm going to go back to the plaintiff, but before I do, I'm glad, Mr. Popov, you mentioned the *pro hac vice* petition. We've been getting a lot of them, as you can imagine, and you have seen. And the Court tries to rule on them as soon as it can. But I just wanted to let you-all know, if there are any additional *pro hac* petitions that you-all think are coming -- and I know we don't have a date for this hearing yet because we're going to go back to that in a minute. But just -- I just wanted to stress that unless anyone has been made counsel of record by a *pro hac* petition that has been granted, then that attorney will not be allowed to participate within the hearing. I can't stop you from coming in the courtroom. But as far as you participating as counsel in the hearing. So, if any -- if there are any other attorneys on behalf of these parties who want to be admitted *pro hac*, I would just encourage you to get those petitions in as early as possible.

Okay, let me go back to the plaintiffs. Any other questions, comments from the plaintiffs' side?

**MR. QUINN:** Thank you, Your Honor. Elias Quinn again for plaintiffs. I did think of one more question. As we were discussing with defendants in anticipation of this hearing, it seems like with the number of witnesses, we anticipate spilling into a second day's worth of time. So, I wanted to ask are we -- when we are looking for October dates, are we looking for two consecutive days to schedule this hearing?

**THE COURT:** You-all know best about how much time it will take for each side to present whatever they want to present at the preliminary injunction hearing. If you-all think it's going to take two days, you need to let me know, and certainly when you propose these dates, let me know that at that time. Currently, I believe I will be able to accommodate back-to-back dates. If there are two dates and they are on different -- you know, they are not consecutive, that would be fine with the Court. Because that's -- that would mean you-all having to organize yourselves a bit better. But if it is going to be more than one day, I think I would prefer that it be back-to-back dates. But if not, then you-all take that into consideration when we start discussing these optional October dates.

Does the -- well, we -- you-all tell me. What were you thinking? I don't know if we ever discussed this at an earlier point. Are you-all thinking it may take more than

one day?

**MR. QUINN:** Your Honor, the conversations between the parties suggested it would spill into two days. It was looking, like, five or six witnesses between the two parties for presentation, which we may try to streamline that so that we can present a one-day option. But I just wanted to understand for scheduling purposes if we came back with two days, if that would work. So we'll get together and make a proposal, I think.

**THE COURT:** All right. I think you identified yourself, Mr. Quinn. But if you didn't, I know that that was you.

And, again, I wouldn't have any problem with two days. I certainly can fit that in in October.

Anything else from the --

**MR. QUINN:** Your Honor, it -- nothing else for plaintiffs. Appreciate it.

**THE COURT:** Let me go back to defendants then.

**MR. POPOV:** Your Honor, this is Chris Popov for the defendants. Nothing further from us.

**THE COURT:** I think, then, that I've covered everything that I wanted to cover with you-all. For what it's worth, just so you-all know, I do anticipate that the October hearing will be in our new courthouse. We will renotice, once we have set the October date -- well, right

now, we're going to go ahead and set it for the existing courthouse. Once I know for sure the timing of when we will be in the new courthouse, we will reset it and the notice will have the updated address on it. Even if you came to the old courthouse for the date that we set it for, it is just a block and a half away. So you can get over there in time. But I wanted to at least give you-all a heads-up about that. I don't think that anyone will be upset with that frankly. But I did want to give you-all a heads-up about it.

All right, if you-all will bear with me just a minute, I want to go over my notes and make sure that there was nothing else that I wanted to mention to you.

**MR. VAN HORN:** Your Honor, this is Danny Van Horn. I'm with the defendants. You said earlier you were going to give us dates in October the Court was not available.

**THE COURT:** Thank you.

Okay. For sure, the dates when the Court is not available: October 7th, October 14, October 23; at least the morning of October 8. And forgive me for going not in an order here.

Just one second. Let me check a few other things.

The week of October 13, I do have criminal trials set. Some of them will be continued. Some will be resolved, I feel. If there is nothing else that may be a

contingency, it would be criminal trials that week. But as I am looking through them, I do not believe any of them will go forward for one reason or another, primarily because I think all will seek a continuance or the Court will receive a plea agreement -- a proposed plea agreement before. But that is the only contingency I think that I cannot predict at this point, although I think it is very doubtful. Everything else, I believe I can navigate around. I hope that's helpful.

Any other questions? Comments?

**MR. QUINN:** Elias Quinn for plaintiffs. Nothing from us, Your Honor. Thank you.

**MR. POPOV:** Chris Popov for the defendants. Nothing further from us, Your Honor. This is Chris Popov.

**THE COURT:** I have nothing further as well. So thank you-all for your participation. And I know that we certainly will be in communication as the days go on. You-all have a great afternoon.

**UNIDENTIFIED SPEAKER:** Thank you, Your Honor.

**UNIDENTIFIED SPEAKER:** Thank you, Your Honor.

**MS. PUTFARK:** Thank you, Your Honor.

**UNIDENTIFIED SPEAKER:** Thank you, Your Honor.

**UNIDENTIFIED SPEAKER:** Thank you, Your Honor.

(Adjourned: 3:50 p.m.)

CERTIFICATE

I, Brenda D. Blackburn, Federal Official CourtReporter, in and for the United States District Court for the Northern District of Mississippi, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing 28 pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Witness my hand, this 25th day of August, 2026.

BRENDA D. BLACKBURN, RPR, CCR NO. 1087
FEDERAL OFFICIAL COURT REPORTER

# EXHIBIT 16

| | |
|---|---|
| **From:** | Danny Van Horn |
| **To:** | "Judge_Brown@msnd.uscourts.gov" |
| **Cc:** | "Ben Grillot"; "crhode@bellsouth.net"; "equinn@earthjustice.org"; "Elizabeth Putfark"; "lgodshall"; "mrock"; "Patrick Anderson"; "rramirez"; "james.beers@troutman.com"; "jconde@boydengray.com"; "jmarwell@velaw.com"; "mbuschbacher@boydengray.com"; Ryan Beckett; "ptraylor@velaw.com"; "tmyers@boydengray.com"; "wfortenberry@boydengray.com"; Keri Herrington; "Popov, Chris"; Gustafson, Adam (ENRD); Darlington, Andrew (ENRD); "vhamilton@selc.org"; "crhode@bellsouth.net"; "crhodes6@bellsouth.net"; "rhodeslf@bellsouth.net"; "scott.stewart@ago.ms.gov" |
| **Subject:** | [EXTERNAL] NAACP v. X.AI Corp., No. 3:26-cv-00074 [IWOV-BUTLERSNOW.FID9397089] |
| **Date:** | Tuesday, September 8, 2026 4:48:15 PM |

Judge Brown:  In our September 3 email regarding our October availability for a preliminary injunction hearing, we indicated that we were not available October 26 and 27 because Mr. Marwell had a Fourth Circuit argument.  We learned today that the Fourth Circuit has moved those appellate arguments to December.  Thus, we are available October 26 and 27.

However, as stated in our September 3 email, we oppose scheduling any preliminary injunction hearing while the question as to the participation of the United States remains unsettled. Defendants continue to urge the Court to grant the United States' motion to intervene independent of any other pending motion.  After being granted intervention, we would then suggest that the United States be brought into the scheduling discussion.  We appreciate the Court's consideration of all the matters before the Court.

**Daniel W. Van Horn**
**Butler Snow LLP**

D: (901) 680-7331 | F: (901) 680-7201
6075 Poplar Avenue, Suite 500, Memphis, TN 38119
P.O. Box 171443, Memphis, TN 38187-1443
Danny.VanHorn@butlersnow.com | vCard | Bio

X (Twitter) | LinkedIn | Facebook | YouTube

---

CONFIDENTIALITY NOTE: This e-mail and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by replying to the sender and deleting this copy and the reply from your system. Thank you for your cooperation.

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiffs,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR ENTRY OF WRITTEN ORDER NO LATER THAN SEPTEMBER 10 ON THE UNITED STATES' AMENDED MOTION TO INTERVENE AND DISMISS**

## INTRODUCTION

In May 2026, Plaintiffs moved to preliminarily enjoin the use of mobile generators that power artificial intelligence innovation used by the Department of War. Dkt. No. 20. The following month, the United States moved to intervene in, and to dismiss, this case to prevent harm to national security. In moving to dismiss this citizen suit, the United States invoked its statutory authority to "intervene as a matter of right at any time," 42 U.S.C. § 7604(c)(2), and to "bring the Government's views to the attention of the court" "if the Executive Branch opposes a particular citizen suit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000). In early July 2026, the United States amended the motion to clarify that it was brought on behalf of Lee M. Zeldin as Administrator of the U.S. Environmental Protection Agency.

More than a month later, the amended motion remains pending. And the United States continues to be sidelined from a case in which Congress has said it has a statutory right to participate. During the most recent status conference—from which the United States was again shut out—the Court indicated it would deny the amended motion at some unspecified time in the future. Ex. A, Aug. 24 Conf. Tr. at 5[1]. At the same conference, the Court contemplated an October hearing on Plaintiff NAACP's Motion for Preliminary Injunction. In other words, the Court has signaled that it will hold a hearing in October without the United States, and it has neither ruled on the United States' amended motion nor provided a date by which it will do so.

---

[1] The United States obtained a copy of the August 24 conference transcript and will email it as Exhibit A to counsel for all parties and this Court's chambers since the 90-day public release restriction deadline is November 24, 2026.

This twilight zone prejudices the United States. Continuing to exclude the United States from this case irreparably injures the Executive Branch's rights—rights baked into both the Constitution and the Clean Air Act. To address this injury, the Court should promptly rule on the amended motion in a written order. Given the anticipated October hearing, the United States respectfully requests the Court enter that ruling no later than September 10, 2026, so that the United States has a reasonable opportunity to seek further review of that ruling before the October hearing. If the Court denies the United States' amended motion, this Court should stay further proceedings until the United States has exhausted review of that denial.

**BACKGROUND**

The United States filed its Motion for Intervention and Dismissal on June 15, 2026, Dkt. No. 58, and the amended motion on July 7, 2026, Dkt. No. 85. In response to the United States' initial motion, NAACP emailed this Court requesting guidance on how to respond. This Court set a status conference for June 29, 2026, Dkt. No. 77, and the Court then denied via email the United States' participation in the conference that scheduled NAACP's response to and the United States' reply in support of the amended motion, Dkt. No. 79.

The Court set another status conference for August 5, 2026, Dkt. No. 103, and again the United States was denied participation via email in that conference, which addressed the Government's amended motion and other scheduling and case management items.

Recently, on August 24, 2026, the Court held another conference without either informing the United States or allowing it to participate, during which it discussed the amended motion. Dkt. No. 114; *see also* Ex. A, at 10-13. In particular, the Court had an exchange with counsel for NAACP where the Court discussed whether it would allow the United States' an opportunity to

cure any denial of the amended motion. *Id*. In the same exchange, the Court reiterated its goal to not allow any refiling to delay the sought-after October preliminary injunction hearing. *Id*.

## ARGUMENT

The United States has an undeniable right to intervene in this case. The Clean Air Act provides that the United States "may intervene *as a matter of right* at any time" in a citizen suit. 42 U.S.C. § 7604(c)(2) (emphasis added). And the Federal Rules direct courts to grant intervention when a party has "an unconditional right to intervene." Fed. R. Civ. P. 24(a)(1). Thus, the United States should be granted prompt intervention as of right rather than sitting on the sidelines as the parties move towards a preliminary injunction hearing. And if the Court intends to *deny* the United States that right, as it signaled it would in the August 24 conference, it should do so promptly in a written order so that the United States may seek further review of that ruling.

Further delaying a ruling on intervention prejudices the United States' by excluding it from proceedings in which it has a legal right to participate, subordinating its enforcement function to private interests, and jeopardizing national security. In the present matter, NAACP is usurping federal enforcement authority and threatening national, economic, and energy security by seeking to shut down a power facility needed for artificial-intelligence innovation that supports the Department of War's military operations. Dkt. No. 58-1 at 2-5. The primary authority to enforce federal law belongs to the Executive Branch, not private organizations. And Article II of the U.S. Constitution mandates that the United States maintain primacy over citizen enforcers of the Clean Air Act. These grave constitutional issues require prompt action by the Court to avoid further prejudice to the United States' interests.

Continued delay also prejudices the United States' ability to timely appeal. Denial of an intervention motion is an appealable final order under 28 U.S.C. § 1291. *Edwards v. City of*

*Houston*, 78 F.3d 983, 992 (5th Cir. 1996). Denials should be in writing to assist the appellate court in reviewing the reasoning underpinning the denial. *Lelsz v. Kavanagh*, 98 F.R.D. 11, 14 (E.D. Tex. 1982) (entering a written ruling on an intervention motion after remand from the Fifth Circuit "upon sober reconsideration of the serious questions implicated in any denial of a purported intervention as of right, . . . and because [this Court] has been ordered to do so by the Fifth Circuit"). In the absence of a decision, written or otherwise, the United States is prejudiced by being denied the opportunity for appellate review of its exclusion from the October hearing in which it is statutorily entitled to participate. *See* Fed. R. App. 4(a)(1). Barring a written ruling entered on or before September 10, the United States, for purposes of appeal, will treat the absence of a written ruling as a constructive denial of its amended motion for intervention and dismissal. *See Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 420-22 (5th Cir. 2002); *In re Fort Worth Chamber of Com.*, 100 F.4th 528, 533 (5th Cir. 2024).

The United States has already suffered harm by being excluded from the proceedings in this case because, while the parties diligently prepare for a hearing on Plaintiffs' motion for a preliminary injunction, the United States has not been allowed to participate. That harm will be magnified if the Court further postpones ruling on the amended motion while scheduling a preliminary injunction hearing with the parties. Despite the United States' unambiguous statutory right to intervene, the Court has not granted it intervention or otherwise ruled on the amended motion. Yet the Court has stressed its plan to not delay the proposed October preliminary injunction hearing. Ex. A at 13:4-5. Because the Court has stated its intention to deny the amended motion, Ex. A at 5, the Court should promptly enter its written ruling on the record so that the United States may seek further review in advance of the planned October hearing.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests the Court enter its written order on the United States' Amended Motion for Intervention and Dismissal on or before September 10, 2026. If the Court denies the United States' amended motion, this Court should stay all proceedings until the United States exhausts appellate review.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Energy and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Energy and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Energy and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

September 2, 2026

# EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** **PLAINTIFFS**

**V.** **NO. 3:26-CV-74-DMB-JMV**

**X.AI CORP.; and MZX TECH LLC** **DEFENDANTS**

**ORDER**

A telephonic status conference was held August 24, 2026. Doc. #114. Based on a transcript request by the defendants' counsel the next day, the transcript of the August 24 status conference was filed August 26. Docs. #115, #116. Because the August 24 status conference concerned case management and planning matters, the Clerk of the Court is directed to restrict access to the transcript to counsel of record and the Court.

**SO ORDERED**, this 2nd day of September, 2026.

**/s/Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiffs,<br><br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**THE UNITED STATES' MEMORANDUM IN SUPPORT OF THE MOTION TO GRANT ACCESS TO AND ALLOW USE OF HEARING TRANSCRIPTS**

The United States respectfully requests the Court allow the timely use of the transcripts in this case from hearings that occurred June 29, August 5, and August 24, 2026, in briefs to be filed by October 15, 2026, in the U.S. Court of Appeals for the Fifth Circuit. Further, the United States requests that the Court make the transcripts of the June 29 and August 5 hearings available for use by the United States by October 1, 2026.

## INTRODUCTION

The United States is appealing the constructive denial of its amended motion for intervention and dismissal ("amended motion"). To adequately represent its interests on appeal, the United States intends to rely on and quote from the transcripts of three hearings that occurred before this Court. To fully brief the Fifth Circuit on the issues giving rise to the United States' appeal, the transcripts provide important facts and context. No party is prejudiced by this request, as Defendants consent to our request to use these transcripts, and Plaintiffs did not respond when

the United States sought their position.[1] Allowing these transcripts to be quoted by all parties is not inconsistent with the purpose of the Northern District of Mississippi's restrictions on using court transcripts–to protect personally identifiable information.

## BACKGROUND

In April 2026, Plaintiffs filed this citizen suit against Defendants x.AI Corp. and MZX Tech LLC alleging violations of the Clean Air Act. Dkt. No. 1. Two months later, Plaintiffs filed a motion for preliminary injunction. Dkt. No. 51. Defendants responded with a motion to dismiss. Dkt. No. 55.

The United States filed a motion to intervene and to dismiss the complaint on June 15, 2026, Dkt. No. 59, and filed an amended motion on July 7, 2026, Dkt. No. 86. The motion explained that the United States possesses an unqualified statutory right to intervene in a citizen suit under the Clean Air Act. Dkt. No. 86 at 7. It also explained that, based on the Executive Branch's preeminent responsibility for enforcement of federal law, the Clean Air Act's citizen suit provision must be interpreted to allow the United States to dismiss any complaint brought by a private citizen. *Id.* at 8. The motion explained that the United States has determined that no claim should be prosecuted against Defendants in this matter. *Id*. Also on the docket is Plaintiffs' motion to strike the United States' motion to intervene and dismiss. Dkt. No. 82. All motions are fully briefed.

The United States requested permission to participate in all three status conferences where this Court discussed with the parties the United States' amended motion to intervene and the United States' potential participation in this case. This Court denied all three requests. In the

---

[1] Plaintiffs emailed Judge Brown's chambers, as they have in the past, seeking guidance and a telephone status conference several hours after the United States emailed them requesting their consent. Ex. A.

August 24 conference, this Court stated that it will deny the United States' amended motion for intervention and dismissal and deny Defendants' motion to dismiss. Dkt. No. 118 at n.1. The Court also stated that it plans to proceed with an October preliminary injunction hearing and requested dates of availability from the Parties for a hearing in October, again sidelining the United States. *Id*.

After learning this from the transcript of the hearing, the United States filed a motion for entry of written order on its amended motion by September 10. Dkt. No. 118. That date passed without any written ruling. *Id*. Shortly after the United States filed the motion for entry of written order on September 2, Dkt. No. 117, this Court entered a minute order restricting access to the August 24 hearing transcript to only the parties, citing concerns about publicly releasing scheduling information, Dkt. No. 119.

The Court appears to be preparing for a preliminary injunction hearing in late October without allowing the United States to participate and despite an unequivocal statutory right to intervene. These actions are prejudicing the United States' interests and rights.

On September 18, 2026, the United States filed a notice of appeal from this Court's constructive denial of its amended motion for intervention and dismissal. Dkt. No. 123. On September 21, the United States moved to stay all proceedings, Dkt. No. 124, and Plaintiffs subsequently emailed this Court stating they will "endeavor to address" this motion by September 28, Ex. A. Plaintiffs timely filed their response. Dkt. No. 128.

Concurrently with this motion, the United States is submitting to the Court the transcript order form requesting release of the June 29 and August 5 transcripts.

## ARGUMENT

The United States is appealing the constructive denial of the amended motion. Dkt. No. 123. As part of its appeal, the United States intends to use the transcripts to provide facts and context necessary to fully brief the Fifth Circuit. In the hearings, the Court addressed with the parties, but not the United States, case management scheduling, the United States' amended motion, the United States' participation in the case, and even the United States' ability to cure a denied amended motion, Dkt. No. 118 at n.1. *See* Dkt. Nos. 79, 104, 114. These facts and more will be important to the Fifth Circuit as it resolves some of the serious questions in this case. Allowing the United States to use these transcripts will help ensure it can adequately represent its rights and interests in litigation on appeal.

No party will be prejudiced. Defendants consent to the United States' request to use these transcripts. Plaintiffs never responded. Even more, the minute entries make clear that there is likely no information that would be treated as confidential, privileged, or otherwise satisfy this Court's personally identifiable information requirements to meet the redaction request requirements, *see* Dkt. Nos. 116, 119; Northern District of Mississippi Redaction Request, https://www.msnd.uscourts.gov/sites/msnd/files/forms/Form_Redaction_Req.pdf (last visited Sept. 24, 2026) (enabling the redaction request for social security numbers, financial account information, names of minors, birth dates, and home addresses).[2] Nor does the United States need to quote any such information to pursue its appeal.

[2] This Court's 7-day deadline for the parties to file a notice of forthcoming redaction request expired in early September as to the August 24 hearing transcript.

## CONCLUSION

For the foregoing reasons, this Court should grant the United States' motion to allow use of the transcripts listed herein in briefs to be filed no later than October 15, 2026, in the U.S. Court of Appeals for the Fifth Circuit. Additionally, to allow the United States to timely pursue its appeal, the United States respectfully requests the Court make available the June 29 and August 5 transcripts for the United States' use by October 1, 2026.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

JOHN K. ADAMS
Associate Deputy Attorney General
U.S. Department of Justice

MICHAEL WEISBUCH
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Energy and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Energy and Natural Resources Division

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel
Florida Bar No. 1018895
U.S. Department of Justice
Energy and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365
Andrew.Darlington2@usdoj.gov

*Counsel for the United States*

September 28, 2026