No. 26-60806

# United States Court of Appeals for the Fifth Circuit

NAACP AND NAACP MISSISSIPPI STATE CONFERENCE,
*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA, ACTING ON BEHALF OF LEE M. ZELDIN AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Movant-Appellant*,

v.

X.AI CORPORATION; MZX TECH, L.L.C.,
*Defendants*.

On Appeal from the United States District Court
for the Northern District of Mississippi, Oxford Division
The Honorable Debra Marie Brown, Chief Judge
No. 3:26-cv-74

## RESPONSE IN OPPOSITION TO THE UNITED STATES' MOTION TO STAY ALL PROCEEDINGS BELOW PENDING APPEAL

Kirti Datla
EARTHJUSTICE
1250 I Street N.W., Floor 4
Washington, DC 20005
(202) 797-5241
kdatla@earthjustice.org

October 16, 2026

*Counsel for Plaintiffs-Appellees*

(additional counsel listed at end)

No. 26-60806

# United States Court of Appeals for the Fifth Circuit

NAACP AND NAACP MISSISSIPPI STATE CONFERENCE,
*Plaintiffs-Appellees*,

UNITED STATES OF AMERICA, ACTING ON BEHALF OF LEE M. ZELDIN AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Movant-Appellant*,

v.

X.AI CORP.; MZX TECH, LLC,
*Defendants*.

## CERTIFICATE OF INTERESTED PARTIES

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**

1. National Association for the Advancement of Colored People
2. Mississippi State Conference of the NAACP

**Counsel for the National Association for the Advancement of Colored People and the Mississippi State Conference of the NAACP:**

3. Ben Grillot, Southern Environmental Law Center
4. Carroll Rhodes, Attorney
5. Elias L. Quinn, Earthjustice

6. Elizabeth Putfark, Southern Environmental Law Center
7. Kirti Datla, Earthjustice
8. Lauren Godshall, Earthjustice
9. Mary K. Rock, Earthjustice
10. Patrick Anderson, Southern Environmental Law Center
11. Rebecca Ramirez, Earthjustice

**Defendants:**

12. X.AI Corp.
13. MZX Tech, LLC

**Counsel for Defendants**

14. Adam Mehes, SpaceXAI Corp., MZX Tech LLC
15. Chadwick J. Harper, Clement & Murphy, PLLC
16. Christopher V. Popov, Vinson & Elkins LLP
17. Daniel W. Van Horn, Butler Snow LLP
18. James Burnham, SpaceXAI Corp., MZX Tech LLC
19. James W. Beers, Jr., Troutman Pepper Locke
20. Jeremy C. Marwell, Vinson & Elkins LLP
21. Jimmy Conde, Boyden Gray PLLC
22. Kenton J. Skarin, SpaceXAI Corp., MZX Tech LLC
23. Keri E. Herrington, Butler Snow LLP
24. Michael B. Buschbacher, Boyden Gray PLLC
25. P. Ryan Beckett, Butler Snow LLP
26. Patrick D. Traylor, Vinson & Elkins LLP
27. Paul D. Clement, Clement & Murphy, PLLC
28. Reid Coleman, SpaceXAI Corp., MZX Tech LLC
29. Taylor M. Meyers, Boyden Gray PLLC
30. Walker Fortenberry, Boyden Gray PLLC

October 16, 2026 /s/ Kirti Datla

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS


**Page**

CERTIFICATE OF INTERESTED PARTIES ............................................ i

TABLE OF AUTHORITIES ........................................................ iv

INTRODUCTION .................................................................. 1

BACKGROUND .................................................................... 3

A. Plaintiffs sue to abate the Plant's harmful, unlawful pollution. .............. 3

B. The United States files an inscrutable intervention motion. .................. 5

C. The District Court states that it has not resolved the United States' role in this case. ......................................................... 6

ARGUMENT ...................................................................... 7

I. The United States Has Not Shown That It Is Likely To Succeed On The Merits. ......................................................................... 7

A. The District Court has not ruled on intervention, so this Court lacks appellate jurisdiction. ..................................................... 7

B. Procedural defects in the intervention motion support denying the pending motion. ............................................................ 10

C. The United States' pending motion to dismiss is irrelevant here. ......... 13

II. The United States Has Not Shown That It Will Suffer Irreparable Harm Absent A Stay. ............................................................. 18

III. The Remaining Equities Further Counsel Against Staying All Proceedings. ................................................................. 20

CONCLUSION ................................................................... 22

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com Servs. LLC v. NLRB*,
151 F.4th 221 (5th Cir. 2025) .................................................... 8, 9

*Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*,
761 F.2d 198 (5th Cir. 1985) .................................................... 19

*Cox v. City of Dallas*,
256 F.3d 281 (5th Cir. 2001) .................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .................................................... 16, 17

*Heaton v. Monogram Credit Card Bank of Ga.*,
297 F.3d 416 (5th Cir. 2002) .................................................... 12

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................... 18

*In re Fort Worth Chamber of Com.*,
100 F.4th 528 (5th Cir. 2024) .................................................... 8

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .................................................... 16

*McIncrow v. Harris Cnty.*,
878 F.2d 835 (5th Cir. 1989) .................................................... 9, 10

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) .................................................... 11

*Save the Bay, Inc. v. U.S. Army*,
639 F.2d 1100 (5th Cir. 1981) .................................................... 14

*Swint v. Chambers Cnty. Comm'n*,
514 U.S. 35 (1995) .................................................... 14

**Page(s)**

*United States v. Texas*,
181 F.4th 548 (5th Cir. 2026) .......... 14

**Statutes**

5 U.S.C. § 702 .......... 17

15 U.S.C. § 15(a) .......... 17

18 U.S.C. § 1514A(b)(1) .......... 17

28 U.S.C. § 1291 .......... 7

28 U.S.C. § 1292(b) .......... 14

28 U.S.C. § 2403 .......... 6

31 U.S.C. § 3730(b)(1) .......... 13

31 U.S.C. § 3730(c)(2)(A) .......... 13

42 U.S.C. § 7604(a) .......... 15, 16

42 U.S.C. § 7604(a)(1) .......... 3, 13

42 U.S.C. § 7604(b)(1) .......... 15

42 U.S.C. § 7604(b)(1)(B) .......... 11

42 U.S.C. § 7604(c)(2) .......... 13, 15

42 U.S.C. § 7604(c)(3) .......... 15

**Other Authorities**

Baronia, et al., *Private Enforcement at the Founding and Article II*,
114 Calif. L. Rev. 131 (2026) .......... 17

Mississippi Department of Environmental Quality, *News*,
bit.ly/3UriLSh .......... 5

**Page(s)**

Shelby County Health Department, Facebook, bit.ly/4jUQP3u ..................... 5

**Rules**

Fed. R. Civ. P. 24(c)........................................................................ 5, 10

Fed. R. Civ. P. 41(a)(1)(A)(i) ................................................................. 11

Fed. R. Civ. P. 62.1 ............................................................................. 10

**Regulation**

40 C.F.R. § 51.166(b)(1)(i) .................................................................. 4

## INTRODUCTION

The United States appealed an intervention order that the District Court has not issued. It now moves to stay all proceedings below, claiming it will be harmed *if* a preliminary-injunction hearing is held and *if* it is not allowed to participate. No hearing is scheduled, yet it deems this motion an emergency.

The United States' appeal is unlikely to succeed. The District Court has not resolved the United States' intervention, so this Court lacks jurisdiction. The United States cannot manufacture a constructive denial by instructing the District Court to act on its preferred timeline. And a hypothetical order denying its first-of-its-kind intervention motion would be correct. That motion did not comply with rules that apply to all intervenors (filing either a complaint- or answer-in-intervention) and took inconsistent positions (seeking to intervene "as a plaintiff" but acting as a defendant by moving to dismiss Plaintiffs' claims). Plaintiffs have repeatedly stated, and the District Court has expressly not taken off the table, that the United States has several routes to participate in this case, including by filing a compliant motion. Those routes do not include a motion that leaves the court and parties without clarity on the United States' planned role here, or on the effect of intervention on later enforcement or future suits.

Nor has the United States shown it will be irreparably harmed absent a stay of all proceedings below pending appeal. It claims (at 2) "an overwhelming

interest in participating in any preliminary-injunction proceedings." It did not express that interest until it sought a written order, and it has not specified how it would participate. Even so, the stay it seeks is not needed to protect its interest. This Court can just state that, to the extent the District Court can be construed as having denied intervention in a way that categorically prohibits the United States from participating in a preliminary-injunction hearing, the denial is stayed to that extent. That would ensure that the United States can specify how it wishes to participate and that the District Court can facilitate its participation.

The remaining equities counsel against a stay. The United States, xAI, and Mississippi discuss the effects a future, hypothetical preliminary-injunction order may have. Their arguments are already aired in the briefing before the District Court (including the declaration on which the United States relies), a hearing can test those arguments, and the court will weigh those arguments when balancing the equities to determine whether, and what form of, an injunction should issue. Their arguments do not identify a way that moving that process forward while this appeal is pending (versus after it is resolved) causes harm. Further delaying a hearing on a motion that has been pending for more than five months *will* cause harm. The enormous, unpermitted gas plant at issue has more than doubled in size over that period, emitting harmful, uncontrolled pollution into the air Plaintiffs and the public must continue to breathe. The

motion's resolution was delayed so the United States could choose how to proceed in this case and is being further delayed because it chose to proceed in a novel, and ultimately impermissible, way. Further delay is unjustified.

This Court should deny a stay of all proceedings pending appeal.

## BACKGROUND

xAI's decision to build the Colossus Gas Plant in Southaven, Mississippi without complying with Clean Air Act requirements governing controls on the plant's pollution necessitated this suit. The Plant contains a series of massive gas turbines, the vast majority of which are not equipped with technology to reduce damaging pollutants like nitrogen oxide, which harms lung health, causes premature death, and is a primary cause of smog. PltfsExG.4-8.[1] The Plant is likely the largest industrial nitrogen oxide source in the greater Memphis area, and one of the largest in the nation. PltfsExD.20. Plaintiffs are the Plant's neighbors. They are breathing in the Plant's emissions and suffering harm from exposure to more pollution than the Act deems safe. PltfsExG.9-12.

### A. Plaintiffs sue to abate the Plant's harmful, unlawful pollution.

The Act allows Plaintiffs to sue to secure compliance with the Act's protections and thereby abate these harms. *See* 42 U.S.C. § 7604(a)(1). After

[1] Citations are to the internal document pagination, not ECF pagination.

notifying the United States and xAI in February 2026, Plaintiffs sued in mid-April. USEx2. Shortly thereafter, they sought a preliminary-injunction to prevent operation of turbines "without the necessary permits and pollution controls." USEx4.1. The United States then informed the District Court that it was evaluating its participation, and that extending existing deadlines would allow it "to file any responses to [the preliminary-injunction and anticipated xAI dismissal] motions." USEx7.1, 3. The court extended the deadlines. USEx8.

During the preliminary-injunction briefing, xAI placed more unpermitted turbines at the Plant. In February, the Plant held 27 unpermitted turbines. PltfsExB.2. By mid-May, the number was 57; xAI informed Plaintiffs that it would increase to 60 by the end of June. *Id.* at 2 & n.4. This massive expansion of unpermitted turbines massively increased the Plant's unlawful air pollution.



[2]

[2] This shows the growth in pollution capacity described in Plaintiffs' Engineering Analysis. *See* PltfsExD. The orange line reflects the threshold that triggers Clean Air Act permitting requirements. 40 C.F.R. § 51.166(b)(1)(i).

xAI's own modeling shows that emissions from sources smaller than the Plant can significantly impact surrounding air quality. PltfsExG.10; PltfsExC.1-1. The on-the-ground reality bears out the commonsense understanding that huge increases like this are harmful: Local authorities issued 26 alerts about ozone pollution in the first nine months of 2026, compared to 10 in all of 2025.[3]

**B. The United States files an inscrutable intervention motion.**

The United States moved to intervene on June 15, seeking to proceed "as a plaintiff to inform the Court of the government's objection to this suit and request dismissal, pursuant to Rules 24(a)(1) and 41(a)(1)(A)(i) … ." PltfsExJ.1. Though seeking to proceed as a plaintiff, it did not file a complaint-in-intervention or endorse Plaintiffs' allegations. *See* Fed. R. Civ. P. 24(c) (requiring intervention motions to include "a pleading that sets out the claim or defense for which intervention is sought"). It sought to dismiss Plaintiffs' claims with prejudice, a position adverse to Plaintiffs and aligned with Defendant xAI.

After Plaintiffs sought guidance on the proper way to address this first-of-its-kind intervention motion,[4] the District Court directed Plaintiffs to raise any

[3] *See* Mississippi Department of Environmental Quality, *News*, bit.ly/3UriLSh (last visited Oct. 16, 2026); Shelby County Health Department, Facebook, bit.ly/4jUQP3u (last visited Oct. 16, 2026).

[4] The United States has not identified, and Plaintiffs have not found, a similar prior motion under the Clean Air Act or parallel environmental statute.

"procedural concerns regarding" the motion through a "motion to strike." USEx10. In their motion to strike, Plaintiffs made plain that the United States "can likely establish *some* basis on which it may participate in this case," but that this intervention motion was defective. USEx11.5-6. The failure to follow rules applicable to all putative intervenors left pressing questions open, such as what the United States' interest and role in the case would be beyond its dismissal motion. *See id.* The United States needed to "clarify the basis for and scope of its proposed participation," whether that be as a plaintiff-intervenor, defendant-intervenor, amicus, or limited party under 28 U.S.C. § 2403. USEx11.6.

Plaintiffs separately responded to the United States' motion to dismiss. PltfsExK. They explained that the motion was relevant "only if" the court granted the United States' intervention motion. PltfsExL.11n4. In that event, Plaintiffs explained why the dismissal motion lacked merit. *Id.* at 11-35.

### C. The District Court states that it has not resolved the United States' role in this case.

Instead of holding a preliminary-injunction hearing on August 24, the District Court continued that hearing to an unspecified date and held a status conference on that day instead. PltfsExO. During the status conference, the court stated that it "intend[ed]" to deny Plaintiffs' "motion to strike," "the United States' motion to intervene," and xAI's "motion to dismiss," with "[w]ritten opinions [to] be issued." USEx15.5:10-13. It did not offer reasoning

for these tentative statements. It did not expressly mention the United States' motion to dismiss. It did state that it continues to parse—at a minimum—the United States' motion to intervene and ultimate participation, explaining that it had not resolved whether the United States may "refile or … try some other approach to intervene." *Id.* at 13:1-4.

The District Court has not rescheduled a preliminary-injunction hearing.

## ARGUMENT

### I. The United States Has Not Shown That It Is Likely To Succeed On The Merits.

This Court lacks appellate jurisdiction over this appeal because the District Court has not issued a reviewable order. If a reviewable order had issued granting the motion to strike, that order would be valid.

#### A. The District Court has not ruled on intervention, so this Court lacks appellate jurisdiction.

This Court's appellate jurisdiction requires a "final decision[]," 28 U.S.C. § 1291, but the District Court has not yet rendered any decision on the United States' intervention motion. The United States argues (at 10) that denial "may be implied" because the court has not ruled on its motion.[5] That is wrong: The

[5] The United States (at 11) and Mississippi (at 8-10) suggest that exclusion from three status conferences constructively denied intervention. Plaintiffs' understanding is that the District Court's practice is to exclude putative intervenors (like other non-parties) until intervention is granted. USEx15.10:16-

District Court's actions are consistent with it taking the time that that it needs, consistent with managing the rest of its docket, to resolve this unusual motion. *See In re Fort Worth Chamber of Com.*, 100 F.4th 528, 535 (5th Cir. 2024) ("District courts have wide discretion in managing their docket, and they do not necessarily deny a motion by failing to rule on a parties' requested timeline.").

Litigants "cannot simply say they need an expedited ruling and then appeal by claiming effective denial when they don't get it on their preferred timeline." *Id.* Whether an effective denial has occurred turns on a case-specific inquiry of the requestor's "diligence in seeking expedited … consideration" and whether there is a "legitimate basis for urgency." *Amazon.com Servs. LLC v. NLRB*, 151 F.4th 221, 227-228 (5th Cir. 2025).

Here, the United States was not diligent in seeking expedited briefing and consideration. Its intervention motion did not ask the District Court to resolve its intervention before a preliminary-injunction hearing or seek to participate in a hearing as alternative relief if denied intervention. Though the preliminary-injunction motion was filed in early May, and a then-pending August 24 hearing was calendared in late May, the United States did not indicate that it wanted to participate in those proceedings. PltfsExA. It did not, for example, lodge a

---

18 ("I have not allowed them to participate in any status conferences unless and until I actually allow intervention.").

proposed brief or evidence. The first time the United States expressed interest in the preliminary-injunction proceedings was in its September 2 motion seeking a written order by September 10. USEx17.4 (referencing "the October hearing in which it is statutorily entitled to participate").

Nor is there a legitimate basis for urgency that justifies imputing a denial. The United States has treated the dates that it told the District Court were critical as flexible. *Compare* PltfsExP.1 (claiming an order was needed by September 10 for it appeal), *with* PltfsExQ (noticing appeal September 18). And that court's actions are consistent with respecting the United States' late-breaking desire that it not hold a hearing in which the United States does not participate. It *has not* calendared a hearing. It *has* stated that it has not yet resolved the United States' ultimate intervention or other participation. USEx15.13:1-4.

In these circumstances, "there is no effective denial" and "no interlocutory decision before this court." *Amazon.com Servs.*, 151 F.4th at 229.

All of the good, intuitive reasons behind this Court's general reluctance to impute an order apply here. Without an order, "there is little opportunity for effective review": This Court must hypothesize (1) the scope of the ruling and (2) the reasoning behind it. *McIncrow v. Harris Cnty.*, 878 F.2d 835, 836 (5th Cir. 1989) (quotation omitted). Here, this Court would have to decide whether to impute an order with a full-stop denial, denial with leave to refile, or some other

qualified denial. USEx15.13:1-4 (District Court's statement that it is still thinking through whether the United States could "refile" or "try some other approach to intervene"). The United States' hypothesizing about potential bases for the unissued order (at 12) previews what this Court would have to do after that. This is all why this Court has "not hesitated to remand" for "some formal or informal statement of reasons" rather than reviewing unexplained (much less unissued) orders. *McIncrow*, 878 F.2d at 836 (quotation omitted).[6]

### B. Procedural defects in the intervention motion support denying the pending motion.

Plaintiffs identified sufficient reasons for denying the United States' first-of-its-kind intervention motion. The United States sought to intervene "as a plaintiff" below, USEx12.1, but acted inconsistently with that descriptor. Plaintiffs have never disputed that the United States has routes to participate in this case. PltfsExR.1 ("The issue plaguing the United States' intervention effort is *how* … , not *whether* the United States can participate at all."). This intervention motion is just not one of them.

*First*, Rule 24(a) requires a party seeking intervention to file a "pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ.

[6] Federal Rule of Civil Procedure 62.1, which governs indicative rulings on a motion seeking relief a district court cannot grant due to a pending appeal, can achieve a similar result.

P. 24(c). For a putative plaintiff-intervenor like the United States here, that is a complaint-in-intervention, which the United States has previously filed when intervening as a plaintiff in this context. USEx11.3 n.4 (providing examples). Compliance with this rule matters, generally and under Section 7604. *See Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) ("[I]t cannot be too much to expect the government to turn square corners … ."). A complaint-in-intervention identifies the claims an intervenor is raising, giving the defendant notice and affecting preclusion and the diligent-prosecution bar under Section 7604.[7] The United States has not filed one, and it has avoided taking a position on Plaintiffs' claims (that is, on whether xAI is violating the Clean Air Act). Its motion thus leaves the District Court unclear on how to manage the United States' role in this litigation and leaves everyone unclear on the effect intervention would have on future Section 7604 suits or government enforcement.

*Second*, the United States moved to dismiss Plaintiffs' suit, an action that aligned it with Defendant xAI, not Plaintiffs. It sought plaintiff status because its first-line dismissal tactic was Rule 41(a)(1)(A)(i), which allows a plaintiff to voluntarily dismiss its own claims. The United States argued that Rule 41 allows

[7] The bar applies if the Administrator "*has commenced* and is diligently prosecuting a civil action … *to require compliance* with the standard, limitation, or order" at issue in a later suit. 42 U.S.C. § 7604(b)(1)(B) (emphasis added).

it to *in*voluntarily dismiss *Plaintiffs'* claims. PltfsExJ.8-10. It has abandoned that argument below and here. *See* PltfsExN.16 (three-sentence treatment in reply); U.S. Mot. (not mentioning Rule 41). Its abandonment of the pretense of being "a plaintiff" in this litigation confirms that its intervention motion is unclear (indeed, inaccurate) about the role it seeks to play before the District Court.

The United States' defenses of its motion do not save it.

*First*, it says (at 12) a complaint-in-intervention was unnecessary because it is seeking to dismiss Plaintiffs' claims.[8] That only confirms that it incorrectly sought to intervene "as a plaintiff" here. That, in turn, further confirms that the District Court would be within its discretion to strike that motion and have the United States refile a coherent one that specifies the actual role it will play.

*Second*, it argues (at 13) that the False Claims Act supports its defendant-masquerading-as-plaintiff move here. But a relator's qui tam suit is brought "in the name of the Government," and that Act authorizes the United States to take over such a suit (put differently, take back claims that are *its own*) and then "dismiss the action" (put differently, dismiss *its own* claims) "notwithstanding

[8] If the United States' view is that it cannot be a defendant-intervenor because it is not violating the Clean Air Act, that misunderstands defensive intervention. The United States often intervenes as a defendant, which just reflects alignment with that side of the "v." *See Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 420 (5th Cir. 2002) ("FDIC attempted to intervene in the case as a party defendant … pursuant to Fed.R.Civ.P. 24(a) or (b).").

the objections of the" qui tam relator. 31 U.S.C. § 3730(b)(1), (c)(2)(A). The Act, in other words, makes the United States the plaintiff at all times, even if a relator may litigate the United States' own suit when the United States is not doing so itself. The Clean Air Act works differently. When a plaintiff sues, he does so "on his own behalf," and if the EPA Administrator later intervenes, he does so as a separate party. 42 U.S.C. § 7604(a)(1), (c)(2). The EPA Administrator thus *does* need to clarify his intended role when intervening under Section 7604(c)(2) and failed to do so here.

### C. The United States' pending motion to dismiss is irrelevant here.

The District Court has not resolved the United States' motion to dismiss. The United States recognizes (at 9) that this appeal is about whether it "may … intervene … ." Consistent with this sequencing, the briefing below addressed intervention and dismissal separately. *See supra* at 5-6.

Even so, the United States seeks to inject its motion-to-dismiss arguments into this intervention appeal by hypothesizing (at 13) that the District Court may think that its motion to dismiss lacked merit and that intervention is therefore futile. To start, Plaintiffs did not move to strike on that basis, nor has the District Court hinted that it had devised that basis sua sponte.[9] What is more, this theory

[9] The futility analysis asks if an intervenor's pleadings "pass Rule 12(b)(6) muster," but the United States has not filed a complaint-in-intervention, so it is

is inconsistent with the United States' statements that it seeks intervention for other reasons, namely, to participate in the preliminary-injunction hearing.

Most importantly, the United States cannot end-run appellate jurisdiction limits in this way. The District Court has not yet ruled on the United States' motion to dismiss. A future denial would be an interlocutory order, not immediately appealable. *See Save the Bay, Inc. v. U.S. Army*, 639 F.2d 1100, 1103 (5th Cir. 1981); *see also* 28 U.S.C. § 1292(b). The United States cannot invent a futility ground for a decision that has not been issued (intervention) in order to conjure appellate jurisdiction over a decision that also has not been issued and would not be appealable (dismissal). *See Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 45-48 (1995) (warning against "drift[ing] away from the statutory instructions" that "control the timing of appellate proceedings").

As to the substance of the dismissal arguments, Plaintiffs agree with the United States (at 17) that this appeal is not "the appropriate time" to address them and so respond only to correct several serious misimpressions the United States' brief might otherwise leave.

*First*, every indicator of statutory meaning forecloses the United States' interpretation of Section 7604 as granting it a unilateral, unreviewable right to

---

not clear how that analysis would operate here. *United States v. Texas*, 181 F.4th 548, 553-554 & n.8 (5th Cir. 2026).

dismiss a plaintiff's claims. To start, Section 7604(c)(2), on which the United States relies, does not expressly grant such a right. It provides only that in a Section 7604(a) suit, the EPA Administrator, "if not a party, may intervene as a matter of right at any time … ." 42 U.S.C. § 7604(c)(2).

Taken together, the rest of Section 7604 stages suits as follows:

(1) A 60-day notice requirement and diligent-prosecution bar work together to set an initial period during which the Administrator or the relevant state official may initiate "a civil action" of their own that precludes a second, separate suit by a plaintiff to abate the same violations. *Id.* § 7604(b)(1). But the would-be plaintiff can intervene in any federal court suit "as a matter of right." *Id.*

(2) If the bar does not apply, the plaintiff may sue on their own behalf to abate the alleged violations. *Id.* § 7604(a). The Administrator may participate in, and influence, the suit in specified ways. *See id.* § 7604(c)(2) (intervention right), (c)(3) (45-day notice requirement for proposed consent decrees to allow for comment and/or use of the intervention right). If he sits a case out, a judgment has "no binding effect upon the United States." *Id.* § 7604(c)(2).

This statutory context reflects a choice to give government actors a right of first refusal with respect to bringing suit in the first stage. And it rules out reading Section 7604 to implicitly require the Administrator's consent (or to give him a veto over) a plaintiff's suit in the second stage. That is because the government's *inaction* is what clears the way for a plaintiff to bring his own abatement suit. Put differently, Section 7604 operates to allow a person harmed by unlawful pollution to sue to protect themselves specifically when the government has chosen not to sue to stop that pollution.

The United States' use (at 15) of *Laidlaw* is flatly misleading. *Laidlaw* says only what was just established. At the first stage, "the Federal Government retains the power to foreclose a citizen suit *by undertaking its own action*." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000) (emphasis added). At the second, if the Administrator "opposes a particular citizen suit," he may "*intervene as a matter of right and bring the Government's views to the attention of the court*." *Id.* (emphasis added and quotation omitted). *Laidlaw* does not endorse (imply, even) a hidden dismissal power at the second stage.

*Second*, and relatedly, the constitutional avoidance canon does not support the United States' penciling in a right to dismiss a plaintiff's claims. The canon facilitates a choice "between competing plausible interpretations." *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018) (quotation omitted). Because the United States' reading is, as explained, atextual, the canon does not apply.

*Third*, Section 7604(a) raises no constitutional concerns. The provision authorizes a private person to sue "on his own behalf," 42 U.S.C. § 7604(a), to abate unlawful pollution causing harm. *See Laidlaw*, 528 U.S. at 187. Such suits are a modern-day counterpart to common-law nuisance suits brought by individuals. *See Cox v. City of Dallas*, 256 F.3d 281, 289, 291 (5th Cir. 2001). For these reasons, and others, every court to address arguments similar to the United States' has rejected them. *See* PltfsExL.24-25 & n.11.

The United States' criticism (at 16) of the inclusion of civil penalties paid into the U.S. Treasury as a potential remedy is wrong. Just like injunctive relief that Section 7604(a) authorizes, penalties "redress" a "future injury" and can "effectively abate[]" harmful conduct "and prevent[] its recurrence." *Laidlaw*, 528 U.S. at 185-187. This remedial scheme also reflects a historical practice of suits seeking penalties to abate nuisances. *See, e.g.*, Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131, 164-165 (2026).

Finally, to the extent that the United States means to be taken literally when it says (at 16) that "[t]he discretion to enforce federal law" is an "exercise of executive power" that must be subject to Executive Branch veto, it is wrong. The U.S. Code is filled with statutes that, like Section 7604, create a cause of action based on a violation of federal laws that federal actors also enforce in parallel. *See, e.g.*, 15 U.S.C. § 15(a) (antitrust); 18 U.S.C. § 1514A(b)(1) (Sarbanes Oxley Act whistleblower protections); *see also* 5 U.S.C. § 702 (Administrative Procedure Act). The United States does not have a veto power over those suits based on some theory that it has constitutional authority to control the total number of adjudicated violations of all federal laws; that is absurd.[10] The Executive Branch's choices about how *it* uses *its own* resources to

[10] Particularly so where, as with Section 7604(a), the provision authorizes suit against Executive Branch actors or agencies.

enforce federal law are of course its own. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). But a plaintiff's use of his own resources to sue under Section 7604 to abate harmful pollution does not direct those choices in any way.

## II. The United States Has Not Shown That It Will Suffer Irreparable Harm Absent A Stay.

The United States' claim of irreparable harm absent a stay of all proceedings—whether framed as based on Section 7604, its national security views, or its role in enforcing the Clean Air Act—turns solely (at 18-20) on its interest in participating in any preliminary-injunction hearing. A stay of all proceedings is not necessary to protect that interest for two reasons. *First*, the United States identified this interest only last month, and since then the District Court has done nothing to impair it. *Second*, even if this Court concludes it must protect that interest, equitable relief must be tailored to that interest, and a stay of all proceedings would be too broad because a narrower stay would suffice.

The United States did not signal that it had an "overwhelming interest" (at 2), or any interest, in the preliminary-injunction proceedings until September 2. *See supra* at 8-9. Since then, the District Court has *not* moved the preliminary-injunction proceedings forward. It has not scheduled a hearing; it has not ruled on that motion. There is thus no indication that it would move forward in a way that does not protect the United States' newly identified interest.

xAI claims (at 3-4) that proceeding with any hearing before intervention is resolved will result in an incomplete record and require any later decision to be unwound if the United States succeeds on appeal.[11] But because the United States has never asked the District Court to allow it to participate in such a hearing, either pending or absent intervention, there is no indication that the court would deny such a request if made. Moreover, neither the United States (nor xAI) has identified any specific way in which its participation would expand the record. The United States has set out its national security views already. PltfsExJ.6, 8-9. The declaration that the United States relies on for those views is in the record already. USEx1. And xAI has raised the same arguments that the United States now raises already. PltfsExH.29-34.

Regardless, a stay of all further proceedings is not needed to accommodate the interest the United States has now identified. For a stay, "something close to genuine necessity should be the mother of its invocation." *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 203 n.6 (5th Cir. 1985). Here, this Court could simply state that, to the extent the District Court can be construed as having denied intervention in a way that categorically prohibits the United

[11] To the extent xAI posits (at 5) that there is some per se rule that all district court proceedings are undone if an intervention denial is reversed—even absent a specific reason why the proceedings might have come out differently with the intervenor's participation—the cases it cites do not say that.

States from participating in any future preliminary-injunction hearing, the denial is stayed to that extent during this appeal. That would be sufficient to guarantee that the United States can specify to the District Court how it wishes to participate and that the District Court can facilitate that participation.

### III. The Remaining Equities Further Counsel Against Staying All Proceedings.

The other equities strongly counsel against a stay of all proceedings.

The United States and its amici discuss what might occur if a preliminary-injunction "shutting down operations" (xAI Br. at 3) at the Plant issues. They cover national security needs for computing power, xAI's profits, and regulatory uncertainty over the Clean Air Act's requirements. *See* U.S. Br. at 18-19; xAI Br. at 5; Miss. Br. at 6-7.[12] Their claims are contestable. For example, this case will produce a definitive ruling on whether the Clean Air Act requires the Plant's turbines to be permitted—that would *increase* regulatory certainty. Indeed, the claims are being contested in briefing below. PltfsExL.22-24; PltfsExM.7-9.

But at bottom, none of these arguments identify a harm tied to the scenario relevant to this stay motion: one flowing from moving preliminary-injunction

[12] The United States told the District Court that considering its references to national security would be "inconsistent" with that court's role. PltfsExJ.9.

proceedings forward while this appeal is pending (versus after it is resolved).[13] Instead, they object to a hypothesized preliminary-injunction order. A hearing's purpose would be to test exactly these objections. And an eventual ruling would reflect the District Court's consideration of all these equities to decide whether, and what form of, preliminary relief should issue. Disagreement with that future order would be resolved through the ordinary appellate process.

What all of these arguments discount is the very real harm that will flow from further delaying proceedings on a preliminary-injunction motion that has been pending for more than five months.

xAI has made use of this delay to expand the Plant to be more than twice the size it was when the motion was filed, and to be one of the largest sources of harmful nitrogen oxide pollution in the country (along with other pollutants). Every day that the Plant's unpermitted turbines emit unlawful pollution, Plaintiffs suffer. *See* PltfsExG.9-12, 21-23. Even short-term pollution increases from the Plant increase their risk of heart disease, lung disease, and premature death. *See* PltfsExE.4-6, 17-19; PltfsExF.

---

[13] These arguments do not describe how the United States' participation would influence the record on or outcome of these claims. But as already explained, a stay of all proceedings is not necessary to avoid harm that might flow if the United States did not participate in a hearing. *See supra* at 19-20.

Plaintiffs, and rest of the surrounding public who are forced to breathe the Plant's pollution, should not be made to wait longer to know whether they can obtain relief from these harms. The preliminary-injunction proceedings were delayed so the United States could choose how to proceed in this case and are being further delayed because it has chosen to proceed in a novel, ultimately impermissible, way. Further delay is unjustified.

## CONCLUSION

For these reasons, this Court should deny the United States' motion for a stay of all proceedings below pending its appeal.

October 16, 2026

Respectfully submitted,

/s/ Kirti Datla

Kirti Datla
EARTHJUSTICE
1250 I Street N.W., Floor 4
Washington, DC 20005
(202) 797-5241
kdatla@earthjustice.org

Benjamin Grillot
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Avenue, N.W., Suite 600
Washington, DC 20001
(202) 963-1141
bgrillot@selc.org

Carroll E. Rhodes
LAW OFFICES OF CARROLL RHODES
119 Downing Street, P.O. Box 588
Hazlehurst, MS 39083
(601) 894-1464
crhode@bellsouth.net

*Counsel for Plaintiffs-Appellees National Association for the Advancement of Colored People and the Mississippi State Conference of the NAACP*

**CERTIFICATE OF SERVICE**

I certify that this response was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit via the appellate CM/ECF system on October 16, 2026. I certify that this response was served on all ECF-registered counsel via the Court's CM/ECF system.

October 16, 2026

/s/ Kirti Datla
Kirti Datla
EARTHJUSTICE
1250 I Street N.W., Floor 4
Washington, DC 20005
(202) 797-5241
kdatla@earthjustice.org
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,136 words, excluding the parts of the response exempted by Federal Rule of Appellate Procedure 32(f).

This response complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 27(d)(E), 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Calisto MT 14-point font.

October 16, 2026

/s/ Kirti Datla
Kirti Datla
EARTHJUSTICE
1250 I Street N.W., Floor 4
Washington, DC 20005
(202) 797-5241
kdatla@earthjustice.org
*Counsel for Plaintiffs-Appellees*

## TABLE OF EXHIBITS

Notice of Evidentiary Hearing on Motion for a Preliminary Injunction,
ECF No. 42 (May 26, 2026) .......... Exhibit A

Plaintiffs' Amended Motion for a Preliminary Injunction,
ECF No. 51 (June 12, 2026) .......... Exhibit B

Attachment 15 to Amended Declaration of Sarah Al-Zhyri,
ECF No. 51-17 (June 12, 2026) .......... Exhibit C

Amended Declaration of Kim Laufenberg,
ECF No. 51-43 (June 12, 2026) .......... Exhibit D

Declaration of Dr. Helen Suh,
ECF No. 51-46 (June 12, 2026) .......... Exhibit E

Supplemental Declaration of Dr. Helen Suh,
ECF No. 51-50 (June 12, 2026) .......... Exhibit F

Brief in Support of Plaintiffs' Amended Motion for a Preliminary Injunction,
ECF No. 52 (June 12, 2026) .......... Exhibit G

Memorandum in Opposition to Plaintiffs' Amended Motion for Preliminary Injunction,
ECF No. 61 (June 15, 2026) .......... Exhibit H

Plaintiffs' Motion to Strike United States' Filing as Procedurally Deficient,
ECF No. 82 (July 1, 2026) .......... Exhibit I

Memorandum in Support of the United States' Amended Motion for Intervention and Dismissal,
ECF No. 86 (July 7, 2026) .......... Exhibit J

Plaintiffs' Response in Opposition to United States' Motion for Intervention and Dismissal,
ECF No. 91 (July 10, 2026) .......... Exhibit K

Plaintiffs' Memorandum in Opposition to the United States' Motion
for Intervention and Dismissal,
ECF No. 92 (July 10, 2026) ............................................................ Exhibit L

Plaintiffs' Rebuttal Memorandum in Support of their Motion for
Preliminary Injunction,
ECF No. 97 (July 15, 2026) ............................................................ Exhibit M

Reply Memorandum in Support of the United States' Amended
Motion for Intervention and Dismissal,
ECF No. 102 (July 24, 2026) ............................................................ Exhibit N

Notice of Continuance of Evidentiary Hearing on Motion for a
Preliminary Injunction,
ECF No. 112 (Aug. 21, 2026) ............................................................ Exhibit O

The United States' Motion for Entry of Written Order No Later Than
September 10 on the United States' Amended Motion to Intervene
and Dismiss,
ECF No. 117 (Sept. 2, 2026) ............................................................ Exhibit P

Notice of Appeal,
ECF No. 123 (Sept. 18, 2026) ............................................................ Exhibit Q

Plaintiffs' Memorandum in Opposition to the United States' Motion
to Stay All Proceedings Pending Appeal,
ECF No. 129 (Sept. 28, 2026) ............................................................ Exhibit R

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** — **PLAINTIFFS**

**V.** — **NO. 3:26-CV-74-DMB-JMV**

**X.AI CORP.; and MZX TECH LLC** — **DEFENDANTS**

**NOTICE**

TAKE NOTICE that a proceeding in this case has been SET as follows:

---

| Place | Date and Time |
|---|---|
| **United States Federal Building**<br>**305 Main Street**<br>**Greenville, Mississippi 38701**<br><br>**Courtroom 1 – Third Floor** | **August 24, 2026**<br>**9:30 a.m.** |

---

Type of Proceeding

**EVIDENTIARY HEARING ON MOTION FOR A PRELIMINARY INJUNCTION [20]
BEFORE CHIEF UNITED STATES DISTRICT JUDGE DEBRA M. BROWN**

***ATTORNEYS ARE RESPONSIBLE FOR NOTIFYING THEIR CLIENTS OF COURT APPEARANCES**

---

DANIEL B. MCHUGH, Clerk of Court

By: /s/LaToya L. Davis
LaToya L. Davis, Courtroom Deputy

Date: May 26, 2026

Electronic notice only to:
All Counsel of Record
U.S. Probation Service
U.S. Marshal Service

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

**Oral Argument Requested Per L.R. 7(b)(6)(A)**

xAI is assembling an array of data centers in neighborhoods with significant Black populations around Memphis. These "Colossus" data centers need electricity—a lot of it. To help power their artificial intelligence ambitions, Defendants xAI and its wholly-owned subsidiary MZX Tech built the Colossus Gas Plant in Southaven, Mississippi. Sited in an area where Plaintiffs NAACP and NAACP MS's members live, work, study, play, attend church—breathe—the companies built their Gas Plant without the permits or pollution controls mandated by the Clean Air Act. To prevent further health harms to Plaintiffs' members and frontline communities, this Court should enter an injunction barring Defendants from operating their Colossus Gas Plant without the necessary permits and pollution controls.

Defendants bought their Southaven property in July 2025. Within three months, they had a network of 18 gas turbines—but they had no Clean Air Act permits or pollution limits.[1]

---

[1] *See* Public Records Collection, Ex. A (Am. Al-Zhyri Decl.) attaching Ex. A-3 (Deed); Ex. A-11 (Nov. 5, 2025 Trinity Update); Ex. A-10 (Nov. 25, 2025 Trinity Update); Ex. A-13 (Dec. 11, 2025 Trinity Update).

By February 2026, Defendants had built out the Colossus Gas Plant to include 27 turbines.[2] Still no permits, pollution limits, or emissions monitoring.

In mid-February, NAACP and NAACP MS sent a notice of intent to sue under the Clean Air Act to the Defendants and relevant state and federal governmental actors detailing their concerns and describing the longstanding legal requirements that Defendants had sidestepped.[3]

Rather than address the urgent public health issues posed by their Colossus Gas Plant, Defendants added 30 *more* gas turbines by May 15, bringing the total up to 57 turbines.[4] But *still* no permit, no pollution limits, no emissions monitoring.

The Clean Air Act's permitting requirements are not mere paperwork exercises. The law requires operators to assess how a facility's pollution will affect air quality *before* it is constructed, and to implement the necessary pollution controls to prevent air quality deterioration before it happens. *See* 42 U.S.C. §§ 7475(a)(3), (a)(4). And the Clean Air Act imposes important accountability requirements: preconstruction permits that set enforceable emissions limits, *id.* § (a)(1), and emissions monitoring to ensure that pollution can be tracked and contained. *Id.* § (a)(7). xAI and MZX Tech did none of that.

Defendants' impatience is paid for by NAACP and NAACP MS members who live near the Colossus Gas Plant. Members are now losing sleep, spending less time in gardens, hosting

---

2 *See* Amended Engineering Analysis, Ex. H (Am. Laufenberg Decl.) ¶ 5 & fig. 1.

3 *See* Ex. A-21 (Notice of Intent).

4 *See* Ex. H (Am. Laufenberg Decl.) ¶¶ 34–35 & fig. 10; Ex. A-34 (May 15, 2026 Trinity Update). Though Defendants recently reported "no current plans" to further expand the facility, *see* Ex. K (May 27, 2026 Counsel Email Exchange), they informed Plaintiffs by email on the afternoon this filing was due that the number of turbines **would be at 60 by the end of June**. *See* Ex. L (June 12, 2026 Counsel Email Exchange and Attachment). Rather than further delay briefing, which might postpone this Court's resolution of this ongoing public health crisis, Plaintiffs may provide updated submissions with their filings already scheduled by the Court.

family less often, and worrying about the pollution aggravating their respiratory conditions.[5] Members are deeply concerned about what this pollution does to their and their loved ones' health. And understandably so. Exposure to this pollution increases risks of asthma attacks and heart disease in their frontline communities.[6] And, while the *sort* of consequences posed by the Gas Plant's pollution are frightening, their *scale* is staggering. Its unpermitted potential emissions of $NO_x$ dwarf every other industrial source of $NO_x$ pollution in the area[7]:




***Figure***: *Comparing 1.1-Gigawatt TVA-Allen Power Plant and Tenn. Int'l Airport in Memphis annual $NO_x$ pollution (per National Emissions Inventory) to Colossus Gas Plant annual $NO_x$ PTE (Ex. H ¶ 53).*

Defendants' excuses for shirking their Clean Air Act obligations do not withstand scrutiny. Defendants will claim the Gas Plant doesn't need a "stationary source" air pollution permit because it is just a collection of "mobile sources." It's not. Each turbine can power a neighborhood and together they can power a city. Each is more than 100 feet long and 200,000 pounds, settled on concrete pads, ducted to stacks, wired to transformers, and piped to water and gas supplies. EPA regulates these as *stationary* gas and combustion turbines. *See* 40 C.F.R. Part

---

5 *See* Ex. B (A. Millsap Decl.); Ex. C (T. Millsap Decl.); Ex. D (Norvell Decl.); Ex. E (Sheard Decl.); Ex. F (T. Thornton Decl.); Ex. G (Tipton Decl.) (provided with updated case captions).

6 *See* Pub. Health Revs., Exs. I (Suh Decl.) ¶¶ 23-24, 37, 45; J (Suppl. Suh Decl.) ¶¶ 7–11.

7 *See* EPA, 2020 National Emissions Inventory Data, https://www.epa.gov/air-emissions-inventories/2020-national-emissions-inventory-nei-data [https://perma.cc/6KHX-LWN2]; Ex. H (Am. Laufenberg Decl.) ¶ 53.

60, Subpart KKKK, and, together, they span an area more than twice that of the school down the street. There is nothing "mobile" about the Colossus Gas Plant.

Defendants may argue that they intend their sprawling Gas Plant to be only "temporary." But intentions aren't grounds for an exemption. The Clean Air Act imposes strict liability on violators, and neither the Act nor Mississippi's air regulations excuse operators from using pollution controls so long as they claim they'll pollute just for a little while.

Defendants may also point to a permit they have for the construction of a 41-turbine gas plant at the Southaven site. But that permit is for a facility the Defendants have not yet built, and it requires pollution controls Defendants have no obligation to install on the current turbine fleet. The facility Defendants are running *right now* has no permit, pollution limits, or monitoring.

The Clean Air Act's requirements are fundamentally protective and preventative. Though they may not like this—it won't come as a surprise to Defendants. Indeed, xAI's co-founder and owner Elon Musk complained in June of 2024 that "[e]nvironmental regulations are, in my view, largely terrible . . . . [Y]ou have to get permission in advance, as opposed to, say, paying a penalty if you do something wrong."[8] Here, xAI and MZX Tech have done—and continue to do—something wrong. And Defendants' violations irreparably harm the wellbeing of Black NAACP and NAACP MS members. Any notion that those harms can be paid for *later* treats the health and welfare of Plaintiffs' members as if it were just one more natural resource the companies can buy and exploit in pursuit of their business goals.

Accordingly, the Court should issue an injunction prohibiting operation of the Defendants' Colossus Gas Plant until they have obtained the necessary permits and implemented the necessary pollution controls to prevent further harm to Plaintiffs' members in the area.

---

[8] *See* A Conversation with Elon Musk [https://perma.cc/R9GC-L8AW] (at 16:28).

Dated: June 12, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit C

# ATTACHMENT 15

Outlook

## RE: EPA Region 4 Comments on PSD Air Quality Modeling Application – MZX Tech LLC

**From** Shannon Lynn <slynn@trinityconsultants.com>
**Date** Sat 12/27/2025 11:36 PM
**To** Rodney Cuevas <RCuevas@mdeq.ms.gov>
**Cc** Jon Hill <JHill@trinityconsultants.com>; mrao@trinityconsultants.com <mrao@trinityconsultants.com>; Brian Ketchum <Brian.Ketchum@trinityconsultants.com>; Slater Smith <Slater.Smith@trinityconsultants.com>; Jaricus Whitlock <jwhitlock@mdeq.ms.gov>; Jeffrey Bland <JBland@mdeq.ms.gov>; Katherine Mertes <KMertes@mdeq.ms.gov>; Preston Bradley <pbradley@mdeq.ms.gov>; Chris Wells <CWELLS@mdeq.ms.gov>; James Jech <JJech@trinityconsultants.com>

2 attachments (6 MB)

2025-1227 Response to Region 4 Model Report Comments FINAL.pdf; 2025-1227 MZX Tech LLC - Volume II - Ambient Air Modeling Analysis FINAL.pdf;

**This Message Is From an External Sender**
This message came from outside your organization.

Dear Mr. Cuevas,

Please find attached, the revised modeling report addressing the comments you provided from EPA Region 4. All associated files have been uploaded to the MDEQ portal link previously provided.

This should now address all concerns raised by MDEQ and EPA Region 4. If you have any questions or require further clarification, please do not hesitate to reach out.

Shannon

**Shannon G. Lynn, P.E., C.M.**
Principal Consultant

P 501.225.6400 x5404 M 501.454.6264
1701 Centerview Drive Suite 109 Little Rock, AR 72211
Email: slynn@trinityconsultants.com

---

**From:** Rodney Cuevas <RCuevas@mdeq.ms.gov>
**Sent:** Tuesday, December 23, 2025 1:04 PM
**To:** Shannon Lynn <slynn@trinityconsultants.com>
**Cc:** Jon Hill <jhill@trinityconsultants.com>; Maya Rao <mrao@trinityconsultants.com>; Brian Ketchum <brian.ketchum@trinityconsultants.com>; Slater Smith <slater.smith@trinityconsultants.com>; Jaricus Whitlock <jwhitlock@mdeq.ms.gov>; Jeffrey Bland <JBland@mdeq.ms.gov>; Katherine Mertes <KMertes@mdeq.ms.gov>; Preston Bradley <pbradley@mdeq.ms.gov>
**Subject:** EPA Region 4 Comments on PSD Air Quality Modeling Application – MZX Tech LLC

Dear Mr. Shannon Lynn,

MDEQ has received draft comments from EPA Region 4 regarding the Prevention of Significant Deterioration (PSD) Air Quality Modeling Application for the MZX Tech LLC project.

The EPA has identified deficiencies and areas requiring clarification before the application can proceed. I have attached the full comment document to this email for your detailed review, but the primary items that need to be addressed include:

- **Ambient Air Boundary (Section 2):** Additional details are needed regarding the exact location of the property fencing and the specific security measures (e.g., cameras, signage, patrols) used to prevent public access.

- **Meteorological Data (Section 2.2.5 of the protocol):** There is a discrepancy between the Upper Air station ID cited in the report and the ID used in the AERMET files that needs to be clarified.

- **Inventory & Screening (Section 3.6.1):** The EPA requires the full list of potential sources and the Q/D calculations used for screening. They also require clarification on whether allowable or actual emissions were used for the cumulative inventory.

- **Missing Modeling Files & Calculations (Sections 4.2 & 5.1):** Several files are missing from the submittal, specifically the "worst-case" analysis files, SUSD emission rate calculations for turbines, and PM10/PM2.5 Class I significance modeling runs.

- **NAAQS Analysis & NO2 Discrepancies (Section 5.2 & Appendix C):**

    - The EPA noted modeled violations of the 1-hour NO2 NAAQS. While the report indicates MZX Tech is not a significant contributor, additional MAXDCONT output files are required to verify this.

    - There are significant discrepancies between the emission rates listed in the Appendix C tables and those used in the modeling input files. These must be reconciled.

    - A significant number of receptors showing concentrations over the SIL were omitted from the cumulative analysis without justification.

Please review the attached document and provide the requested modeling files, corrected tables, and clarifying justifications. Once we have the updated information, MDEQ will coordinate with EPA R4 for further review.

If you have any questions regarding these comments, please let me know.

Best regards,

**Rodney Cuevas, BCES**
*Meteorologist*
*Air Quality Management Branch Manager*
**Mississippi Department of Environmental Quality (MDEQ)**
515 East Amite St.
Jackson, Mississippi 39201
☎ Office: 601-961-5566
☎ Mobile: 228-669-7888
✉ RCuevas@mdeq.ms.gov

Trinity Consultants

1701 Centerview Drive, Ste 109, Little Rock, AR 72211 / P 501.225.6400 / trinityconsultants.com

December 27, 2025

Mr. Rodney Cuevas, BCES
Meteorologist
Air Quality Management Branch Manager
Mississippi Department of Environmental Quality
P.O. Box 2261
Jackson, MS 39225-2261
RCuevas@mdeq.ms.gov

*RE: EPA Region 4 Comments on PSD Air Quality Modeling Application – MZX Tech LLC*

Dear Mr. Cuevas:

Thank you for forwarding the above-referenced document on December 23, 2025. The remainder of this letter will address the questions and comments raised by Region 4. In addition, the modeling report has been revised to address these questions and comments.

For clarification, Region 4 comments will be stated in *bold, italicized font* followed by the response by MZX Tech LLC.

*Section 2 – Proposed Project Description*
*The section states the ambient air boundary line will use a combination of fencing and security measures to prevent the public from accessing the property. EPA Region 4 recommends including describing where exactly the fence is located and what type of security measures (patrol, cameras, signage, etc.) will prevent public access in accordance* ***with EPA's ambient air*** *policy dated December 2, 2019.*

With submission of the final modeling protocol submitted to MDEQ, MZX made the decision to fence the entire boundary to restrict and control access to the site. This was reflected in Section 1.0 Introduction, page 1-2 of the final model protocol document.

*Section 2.2.5 – Meteorological Data*
*The upper air data station selected in this section to represent the meteorological conditions at the project site is the North Little Rock upper air station, ID 3952. However, in the AERMET* ***files provided, specifically in "KMEM_KLTR****-2019-****2023.SFC", the UA ID listed is 00072340. EPA*** *Region 4 recommends clarifying why there is a discrepancy in the upper air station ID between the modeling files and the modeling report.*

This is the same station. The Weather Bureau Army Navy (WBAN) identification number (ID) is 3952 and the World Meteorological Organization ID is 72340.

*Section 3.6.1 – Development of Initial Inventory Source List*
*This section describes the methodology for compiling the nearby source emissions inventory through the Q/D screening assessment for sources outside of the SIA but within 50 km of the project facility. EPA Region 4 recommends providing the full list of potential sources and the Q/D calculations used for screening out sources from the cumulative inventory.*

Tables of the Q/d analysis are attached.

*This section also indicates that total annual emission rate will be utilized for the purposes of the Q/D screening analysis. For the sources that were selected for inclusion in the cumulative EPA Region 4 suggests clarifying whether allowable, typical actual (see Table 8.2 in 40 CFR Part 51, Appendix W for a* ***description of "typical actual" emissions), or true actual emissions*** *were used in the modeling.*

All sources were modeled at permitted allowable emission rates except for Texas Gas Transmissions LLC (MSNOX1-MSNOX18), which used actual emissions from the emissions inventory (EI) data reviewed for this project.

*Section 4.2 – Modeled Sources*
***EPA Region 4 recommends providing the modeling files for the "worst-case" analyses*** *summarized in Tables 4-1 and 4-2.*

These files have been uploaded to MDEQ's file transfer portal.

*This section describes 15 of the 41 turbines will be modeled in startup mode for short-term averaging periods. Based on Table 4-2, the 15 turbines will include TUR2, TUR4, TUR11, TUR6, TUR13, TUR27, TUR18, TUE26, TUR20, TUR28, TUR35, TUR37, TUR38, TUR36, and TUR41. EPA Region 4 recommends providing the calculations for estimating the SUSD emission rate for each of the three turbine types.*

These calculations were presented with Volume I of the application. To summarize, for the ten (10) Solar units (the 5 worst PGM-130 units and 5 worst Titan 350 units), modeled hourly emissions would be the SUSD emissions occurring in 10 minutes summed with 50/60 minutes of normal operating conditions. For the Proenergy worst 5 units, this would be the SUSD emissions occurring in 30 minutes summed with 30/60 minutes of normal operating conditions.

*Section 5.1 – Class II and Class I Significance Analyses*
*Table 5-2 provides modeling concentrations for SO2, NO2, PM10, and PM2.5 Class I significant analyses. However, the modeling files only include SO2 and NO2 inputs and outputs for Class I significance. EPA Region 4 recommends providing the modeling files for the PM10 and PM2.5 Class I significance modeling runs.*

These files have been uploaded to MDEQ's file transfer portal.

*Section 5.2 – NAAQS Analysis*
***EPA Region 4 recommends providing the MAXDCONT output file "NO2o5yrNAAQS_CULP.MDC"*** *to demonstrate the project contribution to the NO2 NAAQS cumulative modeling.*

These files have been uploaded to MDEQ's file transfer portal.

*The air quality modeling identified modeled potential violations of the 1-hour NO2 NAAQS at several locations in the significant impact area. The air dispersion modeling report indicates that MZX Tech does not significantly contribute to these potential violations. In such situations, it remains incumbent on the state or local agency to resolve in a timely manner such*

Case: 26-60306 Document: 37 Page: 48 Date Filed: 10/16/2026



*violations resulting from other existing nearby sources. We request that MDEQ notify EPA Region 4 when these modeled predicted violations have been corrected.*

This comment is not applicable to MZX.

*The modeling files for the cumulative NO2 NAAQS modeling does not include all the receptors that had modeled over the 1-**hour NO2 SIL (7.5 µg/m3) in the significance modeling. The** picture below shows the receptors over the SIL in purple and the receptors modeled in the cumulative analysis in red. EPA Region 4 recommends including all receptors showing a **significance modeling concentration over 7.5 µg/m3 in the cumulative modeling analysis or** providing justification for not including those receptors.*

The 1-hour $NO_2$ NAAQS modeling files containing all receptors in excess of the 7.5 ug/m3 SIL have been provided in a folder title "Additional Files". The files included are:

1. NO2o5yrNAAQS.ami – this is the initial NAAQS file that was used to identify any exceeding receptors (as highlighted in the 1Hr_Exceedances.xlsx file)
2. NO2o5yrNAAQS_CULP.ami – this is the file containing detailed source group and contribution data for the exceeding receptors. The following detailed concentration files are also included:
    a. $NO_2$_all.mdc – contains the MAXDCONT output from the culpability run
    b. NO2o5yNAAQS_Contributions.xlsx – spreadsheet showing the MZK Tech contributions to each of the modeled NAAQS exceedances

*Appendix C*
*Table C-4 lists the modeling parameters for the onsite NO2 point sources. The emission rates provided in the table only match the 1-hour cumulative NAAQS modeling. They do not match the annual cumulative NO2 NAAQS modeling or the 1-hour/annual significance NO2 NAAQS modeling. EPA Region 4 recommends adding a new table for annual NO2 onsite point sources and providing clarification on why the 1-hour significance emission rates do not match the cumulative modeling emission rates.*

Table C.4 reflects the short-term (i.e., 1-hour) emission rates. These rates reflect the maximum hourly emissions, including startup/shutdown emissions. Table C.4b has been added to the inventory tables, and reflects the long-term (i.e., annual) emission rates. The annual rates are the total tons per year rates for each modeled source. Latest version is App C Source Inventory Datav3 (attached).

*Table C-6 provides the modeling parameters for the offsite NO2 point sources. However, the input file for the 1-hour and annual NO2 cumulative modeling does not include several sources, MSNOX2, MSNOX13, MSNOX14, and MSNOX17. EPA Region 4 recommends clarifying why those sources were not included in the modeling.*

These sources operate intermittently and were excluded from the modeling. They have been removed from the revised Table C.6. MSNOX13, MSNOX14 are emergency engines (reported 11 and 9.5 hours of operation, respectively in EI). MSNOX17 is an auxiliary air compressor engine (reported 52 actual hours of operation in EI). MSNOX2 is a compressor turbine with zero actual hours reported in the emissions inventory (i.e., did not operate). All sources with 60 or more hours of operation in the EI were included in the model for this source.

*There are four offsite NO2 point sources, MSNOX43, MSNOX44, MSNOX45, and MSNOX46, listed in the modeling files but not provided in Table C-6. EPA Region 4 recommends clarifying why those sources were not included in the table.*

These are sources that were added after revisions to the SIA associated with the inclusion of startup/shutdown emissions. They were inadvertently excluded from Table C.6, but have been added to the latest version of the table.

*There are 7 offsite sources in Table C-6 where the emission rate reported in the table does not match the cumulative 1-hour and annual NO2 modeling files. EPA Region 4 recommends amending the table to match the modeling inputs or clarifying why there is a difference. See table below for the difference in emission rates:*

| *Offsite NO2 Point Source* | *Emission Rate from Table C-6 (g/s)* | *Emission Rate from Modeling Input files (g/s)* |
|---|---|---|
| *MSNOX3* | *9.17* | *6.7872* |
| *MSNOX4* | *9.17* | *7.8963* |
| *MSNOX5* | *9.17* | *7.4540* |
| *MSNOX6* | *9.17* | *8.0702* |
| *MSNOX7* | *4.67* | *4.2083* |
| *MSNOX8* | *4.67* | *3.6527* |
| *MSNOX9* | *4.67* | *3.8770* |

Table C.6 has been updated to reflect the modeled rates. Modeled rates are actual emissions for these sources.

If you have any questions or comments about the information presented in this letter and attached report, please do not hesitate to call me at 501.454.6264.

Sincerely,

TRINITY CONSULTANTS



Shannon G. Lynn, P.E.
Principal Consultant

Table C.1 - MZX CO Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.2 - MZX $PM_{10}$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.3 - MZX $SO_2$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.4 - MZX $NO_2$ Point Sources (1-hr Averaging Period)

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.4b - MZX $NO_2$ Point Sources (Annual Averaging Period)

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.5 - MZX $PM_{2.5}$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.6 - Offsite $NO_2$ Point Sources

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| RKLNA | Arcosa LW BR, LLC | 746,870.0 | 3,888,350.0 | 66.48 | 8.48E+00 | 30.48 | 329.82 | 21.88 | 1.52 |
| RKLNB | Arcosa LW BR, LLC | 746,870.0 | 3,888,370.0 | 66.57 | 1.07E+00 | 24.38 | 327.59 | 12.19 | 0.76 |
| RKLNC | Arcosa LW BR, LLC | 746,850.0 | 3,888,350.0 | 66.16 | 5.73E+00 | 30.48 | 329.82 | 21.88 | 1.52 |
| MSNOX1 | Texas Gas Transmissions LLC | 759,098.0 | 3,865,424.0 | 62.77 | 1.05E+00 | 12.19 | 766.67 | 17.37 | 1.83 |
| MSNOX3 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 6.79E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX4 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 7.90E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX5 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 7.45E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX6 | Texas Gas Transmissions LLC | 759,025.0 | 3,865,298.0 | 62.39 | 8.07E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX7 | Texas Gas Transmissions LLC | 759,000.0 | 3,865,298.0 | 62.58 | 4.21E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX8 | Texas Gas Transmissions LLC | 759,000.0 | 3,865,298.0 | 62.58 | 3.65E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX9 | Texas Gas Transmissions LLC | 759,001.0 | 3,865,267.0 | 62.56 | 3.88E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX10 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX11 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX12 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX15 | Texas Gas Transmissions LLC | 759,124.0 | 3,865,394.0 | 62.94 | 4.66E-02 | 6.71 | 533.33 | 3.05 | 0.61 |
| MSNOX16 | Texas Gas Transmissions LLC | 759,075.0 | 3,865,331.0 | 62.67 | 2.65E-02 | 4.27 | 533.33 | 3.05 | 0.46 |
| MSNOX18 | Texas Gas Transmissions LLC | 758,974.0 | 3,865,297.0 | 63.03 | 6.30E-03 | 6.71 | 533.33 | 7.01 | 0.15 |
| MSNOX19 | Baptist Memorial Hospital | 774,141.9 | 3,873,758.5 | 94.18 | 2.08E+00 | 3.05 | 0.00 | 0.01 | 0.30 |
| MSNOX20A | JT Shannon Lumber Co. | 771,492.4 | 3,871,923.5 | 87.85 | 4.10E-01 | 10.67 | 491.67 | 12.19 | 0.76 |
| MSNOX20B | JT Shannon Lumber Co. | 771,491.3 | 3,871,905.1 | 87.65 | 4.00E-02 | 15.24 | 491.67 | 12.19 | 0.61 |
| MSNOX21 | TVA Southaven | 770,302.0 | 3,876,411.3 | 85.86 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX22 | TVA Southaven | 770,302.0 | 3,876,358.5 | 85.87 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX23 | TVA Southaven | 770,302.0 | 3,876,305.4 | 85.90 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX24 | TVA Southaven | 770,334.9 | 3,876,306.2 | 85.90 | 2.12E-01 | 27.74 | 561.11 | 10.09 | 0.66 |
| MSNOX26 | Rite Hite Products | 773,278.0 | 3,872,067.0 | 82.76 | 1.45E-01 | 3.05 | 0.00 | 0.01 | 0.30 |
| MSNOX27 | Trunkline Gas Co., LLC | 792,126.3 | 3,848,740.9 | 102.88 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX28 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX29 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX30 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX31 | Trunkline Gas Co., LLC | 792,076.1 | 3,848,708.8 | 105.66 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX32 | Trunkline Gas Co., LLC | 792,076.1 | 3,848,708.8 | 105.66 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX33 | Trunkline Gas Co., LLC | 792,051.2 | 3,848,707.3 | 106.59 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX34 | Trunkline Gas Co., LLC | 792,121.1 | 3,848,894.9 | 106.78 | 5.42E+01 | 14.02 | 672.22 | 9.14 | 1.83 |
| MSNOX35 | Trunkline Gas Co., LLC | 792,168.6 | 3,848,988.9 | 102.02 | 3.02E-02 | 6.10 | 866.67 | 34.14 | 0.25 |
| MSNOX36 | Trunkline Gas Co., LLC | 792,002.7 | 3,848,613.2 | 105.56 | 2.52E-02 | 1.22 | 1005.56 | 2.01 | 0.15 |
| MSNOX37 | Trunkline Gas Co., LLC | 792,049.3 | 3,848,738.3 | 106.54 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX38 | Trunkline Gas Co., LLC | 792,049.3 | 3,848,738.3 | 106.54 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX39 | Trunkline Gas Co., LLC | 792,144.4 | 3,848,957.4 | 102.98 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX40 | Trunkline Gas Co., LLC | 792,200.6 | 3,848,805.4 | 100.70 | 2.52E-03 | 3.05 | 644.44 | 30.48 | 0.30 |
| MSNOX41 | Trunkline Gas Co., LLC | 792,174.6 | 3,848,803.9 | 103.15 | 2.52E-03 | 3.05 | 644.44 | 30.48 | 0.30 |
| MSNOX42 | Trunkline Gas Co., LLC | 792,002.7 | 3,848,613.2 | 105.56 | 1.51E-02 | 3.05 | 255.56 | 0.01 | 0.30 |
| MSNOX43 | Niteo Products LLC | 776,541.5 | 3,856,525.0 | 110.92 | 1.59E-01 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX44 | Nidec Motor Corporation | 773,683.0 | 3,868,716.0 | 96.56 | 1.64E-03 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX45 | SXP Shulz Xtruded Products | 776,679.0 | 3,857,023.2 | 120.15 | 1.27E-01 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX46 | Evercompounds LLC | 786,112.0 | 3,876,564.4 | 97.80 | 1.76E-02 | 3.05 | 491.67 | 12.19 | 0.30 |
| TNNOX01 | TVA Allen | 760,344.0 | 3,884,227.0 | 66.15 | 5.36E+00 | 53.30 | 359.00 | 17.30 | 6.71 |
| TNNOX02 | TVA Allen | 760,341.0 | 3,884,181.0 | 66.23 | 5.36E+00 | 53.30 | 359.00 | 17.30 | 6.71 |
| TNNOX03 | TVA Allen | 760,309.0 | 3,884,139.0 | 66.28 | 2.00E+00 | 15.20 | 526.00 | 10.40 | 1.22 |
| TNNOX04 | TVA Allen | 760,061.0 | 3,884,120.0 | 65.22 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX05 | TVA Allen | 760,061.0 | 3,884,116.0 | 65.19 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX06 | TVA Allen | 760,060.0 | 3,884,112.0 | 65.15 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX07 | Valero Refining Co. TN, LLC | 765,865.3 | 3,886,440.0 | 70.57 | 1.10E+00 | 30.50 | 616.48 | 6.10 | 3.20 |
| TNNOX08 | Valero Refining Co. TN, LLC | 765,925.9 | 3,886,526.1 | 70.60 | 5.60E-01 | 44.20 | 588.71 | 7.80 | 1.68 |
| TNNOX09 | Valero Refining Co. TN, LLC | 765,810.2 | 3,886,325.6 | 69.57 | 3.78E+00 | 86.00 | 449.82 | 7.00 | 4.21 |
| TNNOX10 | Valero Refining Co. TN, LLC | 765,882.7 | 3,886,436.5 | 70.33 | 1.05E+00 | 46.60 | 616.48 | 7.90 | 2.35 |
| TNNOX11 | Valero Refining Co. TN, LLC | 765,882.7 | 3,886,436.5 | 70.33 | 8.40E-01 | 46.60 | 616.48 | 7.90 | 2.35 |
| TNNOX12 | Valero Refining Co. TN, LLC | 765,934.7 | 3,886,525.9 | 70.58 | 3.10E-01 | 35.10 | 616.48 | 9.20 | 1.13 |
| TNNOX13 | Valero Refining Co. TN, LLC | 765,915.3 | 3,886,526.5 | 70.63 | 3.90E-01 | 30.50 | 616.48 | 6.10 | 0.98 |
| TNNOX14 | Valero Refining Co. TN, LLC | 765,879.8 | 3,886,539.2 | 70.68 | 8.60E-01 | 45.70 | 644.26 | 8.80 | 1.59 |
| TNNOX15 | Valero Refining Co. TN, LLC | 766,004.1 | 3,886,486.6 | 69.55 | 1.48E+00 | 29.00 | 605.37 | 5.50 | 1.68 |
| TNNOX16 | Valero Refining Co. TN, LLC | 766,010.9 | 3,886,530.7 | 70.99 | 1.05E+00 | 49.70 | 605.37 | 6.10 | 2.65 |
| TNNOX17 | Valero Refining Co. TN, LLC | 765,952.0 | 3,886,443.6 | 69.73 | 8.00E-02 | 16.80 | 644.26 | 4.90 | 0.61 |
| TNNOX18 | Valero Refining Co. TN, LLC | 765,962.8 | 3,886,436.8 | 69.69 | 1.80E-01 | 53.30 | 866.48 | 5.80 | 0.76 |
| TNNOX19 | Valero Refining Co. TN, LLC | 765,936.4 | 3,886,430.3 | 70.12 | 1.35E+00 | 53.30 | 533.15 | 9.10 | 2.13 |
| TNNOX20 | Valero Refining Co. TN, LLC | 765,827.7 | 3,886,336.7 | 69.53 | 3.30E-01 | 40.50 | 572.04 | 6.10 | 1.37 |
| TNNOX21 | Valero Refining Co. TN, LLC | 765,965.9 | 3,886,523.3 | 70.35 | 4.00E-01 | 34.10 | 605.37 | 14.50 | 1.37 |
| TNNOX22 | Valero Refining Co. TN, LLC | 765,715.2 | 3,886,522.6 | 73.07 | 1.30E-01 | 30.50 | 615.93 | 6.00 | 1.07 |

Table C.6 - Offsite $NO_2$ Point Sources (continued)

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TNNOX23 | Valero Refining Co. TN, LLC | 766,075.0 | 3,886,382.2 | 68.77 | 1.30E-01 | 45.70 | 866.48 | 15.50 | 0.76 |
| TNNOX24 | Valero Refining Co. TN, LLC | 765,877.3 | 3,886,329.4 | 69.50 | 1.40E-01 | 33.50 | 699.82 | 7.90 | 1.10 |
| TNNOX25 | Valero Refining Co. TN, LLC | 765,877.3 | 3,886,329.4 | 69.50 | 1.80E-01 | 36.60 | 720.93 | 8.30 | 1.13 |
| TNNOX26 | Valero Refining Co. TN, LLC | 766,054.7 | 3,886,374.1 | 68.76 | 7.96E+00 | 53.30 | 399.26 | 13.80 | 1.86 |
| TNNOX27 | Valero Refining Co. TN, LLC | 765,796.2 | 3,886,171.5 | 71.36 | 1.77E+00 | 30.50 | 427.59 | 12.70 | 2.29 |
| TNNOX28 | Valero Refining Co. TN, LLC | 765,834.5 | 3,886,597.9 | 70.71 | 6.10E+00 | 60.80 | 337.04 | 13.60 | 3.05 |
| TNNOX29 | Valero Refining Co. TN, LLC | 765,409.8 | 3,886,431.1 | 69.62 | 4.80E-01 | 18.30 | 422.04 | 20.00 | 0.24 |
| TNNOX30 | Valero Refining Co. TN, LLC | 766,729.6 | 3,886,458.0 | 68.64 | 2.20E-01 | 18.30 | 848.59 | 3.30 | 3.66 |
| TNNOX31 | Valero Refining Co. TN, LLC | 765,456.4 | 3,886,496.4 | 71.27 | 1.57E+00 | 64.00 | 1273.15 | 20.00 | 2.02 |
| TNNOX32 | Valero Refining Co. TN, LLC | 765,364.9 | 3,886,273.6 | 68.50 | 1.62E+00 | 61.00 | 1273.15 | 20.00 | 1.17 |
| TNNOX33 | Nucor, Inc. | 758,505.0 | 3,881,388.9 | 64.92 | 1.13E+00 | 60.96 | 683.15 | 10.06 | 1.83 |
| TNNOX34 | Nucor, Inc. | 758,990.4 | 3,881,254.3 | 63.97 | 3.50E-01 | 24.38 | 560.93 | 8.53 | 0.91 |
| TNNOX35 | Nucor, Inc. | 758,921.9 | 3,881,254.3 | 64.08 | 5.60E-01 | 30.48 | 644.26 | 9.75 | 1.22 |
| TNNOX36 | Nucor, Inc. | 758,430.1 | 3,882,122.1 | 65.33 | 6.74E+00 | 51.51 | 380.37 | 13.68 | 6.10 |
| TNNOX37 | Nucor, Inc. | 758,747.5 | 3,882,204.2 | 64.97 | 2.15E+00 | 59.95 | 689.43 | 10.49 | 2.25 |
| TNNOX38 | Nucor, Inc. | 758,601.0 | 3,882,148.2 | 65.17 | 1.30E-01 | 8.23 | 505.40 | 0.01 | 0.98 |
| TNNOX39 | Nucor, Inc. | 758,579.3 | 3,882,125.1 | 65.21 | 1.30E-01 | 46.02 | 1273.00 | 20.00 | 1.55 |
| TNNOX40 | Nucor, Inc. | 758,458.0 | 3,881,886.0 | 65.03 | 2.60E-01 | 1.98 | 422.04 | 15.24 | 0.15 |
| TNNOX41 | Nucor, Inc. | 759,172.7 | 3,882,296.5 | 64.19 | 2.80E-01 | 9.45 | 366.48 | 9.14 | 0.61 |
| TNNOX43 | Nucor, Inc. | 759,299.2 | 3,882,262.9 | 63.99 | 2.30E-01 | 9.45 | 366.48 | 9.14 | 0.61 |
| TNNOX44 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 3.60E-01 | 17.37 | 341.11 | 16.94 | 1.56 |
| TNNOX45 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 7.00E-01 | 21.33 | 450.00 | 18.00 | 1.07 |
| TNNOX46 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.60E-01 | 11.28 | 561.11 | 2.88 | 0.76 |
| TNNOX47 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 8.50E-01 | 20.12 | 433.89 | 13.97 | 1.07 |
| TNNOX48 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.00E-01 | 9.14 | 441.67 | 5.49 | 0.76 |
| TNNOX49 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 6.20E-01 | 12.19 | 355.56 | 87.31 | 0.10 |
| TNNOX50 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 3.20E-01 | 31.09 | 361.11 | 917.24 | 0.25 |
| TNNOX51 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 9.40E-01 | 35.36 | 362.22 | 43.38 | 1.37 |
| TNNOX52 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 9.90E-01 | 45.72 | 331.11 | 32.61 | 1.52 |
| TNNOX53 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 4.40E-01 | 21.33 | 366.67 | 34.35 | 0.92 |
| TNNOX54 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.30E-01 | 36.27 | 363.89 | 16.78 | 1.59 |
| TNNOX55 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.30E-01 | 36.27 | 363.89 | 16.78 | 1.59 |
| TNNOX56 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.00E-01 | 11.12 | 447.22 | 0.01 | 0.71 |
| TNNOX57 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.80E-01 | 11.83 | 447.22 | 2.97 | 0.61 |
| TNNOX58 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.21E+00 | 14.63 | 466.67 | 3.96 | 1.37 |
| TNNOX59 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.04E+00 | 16.46 | 466.67 | 4.72 | 1.22 |
| TNNOX60 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.80E-01 | 15.24 | 466.67 | 3.20 | 1.22 |
| TNNOX61 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.40E-01 | 18.29 | 461.11 | 0.91 | 0.56 |
| TNNOX62 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 7.00E-02 | 18.29 | 461.11 | 0.91 | 0.56 |
| TNNOX63 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.00E-02 | 6.40 | 461.11 | 0.52 | 0.36 |
| TNNOX64 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.50E-01 | 12.19 | 477.78 | 9.14 | 1.01 |
| TNNOX65 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.00E-01 | 35.05 | 461.11 | 0.24 | 1.22 |
| TNNOX66 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 9.00E-02 | 30.48 | 497.22 | 1.52 | 0.46 |
| TNNOX67 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 10.67 | 497.22 | 0.49 | 0.76 |
| TNNOX68 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 6.00E-02 | 6.80 | 497.22 | 0.91 | 0.52 |
| TNNOX69 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 6.86 | 497.22 | 0.79 | 0.46 |
| TNNOX70 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 6.86 | 497.22 | 0.49 | 0.76 |
| TNNOX71 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.20E-01 | 7.77 | 497.22 | 0.79 | 0.76 |
| TNNOX72 | Memphis Cellulose LLC | 776,829.8 | 3,895,012.5 | 78.60 | 3.45E+00 | 16.76 | 597.22 | 14.57 | 1.43 |
| TNNOX73 | Memphis Cellulose LLC | 776,826.2 | 3,895,012.4 | 78.77 | 2.40E-01 | 5.36 | 495.00 | 12.19 | 0.38 |
| TNNOX74 | Memphis Cellulose LLC | 776,826.2 | 3,895,012.4 | 78.77 | 2.52E+00 | 9.14 | 255.56 | 12.19 | 1.00 |
| TNNOX75 | Memphis Cellulose LLC | 776,829.8 | 3,895,012.5 | 78.60 | 3.45E+00 | 18.29 | 527.78 | 13.50 | 1.31 |
| TNNOX76 | Covoro Mining Solutions, LLC | 774,854.0 | 3,906,740.9 | 72.72 | 1.80E-01 | 21.33 | 288.89 | 19.51 | 0.10 |
| TNNOX77 | Covoro Mining Solutions, LLC | 774,826.8 | 3,906,801.8 | 73.04 | 8.11E+01 | 25.91 | 533.33 | 39.62 | 0.76 |
| TNNOX78 | Covoro Mining Solutions, LLC | 774,826.8 | 3,906,801.8 | 73.04 | 1.43E+01 | 25.91 | 288.89 | 35.05 | 1.07 |
| TNNOX79 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX80 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX81 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX82 | Covoro Mining Solutions, LLC | 774,882.1 | 3,906,649.3 | 72.76 | 4.00E-02 | 15.24 | 288.89 | 4.57 | 0.15 |
| TNNOX83 | Covoro Mining Solutions, LLC | 775,002.8 | 3,906,838.0 | 72.86 | 1.80E-01 | 13.72 | 433.33 | 14.02 | 0.30 |
| TNNOX84 | Covoro Mining Solutions, LLC | 774,850.2 | 3,906,864.2 | 72.94 | 3.43E+00 | 30.48 | 422.22 | 7.92 | 2.13 |
| TNNOX85 | Covoro Mining Solutions, LLC | 774,850.2 | 3,906,864.2 | 72.94 | 3.43E+00 | 30.48 | 422.22 | 7.92 | 2.13 |
| TNNOX86 | Covoro Mining Solutions, LLC | 774,875.5 | 3,906,865.0 | 72.88 | 6.76E+00 | 30.48 | 452.22 | 3.81 | 1.45 |
| TNNOX87 | Covoro Mining Solutions, LLC | 774,900.7 | 3,906,865.7 | 72.81 | 6.76E+00 | 18.29 | 452.22 | 13.41 | 1.45 |
| TNNOX88 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 2.10E-01 | 22.86 | 505.56 | 11.19 | 0.46 |
| TNNOX89 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 1.55E+00 | 22.86 | 505.56 | 11.19 | 0.46 |
| TNNOX92 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 3.60E-01 | 22.86 | 505.56 | 11.19 | 0.46 |

Table C.6 - Offsite $NO_2$ Point Sources (continued)

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TNNOX95 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 4.90E-01 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX96 | MSC Airport Authority | 775,512.4 | 3,882,140.2 | 89.61 | 8.50E-01 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX97 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX98 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX99 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX100 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX101 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX102 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |

Arkansas Potential Inventory Sites

| Facility | Permit No. | AFIN | UTM E | UTM N | $NO_X$ Total Emissions (tpy) | Distance to Site (km) | $NO_X$ Q/d |
|---|---|---|---|---|---|---|---|
| Arcosa | 0280-AOP-R5 | 18-00082 | 746,861 | 3,888,508 | 531.4 | 27.05 | 19.64 |
| Valero Partners | 0668-AOP-R14 | 18-00120 | 757,098 | 3,891,132 | 42.5 | 20.88 | 2.04 |
| Tetra Technologies | 0870-AR-20 | 18-00146 | 756,118 | 3,888,620 | 6.7 | 19.69 | 0.34 |
| Trojan Luggage | 1523-AR-2 | 18-00054 | 757,029 | 3,893,997 | 2.3 | 23.21 | 0.10 |
| Warren Oil | 1652-AR-7 | 18-00013 | 757,473 | 3,891,350 | 20 | 20.82 | 0.96 |
| Master Halco | 1719-AR-6 | 18-00230 | 755,846 | 3,888,434 | 0.5 | 19.75 | 0.03 |
| Crittenden Co Landfill | 1994-AOP-R2 | 18-00094 | 750,039 | 3,891,519 | 0 | 26.16 | 0.00 |
| Newberry Tanks | 2206-AR-5 | 18-00077 | 759,590 | 3,893,183 | 0 | 21.15 | 0.00 |
| Consolidated Grain | 2215-AR-2 | 18-00881 | 759,706 | 3,891,839 | 2 | 19.94 | 0.10 |
| Cargill | 2244-A | 18-00920 | 757,150 | 3,889,650 | 5.3 | 19.72 | 0.27 |
| Sterigenics | 2457-A | 18-00913 | 725,796 | 3,895,504 | 22.5 | 48.99 | 0.46 |
| Sloan Valve | 0396-AR-15 | 74-00029 | 650,391 | 3,904,196 | 8.3 | 123.38 | 0.07 |
| Riceland | 0478-AR-16 | 62-00012 | 672,507 | 3,865,028 | 71.4 | 98.24 | 0.73 |
| Boar's Head | 1709-AR-7 | 62-00125 | 699,528 | 3,874,837 | 52.1 | 70.72 | 0.74 |
| Fed Bureau of Prisons | 2198-AR-3 | 52-00018 | 700,629 | 3,873,054 | 79.7 | 69.65 | 1.14 |
| US Army Corp | 1793-AOP-R4 | 39-00023 | 715,189 | 3,846,347 | 720.6 | 62.03 | 11.62 |
| Producers Rice Mill | 0397-AR-5 | 19-00019 | 701,231 | 3,903,106 | 15 | 74.55 | 0.20 |
| Riceland | 0476-AR-5 | 19-00008 | 681,856 | 3,919,039 | 24.2 | 98.79 | 0.24 |
| Mueller Copper Tube | 1027-AR-4 | 19-00004 | 701,609 | 3,901,551 | 0 | 73.63 | 0.00 |
| Riceland | 1608-AR-6 | 19-00006 | 726,167 | 3,904,848 | 30 | 53.29 | 0.56 |
| Producers Rice Mill | 1616-AR-3 | 19-00098 | 678,927 | 3,900,920 | 2.1 | 94.95 | 0.02 |
| Golden Ridge | 2387-AR-1 | 19-00407 | 700,938 | 3,904,834 | 0 | 75.49 | 0.00 |

Mississippi Potential Inventory Sites

| Facility | AI | Plant ID | UTM E | UTM N | $NO_X$ Total Emissions (tpy) | Distance to Site (km) | $NO_X$ Q/d |
|---|---|---|---|---|---|---|---|
| LEHMAN ROBERTS COMPANY, PLANT NUMBER 6 | 5648 | 00007 | 775,845 | 3,850,920 | 84.62 | 24.64 | 3.43 |
| TEXAS GAS TRANSMISSION LLC, LAKE CORMORA | 1079 | 00009 | 759,098 | 3,865,424 | 2475.75 | 14.64 | 169.06 |
| ARDAGH METAL BEVERAGE USA INC | 1063 | 00016 | 792,212 | 3,876,326 | 25.27 | 22.01 | 1.15 |
| NITEO PRODUCTS LLC | 1934 | 00027 | 776,542 | 3,856,525 | 5.21 | 19.44 | 0.27 |
| BAPTIST MEMORIAL HOSPITAL, DESOTO | 2187 | 00038 | 774,142 | 3,873,759 | 72.45 | 4.06 | 17.84 |
| J T SHANNON LUMBER COMPANY | 1525 | 00041 | 1,320,321 | 3,904,733 | 15.46 | 3.32 | 4.66 |
| INTERNATIONAL PAPER CO, OLIVE BRANCH | 5653 | 00046 | 792,471 | 3,875,348 | 4.38 | 22.23 | 0.20 |
| TVA SOUTHAVEN COMBINED CYCLE PLANT | 12199 | 00095 | 770,312 | 3,876,204 | 483.25 | 1.29 | 374.47 |
| NIDEC MOTOR CORPORATION | 18531 | 00101 | 773,683 | 3,868,716 | 0.18 | 7.09 | 0.02 |
| RITE HITE PRODUCTS | 50219 | 00109 | 773,278 | 3,872,067 | 5.04 | 4.16 | 1.21 |
| SXP SCHULZ XTRUDED PRODUCTS LLC | 58173 | 00112 | 776,679 | 3,857,023 | 25.10 | 19.01 | 1.32 |
| EVERCOMPOUNDS LLC | 70500 | 00114 | 786,112 | 3,876,564 | 102.67 | 15.95 | 6.44 |
| ROXUL USA INC | 56942 | 00052 | 808,959 | 3,875,060 | 218.61 | 38.71 | 5.65 |
| TRUNKLINE GAS COMPANY, LLC, INDEPENDENCE | 4105 | 00025 | 792,126 | 3,848,741 | 4865.17 | 34.11 | 142.62 |
| WASTE MANAGEMENT OF TUNICA LANDFILL INC | 8339 | 00033 | 751,800 | 3,852,730 | 30.75 | 28.85 | 1.07 |

Tennessee Potential Inventory Sites

| COMPANY | SITE# | UTM E | UTM N | $NO_X$ Total Emissions (tpy) | Distance to Site (km) | $NO_X$ Q/d |
|---|---|---|---|---|---|---|
| NUCOR STEEL MEMPHIS | 3601 | 759,092 | 3,882,145 | 389.42 | 13.30 | 29.29 |
| ALLEN COMBINED CYCLE PLANT-TVA | 2480 | 760,309 | 3,884,139 | 401.00 | 13.56 | 29.57 |
| VALERO REFINING COMPANY- TENNESSEE, L.L.C. | 2385 | 765,853 | 3,886,434 | 1064.92 | 12.33 | 86.37 |
| SOLAE COMPANY, THE | 4272 | 784,455 | 3,882,172 | 299.83 | 15.95 | 18.80 |
| PMC BIOGENIX | 1231 | 776,905 | 3,895,730 | 424.04 | 21.85 | 19.40 |
| MEMPHIS CELLULOSE LLC | 1001 | 776,830 | 3,895,013 | 348.66 | 21.15 | 16.49 |
| COVORO MINING SOLUTIONS, LLC | 2571 | 774,854 | 3,906,741 | 1086.56 | 32.16 | 33.79 |
| FEDERAL EXPRESS CORP.(HUB) | 2903 | 776,471 | 3,884,523 | 489.06 | 11.45 | 42.73 |
| MEMPHIS-SHELBY COUNTY AIRPORT AUTHORITY | 2491 | 775,512 | 3,882,140 | 31.57 | 8.94 | 3.53 |
| METHODIST HEALTHCARE- MEMPHIS HOSPITALS, METHODIST SOUTH HOSPITAL | 1300 | 771,719 | 3,880,775 | 5.66 | 6.04 | 0.94 |

# PSD PERMIT APPLICATION

## Volume II – Modeling Report

## Greenfield Simple-Cycle Combustion Turbine Project

MZX Tech LLC
Southaven, MS

Prepared By:

TRINITY CONSULTANTS
1701 Centerview Drive
Suite 109
Little Rock, AR 72211
(501) 225-6400

December 2025

Project 250401.5102

# TABLE OF CONTENTS


1. EXECUTIVE SUMMARY 1-1
   1.1 Permitting and Regulatory Requirements ........ 1-1
   1.2 Modeling Summary ........ 1-2
   1.3 Application Contents ........ 1-3

2. PROPOSED PROJECT DESCRIPTION 2-1
   2.1 Description of Proposed Project ........ 2-2

3. PSD MODELING REQUIREMENTS 3-1
   3.1 Class II Significance Analysis ........ 3-2
   3.2 Ambient Background Data ........ 3-4
      *3.2.1 $NO_2$ Background Monitor ........ 3-5*
      *3.2.2 $PM_{2.5}$ Background Monitor ........ 3-5*
      *3.2.3 Ozone Background Monitor ........ 3-6*
   3.3 Ambient Monitoring Requirements ........ 3-8
   3.4 Ozone Ambient Impact Analysis ........ 3-8
   3.5 Class I Requirements ........ 3-9
   3.6 Regional Inventory Data ........ 3-11
      *3.6.1 Development of Initial Inventory Source List ........ 3-11*
      *3.6.2 File Review of Modeling Parameters ........ 3-12*
   3.7 Additional Impacts Analysis ........ 3-12

4. MODEL SELECTION AND METHODOLOGY 4-1
   4.1 Model Selection – AERMOD ........ 4-1
   4.2 Modeled Sources ........ 4-2
   4.3 Receptor Grid and Coordinate System ........ 4-5
   4.4 Urban versus Rural Dispersion Options ........ 4-6
   4.5 Meteorological Data ........ 4-7
   4.6 Building Downwash Analysis ........ 4-15
   4.7 GEP Stack Height Analysis ........ 4-15
   4.8 Modeled Emission Sources ........ 4-16
      *4.8.1 Significance Analysis ........ 4-16*
      *4.8.2 $NO_2$ Modeling Approach ........ 4-16*
      *4.8.3 Tier 1 Analysis - Consideration of Modeled Emission Rates for Precursors (MERPs) ...... 4-16*
         4.8.3.1 Ozone MERPS Assessment ........ 4-17
         4.8.3.2 $PM_{2.5}$ MERPS Assessment ........ 4-18

5. SUMMARY OF RESULTS 5-1
   5.1 Class II and Class I Significance Analyses ........ 5-1
   5.2 NAAQS Analysis ........ 5-2
   5.3 PSD Increment Evaluations ........ 5-3
   5.4 Additional Impact Analyses ........ 5-3
      *5.4.1 Soil and Vegetation Results ........ 5-3*
      *5.4.2 Visibility Results ........ 5-4*

APPENDIX A. FIGURES A

APPENDIX B. MODELING PROTOCOL AND MDEQ RESPONSE B

APPENDIX C. EMISSIONS INFORMATION FOR MODELING C

APPENDIX D. ELECTRONIC MODELING FILES D

# LIST OF FIGURES

Figure 2-1. Project Site Location Map 2-1

Figure 2-2. Facility Ambient Air Boundary and General Site Layout 2-1

Figure 3-1. Location of Selected Background Monitors 3-4

Figure 3-2. Class I Areas Within 300 km of MZX 3-9

Figure 4-1. Meteorological Surface Stations Near Proposed Facility 4-9

Figure 4-2. Windrose for Memphis International Airport 4-11

Figure 4-3. Windrose for Olive Branch Airport 4-12

Figure 4-4. Windrose for West Memphis Municipal Airport 4-13

Figure 4-5. MZX Site and MEM Site 4-14

Case: 26-60306 Document: 37 Page: 68 Date Filed: 10/16/2026

# LIST OF TABLES


Table 1-1.Proposed Project Emissions 1-2

Table 3-1. Significant Impact Levels, NAAQS, and PSD Class II Increments 3-3

Table 3-2. Selected Background Concentrations 3-8

Table 3-3. Class I Q/D Screening Analysis 3-10

Table 3-4. Class I Significant Impact Levels and Increment Thresholds 3-11

Table 4-1. Modeled Source Parameters 4-3

Table 4-2. "Worst-Case" Analysis of Combustion Turbine Stacks 4-5

Table 4-3. Summary of Land Use Analysis 4-7

Table 4-4. Meteorological Surface Stations Near Proposed Facility 4-8

Table 4-5. Surface Characteristics of Selected Meteorological Stations 4-10

Table 4-6. Average Yearly Surface Moisture Conditions for MEM 4-15

Table 5-1. Class II Significance Analysis Results 5-1

Table 5-2. Significant Monitoring Concentration Results 5-2

Table 5-3. Class I Significance Analysis Results 5-2

Table 5-4. NAAQS Analysis Results 5-3

Table 5-5. PSD Increment Analysis Results 5-3

Table 5-6. Soil and Vegetation Impacts 5-4

Table 5-7. VISCREEN Modeling Results 5-4

# 1. EXECUTIVE SUMMARY

MZX Tech LLC (MZX) is proposing to construct and operate a greenfield electricity generating station that will be located at 2875 Stanton Rd South, DeSoto County, Southaven Mississippi. The proposed facility will produce electricity for use and will include simple cycle combustion turbines (CT) and support equipment. Three (3) turbine models will be used for the site, the Solar PGM-130, Solar Titan 350, and Proenergy 6000 PE. Additionally, ten (10) PLUM Pressure Reduction Systems (PRSs) will be installed to regulate the pressure of incoming natural gas and condition the natural gas for use in the combustion turbines. The CT units and PLUM units will fire natural gas as fuel. More detail regarding the proposed project is provided in Section 2 of this application.

The proposed project will require a Prevention of Significant Deterioration (PSD) permit as a new major source. Project-related emissions are anticipated to exceed the PSD significant emission rate (SER) thresholds for total particulate matter with an aerodynamic diameter of 10 microns or less ($PM_{10}$), total particulate matter with an aerodynamic diameter of 2.5 microns or less ($PM_{2.5}$), nitrogen oxides ($NO_X$), volatile organic compounds (VOC), sulfur dioxide ($SO_2$), carbon monoxide (CO), and greenhouse gases (GHG) in terms of carbon dioxide equivalents ($CO_2e$). Therefore the proposed project requires a PSD air quality/dispersion modeling analysis.

The application package contains the necessary state air construction and operating permit application for the proposed project, included in two (2) separate application volumes. This Volume II of the application package includes all the required air quality assessments necessary as part of this PSD permit application. Volume I of the application details the required emissions analyses, regulatory review, and control technology analyses.

## 1.1 Permitting and Regulatory Requirements

MZX is submitting this construction permit application, in accordance with the PSD permitting requirements, to request authorization to construct an assortment of simple-cycle combustion turbines and supporting equipment. Since the proposed facility will be a major source under the PSD permitting program (i.e., the potential to emit for at least one regulated NSR pollutant exceeds 250 tpy), substantive PSD requirements apply with respect to each regulated NSR pollutant whose potential to emit exceeds the applicable SER thresholds. MZX has evaluated emissions increases of CO, $NO_X$, filterable PM, total $PM_{10}$, total $PM_{2.5}$, $CO_2e$, $SO_2$, and VOC resulting from the proposed project for comparison to their respective PSD SER to determine whether PSD permitting is required, as identified in Table 1-1.

Table 1-1.Proposed Project Emissions

| Pollutant | Project Emissions (tpy) | PSD Significant Emission Rate (tpy) | PSD Triggered? (Yes/No) |
|---|---|---|---|
| Filterable PM | 19.6 | 25 | No |
| Total $PM_{10}$ | 19.6 | 15 | Yes |
| Total $PM_{2.5}$ | 19.5 | 10 | Yes |
| $SO_2$ | 156.5 | 40 | Yes |
| $NO_X$ | 423.4 | 40 | Yes |
| VOC | 417.4 | 40 | Yes |
| CO | 364.2 | 100 | Yes |
| $CO_2e$ | 6,410,729 | 75,000 | Yes |

Since the project potential emissions of total $PM_{10}$, total $PM_{2.5}$, $NO_X$, VOC, $SO_2$ and CO exceed their respective SERs, the proposed project is required to undergo PSD review for each pollutant. Because these pollutants trigger PSD permitting, PSD review is also required for $CO_2e$ because the calculated $CO_2e$ project emission increases exceed the applicable SER. Emission calculations are provided in Appendix D of Volume I of this application, and PSD permitting requirements are detailed in Section 3 of Volume I of this application.

MZX is submitting this construction and operating permit application package in accordance with all federal and state requirements. The proposed project will be subject to applicable federal New Source Performance Standards (NSPS), and Mississippi Department of Environmental Quality (MDEQ)'s state regulations. Applicability of these programs is discussed in Section 4 of Volume I of this application.

## 1.2 Modeling Summary

The results of the air quality dispersion modeling analyses presented in this report are summarized as follows:

- Ambient $PM_{10}$ impacts from the project in the form of the standard are below the Class I and Class II Significant Impact Levels (SILs) for all applicable averaging periods.
- Ambient $SO_2$ impacts from the project in the form of the standard are below the Class I and Class II SILs for all applicable averaging periods.
- Ambient $PM_{2.5}$ impacts from the project in the form of the standard are below the Class I and Class II SILs for all applicable averaging periods.
- Ambient CO impacts from the project in the form of the standard are below the Class II SILs for all applicable averaging periods.
- Ambient $NO_2$ impacts for the project in the form of the standard are above the Class II SIL for the 1-hr and annual averaging periods. Subsequent modeling demonstrated compliance with the 1-hr $NO_2$ NAAQS and the annual $NO_2$ NAAQS and Increment standards.

The PSD air quality analyses described in this report demonstrate that the proposed project will neither cause nor contribute to an exceedance of any NAAQS or PSD Increment.

## 1.3 Application Contents

Volume II of this permit application is organized as follows:

- ► Section 2 contains a description of the facility and proposed project;
- ► Section 3 describes the PSD modeling procedures;
- ► Section 4 discusses the technical approach employed in the modeling analyses;
- ► Section 5 describes the results of the PSD dispersion analyses;
- ► Appendix A includes an area map, site layout map, and other supporting figures;
- ► Appendix B includes the modeling protocol and MDEQ response;
- ► Appendix C includes the emissions information used in modeling; and
- ► Appendix D contains electronic modeling files.

# 2. PROPOSED PROJECT DESCRIPTION

Figure 2-1 provides a map of the area surrounding the proposed project location. The approximate central Universal Transverse Mercator (UTM) coordinates of the facility (centered around the emissions sources) are 770.230 kilometers (km) East and 3,874.910 km North in Zone 15 (NAD 83). The area surrounding the facility is predominantly rural.

Figure 2-1. Project Site Location Map




MZX will install fencing around the entire boundary to prevent the public from accessing MZX property. The proposed boundary of the facility is shown in Figure 2-2 (yellow line visible drawn around the facility). The yellow line represents the ambient air boundary for modeling.

Figure 2-2. Facility Ambient Air Boundary and General Site Layout



## 2.1 Description of Proposed Project

MZX is proposing to construct and operate an electricity generating station that will include CT units and support equipment. Three (3) different turbine models and ten (10) PLUM PRSs will be installed to regulate incoming natural gas pressure and condition the natural gas for use in the combustion turbines. The CT and PLUM units will fire natural gas as fuel.

# 3. PSD MODELING REQUIREMENTS

The following sections detail the methods and models used to demonstrate that the proposed project will not cause or contribute to an exceedance of either the NAAQS or the PSD Class I or Class II Increment. The dispersion modeling analyses were conducted in accordance with the following guidance documents, as well as the submitted modeling protocol[1]:

- *Guideline on Air Quality Models* 40 CFR 51, Appendix W (EPA, Revised, November 29, 2024)
- User's Guide for the AMS/EPA Regulatory Model – AERMOD, (EPA, November 2024)
- AERMOD Implementation Guide (EPA, last revised November 2024)
- New Source Review Workshop Manual (EPA, Draft, October 1990)
- Modeling Procedures for Demonstrating Compliance with $PM_{2.5}$ NAAQS (EPA, Memorandum from Mr. Stephen Page, March 23, 2010)
- Revised Draft Guidance for Ozone and Fine Particulate Matter Modeling (EPA, Memorandum from Mr. Richard A. Wayland, September 20, 2021)
- *Revised Policy on Exclusions from "Ambient Air"* (EPA, Memorandum from Mr. Andrew R. Wheeler, December 2, 2019)
- *Guidance for $PM_{2.5}$ Permit Modeling* (EPA, Memorandum from Mr. Stephen Page, May 20, 2014)
- Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier I Demonstration Tool for Ozone and $PM_{2.5}$ under the PSD Permitting Program (EPA, Memorandum from Mr. Richard A Wayland, April 30, 2019)
- Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program (EPA Memorandum from Mr. Peter Tsirigotis, April 17. 2018)
- Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program (EPA Memorandum from Mr. Richard Wayland, April 30. 2024)
- Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ National Ambient Air Quality Standard (EPA, Memorandum from Mr. Tyler Fox, March 1, 2011); and
- Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the $NO_2$ National Ambient Air Quality Standard (EPA, Memorandum from Mr. R. Chris Owen and Roger Brode, September 30, 2014).
- Interpretation of "Ambient Air" in Situations Involving Leased Land Under the Regulations for Prevention of Significant Deterioration (PSD) (EPA, Memorandum from Stephen D. Page to Regional Air Division Directors, June 22, 2007).
- *Q/D Screening Method* (ADEC/AQM, Mr. Alan E. Schuler, June 19, 1997)

Part C of Title I of the Clean Air Act, 42 U.S.C. §§7470-7492, is the statutory basis for the PSD program. The U.S. EPA has promulgated PSD definitions, applicability, and requirements in 40 CFR Part 52.21. PSD is the component of the federal New Source Review (NSR) permitting program that is applicable in areas that are not designated as in nonattainment of the NAAQS. DeSoto County, where the facility is located, is currently designated as "attainment" or "unclassifiable" for all criteria pollutants.[2]

The proposed project will be considered a major modification under PSD since the proposed project emissions increases for certain criteria pollutants are expected to exceed their respective PSD SERs.

---

[1] Modeling protocol submitted to the MDEQ on November 5, 2025, and approved on November 18, 2025. Copies of these documents can be found in Appendix B.

[2] 40 CFR 81.325

As discussed in Volume I and shown in this Volume II report, the project emission rates trigger PSD permitting for multiple criteria pollutants with established SILs, NAAQS, and/or PSD Increment standards, specifically CO, $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$. The ozone-based impacts of the project's $NO_X$ and VOC emissions increases are assessed and summarized in section 4.8.3.

This section addresses requirements for evaluating NAAQS, PSD Increment, Class I Area, and additional impacts.

## 3.1 Class II Significance Analysis

The Class II Significance Analysis was conducted to determine whether the calculated emissions increases for $SO_2$, CO, $NO_2$, $PM_{10}$ and $PM_{2.5}$ would exceed certain ambient concentration thresholds commonly referred to as the SILs, shown in Table 3-1.

Table 3-1. Significant Impact Levels, NAAQS, and PSD Class II Increments

| Pollutant | Averaging Period | PSD Class II SIL (μg/m³) | Primary and Secondary NAAQS (μg/m³) | Class II PSD Increment (μg/m³) |
|---|---|---|---|---|
| $PM_{10}$ | 24-hour | 5 | 150 (1) | 30 |
| | Annual | 1 | -- | 17 |
| $PM_{2.5}$ | 24-hour | 1.2 (2) | 35(4) | 9 (3) |
| | Annual | 0.13 (2) | 9(5) | 4 (3) |
| $NO_2$ | 1-hour | 7.5 | 188(6) | N/A |
| | Annual | 1 | 100(7) | 25 |
| $SO_2$ | 1-hr | 7.8 | 196 | N/A |
| | 3-hr | 25 | 1,300 | 512 |
| | 24-hour | 5 | 365 | 91 |
| | Annual | 1 | 80 | 20 |
| CO | 1-hr | 2,000 | 40,000 | N/A |
| | 8-hr | 500 | 10,000 | N/A |
| Ozone | 8-Hour | 1 ppb | 137 | -- |

(1) Not to be exceeded more than three times in 3 consecutive years (highest sixth high modeled output).

(2) EPA promulgated $PM_{2.5}$ SILs and PSD Increments on October 20, 2010 [75 FR 64864, PSD for Particulate Matter Less Than 2.5 Micrometers Increments, Significant Impact Levels (SILs) and Significant Monitoring Concentration (SMC); Final Rule]. The SILs became effective on December 20, 2010 (i.e., 60 days after the rule was published in the Federal Register) but the U.S. Court of Appeals decision on January 22, 2013 remanded the SIL values back to EPA for reconsideration. EPA has recently provided updated guidance (April 2024) which recommended use of a 24-hr $PM_{2.5}$ SIL of 1.2 μg/m³, and an annual SIL of 0.13 μg/m³.

(3) The above-mentioned court decision did not impact the promulgated increment thresholds for $PM_{2.5}$.

(4) The 3-year average of the 98th percentile 24-hour average concentration (highest eighth high modeled output).

(5) The 3-year average of the annual arithmetic average concentration (highest first high modeled output).

(6) The 3-year average of the 98th percentile of the daily maximum 1-hr average (highest eighth high modeled output).

(7) Annual arithmetic average (highest first high modeled output).

The highest design concentrations out of all given modeling years for each pollutant-averaging time is then compared to the SIL level shown in Table 3-1 to determine if the ambient air impact is significant. In the case of 1-hour $NO_2$, 1-hour $SO_2$, 24-hour and annual $PM_{2.5}$ evaluations, EPA guidance states that the applicant should determine the maximum concentration at each receptor per year, then average those values on a receptor-specific basis over the 5 years of meteorological data prior to comparing with the appropriate SIL. All other pollutants and averaging periods are assessed based on their maximum concentrations in any of the five (5) modeled years.

When modeled design concentrations are less than the applicable SIL, as was the case for several pollutants in this analysis, further analyses (NAAQS and PSD Increment) are not required for those pollutant-averaging period combinations.

As detailed further in Section 4.8.3, the Significance Analysis for $PM_{2.5}$ and $PM_{10}$ also considered secondary $PM_{2.5}$ impacts from the project $NO_X$ and $SO_2$ emissions, in accordance with the updated EPA April 2024 MERPs guidance. Impacts of secondary formation of ozone were also considered through the evaluation of the project VOC and $NO_X$ emissions, in accordance with the EPA April 2024 MERPs guidance.

## 3.2 Ambient Background Data

Ambient background monitoring concentrations are necessary for any required full NAAQS analysis for the facility. As shown in the significance results in Section 5, full impact analyses were required for 1-hour and annual $NO_2$. However, given the vacature of the $PM_{2.5}$ significant monitoring concentration (SMC), per 40 CFR 51.166(i)(5) and 40 CFR 52.21(i)(5)(i)(K), there are no specific pre-construction monitoring exemptions available for $PM_{2.5}$. Given the availability of current, high quality data from existing state-run monitoring networks, MZX is proposing that no preconstruction monitoring be required for $PM_{2.5}$. Additionally, since the project emissions increase will exceed 100 tpy for both $NO_X$ and VOC (precursors to ozone), MZX has selected a background monitor for ozone. Nearby ambient background monitoring stations were reviewed, and the following stations were chosen as appropriately representative ambient background monitoring stations. Locations of the selected background monitors are shown in Figure 3-1.

Figure 3-1. Location of Selected Background Monitors




Monitor selections were based on the criteria listed in EPA's *Guidance on Developing Background Concentrations for Use in Modeling Demonstrations*.[3] When evaluating the criteria from this guidance below, the Marion site was determined to be the most representative background monitor data available.

[3] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on Developing Background Concentrations for Use in Modeling Demonstrations*, Research Triangle Park, North Carolina, EPA 454/R-24-003, November 2024.

- Is the monitor located in an urban or rural setting similar to the project area?
- Are the wind and terrain patterns at the monitor consistent with the project area?
- Is the monitor representative of pollutant transport from other sources located outside of the modeling domain?
- Has ambient data from this monitor been used in previous cumulative impact analysis for the project area or surrounding areas?

### 3.2.1 $NO_2$ Background Monitor

The following site was selected as an appropriately representative background monitor for $NO_2$:

$NO_2$ – LH Polk and Colonial Dr., Marion Site (AQS Site ID 05-035-0005)

The Marion site is the closest geographically to the MZX site (located less than 30km to the northwest) and has valid data through the most recent monitoring year (2024). Marion is in a similar climatological region and is surrounded by similar residential and light industrial landuse types. It is classified as a near road monitor and as such provides a more conservative background value for use in the $NO_2$ modeling analysis.

While background concentrations in the form of the NAAQS standards will be derived for use in the NAAQS modeling analyses results summaries, background concentrations may be derived for use in the NAAQS analyses based on a season and hour-of-day approach. Available EPA guidance (e.g., *Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the $NO_2$ National Ambient Air Quality Standard, September 2014*) would be used for derivation of the season and hour of day background concentrations.

### 3.2.2 $PM_{2.5}$ Background Monitor

As shown in Table 5-1, $PM_{2.5}$ model impacts are below both the 24-hour and annual SILs. As such, no cumulative modeling analyses including ambient background concentrations were required. Nevertheless, since the SMC for $PM_{2.5}$ was vacated, there is no currently-established threshold that specifically eliminates pre-construction monitoring requirement and thus it must still be addressed. The vacated SMC was set at 4 $\mu g/m^3$ on a 24-hour averaging period basis, far in excess of the 1.2 $\mu g/m^3$ SIL which the project models below. There are several $PM_{2.5}$ monitors in the area, each of which have current design values (2022-2024) well below the 24-hour NAAQS of 35 $\mu g/m^3$.[4] The Shelby Farms NCORE Monitoring Site (AQS Site ID 47-157-0075) was chosen to address pre-construction monitoring requirements, based on the following criteria:

1. Proximity – the Shelby Farms site is within 25km of the proposed project site.
2. Monitoring Objective – The Shelby Farms monitor is an NCORE monitor focused on population exposure rather than other monitors in the area which are near road or have alternative monitoring purposes.
3. Dispersion Environment – While the Shelby Farms monitor is not the geographically closest ambient $PM_{2.5}$ monitor to the proposed site, both are located within the same Core-Based Statistical Area (CBSA) (Memphis, TN-MS-AR). The monitoring location is also in a more representative area (e.g., not in high traffic or downtown, heavily urban, or industrial Memphis area) than other surrounding monitors. Both the Shelby Farms monitor and proposed project site are in suburban settings, with a mix of forest, light industry and residential communities which have similar surface roughness. Both areas are also in gently rolling terrain with similar elevations.

---

[4] https://www.epa.gov/system/files/documents/2025-06/pm25_designvalues_2022_2024_final_05_28_25.xlsx

Case: 26-60306 Document: 37 Page: 796 Date Filed: 10/16/2026

4. Emissions Source Distribution – The Shelby Farms monitor is located generally downwind of the densely populated and industrialized locations in the Memphis area, meaning that it would capture the local and regional sources of pollution typical of the overall area. Since the proposed project site is more upwind of the major industrial and anthropogenic sources, and thus not exposed as frequently to direct pollutant transport, the Shelby Farms monitor provides a conservative estimate of background.
5. Meteorology – Both the Shelby Farms monitor location and proposed project site are in the same terrain regime with the same proximity to major water bodies and other features that influence meteorological conditions. There are no unique features at either site that would lead to more or less frequent temperature inversions or extreme stability events. Given that, along with the proximity of the two sites in general, both the monitor and project locations experience similar weather patterns throughout the year.

NCORE stands for the National Core multipollutant monitoring network. Established by the EPA in 2006, this network consists of approximately 80 monitoring stations across the United States that measure multiple air pollutants and meteorological parameters at a single location.

### 3.2.3 Ozone Background Monitor

As discussed in Section 3.4, ozone impacts using the conservative MERP methodology are expected to be well below the EPA-recommended SIL value, thus precluding the need for any cumulative ozone NAAQS review.

However, since the project emissions increase will exceed 100 tpy for both $NO_X$ and VOC (precursors to ozone), a regional characterization of ozone background is provided. The Hernando, MS (AQS Site ID 28-033-0002) site was selected as an appropriately representative background monitor for ozone based on the following factors:

1. Proximity – the Hernando site is within 20km of the proposed project site and is the closest monitor.
2. Monitoring Objective – The Hernando monitoring objective is population exposure rather than other monitors in the area which are near road or have alternative monitoring purposes.
3. Dispersion Environment – Both Hernando and the proposed project site are located within the same CBSA (Memphis, TN-MS-AR). Both sites are also in similar suburban settings, with a mix of forest, light industry and residential communities with similar surface roughnesses. Both areas are also in gently rolling terrain with similar elevations.
4. Emissions Source Distribution – As described in #3, both the Hernando monitor and proposed project site are located in similar suburban settings. There are a few industrial sources in the immediate vicinity of each site, however ozone is driven more by regional pollutant transport and vehicle traffic. The Hernando monitor is an a slight more developed area with increased vehicle traffic flowing in the general vicinity which would make it a somewhat conservative estimate of ambient background.
5. Meteorology – Both the Hernando monitor location and proposed project site are in the same terrain regime with the same proximity to major water bodies and other features that influence meteorological conditions. There are no unique features at either site that would lead to more or less frequent temperature inversions or extreme stability events. Given that, along with the proximity of the two sites in general, both the monitor and project locations experience similar weather patterns throughout the year.

Case: 26-60306 Document: 37 Page: 80 Date Filed: 10/16/2026

The most recent design value period is 2022-2024. The 2022-2024 design value (71 parts per billion [ppb]) is above the ozone NAAQS for the Hernando monitor, however the area continues to be designated attainment for ozone. Further, with the 2025 ozone season ending on October 31, preliminary monitoring data indicates that the 2023-2025 design value will be below the 70 ppb NAAQS. In any case, the proposed project is not significant for ozone, therefore it will not contribute significantly to degradation of the ozone NAAQS in the area.

Table 3-2. Selected Background Concentrations

| PSD Pollutant | Averaging Period | Monitor Background Concentration (μg/m³) | Metric | Monitor Location |
|---|---|---|---|---|
| $NO_2$ | 1-hour | 65.9 | 3-yr average of 98th percentile | Marion Site |
| | Annual | 7.5 | Annual Average | |
| $PM_{2.5}$ | 24-hour | 20.0 | 3-yr average of 98th percentile | Shelby Farms |
| | Annual | 8.4 | Annual Average over 3-yr | |
| Ozone | 8-hour | 71 ppb | 3-yr average of annual 4th highest daily maximum | Hernando |

## 3.3 Ambient Monitoring Requirements

A pre-construction air quality analysis using continuous monitoring data may be required for pollutants subject to PSD review per 40 CFR §52.21(m). Given the extensive network of state-run, EPA-approved ambient monitors for all pollutants triggered by this project, no pre-construction monitoring for ozone should be required.

While not a modeled pollutant, the proposed project has VOC emissions in excess of 100 tpy. Based on this, PSD regulations also require the applicant to address pre-construction monitoring for ozone (VOC). There is already an extensive network of state-run ozone monitors in the area around the project site. Further, as shown in section 4.8.3, potential ozone impacts from the project are well below the EPA-established SIL for ozone. Given the existing monitor network and insignificant impact from the project, no pre-construction monitoring for ozone should be required.

## 3.4 Ozone Ambient Impact Analysis

Elevated ground-level ozone concentrations are the result of photochemical reactions among various chemical species. These reactions are more likely to occur under certain ambient conditions (e.g., high ground-level temperatures, light winds, and sunny conditions). The chemical species that contribute to ozone formation, referred to as ozone precursors, include $NO_X$ and VOC emissions from both anthropogenic (e.g., mobile and stationary sources) and natural sources (e.g., vegetation). Pursuant to 40 CFR 52.21, an ambient ozone impact analysis is not required unless a project's emissions increase is greater than 100 tpy of VOC or $NO_X$. As this project's increase in emissions is greater than 100 tpy of $NO_X$, an ozone impacts analysis was conducted through evaluation of the MERPs.

EPA has issued guidance specifying a SIL value for ozone of 1 ppb, and has developed a demonstration methodology (the MERPs guidance) to provide a framework for a Tier 1 demonstration that can illustrate

that a project will not cause or contribute to any exceedance of ambient ozone standards.[5] The April 2019 EPA guidance document titled *Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and* $PM_{2.5}$ *Under The PSD Permitting Program* was used in conjunction with the most recent April 2024 EPA guidance, to provide a Tier 1 demonstration that ozone impacts from the project will not cause or contribute to ambient air quality levels of ozone. Both VOC and $NO_X$ emissions increases from the project were considered. Details regarding that analysis can be found in Section 4.8.3 of this report.

## 3.5 Class I Requirements

Class I areas are federally protected areas for which more stringent air quality standards apply to protect unique natural, cultural, recreational, and/or historic values. The following Class I areas are located within 300 km of the proposed facility (with the approximate distance to the proposed facility listed) [6]:

- Mingo National Wildlife Refuge (215 km)
- Sipsey Wilderness (233 km)

Figure 3-2. Class I Areas Within 300 km of MZX




All other Class I areas are located at distances greater than 300 km from the proposed facility.

The Federal Land Managers (FLM) have the authority to protect air quality related values (AQRVs) and to consider, in consultation with the permitting authority, whether a proposed major emitting facility or a proposed modification to an existing major emitting facility will have an adverse impact on such values. AQRVs for which PSD modeling is typically conducted include visibility and deposition of sulfur and nitrogen.

[5] *Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier I Demonstration Tool for Ozone and PM2.5 under the PSD Permitting Program* (Memorandum from Mr. Richard A. Wayland, U.S. EPA, to Regional Air Division Directors, April 30, 2019).

[6] All distances approximate and based on data obtained from the Class I Area distance tool as published by the FL DEP at https://floridadep.gov/air/air-business-planning/content/class-i-areas-map

The ratio of emissions to Class I distance (i.e., Q/D) for this project for the Class I areas within 300 km was considered in order to determine if the FLM would require a full AQRV analysis. The FLM's AQRV Work Group (FLAG) 2010 guidance states that a Q/D value of ten or less indicates that AQRV analyses should not be required.[7] The Q/D ratio for all Class I areas within 300 km of the facility was evaluated and demonstrated that impacts will be less than 10. Initial screening criteria were calculated for the Class I areas using proposed MZX plant maximum daily emission estimates and are presented in Table 3-3. As shown, the Q/D values are well below 10 and as such, AQRV analyses should not be required for this project.

Table 3-3. Class I Q/D Screening Analysis

| | Mingo Wilderness Area | Sipsey Wilderness Area |
|---|---|---|
| $SO_2$ (tpy) | 156.53 | 156.53 |
| NOx (tpy) | 474.58 | 474.58 |
| $PM_{10}$ (tpy) | 20.99 | 20.99 |
| $H_2SO_4$ (tpy) | 0.15 | 0.15 |
| Total Emissions (tpy) | 652.25 | 652.25 |
| Distance (km) | 215 | 233 |
| Q/d | 3.03 | 2.80 |

A Significance Analysis was conducted for the Class I areas to determine if an evaluation of PSD Increment impacts upon the Class I area was required. AERMOD was utilized for the $NO_2$, $SO_2$, $PM_{10}$, and $PM_{2.5}$ analyses, whereby a screening procedure was utilized evaluating an array of receptors located 50 km from the facility at 1-degree intervals for a full 360 degrees, creating a ring of hypothetical receptors at a 50 km distance from the facility to compare project emission increase impacts to those receptors at 50 km.[8] Significance results from those receptors demonstrated that the Class I SILs for $PM_{10}$, $PM_{2.5}$, $SO_2$, and $NO_2$ were not exceeded. Results of the analysis can be found in Section 5 of this report.

The Class I area SILs and PSD Increment thresholds utilized are listed below. $PM_{2.5}$ Class I SILs are taken from recent EPA guidance regarding appropriate recommended significant impact levels for $PM_{2.5}$.[9]

---

[7] U.S. Forest Service, National Park Service, and U.S. Fish and Wildlife Service. 2010. Federal land managers' air quality related values work group (FLAG): phase I report, revised (2010). Natural Resource Report NPS/NRPC/NRR, 2010/232. National Park Service, Denver, Colorado.

[8] This assumes that all applicable FLMs have determined that no AQRV analyses are required for the project.

[9] Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program (EPA Memorandum from Richard Wayland, April 30, 2024)

Case 3:26-cv-00078 Document 37-1 Page 84 of 436 Date Filed 10/16/2026

Table 3-4. Class I Significant Impact Levels and Increment Thresholds

| Pollutant | Averaging Period | Class I SIL (μg/m$^3$) | Class I PSD Increment (μg/m$^3$) |
|---|---|---|---|
| $NO_2$ | Annual | 0.1 | 2.5 |
| $PM_{2.5}$ | 24-hour | 0.27 | 2 |
| | Annual | 0.03 | 1 |
| $PM_{10}$ | 24-hour | 0.3 | 8 |
| | Annual | 0.2 | 4 |
| $SO_2$ | 3-hour | 1.0 | 25 |
| | 24-hour | 0.2 | 5 |
| | Annual | 0.1 | 2 |

## 3.6 Regional Inventory Data

As shown in Section 5 of this report, the only pollutants (and averaging periods) that exceeded their respective Class II SIL were 1-hr and annual $NO_2$.

As such, it was necessary to develop regional inventory data for Class II modeling of the previously mentioned pollutant ($NO_2$). Significance evaluations of $NO_2$ showed levels above the SIL that extended to a maximum of 20.9 km from the facility for the 1-hr averaging period and 1.5 km from the facility for the annual averaging period. Modeling inventory information was compiled as described in the following sections.

No other pollutants ($PM_{10}$, $PM_{2.5}$, CO, and $SO_2$) impacts exceeded the Class II SILs and no pollutants exceeded the Class I SILs, as referenced in Section 3.5 and as shown in model results in Section 5.

### 3.6.1 Development of Initial Inventory Source List

Google Earth was relied upon to identify counties or part of the counties that are located within a 50 km radius of the facility. As a result, counties were identified in Tennessee (Shelby, Fayette, and Tipton counties), Mississippi (DeSoto, Marshall, Tate, and Tunica counties), and Arkansas (Crittenden, Cross, St. Francis, Woodruff, and Lee counties).

A comprehensive emissions inventory of all nearby point sources was requested from MDEQ. Nearby sources were also requested from the Shelby County Health Department (SCHD) and the Arkansas Division of Environmental Quality (ADEQ). This inventory was used to determine which nearby sources to include in the cumulative impact modeling. For nearby sources up to 50 km from the proposed MZX site, a Q/D (emission rate/distance) screening assessment was used to determine the additional sources to be modeled. Application of the Q/D assessment involves determining the total annual emission rate (Q) of all sources at a nearby facility and dividing by its distance (D) from the proposed MZX site. If the ratio is greater than or equal to 20, the nearby source was included in the NAAQS/Increment analysis. Sources with a Q/D less than 20 and sources beyond 50 km are indirectly accounted for in the background monitored concentration and do not need to be modeled explicitly. No building downwash was included for these sources.

Limiting the extent and scope of the modeling inventory is supported by EPA statements in the most recently revised Appendix W. Alternative methods for inventory development may be used in accordance with the *Guideline* which states that

Case: 26-60806 Document: 37 Page: 85 Date Filed: 10/16/2026

"*The number of nearby sources to be explicitly modeled in the air quality analysis is expected to be few except in unusual situations. The determination of nearby sources through the application of the EPA's recommended framework calls for the exercise of professional judgment by the appropriate reviewing authority…".*[10]

### 3.6.2 File Review of Modeling Parameters

File reviews at SCHD and MDEQ were conducted for the Title V/PSD major sources already identified (for validity of data from the PSD inventory) as well as for minor sources. Additionally, ADEQ databases were queried for records on facilities identified in the respective state inventories. Based on the results of the file review and additional research, a few identified sources were excluded from the modeling evaluation for the following reasons:

- The site consisted of only emergency use equipment, not subject to inclusion in modeling analyses.
- File review indicated the site of interest was not a source of $NO_2$ emissions, and the source was, therefore, removed from consideration.

A listing of those sites identified, as well as the final major and minor source inventory information modeled for the NAAQS and PSD Increment analysis is included in Appendix C.

## 3.7 Additional Impacts Analysis

PSD regulations require that three "additional impacts" be considered as part of a PSD permit action: a soil and vegetation analysis, an economic growth analysis, and a visibility analysis. The effect of the proposed project's CO, $SO_2$, $NO_2$, $PM_{10}$ and $PM_{2.5}$ emissions increases on local soils and vegetation was addressed through comparison of modeled impacts to the secondary NAAQS. The results of this analysis are discussed in Section 5.4.

An economic growth analysis is intended to assess the amount of new growth that is likely to occur in support of the new project and to estimate emissions resulting from associated growth. Associated growth relates to any residential and commercial/industrial growth that may result from the proposed project. Residential growth depends on the number of new employees and the availability of housing in the area, while associated commercial and industrial growth consists of new sources providing services to the new employees and the facility. The proposed project will not result in a change of the current resources necessary to operate and support the project. Therefore, additional economic growth impacts from the proposed project will be minimal. No significant air quality degradation due to associated growth will be expected. Construction activities will also be planned so that no adverse air quality or visibility impacts occur.

A near-field visibility analysis was conducted for the sensitive receptor closest to the project site, where sensitive receptor is defined as a regional airport, state park, or state historic site located within the project's significant impact area (SIA). The Memphis International Airport (KMEM) is located 6.9 km to the NW of the project site which is within the project SIA for 1-hour $NO_2$. As such, a near-field visibility analysis was conducted for KMEM, using EPA's VISCREEN model, and the results are presented in Section 5.4.

Also, per 40 CFR 52.21, as the net emissions increase for the proposed project is greater than 100 tons per year of $NO_X$, an ambient air quality analysis or gathering of ambient air quality data is required for ozone.

---

[10] Appendix W, Section 8.3.3.b.iii

Additional consideration of ozone is discussed further in Section 4 of this report associated with the EPA guidance document associated with Modeled Emission Rates for Precursors (MERPs), as well as the more recent April 2024 EPA guidance regarding the MERPs.

Case: 26-60806 Document: 37-1 Page: 87 Date Filed: 10/16/2026

# 4. MODEL SELECTION AND METHODOLOGY

This section includes a summary of the modeling methodology originally presented in the dispersion modeling protocol previously submitted to and approved by the MDEQ.

## 4.1 Model Selection – AERMOD

Dispersion models predict downwind pollutant concentrations by simulating the evolution of the pollutant plume over time and space for specific set of input data. These data inputs include the pollutant's emission rate, source parameters, terrain characteristics, and atmospheric conditions.

According to the 40 CFR 51, Appendix W (the *Guideline)*, the extent to which a specific air quality model is suitable for the evaluation of source impacts depends on (1) the meteorological and topographical complexities of the area; (2) the level of detail and accuracy needed in the analysis; (3) the technical competence of those undertaking such simulation modeling; (4) the resources available; and (5) the accuracy of the database (i.e., emissions inventory, meteorological, and air quality data).

Taking these factors into consideration, MZX utilized the AERMOD modeling system to represent all project emissions sources at the facility. AERMOD is the default model for evaluating impacts attributable to industrial facilities in the near-field (i.e., source receptor distances of less than 50 km) and is the recommended model in the *Guideline*.

The latest version (v24142) of the AERMOD modeling system was used to estimate maximum ground-level concentrations in all analyses conducted for this application. AERMOD is a refined, steady-state, multiple source, Gaussian dispersion model and was promulgated in December 2005 as the preferred model for use by industrial sources in this type of air quality analysis.[11] The AERMOD model has the Plume Rise Modeling Enhancements (PRIME) incorporated in the regulatory version, so the direction-specific building downwash dimensions used as inputs are determined by the Building Profile Input Program, PRIME version (BPIP PRIME), version 04274.[12] BPIP PRIME is designed to incorporate the concepts and procedures expressed in the GEP Technical Support document, the Building Downwash Guidance document, and other related documents, while incorporating the PRIME enhancements to improve prediction of ambient impacts in building cavities and wake regions.[13]

The AERMOD modeling system is composed of three modular components: AERMAP, the terrain preprocessor; AERMET, the meteorological preprocessor; and AERMOD, the dispersion and post-processing module.

AERMAP is the terrain pre-processor that is used to import terrain elevations for selected model objects and to generate the receptor hill height scale data that are used by AERMOD to drive advanced terrain processing algorithms. National Elevation Dataset (NED) data available from the United States Geological Survey (USGS) are utilized to interpolate surveyed elevations onto user specified receptor, building, and

[11] 40 CFR Part 51, Appendix W, Guideline on Air Quality Models, Appendix A.1 AMS/EPA Regulatory Model (AERMOD).

[12] Earth Tech, Inc., Addendum to the ISC3 User's Guide, The PRIME Plume Rise and Building Downwash Model, Concord, MA.

[13] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Guidelines for Determination of Good Engineering Practice Stack Height (Technical Support Document for the Stack Height Regulations) (Revised), Research Triangle Park, North Carolina, EPA 450/4-80-023R, June 1985.

Case: 26-60306 Document: 37 Page: 886 Date Filed: 10/16/2026

source locations in the absence of more accurate site-specific (i.e., site surveys, GPS analyses, etc.) elevation data.

AERMET generates a separate surface file and vertical profile file to pass meteorological observations and turbulence parameters to AERMOD. AERMET meteorological data are refined for a particular analysis based on the choice of micrometeorological parameters that are linked to the land use and land cover (LULC) around the meteorological site shown to be representative of the application site.

The AERMOD dispersion model allows for emission units to be represented as point, area, or volume sources. All point sources with vertical releases were modeled with their actual stack parameters (i.e., height, diameter, exhaust gas temperature, and gas exit velocity).

MZX used the BREEZE® graphical interface, developed by Trinity Consultants, to assist in developing the model input files for AERMOD. This software program incorporates the most recent versions of AERMOD (dated 24142) and AERMAP (dated 24142) and provides capability for image-generation. Using the procedures outlined in the *Guideline* as a reference, the AERMOD dispersion modeling for this project was performed using only regulatory default options.

## 4.2 Modeled Sources

MZX modeled the project-associated sources for the significance analysis. This includes the facility's 41 simple cycle combustion turbines (TUR-1 through TUR-41) and 10 Plum PRS units that will be installed as part of this project.

For any off-site impact calculated in the significance modeling analysis that was greater than the SIL for a given pollutant, a NAAQS analysis incorporating nearby sources was performed (cumulative impact analysis). For the cumulative impact analysis, all sources at the facility and the appropriate inventory sources were included.

Modeling analysis for each ambient-air standard utilized inputs that represent the most conservative, or a "worst-case", operating scenario. The "worst-case" operating scenario, for modeling purposes, represents the load and ambient temperature conditions when worst-case concentrations occur because combustion turbine performance varies with generation load and temperature. Rather than modeling various individual load scenarios (e.g., 50%, 75%, 100%), MZX presents a single, conservative modeling case. This case pairs the highest potential emission rates (which typically occur at high loads) with the poorest plume dispersion characteristics (e.g. the lowest exhaust temperature and velocity, which typically occur at lower loads). The intent of this hybrid approach is to create a scenario that is more conservative than any single, real-world operating condition. With compliance demonstrated under this overly conservative scenario, it can be assumed that the facility is in compliance under all other operating loads.

The stack parameters selected to represent "worst-case" are provided in Table 4-1.

Table 4-1. Modeled Source Parameters

| Proposed Unit | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Inside Diameter (m) |
|---|---|---|---|---|
| 350 | 24.4 | 740.3 | 22.4 | 3.35 |
| 130 | 15.2 | 766.5 | 21.5 | 2.74 |
| Proenergy | 25.0 | 617.6 | 23.8 | 3.05 |
| Plum | 7.6 | 477.6 | 2.0 | 0.61 |

The MZX facility is designed to be a continuous power generation site, it is not a peaking or other type of site where it will undergo frequent startup and shutdown activity. Further, the startup/shutdown cycle for each Solar unit completes in ten (10) minutes and each Proenergy unit completes in thirty (30) minutes and there will be no more than six (6) planned startup/shutdown events in a given year. As such, that is no more than one (1) hour of operation in startup/shutdown mode for any specific piece of equipment and no more than 198 hours total across all planned turbines. Given the extremely infrequent nature of those conditions, startup/shutdown events could be excluded from the model based on EPA's Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$, as discussed on page 8 (bold added for emphasis):

"However, the intermittent nature of the actual emissions associated with emergency generators and startup/shutdown in many cases, when coupled with the probabilistic form of the standard, could result in modeled impacts being significantly higher than actual impacts would realistically be expected to be for these emission scenarios. The potential overestimation in these cases results from the implicit assumption that worst-case emissions will coincide with worst-case meteorological conditions based on the specific hours on specific days of each of the years associated with the modeled design value based on the form of the hourly standard."

And also Page 9 (bold added for emphasis):

"Given the implications of the probabilistic form of the 1-hour $NO_2$ NAAQS discussed above, we are concerned that assuming continuous operations for intermittent emissions would effectively impose an additional level of stringency beyond that intended by the level of the standard itself. As a result, we feel that it would be inappropriate to implement the 1-hour $NO_2$ standard in such a manner and recommend that compliance demonstrations for the 1-hour $NO_2$ NAAQS be based on emission scenarios that can logically be assumed to be relatively continuous or which occur frequently enough to contribute significantly to the annual distribution of daily maximum 1-hour concentrations. EPA believes that existing modeling guidelines provide sufficient discretion for reviewing authorities to exclude certain types of intermittent emissions from compliance demonstrations for the 1-hour $NO_2$ standard under these circumstances."

However, in order to ensure the protection of public health across all situations, EPA also discusses alternatives to exclusion on p.11:

"Another approach that may be considered in cases where there is more uncertainty regarding the applicability of this guidance would be to model impacts from intermittent emissions based on an average hourly rate, rather than the maximum hourly emission. For example, if a proposed permit includes a limit of 500 hours/year or less for an emergency generator, a modeling analysis could be based on assuming continuous operation at the average hourly rate, i.e., the maximum hourly rate times 500/8760. This

Case: 26-60306 Document: 71 Page: 90 Date Filed: 10/16/2026

approach would account for potential worst-case meteorological conditions associated with emergency generator emissions by assuming continuous operation, while use of the average hourly emission represents a simple approach to account for the probability of the emergency generator actually operating for a given hour."

MZX utilized an even more conservative emission approach to account for the infrequent nature of startup and shutdown activities at the facility. Since no more than five (5) combustion turbines of each model type (e.g., Solar 130, Solar 350, Proenergy) will be in startup mode in any given hour, MZX's approach consists of determining which (five) 5 sources represent the "worst-case" modeled impact during startup.

The five (5) "worst-case" sources were determined by modeling all combustion turbines at a unit emission rate of 1 gram per second (g/s) to determine which combustion turbines have the highest predicted impact (by turbine type). MZX then modeled a scenario where the five Solar 350s, five Solar 130s, and five ProEnergy turbines with the worst-case impacts are in startup mode within the same hour. The modeled emission rate for these units is a blended hourly rate, calculated by combining the short-duration (e.g., 10 or 30 minutes) startup emissions with the normal maximum hourly rate for the remainder of that hour. The resulting SIL and full impact models, where necessary, thus include a total of fifteen (15) combustion turbines at emission rates assuming one startup every hour for short term averaging periods, and the remaining twenty-six (26) combustion turbines modeled at normal operating emission rates. For annual averaging periods, all combustion turbines were modeled at annualized emission rates equivalent to the total annual emissions estimated for the type of combustion turbine plus the total annual startup and shutdown emissions for the type of combustion turbine. By using this modeling approach, it is acknowledged and accepted that the final permit will include an enforceable operational limit restricting the facility to having no more than five of each turbine type in startup or shutdown mode during any given hour. Table 4-2 provides the results of the analysis to determine which five combustion turbines of each type represent the "worst-case" modeling scenario during startup and shutdown activities.

Table 4-2. **"Worst-Case" Analysis of Combustion Turbine Stacks**

| Predicted Impact Ranking | Solar 130 | | Solar 350 | | Proenergy | |
|---|---|---|---|---|---|---|
| 1 | TUR2 | 2.53 | TUR27 | 1.27 | TUR35 | 10.49 |
| 2 | TUR4 | 2.50 | TUR18 | 1.27 | TUR37 | 8.29 |
| 3 | TUR11 | 2.49 | TUR26 | 1.23 | TUR38 | 6.76 |
| 4 | TUR6 | 2.46 | TUR20 | 1.21 | TUR36 | 5.57 |
| 5 | TUR13 | 2.42 | TUR28 | 1.20 | TUR41 | 4.52 |
| 6 | TUR7 | 2.35 | TUR19 | 1.19 | TUR39 | 3.95 |
| 7 | TUR8 | 2.34 | TUR32 | 1.19 | TUR40 | 2.76 |
| 8 | TUR14 | 2.32 | TUR21 | 1.19 | TUR34 | 2.51 |
| 9 | TUR1 | 2.32 | TUR29 | 1.16 | | |
| 10 | TUR9 | 2.32 | TUR33 | 1.16 | | |
| 11 | TUR3 | 2.31 | TUR31 | 1.16 | | |
| 12 | TUR5 | 2.27 | TUR22 | 1.15 | | |
| 13 | TUR15 | 2.27 | TUR25 | 1.15 | | |
| 14 | TUR16 | 2.25 | TUR24 | 1.15 | | |
| 15 | TUR12 | 2.23 | TUR30 | 1.13 | | |
| 16 | TUR17 | 2.21 | TUR23 | 1.12 | | |
| 17 | TUR10 | 2.13 | | | | |

## 4.3 Receptor Grid and Coordinate System

The entire MZX facility property will be fenced. Modeled concentrations were calculated at ground-level receptors placed along the facility's fence line and on a variable Cartesian receptor grid. Fence line receptors were spaced no further than 50 meters apart. Beyond the fence line, receptors were spaced 100 meters apart on a Cartesian grid extending out to a distance sufficient to resolve the maximum concentration, but at least extending outward to 5 km in all directions. Additionally, less refined receptor grids extend from the finest grid out to 10 km in each direction, with receptors spaced 250 meters apart from 5 km – 8 km from the facility and 500 meters from 8 km to 10 km from the facility. If the SIL is exceeded for any pollutant, additional modeling will be performed to determine the size of the significant impact area (SIA).

In general, the receptors covered a region extending from all edges of the proposed facility ambient boundary to the point where impacts from the project are no longer expected to be significant. The boundary was defined as all areas that will be fenced and/or not accessible to the general public as shown in Figure 2-2. In accordance with EPA's ambient air policy dated December 2, 2019, MZX will use a combination of fencing and security measures to prevent the public from accessing MZX property.

For any pollutants exceeding the Class II SIL, the cumulative modeling for demonstrating compliance with the applicable NAAQS and PSD Increments was conducted for those receptors with impacts equal to or greater than the SIL in the SIL analyses. Since 1-hour $NO_2$ Impacts exceeded the NAAQS, the MAXDCONT option in AERMOD was used to determine if the proposed project was significant (above the corresponding SIL) at the receptors exceeding the standard.

Receptor elevations and hill heights required by AERMOD were determined using the AERMAP terrain preprocessor (version 24142). Terrain elevations from the USGS 1-arc second NED were used for AERMAP processing. In all modeling data files, the location of emission sources, structures, and receptors are represented in the UTM coordinate system, zone 15, NAD-83.

## 4.4 Urban versus Rural Dispersion Options

Classification of land use in the immediate area surrounding a facility is important in determining the appropriate dispersion coefficients to select for a particular modeling application. The selection of either rural or urban dispersion coefficients for a specific application should follow one of two procedures. These include a land use classification procedure or a population-based procedure to determine whether the area is primarily urban or rural.[14]

Of the two methods, the land use procedure is considered more definitive. The land use within the total area circumscribed by a 3-km radius circle around the facility was classified using the land use typing scheme proposed by Auer. If land use types 23 (Developed, Medium Intensity), or 24 (Developed, High Intensity) account for 50% or more of the circumscribed area, urban dispersion coefficients should be used; otherwise, rural dispersion coefficients are appropriate.

AERSURFACE (v24142) was used for the extraction of the land-use values in the domain. The results of the land use analysis evaluation were as follows.

Each USGS NLCD 2016 land use class was compared to the most appropriate Auer land use category to quantify the total urban and rural area. Table 4-1 summarizes the results of this land use analysis. As shown, approximately 82% of the area can be classified as rural, which is well in excess of the 50% threshold established in the Auer procedure. Therefore, rural dispersion coefficients will be used in AERMOD.

[14] 40 CFR Part 51, Appendix W, the Guideline on Air Quality Models (January 2017) – Section 7.2.1.1(b)(i)

Case 3:26-cv-00608 Document 37 Page 93 Date Filed 10/16/2026

Table 4-3. Summary of Land Use Analysis

| Category ID | Category Description | Number of Grid Cells | Percent | Dispersion Class |
|---|---|---|---|---|
| 11 | Open Water | 68 | 0.2% | Rural |
| 21 | Developed, Open Space | 7,593 | 24.2% | Rural |
| 22 | Developed, Low Intensity | 8,098 | 25.8% | Rural |
| 23 | Developed, Medium Intensity | 4,284 | 13.6% | Urban |
| 24 | Developed, High Intensity | 1,466 | 4.7% | Urban |
| 31 | Barren Land | 1 | 0.0% | Rural |
| 41 | Deciduous Forest | 276 | 0.9% | Rural |
| 42 | Evergreen Forest | 54 | 0.2% | Rural |
| 43 | Mixed Forest | 3,719 | 11.8% | Rural |
| 52 | Shrub/Scrub | 257 | 0.8% | Rural |
| 71 | Grassland/Herbaceous | 23 | 0.1% | Rural |
| 81 | Pasture/Hay | 3,054 | 9.7% | Rural |
| 82 | Cultivated Crops | 340 | 1.1% | Rural |
| 90 | Woody Wetlands | 2,105 | 6.7% | Rural |
| 95 | Emergent Herbaceous Wetlands | 60 | 0.2% | Rural |
| | **Total** | 31,398 | 100% | |
| | **Urban** | | 18.3% | |
| | **Rural** | | 81.7% | |

## 4.5 Meteorological Data

Given that site-specific meteorological data was not available for the proposed site, data collected by a representative meteorological site was used. According to Appendix W, the selection of meteorological data to be used in the modeling analysis should be based on spatial and climatological (temporal) representativeness.[15] The representativeness of the data is based on the following:

1. The proximity of the meteorological monitoring site to the area under consideration;
2. The complexity of terrain;
3. The exposure of the meteorological site; and
4. The period during which data are collected.

Site-specific meteorological data or data from National Weather Service (NWS) stations, universities, Federal Aviation Administration (FAA) stations, military stations, and others should be used if possible. The determination of representativeness of site-specific data for AERMOD applications cannot be based solely on

[15] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised January 17, 2017.

proximity.[16] According to Appendix W, the implementation of NWS Automated Surface Observing Stations (ASOS) in the early 1990's should not preclude the use of NWS ASOS data if such a station is determined to be representative of the modeled area.[17] Surface meteorological sites located within 120 km of the proposed site with available comprehensive meteorological data during the 2019-2023 period were evaluated.

Table 4-4. Meteorological Surface Stations Near Proposed Facility

| Met Station ID | WBAN ID | Site Description | Base Elevation (m) | Distance from MZX (km) | Recoverability 2019-2023 |
|---|---|---|---|---|---|
| MEM | 13893 | MEMPHIS | 76.8 | 6.9 | 99.18% |
| OLV | 13815 | OLIVE BRANCH | 124.1 | 22.3 | 91.65% |
| AWM | 53959 | WEST MEMPHIS MUNICIPAL | 63.7 | 24.2 | 92.19% |
| NQA | 93839 | MILLINGTON REGIONAL | 102.4 | 43.4 | 88.75% |
| UTM | 23903 | TUNICA MUNICIPAL | 57.0 | 42.9 | 59.92% |
| CKM | 00314 | CLARKSDALE COUNTY | 51.6 | 84.5 | 69.41% |
| HKA | 53869 | BLYTHEVILLE MUNICIPAL | 77.5 | 110.7 | 95.06% |
| JBR | 03953 | JONESBORO MUNICIPAL | 79.9 | 112.9 | 89.78% |

[16] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Memorandum, April 17, 2018.

[17] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised January 17, 2017.

Figure 4-1. Meteorological Surface Stations Near Proposed Facility




All sites were analyzed for data completeness with AERMET using the latest available 5-year data set for each site. Based on the results, the three sites with the greatest recoverability (AWM, MEM, HKA) were analyzed further to determine recoverability by quarter over the 5-year period (2019-23). MEM showed greater than 90% recoverability for every quarter of each year. AWM showed less than 90% for one quarter and just above 90% for at least two more quarters during the 5-year period. HKA also showed less than 90% recoverability for one quarter and had several quarters below 95%. Given that MEM has complete, recent data and is located in such close proximity to the MZX site, MEM was reviewed to confirm representativeness.

Regulatory application of AERMOD necessitates careful evaluation of the meteorological data for input to AERMET. Data representativeness, in the case of AERMOD, means utilizing data of an appropriate type for constructing realistic boundary layer profiles.[18] Calculations of the boundary layer parameters are dependent on the surface characteristics in the vicinity of the modeled facility. The surface characteristics are quantified by the assignment of three variables: albedo, Bowen ratio, and surface roughness length.

AERSURFACE was used to determine surface characteristics using land cover data from the U.S. Geological Survey (USGS) National Land Cover Data (NLCD) 2016 archives and look-up tables of surface characteristics that vary by land cover type and season.[19] The surface variables were set to vary by season using 12 sectors. For the AERSURFACE analysis, the mean of the surface characteristics generated for average

---

[18] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised January 17, 2017.

[19] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *User's Guide for AERSURFACE Tool*, Research Triangle Park, North Carolina, EPA 454/B-20-008, February 2020.

moisture conditions at each of the nearby meteorological stations were compared to the proposed MZX site. The results of the AERSURFACE analysis showed that MEM site has surface characteristics comparable to the proposed MZX site.

Table 4-5. Surface Characteristics of Selected Meteorological Stations

| Meteorological Station ID | Mean Albedo | Mean Bowen Ratio | Mean Surface Roughness |
|---|---|---|---|
| Proposed MZX Site | 0.160 | 0.697 | 0.163 |
| MEM | 0.170 | 0.883 | 0.042 |

The MEM meteorological site was also evaluated with a land cover analysis, a terrain analysis, a climate analysis, and a wind-rose analysis. For the land cover analysis, a one kilometer (km) radius was centered on the meteorological tower location, and the land use was categorized based on the 2019 NLCD.[20] Impervious and canopy differences among the sites were also examined. The results showed that the MEM site had similar spatial distribution of land use, impervious coverage, and canopy coverage to MZX.

In addition to the land cover similarities, windroses for the 3 nearest meteorological stations were reviewed to ensure climatological consistency between the project site and chosen meteorological site. Figure 4-2 through Figure 4-4 present windroses from MEM, Olive Branch Airport and West Memphis Municipal Airport, respectively. Each of the windroses show prevailing winds with a southerly component and winds much less frequently coming from the western or eastern directions. Overall, the windroses demonstrate consistency in wind flow across the area encompassing the project site and meteorological stations. All windroses were obtained from Iowa State University's, "Iowa Environmental Mesonet" website.[21]

[20] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised January 17, 2017.

[21] https://mesonet.agron.iastate.edu/sites/locate.php

Figure 4-2. Windrose for Memphis International Airport



Case: 3:26-cv-00080-MB-DMV Document #: 37 Page: 98 Date Filed: 10/16/2026

Figure 4-3. Windrose for Olive Branch Airport



Figure 4-4. Windrose for West Memphis Municipal Airport



From the results of all analyses, the MEM NWS site was chosen to best represent the land use, terrain, and exposure of the MZX site. According to Appendix W, Section 8.4.2(b), the surface characteristics input to AERMET should be representative of the land cover in the vicinity of the meteorological data, i.e., the location of the meteorological tower for measured data.[22] Therefore, surface characteristics representative of the MEM NWS site was used in AERMET. The area surrounding the proposed site and the MEM NWS are shown in Figure 4-5.

Figure 4-5. MZX Site and MEM Site




Characterization of surface moisture conditions for the NWS MEM site for each year of meteorology is presented in Table 4-6. The surface moisture conditions were determined by comparing precipitation for the period of data to be processed to the 30-year climatological record, selecting "wet" conditions if precipitation is in the upper 30th percentile, "dry" conditions if precipitation is in the lower 30th percentile, and "average" conditions if precipitation is in the middle 40th percentile.[23]

---

[22] Ibid.

[23] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *ERMOD Implementation Guide*, Research Triangle Park, North Carolina, EPA 454/B-23-009, 2023.

Table 4-6. Average Yearly Surface Moisture Conditions for MEM

| Year | Annual Precipitation [1] | Surface Moisture Classification [2] |
|---|---|---|
| 2019 | 73.14 | WET |
| 2020 | 58.85 | AVG |
| 2021 | 51.80 | AVG |
| 2022 | 51.96 | AVG |
| 2023 | 51.96 | AVG |

1. https://www.ncdc.noaa.gov/cdo-web/search.
2. https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/county/time- series.

According to Appendix W, the EPA has integrated the ADJ_U* option into AERMET as a regulatory option to address issues with model over-prediction of ambient concentrations from some sources associated with under-prediction of the surface friction velocity (u*) during light wind, stable conditions.[24] The ADJ_U* option is specifically recommended for sources using standard NWS airport meteorological data, site-specific meteorological data without turbulence parameters, or prognostic meteorological inputs derived from prognostic meteorological models. The ADJ_U* option was used in AERMET Stage 3.

For upper air data, the closest upper air station is located at the NWS in North Little Rock, AR (KLZK, WMO ID 72340). Twice daily soundings from the NWS KLZK radiosonde site for the 2019-2023 period were used in AERMET.

Given the representativeness for MEM and KLZK, the meteorological data set for the time period from 2019 to 2023, was processed using the ADJ_U* option in the latest version of AERMET (version 24142). The data were processed and prepared using the surface characteristics of the Memphis International Airport surface station. A surface station elevation of 271 ft was utilized in the modeling analyses.

## 4.6 Building Downwash Analysis

AERMOD incorporates the Plume Rise Model Enhancements (PRIME) downwash algorithms. Direction specific building parameters required by AERMOD are calculated using the BPIP-PRIME preprocessor (version 04274). Facility structures were built into the model and downwash influences were evaluated appropriately.

## 4.7 GEP Stack Height Analysis

EPA has promulgated stack height regulations that restrict the use of stack heights in excess of "Good Engineering Practice" (GEP) in air dispersion modeling analyses. Under these regulations, that portion of a stack in excess of the GEP height is generally not creditable when modeling to determine source impacts. This essentially prevents the use of excessively tall stacks to reduce ground-level pollutant concentrations.

This equation is limited to stacks located within 5L of a structure. Stacks located at a distance greater than 5L are not subject to the wake effects of the structure. The wind direction-specific downwash dimensions and the dominant downwash structures used in this analysis are determined using BPIP. In general, the

[24] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised January 17, 2017.

lowest GEP stack height for any source is 65 meters by default.[25] None of the facility's emission unit stacks exceed GEP height.

## 4.8 Modeled Emission Sources

As discussed in Section 3 of this report, the Significance Analysis evaluates the potential emissions of the greenfield facility emissions sources and does not take into consideration any regional off-site emissions sources. The NAAQS and Increment analyses consider emissions from both on-site and off-site sources. This section discusses the emission sources considered, emission rates, and modeling methods utilized in the Significance Analysis and NAAQS and Increment analyses.

### 4.8.1 Significance Analysis

The Significance Analysis was conducted to determine whether the emissions increases associated with the proposed project are modeled to exceed the SIL. This analysis is based on modeling the worst-case operating scenario. Class I and Class II significance modeling utilized worst-case short-term emissions derived for evaluation of long-term (e.g., annual) conditions.

Information providing the modeling inputs utilized in the significance, NAAQS, and Increment analyses, can be found in Appendix C.

### 4.8.2 $NO_2$ Modeling Approach

The revised *Guideline* now indicates Ambient Ratio Method 2 (ARM2) has replaced ARM as the regulatory default Tier 2 NO2 modeling method. MZX utilized ARM2 for modeling $NO_2$ for the 1-hour and annual SIL and NAAQs modeling assessments, and for the annual PSD increment modeling assessment.

All emissions data was input into the AERMOD model as $NO_X$, with the model providing output results in terms of $NO_2$. Electronic modeling files for the $NO_2$ modeling analyses are provided in Appendix D.

### 4.8.3 Tier 1 Analysis - Consideration of Modeled Emission Rates for Precursors (MERPs)

In April 2018, the EPA released guidance recommending SILs for ozone and $PM_{2.5}$.[26] Although this guidance was not a final agency action and did not create any binding requirements on permitting authorities, permit applicants, or the public, the recommended SILs could be used to demonstrate that a proposed source does not cause or contribute to a exceedance of any NAAQS or PSD increments. On April 30, 2024, the EPA provided supplemental guidance to the SILs for ozone and $PM_{2.5}$ which retained the SILs for ozone and 24-hour $PM_{2.5}$ and recommended new, lower SILs for annual PM2.5.[27] MZX used the latest recommended Class II SILs for ozone and $PM_{2.5}$ to assess potential secondary pollutant impacts from the proposed facility.

---

[25] 40 CFR §51.100(ii)

[26] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Memorandum, April 17, 2018.

[27] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, April 30, 2024.

Case: 26-60780 Document: 37 Page: 103 Date Filed: 10/16/2026

In July 2022, the EPA provided final guidance on how to implement the modeling requirements to show PSD compliance for ozone and $PM_{2.5}$.[28] To make the required NAAQS or PSD increment compliance demonstration, proposed sources should provide a full accounting of the combined impacts of each allowable precursor (and the direct component of $PM_{2.5}$) emissions on ambient concentrations of the relevant ozone and $PM_{2.5}$ NAAQS if any precursor(s) (or the direct component of $PM_{2.5}$) would be emitted in a significant amount. In other words, for ozone, if either $NO_X$ or VOC precursor emissions would be emitted in a significant amount (i.e., above their SER), then both precursors should be included in the assessment of ozone impacts. For $PM_{2.5}$, if a source would emit a significant amount of one or more of $NO_X$, $SO_2$, or direct $PM_{2.5}$ emissions, then the source should include $NO_X$ and $SO_2$ precursor as well as direct $PM_{2.5}$ emissions in the assessment of $PM_{2.5}$ impacts. Primary impacts of $PM_{2.5}$ were estimated with the AERMOD modeling system.

To estimate ozone and total $PM_{2.5}$ impacts, the EPA released final guidance on the use of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 demonstration tool.[29] The tool relates single source impacts on secondary pollutants (ozone and secondary $PM_{2.5}$) with an air quality threshold to determine if such an impact causes or contributes to an exceedance of any NAAQS or PSD Increments.[30] MERPs reflect levels of increased precursor emissions that are not expected to cause a significant contribution to ozone and $PM_{2.5}$. In practice, MERPs are intended to be used with SILs as analytical tools for PSD air quality analyses.

The Shelby County (Memphis) hypothetical source was chosen as the representative source for the ozone and $PM_{2.5}$ MERPs analyses. The greater metropolitan Memphis area is less than 20 km from the project location, and the project site and hypothetical source are in the same regional area for influences on ozone formation from VOC and $NO_X$ emissions. The appropriate tpy/stack height combination was chosen for the pollutants in question and the calculations conducted were consistent with EPA guidance to evaluate project-based impacts compared to the ozone SIL.

#### *4.8.3.1 Ozone MERPS Assessment*

All MERP data was pulled from the EPA MERPs View Qlik database, for the Shelby County site.[31] The 10 meter stack data was utilized from Qlik. The SIL analysis demonstration for the proposed project is as follows:

> (($423.39$ tpy $NO_X$ project emissions increase / 500 tpy hypothetical source) * (0.694398 ppb hypothetical source impact)) + (417.4 tpy VOC project emissions increase / 500 tpy hypothetical source) * (0.250293 ppb hypothetical source impact)) = 0.797 ppb

As the predicted ozone value is less than the SIL value of 1, a cumulative analysis for ozone was not required.

---

[28] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance for Ozone and Fine Particulate Matter Permit Modeling*, Research Triangle Park, North Carolina, July 2022.

[29] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and PM2.5 under the PSD Permitting Program*, Research Triangle Park, North Carolina, 2019.

[30] Ibid.

[31] https://www.epa.gov/scram/merps-view-qlik

#### *4.8.3.2 $PM_{2.5}$ MERPS Assessment*

As mentioned above, all MERP data was pulled from the EPA View Qlik database. The 10 meter stack data was utilized from Qlik. The MERP calculations are as follow:

For annual $PM_{2.5}$:

> ((423.39 tpy $NO_X$ project emissions increase / 500 tpy $NO_X$ hypothetical source) * (0.003261 $\mu g/m^3$ hypothetical source impact)) + (156.53 tpy $SO_2$ project emissions increase / 500 tpy $SO_2$ hypothetical source) * (0.008668 $\mu g/m^3$)) = 5.48E-03 $\mu g/m^3$

For daily $PM_{2.5}$:

> ((423.39 tpy $NO_X$ project emissions increase / 500 tpy $NO_X$ hypothetical source) * (0.060261 $\mu g/m^3$ hypothetical source impact)) + (156.53 tpy $SO_2$ project emissions increase / 500 tpy $SO_2$ hypothetical source) * (0.671154 $\mu g/m^3$)) = 2.61E-01 $\mu g/m^3$

The above considerations of additive effects of secondary $PM_{2.5}$ to direct primary $PM_{2.5}$ should be considered highly conservative, since it is highly unlikely that there would be temporal and spatial alignment of primary and secondary $PM_{2.5}$ impacts, particularly for the short term 24-hr averaging period in the near field of the facility, where modeled primary $PM_{2.5}$ impacts are at their highest.

Secondary $PM_{2.5}$ has been added into the summary tables for all $PM_{2.5}$ Class II SIL modeling results in Section 5.

In addition to the Class II values described above, the distance-dependent MERP values were downloaded in order to estimate the impact at the 200 km distance to the nearest Class I area. Those MERP calculations are as follow:

For annual $PM_{2.5}$:

> ((423.39 tpy $NO_X$ project emissions increase / 500 tpy $NO_X$ hypothetical source) * (0.001108 $\mu g/m^3$ hypothetical source impact)) + (156.53 tpy $SO_2$ project emissions increase / 500 tpy $SO_2$ hypothetical source) * (0.000719 $\mu g/m^3$)) = 1.16E-03 $\mu g/m^3$

For daily $PM_{2.5}$:

> ((423.39 tpy $NO_X$ project emissions increase / 500 tpy $NO_X$ hypothetical source) * (0.037541 $\mu g/m^3$ hypothetical source impact)) + (156.53 tpy $SO_2$ project emissions increase / 500 tpy $SO_2$ hypothetical source) * (0.087982 $\mu g/m^3$)) = 5.93E-02 $\mu g/m^3$

Those secondary $PM_{2.5}$ impacts have been added into the summary tables for all $PM_{2.5}$ Class I SIL modeling results in Section 5.

# 5. SUMMARY OF RESULTS

This section summarizes the results of the dispersion modeling analyses. Electronic copies of modeling files are being sent electronically.

## 5.1 Class II and Class I Significance Analyses

As discussed in Sections 3.1 and 3.5, Significance Analyses for Class II and Class I areas, respectively, were conducted to determine the need for further pollutant modeling. Modeled emission points, parameters, and emission rates for the Significance Analyses are provided in Appendix C.

The results of the Class II Significance Analyses for each pollutant are provided in Table 5-1 and represent the maximum modeled concentrations from the significance runs.

Table 5-1. Class II Significance Analysis Results

| Pollutant | Averaging Period | Modeled Concentration (µg/m³) | $PM_{2.5}$ MERP Contribution (µg/m³) | Total $PM_{2.5}$ Impact (µg/m³) | SIL | Exceeds SIL | Radius of Significant Impact (km) |
|---|---|---|---|---|---|---|---|
| $SO_2$ | Annual | 0.26 | -- | -- | 1 | No | N/A |
| | 24-hr | 2.40 | -- | -- | 5 | No | N/A |
| | 3-hr | 5.72 | -- | -- | 25 | No | N/A |
| | 1-hr | 6.95 | -- | -- | 7.8 | No | N/A |
| $NO_2$ | Annual | 3.67 | -- | -- | 1 | Yes | 1.5 |
| | 1-hr | 71.30 | -- | -- | 7.5 | Yes | 20.9 |
| $PM_{10}$ | Annual | 0.06 | 0.005 | 0.07 | 1 | No | N/A |
| | 24-hr | 0.39 | 0.261 | 0.65 | 5 | No | N/A |
| $PM_{2.5}$ | Annual | 0.06 | 0.005 | 0.07 | 0.13 | No | N/A |
| | 24-hr | 0.32 | 0.261 | 0.58 | 1.2 | No | N/A |
| CO | 8-hr | 97.31 | -- | -- | 500 | No | N/A |
| | 1-hr | 150.47 | -- | -- | 2,000 | No | N/A |

1. $PM_{10}$ and $PM_{2.5}$ results include MERPs contribution to the predicted modeled impact.

As shown in Table 5-1, all $PM_{10}$, $PM_{2.5}$, $SO_2$, and CO modeled impacts for the project are less than the applicable Class II SILs. As such, by definition, the project does not cause or contribute to an exceedance of the NAAQS or Class II PSD Increment for $PM_{10}$, $PM_{2.5}$, $SO_2$, or CO. However, the $NO_2$ 1-hr and annual modeled impacts for the project exceeded the Class II SIL. As a result, full impact analyses for $NO_2$ are required and are summarized in subsequent sections.

In addition to assessing project significance, the impacts in Table 5-1 were compared to the PSD SMCs for each of the respective pollutants (with the exception of $PM_{2.5}$ which was addressed in Section 3.2) to determine the need for any pre-construction monitoring. Table 5-2 presents the impact in relation to each SMC.

Table 5-2. Significant Monitoring Concentration Results

| Pollutant | Averaging Period | Modeled Concentration ($\mu g/m^3$) | SMC ($\mu$g/m3) | Exceeds SMC (Yes/No) |
|---|---|---|---|---|
| $SO_2$ | 24-hr | 2.31 | 13 | No |
| $NO_2$ | Annual | 1.75 | 14 | No |
| $PM_{10}$ | 24-hr | 0.40 | 10 | No |
| CO | 8-hr | 97.31 | 575 | No |

As shown in Table 5-2, all pollutants and averaging periods are well below their respective SMC and as such, no pre-construction monitoring is required for the proposed project.

The results of the Class I Significance Analyses for $PM_{10}$, $PM_{2.5}$, $SO_2$, and $NO_2$ are provided in Table 5-3.

Table 5-3. Class I Significance Analysis Results

| Pollutant | Averaging Period | Modeled Concentration ($\mu g/m^3$) | SIL ($\mu g/m^3$) | Exceeds SIL? (Yes/No) |
|---|---|---|---|---|
| $SO_2$ | Annual | 0.01 | 0.1 | No |
| | 24-hr | 0.16 | 0.2 | No |
| | 3-hr | 0.66 | 1 | No |
| $NO_2$ | Annual | 0.04 | 0.1 | No |
| $PM_{10}$ | Annual | 0.002 | 0.2 | No |
| | 24-hr | 0.023 | 0.3 | No |
| $PM_{2.5}$ | Annual | 0.003 | 0.03 | No |
| | 24-hr | 0.074 | 0.27 | No |

1. $PM_{2.5}$ results include MERPs contribution to the predicted modeled impact.

As shown in Table 5-3, the direct modeled impacts were below the applicable Class I SILs for the receptors along the 50 km-radius ring of receptors evaluated in AERMOD.

## 5.2 NAAQS Analysis

A NAAQS modeling analysis was conducted for those pollutants and averaging periods for which the Significance Analysis results equaled or exceeded the Class II SIL. As described in Section 4, the NAAQS and Increment analyses utilized the significant receptors (as derived from the Significance Analysis) for use in the refined analysis. Note that modeled concentrations in excess of the $NO_2$ 1-hr NAAQS were found, however, MZX utilized the MAXDCONT option in AERMOD to demonstrate that the project would be insignificant at the time and location of all modeled exceedances. The full source contribution analysis is included in the electronic modeling file archive. In addition to confirming that the project was not significant at any potential modeled violation, MZX reviewed the locations of the highest modeled concentrations and noted that the receptor locations are located on the property of sources that are also modeled. As such, those high values are not truly exceedances in ambient air.

Modeling source parameters utilized in the NAAQS modeling assessment, for all facility sources evaluated within the significance analysis and for off-site inventory sources, can be found in Appendix C.

Table 5-4. NAAQS Analysis Results

| Pollutant | Averaging Period | Modeled Concentration ($\mu g/m^3$) | Background Concentration ($\mu g/m^3$) | Total Impact ($\mu g/m^3$) | NAAQS ($\mu g/m^3$) | Exceeds NAAQS |
|---|---|---|---|---|---|---|
| $NO_2$ | Annual | 6.4 | 7.5 | 13.9 | 100 | No |
| | 1-hr | 7,121.8 | 65.9 | 7,187.7 | 188 | Yes [1] |

1. Max MZX contribution to any exceedance was 5.24 $\mu g/m^3$, well below the SIL of 7.5 $\mu g/m^3$.

As shown in Table 5-4, no modeled exceedances of the NAAQS at which MZX was significant were found and as such MZX will not cause or contribute to any exceedances of any NAAQS.

## 5.3 PSD Increment Evaluations

A PSD Increment evaluation was conducted for annual $NO_2$ as shown in Table 5-5. No impacts in excess of the annual $NO_2$ Increment were shown by the model and as such, the proposed MZX project will not cause or contribute to any exceedance of the PSD increment.

Table 5-5. PSD Increment Analysis Results

| Pollutant | Averaging Period | Modeled Concentration ($\mu g/m^3$) | Increment ($\mu g/m^3$) | Exceeds Increment (Yes/No) |
|---|---|---|---|---|
| $NO_2$ | Annual | 6.4 | 25 | No |

## 5.4 Additional Impact Analyses

This section presents the results of the additional impact analyses conducted for the proposed project.

### 5.4.1 Soil and Vegetation Results

The results of the significance modeling analyses for those pollutants with impacts less than the SIL and from the full impact analysis for those pollutants with impacts equal to or exceeding the SIL were assessed against the secondary NAAQS standards, which provide protection for public welfare, including protection against decreased visibility, damage to animals, crops, vegetation, and buildings.

As shown in Table 5-6, the impacts for each pollutant are below the applicable secondary NAAQS. Thus, there are no adverse impacts expected on soils or vegetation as a result of the proposed project.

Table 5-6. Soil and Vegetation Impacts

| Pollutant | Averaging Period | Total Concentration (µg/m³) | Secondary NAAQS (µg/m³) | Exceeds Threshold (Yes/No) |
|---|---|---|---|---|
| $SO_2$ [1] | Annual | 0.25 | 26 | No |
| $NO_2$ [2] | Annual | 13.9 | 100 | No |
| $PM_{10}$ [3] | 24-hr | 0.66 | 150 | No |
| $PM_{2.5}$ [4] | Annual | 0.06 | 15 | No |
| | 24-hr | 0.59 | 35 | No |

1. Maximum annual $SO_2$ impacts from the Significance analysis.
2. Maximum annual $NO_2$ impact from the NAAQS analysis.
3. Maximum 24-hr $PM_{10}$ impact from the Significance analysis.
4. Maximum 24-hr and annual $PM_{2.5}$ impacts from the Significance analysis.

### 5.4.2 Visibility Results

Table 5-7 presents the results of the near-field (visible plume) visibility analysis that was performed in VISCREEN. The background visual range input to VISCREEN was 25 km, based on Figure 9 in the VISCREEN User's Guide.[32] The conservative, level 1 default parameters resulted in impacts in excess of the critical values. As such a level 2 analysis was conducted, using actual meteorological conditions for the region. The worst-case 1% meteorological condition during daytime hours identified for analysis was determined from the data included as part of the electronic modeling file submittal for this analysis. The resulting impacts indicate that there are no visible plume concerns at the nearest sensitive receptor, Memphis International Airport.

Table 5-7. VISCREEN Modeling Results

| Background | Theta (deg.) | Azimuth (deg.) | Distance (km) | Alpha (deg.) | Delta-E Critical | Delta-E Plume | Contrast Critical | Contrast Plume |
|---|---|---|---|---|---|---|---|---|
| Sky | 10 | 150 | 10.7 | 19 | 2.00 | 0.961 | 0.05 | -0.002 |
| Sky | 140 | 150 | 10.7 | 19 | 2.00 | 0.317 | 0.05 | -0.004 |
| Terrain | 10 | 84 | 6.9 | 84 | 2.00 | 0.247 | 0.05 | 0.001 |
| Terrain | 140 | 84 | 6.9 | 84 | 2.00 | 0.073 | 0.05 | 0.001 |

[32] https://gaftp.epa.gov/Air/aqmg/SCRAM/models/screening/viscreen/WB4PlumeVisualOCR.pdf

# APPENDIX A. FIGURES

**Figure A-1. Modeled MZX Tech LLC Site Layout**



**Figure A-2. 1-Hour $NO_2$ SIL Results**
**(SIL = 7.5 µg/m$^3$)**




Concentration (ug/m3)

- 0 to 7
- 7 to 7.5
- > 7.5

**Figure A-3. Annual $NO_2$ SIL Results**
**(SIL = 1 μg/m[3])**




Concentration (ug/m3)

- 0 to 0.8
- 0.8 to 1.0
- > 1.0

# APPENDIX B. MODELING PROTOCOL AND MDEQ RESPONSE

# State of Mississippi

**TATE REEVES**
Governor

**MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY**

CHRIS WELLS, EXECUTIVE DIRECTOR

November 18,2025
**Shannon G. Lynn, P.E., C.M.**
Principal Consultant
Trinity Consultants
1701 Centerview Drive Suite 109 Little Rock, AR 72211

**Re: MZX Tech LLC – Revised Modeling Protocol for Greenfield Cycle Combustion Turbine Project**

Dear, Mr. Lynn,
Thank you for your organization's submission of the revised modeling protocol associated with the construction of the three simple cycle combustion turbines in Southaven, Mississippi. The following are MDEQ's observations and review comments on the MZX Tech LLC Revised Modeling protocol dated November 2025, provided for your review and/or consideration. All issues have been resolved and MZX Tech can proceed with modeling activities.

This may not include any questions, comments, or concerns that the MDEQ or EPA Permitting sections may have. We appreciate MZX Tech's attention to these matters. Should you have any questions or need further information, please do not hesitate to contact myself PBradley@mdeq.ms.gov or Rodney Cuevas RCuevas@mdeq.ms.gov

MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY

Cc:

- Jon Hill: JHill@trinityconsultants.com
- Maya Rao: mrao@trinityconsultants.com
- Brian Ketchum: Brain.Ketchum@trinityconsultants.com
- Slater Smith: Slater.Smith@trinityconsultants.com
- Jeffrey Bland: JBland@mdeq.ms.gov
- Jaricus Whitlock: JWhitlock@mdeq.ms.gov

- Rodney Cuevas: RCuevas@mdeq.ms.gov
- Kathernie Mertes: KMertes@mdeq.ms.gov

MISSISSIPPI DEPARTMENT OF
ENVIRONMENTAL QUALITY

# PSD MODELING PROTOCOL

## Greenfield Simple Cycle Combustion Turbine Project

MZX Tech LLC
Southaven, MS

Prepared by:

TRINITY CONSULTANTS
1701 Centerview Drive
Suite 109
Little Rock, AR 72211
(501) 225-6400

November 2025

Project 250401.5102

# TABLE OF CONTENTS

1. INTRODUCTION 1-1
1.1 PSD Applicability 1-3
1.2 Project Emissions 1-3

2. PSD MODELING ANALYSES 2-1
2.1 Modeled Source Scenarios 2-3
2.2 Model Selection 2-5
2.2.1 AERMOD 2-5
2.2.2 Urban Versus Rural Dispersion Options 2-6
2.2.3 Building Downwash Analysis 2-7
2.2.4 Receptor Grid and Coordinate System 2-7
2.2.5 Meteorological Data 2-8
2.2.6 Source Types and Parameters 2-12
2.2.7 GEP Stack Height Analysis 2-12
2.2.8 Ozone and $PM_{2.5}$ Formation 2-13
2.2.9 $NO_2$ Modeling Approach 2-15
2.2.10 $PM_{2.5}$ Precursor Emissions Modeling 2-15
2.3 Class II Significance and NAAQS Analysis 2-15
2.4 Class II Cumulative Impact Analysis 2-16
2.4.1 Regional Source Inventory (Class II Modeling) 2-17
2.4.2 Background 2-18
2.5 Class I Area Impact Analysis 2-20
2.5.1 Class I Significance Analysis 2-20
2.5.2 Class I AQRV Area Analysis 2-21
2.6 Additional Impact Analysis 2-23

3. SUMMARY AND APPROVAL OF MODELING PROTOCOL 3-1

# 1. INTRODUCTION

MZX Tech LLC (MZX) is proposing to construct and operate a new greenfield major source consisting of simple cycle combustion turbines and pressure reduction systems (the "Facility") that will provide electricity to its data center located in Shelby County, Tennessee. The Facility will be located at 2875 Stanton Rd S, DeSoto County, Southaven Mississippi. Three (3) turbine models will be used for the site, the Solar PGM-130, Solar Titan 350, and Proenergy 6000 PE. Additionally, ten (10) PLUM Pressure Reduction Systems (PRSs) will be installed to regulate the pressure of incoming natural gas and condition the natural gas for use in the combustion turbines. The CT units and PRS units will fire natural gas as fuel.

The proposed project will require a Prevention of Significant Deterioration (PSD) permit as a new major source. Project-related emissions are anticipated to exceed the PSD significant emission rate (SER) thresholds for total particulate matter with an aerodynamic diameter of 10 microns or less ($PM_{10}$), total particulate matter with an aerodynamic diameter of 2.5 microns or less ($PM_{2.5}$), nitrogen oxides ($NO_X$), volatile organic compounds (VOC), sulfur dioxide ($SO_2$), carbon monoxide (CO), and greenhouse gases (GHG) in terms of carbon dioxide equivalents ($CO_2e$). Therefore, the PSD permit for the Facility will require an air quality/dispersion modeling analysis to demonstrate that the Facility will not cause or contribute to an exceedance of a National Ambient Air Quality Standard (NAAQS) or PSD increment.

A dispersion modeling protocol has been prepared following available policy and guidance. Trinity Consultants (Trinity), on behalf of MZX, has prepared this protocol describing the proposed methodologies and data resources to be used for any modeling compliance demonstration for the potential project. This protocol includes an overview of the required PSD modeling analyses, and a detailed description of the methodology proposed. The analyses include evaluation and consideration of NAAQS, PSD Increment, additional impacts analyses, visibility and non-air quality impacts, as well as consideration of impacts to Class I Areas.

The following figures show the approximate location of the proposed MZX facility, as well as the approximate facility boundary area that would be utilized in the modeling analysis.




Figure 1-1. MZX Area Map

Figure 1-2 depicts the ambient boundary area of the proposed MZX facility. The entire boundary area indicated below will be fenced to restrict and control access to MZX property.




Figure 1-2. MZX Ambient Boundary Area

Case: 26-60780 Document: 37 Page: 120 Date Filed: 10/16/2026

## 1.1 PSD Applicability

Part C of Title I of the Clean Air Act, 42 U.S.C. §§7470-7492, is the statutory basis for the PSD program. The U.S. Environmental Protection Agency (EPA) has codified PSD definitions, applicability, and requirements in 40 CFR Part 52.21. PSD is one component of the New Source Review (NSR) permitting program applicable in areas that are designated in attainment of the NAAQS. DeSoto County, where the facility is located, is currently designated as unclassifiable or in attainment for all criteria pollutants.[1] The state of Mississippi has received approval from EPA for its PSD permitting program as an authorized component of its state implementation plan (SIP). Accordingly, the Mississippi Department of Environmental Quality (MDEQ) is the PSD permitting authority for DeSoto County.

MZX is requesting authorization to construct and operate an assortment of simple-cycle combustion turbines and supporting equipment. Since the proposed facility will be a major source under the PSD permitting program, emissions from the proposed project must be evaluated and compared to the SER thresholds for regulated pollutants under the PSD program. MZX has evaluated emissions increases of CO, $NO_X$, filterable PM, total $PM_{10}$, total $PM_{2.5}$, $CO_2e$, $SO_2$, and VOC resulting from the proposed project for comparison to their respective PSD SER to determine whether PSD permitting is required, as identified in Table 1-1.

Table 1-1. Proposed Project Emissions Increases

| Pollutant | Project Emissions (tpy) | PSD Significant Emission Rate (tpy) | PSD Triggered? (Yes/No) |
|---|---|---|---|
| Filterable PM | 19.6 | 25 | No |
| Total $PM_{10}$ | 19.6 | 15 | Yes |
| Total $PM_{2.5}$ | 19.5 | 10 | Yes |
| $SO_2$ | 156.5 | 40 | Yes |
| $NO_X$ | 423.4 | 40 | Yes |
| VOC | 417.4 | 40 | Yes |
| CO | 364.2 | 100 | Yes |
| $CO_2e$ | 6,410,729 | 75,000 | Yes |

Since the project potential emissions of total $PM_{10}$, total $PM_{2.5}$, $NO_X$, VOC, $SO_2$ and CO exceed their respective SERs, the proposed project is required to undergo PSD review for each pollutant. Because these pollutants trigger PSD permitting, PSD review is also required for $CO_2e$ because the calculated $CO_2e$ project emission increases exceed the applicable SER.

## 1.2 Project Emissions

MZX has voluntarily elected to implement Lowest Achievable Emission Rate (LAER) for $NO_X$ emissions from the turbines. Best Available Control Technology (BACT) will be applied to the remaining pollutants. These will be discussed in detail in the MZX PSD Permit Application, Volume 1, but preliminary data have been summarized in Tables 1-2 through 1-4 below.

[1] 40 CFR §81.325

Table 1-2. Solar PGM-130 and Solar Titan 350 Combustion Turbines BACT (or LAER) Summary

| Pollutant | Available Technology | BACT (or LAER) Emission Limitation / Work Practice |
|---|---|---|
| $NO_X$ (LAER) | SCR | 2 ppm (15% $O_2$) |
| CO | Oxidation Catalyst | 2 ppm (15% $O_2$) |
| VOC | Good combustion practices, gaseous fuels | 2 ppm (15% $O_2$) |
| $SO_2$ | Use pipeline natural gas | Use pipeline natural gas not to exceed 1 gr S per 100 scf |
| PM | Good combustion practices, gaseous fuels | 5% Opacity |
| GHG | Energy efficient design | 120 lb $CO_2$/MMBtu |

Table 1-3. Proenergy 6000 PE Combustion Turbines BACT (or LAER) Summary

| Pollutant | Available Technology | BACT (or LAER) Emission Limitation / Work Practice |
|---|---|---|
| $NO_X$ (LAER) | SCR | 2 ppm (15% $O_2$) |
| CO | Oxidation Catalyst | 4 ppm (15% $O_2$) |
| VOC | Good combustion practices, gaseous fuels | 2.5 ppm (15% $O_2$) |
| $SO_2$ | Use pipeline natural gas | Use pipeline natural gas not to exceed 1 gr S per 100 scf |
| PM | Good combustion practices, gaseous fuels | 5% Opacity |
| GHG | Energy efficient design | 120 lb $CO_2$/MMBtu |

Table 1-4. PLUM Pressure Reduction System BACT Summary

| Pollutant | Available Technology | BACT Emission Limitation / Work Practice |
|---|---|---|
| $NO_X$ | Exclusive use of natural gas, good combustion practices, and low $NO_X$ burners | 0.049 lb/MMBtu |
| CO | Exclusive use of natural gas and good combustion practices | 0.082 lb/MMBtu |
| VOC | Exclusive use of natural gas and good combustion practices | Exclusive use of natural gas |
| $SO_2$ | Use of clean fuels with inherently low sulfur content | Use pipeline natural gas not to exceed 1 gr S per 100 scf |
| PM | Exclusive use of natural gas and good combustion practices | Exclusive use of natural gas |
| GHG | Exclusive use of natural gas and good combustion practices | Exclusive use of natural gas |

# 2. PSD MODELING ANALYSES

Trinity has prepared this modeling protocol to describe the modeling methodologies and data resources that will be used to evaluate the project's short-range (less than 50 kilometers from plant) air quality impacts in Class II areas as well as long range, regional impacts (50 to 300 kilometers from plant) to Class I area visibility, soils, and vegetation.

The dispersion modeling analyses will be conducted in consideration of the following guidance documents in addition to direct regulatory guidance provided by MDEQ:

- *Guideline on Air Quality Models* 40 CFR 51, Appendix W (EPA, Revised, November 29, 2024)
- User's Guide for the AMS/EPA Regulatory Model – AERMOD, (EPA, November 2024)
- AERMOD Implementation Guide (EPA, last revised November 2024)
- New Source Review Workshop Manual (EPA, Draft, October 1990)
- Modeling Procedures for Demonstrating Compliance with $PM_{2.5}$ NAAQS (EPA, Memorandum from Mr. Stephen Page, March 23, 2010)
- Revised Draft Guidance for Ozone and Fine Particulate Matter Modeling (EPA, Memorandum from Mr. Richard A. Wayland, September 20, 2021)
- *Revised Policy on Exclusions from "Ambient Air"* (EPA, Memorandum from Mr. Andrew R. Wheeler, December 2, 2019)
- *Guidance for $PM_{2.5}$ Permit Modeling* (EPA, Memorandum from Mr. Stephen Page, May 20, 2014)
- Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier I Demonstration Tool for Ozone and $PM_{2.5}$ under the PSD Permitting Program (EPA, Memorandum from Mr. Richard A Wayland, April 30, 2019)
- Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program (EPA Memorandum from Mr. Peter Tsirigotis, April 17. 2018)
- Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program (EPA Memorandum from Mr. Richard Wayland, April 30. 2024)
- Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$ National Ambient Air Quality Standard (EPA, Memorandum from Mr. Tyler Fox, March 1, 2011); and
- Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the $NO_2$ National Ambient Air Quality Standard (EPA, Memorandum from Mr. R. Chris Owen and Roger Brode, September 30, 2014).
- Interpretation of "Ambient Air" in Situations Involving Leased Land Under the Regulations for Prevention of Significant Deterioration (PSD) (EPA, Memorandum from Stephen D. Page to Regional Air Division Directors, June 22, 2007).
- *Q/D Screening Method* (ADEC/AQM, Mr. Alan E. Schuler, June 19, 1997)

Tasks performed in a standard PSD modeling analysis are presented in the flowchart in Figure 2-1.




Figure 2-1. PSD Modeling Flow Chart

## 2.1 Modeled Source Scenarios

MZX will model the project-associated sources for the significance analysis. For any off-site impact calculated in the significance modeling analysis greater than the significant impact level (SIL) established by EPA for a given pollutant, a NAAQS/Increment analysis incorporating nearby sources is required (full or cumulative impact analysis). For the cumulative impact analysis, all sources at the facility and the appropriate inventory sources will be included.

Modeling analysis for each ambient-air standard will utilize inputs that represent the most conservative, or a "worst-case", operating scenario. The "worst-case" operating scenario, for modeling purposes, represents the load and ambient temperature conditions when worst-case concentrations occur because combustion turbine performance varies with generation load and temperature. Rather than modeling various individual load scenarios (e.g., 50%, 75%, 100%), MZX will present a single, conservative modeling case. This case will pair the highest potential emission rates (which typically occur at high loads) with the poorest plume dispersion characteristics (e.g., the lowest exhaust temperature and velocity, which typically occur at lower loads). The intent of this hybrid approach is to create a scenario that is more conservative than any single, real-world operating condition. If compliance is demonstrated under this overly conservative scenario, it can be assumed that the facility is in compliance under all other operating loads.

The stack parameters selected to represent "worst-case" are provided in Table 2-1.

Table 2-1. Modeled Source Parameters

| Proposed Unit | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Inside Diameter (m) |
|---|---|---|---|---|
| 350 | 24.4 | 740.3 | 22.4 | 3.35 |
| 130 | 15.2 | 766.5 | 21.5 | 2.74 |
| Proenergy | 25.0 | 617.6 | 23.8 | 3.05 |
| Plum | 7.6 | 477.6 | 2.0 | 0.61 |

The MZX facility is designed to be a continuous power generation site, it is not a peaking or other type of site where it will undergo frequent startup and shutdown activity. Further, the startup/shutdown cycle for each Solar unit completes in ten (10) minutes and each Proenergy unit completes in thirty (30) minutes and there will be no more than six (6) planned startup/shutdown events in a given year. Given the extremely infrequent nature of those conditions, startup/shutdown events could be excluded from the model based on EPA's Additional Clarification Regarding Application of Appendix W Modeling Guidance for the 1-hour $NO_2$, as discussed on page 8 (bold added for emphasis):

"However, the intermittent nature of the actual emissions associated with emergency generators and startup/shutdown in many cases, when coupled with the probabilistic form of the standard, could result in modeled impacts being significantly higher than actual impacts would realistically be expected to be for these emission scenarios. The potential overestimation in these cases results from the implicit assumption that worst-case emissions will coincide with worst-case meteorological conditions based on the specific hours on specific days of each of the years associated with the modeled design value based on the form of the hourly standard."

And also Page 9 (bold added for emphasis):

"Given the implications of the probabilistic form of the 1-hour $NO_2$ NAAQS discussed above, we are concerned that assuming continuous operations for intermittent emissions would effectively impose an additional level of stringency beyond that intended by the level of the standard itself. As a result, we feel that it would be inappropriate to implement the 1-hour $NO_2$ standard in such a manner and recommend that compliance demonstrations for the 1-hour $NO_2$ NAAQS be based on emission scenarios that can logically be assumed to be relatively continuous or which occur frequently enough to contribute significantly to the annual distribution of daily maximum 1-hour concentrations. EPA believes that existing modeling guidelines provide sufficient discretion for reviewing authorities to exclude certain types of intermittent emissions from compliance demonstrations for the 1-hour $NO_2$ standard under these circumstances."

However, in order to ensure the protection of public health across all situations, EPA also discusses alternatives to exclusion on p.11:

"Another approach that may be considered in cases where there is more uncertainty regarding the applicability of this guidance would be to model impacts from intermittent emissions based on an average hourly rate, rather than the maximum hourly emission. For example, if a proposed permit includes a limit of 500 hours/year or less for an emergency generator, a modeling analysis could be based on assuming continuous operation at the average hourly rate, i.e., the maximum hourly rate multiplied by 500 hours/8760 hours. This approach would account for potential worst-case meteorological conditions associated with emergency generator emissions by assuming continuous operation, while use of the average hourly emission represents a simple approach to account for the probability of the emergency generator actually operating for a given hour."

MZX will utilize an even more conservative emission approach to account for the infrequent nature of startup and shutdown activities at the facility. Since no more than five (5) combustion turbines of each model type (e.g., Solar 130, Solar 350, Proenergy) will be in startup mode in any given hour, MZX's approach consists of determining which (five) 5 sources represent the "worst-case" modeled impact during startup.

The five (5) "worst-case" sources will be determined by modeling all combustion turbines at a unit emission rate of 1 gram per second (g/s) to determine which combustion turbines have the highest predicted impact (by turbine type). MZX will then model a scenario where the five Solar 350s, five Solar 130s, and five ProEnergy turbines with the worst-case impacts are in startup mode within the same hour. The modeled emission rate for these units will be a blended hourly rate, calculated by combining the short-duration (e.g., 10 or 30 minutes) startup emissions with the normal maximum hourly rate for the remainder of that hour. The resulting SIL and full impact models, if necessary, will thus include a total of fifteen (15) combustion turbines at emission rates assuming one startup every hour for short term averaging periods, and the remaining twenty-six (26) combustion turbines will be modeled at normal operating emission rates. For annual averaging periods, all combustion turbines will be modeled at annualized emission rates equivalent to the total annual emissions estimated for the type of combustion turbine plus the total annual startup and shutdown emissions for the type of combustion turbine. By using this modeling approach, it is acknowledged and accepted that the final permit will include an enforceable operational limit restricting the facility to having no more than five of each turbine type in startup or shutdown mode during any given hour.

Case: 26-60806 Document: 37 Page: 126 Date Filed: 10/16/2026

## 2.2 Model Selection

Dispersion models predict downwind pollutant concentrations by simulating the evolution of the pollutant plume over time and space for specific set of input data. These data inputs include the pollutant's emission rate, source parameters, terrain characteristics, and atmospheric conditions.

According to the 40 CFR 51, Appendix W (the *Guideline)*, the extent to which a specific air quality model is suitable for the evaluation of source impacts depends on (1) the meteorological and topographical complexities of the area; (2) the level of detail and accuracy needed in the analysis; (3) the technical competence of those undertaking such simulation modeling; (4) the resources available; and (5) the accuracy of the database (i.e., emissions inventory, meteorological, and air quality data).

Taking these factors into consideration, MZX will use the AERMOD modeling system to represent all project emissions sources at the facility. AERMOD is the default model for evaluating impacts attributable to industrial facilities in the near-field (i.e., source receptor distances of less than 50 km) and is the recommended model in the *Guideline*.

### 2.2.1 AERMOD

The latest version (24142) of the AERMOD modeling system will be used to estimate maximum ground-level concentrations in all Class II Area analyses for this application. AERMOD is a refined, steady-state, multiple source, Gaussian dispersion model and was promulgated in December 2005 as the preferred model for use by industrial sources in this type of air quality analysis.[2] The AERMOD model has the Plume Rise Modeling Enhancements (PRIME) incorporated in the regulatory version, so the direction-specific building downwash dimensions used as inputs are determined by the Building Profile Input Program, PRIME version (BPIP PRIME), version 04274.[3] BPIP PRIME is designed to incorporate the concepts and procedures expressed in the GEP Technical Support document, the Building Downwash Guidance document, and other related documents, while incorporating the PRIME enhancements to improve prediction of ambient impacts in building cavities and wake regions.[4]

The AERMOD modeling system is composed of three modular components: AERMAP, the terrain preprocessor; AERMET, the meteorological preprocessor; and AERMOD, the dispersion and post-processing module. AERMAP is the terrain pre-processor that is used to import terrain elevations for selected model objects and to generate the receptor hill height scale data that are used by AERMOD to drive advanced terrain processing algorithms. National Elevation Dataset (NED) data available from the United States Geological Survey (USGS) are utilized to interpolate surveyed elevations onto user specified receptor, building, and source locations in the absence of more accurate site-specific (i.e., site surveys, GPS analyses, etc.) elevation data. AERMET generates a separate surface file and vertical profile file to pass meteorological observations and turbulence parameters to AERMOD. AERMET meteorological data are refined for a particular analysis based on the choice of micrometeorological parameters that are linked to the land use and land cover (LULC) around the meteorological site shown to be representative of the application site.

[2] 40 CFR Part 51, Appendix W, Guideline on Air Quality Models, Appendix A.1 AMS/EPA Regulatory Model (AERMOD).

[3] Earth Tech, Inc., *Addendum to the ISC3 User's Guide, The PRIME Plume Rise and Building Downwash Model*, Concord, MA.

[4] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidelines for Determination of Good Engineering Practice Stack Height (Technical Support Document for the Stack Height Regulations) (Revised)*, Research Triangle Park, North Carolina, EPA 450/4-80-023R, June 1985.

MZX will use the BREEZE® graphical interface, developed by Trinity Consultants, to assist in developing the model input files for AERMOD. This software program incorporates the most recent versions of AERMOD (dated 24142) and AERMAP (dated 24142) and provides capability for image-generation. Using the procedures outlined in the *Guideline* as a reference, the AERMOD dispersion modeling for this project will be performed using only regulatory default options.

### 2.2.2 Urban Versus Rural Dispersion Options

Classification of land use in the immediate area surrounding a facility is important in determining the appropriate dispersion coefficients to select for a particular modeling application. The selection of either rural or urban dispersion coefficients for a specific application should follow one of two procedures. These include a land use classification procedure or a population-based procedure to determine whether the area is primarily urban or rural.[5]

Of the two methods, the land use procedure is considered more definitive. The land use within the total area circumscribed by a 3-km radius circle around the facility was classified using the land use typing scheme proposed by Auer. If land use types 23 (Developed, Medium Intensity) or 24 (Developed, High Intensity) account for 50% or more of the circumscribed area, urban dispersion coefficients should be used. Otherwise, rural dispersion coefficients are appropriate.

AERSURFACE (v24142) was used for the extraction of the land-use values in the domain. The results of the land use analysis evaluation were as follows.

Each USGS NLCD 2016 land use class was compared to the most appropriate Auer land use category to quantify the total urban and rural area. Table 2-2 summarizes the results of this land use analysis. As shown, approximately 82% of the area can be classified as rural, which is well over the 50% threshold established in the Auer procedure. There, rural dispersion coefficients will be used in AERMOD.

[5] 40 CFR Part 51, Appendix W, the Guideline on Air Quality Models (November 2024) – Section 7.2.1.1(b)(i)

Table 2-2. Summary of Land Use Analysis

| Category ID | Category Description | Number of Grid Cells | Percent | Dispersion Class |
|---|---|---|---|---|
| 11 | Open Water | 68 | 0.2% | Rural |
| 21 | Developed, Open Space | 7,593 | 24.2% | Rural |
| 22 | Developed, Low Intensity | 8,098 | 25.8% | Rural |
| 23 | Developed, Medium Intensity | 4,284 | 13.6% | Urban |
| 24 | Developed, High Intensity | 1,466 | 4.7% | Urban |
| 31 | Barren Land | 1 | 0.0% | Rural |
| 41 | Deciduous Forest | 276 | 0.9% | Rural |
| 42 | Evergreen Forest | 54 | 0.2% | Rural |
| 43 | Mixed Forest | 3,719 | 11.8% | Rural |
| 52 | Shrub/Scrub | 257 | 0.8% | Rural |
| 71 | Grassland/Herbaceous | 23 | 0.1% | Rural |
| 81 | Pasture/Hay | 3,054 | 9.7% | Rural |
| 82 | Cultivated Crops | 340 | 1.1% | Rural |
| 90 | Woody Wetlands | 2,105 | 6.7% | Rural |
| 95 | Emergent Herbaceous Wetlands | 60 | 0.2% | Rural |
| | Total | 31,398 | 100% | |
| | Urban | | 18.3% | |
| | Rural | | 81.7% | |

### 2.2.3 Building Downwash Analysis

AERMOD incorporates the PRIME downwash algorithms. Direction specific building parameters required by AERMOD are calculated using the BPIP-PRIME preprocessor (version 04274). MZX structures will be built into the model and downwash influences will be evaluated appropriately.

### 2.2.4 Receptor Grid and Coordinate System

The entire MZX facility property will be fenced. Modeled concentrations will be calculated at ground-level receptors placed along the facility fenceline and on a variable Cartesian receptor grid. Fenceline receptors will be spaced no further than 50 meters apart. Beyond the fenceline, receptors will be spaced 100 meters apart on a Cartesian grid extending out to a distance sufficient to resolve the maximum concentration, but at least extending outward to 5 km in all directions. Additionally, less refined receptor grids will extend from the finest grid out to 10 km in each direction, with receptors spaced 250 meters apart from 5 km to 8 km from the facility and 500 meters from 8 km to 10 km from the facility. If the SIL is exceeded for any pollutant, additional modeling will be performed to determine the size of the significant impact area (SIA).

In general, the receptors will cover a region extending from all edges of the facility fenceline to the point where impacts from the project are no longer significant. For any pollutants exceeding the Class II SIL, any receptors with impacts greater than or equal to the SIL will be included in the cumulative modeling for

demonstrating the Facility will not cause or contribute to an exceedance of the NAAQS and PSD Increments. If an air quality standard is exceeded, the MAXDCONT option in AERMOD will be used to determine if the proposed project is significant (above the corresponding SIL) at the receptors exceeding the standard.

Receptor elevations and hill heights required by AERMOD will be determined using the AERMAP terrain preprocessor (version 24142). Terrain elevations from the USGS 1-arc second NED will be used for AERMAP processing. In all modeling analysis data files, the location of emission sources, structures, and receptors will be represented in the UTM coordinate system, zone 15, NAD-83.

### 2.2.5 Meteorological Data

Given that site-specific meteorological data is not available for the proposed site, surface data collected by a representative meteorological site will be used. According to Appendix W, the selection of meteorological data to be used in the modeling analysis should be based on spatial and climatological (temporal) representativeness. The representativeness of the data is based on the following:

1. The proximity of the meteorological monitoring site to the area under consideration;
2. The complexity of terrain;
3. The exposure of the meteorological site; and
4. The period during which data are collected.

Site-specific meteorological data or data from National Weather Service (NWS) stations, universities, Federal Aviation Administration (FAA) stations, military stations, and others should be used if possible.[6] The determination of representativeness of site-specific data for AERMOD applications cannot be based solely on proximity.[7] According to Appendix W, the implementation of NWS Automated Surface Observing Stations (ASOS) in the early 1990's should not preclude the use of NWS ASOS data if such a station is determined to be representative of the modeled area.[8] Given that site-specific meteorological data is not available for the MZX site, surface data collected by a representative meteorological site will be used. Surface meteorological sites located within 120 km of the proposed site with available comprehensive meteorological data during the 2019-2023 period were evaluated.

[6] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised November 29, 2024.

[7] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Memorandum from Mr. Peter Tsirigotis, Research Triangle Park, North Carolina, April 17, 2018.

[8] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised November 29, 2024.

Table 2-3. Meteorological Surface Stations Near Proposed Facility

| Met Station ID | WBAN ID | Site Description | Base Elevation (m) | Distance from MZX (km) | Recoverability 2019-2023 |
|---|---|---|---|---|---|
| AWM | 53959 | WEST MEMPHIS MUNICIPAL | 63.7 | 24.2 | 92.19% |
| MEM | 13893 | MEMPHIS | 76.8 | 6.9 | 99.18% |
| OLV | 13815 | OLIVE BRANCH | 124.1 | 22.3 | 91.65% |
| NQA | 93839 | MILLINGTON REGIONAL | 102.4 | 43.4 | 88.75% |
| UTM | 23903 | TUNICA MUNICIPAL | 57.0 | 42.9 | 59.92% |
| CKM | 00314 | CLARKSDALE COUNTY | 51.6 | 84.5 | 69.41% |
| JBR | 03953 | JONESBORO MUNICIPAL | 79.9 | 112.9 | 89.78% |
| HKA | 53869 | BLYTHEVILLE MUNICIPAL | 77.5 | 110.7 | 95.06% |




Figure 2-2. Meteorological Surface Stations Near Proposed Facility

All sites were analyzed for data completeness with AERMET using the latest available 5-year data set for each site. Based on the results, the three sites with the greatest recoverability (AWM, MEM, HKA) were

analyzed further to determine recoverability by quarter over the 5-year period (2019-23). MEM showed greater than 90% recoverability for every quarter of each year. AWM showed less than 90% for one quarter and just above 90% for at least two more quarters during the 5-year period. HKA also showed less than 90% recoverability for one quarter and had several quarters below 95%. Given that MEM has complete, recent data and is in such close proximity to the MZX site, MEM was reviewed to confirm representativeness.

Regulatory application of AERMOD necessitates careful evaluation of the meteorological data for input to AERMET. Data representativeness, in the case of AERMOD, means utilizing data of an appropriate type for constructing realistic boundary layer profiles.[9] Calculations of the boundary layer parameters are dependent on the surface characteristics in the vicinity of the modeled facility. The surface characteristics are quantified by the assignment of three variables: albedo, Bowen ratio, and surface roughness length.

AERSURFACE was used to determine surface characteristics using land cover data from the U.S. Geological Survey (USGS) National Land Cover Data (NLCD) 2016 archives and look-up tables of surface characteristics that vary by land cover type and season.[10] The surface variables were set to vary by season using 12 sectors. For the AERSURFACE analysis, the mean of the surface characteristics generated for average moisture conditions at each of the nearby meteorological stations were compared to the proposed MZX site. The results of the AERSURFACE analysis showed that MEM site has surface characteristics comparable to the proposed MZX site.

Table 2-4. Surface Characteristics of Selected Meteorological Stations

| Meteorological Station ID | Mean Albedo | Mean Bowen Ratio | Mean Surface Roughness |
|---|---|---|---|
| Proposed MZX Site | 0.160 | 0.697 | 0.163 |
| MEM | 0.170 | 0.883 | 0.042 |

The MEM meteorological site was also evaluated with a land cover analysis, a terrain analysis, a climate analysis, and a wind-rose analysis. For the land cover analysis, a one kilometer (km) radius was centered on the meteorological tower location, and the land use was categorized based on the 2019 NLCD.[11] Impervious and canopy differences among the sites were also examined. The results showed that the MEM site had similar spatial distribution of land use, impervious coverage, and canopy coverage to MZX.

From the results of all analyses, the MEM NWS site was chosen to best represent the land use, terrain and exposure of the MZX site. According to Appendix W, Section 8.4.2(b), the surface characteristics input to AERMET should be representative of the land cover in the vicinity of the meteorological data, i.e., the location of the meteorological tower for measured data.[12] Therefore, surface characteristics representative

[9] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised November 29, 2024.

[10] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *User's Guide for AERSURFACE Tool*, Research Triangle Park, North Carolina, EPA 454/B-20-008, February 2020.

[11] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised November 29, 2024.

[12] Ibid.

of the MEM NWS site will be used in AERMET. The area surrounding the proposed site and the MEM NWS is shown in Figure 2-3.




Figure 2-3. MZX Site and MEM Site

Characterization of surface moisture conditions for the NWS MEM site for each year of meteorology is presented in Table 2-5. The surface moisture conditions were determined by comparing precipitation for the period of data to be processed to the 30-year climatological record, selecting “wet” conditions if precipitation is in the upper 30th percentile, “dry” conditions if precipitation is in the lower 30th percentile, and “average” conditions if precipitation is in the middle 40th percentile.[13]

[13] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *AERMOD Implementation Guide*, Research Triangle Park, North Carolina, EPA 454/B-23-009, 2023.

Table 2-5. Average Yearly Surface Moisture Conditions for MEM

| Year | Annual Precipitation [1] | Surface Moisture Classification [2] |
|---|---|---|
| 2019 | 73.14 | WET |
| 2020 | 58.85 | AVG |
| 2021 | 51.80 | AVG |
| 2022 | 51.96 | AVG |
| 2023 | 51.96 | AVG |

1. https://www.ncdc.noaa.gov/cdo-web/search.
2. https://www.ncei.noaa.gov/access/monitoring/climate-at-a-glance/county/time- series.

According to Appendix W, the EPA has integrated the ADJ_U* option into AERMET as a regulatory option to address issues with model over-prediction of ambient concentrations from some sources associated with under-prediction of the surface friction velocity (u*) during light wind, stable conditions.[14] The ADJ_U* option is specifically recommended for sources using standard NWS airport meteorological data, site-specific meteorological data without turbulence parameters, or prognostic meteorological inputs derived from prognostic meteorological models. The ADJ_U* option will be used in AERMET Stage 3.

For upper air data, the closest upper air station is located at the NWS in North Little Rock, AR. Twice daily soundings from the NWS KLZK for the 2019-2023 period will be used in AERMET.

The proposed facility is located in DeSoto County, MS. The nearest and most representative meteorological stations are the Memphis International Airport surface station (ID 13893) and the North Little Rock upper air station (ID 3952). The meteorological data set to be utilized for these analyses covers the time period from 2019 to 2023, and includes meteorological data processed with the ADJ_U* option of AERMET using AERMET v24142. The data was processed and prepared using the surface characteristics of the Memphis International Airport surface station. A surface station elevation of 271 ft will be utilized in the modeling analyses.

### 2.2.6 Source Types and Parameters

The AERMOD dispersion model allows for emission units to be represented as point, area, or volume sources. Point sources with unobstructed vertical releases will be modeled with their actual stack parameters (i.e., height, diameter, exhaust gas temperature, and gas exit velocity). All proposed emission sources will have vertical, unobstructed stacks and will be modeled as such.

### 2.2.7 GEP Stack Height Analysis

EPA has promulgated stack height regulations that restrict the use of stack heights in excess of “Good Engineering Practice” (GEP) in air dispersion modeling analyses. Under these regulations, that portion of a stack in excess of the GEP height is generally not creditable when modeling to determine source impacts. This essentially prevents the use of excessively tall stacks to reduce ground-level pollutant concentrations.

This equation is limited to stacks located within 5L of a structure. Stacks located at a distance greater than 5L are not subject to the wake effects of the structure. The wind direction-specific downwash dimensions

[14] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guideline on Air Quality Models*, Appendix W, Revised November 29, 2024.

Case: 26-60080 Document: 37 Page: 134 Date Filed: 10/16/2026

and the dominant downwash structures used in this analysis are determined using BPIP. In general, the lowest GEP stack height for any source is 65 meters by default.[15] A preliminary evaluation has indicated that none of the proposed emission unit stacks will exceed GEP height.

### 2.2.8 Ozone and $PM_{2.5}$ Formation

In April 2018, the EPA released guidance recommending SILs for ozone and $PM_{2.5}$.[16] Although this guidance was not a final agency action and did not create any binding requirements on permitting authorities, permit applicants, or the public, the recommended SILs could be used to demonstrate that a proposed source does not cause or contribute to an exceedance of the NAAQS or PSD increments. On April 30, 2024, the EPA provided supplemental guidance to the SILs for ozone and $PM_{2.5}$ which retained the SILs for ozone and 24-hour $PM_{2.5}$ and recommended new, lower SILs for annual $PM_{2.5}$.[17] MZX will use the latest recommended Class II SILs for ozone and $PM_{2.5}$ to assess potential secondary pollutant impacts from the proposed facility.

In July 2022, the EPA provided final guidance on how to implement the modeling requirements for ozone and $PM_{2.5}$.[18] To make the required NAAQS or PSD increment demonstration, proposed sources should provide a full accounting of the combined impacts of each allowable precursor (and the direct component of $PM_{2.5}$) emissions on ambient concentrations of the relevant ozone and $PM_{2.5}$ NAAQS if any precursor(s) (or the direct component of $PM_{2.5}$) would be emitted in a significant amount. In other words, for ozone, if either $NO_X$ or VOC precursor emissions would be emitted in a significant amount (i.e., above their SER), then both precursors should be included in the assessment of ozone impacts. For $PM_{2.5}$, if a source would emit a significant amount of one or more of $NO_X$, $SO_2$, or direct $PM_{2.5}$ emissions, then the source should include $NO_X$ and $SO_2$ precursor as well as direct $PM_{2.5}$ emissions in the assessment of $PM_{2.5}$ impacts. Primary impacts of $PM_{2.5}$ will be estimated with the AERMOD modeling system.

To estimate ozone and total $PM_{2.5}$ impacts, the EPA released final guidance on the use of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 demonstration tool.[19] The tool relates single source impacts on secondary pollutants (ozone and secondary $PM_{2.5}$) with an air quality threshold to determine if such an impact causes or contributes to an exceedance of the appropriate NAAQS and PSD Increments.[20] MERPs reflect levels of increased precursor emissions that are not expected to cause a significant contribution to ozone and $PM_{2.5}$. In practice, MERPs are intended to be used with SILs as analytical tools for PSD air quality analyses.

---

[15] 40 CFR §51.100(ii)

[16] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Memorandum from Mr. Peter Tsirigotis, Research Triangle Park, North Carolina, April 17, 2018.

[17] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program*, Research Triangle Park, North Carolina, 2024.

[18] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance for Ozone and Fine Particulate Matter Permit Modeling*, Research Triangle Park, North Carolina, July 2022.

[19] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and PM2.5 under the PSD Permitting Program*, Research Triangle Park, North Carolina, 2019.

[20] Ibid.

The Shelby County (Memphis) hypothetical source is chosen as the representative source for the ozone MERPs analysis. The greater metropolitan Memphis area is less than 20 km from the project location, and the project site and hypothetical source are in the same regional area for influences on ozone formation from VOC and $NO_X$ emissions. The appropriate tpy/stack height combination will be chosen for the pollutants in question and the calculations conducted will be consistent with EPA guidance to evaluate project-based impacts compared to the ozone SIL. If a refined analysis for ozone becomes necessary, then the procedures provided in EPA guidance will be utilized to evaluate project-based impacts compared to existing background concentrations of ozone and the ozone NAAQS.

The modeling report to be provided with the permit application for this project will include a Tier 1 assessment for secondary $PM_{2.5}$ in accordance with EPA's MERPs guidance, using the above discussed Shelby County, TN hypothetical source. Project based emissions for $NO_X$ and $SO_2$ will be used to derive an applicable concentration contribution to the significance modeling results for $PM_{2.5}$. If significance modeling results for $PM_{2.5}$ exceed the SILs, then NAAQS based secondary $PM_{2.5}$ impacts will be included. For any required $PM_{2.5}$ PSD Increment evaluation, offsite source $NO_2$ and $SO_2$ emissions from increment consumers from the regional inventory will be utilized to derive an estimated secondary $PM_{2.5}$ impact as part of the PSD Increment evaluation. Precursor based emission impacts on all $PM_{2.5}$ modeling for this project will be considered.

#### 2.2.8.1.1 Ozone Assessment

Ozone impacts for the SILs analysis will be calculated as the sum of the ratio of precursor emissions to the MERPs. If the sum of the ratios is less than 1, then ozone impacts are below the ozone SIL and no cumulative analysis is necessary.

$$\left(\frac{NOX\ Emissions}{NOX\ MERP}\right) + \left(\frac{VOC\ Emissions}{VOC\ MERP}\right) < 1$$

If ozone impacts are greater than one part per billion (1 ppb), a cumulative ozone impact analysis will be performed following EPA guidance. If a cumulative ozone analysis is needed, the 3-year monitoring design value will be added to the product of the ozone SIL with the ratio of the proposed emission increases of each precursor to its representative MERP. If the calculated cumulative ozone impacts do not exceed the NAAQS, precursor emissions from MZX will not cause or contribute to an exceedance of the ozone NAAQS.

#### 2.2.8.1.2 Secondary $PM_{2.5}$ Assessment

Combined primary and secondary impacts of $PM_{2.5}$ for the 24-hour and annual SILs analyses will be assessed using the highest modeled primary $PM_{2.5}$ concentration, the applicable Class II SILs, precursor emissions, and the representative MERPs. The EPA MERPs equations will be used for estimating secondary $PM_{2.5}$.

If $PM_{2.5}$ impacts are greater than the SIL thresholds, a cumulative $PM_{2.5}$ impact analysis will be performed. For the NAAQS analysis, the monitoring design value will be added to the project's highest modeled $PM_{2.5}$ impacts from the cumulative analyses and to representative MERP ratios.

For the PSD increment consumption analysis, the direct and the secondary component of $PM_{2.5}$ increment consumption from the proposed project as well as direct $PM_{2.5}$ emissions and precursor emissions from any nearby $PM_{2.5}$ increment sources will be included. No background monitoring values will be applied.

If the cumulative total 24-hour and annual $PM_{2.5}$ impacts do not exceed the corresponding NAAQS or the PSD Increments, emissions from MZX will not cause or contribute to an exceedance of the $PM_{2.5}$ standards.

### 2.2.9 $NO_2$ Modeling Approach

The revised *Guideline* now indicates Ambient Ratio Method 2 (ARM2) has replaced ARM as the regulatory default Tier 2 $NO_2$ modeling method. MZX proposes to utilize ARM2 for modeling $NO_2$ for the 1-hour and annual SIL and NAAQs modeling assessments, and for the annual PSD increment modeling assessment. Should further refinement be needed with Tier 3 modeling methods, such as the Ozone Limiting Method (OLM) or Plume Volume Molar Ratio Method (PVMRM), MZX will contact the MDEQ.

### 2.2.10 $PM_{2.5}$ Precursor Emissions Modeling

The April 2019 EPA guidance document titled *Guidance on the Development of Modeled Emission Rates for Precursors (MERPs) as a Tier 1 Demonstration Tool for Ozone and $PM_{2.5}$ under the PSD Permitting Program* establishes Tier 1 procedures for demonstrating that a project will not cause or contribute to ambient air quality impacts of $PM_{2.5}$ associated with secondary $PM_{2.5}$ emissions. The modeling report to be provided with this permit application will include a Tier 1 assessment for secondary $PM_{2.5}$ in accordance with the most recent EPA MERPs guidance. Precursor based emission impacts on all $PM_{2.5}$ modeling for this project will be calculated and added to the direct $PM_{2.5}$ impacts determined from the AERMOD model in all SIL and cumulative analyses (if required).

## 2.3 Class II Significance and NAAQS Analysis

The Significance Analysis is conducted to determine whether emissions increases associated with the potential project could cause a significant impact on the area surrounding the facility. "Significance" is analyzed based on modeling only the new, modified, or associated sources comprising the project; no existing unmodified or associated sources, nor regional facility sources, are included.

"Significant" impacts are defined by design concentration thresholds commonly referred to as the SILs. MZX will model the project associated sources for significance. All project associated sources for the potential project will be new facility sources, and thereby modeled as part of the significance analysis, at their potential emission rates.

Table 2-6. lists the SIL, NAAQS, and Class II PSD Increments for all relevant NSR regulated pollutants for the potential project, subject to modeling, which will be undergoing PSD permitting.[21]

[21] Class I analyses are addressed in a following section.

Table 2-6. Significant Impact Levels, NAAQS, Class II PSD Increments, and Significant Monitoring Concentrations for Relevant NSR Regulated Pollutants

| Pollutant | Averaging Period | PSD Class II SIL (µg/m³) | Primary and Secondary NAAQS (µg/m³) | Class II PSD Increment (µg/m³) |
|---|---|---|---|---|
| $PM_{10}$ | 24-hour | 5 | 150 | 30 |
| | Annual | 1 | -- | 17 |
| $PM_{2.5}$ | 24-hour | 1.2 | 35 | 9 |
| | Annual | 0.13 | 9 | 4 |
| $SO_2$ | 1-hour | 7.8 | 196 | -- |
| | 3-hour | 25 | 1,300 | 512 |
| | 24-hour | 5 | 365 | 91 |
| | Annual | 1 | 80 | 20 |
| $NO_2$ | 1-hour | 7.5 | 188 | -- |
| | Annual | 1 | 100 | 25 |
| Ozone | 8-hour | 1 ppb | 137 | -- |
| CO | 1-hour | 2,000 | 40,000 | -- |
| | 8-hour | 500 | 10,000 | -- |

The highest design concentrations out of all given modeling years for each pollutant-averaging time is then compared to the SIL shown in Table 2-6 to determine if the ambient air impact is significant. In the case of 24-hour and annual $PM_{2.5}$ evaluations, EPA guidance states that the applicant should determine the maximum concentration at each receptor per year, then average those values on a receptor-specific basis over the 5 years of meteorological data prior to comparing with the appropriate SIL. This methodology will be used for both the $PM_{2.5}$ NAAQS and Increment SIL analyses.

The Facility will also evaluate current air quality conditions via an evaluation of monitoring data from the extensive network of ambient $PM_{2.5}$ monitors in the Memphis area and northern Mississippi, the existing ambient monitoring network to satisfy the ambient $PM_{2.5}$ monitoring requirements.

## 2.4 Class II Cumulative Impact Analysis

When modeled design concentrations are less than the applicable SIL, further analyses are not required for that pollutant-averaging period because, according to EPA guidance, the impact is within the natural variability of ambient concentrations and therefore will not cause or contribute to any exceedance of the NAAQS or PSD Increments. If modeled impacts are greater than the SIL, a full NAAQS and PSD Increment analysis is required for that pollutant and averaging period to demonstrate that the project neither causes nor contributes to any exceedances.

The PSD regulations were enacted primarily to “prevent significant deterioration” of air quality in areas of the country where the air quality was better than the NAAQS. Therefore, to promote economic growth in areas where attainment of the NAAQS occurs, some deterioration in ambient air concentrations is allowed. To achieve this goal, the EPA established PSD Increments for $PM_{10}$, $PM_{2.5}$, $SO_2$, and $NO_2$. The PSD Increments are further broken into Class I, II, and III Increments. Since all short-term Class II Increments (Table 2-7) are not to be exceeded more than once per year, the high second high (H2H) modeled impacts for 24-hour averaging periods for respective pollutants from among the five modeled meteorological years

will be compared against the short-term Increment. The highest annual average concentrations will be compared against the annual Increment.

Table 2-7. Class II Increments

| Pollutant | Averaging Period | Class II Increment ($\mu g/m^3$) |
|---|---|---|
| **$PM_{2.5}$** | 24-hour | 9 |
| | Annual | 4 |
| **$PM_{10}$** | 24-hour | 30 |
| | Annual | 17 |
| **$SO_2$** | 3-hour | 512 |
| | 24-hour | 91 |
| | Annual | 20 |
| **$NO_2$** | Annual | 25 |

### 2.4.1 Regional Source Inventory (Class II Modeling)

For any off-site impact calculated in the Significance Analysis that is greater than the SIL for a given pollutant, a NAAQS/Increment analysis incorporating nearby sources is required. The initial SIA radius will be the radius of the pollutant-specific largest distance to which the SIL is exceeded. These distances are anticipated to be less than 10 km for $PM_{10}$, $PM_{2.5}$, and $NO_2$ (including 1-hr $NO_2$).

MZX proposes to limit all off-site inventory sources for consideration to only those sources within 50 km of the proposed facility. A comprehensive emissions inventory of all nearby point sources will be requested from MDEQ. Nearby sources will also be requested from the Shelby County Health Department (SCHD) and the Arkansas Division of Environmental Quality (ADEQ). This inventory will be used to determine which nearby sources will be included in the cumulative impact modeling. All nearby sources of the pollutant within the SIA will be included in the modeling regardless of the level of emissions. For nearby sources up to 50 km outside the SIA, a Q/D (emission rate/distance) screening assessment will be used to determine the additional sources to be modeled. Application of the Q/D assessment involves determining the total annual emission rate (Q) of all sources at a nearby plant and dividing by its distance (D) from the proposed MZX site. If the ratio is greater than or equal to 20, the nearby source will be included in the NAAQS/Increment analysis. Clusters of sources will also be evaluated for inclusion in the modeling if they have a combined Q/D greater than or equal to 20. Sources with a Q/D less than 20 and sources beyond 50 km will be indirectly accounted for in the background monitored concentration. No building downwash will be performed for these sources.

Limiting the extent and scope of the modeling inventory is supported by EPA statements in the most recently revised Appendix W. Alternative methods for inventory development may be used in accordance with the *Guideline* which states that:

> "*The number of nearby sources to be explicitly modeled in the air quality analysis is expected to be few except in unusual situations. The determination of nearby sources through the application of the EPA's recommended framework calls for the exercise of professional judgment by the appropriate reviewing authority…*".[22]

[22] Appendix W, Section 8.3.3.b.iii

Given use of ambient monitoring and background data within the greater Memphis area, many of the nearby source emissions will likely already be accounted for within the ambient background monitoring concentrations, which further supports the use of a limited inventory area for the modeling assessment.

If a PSD increment consumption analysis is required, the construction date of the nearby sources that met the criteria for inclusion in the NAAQS analysis will be reviewed, and all sources which were constructed after the major source baseline date will be included in the PSD increment consumption analysis.

### 2.4.2 Ambient Background Monitors

It is anticipated that only 1-hour $NO_2$ impacts will exceed their SIL value, which would require the selection of ambient background concentrations to be included in the cumulative modeling analysis. However, given the vacatur of the $PM_{2.5}$ significant monitoring concentration (SMC), per 40 CFR 51.166(i)(5) and 40 CFR 52.21(i)(5)(i)(K), there are no specific pre-construction monitoring exemptions available for $PM_{2.5}$. Given the availability of current, high-quality data from existing state-run monitoring networks, MZX is proposing that no preconstruction monitoring be required for $PM_{2.5}$. Additionally, since the project emissions increase will exceed 100 tpy for both $NO_X$ and VOC (precursors to ozone), MZX has selected a background monitor for ozone. Ambient background monitoring concentrations are necessary for any required full NAAQS analysis for the facility. Nearby ambient background monitoring stations were reviewed, and the following sections describe the stations that were chosen as appropriately representative ambient background monitoring stations. Locations of the selected background monitors are shown in Figure 2-4.

#### *2.4.2.1 $NO_2$ Background Monitor*

The following site was selected as an appropriately representative background monitor for $NO_2$:

$NO_2$ – LH Polk and Colonial Dr., Marion Site (AQS Site ID 05-035-0005)

The Marion site is the closest geographically to the MZX site (located less than 30km to the northwest) and has valid data through the most recent monitoring year (2024). Marion is in a similar climatological region and is surrounded by similar residential and light industrial landuse types. It is classified as a near road monitor and as such provides a more conservative background value for use in the $NO_2$ modeling analysis.

While background concentrations in the form of the NAAQS standards will be derived for use in the NAAQS modeling analyses results summaries, background concentrations may be derived for use in the NAAQS analyses based on a season and hour-of-day approach. Available EPA guidance (e.g., *Clarification on the Use of AERMOD Dispersion Modeling for Demonstrating Compliance with the $NO_2$ National Ambient Air Quality Standard, September 2014*) would be used for derivation of the season and hour of day background concentrations.

#### *2.4.2.2 $PM_{2.5}$ Background Monitor*

The following site was selected as an appropriately representative background monitor for $PM_{2.5}$:

$PM_{2.5}$ – Memphis 6388 Haley Rd., Shelby Farms Site (AQS Site ID 47-157-0075)

$PM_{2.5}$ backgrounds are not explicitly needed for any modeling based on preliminary results however a monitor is being provided to address pre-construction monitoring requirements.

To satisfy the need for any pre-construction monitoring, the Shelby Farms Site was chosen for $PM_{2.5}$ consideration as it was not a “near road” monitor, was in a geographic location more similar to the area around the proposed site than other monitors in the Memphis area, and it is considered an urban scale monitor, considering more regional scale impacts to the monitor. While not the geographically closest ambient $PM_{2.5}$ monitor to the proposed site, this monitoring location is in a more representative geographic area (e.g., not in high traffic or downtown Memphis area), than other more nearby monitors, when compared to the MZK facility location.

#### *2.4.2.3 Ozone Background Monitor*

The following site was selected as an appropriately representative background monitor for ozone:

Ozone – 5 East South St., Hernando Site (AQS Site ID 28-033-0002)

As discussed in Section 2.2.8.1, projected ozone impacts using the conservative MERP methodology are expected to be well below the EPA-recommended SIL value, thus precluding the need for any cumulative ozone NAAQS review.

However, since the project emissions increase will exceed 100 tpy for both $NO_X$ and VOC (precursors to ozone), a regional characterization of ozone background will be provided. The Hernando Site was chosen for ozone consideration as it is not a “near road” monitor, is in a geographic location similar to the area around the proposed site, and it is the geographically closest ambient ozone monitor to the proposed site. The most recent design value period is 2022-2024. The 2022-2024 design value (71 parts per billion [ppb]) is above the ozone NAAQS for the Hernando monitor; however the area continues to be designated attainment for ozone. Further, with the 2025 ozone season ending on October 31, preliminary monitoring data indicates that the 2023-2025 design value will again be below the 70 ppb NAAQS. In any case, the proposed project will not be significant for ozone, therefore will not contribute significantly to degradation of the ozone NAAQS in the area.




Figure 2-4. Location of Selected Background Monitors

## 2.5 Class I Area Impact Analysis

The Class I Area Impact Analysis is conducted to determine whether emissions increases associated with the potential project could cause a significant impact on pristine areas of the United States, such as national parks, forests, and wildlife refuges.

### 2.5.1 Class I Significance Analysis

With the Class I Significance Analysis, applicants must show that the proposed project will not cause or contribute to exceedances of any Class I SILs. Additional AERMOD modeling will be performed to assess potential impacts on the Class I SILs. Since AERMOD is EPA's preferred model for assessing impacts at distances up to 50 km, and the nearest Class I area is located over 200 km away, a 360-degree receptor ring will be placed at 50 km from the project site. If the concentrations at these receptors fall below the Class I SILs, the concentrations at the Class I areas would likewise be below the SILs.

$PM_{2.5}$ impacts are a combination of primary impacts directly from the stack and secondarily-formed component based on the project's $NO_x$ and $SO_2$ emissions. As an alternative to the overly conservative modeled screening approach using AERMOD (described above), there is a second level assessment outlined

in EPA's latest MERPs guidance document.[23] Table 2-8 below (taken from Table 1 of that guidance document), provides primary $PM_{2.5}$ impacts using the hypothetical source photochemical modeling that was originally used in support of the secondary $PM_{2.5}$ MERP framework. This approach is still considered conservative since the primary $PM_{2.5}$ modeling was conducted without any plume-depleting processes enabled in the photochemical model.

Table 2-8. Primary $PM_{2.5}$ Impacts for Hypothetical Source Photochemical Modeling

| $PM_{2.5}$ Emission Rate (tpy) | Distance from source (km) | Highest Daily Average Concentration (µg/m3) tall stack | Highest Daily Average Concentration (µg/m3) surface release | Highest Annual Average Concentration (µg/m3) tall stack | Highest Annual Average Concentration (µg/m3) surface release |
|---|---|---|---|---|---|
| 100 | 300 | 0.0117 | 0.0123 | 0.0008 | 0.0009 |
| 100 | 200 | 0.0223 | 0.0212 | 0.0016 | 0.0015 |
| 100 | 100 | 0.0537 | 0.0445 | 0.007 | 0.0049 |
| 150 | 300 | 0.018 | 0.0184 | 0.0012 | 0.0013 |
| 150 | 200 | 0.0328 | 0.0311 | 0.0024 | 0.0022 |
| 150 | 100 | 0.0807 | 0.0632 | 0.0102 | 0.0073 |
| 500 | 300 | 0.061 | 0.0625 | 0.0044 | 0.0045 |
| 500 | 200 | 0.1167 | 0.1095 | 0.0087 | 0.0078 |
| 500 | 100 | 0.2717 | 0.2536 | 0.0379 | 0.0238 |
| 1000 | 300 | 0.1186 | 0.1217 | 0.0087 | 0.0089 |
| 1000 | 200 | 0.23 | 0.2161 | 0.0175 | 0.0157 |
| 1000 | 100 | 0.5445 | 0.5009 | 0.0731 | 0.0477 |

MZX confirmed that the values tabulated in Table 2-8 above conservatively represent the worst-case impacts from any of the modeled hypothetical sources.[24] In addition to the primary impacts discussed above, an applicant must consider secondarily-formed $PM_{2.5}$ from project emissions of $NO_x$ and $SO_2$. In this analysis, the project emissions increases will be multiplied by the ratio of the modeled concentrations to the modeled emission rates for a hypothetical source to estimate project related secondary $PM_{2.5}$ concentrations. Since the Class I areas are more than 50km distant, the distance-dependent data for hypothetical sources will be obtained from EPA's MERPs View Qlik website.[25]

### 2.5.2 Class I AQRV Area Analysis

Class I areas are federally protected areas for which more stringent air quality standards apply to protect unique natural, cultural, recreational, and/or historic values. The Class I area of primary concern for the proposed facility is the Mingo Wilderness in Missouri, as it is the closest Class I area to the facility. The Mingo Wilderness is located approximately 215 km away from the proposed facility. The following Class I areas are located within 300 km of the proposed facility (with the approximate distance to the proposed facility listed) [26]:

[23] https://www.epa.gov/sites/default/files/2020-09/documents/epa-454_r-19-003.pdf

[24] Email from George Bridgers (USEPA) to Jonathan Hill (Trinity) on December 12, 2024.

[25] www.epa.gov/scram/merps-view-qlik

[26] All distances approximate and based on data obtained from the Class I Area distance tool as published by the FL DEP at https://floridadep.gov/air/air-business-planning/content/class-i-areas-map

- Mingo National Wildlife Refuge (215 km)
- Sipsey Wilderness (233 km)




Figure 2-5. Class I Areas Within 300 km of MZX

All other Class I areas are located at distances greater than 300 km from the proposed facility.

The Federal Land Managers (FLM) have the authority to protect air quality-related values (AQRVs), and to consider in consultation with the permitting authority whether a proposed major emitting facility will have an adverse impact on such values. AQRVs for which PSD modeling is typically conducted include visibility and deposition of sulfur and nitrogen.

The ratio of emissions to Class I distance (e.g., Q/D) for this project for the Class I areas within 300 km was estimated in order to determine if the FLM will require a full AQRV analysis. The FLM's AQRV Work Group (FLAG) 2010 guidance states that a Q/D value of ten or less indicates that AQRV analyses should not be required.[27] Initial screening criteria were calculated for the Class I areas using proposed MZX plant maximum daily emissions estimates (based on lb/day scaled up to tpy) and are presented in Table 2-9.

[27] U.S. Forest Service, National Park Service, and U.S. Fish and Wildlife Service. 2010. *Federal land managers' air quality related values work group (FLAG): phase I report, revised (2010)*. Natural Resource Report NPS/NRPC/NRR, 2010/232. National Park Service, Denver, Colorado.

Case: 26-60806 Document: 51-1 Page: 144 Date Filed: 10/16/2026

Table 2-9. Class I Q/D Screening Analysis

| | Mingo Wilderness Area | Sipsey Wilderness Area |
|---|---|---|
| $SO_2$ (tpy) | 156.53 | 156.53 |
| $NO_X$ (tpy) | 474.58 | 474.58 |
| $PM_{10}$ (tpy) | 20.99 | 20.99 |
| $H_2SO_4$ (tpy) | 0.15 | 0.15 |
| Total Emissions (tpy) | 652.25 | 652.25 |
| Distance (km) | 215 | 233 |
| Q/d | 3.03 | 2.80 |

The Q/D ratio for all Class I areas within 300 km of the facility was evaluated and demonstrated that impacts will be far below 10 and as such, AQRV analyses will not be required for this project.

## 2.6 Additional Impact Analysis

The PSD regulations require an additional impacts analysis for each pollutant emitted by a source, including the analysis of the effects of emissions on soils, vegetation and visibility caused by any increase in emissions from the source and from associated growth. The depth of the analysis performed generally depends on existing air quality, the quantity of air emissions, and the sensitivity of local soils and vegetation. The additional analysis will follow EPA's guidance provided in the New Source Review Workshop Manual.[28]

An economic growth analysis is intended to assess the amount of new growth that is likely to occur in support of the proposed project and to estimate emissions resulting from associated growth. Associated growth relates to any residential and commercial/industrial growth that may result from the proposed project. Residential growth depends on the number of new employees and the availability of housing in the area, while associated commercial and industrial growth consists of new sources providing services to the new employees and the facility. No significant air quality degradation due to associated growth will be expected.

The potential for soil and vegetation impacts from increased emissions from MZX will be evaluated on recreationally and commercially valuable vegetation located in the area. The criteria for evaluating impacts on soils and vegetation will be taken from the EPA's, "A Screening Procedure for the Impacts of Air Pollution Sources on Plants, Soils, and Animals".[29] Estimated ambient impacts from MZX will be compared to minimum impact levels for effects on sensitive vegetation as suggested by the EPA. These screening values represent the minimum concentrations at which adverse growth effects or tissue injury in exposed vegetation are reported. Likewise, the potential for soil impacts will also be assessed. State-of-the-art construction equipment and emission controls will be used to keep potential air pollutant impacts less than ambient air quality standards, which are protective of secondary effects on soils and vegetation. Therefore, no adverse impacts to soils or vegetation within the site vicinity are anticipated.

To assess near-field visual impacts from MZX at Class II sensitive areas, the methodology and assumptions outlined in the FLAG report and the EPA's Workbook for Plume Visual Screening and Analysis will be

[28] U.S. Environmental Protection Agency, *New Source Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting*, Research Triangle Park, North Carolina, Draft, October 1990.

[29] U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, *A Screening Procedure for the Impacts of Air Pollution Sources on Plants, Soils, and Animals*, Research Triangle Park, North Carolina, 1980.

reviewed. As directed by MDEQ, the nearest sensitive areas within 20 km of MZX will be evaluated for VISCREEN modeling. The sensitive areas will include regional and international airports as well as state and national parks.

Table 2-10. Class II Sensitive Areas Within 20 km of MZX

| Class II Sensitive Area | Distance from MZX (km) |
|---|---|
| T.O. Fuller State Park | 11.1 |
| Isle-a-port Airport (AP) | 14.3 |
| Memphis Intl. AP | 6.9 |
| Old Forest State Natural Area | 18.9 |




Figure 2-6. Class II Sensitive Areas Within 20 km of MZX

# 3. SUMMARY AND APPROVAL OF MODELING PROTOCOL

MZX is supplying this written preliminary protocol so that MDEQ can formally comment on, approve the methodologies to be used for this analysis, and request any additional information. MZX requests a written response to this protocol as soon as possible. All modeling files and reports will be provided electronically, as part of the permit application.

# APPENDIX C. EMISSIONS INFORMATION FOR MODELING

Case: 3:26-cv-00076-DMB-JMV Doc #: 51-17 Filed: 10/12/26 106 of 110 PageID #: 1227

Table C.1 - MZX CO Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 8.76 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.23 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 2.74 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.11 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.57 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 5.23 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.05 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.2 - MZX $PM_{10}$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.3 - MZX $SO_2$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.1323 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0630 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.1625 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0004 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.4 - MZX $NO_2$ Point Sources (1-hr Averaging Period)

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.82 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.38 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.28 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.18 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.47 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 2.58 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.4b - MZX $NO_2$ Point Sources (Annual Averaging Period)

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.34 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.16 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.46 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.03 | 7.6 | 477.59 | 1.97 | 0.61 |

Table C.5 - MZX $PM_{2.5}$ Point Sources

| Model ID | Description | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TUR18 | 350 | 770,118.3 | 3,874,628.4 | 259.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR19 | 350 | 770,118.3 | 3,874,661.6 | 264.9 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR20 | 350 | 770,118.3 | 3,874,694.8 | 268.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR21 | 350 | 770,118.3 | 3,874,728.0 | 288.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR22 | 350 | 770,118.3 | 3,874,761.2 | 288.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR23 | 350 | 770,118.3 | 3,874,794.4 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR24 | 350 | 770,262.3 | 3,874,777.6 | 292.1 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR25 | 350 | 770,262.3 | 3,874,810.8 | 292.0 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR26 | 350 | 770,227.4 | 3,874,618.7 | 273.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR27 | 350 | 770,227.4 | 3,874,651.9 | 273.4 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR28 | 350 | 770,227.4 | 3,874,685.1 | 267.7 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR29 | 350 | 770,227.4 | 3,874,718.3 | 277.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR30 | 350 | 770,227.4 | 3,874,751.5 | 289.3 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR31 | 350 | 770,227.4 | 3,874,784.7 | 289.6 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR32 | 350 | 770,363.5 | 3,874,770.6 | 291.2 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR33 | 350 | 770,363.5 | 3,874,803.8 | 291.5 | 0.0176 | 24.4 | 740.37 | 22.42 | 3.35 |
| TUR1 | 130 | 770,262.4 | 3,874,613.0 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR2 | 130 | 770,369.4 | 3,874,613.0 | 268.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR3 | 130 | 770,262.4 | 3,874,629.5 | 286.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR4 | 130 | 770,369.4 | 3,874,629.5 | 269.0 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR5 | 130 | 770,262.4 | 3,874,646.0 | 287.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR6 | 130 | 770,369.4 | 3,874,646.0 | 270.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR7 | 130 | 770,262.4 | 3,874,662.5 | 285.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR8 | 130 | 770,369.4 | 3,874,662.5 | 273.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR9 | 130 | 770,262.4 | 3,874,679.0 | 281.7 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR10 | 130 | 770,369.4 | 3,874,679.0 | 277.9 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR11 | 130 | 770,262.4 | 3,874,695.5 | 278.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR12 | 130 | 770,369.4 | 3,874,695.5 | 283.4 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR13 | 130 | 770,261.8 | 3,874,716.5 | 277.8 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR14 | 130 | 770,368.8 | 3,874,716.5 | 289.1 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR15 | 130 | 770,261.8 | 3,874,733.0 | 288.2 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR16 | 130 | 770,368.8 | 3,874,733.0 | 290.5 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR17 | 130 | 770,261.8 | 3,874,749.5 | 290.6 | 0.0088 | 15.2 | 766.48 | 21.46 | 2.74 |
| TUR34 | Proenergy | 770,194.0 | 3,875,130.1 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR35 | Proenergy | 770,194.0 | 3,875,150.5 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR36 | Proenergy | 770,194.0 | 3,875,063.3 | 288.8 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR37 | Proenergy | 770,194.0 | 3,875,083.2 | 288.7 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR38 | Proenergy | 770,194.0 | 3,874,994.9 | 288.6 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR39 | Proenergy | 770,194.0 | 3,875,016.2 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR40 | Proenergy | 770,194.0 | 3,874,927.5 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| TUR41 | Proenergy | 770,194.0 | 3,874,949.9 | 288.4 | 0.0214 | 21.3 | 617.59 | 23.77 | 3.05 |
| PLUM2 | PLUM2 | 770,159.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3 | PLUM3 | 770,249.0 | 3,874,845.0 | 290.6 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4 | PLUM4 | 770,159.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7 | PLLUM7 | 770,189.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8 | PLUM8 | 770,129.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9 | PLUM9 | 770,189.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10 | PLUM10 | 770,129.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1 | PLUM1 | 770,249.0 | 3,874,865.0 | 290.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5 | PLUM5 | 770,219.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6 | PLUM6 | 770,219.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM2B | PLUM2 | 770,161.0 | 3,874,865.0 | 288.3 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM3B | PLUM3 | 770,251.0 | 3,874,845.0 | 290.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM4B | PLUM4 | 770,161.0 | 3,874,845.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM7B | PLLUM7 | 770,191.0 | 3,874,865.0 | 288.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM8B | PLUM8 | 770,131.0 | 3,874,865.0 | 287.9 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM9B | PLUM9 | 770,191.0 | 3,874,845.0 | 289.2 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM10B | PLUM10 | 770,131.0 | 3,874,845.0 | 288.0 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM1B | PLUM1 | 770,251.0 | 3,874,865.0 | 290.4 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM5B | PLUM5 | 770,221.0 | 3,874,865.0 | 288.7 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |
| PLUM6B | PLUM6 | 770,221.0 | 3,874,845.0 | 289.1 | 0.0003 | 7.6 | 477.59 | 1.97 | 0.61 |

Case: 3:26-cv-00074-DMB-JMV Doc #: 51-17 Filed: 06/12/26 112 of 115 PageID #: 1233

Table C.6 - Offsite $NO_2$ Point Sources

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| RKLNA | Arcosa LW BR, LLC | 746,870.0 | 3,888,350.0 | 66.48 | 8.48E+00 | 30.48 | 329.82 | 21.88 | 1.52 |
| RKLNB | Arcosa LW BR, LLC | 746,870.0 | 3,888,370.0 | 66.57 | 1.07E+00 | 24.38 | 327.59 | 12.19 | 0.76 |
| RKLNC | Arcosa LW BR, LLC | 746,850.0 | 3,888,350.0 | 66.16 | 5.73E+00 | 30.48 | 329.82 | 21.88 | 1.52 |
| MSNOX1 | Texas Gas Transmissions LLC | 759,098.0 | 3,865,424.0 | 62.77 | 1.05E+00 | 12.19 | 766.67 | 17.37 | 1.83 |
| MSNOX3 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 6.79E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX4 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 7.90E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX5 | Texas Gas Transmissions LLC | 759,024.0 | 3,865,329.0 | 62.49 | 7.45E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX6 | Texas Gas Transmissions LLC | 759,025.0 | 3,865,298.0 | 62.39 | 8.07E+00 | 9.45 | 622.22 | 48.77 | 0.49 |
| MSNOX7 | Texas Gas Transmissions LLC | 759,000.0 | 3,865,298.0 | 62.58 | 4.21E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX8 | Texas Gas Transmissions LLC | 759,000.0 | 3,865,298.0 | 62.58 | 3.65E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX9 | Texas Gas Transmissions LLC | 759,001.0 | 3,865,267.0 | 62.56 | 3.88E+00 | 9.45 | 583.33 | 32.61 | 0.58 |
| MSNOX10 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX11 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX12 | Texas Gas Transmissions LLC | 758,999.0 | 3,865,328.0 | 62.69 | 1.97E+00 | 5.79 | 751.67 | 24.69 | 0.20 |
| MSNOX15 | Texas Gas Transmissions LLC | 759,124.0 | 3,865,394.0 | 62.94 | 4.66E-02 | 6.71 | 533.33 | 3.05 | 0.61 |
| MSNOX16 | Texas Gas Transmissions LLC | 759,075.0 | 3,865,331.0 | 62.67 | 2.65E-02 | 4.27 | 533.33 | 3.05 | 0.46 |
| MSNOX18 | Texas Gas Transmissions LLC | 758,974.0 | 3,865,297.0 | 63.03 | 6.30E-03 | 6.71 | 533.33 | 7.01 | 0.15 |
| MSNOX19 | Baptist Memorial Hospital | 774,141.9 | 3,873,758.5 | 94.18 | 2.08E+00 | 3.05 | 0.00 | 0.01 | 0.30 |
| MSNOX20A | JT Shannon Lumber Co. | 771,492.4 | 3,871,923.5 | 87.85 | 4.10E-01 | 10.67 | 491.67 | 12.19 | 0.76 |
| MSNOX20B | JT Shannon Lumber Co. | 771,491.3 | 3,871,905.1 | 87.65 | 4.00E-02 | 15.24 | 491.67 | 12.19 | 0.61 |
| MSNOX21 | TVA Southaven | 770,302.0 | 3,876,411.3 | 85.86 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX22 | TVA Southaven | 770,302.0 | 3,876,358.5 | 85.87 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX23 | TVA Southaven | 770,302.0 | 3,876,305.4 | 85.90 | 3.04E+00 | 45.72 | 361.11 | 20.73 | 5.49 |
| MSNOX24 | TVA Southaven | 770,334.9 | 3,876,306.2 | 85.90 | 2.12E-01 | 27.74 | 561.11 | 10.09 | 0.66 |
| MSNOX26 | Rite Hite Products | 773,278.0 | 3,872,067.0 | 82.76 | 1.45E-01 | 3.05 | 0.00 | 0.01 | 0.30 |
| MSNOX27 | Trunkline Gas Co., LLC | 792,126.3 | 3,848,740.9 | 102.88 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX28 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX29 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX30 | Trunkline Gas Co., LLC | 792,100.3 | 3,848,740.3 | 102.91 | 1.28E+01 | 11.58 | 672.22 | 14.93 | 0.61 |
| MSNOX31 | Trunkline Gas Co., LLC | 792,076.1 | 3,848,708.8 | 105.66 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX32 | Trunkline Gas Co., LLC | 792,076.1 | 3,848,708.8 | 105.66 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX33 | Trunkline Gas Co., LLC | 792,051.2 | 3,848,707.3 | 106.59 | 1.15E+01 | 11.89 | 672.22 | 50.90 | 0.41 |
| MSNOX34 | Trunkline Gas Co., LLC | 792,121.1 | 3,848,894.9 | 106.78 | 5.42E+01 | 14.02 | 672.22 | 9.14 | 1.83 |
| MSNOX35 | Trunkline Gas Co., LLC | 792,168.6 | 3,848,988.9 | 102.02 | 3.02E-02 | 6.10 | 866.67 | 34.14 | 0.25 |
| MSNOX36 | Trunkline Gas Co., LLC | 792,002.7 | 3,848,613.2 | 105.56 | 2.52E-02 | 1.22 | 1005.56 | 2.01 | 0.15 |
| MSNOX37 | Trunkline Gas Co., LLC | 792,049.3 | 3,848,738.3 | 106.54 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX38 | Trunkline Gas Co., LLC | 792,049.3 | 3,848,738.3 | 106.54 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX39 | Trunkline Gas Co., LLC | 792,144.4 | 3,848,957.4 | 102.98 | 1.89E-02 | 4.57 | 644.44 | 30.48 | 0.30 |
| MSNOX40 | Trunkline Gas Co., LLC | 792,200.6 | 3,848,805.4 | 100.70 | 2.52E-03 | 3.05 | 644.44 | 30.48 | 0.30 |
| MSNOX41 | Trunkline Gas Co., LLC | 792,174.6 | 3,848,803.9 | 103.15 | 2.52E-03 | 3.05 | 644.44 | 30.48 | 0.30 |
| MSNOX42 | Trunkline Gas Co., LLC | 792,002.7 | 3,848,613.2 | 105.56 | 1.51E-02 | 3.05 | 255.56 | 0.01 | 0.30 |
| MSNOX43 | Niteo Products LLC | 776,541.5 | 3,856,525.0 | 110.92 | 1.59E-01 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX44 | Nidec Motor Corporation | 773,683.0 | 3,868,716.0 | 96.56 | 1.64E-03 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX45 | SXP Shulz Xtruded Products | 776,679.0 | 3,857,023.2 | 120.15 | 1.27E-01 | 3.05 | 491.67 | 12.19 | 0.30 |
| MSNOX46 | Evercompounds LLC | 786,112.0 | 3,876,564.4 | 97.80 | 1.76E-02 | 3.05 | 491.67 | 12.19 | 0.30 |
| TNNOX01 | TVA Allen | 760,344.0 | 3,884,227.0 | 66.15 | 5.36E+00 | 53.30 | 359.00 | 17.30 | 6.71 |
| TNNOX02 | TVA Allen | 760,341.0 | 3,884,181.0 | 66.23 | 5.36E+00 | 53.30 | 359.00 | 17.30 | 6.71 |
| TNNOX03 | TVA Allen | 760,309.0 | 3,884,139.0 | 66.28 | 2.00E+00 | 15.20 | 526.00 | 10.40 | 1.22 |
| TNNOX04 | TVA Allen | 760,061.0 | 3,884,120.0 | 65.22 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX05 | TVA Allen | 760,061.0 | 3,884,116.0 | 65.19 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX06 | TVA Allen | 760,060.0 | 3,884,112.0 | 65.15 | 1.10E-01 | 4.57 | 679.00 | 19.80 | 0.41 |
| TNNOX07 | Valero Refining Co. TN, LLC | 765,865.3 | 3,886,440.0 | 70.57 | 1.10E+00 | 30.50 | 616.48 | 6.10 | 3.20 |
| TNNOX08 | Valero Refining Co. TN, LLC | 765,925.9 | 3,886,526.1 | 70.60 | 5.60E-01 | 44.20 | 588.71 | 7.80 | 1.68 |
| TNNOX09 | Valero Refining Co. TN, LLC | 765,810.2 | 3,886,325.6 | 69.57 | 3.78E+00 | 86.00 | 449.82 | 7.00 | 4.21 |
| TNNOX10 | Valero Refining Co. TN, LLC | 765,882.7 | 3,886,436.5 | 70.33 | 1.05E+00 | 46.60 | 616.48 | 7.90 | 2.35 |
| TNNOX11 | Valero Refining Co. TN, LLC | 765,882.7 | 3,886,436.5 | 70.33 | 8.40E-01 | 46.60 | 616.48 | 7.90 | 2.35 |
| TNNOX12 | Valero Refining Co. TN, LLC | 765,934.7 | 3,886,525.9 | 70.58 | 3.10E-01 | 35.10 | 616.48 | 9.20 | 1.13 |
| TNNOX13 | Valero Refining Co. TN, LLC | 765,915.3 | 3,886,526.5 | 70.63 | 3.90E-01 | 30.50 | 616.48 | 6.10 | 0.98 |
| TNNOX14 | Valero Refining Co. TN, LLC | 765,879.8 | 3,886,539.2 | 70.68 | 8.60E-01 | 45.70 | 644.26 | 8.80 | 1.59 |
| TNNOX15 | Valero Refining Co. TN, LLC | 766,004.1 | 3,886,486.6 | 69.55 | 1.48E+00 | 29.00 | 605.37 | 5.50 | 1.68 |
| TNNOX16 | Valero Refining Co. TN, LLC | 766,010.9 | 3,886,530.7 | 70.99 | 1.05E+00 | 49.70 | 605.37 | 6.10 | 2.65 |
| TNNOX17 | Valero Refining Co. TN, LLC | 765,952.0 | 3,886,443.6 | 69.73 | 8.00E-02 | 16.80 | 644.26 | 4.90 | 0.61 |
| TNNOX18 | Valero Refining Co. TN, LLC | 765,962.8 | 3,886,436.8 | 69.69 | 1.80E-01 | 53.30 | 866.48 | 5.80 | 0.76 |
| TNNOX19 | Valero Refining Co. TN, LLC | 765,936.4 | 3,886,430.3 | 70.12 | 1.35E+00 | 53.30 | 533.15 | 9.10 | 2.13 |
| TNNOX20 | Valero Refining Co. TN, LLC | 765,827.7 | 3,886,336.7 | 69.53 | 3.30E-01 | 40.50 | 572.04 | 6.10 | 1.37 |
| TNNOX21 | Valero Refining Co. TN, LLC | 765,965.9 | 3,886,523.3 | 70.35 | 4.00E-01 | 34.10 | 605.37 | 14.50 | 1.37 |
| TNNOX22 | Valero Refining Co. TN, LLC | 765,715.2 | 3,886,522.6 | 73.07 | 1.30E-01 | 30.50 | 615.93 | 6.00 | 1.07 |

Case: 3:26-cv-00074-DMB-JMV Doc #: 51-17 Filed: 06/12/26 113 of 115 PageID #: 1234

Table C.6 - Offsite $NO_2$ Point Sources (continued)

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TNNOX23 | Valero Refining Co. TN, LLC | 766,075.0 | 3,886,382.2 | 68.77 | 1.30E-01 | 45.70 | 866.48 | 15.50 | 0.76 |
| TNNOX24 | Valero Refining Co. TN, LLC | 765,877.3 | 3,886,329.4 | 69.50 | 1.40E-01 | 33.50 | 699.82 | 7.90 | 1.10 |
| TNNOX25 | Valero Refining Co. TN, LLC | 765,877.3 | 3,886,329.4 | 69.50 | 1.80E-01 | 36.60 | 720.93 | 8.30 | 1.13 |
| TNNOX26 | Valero Refining Co. TN, LLC | 766,054.7 | 3,886,374.1 | 68.76 | 7.96E+00 | 53.30 | 399.26 | 13.80 | 1.86 |
| TNNOX27 | Valero Refining Co. TN, LLC | 765,796.2 | 3,886,171.5 | 71.36 | 1.77E+00 | 30.50 | 427.59 | 12.70 | 2.29 |
| TNNOX28 | Valero Refining Co. TN, LLC | 765,834.5 | 3,886,597.9 | 70.71 | 6.10E+00 | 60.80 | 337.04 | 13.60 | 3.05 |
| TNNOX29 | Valero Refining Co. TN, LLC | 765,409.8 | 3,886,431.1 | 69.62 | 4.80E-01 | 18.30 | 422.04 | 20.00 | 0.24 |
| TNNOX30 | Valero Refining Co. TN, LLC | 766,729.6 | 3,886,458.0 | 68.64 | 2.20E-01 | 18.30 | 848.59 | 3.30 | 3.66 |
| TNNOX31 | Valero Refining Co. TN, LLC | 765,456.4 | 3,886,496.4 | 71.27 | 1.57E+00 | 64.00 | 1273.15 | 20.00 | 2.02 |
| TNNOX32 | Valero Refining Co. TN, LLC | 765,364.9 | 3,886,273.6 | 68.50 | 1.62E+00 | 61.00 | 1273.15 | 20.00 | 1.17 |
| TNNOX33 | Nucor, Inc. | 758,505.0 | 3,881,388.9 | 64.92 | 1.13E+00 | 60.96 | 683.15 | 10.06 | 1.83 |
| TNNOX34 | Nucor, Inc. | 758,990.4 | 3,881,254.3 | 63.97 | 3.50E-01 | 24.38 | 560.93 | 8.53 | 0.91 |
| TNNOX35 | Nucor, Inc. | 758,921.9 | 3,881,254.3 | 64.08 | 5.60E-01 | 30.48 | 644.26 | 9.75 | 1.22 |
| TNNOX36 | Nucor, Inc. | 758,430.1 | 3,882,122.1 | 65.33 | 6.74E+00 | 51.51 | 380.37 | 13.68 | 6.10 |
| TNNOX37 | Nucor, Inc. | 758,747.5 | 3,882,204.2 | 64.97 | 2.15E+00 | 59.95 | 689.43 | 10.49 | 2.25 |
| TNNOX38 | Nucor, Inc. | 758,601.0 | 3,882,148.2 | 65.17 | 1.30E-01 | 8.23 | 505.40 | 0.01 | 0.98 |
| TNNOX39 | Nucor, Inc. | 758,579.3 | 3,882,125.1 | 65.21 | 1.30E-01 | 46.02 | 1273.00 | 20.00 | 1.55 |
| TNNOX40 | Nucor, Inc. | 758,458.0 | 3,881,886.0 | 65.03 | 2.60E-01 | 1.98 | 422.04 | 15.24 | 0.15 |
| TNNOX41 | Nucor, Inc. | 759,172.7 | 3,882,296.5 | 64.19 | 2.80E-01 | 9.45 | 366.48 | 9.14 | 0.61 |
| TNNOX43 | Nucor, Inc. | 759,299.2 | 3,882,262.9 | 63.99 | 2.30E-01 | 9.45 | 366.48 | 9.14 | 0.61 |
| TNNOX44 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 3.60E-01 | 17.37 | 341.11 | 16.94 | 1.56 |
| TNNOX45 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 7.00E-01 | 21.33 | 450.00 | 18.00 | 1.07 |
| TNNOX46 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.60E-01 | 11.28 | 561.11 | 2.88 | 0.76 |
| TNNOX47 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 8.50E-01 | 20.12 | 433.89 | 13.97 | 1.07 |
| TNNOX48 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.00E-01 | 9.14 | 441.67 | 5.49 | 0.76 |
| TNNOX49 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 6.20E-01 | 12.19 | 355.56 | 87.31 | 0.10 |
| TNNOX50 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 3.20E-01 | 31.09 | 361.11 | 917.24 | 0.25 |
| TNNOX51 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 9.40E-01 | 35.36 | 362.22 | 43.38 | 1.37 |
| TNNOX52 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 9.90E-01 | 45.72 | 331.11 | 32.61 | 1.52 |
| TNNOX53 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 4.40E-01 | 21.33 | 366.67 | 34.35 | 0.92 |
| TNNOX54 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.30E-01 | 36.27 | 363.89 | 16.78 | 1.59 |
| TNNOX55 | The Solae Company | 784,455.0 | 3,882,172.3 | 88.78 | 5.30E-01 | 36.27 | 363.89 | 16.78 | 1.59 |
| TNNOX56 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.00E-01 | 11.12 | 447.22 | 0.01 | 0.71 |
| TNNOX57 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.80E-01 | 11.83 | 447.22 | 2.97 | 0.61 |
| TNNOX58 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.21E+00 | 14.63 | 466.67 | 3.96 | 1.37 |
| TNNOX59 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.04E+00 | 16.46 | 466.67 | 4.72 | 1.22 |
| TNNOX60 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 5.80E-01 | 15.24 | 466.67 | 3.20 | 1.22 |
| TNNOX61 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.40E-01 | 18.29 | 461.11 | 0.91 | 0.56 |
| TNNOX62 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 7.00E-02 | 18.29 | 461.11 | 0.91 | 0.56 |
| TNNOX63 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 2.00E-02 | 6.40 | 461.11 | 0.52 | 0.36 |
| TNNOX64 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.50E-01 | 12.19 | 477.78 | 9.14 | 1.01 |
| TNNOX65 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.00E-01 | 35.05 | 461.11 | 0.24 | 1.22 |
| TNNOX66 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 9.00E-02 | 30.48 | 497.22 | 1.52 | 0.46 |
| TNNOX67 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 10.67 | 497.22 | 0.49 | 0.76 |
| TNNOX68 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 6.00E-02 | 6.80 | 497.22 | 0.91 | 0.52 |
| TNNOX69 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 6.86 | 497.22 | 0.79 | 0.46 |
| TNNOX70 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 4.00E-02 | 6.86 | 497.22 | 0.49 | 0.76 |
| TNNOX71 | PMC Biogenix | 776,904.6 | 3,895,730.0 | 79.60 | 1.20E-01 | 7.77 | 497.22 | 0.79 | 0.76 |
| TNNOX72 | Memphis Cellulose LLC | 776,829.8 | 3,895,012.5 | 78.60 | 3.45E+00 | 16.76 | 597.22 | 14.57 | 1.43 |
| TNNOX73 | Memphis Cellulose LLC | 776,826.2 | 3,895,012.4 | 78.77 | 2.40E-01 | 5.36 | 495.00 | 12.19 | 0.38 |
| TNNOX74 | Memphis Cellulose LLC | 776,826.2 | 3,895,012.4 | 78.77 | 2.52E+00 | 9.14 | 255.56 | 12.19 | 1.00 |
| TNNOX75 | Memphis Cellulose LLC | 776,829.8 | 3,895,012.5 | 78.60 | 3.45E+00 | 18.29 | 527.78 | 13.50 | 1.31 |
| TNNOX76 | Covoro Mining Solutions, LLC | 774,854.0 | 3,906,740.9 | 72.72 | 1.80E-01 | 21.33 | 288.89 | 19.51 | 0.10 |
| TNNOX77 | Covoro Mining Solutions, LLC | 774,826.8 | 3,906,801.8 | 73.04 | 8.11E+01 | 25.91 | 533.33 | 39.62 | 0.76 |
| TNNOX78 | Covoro Mining Solutions, LLC | 774,826.8 | 3,906,801.8 | 73.04 | 1.43E+01 | 25.91 | 288.89 | 35.05 | 1.07 |
| TNNOX79 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX80 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX81 | Covoro Mining Solutions, LLC | 774,852.1 | 3,906,802.6 | 73.04 | 1.86E+00 | 10.67 | 558.33 | 39.62 | 0.61 |
| TNNOX82 | Covoro Mining Solutions, LLC | 774,882.1 | 3,906,649.3 | 72.76 | 4.00E-02 | 15.24 | 288.89 | 4.57 | 0.15 |
| TNNOX83 | Covoro Mining Solutions, LLC | 775,002.8 | 3,906,838.0 | 72.86 | 1.80E-01 | 13.72 | 433.33 | 14.02 | 0.30 |
| TNNOX84 | Covoro Mining Solutions, LLC | 774,850.2 | 3,906,864.2 | 72.94 | 3.43E+00 | 30.48 | 422.22 | 7.92 | 2.13 |
| TNNOX85 | Covoro Mining Solutions, LLC | 774,850.2 | 3,906,864.2 | 72.94 | 3.43E+00 | 30.48 | 422.22 | 7.92 | 2.13 |
| TNNOX86 | Covoro Mining Solutions, LLC | 774,875.5 | 3,906,865.0 | 72.88 | 6.76E+00 | 30.48 | 452.22 | 3.81 | 1.45 |
| TNNOX87 | Covoro Mining Solutions, LLC | 774,900.7 | 3,906,865.7 | 72.81 | 6.76E+00 | 18.29 | 452.22 | 13.41 | 1.45 |
| TNNOX88 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 2.10E-01 | 22.86 | 505.56 | 11.19 | 0.46 |
| TNNOX89 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 1.55E+00 | 22.86 | 505.56 | 11.19 | 0.46 |
| TNNOX92 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 3.60E-01 | 22.86 | 505.56 | 11.19 | 0.46 |

Table C.6 - Offsite $NO_2$ Point Sources (continued)

| Model ID | Facility ID | UTM x (m) | UTM y (m) | Elevation (m) | Emission Rate (g/s) | Stack Height (m) | Stack Temp (K) | Stack Velocity (m/s) | Stack Diameter (m) |
|---|---|---|---|---|---|---|---|---|---|
| TNNOX95 | Federal Express Corporation | 776,470.9 | 3,884,522.5 | 77.46 | 4.90E-01 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX96 | MSC Airport Authority | 775,512.4 | 3,882,140.2 | 89.61 | 8.50E-01 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX97 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX98 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX99 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX100 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX101 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |
| TNNOX102 | Methodist South Hospital | 771,719.0 | 3,880,775.0 | 86.21 | 1.00E-02 | 9.14 | 422.22 | 12.19 | 1.00 |

# APPENDIX D. ELECTRONIC MODELING FILES

# Exhibit D

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**AMENDED DECLARATION OF KIM LAUFENBERG**

I, Kim Laufenberg, hereby declare and state as follows:

1. I am an engineering analyst with Environmental Integrity Project ("EIP"). Before joining EIP in November 2025, I worked for the U.S. Environmental Protection Agency ("U.S. EPA") for almost nine years. My resume is attached as Attachment 1.

2. I have significant experience inspecting facilities, analyzing air permits, reviewing engineering reports, studying the Clean Air Act ("CAA"), and examining other air emissions data, along with the calculation of a facility's potential to emit. While at the U.S. EPA, I served as the scientific and technical authority in over 50 inspections, reviewing facility data, ensuring compliance with the CAA, and assisting EPA colleagues and state inspectors with the development of cases where there was noncompliance. With the U.S. EPA, I drafted enforcement documents for every stage of a case (from inspection reports and seizure letters to settlement agreements and consent decrees).

3. On behalf of NAACP, Earthjustice and Southern Environmental Law Center have requested that I develop potential-to-emit ("PTE") calculations of the turbines at 2875 Stanton

Road S., Southaven, Mississippi (the "site"). My conclusions are still being developed and could be affected by information or analysis that has yet to be produced. Thus, these conclusions do not represent my final opinions, but rather a reasonable preliminary description of my opinions in this case.

4. To calculate the site's PTE, I identified the turbines on-site and what pollution controls would likely be installed on the turbines. I did this by analyzing photographs of the turbines (both satellite and flyover imagery), identifying and analyzing turbine specification sheets, and reviewing correspondence between Trinity Consultants and the Mississippi Department of Environmental Quality ("MDEQ").

**PTE Analysis of Evidence as of March 3, 2026**

5. Based on available data, I concluded that there were 27 turbines on-site as of March 3, 2026 (see Figure 1). The 27 turbines were the following: fourteen SMT-130 turbines (see, for example, Figures 2 and 3); five Generation 6 TM-2500; four Generation 7 TM-2500 turbines; three Generation 8 TM-2500 turbines (see, for example, Figures 4 and 5); and one M35 turbine (see, for example, Figures 6 and 7). The manufacturer specification sheets for these turbines (and all others later constructed on the site) are collected in Attachment 2. The red arrows I annotated in Figures 2-7 reflect identifiable features of the turbines that matchup between the pictures of the turbines and their corresponding specification sheets.




***Figure 1**: Satellite photo of site with annotations by Kim Laufenberg (March 3, 2026)*






***Figures 2 and 3****: October 31, 2025 Flyover photo zoomed to turbine (top) and Solaris SMT-130 turbine from spec sheet (bottom) with arrow annotations by Kim Laufenberg*





***Figures 4 and 5****: October 31, 2025 Flyover photo zoomed to turbine (left) and Generation 8 TM-2500 turbine from spec sheet (right) with arrow annotations by Kim Laufenberg*





***Figures 6 and*** *7: October 31, 2025 Flyover photo zoomed to turbine (left) and M35 turbine from spec sheet (right) with arrow annotations by Kim Laufenberg*

6. Each of these turbines has a heat input greater than 10 one million British thermal units per hour (MMBtu/hr). Specifically, their calculated heat input values are approximately:

a. 159.18 MMBtu/hr for the SMT-130 turbines;

b. 301.84 MMBtu/hr for the Generation 6 TM-2500 turbines;

c. 301.84 MMBtu/hr for the Generation 7 TM-2500 turbines;

d. 339.56 MMBtu/hr for the Generation 8 TM-2500 turbines;

e. and 318.86 MMBtu/hr for the M35 turbine.

7. Collectively, the 27 turbines have a generating capacity of at least 495 megawatts (MW), according to a December 10, 2025 email from Trinity Consultants to MDEQ. A generating capacity of 495 MW is comparable to a medium-sized, base-load power plant which could power 350,000–400,000 homes. The total power outputs provided in the referenced email vary from that of the manufacturer specification sheets utilized in my PTE calculation (see paragraph 9). Manufacturer specification sheets provide a theoretical maximum power under strict conditions (e.g., 15°C air temperature, located at sea level, and 60% humidity).

8. As there is no permit application or permit for any of these 27 turbines limiting the hours of operation, my PTE calculations assume 8,760 hours of operation per year for each turbine to calculate maximum potential emissions.

9. My PTE calculations incorporate the following information from the collected manufacturer specification sheets for:

a. the SMT-130 turbines: engine power (16,530 kilowatts (kW)) and heat rate (9,630 Btu/kW-hr);

b. the Generation 6 TM-2500 turbines: engine power (30,700 kW) and heat rate (9,832 Btu/kW-hr);

c. the Generation 7 TM-2500 turbines: engine power (30,700 kW) and heat rate (9,832 Btu/kW-hr);

d. the Generation 8 TM-2500 turbines: engine power (34,600 kW) and heat rate (9,814 Btu/kW-hr);

e. and the M35 turbine: engine power (35,020 kW) and heat rate (9,105 Btu/kW-hr).

10. I calculated the PTE of nitrogen oxides (NOx), carbon monoxide (CO), sulfur dioxide (SO2), volatile organic compounds (VOC), particulate matter (PM), formaldehyde, and toluene.

11. All PM (both filterable and condensable) from natural gas-fired turbines is < 1.0 micrometer in diameter, meaning all the emitted PM is PM2.5, as PM2.5 is <2.5 micrometers in diameter or smaller.

12. I calculated the PTE for this set of pollutants to evaluate if the major source thresholds would be surpassed for criteria pollutants and if hazardous air pollutants ("HAP"), both formaldehyde and toluene, would trigger additional requirements. The area surrounding the site (DeSoto County) is not formally designated nonattainment, and the major source threshold for each criteria pollutant is 250 tons per year (tpy). For HAPs, if one HAP is greater than 10 tpy OR if a combination of HAPs are greater than 25 tpy, more stringent standards apply.

13. AP-42 served as the basis for emission factors for my PTE calculations, in the absence of additional information. Published by U.S. EPA, AP-42 is a compilation of air emission factors from over 200 air pollution source categories. It is extensively used for compiling emission inventories, calculating emissions for operating permits, and determining

control technology requirements. While not the only method, AP-42 is an industry standard for estimating air emissions for regulatory compliance.

14. Where there was additional information to suggest a different emission rate than in AP-42, such as the installation of an emission control on the turbine, my PTE calculations incorporate it.

15. Based on visual observations and correspondence between MDEQ and Trinity Consultants (email dated August 18, 2025), I concluded that the SMT-130 turbines have selective catalytic reduction ("SCR") pollution controls installed on them.

16. SCR is a common emission control device for coal- and natural gas-fired boilers, process heaters, gas-turbines, and reciprocating internal combustion engines. SCR achieves NOx reductions by using ammonia or urea which is injected into the ductwork downstream of the combustion unit. It can be used separately or in combination with other combustion control technologies.

17. For the SMT-130 turbines, I used the permit from the Colossus I facility in Shelby County, Tennessee for all emission factors because that permitted facility also had SMT-130 turbines with SCR controls. The Colossus I permit refers to SCR as "best available control technology" or "BACT" for the turbines, as that term is used under the Clean Air Act.

18. The emission factors for PM, formaldehyde, and toluene for the SMT-130 turbines in the Colossus I permit align with AP-42 uncontrolled emission factors.

19. Without SCR, the SMT-130 turbines would have a NOx emissions rate of 0.32 lb/MMBtu (taken from AP-42, Table 3.1-1); whereas with SCR, I have applied a NOx emissions rate of 0.00748 lb/MMBtu (from the Colossus I permit, converting 2 parts per million (PPM)) for the SMT-130 turbines.

20. The TM-2500 turbines and the M35 turbine do not have SCR. It is possible to install and operate these turbines with SCR, and doing so would reduce their NOx emissions. Based on the November 5, 2025 email from Trinity Consultants to MDEQ, my PTE calculations assume water injection is installed achieving a 25 PPM emission rate for NOx on these turbines. A 25 PPM emission rate is an emission rate of 0.09347 lb/MMBtu.

21. By incorporating an emission factor of 2 PPM for an SCR versus only 25 PPM for water injection, the control efficiency increases to a 92% reduction of NOx emissions.

22. It is also possible to operate the TM-2500 turbines and the M-35 turbine with water injection. My PTE calculations assume they are being operated with water injection (as noted in communication between Trinity and MDEQ, dated August 18, 2025); however, I cannot confirm whether the turbines are in fact being operated with or without the water injection control. I have incorporated the assumption of water injection into the emission factors for CO and PM on these turbines. Water injection does not control SO2, VOC, formaldehyde, or toluene.

23. I concluded that, as of March 3, 2026 with the above-described 27 turbines on-site, the site has the potential to emit: 1,732.71 tons per year (tpy) of NOx; 588.26 tpy of CO; 181.62 tpy of PM; 107.25 tpy of VOCs; 86.50 tpy of SO2, 19.54 tpy of formaldehyde; and 3.58 tpy of toluene.

**PTE (tpy) - xAI's 27 Turbines at 2875 Stanton Rd S, Southaven, MS as of March 3, 2026**

| | #Units | NOx | CO | SO2 | VOC | PM | Formaldehyde | Toluene |
|---|---|---|---|---|---|---|---|---|
| **SMT-130** | 14 | 72.99 | 55.54 | 26.12 | 69.96 | 64.42 | 6.93 | 1.27 |
| **TM-2500** | 12 | 1,529.19 | 490.82 | 55.63 | 34.36 | 107.98 | 11.62 | 2.13 |
| **M35** | 1 | 130.54 | 41.90 | 4.75 | 2.93 | 9.22 | 0.99 | 0.18 |
| **TOTAL** | 27 | 1,732.71 | 588.26 | 86.50 | 107.25 | 181.62 | 19.54 | 3.58 |

24. The TM-2500 turbines are responsible for the majority of NOx, CO, PM, SO2, formaldehyde, and toluene emissions.

**PTE Analysis of Evidence as of April 14, 2026**

25. High resolution aerial images of the site that were taken on April 14, 2026, from SouthWings, showed 33 total turbines at the site (see Figure 8[1]). The 27 turbines described previously remain at the site, and six new turbines have been constructed (see Figure 9).




***Figure 8****: Flyover photo of the turbines with annotations by Kim Laufenberg (April 14, 2026)*

26. I identified three of the new turbines as Generation 8 TM-2500 turbines based on the units' exhaust silencers, the layout of the control house to the side of the turbines, and the large air filters on the sides of the units – the same as that of the previously identified Generation 8 TM-2500 turbines. This brings the total number of Generation 8 TM-2500 turbines on-site to six.

[1] Note, the red numbering in Figure 8 varies slightly from Figure 1. Turbines #21-27 were numbered left to right as the six newly added turbines then continued this number convention.

27. I identified three other new turbines as Jereh JT35 natural gas-fired turbines (due to the logos, stack exhaust location, air intakes, and general unit coloring). The manufacturer specification sheet for the Jereh JT35 turbines is included in Attachment 2.



***Figure 9****: Flyover photo of the six new turbines (April 14, 2026)*

28. Jereh manufacturer has two units of similar layout (JT35 and JT25). For my PTE calculation, I selected the JT35 turbine over the JT25 turbine due to the engine (LM2500+G4, same as that of the Generation 8 TM-2500) and a manufacturer citation on its website that provides that the JT35 is ideal for fulfilling long-term power needs for data centers.

29. The Jereh JT35 turbines have a calculated heat input of 291.66 MMBtu/hr.

30. To incorporate these six new turbines in my PTE calculations, I applied the same assumptions regarding Generation 8 TM-2500 turbines as in the earlier calculation to the three new turbines of that make and model. For the Jereh turbines, I used the power and heat rate values from the manufacturer specifications (33,800 kW and 9,104 kJ/kW-hr respectively), and utilized AP-42 emissions factors, except for NOx. Water injection was assumed as the infrastructure would

already be in place at the site for the TM-2500 turbines and M35 turbine. The JT35 turbine has the same engine as the Generation 8 TM-2500 turbine which was noted to have water injection, and the same NOx emissions factor (25 PPM) is noted in the manufacturer specifications.

31. I updated my PTE calculations to reflect the 33 turbines on-site as of April 14:

| PTE (tpy) - xAI's 33 Turbines at 2875 Stanton Rd S, Southaven, MS as of 4/14/2026 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | #Units | NOx | CO | SO2 | VOC | PM | Formaldehyde | Toluene |
| **SMT-130** | 14 | 72.99 | 55.54 | 26.12 | 69.96 | 64.42 | 6.93 | 1.27 |
| **TM-2500** | 15 | 1,946.23 | 624.67 | 70.80 | 43.73 | 137.43 | 14.78 | 2.71 |
| **M35** | 1 | 130.54 | 41.90 | 4.75 | 2.93 | 9.22 | 0.99 | 0.18 |
| **JT35** | 3 | 358.21 | 114.97 | 13.03 | 8.05 | 25.29 | 2.72 | 0.50 |
| **TOTAL** | 33 | 2,507.96 | 837.08 | 114.70 | 124.67 | 236.36 | 25.43 | 4.66 |

32. I compared the 33 turbines at the site to the 41 turbines in the permit that MDEQ issued to MZX Tech LLC for 2875 Stanton Rd S, Southaven, Mississippi on March 11, 2026. None of the 33 turbines currently observed on-site are included in that permit.

**PTE Analysis of Evidence Through May 15, 2026**

33. On May 6, 2026, Trinity Consultants sent MDEQ what was described as "the current inventory of portable turbines." That email indicated 46 turbines were on-site.

34. On May 12, 2026, a satellite image of the Southaven site revealed there to be 57 turbines on site at the facility. The most recent additions to the facility are circled in red in Figure 10 below:



***Figure 10****: Satellite photo revealing additional turbine installations with annotations by Kim Laufenberg (May 12, 2026)*

35. On May 15, 2026, Trinity Consultants sent MDEQ another list itemizing the turbines at the Southaven site, and providing the unit types, emissions controls, total power outputs, and installation dates for each. According to that list, there were 57 turbines on-site, and two more that would be installed sometime later. This number aligns with my review of the May 12, 2026 satellite photo.

36. Figure 11 zooms in on the top right corner of the May 12, 2026 satellite photo, and labels the new turbines in line with the May 15, 2026 email list disclosed by Trinity Consultants to MDEQ:




***Figure 11****: Satellite photo – East Side of Southaven Site, Turbines #34-41 with annotations by Kim Laufenberg (May 12, 2026)*

37. Figure 12 zooms in on the bottom left corner of the May 14, 2026 satellite photo, and labels the new turbines in line with the May 12, 2026 email list disclosed by Trinity Consultants to MDEQ:




***Figure 12****: Satellite photo – West Side of Southaven Site, Turbines #42–59 with annotations by Kim Laufenberg (May 12, 2026)*

38. Based on my review of this new information and the manufacturer specifications for the types of turbines identified as on-site by Trinity Consultants, I identified two new types of turbines being utilized at the site. The manufacturer specification sheets for these turbines are also now included in Attachment 2.

39. Trinity Consultants' May 15, 2026 email list identifies turbines #34-41 as Mitsubishi FT8 turbines. This comports with my observations that this is a new type of turbine and has a different layout than the previously identified turbines. The images in Figure 13 and 14 below with my annotated red arrows highlight the identifying features of this turbine discernible in the zoomed-in portion of the May 12, 2026, satellite image:




***Figure 13 and 14***: *Comparison of FT8 specification image (left) to May 12, 2026 satellite image (right) with arrow annotations by Kim Laufenberg*

40. Turbines #55-59 were also noted to be Mitsubishi FT8 turbines in the May 15, 2026 email list. In the May 12, 2026 satellite photo, these turbines appear to be under construction.

41. The Mitsubishi FT8 turbines have a calculated heat input of 288.12 MMBtu/hr.

42. Trinity Consultants' May 15, 2026 email list identifies turbines #42–45 and #47 as TM-2500, Generation 4 turbines. This comports with my observations that this is a new type of turbine and has a different layout than the previous identified turbines. The images in Figure 15

and 16 with my annotated red arrows highlight the identifying features of this turbine discernible in the zoomed-in portion of the May 12, 2026 satellite image:



***Figure 15 and 16****: Comparison of Generation 4 TM-2500 specifications (top) May 15, 2026 satellite image (bottom) with arrow annotations by Kim Laufenberg*

43. The Generation 4 TM-2500 turbines have a calculated heat input of 213.75 MMBtu/hr.

44. Seven turbines (#48-54) had layouts comparable to turbines identified in previous satellite imagery (see Figures 1 and 12 for comparison), primarily the Generation 8 TM-2500 turbines. Turbine #54's layout doesn't fully align with the Generation 8 yet instead mimicked that of the Generation 6 TM-2500 turbine.

45. Turbines #46 and #55 were noted to be "not on site" in the May 15, 2026 email list between Trinity Consultants and MDEQ. This aligns with what was observed in the May 12, 2026 satellite photo (empty areas could be seen where these turbines may be installed, see Figure 12).

46. To incorporate these twenty-four new turbines in my PTE calculations, I applied the same assumptions regarding Generation 6 and 8 TM-2500 turbines as in earlier calculations to the seven new turbines of those makes and models (turbines #48-54). For the twelve Mitsubishi FT8 turbines (#34–41 and #56–59), I used the engine power and heat rate values from the manufacturer specifications (30,941 kW and 9,312 Btu/kW-hr respectively). For the five Generation 4 TM-2500 turbines, I again used the engine power and heat rate values from the manufacturer specifications (22,500 kW and 9,500 Btu/kW-hr respectively). Aligning with the previous turbines and capturing the worst-case scenario, 8,760 hours of operation per year was assumed. I utilized AP-42 emissions factors, except for NOx and SO2. Water injection was assumed as the infrastructure would already be in place at the site for the TM-2500 turbines, M35 turbine, and JT35 turbines and the May 15, 2026 email list noted these turbines use "demin water" for emission control. For a NOx emission factor, 25 PPM was assumed as this value is noted in the manufacturer specifications.

47. All SO2 emission factors were updated for the TM-2500, M35, JT35, and FT8 turbines as the emission profile provided a fuel gas analysis with a 0.01 grains Sulfur/scf factor along with a fuel heat value (1,054.60 Btu/scf) from Memphis Light, Gas and Water.

48. The Generation 8 TM-2500 engine power and heat rate were edited assuming 60 Hertz (Hz) versus 50Hz. 60Hz engines have a greater power output, better efficiency, need

smaller transformers, and are more standard in the U.S. The 60Hz engine powers align better with the May 15, 2026 email list and therefore all turbines were assumed to be 60Hz.

49. After reviewing the new information, including the emissions control information provided in the May 15, 2026 email, I reevaluated my prior assumptions concerning Generation 6 and 7 TM-2500 turbines—particularly the use of performance specifications from the LM2500+ engines for these models. Based on my review, I updated the engine power and heat rate to the values given in the TM-2500 specification sheet (included in Attachment 2) (previously 30,700 kW and 9,832 Btu/kW-hr, now 30,988 kW and 9,282 Btu/kW-hr) for turbines #10–17, #20, and #54. This adjustment had a negligible impact on the PTE calculation for those turbines, but in all respects somewhat lowered the calculated PTE values for those units.

50. I noticed several discrepancies in the information provided to MDEQ by Trinity Consultants regarding the turbines used at the Southaven site. Some of these discrepancies required a resolution to calculate the facility's PTE. Of note:

a. The May 15, 2026 email list identifies turbines #31–33 as Generation 8 TM-2500 turbines. However, as described above in Paragraph 27, the flyover photos clearly show these units to be Jereh JT35 turbines. In my calculations, I assumed these units were Jereh JT35s, which have a lower heat input and engine power, and therefore lower emissions profile than the Generation 8 TM-2500 turbines even though they use the same engine.

b. When comparing the Trinity Consultants' May 15, 2026, email list to a previous email exchange between Trinity and MDEQ (dated December 11, 2025), the total power output for two of the turbines change. Turbines #8 and #9, both listed as Generation 8 TM-2500 turbines, were previously indicated

to be 25 MW. The latest exchange suggests they are 35 MW turbines. This adjustment brings Trinity Consultants' stated generating capacity for these turbines in line with manufacturer specifications. Since my emissions calculations relied on manufacturer specifications rather than Trinity Consultants' summary lists, this adjustment did not change my evaluation of the facility's PTE.

c. Trinity Consultants provided MDEQ with calculated emissions profiles for some the units at the site. However, the firm's calculations appear to assume that every size of TM-2500 will have the same heat rate. That is very unlikely to be true, as heat rates vary significantly by engine size, configuration, and technology. For my assessment, I utilized each turbine's heat rate from manufacturer specifications for the PTE calculations.

d. Turbine #9 in the May 15, 2026, email list is noted to be a Generation 8 TM-2500 turbine, while in previous email exchanges between Trinity Consultants and MDEQ (on December 11, 2026) it was indicated to be a M35 turbine. The difference in turbine layouts can be seen in Figures 4 and 5 (for the Generation 8 TM-2500 turbine) and Figures 6 and 7 (for the M35 turbine). In my calculations, I assumed this was a M35 turbine which has a slightly lower heat input and engine power than the Generation 8 TM-2500 turbine even though they use the same engine.

51. I updated my PTE calculations to reflect the new information about the existing turbines and include the additional turbines:

| PTE (tpy) - xAI's 57 Turbines at 2875 Stanton Rd S, Southaven, MS as of 5/15/2026 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | #Units | NOx | CO | SO2 | VOC | PM | Formaldehyde | Toluene |
| SMT-130 | 14 | 72.99 | 55.54 | 26.45 | 69.96 | 64.42 | 6.93 | 1.27 |
| TM-2500 | 27 | 3,315.30 | 1,064.09 | 96.10 | 74.49 | 234.10 | 25.18 | 4.61 |
| M35 | 1 | 130.54 | 41.90 | 3.78 | 2.93 | 9.22 | 0.99 | 0.18 |
| JT35 | 3 | 358.21 | 114.97 | 10.38 | 8.05 | 25.29 | 2.72 | 0.50 |
| FT8 | 12 | 1,423.51 | 454.31 | 41.03 | 31.80 | 99.95 | 10.75 | 1.97 |
| TOTAL | 57 | 5,300.54 | 1,730.82 | 177.73 | 187.23 | 432.98 | 46.58 | 8.53 |

52. In addition, I calculated the facility's PTE using the emissions profiles provided by Trinity Consultants to MDEQ. Because Trinity Consultants understates the likely heat rates of several of the turbines, the calculation understates the PTE posed by this facility. Nonetheless, even using Trinity Consultant's heat rate values, the Colossus Gas Plant's PTE would be:

a. in excess of 4,400 tpy of NOx;

b. in excess of 7,000 tpy of CO;

c. in excess of 370 tpy of PM; and

d. in excess of 56 tpy of total HAPs.

53. Looking at the latest-available (2020) National Emission Inventory (NEI)[2] to compare the NOx PTE to annual emission for other facilities, for NOx emissions the Southaven site[3] ranks:

[2] U.S. EPA National Emissions Inventory 2020 NEI Data Retrieval Tool, available at https://www.epa.gov/air-emissions-inventories/2020-national-emissions-inventory-nei-data ("Online 2020 NEI Data Retrieval Tool").

[3] As actual annual emissions data is not available for the Southaven site, the calculated NOx PTE was compared to NEI values.

a. The greatest polluter in the Memphis Metropolitan Statistical Area, which covers 8 counties[4], dwarfing the next largest emitter, Memphis International Airport whose NOx annual emissions are one-fifth (1,077 tpy) that of the Southaven site's PTE (5,300 tpy). A comparable 1.1-gigawatt combined-cycle natural gas-fired plant, TVA-Allen in Shelby County, Tennessee, has annual NOx emissions of only 230 tpy.

b. The largest NOx emitter in Mississippi, Tennessee, and Arkansas.

c. In the top 50 of over 52,000 facilities in the nation. That is the top 0.1% of NOx emitters in the country.

54. I compared the 57 turbines at the site to the 41 turbines in the permit that MDEQ issued to MZX Tech LLC for 2875 Stanton Rd S, Southaven, Mississippi on March 11, 2026. None of the 57 turbines currently observed on-site are included in that permit. In addition, neither of two additional turbines listed by Trinity Consultants in the May 15, 2026 email disclosure but not yet on-site are included in that permit.

**Additional On-site Construction**

55. Aerial photographs show that a significant amount of construction work has occurred at the site.

56. As of my April analysis, concrete pads were poured to support the turbines; electrical lines, gas supply lines, and water injection lines were installed; three white buildings, which appear to be switch houses, were erected; at least 17 transformers were installed; and, as

[4] Arkansas – Crittenden County; Mississippi – DeSoto, Marshall, Tate, and Tunica Counties; Tennessee – Fayette, Shelby, and Tipton Counties.

mentioned above, SCR was installed on several units (including exhaust stacks and ammonia tanks).

57. As of my May analysis, several transformers have been newly installed, and two more switch house buildings can be observed in the May 12, 2026 satellite imagery (see Figures 11 and 12). Electrical lines can be seen running from turbines #34-41 as well.

58. Though the concrete pads are currently being used to support the turbines, that kind of foundation is not necessary for the make and model of turbines currently in use, especially if they are used short term. The turbines currently in use could instead be supported by alternative materials, such as gravel mats or timber mats. Compared to alternatives, concrete pads are more expensive, are intended for longer term use, and are less prone to weather damage.

59. There are significant building and decommissioning times associated with the type of infrastructure at the project site. The type of work implemented at the site indicates that the materials, equipment, and structures are likely not for temporary use. For example, equipment like natural gas supply lines, electrical connections, and the concrete slab foundations both support these turbines and could be repurposed and adapted for future turbines.

60. The extent of construction already implemented at the site indicates that the infrastructure will be part of the power source long term.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 10, 2026.

Signed by:
Kim Laufenberg
947641BD46E947E...

Kim Laufenberg

# Exhibit E

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**DECLARATION OF DR. HELEN SUH**

I, Dr. Helen Suh, declare under penalty of perjury that the following is true and correct.

**QUALIFICATIONS**

1. I am a Professor in the Department of Civil and Environmental Engineering at Tufts University in Medford, Massachusetts and a Senior Fellow in the Department of Public Health at NORC at the University of Chicago.

2. I hold a Doctorate and Master of Science in Environmental Health from the Harvard T.H. Chan School of Public Health and a Bachelor of Science from the Massachusetts Institute of Technology.

3. I have over 30 years of experience characterizing exposures to air pollutants, including fine particulate matter ($PM_{2.5}$), nitrogen dioxide, ozone, volatile organic compounds (VOCs), carbon monoxide, and sulfur dioxide, and their effect on human health.

4. My research integrates rigorous exposure assessment and epidemiological methods, including the development of GIS-based spatiotemporal exposure models, methods to quantify and correct for exposure measurement error, and epidemiological analyses of the health impacts of air pollutants and extreme weather.

5. I currently serve as Principal Investigator on two National Institute of Health (NIH)-funded R01 research grants examining: (1) associations between long-term $PM_{2.5}$ and associated metal exposures and dementia-related outcomes, including incident dementia, cognitive decline, and dementia-associated neuropathology, in a large prospective cohort of older adults; and (2) the health impacts of extreme weather events and community-level determinants of vulnerability.

6. I have led exposure assessment studies that characterize outdoor, indoor and personal air pollutant exposures and that develop monthly GIS-based spatio-temporal models to predict $PM_{2.5}$ and their component concentrations at any location in the conterminous United States.

7. I have also previously led epidemiological studies investigating the impact of short- and long-term air pollutant exposures on cause-specific mortality and hospital admissions, as well as cardiovascular, respiratory, and cognitive outcomes.

8. In addition to NIH, my research has been funded by the US Environmental Protection Agency, the Health Effects Institute, the US Department of Energy, and the Electric Power Research Institute. My findings are described in 158 articles published in leading peer-reviewed journals.

9. My expertise is widely recognized at the highest levels of scientific and regulatory oversight. I served as a charter member of the EPA Clean Air Scientific Advisory Committee (CASAC), a seven-member committee appointed by the EPA Administrator to provide independent scientific advice on the National Ambient Air Quality Standards—the federal

standards governing permissible levels of air pollutants in the United States. I have also served on CASAC panels for specific pollutants including PM, nitrogen dioxide, and ozone, on the US EPA Human Studies Review Board, on numerous NIH study sections, and on several National Academies of Sciences committees, including those reviewing the EPA Integrated Risk Information System (IRIS) Assessment on Formaldehyde and estimating mortality risk reduction from tropospheric ozone exposure. I previously served as Associate Editor of the Journal of Exposure Science and Environmental Epidemiology.

**BACKGROUND AND METHODOLOGY**

10. I submit this Declaration in support of the plaintiffs in the case *NAACP and NAACP Mississippi State Conference v. X.AI and MZX Tech LLC*, No. 3:26-cv-00074-MPM-JMV. I understand that the NAACP and NAACP Mississippi State Conference brought this action to remedy Defendants' alleged failure to apply for or receive air permits required by the federal Clean Air Act and Mississippi State Implementation Plan prior to constructing and operating gas combustion turbines located at 2875 Stanton Road in Southaven, Mississippi. Given my expertise in air pollution exposure science and epidemiology, I have been asked to provide a scientific assessment of the potential public health risks posed by emissions from these unpermitted turbines.

11. To do so, I reviewed relevant peer-reviewed and gray literature addressing the health effects associated with $PM_{2.5}$ and nitrogen oxide (NOx) exposures. The Plant emits additional pollutants of public health concern, including sulfur dioxide, carbon monoxide, and volatile organic compounds, such as formaldehyde, whose health implications may be addressed through a subsequent expert analysis or report for this litigation.

12. I also reviewed maps of the communities residing within a six-mile radius of the gas turbines to characterize the communities living near the gas turbines, including the presence of parks, schools and other areas where people may congregate, and their percentage of children and minority and low income populations.[1]

13. In preparing this Declaration, I drew upon my education, training, and experience in environmental health science, including my expertise in epidemiology, exposure science, and air pollution.

14. This opinion is based upon the available information as of this date and subject to change or refinement as additional information is made available. All opinions expressed in this Declaration are held to a reasonable degree of scientific certainty.

15. Appended to this Declaration are a list of documents that I considered and relied upon during my preparation of this Declaration: my curriculum vitae (Attachment 1); a list of my publications from the past ten years (Attachment 2); and a list of my expert testimony from the prior four years (Attachment 3).

**FINDINGS**

16. According to engineering analysis conducted for this case, the Colossus Gas Plant has the potential to emit 2,508 tons of NOx, 236 tons of PM, 837 tons of carbon monoxide (CO), and 115 tons of sulfur dioxide ($SO_2$) annually, as well as emissions of formaldehyde, toluene, and other volatile organic compounds.[2]

---

[1] The demographic and socioeconomic information was drawn from EPA's EJScreen tool. EPA removed public access to the tool on February 5, 2025, so I used a Reconstruction of Version 2.3 EJScreen that is available at: https://pedp-ejscreen.azurewebsites.net [https://perma.cc/574Z-TBNE].

[2] The referenced engineering analysis is included in a separate declaration of Kim Laufenberg.

17. The pollutants emitted by the Colossus Gas Plant are associated with serious adverse health effects. Critically, the scientific evidence demonstrates that for $PM_{2.5}$ and $NO_2$, there is no safe level of exposure. Any increase in ambient concentrations above background levels carries the potential for adverse public health consequences, particularly for vulnerable populations including children, older adults, and individuals with pre-existing cardiovascular and respiratory disease. The scientific basis for my conclusions is reviewed in detail below.

18. The communities surrounding the Colossus Gas Plant include precisely the populations that EPA and the broader scientific literature have identified as facing elevated risk from $PM_{2.5}$ and $NO_2$ exposure. Approximately 158,685 people live within 6 miles of the Plant, of whom roughly 77% are persons of color and 13.7% of households have annual incomes below $15,000. Children and older adults, populations that EPA has identified as at increased risk based on adequate evidence, together comprise more than 22% of the near-Plant population. The 6-mile radius also encompasses 66 parks and 24 elementary schools, where children and other vulnerable individuals regularly congregate. Several census tracts surrounding the Plant have amongst the highest percent of people of color and children, higher than approximately 95% of US census tracts.

19. The emissions profile of the Colossus Gas Plant and the demographic profile of the surrounding communities raise important public health concerns. The Plant's emissions of PM and NOx, pollutants which have been shown to have no safe level of exposure, will increase ambient concentrations of $PM_{2.5}$ and $NO_2$ in nearby communities that already include disproportionately high percentages of populations identified by EPA as facing elevated risks from these pollutants.

20. Based on the above, it is my opinion that emissions from the Colossus Gas Plant are likely to cause foreseeable adverse public health impacts on the surrounding population, with the burden of those impacts falling disproportionately on the most vulnerable members of the community, including children, older adults, persons of color, and low-income households living near the Plant.

***$PM_{2.5}$***

21. $PM_{2.5}$ refers to airborne particles with an aerodynamic diameter of 2.5 micrometers or less. Due to their small size, these particles can penetrate deep into the lungs and can translocate into the bloodstream, reaching distal organs including the heart and brain. The adverse health effects of $PM_{2.5}$ exposure are among the most extensively documented in the environmental health literature.

22. EPA's 2019 Integrated Science Assessment (ISA) for Particulate Matter[3], the most current comprehensive synthesis of the $PM_{2.5}$ health effects literature, concluded that causal relationships exist between $PM_{2.5}$ exposure and cardiovascular effects and mortality for both short- and long-term exposures, and between long-term $PM_{2.5}$ exposure and lung cancer (U.S. EPA, 2019).

23. Likely causal relationships were additionally identified between short- and long-term exposure and respiratory effects, including asthma exacerbation, combined respiratory-related diseases, and impaired lung function growth, and between long-term exposure and nervous system effects (U.S. EPA, 2019).

---

[3] U.S. EPA. (2019). Integrated Science Assessment (ISA) for Particulate Matter (Final Report). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-19/188, 2019.

24. Short-term $PM_{2.5}$ exposure, occurring over hours to days, has been associated with a range of acute cardiovascular and respiratory effects. Epidemiological time-series and panel studies conducted across multiple cities and countries have documented associations between day-to-day increases in $PM_{2.5}$ and increased rates of emergency department visits and hospital admissions for conditions including ischemic heart disease, heart failure, stroke, arrhythmia, and respiratory disease, as well as increased all-cause and cause-specific mortality.[4,5,6,7] These effects have been observed at $PM_{2.5}$ concentrations well below the current 24-hour NAAQS of 35 $\mu g/m^3$, and at concentrations representative of typical ambient air quality in US cities.

25. The evidence for long-term $PM_{2.5}$ health effects is equally robust, grounded in a large and consistent body of epidemiologic evidence, including that from the landmark Harvard Six Cities Study[8] and the American Cancer Society Cancer Prevention Study II.[9] More recent analyses have extended and reinforced these findings, with studies, including the NIH-AARP Diet and

---

[4] Fan, J., Li, S., Fan, C. et al. The impact of PM2.5 on asthma emergency department visits: a systematic review and meta-analysis. Environ Sci Pollut Res 23, 843–850 (2016). https://doi.org/10.1007/s11356-015-5321-x

[5] Dominici F, Peng RD, Bell ML, et al. Fine Particulate Air Pollution and Hospital Admission for Cardiovascular and Respiratory Diseases. JAMA. 2006;295(10):1127–1134. doi:10.1001/jama.295.10.1127

[6] Kloog I, Ridgway B, Koutrakis P, Coull BA, Schwartz JD. Long- and short-term exposure to PM2.5 and mortality: using novel exposure models. Epidemiology. 2013 Jul;24(4):555-61.

[7] Di Q, Dai L, Wang Y, et al. Association of Short-term Exposure to Air Pollution With Mortality in Older Adults. JAMA. 2017;318(24):2446–2456. doi:10.1001/jama.2017.17923

[8] Dockery DW, Pope CA 3rd, Xu X, Spengler JD, Ware JH, Fay ME, Ferris BG Jr, Speizer FE. An association between air pollution and mortality in six U.S. cities. N Engl J Med. 1993 Dec 9;329(24):1753-9.

[9] Pope CA, Ezzati M, Dockery DW. Fine-Particulate Air Pollution and Life Expectancy in the United States. N Engl J Med 2009;360:376-386.

Health Study[10] and the US Medicare population,[7,11,12] demonstrating significant associations between short- and long-term $PM_{2.5}$ exposure and cause-specific mortality at lower, post-2000 $PM_{2.5}$ exposure levels, even at concentrations below the then-current US National Ambient Air Quality Standard (NAAQS).

26. The biological mechanisms underlying the observed associations between short- and long-term $PM_{2.5}$ exposure and adverse health effects include oxidative stress, systemic inflammation, autonomic nervous system dysfunction, and DNA damage, pathways supported by convergent toxicological and epidemiological evidence.

27. The NAAQS are designed to protect public health with an adequate margin of safety, but they do not represent a zero-risk level (e.g., a concentration below which no adverse effects would occur in any member of the population). As EPA has stated: "The Act does not require the Administrator to establish a primary NAAQS at a zero-risk level, but rather at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety."[13]

28. The NAAQS are also not static; they are continually revised as new health evidence is provided. For $PM_{2.5}$, this is particularly significant: the epidemiological literature supports a linear, no-threshold concentration-response relationship for both short- and long-term exposures, meaning there is no concentration at which an increase in $PM_{2.5}$ does not result in an increase in

---

[10] Thurston GD, Ahn J, Cromar KR, Shao Y, Reynolds HR, Jerrett M, Lim CC, Shanley R, Park Y, Hayes RB. Ambient Particulate Matter Air Pollution Exposure and Mortality in the NIH-AARP Diet and Health Cohort. Environ Health Perspect. 2016 Apr;124(4):484-90.

[11] Wang B, Eum K, Kazemiparkouhi F, Li C, Manjourides J, Pavlu V, Suh HH. The impact of long-term $PM_{2.5}$ exposure on specific causes of death: exposure-response curves and effect modification among 53 million U.S. Medicare beneficiaries. *Environ Health* 2020; 19: 20.

[12] Di Q, Wang Y, Zanobetti A, Wang Y, Koutrakis P, Choirat C, Dominici F, Schwartz JD. Air Pollution and Mortality in the Medicare Population. N Engl J Med. 2017 Jun 29;376(26):2513-2522.

[13] Federal Register Volume 62, Number 138 (Friday, July 18, 1997), pg. 38652-38760.

adverse health outcomes.[3,14] As a result, even incremental increases in $PM_{2.5}$ concentrations below the NAAQS carry quantifiable public health consequences.

29. Consistent with this, large-scale epidemiological studies, including analyses of tens of millions of Medicare beneficiaries, have documented significant associations between short-[15] and long-term[12] $PM_{2.5}$ exposure and mortality at annual average concentrations below the current 24-h and annual NAAQS of 35 and 9 μg/m$^3$, respectively, with effect estimates per unit increase in $PM_{2.5}$ that are at least as large, and in some analyses larger, at lower concentrations than across the full exposure range.

30. In recognition of this evidence, and after considering the best available science, CASAC recommendations, and ~700,000 public comments, EPA strengthened the annual $PM_{2.5}$ NAAQS on February 7, 2024, lowering the standard from 12.0 to 9.0 μg/m$^3$.[16] This downward revision of the NAAQS, which was driven by documented health effects at concentrations previously considered acceptable, is itself compelling evidence that compliance with the NAAQS does not constitute a guarantee of safety.

31. It should be noted that in November 2025, the current EPA administration requested that the D.C. Circuit vacate the 2024 revision, and in March 2025 announced its intention to reconsider the standard.

32. However, this request to vacate the 2024 revision does not alter the underlying scientific evidence on which the 2024 revision was based. That evidence supports the conclusion that any

---

[14] Dominici F, Zanobetti A, Schwartz J, Braun D, Sabath B, Wu X. Assessing Adverse Health Effects of Long-Term Exposure to Low Levels of Ambient Air Pollution: Implementation of Causal Inference Methods. Res Rep Health Eff Inst. 2022 Jan;2022(211):1-56. PMID: 36193708; PMCID: PMC9530797.

[15] Shi L, Zanobetti A, Kloog I, Coull BA, Koutrakis P, Melly SJ, Schwartz JD. Low-Concentration $PM_{2.5}$ and Mortality: Estimating Acute and Chronic Effects in a Population-Based Study. Environ Health Perspect. 2016 Jan;124(1):46-52.

[16] https://www.epa.gov/pm-pollution/national-ambient-air-quality-standards-naaqs-pm

incremental increase in ambient $PM_{2.5}$ concentrations, including those associated with the Colossus Gas Plant, carries quantifiable public health consequences, regardless of whether the area remains in compliance with the NAAQS.

***NOx and Nitrogen Dioxide ($NO_2$)***

33. Nitrogen oxides are a class of highly reactive gases that are produced primarily through high-temperature combustion processes, including the operation of gas-fired turbines. The two most important members of this group are nitric oxide (NO) and $NO_2$. NO is initially emitted in the largest quantities during combustion but rapidly oxidizes in the atmosphere to form $NO_2$.

34. $NO_2$ is the component of NOx that poses the greatest public health concern and is the regulatory indicator under the Clean Air Act for NOx. In addition to its direct toxic effects, $NO_2$ is a key precursor to ground-level ozone and $PM_{2.5}$. As a result, $NO_2$ also contributes to the health burdens of multiple pollutants, including $PM_{2.5}$.

35. $NO_2$ is a potent oxidizing agent. Upon inhalation, it is absorbed in the respiratory tract, where it generates reactive oxygen species that trigger oxidative stress and inflammation in airway tissues, impairing mucociliary clearance, increasing airway hyperresponsiveness, and enhancing susceptibility to respiratory infections and allergens.[17]

36. With chronic exposure, $NO_2$-induced oxidative damage extends beyond the respiratory tract to include systemic vascular inflammation and endothelial dysfunction, contributing to cardiovascular disease.

37. EPA's 2016 Integrated Science Assessment (ISA) for Oxides of Nitrogen,[17] the most recent comprehensive synthesis of the $PM_{2.5}$ health effects literature, concluded that a causal

[17] U.S. EPA. Integrated Science Assessment (ISA) for Oxides of Nitrogen - Health Criteria (Final Report, Jan 2016). U.S. Environmental Protection Agency, Washington, DC, EPA/600/R-15/068, 2016.

relationship exists between short-term[18] $NO_2$ exposure and respiratory effects, with this determination based primarily on multiple lines of evidence linking $NO_2$ exposure to asthma attacks.

38. In the ISA, short-term $NO_2$ exposure was also associated with respiratory infection, respiratory effects in healthy populations, and respiratory mortality, although uncertainty remained as to whether these effects were due to $NO_2$ itself or to other correlated traffic-related pollutants.

39. The ISA also found likely causal relationships for long-term $NO_2$ exposure with respiratory effects, particularly asthma development in children. Observed associations with cardiovascular effects, diabetes, reproductive and developmental effects, total mortality, and cancer were deemed to be suggestive, due again to concerns regarding whether observed effects were independent of other co-emitted traffic-related pollutants.

40. Since the 2016 ISA, new epidemiological evidence has been published that demonstrate health impacts from $NO_2$ exposure, supporting previous findings and providing new evidence of health effects resulting from $NO_2$ exposures below current EPA standards.

41. For example, a meta-analysis by Meng et al.[19] examined the short-term health effects of $NO_2$ across 398 cities in 18 countries, providing some of the most comprehensive global evidence to date on the relationship between $NO_2$ exposure and mortality.

42. The study found that for each 10 $\mu g/m^3$ increase in daily $NO_2$ concentration, the risk of total mortality increased by 0.46%, with significant associations also observed for cardiovascular

[18] Short-term exposure defined as minutes up to a month-long exposures.

[19] Meng X, Liu C, Chen R, et al. Short term associations of ambient nitrogen dioxide with daily total, cardiovascular, and respiratory mortality: multilocation analysis in 398 cities. BMJ 2021; 372: n534. doi: https://doi.org/10.1136/bmj.n534

and respiratory mortality. Importantly, these associations remained statistically significant even after adjusting for exposures to inhalable particles ($PM_{10}$) and to $PM_{2.5}$, providing evidence that $NO_2$ has adverse health effects independent of particulate matter.

43. Further, the association between short-term $NO_2$ exposure and mortality was almost linear across the range of ambient concentrations studied, with no discernible threshold below which health effects were absent. This finding indicates that health risks associated with $NO_2$ were present even at concentrations below current regulatory standards and World Health Organization air quality guidelines.

44. Together, these findings suggest that any increase in ambient $NO_2$ concentrations is harmful to health, even when concentrations remain within current regulatory limits.

***Vulnerable Populations***

45. Scientific evidence indicates that the health burdens of $PM_{2.5}$ and $NO_2$ are not borne equally across the population. As discussed in their most recent ISAs, EPA found adequate scientific evidence that both children and non-white populations are at increased risk for $PM_{2.5}$-related health effects, and that both children and older adults (65+ years) are at increased risk for $NO_2$-related health effects.[20]

*Children*

---

[20] EPA's ISAs for $PM_{2.5}$ and $NO_2$ classified evidence on whether specific populations or life stages face increased risk for pollution-related health effects as: "adequate," "suggestive," "inadequate," or "evidence of no effect." Adequate evidence was defined as there being "substantial, consistent evidence within a discipline to conclude that a factor results in a population or lifestage being at increased risk of air pollutant-related health effect(s) relative to some reference population or lifestage. Where applicable, this evidence includes coherence across disciplines. Evidence includes multiple high-quality studies."

46. Children were identified as a population at increased risk of adverse health effects from both $PM_{2.5}$ and $NO_2$ exposure, reflecting their developing respiratory systems, higher ventilation rates relative to body mass, greater proportion of oral breathing, and tendency to spend more time outdoors, factors which together contribute to higher effective doses of inhaled pollution and greater vulnerability to its effects.[3,17]

47. For $PM_{2.5}$, exposures have been associated with several adverse health effects in children, including impaired lung function growth, decrements in lung function, and asthma development, with the magnitude of associations generally similar to those observed for adults.

48. A study conducted in 2015 of air quality and lung development in children found that declines in both long-term $PM_{2.5}$ and $NO_2$ exposures were associated with statistically and clinically significant improvements in forced expiratory volume in one second (FEV1)[21] and forced vital capacity (FVC) in both sexes and in children with and without asthma..[22]

49. Further, the percentage of children with clinically low FEV1 at age 15 declined significantly with lower $PM_{2.5}$ and $NO_2$ levels, proving evidence of meaningful improvements in lung growth associated with declining exposures.

50. The epidemiological evidence for $NO_2$ similarly shows greater susceptibility to respiratory effects in children compared to adults. The most robust evidence comes from studies of asthma hospital admissions and emergency department visits, where comparisons between

---

[21] Defined as <80% of the predicted value

[22] Gauderman WJ, Urman R, Avol E, Berhane K, McConnell R, Rappaport E, Chang R, Lurmann F, Gilliland F. Association of Improved Air Quality with Lung Development in Children. N Engl J Med 2015; 372:905-913

children aged 0–14 years and older age groups show larger associations with short-term $NO_2$ exposure in children, particularly for asthma exacerbation requiring acute medical care.[23]

51. A systematic review and meta-analysis of 67 studies, 48 of which included data specifically on children, found a pooled relative risk of 1.014 (95% CI: 1.008–1.020) per 10 $\mu g/m^3$ increase in 24-hour $NO_2$ concentration for asthma-related emergency room visits and hospitalizations, with high certainty of evidence and with the association strength found to be greater in children than in adults.[24]

52. In addition, a recent prospective cohort study of generally healthy children in metropolitan Boston[25] found that long-term $NO_2$ exposure, both during the first year of life and from birth through early adolescence, was associated with lower lung function, with results suggesting that the effects of early life $NO_2$ exposure persist throughout the life course. Notably, adverse effects were observed at $NO_2$ concentrations well below the current US annual standard.

*Older Adults*[26]

53. The 2016 ISA also concluded that older adults are at increased risk for $NO_2$-related health effects. This conclusion was based primarily on epidemiological evidence of larger effects from short-term $NO_2$ exposures in this age group relative to younger adults.[17]

---

[23] While a small number of studies found no age-related difference for $NO_2$-associated asthma outpatient visits and medication use, outcomes that reflect less severe disease, these findings do not undermine the overall conclusion, as the evidence for more serious outcomes requiring acute medical care were found to be sufficiently consistent.

[24] Zheng XY, Orellano P, Lin HL, Jiang M, Guan WJ. Short-term exposure to ozone, nitrogen dioxide, and sulphur dioxide and emergency department visits and hospital admissions due to asthma: A systematic review and meta-analysis. Environment International 2021; 150, 106435.

[25] Zetlen HL, Rifas-Shiman SL, Gibson H, Oken E, Gold DR, Rice MB. Long-Term Exposure to Nitrogen Dioxide and Ozone and Respiratory Health in Children. Ann Am Thorac Soc. 2025 Feb;22(2):226-234.

[26] 65 years and older.

54. Older adults may be particularly susceptible to $NO_2$ due to age-related declines in lung function, reduced mucociliary clearance, and the deterioration of immune function with age, which may increase susceptibility to $NO_2$-triggered airway inflammation and respiratory infections.[17] Older adults also have a higher prevalence of underlying cardiovascular and respiratory disease, which can lower the threshold at which $NO_2$ exposure produces clinically significant effects.[17]

55. Epidemiological studies of short-term $NO_2$ exposure generally show one- to threefold larger associations between short-term $NO_2$ exposure and asthma hospital admissions and emergency department visits in adults aged 65 years and older compared to those aged 15-64 years, although a small number of studies found no increased risk in older adults.[17] Results for all respiratory hospital admissions similarly showed larger associations with $NO_2$ for older adults.

56. For non-respiratory effects, associations between short-term $NO_2$ and total mortality are also generally larger in older adults, with evidence pointing to particularly elevated risk among the oldest adults, those over 75 or 85 years of age.

57. While the evidence for long-term $NO_2$ exposure and health effects in older adults has been less consistent, a study of the US Medicare population found significant associations between long-term $NO_2$ exposure and mortality from all causes, cardiovascular disease, respiratory disease, and cancer, with no evidence of a threshold across the full range of $NO_2$ exposures.[27]

---

[27] Eum KD, Honda TJ, Wang B, Kazemiparkouhi F, Manjourides J, Pun VC, Pavlu V, Suh H. Long-term nitrogen dioxide exposure and cause-specific mortality in the U.S. Medicare population. Environ Res., 2022. 1;207:112154. doi: 10.1016/j.envres.2021.112154.

*Race and Ethnicity*

58. EPA concluded that there was adequate scientific evidence that non-white populations, particularly Black populations, face increased risk for $PM_{2.5}$-related health effects, reflecting both higher exposures[28] and consistent evidence of elevated health risks across multiple studies. Consistent with this conclusion, a recent study by Josey et al.[29] found that Black and low-income Americans face significantly higher $PM_{2.5}$-associated mortality risk than other demographic groups and benefit more when $PM_{2.5}$ levels decrease.

59. These elevated health risk risks reflect, in part, the substantially higher $PM_{2.5}$ exposures experienced by non-white as compared to white populations. Liu et al.[30] showed that racial and ethnic minority groups consistently face higher exposures to multiple air pollutants, including $PM_{2.5}$, compared to their white counterparts. Although absolute exposure disparities declined as overall air pollution levels fell between 1990 and 2010, racial and ethnic disparities in $PM_{2.5}$ exposure persisted across income levels, in both urban and rural areas, and in all states.

60. While EPA's 2016 ISA did not find adequate evidence that race and ethnicity modify $NO_2$-related health risks, the same patterns of disproportionate exposure documented for $PM_{2.5}$ have also been observed for $NO_2$. In 2010, the disparity between the racial and ethnic group with the highest versus lowest national average $NO_2$ exposure was 54%, larger than disparities observed for any other pollutant studied.[30] Given the well-documented higher $NO_2$ exposures experienced by non-white and low-income communities, and the adverse health effects of $NO^2$

[28] Jbaily A, Zhou X, Liu J, Lee TH, Kamareddine L, Verguet S, Dominici F. Air pollution exposure disparities across US population and income groups. Nature. 2022; 601(7892): 228-233.

[29] Josey KP, Delaney SW, Wu X, Nethery RC, DeSouza P, Braun D, Dominici F. Air Pollution and Mortality at the Intersection of Race and Social Class. N Engl J Med 2023; 388: 1396-1404.

[30] Liu J, Clark LP, Bechle MJ, Hajat A, Kim SY, Robinson AL, Sheppard L, Szpiro AA, Marshall JD. Disparities in Air Pollution Exposure in the United States by Race/Ethnicity and Income, 1990-2010. Environ Health Perspect. 2021 Dec;129(12):127005. doi: 10.1289/EHP8584.

described above, these populations warrant particular consideration in assessing the public health implications of the unpermitted turbines.

*Vulnerable Populations Near the Plant*

61. The scientific evidence reviewed above demonstrates that children, older adults, and non-white and low-income populations may face elevated health risks from $PM_{2.5}$ and $NO_2$ exposure.

62. For children and older adults, biological factors, including developing or declining respiratory systems and immune function, may contribute to greater susceptibility to the health effects of these pollutants.

63. For non-white and low-income populations, disproportionately higher exposures to $PM_{2.5}$ and $NO_2$, combined with higher burdens of underlying disease and reduced access to healthcare, may further compound their risk.

64. As described below, the communities surrounding the unpermitted turbines include precisely these populations (Figure 1.B-E), as well as locations where they congregate, such as schools and parks (Figure 1.A), raising particular concern about the public health implications of emissions from the Colossus Gas Plant. 65.Approximately 158,685 people in 61,328 households live within a 6-mile radius of the Plant.[31]

65. A large fraction of these individuals are persons of color (Figure 1.B); approximately 77% of the population within the 6-mile radius of the Plant are persons of color.[32] Within Mississippi alone, approximately 41,798 persons of color live within 6 miles of the Plant. As

---

[31] Population and household counts are derived from the American Community Survey (ACS) 5-year estimates, 2020–2024, at the census tract level.

[32] Percentages reported in the body text (e.g., 77%, 13.7%) are calculated as the count within the 6-mile radius divided by the total population (or total households) within that radius.

shown in Figure 1.B, many of the census tracts surrounding the Plant fall in the highest national category for percent people of color (73.8%–100%), meaning these tracts have a higher share of people of color than approximately 95% of all census tracts nationwide.[33]

66. Households located near the Plant are poor, with 8,376 households (or 13.7% of all households) within the 6-mile radius having incomes less than $15,000 per year (Figure 1.C).[32] The areas immediately surrounding the Plant include census tracts that have among the highest percentages of poor households.

67. Children and older adults also live near the Plant, comprising 7% and 15.5% of the near - Plant population, respectively (Figures 1.D–E). Several census tracts within 6 miles of the Plant have a higher fraction of children than approximately 95% of all census tracts nationwide. In addition, 66 parks and 24 elementary schools, locations where children and families often congregate, lie within 6 miles of the Plant, of which 40 parks and 9 elementary schools are in Mississippi.

## CONCLUSIONS

68. As presented above, the Plant emits pollutants for which no safe exposure threshold has been established, and the surrounding population includes high concentrations of individuals with heightened vulnerability to those pollutants. Together, these factors support a reasonable scientific conclusion that the Plant's operations pose meaningful public health risks to local communities. Accordingly, it is my opinion that emissions from the Colossus Gas Plant are likely to increase public health risks for the surrounding population, with these risks falling

---

[33] Shading categories in Figure 1.B-E reflect each census tract's value relative to the national distribution of US census tracts. For example, the highest bin for percent people of color (73.8%–100%) identifies tracts in which the share of people of color exceeds that of approximately 95% of US census tracts.

disproportionately on its most vulnerable members, including children, older adults, persons of color, and low-income households.

**Figure 1. Community Characteristics Within Six Miles of the Colossus Gas Plant, Southaven, Mississippi.**[1]







[1] Maps show a six-mile radius around the Colossus Gas Plant located at 2875 Stanton Road, Southaven, Mississippi. The red circle indicates the six-mile radius. Map A depicts public K-12 Schools. Maps B-E feature Census Tracts. The state line delineating Tennessee from Mississippi is shown. All maps drawn at a 1:350,000 scale.

Last updated: May 05, 2026
Sources: American Community Survey 5-Year Estimates (2020-2024), National Center for Education Statistics, DeSoto County GIS, Memphis Open Data, the Trust for Public Land, ESRI Living Atlas

Executed on May 5, 2026



Dr. Helen Suh

# Exhibit F

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**SUPPLEMENTAL DECLARATION OF DR. HELEN SUH**

I, Dr. Helen Suh, declare under penalty of perjury that the following is true and correct.

## INTRODUCTION

1. I have been asked to update my expert opinion on the potential public health risks posed by emissions from unpermitted gas combustion turbines operating at the Colossus Gas Plant at 2875 Stanton Road in Southaven, Mississippi.

2. This update was requested because additional gas turbines have recently been installed and operated at the Colossus Gas Plant, which now has a total of at least 57 unpermitted gas combustion turbines on site.[1]

3. In my earlier Declaration,[2] I concluded that the unpermitted emissions from the Colossus Gas Plant, as then configured, were likely to increase public health risks for the surrounding

[1] Trinity Consultants email to MDEQ, May 15, 2026, "Updated Count and Emissions Profiles," attached to declaration of Sarah Al-Zhyri.

[2] Dkt. 20-39, Suh Declaration, May 6, 2026.

population. These risks fell disproportionately on its most vulnerable members, including children, older adults, persons of color, and low-income households.

**METHODOLOGY**

4. For this update, I obtained an updated engineering analysis of potential emissions (PTE) from the Colossus Gas Plant,[3] which now includes the additional gas turbines.

5. I compared the updated PTE values to those from the earlier engineering analysis[4] and assessed the implications of the additional emissions for public health risks to the surrounding population.

**FINDINGS**

6. According to the updated engineering analysis, the Colossus Gas Plant has the potential to emit over 5,300 tons of nitrogen oxides (NOx), over 430 tons of particulate matter (PM), 1,700 tons of carbon monoxide (CO), over 170 tons of sulfur dioxide ($SO_2$), and over 46 tons of formaldehyde annually. The Plant also has the potential to emit other pollutants, including toluene and other volatile organic compounds.

7. As shown on Table 1, the additional turbines has the potential to increase pollutant emissions substantially. Potential NOx and CO emissions more than double, while those for PM increase by 83%, $SO_2$ by 55%, and formaldehyde by 88%.

---

[3] The referenced engineering analysis is included in a separate declaration of Kim Laufenberg.

[4] Exhibit H, Declaration of Kim Laufenberg, Dkt. No. 20-38.

**Table 1**. PTEs Before and After the Installation of Additional Gas Turbines[4]

| Time Period | No. of Turbines | PTEs (tons) | | | | |
|---|---|---|---|---|---|---|
| | | NOx | PM | CO | $SO_2$ | Formaldehyde |
| April 2026 | 33 | 2,508 | 236 | 837 | 115 | 25 |
| June 2026 | 57 | 5,301 | 433 | 1,731 | 178 | 47 |

8. These increased emissions will likely result in higher ambient concentrations of these pollutants and through this, higher exposures for populations living in the surrounding areas. While each of these pollutants pose public health risks, my Declaration reviewed only the scientific literature on $PM_{2.5}$ and $NO_2$.[5]

9. For $PM_{2.5}$ and $NO_2$ in particular, no safe level of exposure has been identified. Any increase in ambient concentrations therefore increases the potential for adverse public health consequences, including increased risks of cardiovascular and respiratory effects.

## CONCLUSIONS

10. My initial findings and conclusions are consistent with and not changed by this additional information.

11. The increased PTEs include pollutants for which no safe exposure threshold has been identified. Further, the surrounding population includes individuals with heightened vulnerability to those pollutants.[6] Together, these factors support a reasonable scientific

---

[5] As noted in my previous analysis, health effects associated with additional pollutants, including sulfur dioxide, carbon monoxide, volatile organic compounds, and formaldehyde may be addressed through a subsequent expert analysis or report for this litigation. Dkt. 20-39, Suh Decl. ¶ 11.

[6] Dkt. 20-39, Suh Decl. at ¶¶ 61-67 and Figure 1.

conclusion that the operation of additional gas turbines at the Colossus Gas Plant increases the public health risks to the surrounding population.

Executed on June 9, 2026

Dr. Helen Suh

# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**BRIEF IN SUPPORT OF PLAINTIFFS' AMENDED**
**<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

**ORAL ARGUMENT REQUESTED PER L.R. 7(b)(6)(A)**

## TABLE OF CONTENTS


**INTRODUCTION** .......... 1

I. **BACKGROUND** .......... 2

A. The Clean Air Act requires operators to prevent harmful air pollution. .......... 2

B. Defendants constructed the Colossus Gas Plant without any permits and operated it without necessary pollution controls. .......... 4

C. The Colossus Gas Plant poses dangers to public health and welfare. .......... 6

II. **STANDARD OF REVIEW** .......... 8

III. **ARGUMENT** .......... 9

A. Plaintiffs have standing to bring this lawsuit. .......... 9

B. The Court has statutory jurisdiction over this Clean Air Act citizen suit .......... 12

C. A Preliminary Injunction is warranted to protect Plaintiffs from the unpermitted and uncontrolled pollution of the Colossus Gas Plant .......... 13

1. Plaintiffs are likely to succeed in establishing Defendants are violating the law .......... 13

a. Claim 1: Defendants lack the necessary preconstruction permit to build and operate the Colossus Gas Plant. .......... 13

b. Claim 2: Defendants lack the permits to build and operate the Colossus Gas Plant as a major stationary source. .......... 15

2. Defendants' excuses for shirking air pollution permit, control, and monitoring requirements do not withstand scrutiny .......... 17

a. The turbines of the Colossus Gas Plant are not "mobile sources." .......... 17

b. Whether the turbines are "temporary" is irrelevant. .......... 19

3. Plaintiffs face a substantial threat of irreparable harm. .......... 21

4. The balance of harms tips decisively in Plaintiffs' favor. .......... 23

5. An injunction is in the public interest. .......... 25

D. Waiver of bond is appropriate here. .......... 25

IV. **CONCLUSION** .......... 26

In Southaven, Mississippi—a community already burdened by air pollution—Defendants built their Colossus Gas Plant to power xAI's nearby data center. Following the "move fast and break things" business model, the companies built their network of massive gas-fired turbines without any air pollution permits or the necessary pollution controls. Defendants certainly built their Plant fast, but in doing so they betrayed the community—and broke the law.

New sources of air pollution pose new risks to the health and welfare of those communities most likely to bear the brunt of environmental and climate decisions, frontline and fenceline neighborhoods. That's why the Clean Air Act requires operators to get permits that set pollution limits *before* they build their facility, and then to operate it in accordance with those permit limits. Without controls, the Colossus Gas Plant's turbines can emit *ten times* the amount of nitrogen oxides pollution they should under the Act, contributing to increasing risks of heart disease, lung disease, and premature death in the surrounding neighborhoods where Black and other frontline communities live, including members of Plaintiffs NAACP and NAACP MS.

The Clean Air Act's permitting system is not "red tape" that operators can cut to save time and money; it is a safety belt that protects the lives and livelihoods of surrounding communities. But, disregarding neighbors' health and the Act's plain requirements, Defendants continue to expand the Gas Plant's capacity without air permits, pollution controls, emissions monitoring, or community involvement, trading public health for speed in their race to market.

Only an injunction prohibiting operations can protect the community and prevent illegal harms as the Clean Air Act demands. The law requires permits and controls; Defendants don't have them. The Gas Plant—colossal and growing—causes imminent and irreparable harm each day it operates, disrupting the lives of community members and exposing them to illegal

pollution. This Court should enjoin the Colossus Gas Plant's operation until Defendants obtain the permits and implement the pollution controls that federal and state laws require.

## I. BACKGROUND

### A. The Clean Air Act requires operators to prevent harmful air pollution.

More than 50 years ago, Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare" of communities like those living near the Colossus Gas Plant. 42 U.S.C. § 7401(b)(1). In it, Congress directed EPA to establish air quality standards,[1] which State permitting authorities would work to attain and maintain as they managed regional development. Setting the paradigm for cooperative federalism, the Clean Air Act then allowed States to develop their own regulations—"State Implementation Plans"—to implement the Act's protections. 42 U.S.C. § 7407(a). State Implementation Plans must be at least as stringent as the federal template, and once approved by EPA, they become federally enforceable under the Clean Air Act. 42 U.S.C. §§ 7413, 7604. EPA has approved the Mississippi State Implementation Plan (SIP). 40 C.F.R. § 52.1270(c)–Table 1.

Congress in its statute and Mississippi in its SIP recognized that all *new* stationary sources of air pollution pose *new* and additional risks to the health and welfare of downwind communities. As such, before constructing a new source of air pollution, owners and operators must apply for permits that establish pollution limits, and then they must install and operate the necessary pollution controls to ensure the source keeps its pollution below those limits. There are two distinct permitting requirements at issue here:

---

[1] Called the National Ambient Air Quality Standards (or NAAQS). 42 U.S.C. § 7409(b)(1).

**1. New Source Construction Permits**. All new stationary sources of criteria pollutants—including nitrogen oxides ($NO_x$) and fine particulate matter ($PM_{2.5}$)—must apply for and obtain permits prior to construction and operation unless specific, enumerated exemptions apply. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013). "Stationary source" is defined as "any building, structure, facility, or installation which emits or may emit regulated air pollutant(s)." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013). Permits to construct include emissions limitations based on Clean Air Act requirements. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (10) (2013). Any later issuance of a permit from the Mississippi Permit Board "does not release the permittee from liability for constructing or operating air emissions equipment" without first obtaining a permit to construct. 11 Pt. 2 Ch. 2 Miss. Code R. 2.2 B (7) (2013).

**2. New Source Review Permits for Major Sources of Criteria Pollutants**. The Clean Air Act's New Source Review program requires new "major" sources of criteria air pollutants to obtain permits and comply with stringent emission limits that reduce pollution in order to "protect public health and welfare from any actual or potential adverse effect" from that air pollution. 42 U.S.C. § 7470(1). These strict limits are referred to as "best available control technology" or "BACT," and are defined as "an emission limitation" that restricts pollutant discharges "on a continuous basis." *Id.* §§ 7475(a)(4), 7479(3), 7602(k). Set case-by-case, BACT must achieve the maximum pollution reduction possible considering "energy, environmental and economic impacts and other costs." *Id.* § 7479(3). The BACT requirement reflects Congress' design to "prevent" the "deterioration" of air quality, 42 U.S.C. §§ 7470–7492, so BACT limits must be set by permits *before* the new source is constructed, *id.* § 7475(a)(1), and the source must comply with the limitation during its operations thereafter. *Id.* § 7475(a)(4). No such permit can be issued for a new major source unless the owner or operator of the facility demonstrates

through air modeling that the facility will not cause or contribute to air pollution in excess of regional air quality standards, *id.* §7475(a)(3). Operators must establish air quality monitoring to track the facility's air pollution impacts. *Id*. § 7475(a)(7); *see also* 40 C.F.R. §§ 51.166(k), (m).

**B. Defendants constructed the Colossus Gas Plant without any permits and operate it without necessary pollution controls.**

In July of 2025, MZX Tech, a subsidiary of xAI, acquired property at 2875 Stanton Road South in Southaven, DeSoto County, Mississippi.[2] On July 25, the Vice President of Operations for xAI informed the Mississippi Department of Environmental Quality (MDEQ) of Defendants' "plans to build energy resources at our property in DeSoto County," beginning with unpermitted, "temporary" gas-fired turbines.[3] The turbines would provide fast power to xAI's Colossus 2 data center, xAI's second data center in Shelby County, Tennessee, a mile away.

Four days later, on July 29, MDEQ claimed in a two-paragraph letter that xAI's turbines were "exempt" from permitting requirements because they were "[1] 'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer) and [2] 'temporary' as it is intended for each to remain on-site (2875 Stanton Road South; Southaven, MS) for less than twelve (12) months."[4] In the meantime, MZX Tech stated that it would apply for air permits for a different set of turbines intended for future use at the site.[5]

---

2 *See* Public Records Collection, Ex. A (Am. Al-Zhyri Decl.) attaching Ex. A-3 (Deed).

3 Ex. A-4 (July 25, 2025 xAI Update).

4 Ex. A-5 (MDEQ's Determination Letter).

5 On August 22, 2025, MZX submitted a permit application proposing a different turbine fleet (and pollution controls) for the site, then revised its application on January 14, 2026. MDEQ issued MZX a permit on March 11, 2026. *See* Ex. A-18 (Amended PSD Air Permit Application) and Ex. A-25 (PSD Air Permit), respectively.

By August 1, 2025, Defendants had begun constructing gas-fired combustion turbines each the size of a single-family home at the Southaven property.[6] By the end of August, 18 gas-fired turbines had been built on site. By November, all 18 were powering xAI's data center.[7] And by December, Defendants had installed 9 more turbines, bringing the Plant's total to 27.[8]

Early community opposition to xAI's developments in the Memphis Area had publicly highlighted that residents and surrounding NAACP community members were concerned with the company's apparent circumvention of the law and disregard for public health. *See*, *e.g.*, Ex. G (Tipton Decl.) at ¶¶ 9, 10. Defendants met the same local opposition to their installation of gas-burning turbines without first inviting public participation in Southaven. On February 13, 2026, Plaintiffs issued a Notice of Intent to Sue, detailing Defendants' failures to follow Clean Air Act requirements, and underscoring the burdens those violations foist on frontline communities and neighbors that may be particularly vulnerable to risks posed by increased air pollution—like NAACP and NAACP MS's members living in the surrounding area.[9]

Aerial photographs from March 3 confirmed that 27 turbines were still on site at Defendants' Colossus Gas Plant in Southaven.[10] These 27 turbines have a combined generating capacity of at least 495 MW—enough to power 400,000 homes.[11]

On March 11, MZX Tech obtained a Prevention of Significant Deterioration (PSD) permit to build and operate a *different* fleet of gas turbines—complete with (at least some)

---

[6] Ex. A-11 (Nov. 25, 2025 Trinity Update).

[7] Ex. A-10 (Nov. 5, 2025 Trinity Update) at 2.

[8] Ex. A-13 (Dec. 11, 2025 Trinity Update).

[9] *See* Ex. A-21 (Notice of Intent).

[10] Ex. A-23 (March 3, 2026 Satellite Photo).

[11] Ex. A-13 (Dec. 11, 2025 Trinity Update); Eng. Analysis, Ex. H (Laufenberg Decl.) ¶ 7.

mandatory pollution controls.[12]

By April 14, 2026, over two months after Defendants received the NOI, aerial photographs revealed the construction of six additional turbines, all added after March 3.[13]

On May 12, 2026, satellite images revealed 57 turbines at the facility.[14] Then, on May 15, 2026, Defendants' consultants sent MDEQ an inventory of 57 turbines on site, —and indicated that two additional turbines would be installed later.[15]

All of the configurations of turbines onsite—from 18 to 27 to 33 to 57 and beyond—required Clean Air Act permits prior to construction, best available control technology to limit pollution during operations, and emissions monitoring for pollution tracking and transparency. Defendants have not obtained a single air permit for these turbines or otherwise complied with the Clean Air Act requirements at any point from installation to now.

### C. The Colossus Gas Plant poses dangers to public health and welfare.

The combustion turbines at Defendants' facility emit pollutants known to negatively impact human health, including nitrogen oxides ($NO_x$), fine particulate matter ($PM_{2.5}$), and carbon monoxide (CO). These pollutants have been regulated as dangerous for generations, and Black and frontline communities and vulnerable populations—like Plaintiffs' members in the area—face greater risks and bear a greater health burden from such pollution.[16]

---

12 *See* Ex. A-25 (PSD Air Permit).

13 *See* Ex. A-29 (April 14, 2026 Satellite Photo); Ex. H (Am. Laufenberg Decl.) ¶ 25.

14 *See* Ex. A-33 (May 12, 2026 Satellite Photo); Ex. H (Am. Laufenberg Decl.) ¶ 34.

15 *See* Ex. A-34 (May 15, 2026 Trinity Update). Defendants' June 12 disclosure revealed there will be 60 turbines on site by the end of the month. Ex. L (June 12, 2026 Counsel Email Exchange and Attachment).

16 *See* Public Health Review, Ex. I (Suh. Decl.) ¶¶ 61–68; Ex. J (Suppl. Suh Decl.) ¶¶ 8-9.

Nitrogen dioxide ($NO_2$), a significant component of $NO_x$, can irritate airways and lead to short-term respiratory symptoms and susceptibility to allergens, as well as long-term conditions like cardiovascular disease, respiratory disease, or even premature mortality.[17] $NO_x$ also reacts with other chemicals in the air to form both $PM_{2.5}$ and ozone, and it is a primary cause of smog. Among other harmful health effects, ozone irritates people's lungs and causes asthma attacks.[18]

Like $NO_2$, $PM_{2.5}$ exposure increases the risks of lung disease, heart disease, and even premature death in downwind communities.[19] Importantly—and as courts have recognized, "there is no safe level below which $PM_{2.5}$ is not harmful." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 773 (E.D. Mo. 2019), *aff'd in part, rev'd in part on different grounds and remanded*, 9 F.4th 989 (8th Cir. 2021). Indeed, "*any* incremental increase in $PM_{2.5}$ exposure produces an incremental increased risk of mortality and other health effects in the population exposed to" that pollution. *Id.* at 774 (emphasis added).

Carbon monoxide—still another pollutant emitted by the Gas Plant—adversely affects human health by reducing the amount of oxygen transported in the bloodstream to critical organs, like the heart and brain.[20]

When it consisted of 27 turbines, the Colossus Gas Plant had the potential to emit 1,732.71 tons of $NO_x$ per year, 588.26 tons of CO, and 181.62 tons of $PM_{2.5}$, among other

---

17 *See* Ex. I (Suh Decl.) ¶¶ 34-44.

18 *See, e.g., Health Effects of Ozone Pollution*, ENV'T PROT. AGENCY, published on EPA.gov [https://perma.cc/4P3V-Q7BE] (last updated May 23, 2025).

17 *See* Ex. I (Suh Decl.) ¶¶ 21–32; *Health and Env't Effects of Particulate Matter (PM)*, ENV'T PROT. AGENCY, [https://perma.cc/S5EY-5DXN] (last updated May 23, 2025).

20 *See Basic Information about Carbon Monoxide (CO) Outdoor Air Pollution*, ENV'T PRO. AGENCY, [https://perma.cc/37NM-W34U] (last updated June 17, 2025).

pollutants.[21] Even then, it ranked as far-and-away the largest industrial source of $NO_x$ in the 11-county Memphis Metropolitan Statistical Area.[22] With more than 57 turbines,[23] the Gas Plant has the potential to emit a staggering 5,300.54 tons of $NO_x$ per year, 1,730.82 tons of CO, and 432.98 tons of $PM_{2.5}$.[24] Of the turbines on site, only the 14 smallest are equipped with appropriate controls to reduce emission of smog-forming pollutants; the larger models are not.[25]

Emissions from the Colossus Gas Plant contribute to already high levels of air pollution in DeSoto County and neighboring Shelby County, Tennessee, both of which received an "F" from the American Lung Association for ozone pollution in 2026.[26] And as ozone formation increases during the upcoming summer months, Defendants' operations of the unpermitted Plant pose an urgent threat to the city's air quality.

## II. STANDARD OF REVIEW

To obtain a preliminary injunction, a party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also City of El Cenzio, Tex. v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (setting forth elements). When an injunction is sought pursuant to a federal statute, a court's exercise of its equitable discretion is "conditioned by the necessities of

---

[21] Ex. H (Am. Laufenberg Decl.) ¶¶ 11, 23.

[22] For comparison, the next largest industrial $NO_x$ source emitted 743 tons in the most recent reporting year. *Cf.* 2020 National Emissions Inventory (NEI) Data, ENV'T PROT. AGENCY (2020), [https://perma.cc/N6MM-NN6X]; Ex. H (Am. Laufenberg Decl.) ¶ 23.

[23] *See* Ex. L (June 12, 2026 Counsel Email Exchange and Attachment).

[24] Ex. H (Am. Laufenberg Decl.) ¶¶ 11, 51.

[25] *Id.* ¶¶ 15–16, 20.

[26] *See* "State of the Air: 2026 Report," AM. LUNG ASS'N (2026) [https://perma.cc/5R2W-VEAX] at 108 (Grade for Desoto County, Miss.) at 146 (Grade for Shelby County, Tenn.).

the public interest which Congress has sought to protect." *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1193 (6th Cir. 1981). In enacting the Clean Air Act, Congress determined that "the public interest required that substantial measures be taken to combat the deleterious effects of air pollution." *City of Painesville,* 644 F.2d at 1193.

## III. ARGUMENT

Defendants' violations of the Clean Air Act warrant a preliminary injunction to protect the public health and welfare—to give NAACP and NAACP MS members in Southaven and other downwind communities in the Memphis area the benefit of the statutory protections Congress enshrined in the Clean Air Act half a century ago. Plaintiffs have standing to bring this lawsuit, this Court has jurisdiction over this case under the statute, and this Court should enter an injunction prohibiting the operation of the Colossus Gas Plant.

### A. Plaintiffs have standing to bring this lawsuit.

An organization has associational standing to file suit where (1) at least one member would otherwise have standing, (2) the interests at stake in the litigation are germane to the organizations' purposes, and (3) neither the claims asserted nor the relief requested requires an individual member's participation in the suit. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000). An organization's member has standing where they face (1) an actual or imminent injury in fact that (2) can be traced to the defendant's conduct and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, at least one member of each NAACP and the NAACP MS suffers an injury traceable to the unlawful construction and operation of the turbines, injuries that would be redressed by favorable relief. *Cf. Lujan* 504 U.S. at 560-61.

The existing Colossus Gas Plant poses actual and imminent harms to Plaintiffs' members in the surrounding area, some of whom live less than a mile from the Gas Plant's unpermitted

smokestacks. Plaintiffs' members Stephanie Norvell, Robert Tipton, Khadijah Sheard, Tracy Thornton, and Tiffany and Adrian Millsap live, work, garden, attend church, volunteer—*breathe*—in neighborhoods adjacent to Defendants' Gas Plant.[27] The Gas Plant's operations have upended their lives with new fears, lost sleep, and changed routines. And MZX Tech's own air quality studies underscore the threats these turbines pose to downwind communities. MZX's future facility in Southaven—that fleet of turbines Defendants *did* bother to permit—will emit almost 425 tons of $NO_x$ pollution per year.[28] But even at that level—less than *a twelfth* of the $NO_x$ potential posed by the fleet that is operating right now—MZX Tech projected facility pollution would exceed the "significant impact levels" used in permitting assessments as far as 20 kilometers away from the stacks.[29]




Under that threatening "red blob" of dangerous air quality impacts MZX projected for its future facility with a *fraction* of the pollution lie the homes and churches of Plaintiffs' members, including those of the standing witnesses in this case. So, members of Plaintiffs' organizations "[sit] squarely in the discharge zone of [the] polluting facility" currently operating at the same

[27] *See* associated declarations, attached at Exhibits B–G (case captions updated).

[28] Ex. A-15 (Trinity Modeling Report) at 28.

[29] *Id.* at 69.

address. *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000); *see also Texans United,* 207 F.3d at 793 (finding traceability where unlawful emissions reach plaintiff members' residences); *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1245 (10th Cir. 2021) (holding a person injured by air pollution has standing under the Clean Air Act "to seek a remedy from a defendant that emits the injurious pollutant in the geographic vicinity of where the person is injured" and collecting cases).

Of course, the pollution emitted by the existing Colossus Gas Plant need not exceed the "significant impact levels" used in certain permitting steps to cause actual and imminent harms. At any level, increased exposure to air pollution like the pollution emitted by the Gas Plant increases risks of negative health effects, especially for children, older adults, and people with pre-existing cardiovascular and respiratory disease. *See* Ex. I (Suh Decl.) ¶¶ 16-20; 61–68; Ex. J (Suppl. Decl.) ¶¶ 3, 11. Even short-term increases in exposure are associated with increased rates of hospital admissions for heart failure, stroke, arrhythmia, and respiratory disease, and even premature death. Ex. I (Suh Decl.). ¶¶ 24, 43, 55-56; Ex. J (Suppl. Decl.) ¶ 9. Moreover, Plaintiffs' members' reasonable fear of exposure to that pollution limits their ability to enjoy their homes and communities the way they otherwise would—a "measurable intrusion" into their daily lives. *W. Va. Rivers Coal., Inc. v. Chemours Co.*, 793 F. Supp. 3d 790, 806 (S.D. W. Va. 2025); *see also, S. Tex. Env't. Just. Network v. Tex. Comm'n on Env't. Quality*, 165 F.4th 356, 366 (5th Cir. 2026) (injury in fact where individuals "allege that breathing polluted air will harm their health" and interfere with aesthetic enjoyment of places they visit).[30]

[30] *See, e.g.*, Ex. E (Sheard Decl.) ¶¶ 15–17, 22–24; Ex. B (A. Millsap Decl.) ¶¶ 17, 18; Ex. G (Tipton Decl.) ¶¶ 12, 15, 16; Ex. F (T. Thornton Decl.) ¶¶ 14, 15, 17.

These harms would be redressed by a decision of the Court enjoining illegal operations of the Gas Plant and requiring compliance with the Clean Air Act's permitting and control requirements going forward. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184–86 (2000) (recognizing injunctive relief as a form of redress for a citizen's injury from excess pollution).[31]

Finally, the members' interests are germane to the NAACP's and NAACP MS's missions, which include advocating for clean air, healthful communities, and environmental justice in Mississippi.[32] Neither the claims asserted nor the relief requested require participation by individual members. *Laidlaw,* 528 U.S. at 181. Therefore, Plaintiffs have standing.

**B. The Court has statutory jurisdiction over this Clean Air Act citizen suit.**

The Clean Air Act's citizen suit provision authorizes citizens to sue for violations of "an emission standard or limitation" under the Act. 42 U.S.C. § 7604(a)(1). Plaintiffs must provide Defendants, and others, with at least 60 days of notice before they bring certain types of claims. *Id.* § 7604(a)(1), (b)(1)(A). Here, Plaintiffs provided notice on February 13, 2026, and filed suit 60 days later, on April 14, 2026. Thus, this Court has jurisdiction.

MDEQ's brief 2025 letter to xAI agreeing the Colossus Gas Plant was exempt from permitting does not bar this suit. Citizen suits may still proceed after state agencies determine permits are not required, *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1011–12 (9th Cir. 2002), or while agencies pursue parallel investigations. *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 469 (S.D. Tex. 2011). Just as state applicability determinations do not bar federal enforcement under the Clean Air Act, *United States v. S. Ind.*

---

[31] *Cf.*, *e.g.*, Ex. B (A. Millsap Decl.) ¶ 24; Ex. D (Norvell Decl.) ¶ 23.

[32] Ex. G (Tipton Decl.) ¶¶ 3, 17; Ex. E (Sheard Decl.) ¶¶ 4, 13; Ex. C (T. Millsap Decl.) ¶ 5; Ex. F (Thornton Decl.) ¶ 11.

Case: 3:26-cv-00074-DMB-JMV Doc #: 52 Filed: 03/12/26 15 of 29 PageID #: 1550

*Gas & Elec. Co.*, No. IP99-1692-CMF, 2002 WL 1760699, at *4 (S.D. Ind. July 26, 2002), they do not shield operators from citizen enforcement. If they did, it would frustrate the very purpose of the citizen suit provision. *Ass'n to Protect Hammersley*, 299 F.3d at 1011–12.

### C. A Preliminary Injunction is warranted to protect Plaintiffs from the unpermitted and uncontrolled pollution of the Colossus Gas Plant.

Defendants unlawfully operate an unpermitted power plant, one of the largest sources of air pollution for miles. The law and equities weigh in favor of preliminary injunctive relief to prevent further harm to the surrounding community as the Clean Air Act requires.

#### 1. Plaintiffs are likely to succeed in establishing Defendants are violating the law.

The Clean Air Act requires operators to obtain permits and control new sources of air pollution. Defendants didn't—and they continue to expand their unpermitted facility even now.

a. **Claim 1:** Defendants lack the necessary preconstruction permit to build and operate the Colossus Gas Plant.

With but a few exceptions not relevant here, Mississippi's regulations require: [1] owners or operators of [2] "any new stationary source" [3] of criteria pollutants to [4] obtain a permit "before beginning construction." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013). This requirement applies *regardless* of whether the facility is a "major" or "minor" source of pollutants. *Id.* Moreover, even after a stationary source has obtained a construction permit, an owner or operator "cannot begin operation" until they certify construction was completed in accordance with the permit. 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (1), (3) (2013). Plaintiffs likely will succeed in establishing all four elements.

MZX Tech owns the property on which the Colossus Gas Plant was built—its name is on the deed.[33] And MZX Tech represented to the MDEQ that it was responsible for the installation and operation of the turbines in question on the site.[34] Meanwhile, xAI officers have coordinated with MDEQ and present themselves as responsible for the permitting and operation of the Gas Plant.[35] Defendants own and operate the Colossus Gas Plant.

The Colossus Gas Plant is also a "stationary source." Under the SIP, a "stationary source" is "any building, structure, facility, or installation which emits or may emit regulated air pollutant(s)." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013). The turbines at the Gas Plant are unquestionably structures that—according to their own manufacturer spec sheets—emit air pollution while operating. And the emissions stacks Defendants built to vent the pollution stand as stories-tall admissions of that fact. *See* Compl., Dkt. No. 1, at 29 fig. 5.

Next, the Colossus Gas Plant emits air pollution. The Mississippi SIP defines "[r]egulated air pollutant[s]" as, among other things, any pollutant regulated as part of the New Source Review program. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (21). The Clean Air Act defines New Source Review pollutants as any pollutant subject to the NAAQS. 40 C.F.R. § 52.21(b)(50). The Act establishes NAAQS for $NO_x$, $PM_{2.5}$, and ozone, among others. 40 C.F.R. §§ 50 et seq. The Colossus Gas Plant plainly emits regulated air pollution. Ex. H (Am. Laufenberg Decl.) ¶¶ 11, 23, 31, 51-52. Many of the specification sheets for these turbines describe their emission of $NO_x$.

---

33 *See* Ex. A-3 (Deed).

34 *See*, *e.g.*, Ex. A-18 (Amended PSD Air Permit Application) at 4, 10.

35 *See* Ex. A-5 (MDEQ's Determination Letter) (discussion of air pollution permitting directed to the "Vice President of Operations" at xAI); Ex. A-7 (Original PSD Air Permit Application) at 9, 15 (listing Dan Rowland at xAI as the Responsible Official for the facility and the Duly Authorized Representative for air permit matters); *cf United States v. EES Coke Battery*, No. 22-11191 2026 WL 498640 at *7 (E.D. Mich. Feb 17, 2026) (parent company is directly liable where it exhibits control over a facility's "environmental decision-making").

*See id*. at Att. 2. At xAI's sister facility in Shelby County, Tennessee, the company has an operating permit for a fleet of 15 Solar SMT-130 gas turbines—the very same type as some of those installed in Southaven—which regulates their emission of $PM_{2.5}$, $NO_x$, $SO_2$, and CO.[36]

Finally, MZX Tech began construction of the Colossus Gas Plant without a permit. It also began operations without submitting a certification of construction as the regulations require. *Accord* 11 Pt. 2 Ch. 2 Miss. Code R. 2.5 D (1), (4) (2013). To this day, Defendants have neither a construction permit nor enforceable emissions limitations constraining the Gas Plant's pollution.

"[A] showing of a substantial likelihood of success on the merits[] does not require that the movant prove his case. . . . Even some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators., USA v. City of Dallas*, 760 F. Supp. 2d 693, 696 (N.D. Tex. 2010) (citing, inter alia, *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co*., 621 F.2d 683, 686 (5th Cir. 1980) ("[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.")). Here, the law requires a permit, and Defendants don't have one. It's as simple as that.

b. **Claim 2:** Defendants lack the permit to build and operate the Colossus Gas Plant as a major stationary source.

In addition to failing to obtain the Mississippi-required preconstruction permit for *all* air pollution sources, Defendants failed to obtain the specific New Source Review permit required for its "major" source of air pollution. Pursuant to the Clean Air Act: [1] owners and operators of [2] any "major emitting facility" must [3] obtain a Prevention of Significant Deterioration permit (which would set BACT) [4] prior to construction. 42 U.S.C. § 7475(a); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) (adopting PSD regulations into Mississippi SIP). As established above, MZX

36 *See* Ex. A-2 (Shelby County's Colossus 1 Permit).

Tech and xAI are the owners and operators of the Colossus Gas Plant, a stationary source which they constructed—and now operate—without *any* Clean Air Act permits. Elements 1, 3, and 4 are met here again. All that remains is whether the facility is a "major emitting facility" under the Act. There is no question that it is.

The Clean Air Act defines a "major" source as one that "emits, or has the potential to emit" more than 250 tons per year of a regulated criteria pollutant, including $NO_x$, CO, $PM_{2.5}$, or ozone. 40 C.F.R. § 51.166(b)(1)(i)(B). Here, the 57-turbine Colossus Gas Plant has the potential to emit over 5,300 tpy of $NO_x$, and 1,730 tpy of CO—several multiples of the 250 tpy threshold. *See* Ex. H (Am. Laufenberg Decl.) ¶¶ 51-52. Because the plant is a major source of $NO_x$, it also is automatically a major source for ozone under the relevant regulations. 40 C.F.R. § 52.21(b)(ii) ("[a] major source that is major for . . . $NO_x$ shall be considered major for ozone"). As a major emitting facility, the Gas Plant was required to implement "best available control technology" to prevent its harmful emissions prior to its construction. *See* 42 U.S.C. § 7475(a)(4).

The BACT requirement is clear. EPA published its guidance on another company's BACT analysis for similar gas turbines *more than 25 years ago*.[37] More recently, Shelby County issued a permit that "require[s] BACT" for a network of 15 gas turbines at a related xAI site in Tennessee.[38] The Colossus Gas Plant at issue here consists of at least 59 operating gas turbines—many the same make and model as at the Tennessee site. There should be no doubt that the Gas Plant is a major emitting facility for which Defendants also need a major source PSD permit.

---

[37] *See* Letter from Genevieve Damico, ENV'T PROT. AGENCY, ENV'T PROT. AGENCY, to Donald E. Sutton, Ill, ENV'T PROT. AGENCY (July 5, 2000) [https://perma.cc/W2ET-7LZ4] (Presented on EPA's website as "Assistance in Determining BACT for Simple-Cycle Natural Gas Turbine Peaker Project").

[38] Ex. A-2 (Shelby County's Colossus 1 Permit).

These are not mere paperwork violations. PSD permits impose stringent emissions limitations which are set (as the name implies) according to the *best available control technology*. By way of example, selective catalytic reduction systems (known in the industry as SCRs), are generally considered to set best available control technology limits for $NO_x$ pollution from gas turbines. In fact, SCRs are exactly what the permit requires for xAI's sister facility in Shelby County, Tennessee.[39] And as EPA reported in 2019, "commercial coal-, oil-, and natural gas–fired SCR systems are often designed to meet control targets of over 90 percent."[40] That means, by skirting the Clean Air Act permitting requirements, turbines at Defendants' Colossus Gas Plant may be emitting ten times as much $NO_x$ as they should.

### 2. ***Defendants' excuses for shirking air pollution permit, control, and monitoring requirements do not withstand scrutiny.***

Defendants have suggested their Colossus Gas Plant is "exempt" from permit and control requirements because the turbines are "mobile" sources and the installation is "temporary." The first purported exemption is inapplicable; the second does not exist. In any event, it is Defendants' burden to establish the benefit of any exemption. *See*, *e.g.*, *NLRB v. Ky. River Cmty. Care, Inc*., 532 U.S. 706, 711 (2001); *FTC v. Morton Salt Co*., 334 U.S. 37, 44–45 (1948).

#### a. <u>The turbines of the Colossus Gas Plant are not "mobile sources."</u>

The manufacturer specifications for Solar's SMT-130 turbines note that, once installed, the unit is 14 feet tall, almost 100 feet long, and weighs more than 200,000 pounds. *See* Ex. H-2 (collecting manufacturer specification sheets for Colossus Gas Plant turbines). Defendants' Colossus Gas Plant is a network of 59 turbines (and growing)—all at least the size of the SMT-

---

[39] *See* Ex. A-2 (Shelby County's Colossus 1 Permit).

[40] ENV'T PROT. AGENCY, Chapter 2 Selective Catalytic Reduction, 2-1 (John L. Sorrels, et al. eds, 2019) [https://perma.cc/L7A3-KKV2].

130s (the M35 turbine weighs in at more than 400,000 pounds). The turbines have all been installed on concrete pads. Ex. H (Am. Laufenberg Decl.) ¶¶ 56, 58-59 (noting that concrete pads are used to support more permanent structures). Nevertheless, xAI's correspondence with MDEQ in July 2025 suggests the Gas Plant is somehow exempt from air pollution permitting requirements because the turbines are "mobile" sources of air pollution.[41] This argument stretches the text of the Clean Air Act's mobile source provisions beyond the breaking point.

To be sure, the SIP provides an exemption for "mobile" sources, a term that is not defined by the State. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.13 D (3) (2013). But EPA regulations do define "mobile source"; it means "a motor vehicle, nonroad engine or nonroad vehicle." 40 C.F.R. § 51.50. As the Colossus Gas Plant's turbines are neither "self-propelled" nor "vehicle[s]" that carry or move anything, they are not "motor vehicles" or "nonroad vehicles." *Cf.* 42 U.S.C. §§ 7550(2) (defining "motor vehicle"); 7550(11) (defining "nonroad vehicle"). The last option—"nonroad engine"—is defined as "an internal combustion engine" that, among other things, "is not affected by sections 111 or 202 of the Clean Air Act. *Id.*; *see also* 42 U.S.C. § 7550(10). However, the turbines here *are* subject to a New Source Performance Standard ("NSPS") under Section 111 of the Act because they are gas turbines with a heat-input capacity greater than 10 MMBtu/hr. *See* Ex. H (Am. Laufenberg Decl.) ¶¶ 6, 29, 41, 43; 40 C.F.R. Part 60, Subpart KKKK. As such, they are excluded from being considered "nonroad engines."[42]

---

[41] Ex. A-4 (July 25, 2025 xAI Update); Ex. A-5 (MDEQ's Determination Letter)

[42] *See also* 40 C.F.R. § 1068.30 (excluding from "nonroad engine" those subject to NSPS); NSPS Review for Stationary Combustion Turbines and Stationary Gas Turbines (Jan. 9, 2026), 91 Fed. Reg. 1910, 1926-27 ("Historically . . . EPA has not regulated combustion turbines, even those that may be portable, as nonroad engines, but rather as stationary sources.").

Notably, the NSPS for gas turbines describes them as "stationary" because they are "not self-propelled or intended to be propelled while performing its function," even while it recognizes that that such sources "may, however, be mounted on a vehicle for portability." 91 Fed. Reg. 1910, 1914 (Jan. 15, 2026). Ultimately, there is a world of difference between the hand-held or cart-carried generators that might be used for powering construction tools—the natural reading of mobile "nonroad engines" *id.*—and the building-sized gas turbines Defendants installed here, each of which can power a neighborhood, and together can power a city. The Clean Air Act's provisions and EPA's regulations recognize that difference. Defendants' attempt to shoehorn their Colossus Gas Plant into the Clean Air Act's regulation of mobile sources is unavailing. Congress does not "hide elephants in mouseholes," and though the Act left the garage door open to mobile sources, it does not mean MZX can drive its power plant inside. *Accord Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

b. Whether the turbines are "temporary" is irrelevant.

The turbines at the Colossus Gas Plant are attached to natural gas supply lines, water injection lines, and connected—through transformers and electrical lines—to the Colossus 2 data center. *See* Ex. H (Am. Laufenberg Decl.) ¶¶ 56-57. They are permanent installations for purposes of the Clean Air Act and should be permitted as such.

Even so, MDEQ agreed with xAI's letter proposal that the Colossus Gas Plant could be considered "exempt" from permitting requirements because the turbines were "temporary."[43] But neither xAI in its letter nor MDEQ in its response cite anything for the principle.

Defendants' dreamed-up exemption for "temporary" major sources does not exist in the text of the Clean Air Act. Nor does the Act allow room to read in such a loophole. It is black-

[43] Ex. A-4 (July 25, 2025 xAI Update); Ex. A-5 (MDEQ's Determination Letter).

letter law that "[t]he Clean Air Act imposes strict liability on owners and operators that violate its provisions." *United States v. EES Coke Battery*, *LLC*, No. 22-11191, 2026 WL 498640, at *7 (E.D. Mich. Feb. 17, 2026) (citing *United States v. Anthony Dell'Aquilla Enters. & Subsidiaries*, 150 F.3d 329, 332 (3d Cir. 1998)). The purported "exemption" is based on nothing more than Defendants' expressed *intent* that the turbines of the Colossus Gas Plant would be "temporary." Allowing such "exemptions" based on the unenforceable statements of developers would replace the Act's rigorous preconstruction permitting program with a pinky swear.

What is more, Mississippi's SIP explicitly contemplates "facilit[ies] which will be located only temporarily at a site." 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (5) (2013). Far from exempting such facilities from permit requirements, the regulations note that the State's Permit Board may "issue a statewide permit or a permit for operation in multiple areas" to ensure the source controls its pollution *wherever* it is parked. *Id*.

Defendants may also try to argue that no New Source Review permit was required because it had not begun actual construction. Not so. Under the Clean Air Act, and as incorporated in the Mississippi SIP, no "new major stationary source . . . shall begin actual construction without a [PSD] permit." 40 C.F.R. § 52.21(a)(2)(iii); 11 Pt. 2 Ch. 5 Miss. Code R. 5.2. The phrase "begin actual construction" means "initiation of physical on-site construction activities on an emissions unit which are of a permanent nature." 40 C.F.R. § 52.21(b)(11)). These activities "include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures." *Id.*

Here, Defendants have installed dozens of gas turbines. They have added exhaust stacks to some turbines. They have laid concrete slabs, erected three structures (likely switch houses used to route electrical current) and installed seventeen transformers. Ex. H (Am. Laufenberg

Decl.) ¶¶ 56–57. Further, Defendants have run electric lines, gas supply lines, and water injection lines to each turbine. *Id*. Decommissioning this infrastructure would take significant time—and indicates the materials, equipment, and structures are not "temporary." *Id.* ¶¶ 58–60. These are "physical on-site construction activities" on emissions units that are "of a permanent nature." Even if Defendants eventually swap out the first set of gas turbines for a (permitted) set later, they cannot evade the Clean Air Act's public health protections in the meantime. A company with a rotating fleet of gas turbines cannot be allowed perpetual exemptions on an installment plan. The size of Colossus Gas Plant and the threat it poses to public health demand control measures pursuant to the Act's New Source Review permitting program.

### 3. ***Plaintiffs face a substantial threat of irreparable harm.***

Plaintiffs have suffered irreparable harm to their health and wellbeing due to pollution from the Colossus Gas Plant—and they are certain to suffer further irreparable harms in the absence of an injunction. *Accord Winter*, 555 U.S. at 22. A harm is irreparable "where there is no adequate remedy at law[.]" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "[B]reathing and smelling polluted air" constitutes an "injury-in-fact," *Texans United*, 207 F.3d at 792, that cannot be adequately addressed by legal remedies. *See Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 936 (7th Cir. 2008) (finding irreparable injury where a Clean Air Act violation would result in "more relaxed emission standards"). And "[e]nvironmental injury," including damage to natural resources, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987). In short, "irreparable harm . . . is obvious" where "emissions of harmful pollutants damage human health and the environment." *United States v. Gear Box Z Inc.*, 526 F. Supp. 3d 522, 528 (D. Ariz. 2021) (finding irreparable harm based on health impacts of pollution from unpermitted diesel generators); *see also Sierra*

*Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 358–59 (D.D.C. 2012) (finding irreparable harm posed by potential pollution of power plant expansion).

Members of NAACP MS, who are also members of NAACP, live, work, and recreate near the Colossus Gas Plant and they are injured by the unlawful pollution resulting from Defendants' failure to adhere to the Clean Air Act.[44] These members include Stephaine Norvell and Tracey Thornton, who live less than one mile away from the Plant.[45] Ms. Norvell is very worried that exposure to air pollution from the turbines while doing the things she enjoys—tending to her garden, grilling and hosting company on her deck, going for walks in the neighborhood—will negatively impact her health as well as the health of her husband, both of whom have survived cancer and have heart conditions. *See* Ex. D (Norvell Decl.) ¶¶ 9–10, 13. After working long shifts, Mr. Thornton prefers to spend his time at home in the garden or relaxing in his favorite spot—his renovated garage with the door open to the fresh breeze. *See* Ex. F (Thornton Decl.) ¶¶ 6–8. But he is worried the Plant's pollution will impact his sinus health and the health of his neighbors, and now keeps his door closed. *See id.* ¶¶ 14–15, 18.

Other neighbors and members of NAACP and NAACP MS who live near the Colossus Gas Plant share these concerns. Robert Tipton, President of the DeSoto County Chapter of the NAACP Mississippi State Conference, lives about five miles from the Gas Plant and likes to spend most of his time outside, but now he worries the Gas Plant's pollution will exacerbate his sarcoidosis and threatens the health of his family, friends, and fellow NAACP branch members. *See* Ex. G (Tipton Decl.) ¶¶ 6, 11, 15–16, 18. Khadijah Sheard is a registered nurse who lived

---

[44] *Accord Diesel Power Gear*, 21 F.4th at 1245 (collecting cases recognizing injuries are traceable to plaintiffs in areas near regulated pollution).

[45] *See* Ex. D (Norvell Decl.) ¶ 7; Ex. F (Thornton Decl.) ¶ 3.

less than a mile from the facility until she moved to get away from it. *See* Ex. E (Sheard Decl.) ¶¶ 6, 22. Still, her concern about increased risk of respiratory disease because of the Plant's pollution interferes with her ability to enjoy her time visiting nearby parks, volunteering with NAACP MS, and attending her local Southaven church. *See id.* ¶¶ 3, 16–18. And Adrian and Tiffany Millsap live around 5.5 miles of the turbines. *See* Ex. B (A. Millsap Decl.) ¶ 3; Ex. C (T. Millsap Decl.) ¶ 3. Since learning about the turbines, they have limited their time outside to avoid exposure, which Mrs. Millsap worries will increase her already severe allergies, and could aggravate allergy and asthma symptoms of family members when they visit. Ex. C (T. Millsap Decl.) ¶¶ 13–16; *cf. Franklin Cnty. Power*, 546 F.3d at 936 (finding "a decrease in recreational and aesthetic enjoyment" due to pollution could not be remedied by economic award).

These members' concerns are consistent with the proven health effects of short and prolonged exposure to $NO_x$, ozone, and $PM_{2.5}$—pollutants which the Gas Plant's turbines emit. *See* Ex. I (Suh Decl.) ¶¶ 24, 43, 55-56; *accord Laidlaw*, 528 U.S. at 183–84 (crediting members' reasonable concerns). Pollution increases from the Gas Plant—particularly on top of the already high levels of ozone and $NO_x$ pollution the greater Memphis area—will likely impact the health of these members and public health generally, particularly for residents facing prolonged exposures. *See* Ex. I ¶¶ 16-20; 61-68; Ex. J ¶¶ 6-11. These members will continue to suffer irreparable harm to their health and to their enjoyment of their communities absent an injunction.

### 4. *The balance of harms tips decisively in Plaintiffs' favor.*

The balance of equities here favors protecting the health and recreational wellbeing of Plaintiffs' members and preventing illegal air pollution throughout the region. Plaintiffs' members breathe Defendants' unlawful pollution and live daily with the increased health risks that pollution poses. They are reasonably concerned about their health and the health of their families, and have reduced how often they do activities they enjoy, such as inviting family

members to their home and entertaining outdoors, because of the pollution.[46] Where this injury is not only likely but already occurring, the balance of harms "favor[s] the issuance of an injunction to protect" human health and the environment. *Amoco Prod. Co.*, 480 U.S. at 545.

Moreover, where Congress has proscribed conduct, it has balanced the equities already. *Accord Burlington N. R.R. v. Bair*, 957 F.2d 599, 601–02 (8th Cir. 1992) ("Congress has already balanced the equities and has determined that, as a matter of public policy, an injunction should issue where the defendant is engaged in, or is about to engage in, any activity which the statute prohibits." (citation omitted)). Though courts need not issue an injunction in all cases, neither can they "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop*., 532 U.S. 483, 497 (2001).

Defendants may complain an injunction would be costly to their business. But "[t]he costs of pollution controls are a cost of doing business." *United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 815 (E.D. Mo. 2019), *aff'd in part, rev'd in part on diff. grounds*, 9 F.4th 989 (8th Cir. 2021). They began construction and operation of the 60-turbine Colossus Gas Plant without a permit almost immediately after purchasing the property. *See* Section 1.B. They did so despite public opposition to and express concerns with the practice of using unpermitted gas turbines to power another xAI data center in nearby Tennessee.[47] Moreover, MZX *did* apply to permit an entirely different gas plant to be constructed on this very site. Though the permit is insufficient,[48] *that* gas plant—which promises pollution controls and emissions limitations—is the only facility that MDEQ has reviewed and considered, and it is the only one MZX is allowed

---

[46] *See*, *e.g.*, Ex. C (T. Millsap) ¶¶ 14–16; Ex. G (Tipton Decl.) ¶¶ 12, 15–16, 18.

[47] *See* Ex. G (Tipton Decl.) ¶¶ 9–10 (describing earlier community organizing).

[48] Ex. A-28 (NAACP and Young, Gifted and Green's Permit Appeal).

to construct and operate. There is no Clean Air Act loophole that allows a company to operate one facility while it goes through the required permitting process for *another* facility because it can't be bothered to wait. The time and money required to review a facility's design, establish pollution limits, and install the necessary controls before operation—the time and money necessary to protect the health and welfare of downwind communities—are indelible costs of doing business. *United States v. City of Painesville, Ohio*, 644 F.2d 1186, 1194 (6th Cir. 1981) (Congress prioritized the Act even where relief "would be expensive").

**5. *An injunction is in the public interest.***

The public interest strongly favors an injunction. "Enforcement of the environmental laws is in the public interest." *Commonwealth Oil Refin. Co., Inc. v. United States Env't Prot. Agency*, 805 F.2d 1175, 1190 (5th Cir. 1986). Courts recognize preliminary injunctions requiring Clean Air Act compliance are in the public interest. *United States v. Gear Box Z Inc.,* 526 F. Supp. 3d 522, 529 (D. Ariz. 2021) ("Congress enacted the CAA to combat air pollution, which itself is a declaration of public policy."); *see also Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, No. 2:17-cv-00032-RJS-DBP, 2020 WL 4282148, at *27 (D. Utah Mar. 6, 2020) *aff'd in part and remanded on other grounds by* 21 F.4th 1229 (10th Cir. 2021).

Here, reducing unacceptable risks of breathing illegal pollution serves the Clean Air Act's purpose of "protect[ing] and enhance[ing] the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Allowing the facility to operate during litigation would reward private companies that build their own personal power plants next to homes, schools, and churches without obtaining permits and implementing controls in hopes they can just "pay a penalty" later.

**D. Waiver of bond is appropriate here.**

This Court should enjoin the operation of the unpermitted Colossus Gas Plant without

requiring a bond. Federal Rule of Civil Procedure 65(c) allows courts to require security in instances of a preliminary injunction, but issuance and amount of such security is within the discretion of the court. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978) (per curiam)). Indeed, a court "may elect to require no security at all." *Id.* Courts elect not to require security for plaintiffs "engaged in public interest litigation." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (affirming a decision not to require a bond where the parties included a union and a welfare rights organization "seeking to protect citizens . . . from perceived adverse economic and social consequences"). This guarantees that public interest groups are not "barred from obtaining meaningful judicial review." *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13-cv-60-BO, 2014 WL 1922234, at *10 (E.D.N.C. May 13, 2014); *see also Louisiana Delta Serv. Corps v. Corp. for Nat'l & Cmty. Serv.*, No. cv25-378-JWD-RLB, 2025 WL 1787429, at *31 (M.D. La. June 27, 2025) (contrasting a case seeking equitable relief from a contractual dispute for money damages, where a bond would be more appropriate). Here, the Court should exercise its discretion and waive the bond or require only a nominal amount, consistent with courts' practices in other environmental cases. *See, e.g.*, *Wisconsin Heritages, Inc. v. Harris*, 476 F. Supp. 300, 302 (E.D. Wis. 1979) (collecting cases and waiving bond where plaintiffs were enforcing an environmental statute).

## IV. CONCLUSION

For the foregoing reasons, the NAACP and NAACP MS ask this Court to **GRANT** the motion for a preliminary injunction and enjoin xAI and MZX Tech from operating any of the unpermitted turbines at the Colossus Gas Plant until they obtain the necessary permits and implement the requisite pollution controls.

Dated: June 12, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | | |
|---|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE,**<br>*Plaintiffs,*<br>v.<br>**X.AI Corp. and MZX Tech LLC,**<br>*Defendants.* | § § § § § § § § § § § | **Case No. 3:26-cv-00074-DMB-JMV** |

**MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

Daniel W. Van Horn (MS Bar No. 102105)
BUTLER SNOW LLP
6075 Poplar Ave., Suite 500
Memphis, TN 38187
(901) 680-7331
danny.vanhorn@butlersnow.com

P. Ryan Beckett (MS Bar No. 99524)
Keri E. Herrington (MS Bar No. 106815)
BUTLER SNOW LLP
1020 Highland Colony Pkwy., Suite 1400
Ridgeland, MS 39157
(601) 948-5711
(601) 948-5177
keri.herrington@butlersnow.com
ryan.beckett@butlersnow.com

Patrick D. Traylor* (DC Bar No. 449350)
Jeremy C. Marwell* (DC Bar No. 1000299)
VINSON & ELKINS LLP
2200 Pennsylvania Ave. NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com

Michael B. Buschbacher*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

**Pro Hac Vice*

*Attorneys for X.AI Corp. and MZX Tech LLC*

# TABLE OF CONTENTS

**Page**


INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1

STATEMENT OF FACTS ........................................................................................ 5

STANDARD OF REVIEW ....................................................................................... 7

ARGUMENT ............................................................................................................ 8

I. Plaintiffs have not shown that they will likely suffer irreparable harm. ............................ 8

- **A.** Data show that ambient air quality has met EPA standards since the turbines began operating, and that is not projected to change under even the most conservative modeling standards. ........................................................ 8
- **B.** Plaintiffs have not shown irreparable harm. ........................................................ 9
  - 1. The declarations do not establish a substantial threat of irreparable harm. ............................................................................................ 10
  - 2. The portable turbines' temporary status, and the ongoing transition to permanent power sources, cut further against finding irreparable harm. ............................................................................................ 12
- **C.** The NAACP's delay in seeking injunctive relief undercuts their allegations of irreparable harm and precludes equitable relief. ............................ 13

II. The NAACP has shown no likelihood of success on the merits. ..................................... 14

- **A.** The NAACP lacks statutory standing. ................................................................ 15
- **B.** Citizen-suit liability cannot extend to conduct, like Defendants' here, undertaken in compliance with a federally approved state SIP. ........................... 16
- **C.** Defendants did not "begin actual construction." .................................................. 20
- **D.** Fair notice principles bar liability, because Defendants reasonably relied on Mississippi's determination that no permit was required. ............................... 22
- **E.** The CAA's citizen suit provision violates Article II of the U.S. Constitution. ...................................................................................................... 26

III. Catastrophic harms to Defendants and the public outweigh any injuries to Plaintiffs. ................................................................................................................ 29

- **A.** Any impacts to Plaintiffs' members from temporary, incremental emissions in an attainment area are dwarfed by the catastrophic harms an injunction would inflict on Defendants and hundreds of millions of AI users worldwide. ......................................................................................... 29
- **B.** An injunction would disserve the public interest. ................................................ 32

IV. Any injunction must be conditioned on the NAACP posting bond. ................................ 34

CONCLUSION ........................................................................................................ 34

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ........ 18

*Anibowei v. Morgan*,
70 F.4th 898 (5th Cir. 2023) ........ 7, 8

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........ 28

*Canal Auth. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ........ 29

*CFTC v. EOX Holdings, L.L.C.*,
90 F.4th 439 (5th Cir. 2024) ........ 24, 25

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) ........ 26

*Concepts in Prod., LLC v. Joiner*,
No. 17-cv-118, 2018 WL 3419269 (N.D. Miss. July 13, 2018) ........ 10

*Dep't of Transp. v. Ass'n. of Am. R.R.*,
575 U.S. 43 (2015) ........ 28

*Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*,
630 F.3d 431 (5th Cir. 2011) ........ 21

*E.T. v. Paxton*,
19 F.4th 760 (5th Cir. 2021) ........ 33, 34

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ........ 28

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
867 F.3d 564 (5th Cir. 2017) ........ 22

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........ 22

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 16

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........ 28

*Gates & Fox Co. v. OSHA*,
790 F.2d 154 (D.C. Cir. 1986) ........ 22, 23

*Gen. Motors Corp. v. Harry Brown's, LLC*,
563 F.3d 312 (8th Cir. 2009) ........ 31

**Cases—Continued:** **Page(s)**

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
607 F.3d 453 (7th Cir. 2010) .......... 34

*Haig v. Agee*,
453 U.S. 280 (1981) .......... 33

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 27

*Holland Am. Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) .......... 10, 11, 12

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 16

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .......... 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 18

*Maryland v. King*,
567 U.S. 1301 (2012) .......... 33

*McMillen v. Itawamba Cnty. Sch. Dist.*,
702 F. Supp. 2d 699 (N.D. Miss. 2010) .......... 33

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*,
200 F. Supp. 2d 551 (E.D. N.C. 2001) .......... 28

*Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*,
No. 23-10520, 2026 WL 1689717 (5th Cir. June 11, 2026) .......... 28

*Optimus Steel LLC v. U.S. Army Corps of Eng'rs*,
492 F. Supp. 3d 701 (E.D. Tex. 2020) .......... 31, 32, 33

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
839 F.3d 1 (D.C. Cir. 2016) .......... 25

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
881 F.3d 75 (D.C. Cir. 2018) .......... 25

*Phillips v. Charles Schreiner Bank*,
894 F.2d 127 (5th Cir. 1990) .......... 34

*Residents of Gordon Plaza, Inc. v. Cantrell*,
25 F.4th 288 (5th Cir. 2022) .......... 26

*Ronaldo Designer Jewelry, Inc. v. Cox*,
No. 17-cv-2, 2017 WL 3879095 (N.D. Miss. Sept. 5, 2017) .......... 13, 14

Case: 3:26-cv-00074-DMB-JMV Doc #: 61 Filed: 05/15/26 5 of 44 PageID #: 2060

**Cases—Continued:** **Page(s)**

*S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*,
165 F.4th 356 (5th Cir. 2026) .......... 16

*Save RGV v. Space Expl. Techs. Corp.*,
No. 24-cv-00148, 2024 WL 5357188 (S.D. Tex. Nov. 21, 2024) .......... 31, 33

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 27

*Sierra Club v. La. Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) .......... 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
990 F. Supp. 2d 9 (D.D.C. 2013) .......... 13, 33

*SO Apartments, L.L.C. v. City of San Antonio*,
109 F.4th 343 (5th Cir. 2024) .......... 29

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
No. 23-cv-58, 2023 WL 2759864 (D. Alaska Apr. 3, 2023) .......... 13

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 15

*Trump v. United States*,
603 U.S. 593 (2024) .......... 27

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .......... 28

*United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.*,
207 F.3d 1193 (10th Cir. 2000) .......... 16

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 28

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 (S.D. Ohio 2001) .......... 28

*United States v. Cinergy Corp.*,
623 F.3d 455 (7th Cir. 2010) .......... 16, 18, 19

*United States v. Hoechst Celanese Corp.*,
128 F.3d 216 (4th Cir. 1997) .......... 23, 24, 25, 26

*United States v. Texas*,
599 U.S. 670 (2023) .......... 27

*Upton v. SEC*,
75 F.3d 92 (2d Cir. 1996) .......... 25

*Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*,
191 F. Supp. 3d 1287 (D. Utah 2016) .......... 19

**Cases—Continued:** **Page(s)**

*W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin.*,
302 F. Supp. 2d 672 (S.D. Tex. 2004) ........ 13

*W. Va. Rivers Coal., Inc. v. Chemours Co.*,
No. 25-1924, 2026 WL 1579491 (4th Cir. June 3, 2026) ........ 11

*W. Watersheds Project v. Salazar*,
692 F.3d 921 (9th Cir. 2012) ........ 31

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982) ........ 29, 32

*Winter v. NRDC*,
555 U.S. 7 (2008) ........ 10, 11, 12, 29, 32

*Wis. Res. Prot. Council v. Flambeau Mining Co.*,
727 F.3d 700 (7th Cir. 2013) ........ 22

**Constitutional Provisions:**

U.S. Const. art. II, § 1, cl. 1 ........ 27

U.S. Const. art. II, § 3 ........ 27

**Statutes:**

29 U.S.C. § 216(b) ........ 15

42 U.S.C. § 7409(b)(1) ........ 8, 11

42 U.S.C. § 7410 ........ 19

42 U.S.C. § 7411 ........ 23

42 U.S.C. § 7411(a)(3) ........ 23

42 U.S.C. § 7413(a)(1) ........ 19

42 U.S.C. § 7475(a) ........ 20

42 U.S.C. § 7550(10) ........ 23

42 U.S.C. § 7602(e) ........ 15

42 U.S.C. § 7602(z) ........ 23

42 U.S.C. § 7604(a) ........ 15, 19

42 U.S.C. § 7604(a)(1) ........ 27

42 U.S.C. § 7604(a)(3) ........ 27

42 U.S.C. § 7604(d) ........ 34

42 U.S.C. § 7604(f) ........ 27

**Statutes—Continued:** **Page(s)**

42 U.S.C. § 7607(b)(1) ..... 19

42 U.S.C. § 7607(b)(2) ..... 19

**Regulations:**

40 C.F.R. § 51.50 ..... 19

40 C.F.R. § 52.21 ..... 20

40 C.F.R. § 52.21(a)(2)(iii) ..... 20

40 C.F.R. § 52.21(b) ..... 20

40 C.F.R. § 52.21(b)(11) ..... 20, 21

40 C.F.R. § 60.4420 ..... 24

40 C.F.R. § 1036.5(d) ..... 23

40 C.F.R. § 1068.30(1)(iii) ..... 23

40 C.F.R. § 1068.31(e)(1) ..... 24

40 C.F.R. § 1068.31(e)(2) ..... 24

43 Fed. Reg. 26,380 (June 19, 1978) ..... 11

71 Fed. Reg. 14,658 (Mar. 23, 2006) ..... 17

85 Fed. Reg. 10,070 (Feb. 21, 2020) ..... 17

89 Fed. Reg. 101,306 (Dec. 13, 2024) ..... 26

90 Fed. Reg. 8,741 (Jan. 31, 2025) ..... 32

91 Fed. Reg. 1,910 (Jan. 15, 2026) ..... 9, 26

11 Pt. 2 Ch. 2 Miss. Code R. 2.1(B) (2013) ..... 20

11 Pt. 2 Ch. 2 Miss. Code R. 2.1(D)(2) (2013) ..... 17, 20

11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(1) (2024) ..... 22

11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(4) (2024) ..... 22

11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013) ..... 17, 20

11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D)(3) (2013) ..... 23

**Rules:**

FED. R. CIV. P. 65(c) ..... 34

**Other Authorities:** **Page(s)**

AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) .................................... 17

BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................................................ 15, 21

BLACK'S LAW DICTIONARY (4th ed. 1968) ................................................................................. 15

Draft Memorandum from Anne L. Idsal, EPA Principal Deputy Assistant Adm'r, to Reg' Air Div. Dirs. (Mar. 25, 2020), https://tinyurl.com/2zhrud43 ...................................................... 20

EPA, *Mississippi Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants*, https://tinyurl.com/5a77pu4w ........................................................................... 8

Letter from Aaron Szabo, Assistant Adm'r, EPA Region 9, to Philip McNeely, Dir., Maricopa Cnty. Air Quality Dep't (Sept. 2, 2025), https://tinyurl.com/4knpnwck ................................. 22

MDEQ, *NSR/PSD Revision – Appendix G-6* (July 28, 2005) ..................................................... 17

Prakash, Saikrishna, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701 (2003) .......................................................................................... 27

Press Release, U.S. Dep't of War, The War Department to Expand AI Arsenal on GenAI.mil With xAI (Dec. 22, 2025), https://tinyurl.com/3ek875j9 ........................................................ 32

WEBSTER'S NEW COLLEGIATE DICTIONARY (1980) ....................................................................... 21

WHITE HOUSE, FACT SHEET: PRESIDENT DONALD J. TRUMP ADVANCES ENERGY AFFORDABILITY WITH THE RATEPAYER PROTECTION PLEDGE (Mar. 4, 2026), https://tinyurl.com/42ced4xp .... 32

WHITE HOUSE, WINNING THE RACE: AMERICA'S AI ACTION PLAN (2025), https://tinyurl.com/6rrx2kbk ........................................................................................... 32

## INTRODUCTION AND SUMMARY OF ARGUMENT

In August 2025, after receiving written confirmation from the Mississippi Department of Environmental Quality ("MDEQ") that no air permit would be required, MZX Tech LLC began deploying temporary, portable gas-fired turbines at its Stanton Road property in Southaven, Mississippi, to provide power to nearby computing facilities. Over the next ten months, relying on MDEQ's guidance, Defendants MZX and xAI invested [redacted] in those facilities. Today, they constitute a computational resource unique in the United States and possibly the world. They power xAI's cutting-edge artificial intelligence model Grok, and other frontier AI models, including Anthropic's Claude and Google's Gemini. Hundreds of millions of people and businesses worldwide use these models, as does the federal government. Meanwhile, Defendants are already transitioning the computing facilities to a permanent power supply, that will replace temporary portable turbines at Stanton Road with permanent, permitted turbines subject to state-of-the-art emission controls. In fact, by the time this Court hears argument on the pending motions, numerous temporary turbines will already have been removed. [redacted]

MZX's development plans, undertaken in close coordination with Mississippi regulators, reflect the critical role that access to power generation plays in the global AI race, as well as the enormous capital investments necessary to advance U.S. economic, technological, and national security interests in this area. An abrupt loss of power from Stanton Road would inflict catastrophic harms on Defendants and hundreds of millions of users worldwide: Grok would largely cease to function, and other cutting-edge AI services would be significantly disrupted, with cascading harms to users, companies, and America's national-security interests.

Despite all this, Plaintiffs now ask the Court to disrupt the status quo and immediately shut down the temporary turbines at Stanton Road. Plaintiffs claim that Defendants needed a "stationary

source" permit before using those portable turbines. Although they have known all pertinent facts since at least September 2025—more than eight months ago—only now do they demand an injunction. Without explaining the belated timing of their motion, they ground their late-breaking injunctive request on speculation that another few months of portable turbine operations may pose health or welfare risks for some of their members. And they do so notwithstanding the U.S. Environmental Protection Agency's ("EPA") determination that the area is in attainment with national ambient air quality standards—standards set to protect human health and welfare.

Plaintiffs' motion must be denied. The proposed injunction would be, so far as Defendants can determine, unprecedented in the history of the Clean Air Act ("CAA"). And it would harshly punish Defendants for making perhaps the largest private investment in Mississippi's history, in reasonable reliance on state regulators' determination that no permit was needed for temporary use of portable turbines. An injunction would cost xAI [redacted], would render Grok essentially useless and disrupt other companies' access to computing resources that help power AI tools that millions—including the federal government—rely on, and handicap U.S. global competitiveness. What is more, the proposed injunction offers no tangible benefit to Plaintiffs or their members. The Southaven area is designated as in attainment with stringent federal and state air-quality standards that fully protect human health and welfare. Defendants developed, and are already implementing, a plan to remove all the temporary portable turbines from Stanton Road, and replace them with permanent power sources for which MDEQ already issued a permit. In short, granting Plaintiffs' belated injunction would yield them little (if any) benefit, while inflicting catastrophic harms on xAI and MZX, depriving hundreds of millions of users of the benefit of Grok and other AI tools, frustrating U.S. AI policy, and harming the public interest. Granting the

injunction would be profoundly harmful—and profoundly wrong, for Plaintiffs' arguments fail at every step.

*No irreparable harm.* Analyses of local air quality monitoring data show that the temporary turbines have not adversely impacted air quality. And computer modeling shows that the temporary turbines will not cause the area to exceed federal air quality standards that protect human health and welfare, with a margin of safety to protect even the most vulnerable populations. These data disprove Plaintiffs' speculative fears of health and welfare impacts. While Plaintiffs' expert declaration posits that any emissions (even, apparently, one molecule) increase the risk of harm, that "no safe level" theory cannot be reconciled with EPA's use of thresholds and standards to protect health and welfare. Nor have Plaintiffs shown that their members will *likely* suffer irreparable harm if the temporary turbines continue operating briefly before their removal.

Plaintiffs' unexplained eight-month delay in seeking injunctive relief undercuts their claims of urgency and irreparable harm. Plaintiffs' counsel have been aware of the material facts since no later than September 2025. Yet for months, Plaintiffs dragged their feet, while Defendants invested [redacted] in computing infrastructure and cutting-edge AI models that currently depend entirely on power from temporary turbines at Stanton Road, all in reasonable reliance on MDEQ's determination that no permit was required for the mobile sources. This Court has denied preliminary injunctions based on shorter periods of delay, and the same result is warranted here.

*No likely success on the merits.* Plaintiffs have shown no likelihood of success on the merits of their claims. First, under the CAA's citizen-suit provision, Plaintiffs lack statutory standing to assert claims on behalf of their members. Second, liability cannot extend to conduct, like Defendants' here, that complies with a federally approved state implementation plan. Third, the use of temporary, portable turbines did not trigger a permit obligation because MZX did not "begin

actual construction" of any permanent emission unit. Fourth, even assuming for the sake of argument that the Court sees some merit in Plaintiffs' claims, no liability could accrue because Defendants lacked fair notice that their conduct would violate the Clean Air Act or Mississippi's implementation plan—particularly where they sought, and proceeded in reasonable reliance on, MDEQ's determination that the temporary use of portable turbines does not require a permit. Finally, the CAA's citizen-suit provision itself violates Article II of the U.S. Constitution because it vests federal law enforcement authority outside of the executive branch.

*Harms to non-moving parties and the public interest.* Even if Plaintiffs could overcome those barriers, the balance of harms and public interest factors weigh decisively against granting relief. Shutting down the temporary turbines before permanent power is available would inflict immediate and catastrophic damage on xAI, rendering effectively useless the Grok AI tool currently used by [redacted], and harming other companies (such as Anthropic, Google, and Cursor) that also use these unique computing resources. For its part, xAI would suffer financial losses on the order of approximately [redacted]—a figure that, if anything, understates the harms, as it does not include potential damage to AI models, hardware, or software. An injunction would also frustrate U.S. policy favoring the development of AI technology. And it would harm Mississippi's sovereign prerogative to interpret and enforce its own laws, since Plaintiffs ask the Court to overrule MDEQ's determination that the portable, temporary turbines are exempt from stationary-source permitting. All these harms weigh heavily against granting a preliminary injunction, particularly as the region remains in attainment with highly protective federal standards and real-world data shows that the temporary turbines have not significantly affected regional air quality.

The Court should deny the motion. If the Court were to consider granting any injunctive relief, it must set a bond sufficient to protect Defendants from the [redacted] they would suffer. There is no basis to exempt Plaintiffs from that requirement.

**STATEMENT OF FACTS**

In July 2025, MZX acquired an existing industrial property at 2875 Stanton Road S., Southaven, Mississippi, with the intention of powering nearby high-performance computing facilities. Ex. 2 (Worthington Decl.) ¶ 5; Ex. 3 (Jacobson Decl.) ¶¶ 16–23. Before bringing any power-generation equipment to the site, MZX met with MDEQ to discuss its plans, including its forthcoming application for a Prevention of Significant Deterioration ("PSD") permit for the new power plant. Worthington Decl. ¶¶ 5–7. MZX also sought MDEQ's written guidance and authorization regarding the potential use of temporary, mobile turbines to power nearby computing facilities while permanent turbines were being permitted and installed. *Id.* ¶¶ 6–7; *see* Doc. 51-6.

On July 29, 2025, MDEQ responded with a formal determination letter confirming that the portable turbines constitute "mobile" sources under Mississippi's federally approved State Implementation Plan ("SIP"). Doc. 51-7. Thus, in MDEQ's view, the temporary turbines "are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D," and no permit would be required to use them at the Stanton Road site. *Id.* MDEQ's position was based on the fact that each turbine would "remain affixed to a portable unit (i.e., a flatbed trailer) and [would be] 'temporary,'" i.e., would "remain on-site . . . for less than twelve (12) months." *Id.* Although no permit was required, MDEQ urged MZX to use such emission control technology as may be "available and applicable to portable combustion turbines," and to advise the agency of "any additional emission control technology that will be utilized during [the temporary turbines'] operation." *Id.*

Relying on MDEQ's formal determination, MZX brought the first portable temporary turbines to the Stanton Road site on August 1, 2025. Worthington Decl. ¶ 8. In accordance with MDEQ's instructions, each temporary turbine is operated with appropriate emissions controls to limit air pollution. *See id.*, Ex. A (chart listing each temporary turbine). Three weeks later, MZX filed its PSD permit application with MDEQ for the future power plant. Doc. 51-9.

Over time, while development progressed at Stanton Road and the nearby computing facilities, MZX brought additional temporary turbines to the Stanton Road site. Worthington Decl. ¶ 13. Between November 2025 and June 2026, MZX brought additional temporary turbines to the site, for an expected total of 60 portable turbines by the end of June. *Id.* ¶¶ 14–15. MZX has kept MDEQ informed about the status of all temporary turbines at Stanton Road. *Id.* ¶ 16. More than a dozen are equipped with selective catalytic reduction emission controls; all the other temporary turbines reduce emissions using a sophisticated, tried-and-tested demineralized water control process. *Id.* ¶ 22 & Ex. A (chart). And MZX has already begun the process for installing permanent turbines at Stanton Road to replace the temporary turbines. *Id.* ¶¶ 11, 23–24.

On March 11, 2026, MDEQ issued MZX the final air permit for the construction and operation of the permanent turbines. Doc. 51-27. That permit authorizes MZX to construct and operate permanent combustion turbines with specified emissions controls, *id.* at 9-11, and an aggregate power generation capacity of 1.2 gigawatts. Worthington Decl. ¶ 9. Once operational, these permanent turbines [redacted] will supply the site's electricity needs. *Id.* ¶¶ 10, 12.

[redacted] *Id.* ¶ 11. Although manufacturer-driven construction delays have delayed the installation of some of the permanent turbines, MZX will start removing temporary turbines from the Stanton Road site by

August 1, 2026, with all such units removed before their respective 12-month marks of being on-site. *Id.* ¶ 20. [redacted]. *Id.* ¶¶ 23–24.

Today, the Stanton Road site is the operational backbone for Grok and other AI products serving hundreds of millions of customers in the United States and worldwide every month. Jacobson Decl. ¶¶ 14, 16, 19–23. The site currently constitutes the only power source for high-performance, neighboring computing facilities, which together comprise the densest deployment of AI computing hardware in the United States and perhaps the world. *Id.* ¶¶ 16–18, 23. Those facilities handle all of xAI's model training and products and provide services to other AI companies, including Anthropic, Google, and Cursor. *Id.* ¶¶ 19–22, 24–34. Defendants have invested [redacted] in that computing infrastructure and employ a highly-trained, specialized workforce—all of which currently depend on power from the temporary turbines at Stanton Road. Jacobson Decl. ¶¶ 27, 35–38; Ex. 5 (Trettel Decl.) ¶¶ 6, 8–9. An injunction shutting down the temporary turbines *now*, before permanent power is available, would shut down the computing facilities and largely disable the Grok AI tool, with catastrophic consequences for MZX's and xAI's businesses. Doing so would inflict [redacted] of harm on xAI, undercut the country's position in the global "AI race," and deprive hundreds of millions of users of the benefits of Grok and other AI services. Jacobson Decl. ¶¶ 24–34; Trettel Decl. ¶ 9.

**STANDARD OF REVIEW**

"[A] preliminary injunction is an *extraordinary and drastic remedy* which should not be granted unless the movant *clearly* carries the burden of persuasion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (emphases added). The movant must clearly show:

(1) a substantial likelihood that plaintiff will prevail on the merits,

(2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,
(3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and
(4) that granting the preliminary injunction will not disserve the public interest.

*Id*. When a movant fails "sufficiently to establish *any one* of the four criteria," the court must deny the request for a preliminary injunction." *Id.* at 905.

**ARGUMENT**

**I. Plaintiffs have not shown that they will likely suffer irreparable harm.**

**A. Data show that ambient air quality has met EPA standards since the turbines began operating, and that is not projected to change under even the most conservative modeling standards.**

Plaintiffs argue that they have shown irreparable harm because their members fear that the temporary turbine emissions may impact their health. But analyses of air quality monitoring data, backed up by rigorous computer modeling, demonstrate that the temporary turbines have had no significant impact on attainment with the National Ambient Air Quality Standards ("NAAQS") and other applicable federal and state health- and welfare-protective standards. The NAAQS most relevant to this case were most recently set by the EPA from 2010 to 2024, at levels determined to protect public health and welfare, including the most vulnerable populations, with an additional "margin of safety." 42 U.S.C. § 7409(b)(1). The EPA has for the last decade designated air quality in the Memphis metropolitan area (including the Southaven area) as "attainment," meaning the region's air quality complies with all the NAAQS, including for ozone, nitrogen dioxide ($NO_2$), and fine particulate matter ($PM_{2.5}$). *See* EPA, *Mississippi Nonattainment/Maintenance Status for Each County by Year for All Criteria Pollutants*, https://tinyurl.com/5a77pu4w (last updated May 31, 2026). That attainment designation has been in effect at all times relevant here.

Operating temporary portable turbines at Stanton Road has not changed that reality. Recent air dispersion modeling shows that concentrations of $NO_2$ and $PM_{2.5}$ will remain below the

NAAQS, Ex. 4 (Gasparini Decl.) ¶ 53, and that concentrations of formaldehyde are far below the relevant effects screening levels. *Id.* ¶¶ 53, 56.[1] This modeling is inherently over-predictive and uses worst-case assumptions specifically designed to ensure that predicted impacts are protective of human health and the environment. *Id.* ¶ 54. And quantitative analysis of publicly reported, real-time air quality monitoring data shows that concentrations of the substances discussed by Plaintiffs (ozone, $NO_2$, and $PM_{2.5}$), measured at the air quality monitors selected by MDEQ and EPA as representative of ambient air quality around the Stanton Road site have not been adversely affected by the temporary turbines. *Id.* ¶¶ 42, 45, 49.[2] In short, the temporary turbines have had no material impact on the area's air quality and are therefore not causing any adverse impacts to human health—and that is not projected to change.

**B. Plaintiffs have not shown irreparable harm.**

Plaintiffs have not even attempted to engage with this empirical record, and have not met their burden to prove that the continued temporary use of portable turbines at Stanton Road, while the site transitions to permanent power, will cause their members irreparable harm. Rather than engage with real-world data, Plaintiffs rely on (a) a generalized literature review purporting to show that *any amount* of $NO_2$ or $PM_{2.5}$—apparently even one molecule—harms human health; and (b) declarations by several members expressing subjective fears about potential health and welfare

[1] Plaintiffs' motion and declarations focus on potential harms from $NO_2$ and $PM_{2.5}$, and make no argument specific to formaldehyde. *E.g.*, Doc. 52 at 11–14, 23–25; Doc. 51-46 ¶ 11 (Suh Declaration does not attempt to address "health implications" associated with formaldehyde.). They may not add such an argument for the first time on reply. Regardless, modeling shows that formaldehyde emissions will not constitute irreparable harm.

[2] As MZX reported to MDEQ, even though these are mobile sources, their controlled emission levels comply with the stringent federal requirements for stationary combustion sources established under EPA's New Source Performance Standards. *Compare* Doc. 1-1 at 11 n.27 (noting that the company represented emission rates for $NO_X$ of 25 parts per million ("ppm") or less), *with* 91 Fed. Reg. 1,910, 1,925 (Jan. 15, 2026) ("The EPA finds 25 ppm to be the appropriate standard of performance for $NO_X$ emissions from temporary [stationary] combustion turbines.").

impacts. *See* Doc. 52 at 23–25.[3] Plaintiffs have not met their burden to prove a "substantial threat" of the claimed injury, or that any injury is irreparable. *Concepts in Prod., LLC v. Joiner*, No. 17-cv-118, 2018 WL 3419269, at *5 (N.D. Miss. July 13, 2018) (Brown, J.).

1. <u>The declarations do not establish a substantial threat of irreparable harm.</u>

Plaintiffs must show that irreparable harm is "likely," not merely possible. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). And "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). Plaintiffs do not come close to meeting that standard.

The crux of Plaintiffs' irreparable harm arguments are two declarations by Dr. Helen Suh addressing potential health impacts of particulate matter, nitrogen dioxide, and other emissions. Doc. 51-46; Doc. 51-50. But those declarations only review literature, and make generalized statements, about the potential health effects from exposure to those pollutants. Dr. Suh offers no site-specific exposure assessment or analysis. *See generally* Doc. 51-46; Doc. 51-50. She does not attempt to (1) model actual ambient air quality concentrations at or near any declarant's residence, school, or gathering place; (2) calculate individual exposure doses; (3) provide any site-specific quantitative risk assessment; or (4) account for background emissions or ambient levels from other sources.[4] Rather, she opines that *any amount* of emissions may "cause foreseeable adverse public health impacts," Doc. 51-46 ¶ 20, based on her view that there is "no safe level" of $NO_2$ or $PM_{2.5}$, *id.* ¶ 19; Doc. 51-50 ¶ 9. Tellingly, her declaration does not discuss EPA regulations exempting temporary emission sources from assessing impacts on air quality, because those impacts are so

[3] For Court docket entries, Defendants cite to the PDF page number as shown in the ECF header.

[4] Plaintiffs' amended declaration from Kim Laufenberg relies on "potential to emit" calculations that assume all turbines operate at maximum capacity 24 hours a day, 365 days a year. That is a theoretical, "worst-case" screening metric, not evidence of actual emissions. Doc. 51-43 ¶¶ 8–10, 46.

short-lived. *See* 43 Fed. Reg. 26,380, 26,394 (June 19, 1978). This type of generic analysis about the potential risks of pollutant exposure cannot prove irreparable harm.

*West Virginia Rivers Coalition, Inc. v. Chemours Company*, No. 25-1924, 2026 WL 1579491, at *10 (4th Cir. June 3, 2026), is instructive. There, applying the *Winter* factors, the Fourth Circuit vacated a preliminary injunction for "clear error" where the record did not show that irreparable harm was "more likely than not." *Id.* at *10–11. As here, a plaintiff's expert asserted that incremental exposure to a pollutant would "increase[] the risk" of harm by "some uncertain amount." *Id.* at *9–10. The Fourth Circuit held that, "[a]s a matter of law, the risk [the expert] described isn't irreparable harm," because at most the exposure "made harm likelier, not more likely than not." *Id.* at *10. The expert "admitted she couldn't opine on the harm [any specific plaintiffs] would suffer," and had not considered individual exposure profiles. *Id.* at *11. So too here. Dr. Suh's "no safe level" theory rests on the notion that any emissions incrementally increase risk. She neither proves that irreparable harm is more likely than not, nor attempts to show irreparable harm to any specific individuals.

More broadly, Dr. Suh's "no safe level" theory cannot be squared with the legal framework governing air quality, in which EPA sets concentration levels (i.e., thresholds) that sufficiently protect human health, including a margin of safety. *See* Gasparini Decl. ¶ 27; 42 U.S.C. § 7409(b)(1). The practical consequences of Dr. Suh's theory would turn the preliminary-injunction standard on its head. If Dr. Suh were correct, *any* plaintiff near *any* emissions source of *any* magnitude (from a backyard barbecue to a home backup generator) could show irreparable harm. Emergency injunctions would be the norm, not an "extraordinary remedy" reserved for exceptional cases. *Winter*, 555 U.S. at 24; *see Holland Am.*, 777 F.2d at 997 ("Injunctive relief is . . . not to be granted routinely."). Dr. Suh's declarations, in short, cannot meet Plaintiffs' burden.

The subjective concerns of Plaintiffs' members (even if genuinely felt), and actions taken in response to those fears, cannot close the gap. For instance, Tiffany Millsap describes respiratory problems she has experienced since moving to the area *six* years ago (i.e., long before any temporary turbines at Stanton Road), and speculates that she "can't imagine how bad it will be if my symptoms get even worse because of more pollution." Doc. 51-38 (T. Millsap Decl.) ¶¶ 2, 13. Adrian Millsap reports that unnamed family members "seem[] to have" respiratory symptoms when they visit, and recounts "stories about [unnamed] people whose children are developing asthma problems." Doc. 51-37 (A. Millsap Decl.) ¶¶ 17–18, 22. Neither declarant provides any specific basis to connect their fears or symptoms to turbines at Stanton Road, as distinct from any other of the myriad emissions sources in the area, or other causes. *See id.*; *see also* Doc. 51-40 (Sheard Decl.) ¶ 16 (allergies "acting up" that "could be from the added pollution"). Alleged third-party harms also don't suffice. *Winter*, 555 U.S. at 21–23.

For her part, Stephanie Norvell catalogues pre-existing health conditions and is "*worried* that more pollution . . . will worsen my health conditions or lead to new conditions." Doc. 51-39 (Norvell Decl.) ¶ 9 (emphasis added). Tracy Thornton is "*worried* about how exposure to the pollution could harm my health." Doc. 51-41 (Thornton Decl.) ¶ 14 (emphasis added). And Robert Tipton is "*afraid* my sarcoidosis will come out of hibernation." Doc. 51-42 (Tipton Decl.) ¶ 15 (emphasis added); *see also* T. Millsap Decl. ¶¶ 14, 16; A. Millsap Decl. ¶ 18; Sheard Decl. ¶ 13. At most, the declarants offer the kind of "[s]peculative injury" and "unfounded fear[s]" that cannot carry the heavy burden necessary to support preliminary injunctive relief. *Holland Am.*, 777 F.2d at 997. Even taking the declarations at face value, "[s]peculative injury is not sufficient." *Id.*

2. The portable turbines' temporary status, and the ongoing transition to permanent power sources, cut further against finding irreparable harm.

Nor have Plaintiffs shown that irreparable harm is likely to occur during the limited time when temporary turbines will operate before removal. Plaintiffs must prove that any temporary impacts will cause lasting, permanent damage. *See W. Ala. Quality of Life Coal. v. U.S. Fed. Highway Admin*., 302 F. Supp. 2d 672, 684 (S.D. Tex. 2004) ("temporary effects" from pollution sources occurring for "33 months" were not "permanent or of [a] long duration"); *Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt*., No. 23-cv-58, 2023 WL 2759864, at *7 (D. Alaska Apr. 3, 2023) (impacts "short-lived"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39 (D.D.C. 2013) (Jackson, J.) (effects not "permanent or irreversible").

MZX has already begun the process of installing the permanent turbines [redacted]. Worthington Decl. ¶¶ 11–12, 20, 23–24. Specifically, [redacted]. *Id*. ¶¶ 11, 23. Plaintiffs thus face the difficult task of proving injury from incremental emissions that are already scheduled to decrease dramatically in the near future, and zero out completely not long thereafter. And although temporary turbines have operated for nearly a year, Plaintiffs adduce no concrete evidence of harms to human health, still less show that specific persons will likely suffer irreparable harm from the incremental, temporary emissions. *See* Doc. 51-46; Doc. 51-50.

**C. The NAACP's delay in seeking injunctive relief undercuts their allegations of irreparable harm and precludes equitable relief.**

Plaintiffs' unexplained eight-month delay in seeking a preliminary injunction also weighs heavily against granting relief. "[A] plaintiff's undue delay . . . demonstrates that there is no apparent urgency to the request for injunctive relief." *Ronaldo Designer Jewelry, Inc. v. Cox*, No. 17-cv-2, 2017 WL 3879095, at *10 (N.D. Miss. Sept. 5, 2017) (Brown, J.) (internal quotation marks omitted). Courts in this Circuit thus routinely "decline[] to grant injunctive relief where a

plaintiff, without sufficient explanation, delayed for five months or more." *Id.* at *10 (collecting cases). The NAACP's lengthy inaction undercuts claims of urgency or irreparable harm.

The NAACP's own exhibits show they could have acted far sooner. Starting in August 2025, in reliance on MDEQ's July 29, 2025 determination, MZX moved temporary portable turbines to the site. Doc. 51-7; Worthington Decl. ¶ 8 & Ex. A. The NAACP's counsel sought a public records disclosure from MDEQ on September 12, 2025, and received responsive documents almost immediately—on September 18 and October 6, 2025. Doc. 51-10; Doc. 51-11. Those documents disclosed: (a) that MZX had consulted with MDEQ in late July 2025 regarding the potential use of portable turbines at Stanton Road; (b) that MDEQ determined that portable temporary turbines did not need a permit; (c) that MZX had brought temporary turbines to the site over time; and (d) that MZX had applied for a PSD permit to construct permanent turbines. Doc. 51-6; Doc. 51-7; Doc. 51-9. Plaintiffs have thus known the material facts since September 2025 at the latest. Even accounting for the statutory citizen-suit notice period, Plaintiffs inexplicably did not seek preliminary injunctive relief until May 2026. Doc. 20.

While Plaintiffs dragged their feet, Defendants invested [redacted] in computing facilities in reasonable reliance on Mississippi's determination that the temporary portable turbines did not need a permit. Hundreds of millions of users worldwide came to rely on the AI tools that the facilities support. MZX will have already started removing temporary turbines from Stanton Road by the time this Court hears argument on this motion, and MZX plans to remove most of the temporary turbines [redacted]. In this context, the NAACP's delay forecloses injunctive relief. *See Ronaldo*, 2017 WL 3879095, at *10.

**II. The NAACP has shown no likelihood of success on the merits.**

Plaintiffs have not shown any substantial likelihood of success on the merits, because: (1) Plaintiffs lack statutory standing to sue on behalf of third parties; (2) CAA liability cannot

extend to conduct, like Defendants' here, undertaken in compliance with a federally approved SIP; (3) MZX's use of temporary turbines did not "begin actual construction" of any permanent emission unit; (4) Defendants lacked fair notice that their conduct violated the CAA; and (5) the CAA's citizen-suit provision violates Article II of the Constitution.

**A. The NAACP lacks statutory standing.**

The plain text of the CAA's citizen-suit provision precludes NAACP from bringing suit on behalf of its members. Statutory standing turns on "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). The citizen-suit provision states that "any person may commence a civil action *on his own behalf*." 42 U.S.C. § 7604(a) (emphasis added). The plain meaning of "on his own behalf" indicates that a plaintiff may sue only for his "[b]enefit," not for the benefit of another. *Behalf*, BLACK'S LAW DICTIONARY (4th ed. 1968); *Behalf*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[O]n behalf of means 'in the name of, on the part of, as the agent or representative of.'"). The CAA specifically defines "person" to include an "association." 42 U.S.C. § 7602(e). So in providing that a person may sue "on his own behalf," the Act must mean that the person—including an association—cannot sue on another's behalf. Put differently, an organization may therefore sue "to vindicate only its own interests as an organization, and not the interests of its individual members." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.6 (1998). Thus, the NAACP may not sue on its members' behalf, but must itself have suffered an organizational injury.[5]

---

[5] Courts strictly follow the plain text of other causes of action that prevent organizations from vindicating member rights. For example, the Fair Labor Standards Act only authorizes suits "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). As the Tenth Circuit and several other courts have concluded, "[t]he wording of this provision suggests that standing to pursue an action for liability is statutorily limited to employees only," and precludes suits by unions as representatives of employees. *United Food & Commercial Workers Union,*

The NAACP, however, does not allege that it has suffered any organizational injury sufficient to satisfy Article III, *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394–95 (2024), and it may not do so for the first time on reply. It instead brings this "suit on behalf of its members," relying solely upon a theory of associational standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In other words, the NAACP relies exclusively on alleged "harms to Plaintiffs' *members*." Doc. 52 at 11–14 (emphasis added). The statutory text forbids that sort of on-behalf-of-others suit. If "on his own behalf" means anything, it must mean that a plaintiff may not sue as a representative of a third party—but that is exactly what the NAACP attempts here. The NAACP therefore lacks a cause of action and cannot succeed on the merits.

**B. Citizen-suit liability cannot extend to conduct, like Defendants' here, undertaken in compliance with a federally approved state SIP.**

Plaintiffs allege that Defendants are violating Mississippi's SIP, and the CAA, by deploying and using turbines without a permit. *See* Doc. 52 at 15–19. But where a SIP's language is clear and unambiguous, a court must enforce it as written. *See S. Tex. Env't Just. Network v. Tex. Comm'n on Env't Quality*, 165 F.4th 356, 369–70 (5th Cir. 2026). The CAA "does not authorize the imposition of sanctions for conduct that complies with a [SIP] that the EPA has approved." *United States v. Cinergy Corp.*, 623 F.3d 455, 458 (7th Cir. 2010). Rather, the CAA makes *states* primarily responsible for protecting air quality through state regulations that are approved by the EPA (i.e., EPA-approved SIPs); *see Sierra Club v. La. Dep't of Env't Quality*, 100 F.4th 555, 560–61 (5th Cir. 2024) (recognizing that the CAA "operates as 'an experiment in cooperative federalism,'" and states have primary responsibility "for implementing [air quality] standards" (cleaned up)). Plaintiffs' claims fail because Mississippi's EPA-approved SIP excludes

---

*Local 1564 v. Albertson's, Inc.*, 207 F.3d 1193, 1200 (10th Cir. 2000). Similarly here, the natural reading of "on his own behalf" is that the NAACP may not sue as a representative of its members.

mobile sources from permitting requirements, and ordinary meaning, MDEQ's views, and common sense all confirm that MZX's trailer-mounted turbines are mobile sources.

Under Mississippi's SIP, "[m]obile sources" are "[c]ategorical[ly]" "excluded from the requirement for a permit to construct and a permit to operate." 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013); *accord id.* R. 2.1(D)(2).[6] Because the SIP does not define the term "mobile source," it must be interpreted according to ordinary meaning. "Mobile" means "[c]apable of moving or being moved readily from place to place." *Mobile*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1129 (4th ed. 2000). A mobile source is therefore an emission source that can move or be moved. Plaintiffs argue the temporary turbines' size shows they are stationary sources, but Plaintiffs' own exhibits show that the turbines are mobile. The turbines are pictured on trailers being hauled down the highway, *see* Doc. 51-23 at 34; Doc. 51-45 at 2, and their manufacturers market them as "mobile" power solutions, *see* Doc. 51-45 at 4–5 (GE TM2500 spec. sheet offering "power potential on wheels" and as a "mobile, two-trailer assembly" that "can be transported via land, sea, and air"); *id.* at 2 (Solar SMT-130 advertised for "mobile and rapid deployment power generation," requiring "[n]o [c]oncrete [f]oundation"). MZX's turbines are "mobile sources" in the ordinary sense of that phrase: they are designed to serve as temporary power solutions that can be moved via flatbed trailer on and off a site as needed. Worthington Decl. ¶¶ 8, 17, 19–21, 24.

MDEQ reads its SIP the same way: "MDEQ understands that the referenced turbines will be 'mobile' as each will remain affixed to a portable unit (i.e., a flatbed trailer) and 'temporary' as it is intended for each to remain on-site . . . for less than twelve (12) months." Doc. 51-7. As a

[6] EPA first approved this mobile-source SIP provision in March 2006. *See* 71 Fed. Reg. 14,658 (Mar. 23, 2006); MDEQ, *NSR/PSD Revision – Appendix G-6*, at PDF p. 29 (July 28, 2005), Doc. ID EPA-R04-OAR-2005-MS-0001-0004, https://perma.cc/MSC4-JHZQ. And EPA most recently approved Mississippi's SIP in February 2020. *See* 85 Fed. Reg. 10,070 (Feb. 21, 2020).

result, MDEQ determined that such "turbines are exempt from permitting requirements pursuant to 11 Mississippi Administrative Code Part 2, Chapter 2, Rule 2.13.D." *Id*. Given MDEQ's authority and unique expertise with the SIP and familiarity with the relevant facts, its position is entitled to careful consideration and real weight. *See Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 490–91 (2004) ("state agency's" application of SIP provisions should be sustained except where "not based on a reasoned analysis" (citation omitted)); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402–03 (2024) (agency views can be "especially informative" where determination "rests on factual premises within [the agency's] expertise").

This case aligns with *Cinergy*, where the Seventh Circuit found that compliance with a SIP precluded liability for an alleged failure to obtain a permit. 623 F.3d at 458. There, the United States alleged that Cinergy, the owner of a coal-fired electric power plant, violated the CAA—as implemented through then-current EPA regulations—by modifying its plant in ways that would increase actual, annual emissions. *Id.* at 456. Cinergy countered that a permit was not necessary because, under the federally approved version of Indiana's SIP in effect at the time of the alleged conduct, "hourly capacity rather than annual emissions determined whether a permit was required," and Cinergy's project increased annual emissions by increasing the hours of operation, not the hourly emissions rate. *Id.* at 457–58. The Seventh Circuit sided with Cinergy, holding that a "straightforward reading" of the SIP "permitted [Cinergy] without fear of sanctions to make modifications without a permit as long as they would not increase [the] plant's potential generating capacity, even if they would increase its annual output." *Id.* at 458. Accordingly, the United States could not "impos[e] . . . sanctions"—even for a violation of then-current EPA regulations—where the "conduct . . . complie[d]" with Indiana's SIP, which "EPA ha[d] approved." *Id.*; *accord Utah Physicians for a Healthy Env't v. Kennecott Utah Copper, LLC*, 191 F. Supp. 3d 1287, 1293–96,

1301 & n.85 (D. Utah 2016) (citing *Cinergy* and holding that where a mine owner complied with an "unambiguous" SIP provision, citizen-suit plaintiffs could not impose "liability").[7]

The same holds true here. A "straightforward reading" of Mississippi's SIP shows that MZX's turbines fall within the ordinary meaning of "mobile source," just as MDEQ concluded. Because Defendants complied with the EPA-approved SIP, not even the United States could impose liability on Defendants for this conduct. *Cinergy*, 623 F.3d at 458 ("The Clean Air Act does not authorize the imposition of sanctions for conduct that complies with a [SIP] that the EPA has approved."). After all, the CAA vests states with responsibility for enacting and enforcing SIPs and does not contemplate imposing sanctions for conduct that complies with a state plan. *E.g.*, 42 U.S.C. §§ 7410, 7413(a)(1), 7604(a). This case is no exception to that rule.

Instead of Mississippi's SIP, Plaintiffs point to a federal regulation. *See* Doc. 52 at 20–21 (quoting 40 C.F.R. § 51.50). But in *Cinergy*, although the federal regulation was more restrictive, the Seventh Circuit held that the company could not be sanctioned for conduct that complied with an EPA-approved SIP. *See* 623 F.3d at 458–49. So too here. Plaintiffs' remedy, if any, is to persuade Mississippi to modify its SIP, or perhaps to urge the EPA to revisit its approval of Mississippi's SIP. Plaintiffs may not, however, impose liability on Defendants for conduct that complied with Mississippi's federally approved SIP.[8]

---

[7] Although the Eighth Circuit distinguished *Cinergy* in *United States v. Ameren Missouri*, it did so based on differences in the underlying SIPs. *See* 9 F.4th 989, 1003 (8th Cir. 2021) (explaining that the Missouri SIP, unlike the Indiana SIP in *Cinergy*, expressly "incorporate[d]" certain federal rules and "expressly provide[d] that" federal rules "as set out in the Code of Federal Regulations supersede any conflicting provision in the state SIP"). Here, neither the mobile-source exclusion in Mississippi's SIP nor EPA's notice of approval of the same include any similar incorporation or superseding language.

[8] *Cf.* 42 U.S.C. § 7607(b)(2) (disallowing judicial review in enforcement proceedings of EPA SIP approval actions for which judicial review was available under 42 U.S.C. § 7607(b)(1)).

Plaintiffs briefly contend that the SIP's treatment of "facilit[ies] which will be located only temporarily at a site" shows that MZX's turbines are not categorically exempt, because MDEQ may issue permits for temporary facilities. *See* Doc. 52 at 22. That argument misunderstands the exemption, which addresses temporary *stationary sources*; it does not displace the SIP's categorical exclusion of *mobile sources*. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D) (2013). In any event, the cited provision is permissive, not mandatory, and MDEQ has not invoked that authority here. *See id*. (permit "may issue" for a temporary stationary source).

**C. Defendants did not "begin actual construction."**

Plaintiffs' claims fail for an additional, independent reason: they have not met their burden to prove that Defendants "began actual construction" on a stationary source. Under federal law, "[n]o new major stationary source . . . shall begin actual construction without a permit." 40 C.F.R. § 52.21(a)(2)(iii); *see* 42 U.S.C. § 7475(a).[9] By its plain terms, this provision defines when sources become subject to permitting requirements and, by negative implication, what activities may occur without a permit. Under Mississippi's SIP, absent an exclusion, "any new stationary source or modification of a stationary source must have a permit . . . before beginning actual construction." 11 Pt. 2 Ch. 2 Miss. Code R.2.1(D)(2) (2013). EPA regulations define "[b]egin actual construction" as the "initiation of physical on-site construction activities on an emissions unit which are *of a permanent nature*." 40 C.F.R. § 52.21(b)(11) (emphasis added); *see also* Draft Memorandum from Anne L. Idsal, EPA Principal Deputy Assistant Adm'r, to Reg' Air Div. Dirs. 1–2 (Mar. 25, 2020), https://tinyurl.com/2zhrud43.

[9] Mississippi adopted and incorporated 40 C.F.R. § 52.21, including the definitions in § 52.21(b), into its SIP. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1(B) (2013).

Case: 3:26-cv-00074-DMB-JMV Doc #: 61 Filed: 09/15/26 29 of 44 PageID #: 2084

Plaintiffs have not met their burden to show that Defendants began actual construction on an emissions unit. Where a regulation's text "is unambiguous and does not lead to an absurd result," the interpretive inquiry ends there. *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 438 (5th Cir. 2011). "Permanent" means "continuing or enduring without fundamental or marked change." *Permanent*, WEBSTER'S NEW COLLEGIATE DICTIONARY 847 (1980), or "not subject to change, replacement, fluctuation, or transience," *Permanent*, BLACK'S LAW DICTIONARY (12th ed. 2024). The temporary turbines, and the activities MZX undertook to deploy them, are not "permanent." The turbines arrived and remain on wheeled trailers, were never affixed to permanent foundations, and will each operate for no more than one year before being removed. *See* Doc. 51-6; Doc. 51-7; Worthington Decl. ¶¶ 6–8, 20–21, 24. While MZX took other steps, such as pouring concrete pads (on which the wheeled trailers are parked, Worthington Decl. ¶ 19), running lines to bring gas to the turbines or transmit electric power away, and erecting certain buildings, *see* Doc. 52 at 22–23, these constructed items are not themselves emissions units. Because MZX did not perform any construction "on an emissions unit" (i.e., on the temporary turbines themselves) that is "of a permanent nature," the Plaintiffs' claim fails.

Plaintiffs contend that the ancillary work amounted to "begin[ning] actual construction," noting that construction includes "building supports and foundations, laying underground pipework and construction of permanent storage structures." *See* Doc. 52 at 22 (quoting 40 C.F.R. § 52.21(b)(11)). But as to the concrete pads, the portable turbines parked on the pads are not stationary sources and, in fact, do not require concrete foundations to operate. *See* Worthington Decl. ¶ 19. The gas and power lines are serving mobile sources, not the stationary sources to which the SIP's and the PSD program's preconstruction permit requirements apply. As to the "associated buildings," EPA guidance confirms that buildings that are neither emissions units nor emission-

control devices, may be constructed without a permit. *See* Letter from Aaron Szabo, Assistant Adm'r, EPA Region 9, to Philip McNeely, Dir., Maricopa Cnty. Air Quality Dep't (Sept. 2, 2025), https://tinyurl.com/4knpnwck. Plaintiffs have not alleged that the structures at the Stanton Road site are emissions units or emission-control devices.

Plaintiffs briefly suggest that Defendants violated the SIP by beginning operation without filing a "certification of construction" under Rule 2.5(D)(1) and (4). *See* Doc. 52 at 15–17. But, again, this requirement applies only "[u]pon the completion of construction" of stationary sources that required a preconstruction permit in the first instance. Because the portable turbines are exempt, no certification was required. *See* 11 Pt. 2 Ch. 2 Miss. Code R 2.5(D)(1), (4) (2024).

**D. Fair notice principles bar liability, because Defendants reasonably relied on Mississippi's determination that no permit was required.**

Even if Plaintiffs could show a likelihood of success on their permit-related claims, fair notice principles shield Defendants from liability here. That is because they reasonably relied on MDEQ's July 2025 determination that the portable, temporary turbines did not require a permit.

Laws "must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Fair notice "requires the agency to have stated with ascertainable certainty what is meant by the standards it has promulgated," *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017) (cleaned up). Courts, in turn, must not "validat[e] the application of a regulation that fails to give fair warning of the conduct it prohibits or requires." *Gates & Fox Co. v. OSHA*, 790 F.2d 154, 156 (D.C. Cir. 1986); *see also Wis. Res. Prot. Council v. Flambeau Mining Co.*, 727 F.3d 700, 708–09 (7th Cir. 2013) (applying fair notice principles to a citizen suit under the Clean Water Act).

In assessing a fair notice defense, a court need not conclusively interpret relevant provisions or determine whether conduct violated the law. Rather, a court asks only whether the

party had fair notice of the interpretation being enforced against it. *See, e.g.*, *Gates & Fox Co.*, 790 F.2d at 156. Thus, the inquiry asks "whether [the regulated party] lacked reasonable notice." *United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997). The starting point is whether a party received notice "in the most obvious way of all: by reading the regulations." *Gen. Elec. Co. v. U.S. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

Defendants lacked fair notice that the mobile turbines required preconstruction permits. Those turbines are portable units mounted on flatbed trailers, designed to be rapidly deployed, operated temporarily, and wheeled in and out of sites as needed. These characteristics supported Defendants' reasonable expectation that the turbines are exempt from stationary-source permitting requirements under Mississippi's SIP. 11 Pt. 2 Ch. 2 Miss. Code R. 2.13(D)(3) (2013). That is especially true because Mississippi's regulators *told them as much*. The analysis should stop there.

To the extent federal law and regulations are pertinent, they did not provide fair notice either. The CAA defines "stationary source" to mean "any building, structure, facility, or installation" that emits covered air pollutants, while excluding "nonroad engines." *See* 42 U.S.C. §§ 7411(a)(3), 7602(z). A "nonroad engine" is an "internal combustion engine" that, inter alia, is not subject to a New Source Performance Standard ("NSPS") under Section 111 of the Act. *Id.* § 7550(10); *see* 40 C.F.R. § 1036.5(d). But Section 111, in turn, applies only to "stationary sources"—a term defined circularly to exclude "nonroad" engines. 42 U.S.C. § 7411.

EPA's implementing regulations compound the problem. They define a "nonroad engine" to include an internal combustion engine that is "portable or transportable, meaning designed to be and capable of being carried or moved from one location to another." 40 C.F.R. § 1068.30(1)(iii). Such an engine nevertheless "cease[s]" to be a nonroad engine—and instead becomes "stationary"—if it remains at one location for 12 months or is "otherwise regulated by a

federal [NSPS] promulgated under section 111." *Id.* § 1068.31(e)(1)–(2).[10] This circular array of definitions—where "nonroad engine" is defined by reference to "stationary source," and "stationary source" by reference to "nonroad engine"—yields profound uncertainty about whether the temporary use of portable turbines falls within the "nonroad engine" exemption.

Plaintiffs assert that these turbines are subject to NSPS Subpart KKKK, which applies to certain stationary combustion turbines with a heat-input capacity greater than 10 MMBtu/hr. *See* Doc. 52 at 20–21. But Subpart KKKK's definition of "stationary" turbines—encompassing turbines "not self-propelled or intended to be propelled while performing its function" even though they "may . . . be mounted on a vehicle for portability," 40 C.F.R. § 60.4420—only adds ambiguity. Certainly, nothing in the CAA or regulations foreclosed reading these provisions to exclude turbines that move around and are used temporarily. *See CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 445–46 (5th Cir. 2024); *Hoechst Celanese Corp.*, 128 F.3d at 225.[11]

Given the importance of the issue and the enormous investments being contemplated, MZX reasonably sought confirmation from state regulators before deploying any turbines at Stanton Road. MDEQ confirmed that "the referenced turbines are exempt from permitting requirements" under Mississippi law because they would be "mobile" (by remaining affixed to trucks) and "temporary" (by remaining on-site for less than 12 months). Doc. 51-7. When a regulated party proactively seeks a determination from the agency responsible for interpreting and enforcing regulations, fair-notice principles entitle reliance on the agency's response. *See Hoechst Celanese*

---

[10] In other words, EPA itself recognized that portable equipment designed to move between locations within 12 months may not be subject to stationary source permitting requirements. This is not a "dreamed-up exemption." Doc. 52 at 21. It is codified in EPA's regulations.

[11] A 2026 EPA rulemaking preamble, *see* Doc. 52 at 20 n.42, could not have provided notice because it *postdates* MDEQ's determination, on which MZX relied here. *See Hoechst Celanese Corp.*, 128 F.3d at 224–30.

Case: 26-60806 Document: 37 Page: 273 Date Filed: 10/16/2026

*Corp.*, 128 F.3d at 225; *see also PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 49 (D.C. Cir. 2016) (Kavanaugh, J.) (where party seeks and receives prior official assurance that conduct would be legal, "[n]o one would seriously contend that the [government] had acted fairly or in a manner consistent with basic due process" if it later seeks to penalize that very conduct), *vacated on other grounds*, 881 F.3d 75 (D.C. Cir. 2018) (en banc). Because even the government cannot perform such a bait-and-switch, it would be perverse to allow private parties to punish Defendants for conduct that state regulators sanctioned.

Notably, MDEQ's determination did not occur in isolation. Just weeks earlier, Tennessee regulators concluded that no CAA permit was needed for temporary use of portable turbines in Memphis, resting on a slightly different, but ultimately complementary, rationale. Ex. 6 at 3. The Tennessee regulators observed that EPA "is aware of and has not objected to the determination that the temporary turbines are not subject to stationary source air permitting requirements." *Id.*[12] Fair notice shields regulated parties from liability where regulators are clearly "aware" that parties are taking certain actions, but the agency "[takes] no steps to advise the public" that "the practice was questionable." *EOX Holdings*, 90 F.4th at 445 (quoting *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996)). Given state regulators' shared view that no permit was required, and the EPA's apparent acquiescence, Defendants reasonably relied on MDEQ's determination.

The Fourth Circuit's decision in *United States v. Hoechst Celanese Corporation* confirms the fair notice concern here. There, a plant operator faced regulatory ambiguity regarding EPA emissions regulations and sought guidance from the Texas Air Control Board ("TACB"). 128 F.3d

---

[12] In November 2024, EPA Region 4 acknowledged in writing that "EPA Region 4 permitting staff previously consulted with SCHD permitting staff" regarding the temporary turbines and had "provided informal feedback." Ex. 7 at 3. Although EPA stated those inquiries would "trigger a formal review process" leading to "a Regulatory Interpretation," *id.*, no such Interpretation has issued.

at 224–25. The TACB determined the facility was exempt, and although the EPA's Regional Office received TACB's letter, it "took no action to rescind or invalidate the exemption." *Id.* at 225. The Fourth Circuit held the company lacked fair notice that its conduct would violate the law, reasoning that the TACB's letter and the EPA's silence gave the company "reason to believe that its interpretation . . . was accurate," particularly given ambiguity in the regulations. *Id.* at 226.

The fair-notice defense here is even stronger. Unlike in *Hoechst*, where the operator extrapolated guidance about a Texas facility to a South Carolina plant, MZX received a formal determination from the agency with delegated authority to implement and enforce CAA permitting requirements in Mississippi, addressing turbines at the specific location. Moreover, MZX sought MDEQ's determination before bringing any turbines to the site. And MDEQ has not expressed any change in its interpretation even after a January 2026 EPA rulemaking on standards for temporary turbines.[13] *See* 91 Fed. Reg. at 1,927. In this context, it would violate fair-notice principles to issue an injunction predicated on the notion that Defendants violated the Clean Air Act by not obtaining a permit that Mississippi regulators told Defendants was not required.

**E. The CAA's citizen-suit provision violates Article II of the U.S. Constitution.**

Plaintiffs' claims fail for the independent reason that the CAA's citizen-suit provision violates Article II and the separation of powers by allowing private parties to exercise law-enforcement authority vested in the Executive Branch.

---

[13] In December 2024, EPA published a proposed rule suggesting that Subpart KKKK applied to "portable turbines" that "meet other applicability criteria." 89 Fed. Reg. 101,306, 101,345 (Dec. 13, 2024). The phrase "other applicability criteria," however, left unclear which criteria applied and whether temporary operation affected applicability. The proposed rule also acknowledged longstanding ambiguity about the status of temporary turbines and solicited comment on whether exemptions should exist. *Id.* In any event, proposed rules do not provide interpretations "carrying the force of law" and should not be afforded any deference. *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 297–98 (5th Cir. 2022) ("a proposed regulation does not represent an agency's considered interpretation of its statute" (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986))).

Article II provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. In other words, "[t]he entire 'executive Power' belongs to the President alone." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020); *see* U.S. Const. art. II, § 1, cl. 1; *id.* § 3. This power has long been understood to include the core law-enforcement power to prosecute all public offenses, whether civil or criminal. *See* Saikrishna Prakash, *The Essential Meaning of Executive Power*, 2003 U. Ill. L. Rev. 701, 800 (2003).

"[U]nder Article II, the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678–79 (2023) (cleaned up). This discretion includes civil enforcement. *See In re Aiken Cnty.*, 725 F.3d 255, 264 & n.9 (D.C. Cir. 2013) (Kavanaugh, J.); *see also Heckler v. Chaney*, 470 U.S. 821, 832 (1985). The Take Care Clause makes the President's authority over enforcement actions "conclusive and preclusive," thus "disabl[ing]" Congress from "acting upon the subject." *Trump v. United States*, 603 U.S. 593, 607, 620 (2024) (cleaned up).

The CAA vests law-enforcement power in private persons without regard to these bedrock constitutional principles. The citizen-suit provision states that "any person" may "commence a civil action on his own behalf" against "any" other "person . . . who is alleged to have violated . . . or to be in violation of" numerous CAA requirements, including emissions regulations and permitting requirements. 42 U.S.C. § 7604(a)(1), (a)(3), (f). And the "enforcement authority" in 42 U.S.C. § 7604 includes both sweeping injunctive relief and "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court"—"a quintessentially executive power." *Seila Law*, 591 U.S. at 219; *accord Nat'l Horsemen's Benevolent & Prot. Ass'n v. Black*, No. 23-10520, 2026 WL 1689717, at *7 (5th Cir. June 11,

2026) ("The power[s] … to sanction [and] sue" are "quintessentially executive functions."). As courts have long recognized, citizen-suit plaintiffs are not ordinary civil litigants but act as enforcement authorities: "private attorneys general" who "seek relief not on their own behalf but on behalf of society as a whole." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004).

For decades, Justices of the Supreme Court have noted that "exactions of public fines by private litigants, and the delegation of Executive power which might be inferable from the authorization" raise "[d]ifficult and fundamental questions" under "Article II of the Constitution." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 197 (2000) (Kennedy, J., concurring); *see also id.* at 209 (Scalia, J., joined by Thomas, J., dissenting); *Dep't of Transp. v. Ass'n. of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). This makes sense. Nobody elected the NAACP, no official appointed them, and they have taken no oath of allegiance. Yet they assert here authority to unilaterally "conduct[ ] civil litigation . . . for vindicating public rights," *Buckley v. Valeo*, 424 U.S. 1, 140 (1976), based on conduct that the United States has not sought to punish—and that Mississippi has approved.[14] Granted, some district courts have upheld the constitutionality of CAA (and CAA-style) citizen suits.[15] But these cases predate more recent Supreme Court decisions, which make clear that when "the Constitution vests the executive power in the President," that means *all* of it. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025). Today, there

---

[14] Unlike the False Claims Act ("FCA"), which creates a similar "private attorney general" action known as "*qui tam*," the CAA provides no express mechanism for the executive branch to direct or dismiss citizen suits it disagrees with. And even that check may not be enough. Three Justices have signaled that private *qui tam* actions under the FCA may violate Article II. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *id.* at 449 (Thomas, J., dissenting). The CAA's citizen-suit provision is *a fortiori* unconstitutional because it lacks FCA's express mechanisms intended to protect executive discretion.

[15] *E.g., N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., L.L.C.*, 200 F. Supp. 2d 551, 555–56 (E.D. N.C. 2001); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (S.D. Ohio 2001).

is no longer any question: CAA citizen suits violate Article II, because they give core executive law enforcement power to private parties. Thus, none of Plaintiffs' claims are likely to succeed.

## III. Catastrophic harms to Defendants and the public outweigh any injuries to Plaintiffs.

### A. Any impacts to Plaintiffs' members from temporary, incremental emissions in an attainment area are dwarfed by the catastrophic harms an injunction would inflict on Defendants and hundreds of millions of AI users worldwide.

The NAACP's claimed injuries are vastly outweighed by the catastrophic and incalculable harms an injunction would cause to Defendants and millions of people and businesses worldwide that depend on xAI's tools and services. "[T]he award of an interlocutory injunction . . . has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (cleaned up). "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (cleaned up). A movant's injuries must not only be irreparable, but must also *outweigh* harms to the defendant and others. *See Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974); *SO Apartments, L.L.C. v. City of San Antonio*, 109 F.4th 343, 348 (5th Cir. 2024). Plaintiffs cannot make that showing.

Consider first the devastating impact of any injunction on Defendants and their customers. Issuing an injunction and precipitously shutting down the Stanton Road facility, even temporarily, would cause profound, irreparable, and incalculable harms to MZX, xAI, and the hundreds of millions of customers and users who depend on xAI's services and those of other AI providers. The Tulane Road and Stateline computing facilities together comprise the most dense deployment of advanced Graphic Processing Units anywhere in the United States and possibly the world—representing an investment of [redacted] in computing infrastructure. Jacobson Decl. ¶¶ 17–18, 27; Trettel Decl. ¶¶ 4–6, 9. [redacted]. Jacobson Decl. ¶ 26. Shutting down the temporary turbines

before permanent power comes online would deprive those computing facilities of the power needed to run, halting essentially all AI model training, refinement, and development at those sites. *Id.* ¶¶ 23–32. xAI's ability to serve an estimated [redacted] users of Grok would be severely impaired, and the shutdown would create a substantial risk of Grok becoming effectively useless. *Id.* ¶¶ 14, 25, 29–31, 33.

The longer a shutdown lasts, the greater the likelihood that xAI will suffer *permanent* competitive damage, from its AI model falling behind its competitors' models, and will lose customers, at a time when AI models are locked in fierce global competition. *Id.* ¶¶ 27–34. Harms would continue long after a temporary power outage is restored. Data, storage, and training runs could not be accessed during the outage; partially trained models would grow stale; data and hardware would risk corruption from an abrupt loss of power. *Id.* ¶¶ 27–30. Restarting training runs, frozen in time from a shutdown, may not even be possible, and the work done across [redacted] could be permanently lost, requiring starting from scratch. Every frontier AI company releases new models at least every few weeks, as training and refinement is a continual process; models that are not continuously trained become obsolete relative to competitors. *Id.* ¶¶ 13, 20, 28–29. xAI is no exception; [redacted]. *Id.* ¶ 31. Shutting down Stanton Road [redacted]. This description of harms is likely underinclusive: a prolonged, full shutdown of a computing facility of this sort is, to Defendant's knowledge, unprecedented. *Id.* ¶¶ 19, 26, 28.

Nor would the cascading harms end there. A lengthy outage could also lead xAI to lose its highly skilled and specialized workforce, together with local construction contractors and

hundreds of salaried maintenance personnel. Jacobson Decl. ¶¶ 35–38; *see Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (harms to movant in lost jobs and public interest in maintaining jobs weighed against injunction); *W. Watersheds Project v. Salazar*, 692 F.3d 921, 923 (9th Cir. 2012) (lost jobs are "properly . . . weighed against" environmental harms in preliminary-injunction analysis).

Moreover, other AI companies, including Anthropic, Google, and Cursor, use the computing facilities powered by Stanton Road. Jacobson Decl. ¶¶ 22, 32. For example, xAI has contracts to provide computing power to support Anthropic's AI model "Claude," and Google's Gemini AI platform. *Id.* ¶ 22. Because the temporary turbines are currently the only available power source for the Tulane Road and Stateline computing facilities, a forced shutdown would also disrupt these other companies' access to this computing power.

Large language models like Grok also play a critical role in maintaining America's global advantage in AI. Because xAI and other U.S. companies rely on the uniquely large-scale computing infrastructure powered by Stanton Road, a shutdown could erode the U.S. edge over countries like China, with adverse national-security implications. *Id.* ¶¶ 24, 32; *see Save RGV v. Space Expl. Techs. Corp.*, No. 24-cv-00148, 2024 WL 5357188, at *4 (S.D. Tex. Nov. 21, 2024) (injunction could "impact national security by halting" or "delaying" programs "relied on by multiple government agencies").

In sum, shutting down the temporary turbines before permanent power is online would bring xAI's core operations to a standstill, inflict lasting damage, and harm other major companies. Devastating damage to "business operations" and customer relationships is the kind of "severe harm[]" that cuts against injunctive relief. *Optimus Steel LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 726–27 (E.D. Tex. 2020). Plaintiffs' generalized and speculative allegations about

incremental and short-term risks to health are thus vastly outweighed by the certain, catastrophic, and irreparable harms to xAI, MZX, other AI companies, and hundreds of millions of users worldwide. *See id.* at 727; *see also Winter*, 555 U.S. at 23–31.

**B. An injunction would disserve the public interest.**

Plaintiffs' massively disruptive and destructive injunction would ill-serve the public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312; *see Winter*, 555 U.S. at 24–26 (reversing lower courts for "understat[ing]" an "injunction's consequent adverse impact on the public interest"). Plaintiffs thus err in ignoring many countervailing interests and suggesting that enforcing environmental laws, and wielding the Clean Air Act to reduce incremental emissions, always serves the public interest. *See* Doc. 52 at 27.

First, an injunction would frustrate U.S. AI policy by impairing access to critical AI infrastructure. Executive Order 14179 established a national policy "to sustain and enhance America's global AI dominance" to promote "economic competitiveness, and national security." 90 Fed. Reg. 8,741, 8,741 (Jan. 31, 2025). The White House has emphasized that the U.S. "must aggressively adopt AI within its Armed Forces" to "maintain its global military preeminence." WHITE HOUSE, WINNING THE RACE: AMERICA'S AI ACTION PLAN 11 (2025), https://tinyurl.com/6rrx2kbk. Critically, the military uses xAI's tools in service of national defense. *See*, *e.g.*, Press Release, U.S. Dep't of War, The War Department to Expand AI Arsenal on GenAI.mil With xAI (Dec. 22, 2025), https://tinyurl.com/3ek875j9. Defendants' "bring your own power" model aligns with the President's directive that AI companies "build, bring, or buy new generation resources" to avoid straining the public grid. *See* WHITE HOUSE, FACT SHEET: PRESIDENT DONALD J. TRUMP ADVANCES ENERGY AFFORDABILITY WITH THE RATEPAYER PROTECTION PLEDGE (Mar. 4, 2026), https://tinyurl.com/42ced4xp. Shutting down the Stanton

Road turbines, and with them the two nearby computing facilities, would frustrate these national priorities. *See Haig v. Agee*, 453 U.S. 280, 292 (1981); *Save RGV*, 2024 WL 5357188, at *4.

Second, an injunction would disserve the public interest in fair and predictable enforcement of environmental laws. Shutting down Stanton Road would punish MZX and xAI for actions and investment undertaken in reasonable reliance on Mississippi's determination that the portable turbines do not need air permits. The public interest protects "rights guaranteed under the Constitution," including due process. *McMillen v. Itawamba Cnty. Sch. Dist.*, 702 F. Supp. 2d 699, 705 (N.D. Miss. 2010). Plaintiffs' hyperbolic suggestion that Defendants built "personal power plants" without permits "in hopes" of simply paying a penalty later, Doc. 52 at 27, misstates the record. MZX received MDEQ's formal determination that no permit was required to use portable turbines, before bringing any such units to Stanton Road. MZX has kept MDEQ apprised of all additional temporary turbines, all of which satisfy the conditions in the July 2025 letter. MDEQ has consistently maintained its position that no permit is required. Worthington Decl. ¶¶ 6–8, 16. Preliminarily enjoining operation of the portable turbines would undermine the CAA's cooperative federalism scheme, be profoundly inequitable, and disserve the public interest. *See Sierra Club*, 990 F. Supp. 2d at 43 (public interest weighed against enjoining a project that would "cast[] doubt" on the statutory permitting process); *Optimus Steel LLC*, 492 F. Supp. 3d at 727 ("public interest in allowing energy infrastructure to develop").

Third, an injunction would harm Mississippi's sovereign interests. "[A]ny time a State is enjoined by a court from effectuating [its] statutes . . . , it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (applying that principle in injunction context to state executive-branch action). MDEQ determined that these temporary turbines were mobile

sources exempt from preconstruction permitting. Granting Plaintiffs relief would effectively override Mississippi's determination and nullify the state's regulatory action, contrary to the state's prerogative to interpret and enforce its own laws. *See E.T.*, 19 F.4th at 770.

**IV. Any injunction must be conditioned on the NAACP posting bond.**

The motion should be denied. But if the Court contemplates granting relief, it should require Plaintiffs to post bond. An injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); 42 U.S.C. § 7604(d) (applying bond requirement to CAA citizen-suits). Plaintiffs cannot avoid this requirement simply by calling their case "public interest" litigation. Rule 65(c) "not only contains no such exception but also states flatly" that an injunction may issue "only if the movant gives security." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 457 (7th Cir. 2010). A party "is not entitled to a preliminary injunction unless [they] post[] security indemnifying [the enjoined party] against the financial losses it might suffer," and "failure to require the posting of a bond . . . constitutes grounds for reversal of an injunction." *Phillips v. Charles Schreiner Bank*, 894 F.2d 127, 131 (5th Cir. 1990) (cleaned up). An injunction shutting down Stanton Road during pendency of this litigation would inflict annualized financial losses on xAI of approximately [redacted]. Trettel Decl. ¶ 9. And because the full scope of harms to Defendants exceeds even this financial estimate, if the Court is inclined to grant any injunctive relief, it should hold a separate hearing and allow supplemental briefing on the bond amount, before any injunction takes effect.

## CONCLUSION

The Court should deny Plaintiffs' amended motion for a preliminary injunction. If the Court concludes that any preliminary injunctive relief is warranted, it should require a bond commensurate with Defendants' likely losses and harms.

Dated: June 15, 2026

Respectfully submitted,

/s/ Daniel W. Van Horn
Daniel W. Van Horn (MS Bar No. 102105)
BUTLER SNOW LLP
6075 Poplar Ave., Suite 500
Memphis, TN 38187
(901) 680-7331
danny.vanhorn@butlersnow.com

P. Ryan Beckett (MS Bar No. 99524)
Keri E. Herrington (MS Bar No. 106815)
BUTLER SNOW LLP
1020 Highland Colony Pkwy., Suite 1400
Ridgeland, MS 39157
(601) 948-5711
(601) 948-5177
keri.herrington@butlersnow.com
ryan.beckett@butlersnow.com

Patrick D. Traylor* (D.C. Bar No. 449350)
Jeremy C. Marwell* (D.C. Bar No. 1000299)
VINSON & ELKINS LLP
2200 Pennsylvania Ave. NW
Suite 500 West
Washington, D.C. 20037
(202) 639-6500
ptraylor@velaw.com
jmarwell@velaw.com

Michael B. Buschbacher*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW, Suite 900
Washington, D.C. 20006
(202) 955-0620
mbuschbacher@boydengray.com

*Pro Hac Vice*

*Attorneys for X.AI Corp. and MZX Tech LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2026, I filed the foregoing document with the Clerk of the U.S. District Court for the Northern District of Mississippi through the Court's CM/ECF system, which shall send notification of such filing to all parties of record in this case.

*/s/ Daniel W. Van Horn*
Daniel W. Van Horn

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

## PLAINTIFFS' MOTION TO STRIKE UNITED STATES' FILING AS PROCEDURALLY DEFICIENT

In its "Motion for Intervention and Dismissal," the United States asks that this Court allow it "to intervene as a plaintiff and then dismiss this case." *See* Dkt. No. 58. As described in the attending Memorandum in Support of this motion, United States' filings are procedurally deficient because (1) though the Clean Air Act grants a right of intervention to "the Administrator" of the Environmental Protection Agency, there is no indication EPA is participating in this case, and (2) the motion to intervene was not accompanied by a complaint in intervention and did not articulate a claim for relief. Plaintiffs provided the United States the opportunity to correct these deficiencies. Counsel for the United States advised, "[w]e stand by our filings." As such, Plaintiffs ask this Court, pursuant to Federal Rule of Civil Procedure 12(f)(2), to strike the United States' motion and associated memorandum in support (Dkt. Nos. 54 & 55) as procedurally deficient. Should the United States be given the opportunity to file papers correcting these deficiencies, Plaintiffs ask that the United States' intervention effort not delay resolution of the Parties' timely motions.

Dated: July 1, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiff,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'**
**<u>AMENDED MOTION FOR INTERVENTION AND DISMISSAL</u>**

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Legal background ........ 2

B. Factual background ........ 5

C. Procedural background ........ 6

ARGUMENT ........ 7

I. The United States is entitled to intervene in this Clean Air Act citizen suit. ........ 7

II. Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action. ........ 8

A. The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo. ........ 10

B. Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act. ........ 17

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Cases** Pages(s)

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) ........ 3, 4, 21

*Appalachian Power Co. v. EPA.*,
249 F.3d 1032 (D.C. Cir. 2001) ........ 2

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*,
299 F.3d 1007 (9th Cir. 2002) ........ 16

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (5th Cir. 2003) ........ 2

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023), *aff'd*, 602 U.S. 406 (2024) ........ 17

*Citizens for Clean Power v. Indian River Power, LLC*,
636 F. Supp. 2d 351 (D. Del. 2009) ........ 14

*Citizens for Resp. & Ethics in Wash. v. FEC*,
602 U.S. 406 (2024) ........ 17

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) ........ 22

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) ........ 18

*Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*,
718 F.2d 1341 (5th Cir. 1983) ........ 10

*Dubois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) ........ 11

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) ........ 4, 14, 19

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) ........ 4, 11, 14, 16

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) ........ 11, 16, 19, 20

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990)........................................................................................ 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000)............................................................................ 13, 17, 18, 19, 20

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987)................................................................................ 4, 11, 12, 14, 16

*Hamker v. Diamond Shamrock Chem. Co.*,
756 F.2d 392 (5th Cir. 1985).................................................................................. 11, 13

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equipment Inc.*,
434 F.3d 320 (5th Cir. 2005)............................................................................................ 8

*Heckler v. Chaney*,
470 U.S. 821 (1985)......................................................................................... 9, 12, 14

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013)................................................................................. 18, 22

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)...................................................................................................... 17

*Karr v. Hefner*,
475 F.3d 1192 (10th Cir. 2007)............................................................................... 14, 15

*Marcaida v. Rascoe*,
569 F.2d 828 (5th Cir. 1978).......................................................................................... 10

*Merrick v. Diageo Ams. Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015)............................................................................................ 4

*Montgomery Env't Coal. v. Costle*,
646 F.2d 595 (D.C. Cir. 1981).......................................................................................... 4

*NRDC, Inc. v. Train*,
510 F.2d 692 (D.C. Cir. 1974)........................................................................................ 12

*Residents of Gordon Plaza, Inc. v. Cantrell*,
25 F.4th 288 (5th Cir. 2022)............................................................................................. 4

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001).................................................................................. 20, 21

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020)............................................................................................ 18, 19, 23

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 23

*Stringer v. Town of Jonesboro*,
986 F.3d 502 (5th Cir. 2021) .......... 14

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.*,
973 F.2d 1320 (7th Cir. 1992) .......... 15, 17

*Tex. Workforce Comm'n v. U.S. Dep't of Educ.*,
973 F.3d 383 (5th Cir. 2020) .......... 12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 22

*Trump v. United States*,
603 U.S. 593 (2024) .......... 18

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) .......... 8, 9, 24

*United States v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) .......... 11

*United States v. Ford Motor*,
814 F.2d 1099 (6th Cir. 1987) .......... 3

*United States v. Hansen*,
599 U.S. 762 (2023) .......... 17

*United States v. Jones*,
109 U.S. 513 (1883) .......... 21

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 3

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 3

**Statutes**

15 U.S.C. § 15 .......... 22

15 U.S.C. § 15(a) .......... 22

16 U.S.C. § 1540(g) .......... 4

31 U.S.C. § 3730 .......... 20
31 U.S.C. § 3730(c)(2)(A) .......... 20
33 U.S.C. § 1365 .......... 4
42 U.S.C. § 2000e-5(f) .......... 22
42 U.S.C. § 2000e-5(g)(1) .......... 22
42 U.S.C. § 6972 .......... 4
42 U.S.C. § 7401 *et seq.* .......... 2
42 U.S.C. § 7401(a)(3) .......... 21
42 U.S.C. § 7408 .......... 2
42 U.S.C. § 7409 .......... 2
42 U.S.C. § 7410 .......... 2
42 U.S.C. § 7410(a) .......... 21
42 U.S.C. § 7410(a)(1) .......... 3
42 U.S.C. § 7410(a)(2)(C) .......... 3
42 U.S.C. § 7410(k) .......... 21
42 U.S.C. § 7412 .......... 3
42 U.S.C. § 7412(i)(1) .......... 3
42 U.S.C. § 7412(*l*)(1) .......... 4
42 U.S.C. § 7412(*l*)(7) .......... 4
42 U.S.C. § 7413 .......... 3
42 U.S.C. § 7413(a) .......... 4
42 U.S.C. § 7413(a)(1) .......... 4
42 U.S.C. § 7413(a)(1)-(3) .......... 11

42 U.S.C. § 7413(b) .......... 4, 11

42 U.S.C. § 7413(c) .......... 4

42 U.S.C. § 7414 .......... 3

42 U.S.C. §§ 7470-7492 .......... 3

42 U.S.C. § 7477 .......... 4

42 U.S.C. § 7604 .......... 4

42 U.S.C. § 7604(a) .......... 5

42 U.S.C. § 7604(a)(1)-(3) .......... 5

42 U.S.C. § 7604(a)(3) .......... 5

42 U.S.C. § 7604(b)(1) .......... 13

42 U.S.C. § 7604(b)(1)(A) .......... 5

42 U.S.C. § 7604(b)(1)(B) .......... 5, 22

42 U.S.C. § 7604(c)(2) .......... 1, 5, 7, 10

42 U.S.C. § 7604(c)(3) .......... 5, 13

42 U.S.C. § 7604(g) .......... 23

42 U.S.C. § 7604(g)(1) .......... 5

42 U.S.C. § 7604(g)(2) .......... 23

42 U.S.C. § 9659 .......... 4

**Rules**

Fed. R. Civ. P. 24(a)(1) .......... 1

Fed. R. Civ. P. 41(a) .......... 22

Fed. R. Civ. P. 41(a)(1)(A)(i) .......... 1

Fed. R. Civ. P. 41(a)(1) .......... 8

Case: 3:26-cv-00074-DMB-JMV Doc #: 86 Filed: 06/07/26 8 of 33 PageID #: 2231

**Regulations**


40 C.F.R. §§ 63.6080–63.6175 .......... 3

11 Miss. Admin. Code Pt. 2, R. 2.1 (2024) .......... 2

11 Miss. Admin. Code Pt. 2, R. 5.2 (2024) .......... 2


**Other Authorities**


U.S. Constitution, Art. II, § 1 Cl. 1 & § 3 .......... 17, 18

S. Rep. No. 91-1196 (1970) .......... 15, 16

131 Cong. Rec. 6738 (1985) .......... 13

*Declaring a National Energy Emergency*
Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) .......... 8

*Removing Barriers to American Leadership in Artificial Intelligence*
Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025) .......... 8

Michael S. Greve, *The Private Enforcement of Environmental Law*,
65 Tulane L. Rev. 339 (1990) .......... 20

## INTRODUCTION

Through a citizen suit under the Clean Air Act, Plaintiffs NAACP and NAACP Mississippi State Conference (collectively, NAACP) seek to enforce federal law by obtaining civil penalties payable solely to the United States Treasury. In doing so, the NAACP threatens American national, economic, and energy security by seeking to shut off the power supply for artificial-intelligence innovation that supports the Department of War's military operations.

The power to execute federal law, however, belongs to the Executive Branch. Accordingly, the Clean Air Act affords the United States primacy over citizen-enforcers when it comes to enforcement discretion—as Article II of the Constitution mandates. The United States, acting on behalf of the Administrator of the U.S. Environmental Protection Agency, Lee M. Zeldin (together, the United States), thus moves to intervene in this Clean Air Act citizen suit as a plaintiff to inform the Court of the government's objection to this suit and request dismissal, pursuant to Rules 24(a)(1) and 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure.

There is no question the United States is entitled to intervene. A court shall grant intervention when a party has "an unconditional right to intervene," Fed. R. Civ. P. 24(a)(1), and the Clean Air Act mandates that the United States "may intervene as a matter of right at any time" in a citizen suit, 42 U.S.C. § 7604(c)(2).

The United States is equally entitled to dismiss this case. The NAACP may not pursue this Clean Air Act enforcement action over the United States' objection. The United States' statutory right to intervention encompasses the right to dismiss this case because, relative to citizen-enforcers like the NAACP, the statute affords the United States primacy over when and how the statute should be enforced. Article II of the Constitution also counsels in favor of that construction of the Clean Air Act by vesting the power to seek civil penalties on behalf of the United

States conclusively and preclusively in the Executive Branch. That includes the discretion to decide when such an enforcement action is unwarranted or inconsistent with federal enforcement priorities, and an interpretation that undermines that discretion would raise serious Article II concerns.

Accordingly, this Court should allow the United States to intervene as a plaintiff and then dismiss this case.

## BACKGROUND

### A. Legal background

The Clean Air Act sets out a comprehensive program for regulating emissions of air pollutants. *See* 42 U.S.C. § 7401 *et seq*. The United States, through the Environmental Protection Agency (EPA), exercises broad powers to administer the Act. *See BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). States likewise perform a coordinate role. *Id.* To start, we briefly describe the complex Clean Air Act programs that the NAACP seeks to enforce in this lawsuit. *See* Dkt. No. 1 at 38-42. We next describe the statute's enforcement mechanisms.

**1.** The NAACP's claims (*id.* at 38-41) relate to national ambient air-quality standards that EPA adopts as needed to protect public health and welfare. 42 U.S.C. §§ 7408, 7409. States adopt implementation plans (referred to as SIPs) to maintain EPA's standards within their borders, subject to EPA approval and oversight authority. *Id.* § 7410. SIPs may also "be revised at the EPA's insistence if found to be inadequate to ensure maintenance of the [national standards] or public health." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001).

Mississippi has an EPA-approved SIP that includes provisions to carry out the Clean Air Act's prevention of significant deterioration (PSD) program. *See* 11 Miss. Admin. Code Pt. 2,

Rs. 2.1, 5.2 (2024). The SIP and PSD programs require various permits before building or modifying certain stationary emission sources, plus monitoring as necessary to ensure continued compliance. *Id.* Rs. 2.1(D), 2.5(D); 42 U.S.C. §§ 7470-7492; *see Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308-09 (2014) (describing the PSD program).

The NAACP also alleges, Dkt. No. 1 at 41-42, violations of the Act's regulatory program for hazardous pollutants, which targets certain emissions that can be toxic to human health. 42 U.S.C. § 7412; *see West Virginia v. EPA*, 597 U.S. 697, 707-08 (2022) (describing that program). The hazardous-pollutant program, similar to the SIP and PSD programs, requires federal or state approval before building new major sources of the covered pollutants. 42 U.S.C. § 7412(i)(1). For certain stationary combustion turbines regulated under this program, EPA regulations set out emission limits and, again, impose monitoring, reporting, and recordkeeping requirements to ensure compliance. 40 C.F.R. §§ 63.6080-63.6175.

**2.** Investigating and enforcing compliance with these regulatory programs is the work of the federal and state regulators. As for state enforcement, under the statute's cooperative-federalism scheme, SIPs must provide for enforcement, including as to the modification or construction of new stationary sources. 42 U.S.C. § 7410(a)(1), (2)(C). "Although it is clear that the Clean Air Act contemplates very significant participation in air pollution control by state air pollution control agencies, it is equally clear that the final authority is vested in [EPA]." *United States v. Ford Motor Co.*, 814 F.2d 1099, 1102 (6th Cir. 1987). That is because the United States retains "broad oversight" and independent enforcement authority. *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 468, 485 (2004) (*ADEC*); *see*, *e.g.*, 42 U.S.C. §§ 7413, 7414 (outlining federal investigative and enforcement powers).

For example, EPA has independent authority to enforce SIP requirements, such as through administrative orders, prescribing an administrative penalty, or filing a civil enforcement action for civil penalties or injunctive relief. 42 U.S.C. § 7413(a)(1), (b). EPA has similar authority when it "finds that a State is not complying with a [Clean Air Act] requirement governing construction of a pollutant source." *ADEC*, 540 U.S. at 468 (citing 42 U.S.C. § 7413(a)). Section 7477, "[d]irected specifically to the PSD program," provides that EPA can "take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction" of noncompliant facilities. *Id.* at 468-69 (quoting 42 U.S.C. § 7477). In addition to these provisions, the statute specifically reserves federal enforcement authority regarding hazardous pollutants, even where states have their own implementation program for such pollutants (which, again, must be EPA approved). 42 U.S.C. § 7412(*l*)(1), (7). Certain statutory violations also carry federal criminal sanctions. *Id.* § 7413(c).

To "supplement rather than to supplant" federal and state enforcement discretion, the Clean Air Act also includes a "citizen suit" provision. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987); 42 U.S.C. § 7604.[1] This provision enlists the aid of so-called "private attorneys general" to enforce the statute where government authorities purportedly "fail" to exercise enforcement responsibility. *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461,

---

[1] Other major federal environmental laws with citizen-suit provisions include the Clean Water Act, 33 U.S.C. § 1365, Endangered Species Act, 16 U.S.C. § 1540(g), Resource Conservation and Recovery Act, 42 U.S.C. § 6972, and Comprehensive Environmental Response, Compensation, and Liability Act, *id.* § 9659, among others. Those provisions are similar to the Clean Air Act's provisions, so precedent and context regarding other environmental citizen-suit provisions are "persuasive" here. *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act"); *see, e.g.*, *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 301 (5th Cir. 2022); *Montgomery Env't Coal. v. Costle*, 646 F.2d 595, 597 (D.C. Cir. 1981).

475-77 (6th Cir. 2004) (explaining Clean Air Act citizen suits' "interstitial" enforcement role). Private parties may "commence a civil action" to enforce the Act in three circumstances: (1) against persons for violations of emissions standards or limits, (2) against EPA for alleged failures to perform nondiscretionary duties, and (3) against persons for violations of permitting requirements. 42 U.S.C. § 7604(a)(1)-(3). In actions against private parties under subsections (a)(1) and (3), a court may order civil penalties payable to the United States Treasury, an injunction requiring compliance, or both. *Id.* § 7604(a), (g)(1).

Given private citizens' secondary enforcement role, the citizen-suit provision includes several procedural constraints designed to protect federal enforcement and policy interests. Upon filing *any* citizen suit, for example, the citizen "shall serve a copy of the complaint" on the U.S. Attorney General and EPA. *Id.* § 7604(c)(3). "[I]f not a party," the United States "may intervene as a matter of right at any time in the proceeding." *Id.* § 7604(c)(2). For subsection (a)(1) actions, specifically, the citizen must notify EPA, the relevant state, and the alleged violator 60 days before filing suit. *Id.* § 7604(b)(1)(A). EPA (or a state) may preclude the citizen's intended enforcement action by filing its own and "diligently prosecuting" that action. *Id.* § 7604(b)(1)(B).

**B. Factual background**

This case concerns how Defendants xAI and MZX Tech LLC (collectively, xAI) use temporary, gas-fired turbines to power data centers that support the Grok artificial-intelligence platform. Dkt. No. 1 ¶ 6; Dkt. No. 52 at 4-6. The Mississippi Department of Environmental Quality determined that the State's SIP did not require Clean Air Act permits for the turbines that help power Grok. Dkt. No. 1-2 at 5.

Grok's continued operation and availability "is a matter of paramount national security" for the reasons detailed in the attached declaration of Cameron Stanley, the Department of War's Chief Digital and Artificial Intelligence Officer (CDAO). Ex. A ¶ 8. Grok is "one of only four proprietary state-of-the-art" AI models that can support "national security applications," and "one of just three" suitable to support "mission-critical operations across Secret and Top-Secret classified networks." *Id.* ¶ 4. The Department specifically relies on xAI's "Grok Gov Model," which offers features "found in no other frontier AI model." *Id.* ¶ 5. For example, during Operation Epic Fury, Grok (through the Department's Maven Smart Systems) "enabled U.S. forces to deploy over 2,000 munitions to 2,000 distinct targets within 96 hours . . . , a testament to the greatly increased operational efficiency made possible by the Grok Gov Model." *Id.* ¶ 6. "If Grok Gov Model cannot be deployed, refined, and upgraded" across the Department to support future operations, "due to either limitations in energy supply or limited reserve compute capability, such as those requested by [the NAACP] in this matter," that would "severely impact[]" "many tools" used by the Department's military and civilian personnel. *Id.* ¶ 10.

The State of Mississippi has similarly determined that continued operation of xAI's data centers and turbines serves the State's interests. Ex. B. If the NAACP successfully shuts down xAI's turbines through this civil enforcement action, the State explained, that "would create an immediate and substantial disruption to the State's economy" and "disrupt the Clean Air Act's delicate balance of cooperative Federalism." *Id.*

### C. Procedural background

The NAACP filed this Clean Air Act citizen suit on April 14, 2026. Dkt. No. 1. The complaint alleges that xAI is violating Mississippi's SIP, the PSD program, and EPA's hazardous-pollutant regulations because the gas-fired turbines lack certain permits and approvals, and

are allegedly not complying with emissions limits, employing certain pollution controls, or monitoring, reporting, and keeping records as necessary to ensure continued compliance. *E.g.*, *id.* ¶¶ 103, 112, 116, 226-227, 231, 251. Although the state agency determined that the SIP does not require permits for the turbines and has declined any enforcement, the NAACP disagrees with that determination. *Id.* ¶¶ 179-191. As relief, the NAACP seeks steep civil penalties—payable to the United States treasury—of $124,426 per day of violation, plus injunctive relief ordering xAI to stop operating its turbines "unless and until [xAI] obtain[s] the required permits," employ certain pollution controls allegedly mandated by the Clean Air Act, and take other mitigating measures. *Id.* ¶ 12; *id.* at 42.

On May 6, 2026, the NAACP moved to preliminarily enjoin xAI from operating the turbines that power xAI's data centers. Dkt. No. 20; *see also* Dkt. Nos. 51, 52. On May 13, 2026, the Court held a status conference. Dkt. No. 36. Prior to the status conference, the United States filed a notice informing the Court that the United States "is evaluating possible intervention or amicus participation in this lawsuit." Dkt. No. 35 at 1. As a result, the Court entered a briefing schedule ordering (1) xAI to respond to the preliminary injunction motion and to file any motion to dismiss by June 15, 2026, and (2) the United States to file any intervention or substantive motion also by June 15. Dkt. No. 40. On May 26, 2026, the Court scheduled an evidentiary hearing on the NAACP's preliminary-injunction motion for August 24, 2026. Dkt. No. 42.

## ARGUMENT

### I. The United States is entitled to intervene in this Clean Air Act citizen suit.

The Clean Air Act provides that the Administrator of EPA "may intervene as a matter of right at any time" in a citizen-suit proceeding. 42 U.S.C. § 7604(c)(2). Because the United States is acting on behalf of the EPA, the United States is entitled to intervene.

### II. Consistent with the role of Executive Power under Article II of the Constitution, the United States' right to intervene includes a right to dismiss this entire enforcement action.

The United States moves to dismiss the NAACP's complaint and is entitled to do so under Federal Rule of Civil Procedure 41(a)(1). That rule provides an "absolute right" to dismiss this action because xAI has not yet filed an answer or motion for summary judgment. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d 320, 324 (5th Cir. 2005); *cf. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023).

In its prosecutorial discretion, the United States, through the Department of Justice, has determined that dismissal of this civil enforcement action accords with federal policy, national security, and the public interest. Pertinent federal policies include the President's determination that expansion of our energy infrastructure is "an immediate and pressing priority" for our national and economic security. Exec. Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025). The President has also determined that "[i]t is the policy of the United States to sustain and enhance America's global AI dominance in order to promote human flourishing, economic competitiveness, and national security." Exec. Order No. 14179, 90 Fed. Reg. 8741 (Jan. 23, 2025). Similarly, the President's June 5, 2026, National Security Presidential Memorandum explained that "[p]revious administrations imposed undue bureaucracy that hampered the pace of AI adoption, fostered dangerous dependencies on single vendors, and made it challenging for our warfighters

to adopt the most advanced technologies." NSPM-11 (https://perma.cc/TV5X-F3VU). And supporting the Nation's artificial-intelligence capabilities is a pillar of the EPA Administrator's "Powering the Great American Comeback" initiative.[2]

The claims pressed and the relief sought by the NAACP's complaint threaten artificial-intelligence innovation, plus the energy needed to power it. The NAACP's attempt to cut off the power that supports Grok also threatens national security because, for the reasons expressed in CDAO Stanley's declaration, Grok provides critical support for the Department of War's military operations. Ex. A. For its part, the State of Mississippi—the Clean Air Act's other primary enforcer on this case's facts—agrees with the United States' determination that the NAACP's attempted enforcement is unwarranted and opposes this citizen suit. Ex. B.

To be clear, the United States' reasons for *why* the NAACP's attempted enforcement action is irreconcilable with federal policy do not dictate whether this Court should dismiss this case. Where "Rule 41 entitles the movant to a dismissal," a "district court has no adjudicatory role." *Polansky*, 599 U.S. at 436 n.4. In this context—where the United States is dismissing an enforcement action—reviewing the government's reasons for dismissal would also be inconsistent with the principle that federal "decisions to refuse enforcement" are "unsuitab[le]" for judicial review. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The dispositive point is that the United States seeks to exercise its preclusive enforcement discretion to dismiss this lawsuit in its entirety.

---

[2] *See* EPA Administrator Lee Zeldin Announces EPA's "Powering the Great American Comeback" Initiative (Feb. 4, 2025) (https://perma.cc/B8RX-YS3F). EPA has also reiterated that "enforcement activities must properly consider Executive Orders." Memorandum from the Acting Assistant Administrator, EPA Office of Enforcement and Compliance Assurance (Dec. 5, 2025) (https://perma.cc/PVM3-RSLM).

Nor does it make any difference whether NAACP objects to dismissal. The United States' express and unconditional right to intervene in this citizen suit necessarily includes the right to unilaterally dismiss the case in its entirety. That is true for two reasons. First, permitting the NAACP to pursue this Clean Air Act enforcement action seeking civil monetary penalties payable exclusively to the United States over the United States' objection is irreconcilable with the statute's assignment of enforcement authority. Second, interpreting the Clean Air Act to allow the enforcement action to proceed over the United States' objection would give rise to significant questions under the Vesting and Take Care Clauses in Article II of the Constitution. By contrast, interpreting the United States' intervention right as including the right to dismiss would avoid grave doubts about the citizen-suit provision's constitutionality.

### A. The Clean Air Act does not authorize citizen-enforcement actions that seek relief the governmental enforcers choose to forgo.

The United States' statutory "right" to intervene "at any time" in citizen suits includes the right to dismissal. 42 U.S.C. § 7604(c)(2). When a party intervenes as a matter of right, it is afforded the status of an original party. *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978). That status, in turn, means that the United States' statutory intervention right necessarily encompasses other procedural rights that are inherent in "fully" litigating a matter. *Donovan v. Oil, Chem., & Atomic Workers Int'l Union & Its Loc. 4-23*, 718 F.2d 1341, 1350-51 (5th Cir. 1983). In the specific context at issue here—where the Clean Air Act entitles the United States to intervene so that the government can protect federal policy interests from private enforcers' conflicting interests—the United States' procedural rights must be interpreted to include the right to dismiss the citizen suit.

The Clean Air Act's structure and allocation of enforcement authority confirm that interpretation. Nothing in the statute suggests that Congress, when enacting the citizen-suit provision, deputized citizens to "commandeer the federal enforcement machinery," especially where the United States has determined that a citizen's suit would not serve the public interest. *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987) (rejecting view that citizen-suit provisions' purpose is to "giv[e] the 'little guy' access to enforcement power of the federal government" (citation omitted)). Instead, statutory structure and precedent establish that the United States' enforcement prerogatives supersede those of citizen-enforcers. That means "the statute authorizes citizen suits only with the consent of governing authorities." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 375 n.32 (5th Cir. 2024) (en banc) (Jones, J., dissenting). And citizens may not seek relief that government enforcers deliberately choose "to forgo." *Gwaltney*, 484 U.S. at 61.

**1.** The Clean Air Act vests "primary enforcement authority" in the United States, along with state regulators—not private parties. *Env't Conservation Org.*, 529 F.3d at 528 (discussing the Clean Water Act's materially similar division of authority); *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 288-89 (3d Cir. 2013) ("primary enforcers"). The United States enjoys wide discretion in deciding how aggressively to induce statutory compliance in light of its policy priorities—whether, for example, issuing an EPA administrative compliance order, displacing state implementation decisions found to be inadequate, or filing a civil action for civil penalties and injunctive relief. 42 U.S.C. § 7413(a)(1)-(3), (b); *see Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 395 (5th Cir. 1985) (interpreting materially similar Clean

Water Act provisions to conclude that the federal government "plays the central role" in "enforcement"). And, as outlined above, the United States retains independent oversight and enforcement authority even as the statute also provides for state participation.

This discretion allows the United States to tailor remedies to the particular facts and achieve the desired level of deterrence. The federal government's decisions not to enforce "often involve[] a complicated balancing of a number of factors which are peculiarly within its expertise," such as how "the particular enforcement action" "best fits the [government]'s overall policies." *Heckler*, 470 U.S. at 831. Allowing this citizen suit to proceed over the United States' objection would enable citizen-enforcers to marshal federal enforcement machinery—complete with penalties payable to the United States Treasury—without regard for the suit's impacts on federal interests and its implications beyond this case.

Congress did not contemplate that result. Where, as here, the United States has determined a citizen's attempted civil enforcement action is inconsistent with federal policy and the public interest, the United States' primary enforcement role entitles it to dismissal. Any contrary interpretation of the citizen-suit provision would allow citizens to curtail the United States' considered enforcement discretion and transform "citizens' role from interstitial" to "intrusive." *Gwaltney*, 484 U.S. at 61. Declining to dismiss this action would also render ineffective the express procedural constraints Congress enacted to protect against "the obvious danger [of] unlimited public actions" and confine citizen suits to their interstitial, secondary role. *NRDC, Inc. v. Train*, 510 F.2d 692, 700 (D.C. Cir. 1974); *see Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (an "interpretation that furthers rather than obstructs the [text]'s purpose should be favored").

Those constraints include the United States' unconditional right to notice of any citizen-suit complaint upon filing, its right to 60-days' notice before filing any complaint alleging violations of emission standards or limitations, and its entitlement to intervene "as a matter of right at any time." 42 U.S.C. § 7604(b)(1), (c)(2), (3). Congress even provided an additional notice-and-intervention mechanism when there is a proposed consent judgment between private parties and alleged violators, forbidding a court from adopting such a judgment without affording the United States an opportunity to review it. *Id.* § 7604(c)(3). This set of notice-and-intervention requirements "strongly indicates" that federal officials are "of central importance in the enforcement of the Act" and "highlights their primary role." *Hamker*, 756 F.2d at 395-96. In fact, the requirements were designed in part for the precise situation here—to facilitate the United States' opposition to citizen suits that are inconsistent with federal policy. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 188 n.4 (2000) ("if the Executive Branch opposes a particular citizen suit," the United States may intervene to "bring the Government's views to the attention of the court"); 131 Cong. Rec. 6738 (1985) (service of a citizen-suit complaint on the United States protects the government's ability to "point out to a court where some ruling or decree would be inconsistent with the government's enforcement program"). Through this motion, the United States does just that.

Reinforcing the federal government's preeminent enforcement discretion, Congress expressly envisioned that the United States could preclude citizen-enforcement actions. Section 7604(b)(1) allows the United States, upon receiving 60-days' notice of a subsection (a)(1) citizen suit, to displace any planned citizen action by filing a federal civil action and "diligently prosecuting" that action. 42 U.S.C. § 7604(b)(1) The "diligent prosecution" bar allows the United States to chart its own course in enforcement, including in circumstances where the

United States determines that a pre-citizen suit settlement agreement is appropriate. *See Karr v. Hefner*, 475 F.3d 1192, 1194-95, 1197-98 (10th Cir. 2007); *Citizens for Clean Power v. Indian River Power, LLC*, 636 F. Supp. 2d 351, 354-58 (D. Del. 2009). Any other interpretation would grossly intrude on core prosecutorial functions of the Executive Branch, as explained below. *Infra* Part II.B. Thus, the diligent-prosecution bar reinforces, rather than divests, the United States' inherent discretion to decide the statute should not be enforced in a particular case. *Cf. Heckler*, 470 U.S. at 831-32. Like the notice-and-intervention provisions, the diligent-prosecution bar "confirm[s] the supplemental role of citizen suits." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 506 (5th Cir. 2021).

**2.** Numerous courts have recognized that the federal government's enforcement prerogatives carry the day over citizens' contrary enforcement preferences. In *Gwaltney*, for example, the Supreme Court stressed the "danger" of allowing citizens to supplant federal enforcement decisions in the materially similar Clean Water Act context: "Suppose that the [EPA] Administrator identified a violator" of the statute and "issued a compliance order," but "agreed not to assess or otherwise seek civil penalties." 484 U.S. at 60-61. Allowing citizens to seek the relief that the United States "chose to forgo," the Court explained, would "curtail[] considerably" the government's "discretion to enforce the Act in the public interest." *Id.* at 61.

Following *Gwaltney*'s lead, the Fifth Circuit and other courts have stressed the primacy of the United States' enforcement discretion when citizen enforcers seek remedies beyond what the government deems proper. *See*, *e.g.*, *Env't Conservation Org.*, 529 F.3d at 528 (concluding that citizen suit was moot because, after it was filed, EPA induced compliance, and allowing the citizens to seek additional relief "would effectively cede primary enforcement authority" to citizens); *Ellis*, 390 F.3d at 477 (reasoning that citizens' desired relief, "more stringent" than what

EPA obtained, would inappropriately "second-guess[]" EPA's "assessment of an appropriate remedy"); *EPA v. City of Green Forest*, 921 F.2d 1394, 1403 (8th Cir. 1990) (concluding that consent decree "in a later-filed EPA action" precluded "citizens' claims brought prior to [the] government action"); *Karr*, 475 F.3d at 1197 (emphasizing how diligent prosecution need not "be far-reaching or zealous," "[n]or must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff"); *cf. Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1324 (7th Cir. 1992) (rejecting argument that the United States does not diligently prosecute an action where "it does not sue the persons, or use the theories, the private plaintiff prefers" because that argument "would strip EPA of the control the [Resource Conservation and Recovery Act] provides").

The intrusion of allowing this action to proceed over the United States' objection would be no less significant. If anything, the intrusion would be more pronounced than the circumstances that the Supreme Court considered in *Gwaltney* and those addressed by other courts. Here, the United States does not simply prefer less stringent enforcement than the private enforcers. Rather, the United States has determined that *no* relief sought by this civil enforcement action—for any civil penalty or any type of injunctive relief to shutdown xAI's turbines—is consistent with federal policy and the public interest. To the contrary, any such relief would be highly detrimental to both. Allowing the NAACP to substitute its enforcement decision—that subjecting xAI to civil litigation to impose civil penalties and an injunction to shut down the turbines *is* warranted—impermissibly overrides the government's discretion to decide when and how enforcing the Clean Air Act against a particular defendant for a particular activity is contrary to the public interest. *Cf.* S. Rep. No. 91-1196, at 37 (1970) (stressing that Clean Air Act citizen suits should not yield "inconsistent" federal policy).

Accordingly, any suggestion that this suit should go forward *because* the federal and state governments are declining to enforce gets things backwards. *See* Dkt. No. 52 at 13 (citing a description of citizen suits' "purpose" from *Association to Protect Hammersley, Eld, & Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007, 1011-12 (9th Cir. 2002)). The Clean Air Act's citizen-suit provision does not allow private enforcement in each and every case where governmental actors decline to enforce. *See* S. Rep. No. 91-1196, at 37 (recognizing there may be situations where "the agency had not initiated abatement proceedings" but "courts would be expected to consider [the citizen suit] against the background of the agency action" and order "dismissal"). Citizen suits "are proper only 'if the Federal, State, and local agencies *fail* to exercise their enforcement responsibility.'" *Env't Conservation Org.*, 529 F.3d at 528 (emphasis added) (quoting *Gwaltney*, 484 U.S. at 60).

Here, the United States is not "fail[ing]" to exercise its enforcement responsibility. Instead, the United States has considered this civil-enforcement action in light of Executive Branch policy, found the action contrary to the public interest, and intervened to inform the Court of that determination. Even more, the Clean Air Act's statutory process was carried out: the State of Mississippi reviewed xAI's notice last year in light of its own SIP's permitting provisions and agrees with the United States' enforcement determination. Ex. B. Because citizens are "not permitted to upset the primary enforcement role" of the United States, *Env't Conservation Org.*, 529 F.3d at 531, the United States' determination is controlling, *see ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).

* * *

In short, the Clean Air Act's citizen-suit provision "belongs to a genre common to environmental laws under which citizen suits serve as goads to both the EPA and polluters without

displacing the federal agency as the principal enforcer." *Heritage Grp.*, 973 F.2d at 1324. Allowing this action to proceed over the United States' objection would essentially cede principal enforcement authority to the NAACP. The Clean Air Act does not contemplate, let alone require, that result. The citizen-suit provision's authorization for federal intervention must be interpreted to include the right to dismiss the case.

### B. Dismissal is required to avoid serious constitutional questions arising from the alternative interpretation of the Clean Air Act.

Article II commits Executive enforcement power to the President: "The executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 1 Cl. 1 & § 3. But interpreting the Clean Air Act to authorize citizen enforcement actions that seek civil penalties payable to the United States over the United States' objection would "deprive[]" the United States of "discretion to decide that a given violation" (assuming any occurred) "should not be the object of suit at all." *Laidlaw*, 528 U.S. at 210 (Scalia, J., dissenting). That would be "constitutionally bizarre." *Id*. Because interpreting the Clean Air Act's federal intervention right to entitle the United States to dismissal is consistent with the statute's structure and avoids that serious Article II concern, that interpretation should be favored.

When a statute and the Constitution "brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). To that end, the "well-established" canon of constitutional avoidance counsels that courts should not adopt a statutory interpretation—even if "otherwise acceptable"—that "would raise serious constitutional problems." *Cargill v. Garland*, 57 F.4th 447, 471 (5th Cir. 2023) (en banc) (citation omitted), *aff'd*, 602 U.S. 406 (2024). In other words, courts must "shun" interpretations that raise "serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

The constitutional concerns with allowing the suit to proceed over the United States' objection are significant. Under Article II, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, §§ 1, 3). The President's power to faithfully execute the law includes "[t]he Presidential power of prosecutorial discretion" and, in turn, the "*unilateral* power[]" "not to seek charges against violators of a federal law." *In re Aiken County*, 725 F.3d 255, 262-64 (D.C. Cir. 2013) (Kavanaugh, J.). And because "prosecutorial decision-making" is a "special province of the Executive Branch," it "implicates conclusive and preclusive" authority, *Trump v. United States*, 603 U.S. 593, 620-21 (2024) (marks omitted), regarding both criminal and "[c]ivil enforcement actions," *Citizens for Resp. & Ethics in Wash. v. FEC*, 993 F.3d 880, 888 (D.C. Cir. 2021). Indeed, "[l]ike the decision not to prosecute in criminal cases," "[c]ivil enforcement actions are presumptively committed to the agency's discretion" and cannot be second-guessed by courts, much less private citizens. *Id.*

In light of Article II's commitment of federal enforcement power to the Executive, several Supreme Court Justices have identified "[d]ifficult and fundamental questions" about whether citizen-suit provisions impermissibly transfer Executive enforcement discretion to private parties. *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring); *see also id.* at 209-10 (Scalia, J., joined by Thomas, J., dissenting); *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). So too have many Fifth Circuit judges. In a case brought under

Case: 26-60806 Document: 37 Page: 315 Date Filed: 10/16/2026

the Clean Air Act's citizen-suit provision, Judge Jones—joined by seven other judges—recognized citizen suits' "potential to usurp the Executive Branch's principal prosecutorial responsibility." *ExxonMobil*, 123 F.4th at 375 n.32 (Jones, J., dissenting).[3]

The NAACP's civil enforcement action illustrates why those concerns are well founded. "As a starting point, it is well to remember that the Clean Air Act primarily serves public, not private, interests," and thus "[c]itizens acting as 'private attorneys general' . . . seek relief not on their own behalf but on behalf of society as a whole." *Ellis*, 390 F.3d at 477. Permitting the NAACP to seek civil penalties payable to the United States on terms to which the United States objects raises serious concerns under Article II. Punishing unlawful conduct through civil penalties payable to the Treasury on behalf of the United States is "a quintessentially executive power." *Seila Law*, 591 U.S. at 219. The NAACP's complaint asks this Court to impose staggering penalties necessarily payable to the Treasury—relief that does not meaningfully differ from a civil enforcement action brought on behalf of the United States, and that bears only the most attenuated relationship, if any, to the plaintiff's own asserted injuries. Dkt. No. 1 ¶¶ 229, 246, 255. It is highly doubtful that the NAACP's attempted "exaction[] of public fines" over federal opposition is "permissible in view of the responsibilities committed to the Executive by Article II." *Laidlaw*, 528 U.S. at 197 (Kennedy, J., concurring).[4]

---

[3] Judge Davis, joined by six other judges, disagreed that the *ExxonMobil* citizen suit posed an Article II concern for "three main reasons": (1) the Clean Air Act "sets clear limits . . . to ensure that [citizens] do not overstep their role," (2) the United States "support[ed]" the citizen suit, and (3) Congress desired citizen enforcement. *See* 123 F.4th at 342-44. The second key factor—the United States' support—is absent here.

[4] This Court, of course, is bound by *Laidlaw*'s holding that civil penalties payable to the U.S. Treasury can redress private injuries by deterring future violations, but the United States expressly preserves the argument for future appellate proceedings that that holding was incorrect for the reasons stated in Justice Scalia's dissent. In the interim, this Court need not and should not exacerbate that error by extending *Laidlaw*'s flawed reasoning on a question of Article III redressability into the distinct context of Article II.

There is no Founding-era evidence showing a history or tradition of citizens exercising this type of enforcement power. *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752-53 (5th Cir. 2001) (en banc) (explaining how Founding-era acceptance of qui tam actions was "certainly a touchstone illuminating" their consistency with Article II (marks and citation omitted)). That is because civil penalties payable only to the United States Treasury "do[] not provide a mechanism for individual relief in any traditional sense," even assuming those penalties indirectly provide "some incidental benefit to the plaintiff." *Laidlaw*, 528 U.S. at 204, 209 (Scalia, J., dissenting); *see also ExxonMobil*, 123 F.4th at 396 n.3 (Oldham, J., dissenting) (highlighting similar concerns as to the Clean Air Act). The "traditional business of Anglo-American courts is relief specifically tailored to the plaintiff's injury," but a civil penalty is "a public fine diverted to a private interest." *Laidlaw*, 528 U.S. at 204, 209-10 (Scalia, J., dissenting). Allowing the NAACP to seek those penalties "without meaningful public control" is thus tantamount to making the organization "a self-appointed mini-EPA." *Id.* at 209-10; *see also* Michael S. Greve, *The Private Enforcement of Environmental Law*, 65 Tulane L. Rev. 339, 349-50 (1990) (explaining how the "independence" of environmental citizen-enforcers is unique).[5]

Indeed, while the Clean Air Act sharply increased federal authority in the field, air-pollution regulation and enforcement was traditionally the primary responsibility of state and local

---

[5] *Riley*'s conclusion that Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law" does not undermine the United States' position here. 252 F.3d at 753. *Riley* made that statement in upholding the False Claims Act's qui tam provisions, which allow private plaintiffs (called "relators") to pursue actions for fraudulent claims in the United States' name and share in any monetary recovery. *See* 31 U.S.C. § 3730. Clean Air Act citizen suits lack the historic pedigree that was critical to the Fifth Circuit's analysis. *See Riley*, 252 F.3d at 752; U.S. Intervenor Br. at 22-30, *United States ex rel. Taylor v. Healthcare Assocs. of Tex. LLC*, No. 25-10842 (5th Cir. Mar. 23, 2026). The False Claims Act also expressly retains the United States' ability to "assume control" over qui tam litigation, such as "the unilateral power to dismiss an action." *Riley*, 252 F.3d at 753; 31 U.S.C. § 3730(c)(2)(A).

governments. 42 U.S.C. § 7401(a)(3). To the extent the Clean Air Act's scheme of cooperative-federalism relies on state enforcement, the federal government, "from the time of its establishment," "has been in the habit of using, with the consent of the states, their officers, tribunals, and institutions as its agents." *United States v. Jones*, 109 U.S. 513, 519 (1883). The statute also includes detailed control mechanisms that preserve Executive oversight authority and enforcement discretion. *See*, *e.g.*, 42 U.S.C. § 7410(a), (k) (providing for EPA approval of SIPs); *ADEC*, 540 U.S. at 469 (holding that EPA may "act to block construction" of a new facility "permitted by [a state agency]"). But the Clean Air Act's private-attorney-general model is different in kind, and it lacks the historic tradition that supports the constitutionality of cooperative-federalism.

Dismissal is necessary regardless of the fact that the NAACP seeks not just civil penalties but also injunctive relief—shutting down the data centers' power source until xAI obtains government permits and approval that Mississippi says it does not need. Dkt. No. 1 at 42. For the reasons explained above, the citizen-suit provision's authorization of civil penalties payable to the Treasury independently warrants interpreting the provision to allow the United States a right to dismissal. Because interpreting the statute to include a right of dismissal entitles the United States to dismiss *the entire action*, there is no plausible basis to distinguish a citizen suit that seeks only penalties from one that seeks penalties and injunctive relief. That means the NAACP's request for injunctive relief in addition to penalties does not save its complaint from dismissal.

Interpreting the Clean Air Act to provide the control mechanism that the United States invokes here—the ability to dismiss the citizen suit—would avoid these serious Article II concerns. *Cf. Riley*, 252 F.3d at 753 (citing the Executive's "significant amount of control over [qui tam] litigation" as a factor supporting its constitutionality). Conversely, allowing this citizen suit

to proceed unchecked by federal control would impermissibly intrude on Executive Branch prerogatives, including the ability to align the enforcement of federal law with broader public interests, as ultimately determined by the President.

Without the right of dismissal under Rule 41(a) here, the only way that the Executive could preclude the citizen suit is by "diligently prosecuting" its own enforcement action. *See* 42 U.S.C. § 7604(b)(1)(B). But that would only exacerbate the Article II violation by stripping the Executive Branch of discretion to determine that *no* enforcement action is the proper course. *See Citizens for Resp. & Ethics*, 993 F.3d at 888 (stressing that such civil-enforcement decisions lie with the Executive). Requiring the Executive to diligently prosecute the action to dispose of it would violate Article II because "Congress may not *mandate* that the President prosecute a certain kind of offense or offender," *Aiken Cnty.*, 725 F.3d at 263, and "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law" lies with "the Executive Branch," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

The United States does not dispute that Congress has the power to authorize private parties who have suffered Article III injury to sue to enforce certain federal statutes. *See*, *e.g.*, *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022) ("'[P]rivate individuals may sue to enforce' . . . antidiscrimination statutes[.]"). Private suits under such provisions, like Title VII of the Civil Rights Act and the antitrust laws, generally do not raise Article II concerns even if Congress created the private right of action for the purpose of supplementing government enforcement actions. *See*, *e.g.*, 42 U.S.C. § 2000e-5(f); 15 U.S.C. § 15. But traditional private rights of action ordinarily provide some form of highly personalized relief, like a mechanism to compensate monetary harms that the plaintiff personally suffered. *See*, *e.g.*, 42 U.S.C. § 2000e-5(g)(1) (Civil Rights Act, providing for reinstatement and backpay); 15 U.S.C. § 15(a) (Clayton

Act, providing that "person[s] who shall be injured in his business or property" can recover treble "damages by him sustained").

The differences between other statutes' private rights of action (for more individualized relief) and Clean Air Act citizen suits that do not compensate any specific injury to the citizen-plaintiff heighten the Article II concerns as to citizen suits. Unlike private rights of action in statutes like the Civil Rights Act and the Clayton Act, the Clean Air Act does not provide for compensatory monetary relief. *See* 42 U.S.C. § 7604(g). It instead authorizes private citizens to pursue monetary penalties generally payable only to the Treasury—again, a quintessentially executive power that "vindicat[es] the rule of law" rather than compensating any personal monetary harm. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998); *see also Seila Law*, 591 U.S. at 219.[6]

For all those reasons, the best interpretation of the Clean Air Act—which ensures the Executive Branch retains its primacy over the enforcement of federal law—is also necessary to avoid grave constitutional problems with the statute's citizen-suit provisions. The Constitution, the Clean Air Act, and precedent all point to the same conclusion: the NAACP cannot wrestle enforcement responsibility away from the Executive Branch.

---

[6] The citizen-suit provision contains a limited exception to the general rule that penalty proceeds are payable to the Treasury—no more than $100,000 may be used to fund "beneficial mitigation projects" that "enhance the public health or the environment." *See* 42 U.S.C. § 7604(g)(2). So, even when that exception applies, penalties do not compensate monetary harms personal to citizen-enforcers. The NAACP also seeks civil penalties far exceeding $100,000. *See*, *e.g.*, Dkt. No. 1 at 42.

## CONCLUSION

For the foregoing reasons, the United States moves to intervene as a matter of right and respectfully requests that this Court dismiss the case. While the Court's role in acting on this filing is limited, *see Polansky*, 599 U.S. at 436 n.4, the United States stands ready to present oral argument if oral argument would assist the Court's review.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

July 7, 2026

# Exhibit K

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintifffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO UNITED STATES'S MOTION FOR INTERVENTION AND DISMISSAL**

The United States first filed its Motion for Intervention and Dismissal (Dkt. No. 58) and Memorandum in Support (Dkt. No. 59) on June 15, 2025. In light of procedural deficiencies in those filings, namely: (1) its failure to indicate that the Environmental Protection Agency sought intervention, as required by the statutory provision the government cited, and (2) its failure to file a complaint or otherwise articulate any claim against Defendants that would allow the government to participate as a plaintiff, Plaintiffs NAACP and NAACP Mississippi State Conference (together NAACP) moved to strike those pleadings. *See* Dkt. Nos. 82 & 83. That motion remains pending.

Though the United States originally represented it "stands by its filings," on July 7, 2026, the United States filed, without conference or leave, amended versions of its Motion and Memorandum. Dkt. Nos. 84 & 85, respectively. Those filings appear aimed at correcting the first failure (EPA's nonparticipation) but do not address the second. Nor do they make any other substantive adjustment to their content. As such, NAACP files this Response in Opposition to respond to both sets of filings. NAACP's attending Memorandum in Opposition cites to and discusses the United States' timely-filed papers (Dkt. Nos. 58 & 59). However, the United States's

parallel amended motion and memorandum are substantially similar in content and thus pincites to the former serve as pincites to the latter. As to their substance, NAACP responds as follows:

1. The United States does not dispute that xAI broke federal law when it installed—and began operating—the Colossus Gas Plant, which powers its Colossus 2 data center using dozens of unpermitted gas turbines at a facility just south of Memphis. Nor does the United States dispute that these turbines emit hundreds of tons per year of dangerous pollutants that directly harm the frontline communities that live, work, pray, play, and breathe in the shadow of the Plant, including Plaintiffs' members.

2. Rather than help Plaintiffs secure relief from this harmful pollution, the United States instead moves to intervene to assert an absolute right to *prevent* these communities from suing to address their harms, which would leave the local choir singers, gardeners, and grandparents that tried to protect themselves and their loved ones from breathing polluted air to face that pollution without any opportunity to protect their rights in court. The United States maintains that it can do so because it has the unreviewable right to dismiss *any* Clean Air Act citizen suit for any reason if it determines that curbing unlawful pollution is not the government's priority. This assertion of authority is unprecedented, and its claimed veto power finds no support in the Clean Air Act. Congress intended that federal and state governments, as well as citizens, would take action to ensure the protections of the Act exist in practice, not just on paper. And Congress created the citizen suit provision of the Clean Air Act precisely for situations like these: To allow citizens to abate pollution that is causing them particularized harm when the government—and states—have failed to require compliance with the law.

3. None of the United States's arguments for claiming this right to dismiss hold up. First, even assuming the United States is properly aligned as a plaintiff, Federal Rule of Civil

Procedure 41 does not grant such a right, because it allows a plaintiff only to dismiss its own claims—*not* the claims of another plaintiff.

4. Second, the United States fares no better under the Clean Air Act. The government does not even attempt to locate any dismissal right in the text of the Act. Nor could it: Unlike other statutes, nothing in the Act's text grants the United States the right to override a private suit to abate pollution. Instead, the Act authorizes citizens harmed by unlawful pollution to sue to abate pollution when the government refuses to act, and it allows the government to participate only in more limited ways that stop far short of allowing it to dismiss the citizen plaintiff's action. No court has held otherwise, and this Court should reject the United States's effort here.

5. Finally, the United States asks this Court to adopt its atextual reading of the Clean Air Act "to avoid serious constitutional questions" under Article II. That is not how constitutional avoidance works, and, in any event, citizen suits raise no Article II concern. Citizen suits are private rights of action, created by Congress, that allow private plaintiffs to sue on their own behalf, not on behalf of the government. Unsurprisingly, then, every court to address these constitutional arguments have rejected them. This Court should not be the first to hold otherwise.

6. In support of its Response in Opposition to the United States' Motion for Intervention and Dismissal, Plaintiffs rely on their memorandum brief filed contemporaneously herewith.

For the foregoing reasons and as further set forth in NAACP's attending Memorandum in Opposition, the United States's Motion to Dismiss should be denied.

Dated: July 10, 2026

Respectfully submitted,

/s/ Carroll Rhodes

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

/s/ Elias L. Quinn

Elias L. Quinn (CO Bar No. 42159)
(Pro Hac Vice) – Lead Counsel
Mary Rock (IL Bar No. 6332240)
(Pro Hac Vice)
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
(Pro Hac Vice)
Rebecca Ramirez (TX Bar No. 24126749)
(Pro Hac Vice)
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

/s/ Benjamin Grillot

Benjamin Grillot (DC Bar. No. 982114)
(Pro Hac Vice) – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE UNITED STATES'S MOTION FOR INTERVENTION AND DISMISSAL**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

A. The Clean Air Act regulates air pollution emissions to prevent serious harm to our health and environment. ................................................................ 3

B. The federal government, states, and individuals each play a role in ensuring compliance with Clean Air Act standards. ......................................... 5

C. xAI constructed its Colossus Gas Plant without obtaining Clean Air Act permits ........................................................................................ 8

D. xAI's Clean Air Act violations harm the community around the plant. .......... 10

E. To protect its members' health, NAACP sued under Section 7604. ................ 10

ARGUMENT ........................................................................................................ 11

I. Rule 41 does not grant the United States a unilateral right to dismiss Plaintiffs' action. ........................................................................................ 11

II. The Clean Air Act does not grant the United States a unilateral right to dismiss the entire action. ........................................................................ 14

A. The text does not support the United States's view. ....................................... 15

B. Precedent does not support the United States's view. ..................................... 18

C. The United States's remaining arguments lack merit. .................................... 19

III. The constitutional avoidance canon does not support interpreting the Clean Air Act to grant the United States a unilateral right to dismiss. ....................................... 24

A. Section 7604 does not raise constitutional concerns. ...................................... 24

B. The United States's contrary arguments lack merit. ....................................... 30

CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

In re *Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ....................20

*Atl. States Legal Found. v. Buffalo Envelope*,
823 F. Supp. 1065 (W.D.N.Y. 1993) ....................25

*Campaign Legal Ctr. v. Iowa Values*,
573 F. Supp. 3d 243 (D.D.C. 2021) ....................25

*Capitol Records v. Alaujan*,
626 F. Supp. 2d 152 (D.D.C. 2009) ....................25

*Chesapeake Bay Found. v. Bethlehem Steel Corp.*,
652 F. Supp. 620 (D. Md. 1987) ....................25

*United States ex rel. CIMZNHCA v. UCB, Inc.*,
970 F.3d 835 (7th Cir. 2020) ....................12

*United States ex rel. Clarissa Zafirov v. Fla. Med. Assocs.*
(11th Cir. Jan. 6, 2025) ....................32

*Conservation Law Found. of New England, Inc. v. Browner*,
840 F. Supp. 171 (D. Mass. 1993) ....................26

*Cook v. Gralike*,
531 U.S. 510 (2001) ....................17

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ....................13

*Cox v. City of Dallas*,
256 F.3d 281 (5th Cir. 2001) ....................28, 29

*Curry v. Regents of the Univ. of Minn.*,
167 F.3d 420 (8th Cir. 1999) ....................21

*Davis v. Passman*,
442 U.S. 228 (1979) ....................25

*Dubois v. Thomas*,
820 F.2d 943 (8th Cir. 1987) ....................20

*Ellingburg v. United States*,
607 U.S. 163 (2026) .......... 29

*Ellis v. Gallatin Steel Co.*,
390 F.3d 461 (6th Cir. 2004) .......... 19, 27

*Elmore v. Henderson*,
227 F.3d 1009 (7th Cir. 2000) .......... 12

*Enbridge Energy, LP v. Nessel*,
146 S. Ct. 1074 (2026) .......... 23

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) .......... 16, 18, 19

*Environment Texas Citizen Lobby, Inc. v. Exxon Mobil Corp.*
(5th Cir. Jan. 17, 2023) .......... 32

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990) .......... 18, 19

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... *passim*

*United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*,
157 F.4th 758 (5th Cir. 2025) .......... 30

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) .......... 6, 7, 18, 19, 26

*Hall v. Hall*,
584 U.S. 59 (2018) .......... 13

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989) .......... 16

*Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*,
434 F.3d 320 (5th Cir. 2005) .......... 13, 14

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 19, 20

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 24

*Karr v. Hefner*,
475 F.3d 1192 (10th Cir. 2007) .......... 19

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) ........................................................ 25

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) ........................................................ 27

*United States ex rel. Montcrief v. Peripheral Vascular Assocs.*,
133 F.4th 395 (5th Cir. 2025) ........................................................ 30

*N. Carolina Shellfish Growers Ass'n & N. Carolina Coastal Fed'n v. Holly Ridge*,
No. 7:01-cv-36 (E.D.N.C. Aug. 15, 2001) ........................................................ 32

*Natural Res. Def. Council v. Outboard Marine Corp.*,
692 F. Supp. 801 (N.D. Ill. 1988) ........................................................ 25

*Orange Env't v. Cnty. of Orange*,
923 F. Supp. 529 (S.D.N.Y. 1996) ........................................................ 27

*Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*,
506 F.2d 914 (5th Cir. 1975) ........................................................ 12

*Plains Growers, Inc. v. Ickes-Braun Glasshouses, Inc.*,
474 F.2d 250 (5th Cir. 1973) ........................................................ 12

*United States, ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023) ........................................................ 14

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) (en banc) ........................................................ 25, 28, 30, 34

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) ........................................................ 15, 23

*Seila Law v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) ........................................................ 30, 33, 34

*Sierra Club v. Franklin Cnty. Power of Ill.*,
2006 WL 8455938 (S.D. Ill. 2006) ........................................................ 25

*Soap Corp. of Am. v. Reynolds*,
178 F.2d 503 (5th Cir. 1949) ........................................................ 31

*Sommers v. Bank of Am., N.A.*,
835 F.3d 509 (5th Cir. 2016) ........................................................ 12

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................ 27, 30

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998)....27, 33

*Stringer v. Town of Jonesboro*,
986 F.3d 502 (5th Cir. 2021) ....18

*Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto*,
600 F. Supp. 1474 (D.N.J. 1985) ....25

*Supporters to Oppose Pollution, Inc. v. Heritage Grp.*,
973 F.2d 1320 (7th Cir. 1992) ....19

*U.S. ex rel. Taylor v. Healthcare Assocs. of Tex.*
(5th Cir. Mar. 23, 2026) ....30

*TransUnion v. Ramirez*,
594 U.S. 413 (2021)....25

*Trump v. Slaughter*,
2026 WL 1855612 (U.S. June 29, 2026) ....33

*U.S. Dep't of Energy v. Ohio*,
503 U.S. 607 (1992)....26

*United States ex rel. Conyers*,
108 F.4th 351, 357 (5th Cir. 2024) ....23

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 ....25

*United States v. Nixon*,
418 U.S. 683 (1974)....21

*Vt. Agency of Natural Res. v. U.S. ex rel Stevens*,
529 U.S. 765 (2000)....30

*Water Keeper All. v. Smithfield Foods*,
2001 WL 1715730 (E.D.N.C. Sept. 20, 2001)....25

*Weinstein v. 440 Corp.*,
146 F.4th 1046 (11th Cir. 2025) ....12

*Wis. Cent. Ltd v. United States*,
585 U.S. 274 (2018)....15, 23

**Statutes**

12 U.S.C. § 5511(a) ....33

18 U.S.C. § 1514A(b)(1) ..... 21

28 U.S.C. § 517 ..... 35

31 U.S.C. § 3730 ..... 14

33 U.S.C. § 1365 ..... 32

33 U.S.C. § 1365(g) ..... 27

42 U.S.C. § 7401(b)(1) ..... 2

42 U.S.C § 7401(c) ..... 2

42 U.S.C. § 7409) ..... 3

42 U.S.C § 7410 ..... 3

42 U.S.C § 7412(i) ..... 5, 22

42 U.S.C. § 7412(a)(1) ..... 5

42 U.S.C § 7412(d) ..... 3

42 U.S.C. § 7413 ..... 5

42 U.S.C. § 7413(b) ..... 13

42 U.S.C. § 7418(b) ..... 22

42 U.S.C. §§ 7470–7492 ..... 4

42 U.S.C. § 7475(a) ..... 5

42 U.S.C. § 7479(1) ..... 5

42 U.S.C. § 7602(e) ..... 26

42 U.S.C. § 7604 ..... *passim*

**Federal Rules and Regulations**

40 C.F.R. § 51.166(b)(1)(i) ..... 5

40 C.F.R. § 52.21(b)(50)(i) ..... 5

40 C.F.R. § 52.1270(c) ..... 3

40 C.F.R. §§ 63.6080–63.6175 ..... 9

76 Fed. Reg. 54294 (Aug. 31, 2011) ........ 3, 4

80 Fed. Reg. 65292 (Oct. 26, 2015) ........ 4

83 Fed. Reg. 17226 (Apr. 18, 2018) ........ 3, 4

89 Fed. Reg. 16202 (Mar. 6, 2024) ........ 4

90 Fed. Reg. 316 (Jan. 3, 2025) ........ 4

91 Fed. Reg. 1910 (Jan. 15, 2026) ........ 9

Fed. R. of Civ. P. 3 ........ 11

Fed. R. of Civ. P. 21 ........ 12

Fed. R. of Civ. P. 24 ........ 12

Fed. R. of Civ. P. 41 ........ 11, 12, 13, 14

Fed. R. of Civ. P. 42 ........ 13

**State Rules and Regulations**

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 C (28) (2013) ........ 5

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013) ........ 5

11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024) ........ 5

**Other Authorities**

U.S. Const. Article II, § 1, cl. 1 ........ 24

U.S. Const. Article II, § 3 ........ 24

1 Comm. on Pub. Works, 93d Cong., A Legislative History of the Clean Air Amendments of 1970 (1974) ........ 6, 7

Amendment No. 1373 § 609(a)(3) (Mar. 26, 1990), reprinted in 4 Comm. on Env't and Pub. Works, 103d Cong., Legislative History of the Clean Air Act Amendments of 1990 (1998) ........ 17

*Announcing xAI for Government, xAI* (July 14, 2025), https://x.ai/news/government ........ 23

Carmen Arroyo & Rachel Metz, *SpaceX Inks Multibillion-Dollar Computing Deal with Reflection AI*, Yahoo! Finance (June 22, 2026), https://finance.yahoo.com/technology/ai/articles/spacex-inks-multibillion-dollar-computing-150509579.html ....................24

*New Compute Partnership with Anthropic*, xAI (May 6, 2026), https://x.ai/news/anthropic-compute-partnership....................24

Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131 (2026)....................26, 27, 30, 32, 34, 35

Restatement (Second) of Torts § 821C....................29

Restatement (Second) of Torts § 821D....................28

SpaceX, Registration Statement Amendment No. 2 Free Writing Prospectus (Form S-1) (June 3, 2026), https://perma.cc/TVT6-GS7G;....................24

SpaceX, Registration Statement (Form S-1) (May 20, 2026), https://perma.cc/GMF2-5W7U ....................24

3 William Blackstone, *Commentaries* ....................28, 29, 31

## INTRODUCTION

The United States does not dispute that xAI broke federal law when it installed—and began operating—the Colossus Gas Plant, which is comprised of dozens of unpermitted gas turbines in Southaven, Mississippi that power its Colossus 2 data center. Rightly so: At the heart of this lawsuit is xAI's decision to flout the Clean Air Act by constructing an industrial power plant without the permits and pollution controls that have been required for plants like it for the past 50 years. Nor does the United States dispute that these turbines emit hundreds of tons per year of dangerous pollutants that directly harm the frontline communities that live, work, play, and breathe in the shadow of the Plant, including Plaintiffs' members. Rightly so, again: The plant has the capacity to emit enough pollution that it is likely far and away the largest industrial source of smog-forming nitrogen oxides in the greater Memphis area.

Rather than help Plaintiffs secure relief from this harmful pollution, the United States instead moves to intervene to assert an absolute right to *prevent* these communities from suing to address their harms, which would leave the local choir singers, gardeners, and grandparents that tried to protect themselves and their loved ones from breathing polluted air to face that pollution without any opportunity to protect their rights in court. The United States maintains that it can do so because it has the right to dismiss *any* Clean Air Act citizen suit for any reason if it determines that curbing unlawful pollution is not the government's priority. This assertion of authority is unprecedented, and its claimed veto power finds no support in the Clean Air Act. Congress intended that federal and state governments, as well as citizens, would take action to ensure the protections of the Act exist in practice, not just on paper. And Congress created the citizen suit provision of the Clean Air Act precisely for situations like these: to allow citizens to abate

pollution that is causing them particularized harm when the government—and states—have failed to require compliance with the law.

None of the United States's arguments for claiming this right to dismiss hold up. First, Federal Rule of Civil Procedure 41 does not grant such a right, because it allows a plaintiff only to dismiss its own claims—*not* the claims of another plaintiff.

Second, the United States fares no better under the Clean Air Act. The government does not even attempt to locate any dismissal right in the text of the Act. Nor could it: Unlike other statutes, nothing in the Act's text grants the United States the right to override a private suit to abate pollution. Instead, the Act authorizes citizens harmed by unlawful pollution to sue to abate pollution when the government refuses to act, and it allows the government to participate only in more limited ways that stop far short of allowing it to dismiss the citizen plaintiff's action. No court has held otherwise, and this Court should reject the United States's effort here.

Finally, the United States asks this Court to adopt its atextual reading of the Clean Air Act "to avoid serious constitutional questions" under Article II. That is not how constitutional avoidance works, and, in any event, citizen suits raise no Article II concern. Citizen suits are private rights of action, created by Congress, that allow private plaintiffs to sue on their own behalf, not on behalf of the government. Unsurprisingly, then, every court to address these constitutional arguments has rejected them. This Court should not be the first to hold otherwise.

## BACKGROUND

The Clean Air Act exists "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). A "primary goal" of the Act "is to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention." *Id.*

§ 7401(c). The Act achieves these goals by giving the federal and state governments—and also the people the Act exists to protect—specific roles to ensure that its protections are realized. This case shows exactly why Congress structured the Act in this way and highlights the risks of rewriting that structure to cut out the people the Act is intended to protect.

### A. The Clean Air Act regulates air pollution emissions to prevent serious harm to our health and environment.

The Clean Air Act programs relevant here start by requiring the creation of standards that provide a basic level of protection for people who will breathe in the regulated pollutants. Under the National Ambient Air Quality Standards (NAAQS) program, the EPA Administrator must set standards (i.e., the NAAQS) for criteria pollutants at a level protective of public health and welfare. *See* 42 U.S.C. § 7409(a)–(b). These standards then get implemented at the state level in state implementation plans (SIPs), which must include standards and processes for issuing permits that will ensure that pollution sources meet applicable emissions limits. *Id.* § 7410(a), (k); *see also* 40 C.F.R. § 52.1270(c) (EPA-approved SIP for Mississippi). Under the hazardous air pollutants program, the Administrator must set National Emission Standards for Hazardous Air Pollutants (NESHAPs) on a category-of-source basis for sources that emit these pollutants. *See id.* § 7412(d).

These standards exist because the air pollutants they regulate pose real threats to our health. *See* Dkt. No. 1 (Complaint) ¶¶ 79, 82, 85, 87. For example, even short-term exposure to carbon monoxide (a criteria pollutant) is linked to serious heart problems. *See* Review of National Ambient Air Quality Standards for Carbon Monoxide, 76 Fed. Reg. 54294, 54298–299 (Aug. 31, 2011). Nitrogen dioxide and ozone (two other criteria pollutants) both harm, among other things, lung health. *See* Review of the Primary National Ambient Air Quality Standards for Oxides of Nitrogen, 83 Fed. Reg. 17226, 17233, 17240 (Apr. 18, 2018) (concluding that short- and long-term exposure cause respiratory harm, such as worsening asthma); National Ambient Air Quality

Case: 3:26-cv-00074-DMB-JMV Doc #: 92 Filed: 03/10/26 13 of 45 PageID #: 2350

Standards for Ozone, 80 Fed. Reg. 65292, 65302, 65305–308 (Oct. 26, 2015) (noting that short-term ozone exposure causes decreased lung function and worsened asthma symptoms, and long-term exposure causes irreversible lung damage). Fine particulate matter (a fourth criteria pollutant) can cause premature death. *See* Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, 89 Fed. Reg. 16202, 16223, 16227 (Mar. 6, 2024). Formaldehyde is considered a "hazardous air pollutant," and is a human carcinogen that also causes respiratory harm. *See* Formaldehyde; Risk Evaluation Under the Toxic Substances Control Act (TSC); Notice of Availability, 90 Fed. Reg. 316, 317 (Jan. 3, 2025).

The people most harmed by exposure to these pollutants are already our most vulnerable. For example, young children and those with preexisting health conditions are most affected by carbon monoxide exposure. *See* 76 Fed. Reg. at 54298–299. And people with asthma, children, older adults, and those who spend large amounts of time in areas with elevated nitrogen dioxide levels (such as near roadways) are at a higher risk. *See* 83 Fed. Reg. at 17245–246.

Under the Act, new sources receive particular attention, to ensure that they are built with the best pollution control technology in place. As part of the NAAQS program, new sources in areas classified as being in "attainment" with the relevant NAAQS must comply with the Prevention of Significant Deterioration (PSD) program's requirements, which include pre-construction permits. 42 U.S.C. §§ 7470–7492.[1] These requirements prohibit construction unless the source will not cause or contribute to an exceedance of the NAAQS and pollution controls are installed that reflect the maximum degree of reduction achievable through the use of stringent

[1] The area this case concerns is classified as in attainment. *See* Dkt. No. 1 ¶ 72. But that does not mean its air quality is safe. The number of high ozone days has increased annually for the past seven years, and more recently, the data from DeSoto County and Memphis show that concentrations of ground-level ozone exceed the NAAQS. *Id.* ¶¶ 172–174.

pollution controls on an ongoing basis. *See id.* § 7475(a)(3)–(4). As part of the hazardous air pollutants program, new sources cannot be constructed without a permit that guarantees it will be in compliance with the relevant NESHAP. *See id.* § 7412(i). And under Mississippi's SIP, new sources of criteria pollutants must obtain permits before construction begins, so that the state can impose emission limits on those new sources. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013).

These requirements apply to stationary sources. The PSD program applies to construction of a "major stationary source," which is one that emits, or has the potential to emit, 250 tons per year or more of a criteria pollutant. 42 U.S.C. §§ 7475(a)(1), 7479(1); 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(50)(i); *see also* 11 Pt. 2 Ch. 5 Miss. Code R. 5.2 (2024). The hazardous air pollutants program applies to a "major source," which is "any stationary source" or group of sources "that emits or has the potential to emit . . . 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C. § 7412(a)(1). The Mississippi SIP applies to new stationary sources of criteria pollutants, regardless of whether they meet the PSD program's emission thresholds. *See* 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D (2013); *see also id.* 2.1 C (28) (2013) (defining "stationary source" as "any building, structure, facility, or installation which emits or may emit a regulated air pollutant").

**B. The federal government, states, and individuals each play a role in ensuring compliance with Clean Air Act standards.**

The Act assigns a role in securing compliance to the federal government, the relevant state government, and the people whom polluters harm by evading pollution limits. States and the federal government have several options available to them: They may, for example, address violations that occurred in the past but have ceased, may use administrative processes as an alternative (or precursor) to judicial proceedings, and may sue polluters. *See* 42 U.S.C. § 7413.

But Congress recognized that there might be circumstances where these governmental actors "cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 62 (1987). Because it would be "impossible for government enforcement to control all significant acts of pollution," Congress extended a "private right" to "persons directly affected or concerned" so that their "rights cannot be violated with impunity." 1 Comm. on Pub. Works, 93d Cong., A Legislative History of the Clean Air Amendments of 1970, at 355 (1974) (hereinafter *"Legislative History*") (Sen. Hart quoting testimony of former Attorney General Ramsey Clark). Citizens would bring such suits, reasoned the Act's supporters, because of their "incentive[] to protect the health and welfare of those suing." *Id.* (Sen. Hart). In this way, citizen suits would not be a one-to-one "substitute" for "the enforcement efforts of the responsible administration agencies," but a way to "complement and encourage the abatement activities of government agencies." *Id.* at 263 (Sen. Spong); *see also id.*at 355 (Sen. Hart); *id.* at 436–437 (Sen. Rpt.).

Accordingly, the Act gives those harmed by unlawful emissions the option to sue to abate those violations. "[A]ny person" may bring "a civil action on his own behalf" against a polluter "alleged . . . to be in violation of" "an emission standard or limitation under" the Act or an "order" respecting "a standard or limitation." 42 U.S.C. § 7604(a)(1). Under this provision, people sue to address "harm" that "lies in the present or the future, not in the past"—that is, ongoing harm. *See Gwaltney*, 484 U.S. at 59 (interpreting parallel Clean Water Act provisions). Put simply, Congress authorized "a plaintiff who is injured or faces the threat of future injury due to illegal conduct"—that is, violations of the Clean Air Act—to sue. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

The Act imposes procedural requirements to incentivize state and federal governments to address violations in the first instance. A person must give the violator, the relevant state, and the EPA Administrator 60 days' notice before suing. *See* 42 U.S.C. § 7604(b)(1)(A). This gives the polluter the "opportunity to bring itself into complete compliance" and "render [the suit] unnecessary" and also allows the governments a chance to consider the violations and decide whether to act themselves. *Gwaltney*, 484 U.S. at 59–60. If a government does act and "has commenced and is diligently prosecuting a civil action . . . to require compliance," a person may not bring a separate suit. 42 U.S.C. § 7604(b)(1)(B). In this way, citizen suits both allow those harmed by pollution to vindicate their rights and serve as a "useful instrument for detecting violations and bringing them to the attention of the enforcement agencies." *Legislative History*, at 280 (Sen. Muskie).

A person who clears these hurdles may proceed with the suit, though as he does, the Clean Air Act contains multiple provisions that ensure the federal government can participate in the case. The federal government must be served with the complaint, and the EPA Administrator may intervene in the case as a matter of right, and at any time. *See* 42 U.S.C. § 7604(c)(2). The Attorney General and EPA Administrator must also receive notice and have a chance to weigh in on the proposal before any consent judgment enters. *See id.* § 7604(c)(3).

As to remedies, the Act authorizes the person to obtain relief in two ways. A court may order injunctive relief. *See id.* § 7604(a). The court may also "apply any appropriate civil penalties," to be paid into a U.S. Treasury fund. *Id.* This type of civil penalty can "encourage defendants to discontinue current violations and deter them from committing future ones," thereby "afford[ing] redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct." *Laidlaw*, 528 U.S. at 169, 186.

### C. xAI constructed its Colossus Gas Plant without obtaining Clean Air Act permits.

This case stems from xAI's decision to flout the Act by installing and operating gas turbines—without a Clean Air Act permit—to create the Colossus Gas Plant in Southaven, Mississippi, which is in DeSoto County and part of the greater Memphis area. Dkt. No. 1 ¶ 41.[2] xAI installed twenty-seven of these unpermitted turbines on-site between August and December 2025. *Id.* ¶ 4. These turbines sit on newly laid concrete pads, and together with transformers, electrical lines, gas supply lines, water injection lines, and other infrastructure, make up the plant. *Id.* ¶ 153.





***Figures*** 4 (left) and 5 (right) of NAACP's Complaint, Dkt. No. 1, at 26 & 29, respectively.

This is not the first time xAI has pulled this move. Last year, 10 miles away from the Colossus Gas Plant, xAI installed unpermitted turbines in Memphis's Boxtown neighborhood. *Id.* ¶ 10. And xAI appears to be planning to repeat this tactic a third time. *Id.*

The Colossus Gas Plant is materially indistinguishable from other power plants that must undergo review to comply with Clean Air Act requirements before construction. The plant could generate 495 megawatts of energy—comparable to a medium-sized power plant that could power

[2] Allegations in the complaint must be taken as true for the purposes of deciding this motion to dismiss, and this opposition brief focuses on the complaint for that reason.

up to 400,000 homes. Dkt. No 51-43 (Laufenberg Decl.) ¶ 7; Dkt. No. 1 ¶ 143. The plant has the potential to emit over 1,700 tons of smog-forming nitrogen oxides, likely making it the largest industrial source of nitrogen oxides in the greater Memphis area. Dkt. No. 1 ¶ 8.[3] That was at the time of the complaint. Now, the plant has more than double the number of turbines and emits triple the amount of pollution—making it among the largest sources of nitrogen oxide pollution in the country. *See* Dkt. No. 51-43 ¶ 53.

The EPA has explained that turbines like these are stationary sources under the Clean Air Act programs at issue here. Under the hazardous air pollutant program, EPA issued national emission standards for stationary combustion turbines to limit formaldehyde, toluene, benzene, acetaldehyde, and other pollutants. *See* 40 C.F.R. §§ 63.6080–63.6175. The relevant regulations define stationary to mean "that the combustion turbine is not self propelled or intended to be propelled while performing its function." *Id.* § 63.6175. Earlier this year, EPA stated that "[h]istorically" it has regulated even portable "combustion turbines . . . as stationary sources." New Source Performance Standards Review for Stationary Combustion Turbines and Stationary Gas Turbines, 91 Fed. Reg. 1910, 1926–27 (Jan. 15, 2026).

Even so, xAI did not seek and obtain the required Clean Air Act permits before constructing the Colossus Gas Plant. Instead, on July 25, 2025, it emailed the Mississippi Department of Environmental Quality of its plans to construct the plant without seeking a permit. Dkt. No. 1 ¶ 132. Four days later, the agency wrote back, stating that based on information at a prior meeting and the email, the turbines would be "mobile" because they would "remain affixed to a portable unit (i.e., a flatbed trailer)" and also "temporary" because they were "intended . . . to remain on-

[3] Indeed, at the time of the Complaint, the plant had the potential to emit more than twice the nitrogen oxide air pollution of the next largest source in the tri-state area—the Memphis International Airport. Dkt. No. 51-43 ¶ 53.

site . . . for less than twelve (12) months." Dkt. No. 1-2 (MDEQ Letter) at Ex. B-2. For that reason, the agency stated that the turbines were exempt from permitting requirements.

**D. xAI's Clean Air Act violations harm the community around the plant.**

This failure to obtain a permit—and therefore to comply with the Clean Air Act processes and provisions that exist to protect human health and the environment—is causing real harm. The harmful pollutants the plant emits, including nitrogen oxides and formaldehyde, are tied to increases in asthma, respiratory diseases, heart problems, and certain cancers in persons exposed to them. Dkt. No 1 ¶ 7. Tens of thousands of people live, worship, study, and work in the homes, churches, and schools that immediately surround the Colossus Gas Plant. *Id.* ¶ 5. A Clean Air Act permit for a pollution source as large as the Colossus Gas Plant would require application of best available control technology to reduce emissions; not applying for a permit means xAI avoided those controls for its turbines. *Id.* ¶ 9.

Plaintiffs' members have experienced the effects of the plant first-hand. *Id.* ¶¶ 31–43. That includes a member who is exposed to pollution at her home, every day, when she waters her plants or relaxes on her patio. *Id.* ¶¶ 33–34. It also includes another nearby family, which has been forced by the plant to rethink the amount of time they spend outside working in their gazebo, tending their garden, and even walking their dog, particularly in light of one family member's serious pre-existing respiratory issues. *Id.* ¶¶ 36–39. And it includes a man who must limit his time working outside on his property because the plant's pollution threatens to aggravate his health conditions. *Id.* ¶¶ 41–42.

**E. To protect its members' health, NAACP sued under Section 7604.**

NAACP complied with the Act's procedural requirements and then sued to abate the harm many of its members are suffering from xAI's unlawful actions. NAACP first brought these Clean Air Act violations to the attention of xAI, the federal government, and Mississippi per the notice

provisions. Dkt. No. 1 ¶ 15. xAI did not correct the violations. Neither Mississippi nor the U.S. Environmental Protection Agency acted to abate these harmful violations. *Id.* ¶ 191. NAACP thus sued in April 2026. The United States has now moved to dismiss.[4]

## ARGUMENT

The United States's motion sometimes identifies Rule 41 (at 8–9) and sometimes identifies the Clean Air Act's "authorization for federal intervention" (at 17) as the source of its claimed authority to dismiss a Section 7604 action unilaterally and without any judicial review. For completeness, this opposition brief addresses each argument in turn. Neither route has merit.

### I. Rule 41 does not grant the United States a unilateral right to dismiss Plaintiffs' action.

The United States says (at 8) that it seeks to (and can) dismiss the NAACP's claims under Federal Rule of Civil Procedure 41(a)(1). There is no support for its request. Not in the text of the federal rules, not in precedent, and not in common sense.

The United States's extraordinary position—that one plaintiff to an action can unilaterally dismiss the claims of another under Rule 41(a)(1)—has no grounding in the federal rules. The rules allow "the plaintiff" to "dismiss an action without a court order by filing . . . a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1). The rules elsewhere explain that an "action is commenced by filing a complaint." Fed. R. Civ. P. 3. Rule 41(a)(1) thus ties "the plaintiff" to the "action" that that plaintiff can dismiss without a court order. That is, after the plaintiff commences its action via its complaint, it can dismiss that action (its claims) under the terms of Rule 41(a)(1).

[4] The United States's arguments are relevant only if it is granted intervention. If Plaintiffs' motion to strike the United States's motion to intervene is granted (and the United States is not a party), this Court would not need to address the United States's motion to dismiss.

Rule 24 confirms that an intervening plaintiff cannot dismiss the original plaintiff's claims under Rule 41. It refers to the original plaintiff's action as "the main action," that is, as distinct from an action commenced by an intervening plaintiff. Fed. R. Civ. P. 24(b)(1)(B). This textual distinction between the initiating action and the intervenor's claims reinforces that, although an original plaintiff can dismiss the main action after another plaintiff intervenes, and although an intervening plaintiff can dismiss its additional action after intervening, neither can dismiss the claims of the other under Rule 41(a)(1).

This straightforward reading of the Federal Rules accords with case law, which explains that Rule 41 "[b]y itself . . . obviously does not authorize an intervenor-plaintiff to effect involuntary dismissal of the original plaintiff's claims." *United States ex rel. CIMZNHCA v. UCB, Inc.*, 970 F.3d 835, 850 (7th Cir. 2020). That is because, as just explained, "under Rule 41(a), an 'action' refers to all claims that an individual plaintiff has brought against an individual defendant, even if multiple actions involving multiple parties have been combined into a single lawsuit." *Weinstein v. 440 Corp.*, 146 F.4th 1046, 1051 (11th Cir. 2025); *Plains Growers, Inc. v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250, 254 (5th Cir. 1973) (collecting cases and determining the "better view" is that Rule 41(a) "can be effected against less than all of the defendants"); *cf. Elmore v. Henderson*, 227 F.3d 1009, 1011–12 (7th Cir. 2000) ("When there are several plaintiffs in a single suit and one is dismissed out, whether under Rule 21 or any other rule or doctrine, it is as if he had brought a separate suit that was dismissed."); *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 n.5 (5th Cir. 2016) (intervention as of right can be appropriate even after initial plaintiff's suit has been "dismissed voluntarily"). So, Rule 41(a)(1) just "grants a plaintiff an unconditional right to dismiss *his* complaint." *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 915 (5th Cir. 1975) (emphasis added).

This reading also avoids absurd results. Agreeing with the United States's reading would mean that Rule 41(a)(1) gives plaintiffs (original or intervening) quite an extraordinary benefit: The right to control the litigation of *another* plaintiff by dismissing *all* of their claims.[5] But Rule 41(a)(1) was just "designed to limit a plaintiff's ability to dismiss an action" in order to address the burden on defendants of being repeatedly summoned into court by the same plaintiff. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397 (1990). It "was not designed to give a plaintiff any benefit other than the right to take one such dismissal without prejudice." *Id.* If the drafters of the rule meant to "transform" the plaintiff's dismissal right in Rule 41(a)(1) in the way the United States envisions, "we would have heard about it." *Hall v. Hall*, 584 U.S. 59, 74 (2018) (explaining, when interpreting Rule 42's authorization of consolidating actions, that no sensible draftsperson would "silently and abruptly reimagine" a well-understood term).[6]

Against all of this, the United States has (at 8) two citations to offer. One is irrelevant. The other undermines the United States's argument.

The first case states the basic proposition that "[t]he plaintiff has an absolute right to a Rule 41(a)(1) dismissal," which operates without prejudice, "put[ting] the plaintiff in a legal position as if he had never" sued. *Harvey Specialty & Supply, Inc. v. Anson Flowline Equip. Inc.*, 434 F.3d

---

[5] Compounding the illogic: Applying the United States's reading of Rule 41(a)(1) in a suit the Administrator initiates under 42 U.S.C. § 7413(b), and in which a person "intervene[s] as a matter of right" as a plaintiff under 42 U.S.C. § 7604(b)(1)(B), means that the person could dismiss the United States's claims along with their own.

[6] Agreeing with the United States would create a real risk of gamesmanship. Imagine, for example, a corporation that agrees with 99% of a government action. If a plaintiff sues to challenge that action, that corporation would have an incentive to seek to intervene as a plaintiff, relying on the 1% of the action it disagrees with and then move under Rule 41(a)(1) to dismiss both the plaintiff's claims and its own. Because courts do not probe the reasons for a Rule 41(a)(1) dismissal, the original plaintiff would be powerless to protect their claims. That would leave the government action insulated from challenge. That cannot be how Rule 41(a)(1) works.

320, 324 (5th Cir. 2005) (asking whether a Rule 41(a)(1) dismissal is a "final judgment" for the purposes of the Anti-Injunction Act's relitigation exception and answering no). That means the United States can dismiss its own claims. It does not say an intervening plaintiff can dismiss an original plaintiff's claims (indeed, there was no intervening plaintiff in *Harvey Specialty*).

The second addressed the standard for resolving Rule 41(a)(2) dismissal motions in qui tam suits, which are brought by relators (as plaintiffs) "on behalf of and in the name of the Government." *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 437 (2023). When the United States decides to proceed with an action brought by a relator, the False Claims Act expressly gives it "primary responsibility for prosecuting the action," which includes the ability to "dismiss the action notwithstanding the objections of the [relator]" if the relator received notice and "an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(1), (2)(A). Even there, where (unlike here) "[t]he suit alleges injury to the Government alone," and (also unlike here) the statute expressly grants a right to dismiss over the relator's objection, one "[p]art of the district court's task" in resolving a Rule 41(a)(2) motion "is to consider [the relator's] interests." *Polansky*, 599 U.S. at 437. The fact that the False Claims Act contains a specific, structured process for the United States to dismiss relators' claims over their objection strongly counsels against reading Rule 41(a)(1) to provide any and all intervening plaintiffs, in any kind of suit, with the right to unilaterally, and without review, dismiss another plaintiff's claims.

In sum, Rule 41(a)(1) does not grant the United States the authority it is looking for.

## II. The Clean Air Act does not grant the United States a unilateral right to dismiss the entire action.

That leaves the United States with the Clean Air Act provision that grants the Administrator a right to intervene in a suit under Section 7604(a). *See* Dkt. No. 59 (U.S. Br.) at 10 (citing 42 U.S.C. § 7604(c)(2)). But nothing in that language (or the rest of Section 7604) grants it a

unilateral right to dismiss a suit brought under Section 7604(a). Just the opposite: Over and over, the Clean Air Act expressly preserves the ability of people who are being harmed by unlawful air pollution to abate that harm through a suit when no one else does so and also expressly identifies when and how federal government actors can intervene in and influence these people's suits.

**A. The text does not support the United States's view.**

To start with the obvious, the United States does not identify any Clean Air Act text that expressly grants it "the right to dismiss . . . [a] citizen suit" (at 10), presumably because it recognizes that there is none. The provision that it cites states that the EPA Administrator "may intervene as a matter of right at any time" in "any action" under Section 7604. 42 U.S.C. § 7604(c)(2). It does not state that, once he intervenes, the EPA Administrator may dismiss the action as a matter of right. And, as discussed (at 14), the False Claims Act shows that Congress knows how to grant the United States the ability to seek dismissal of a case, and the textual choice not to do so here must be respected. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018).

Instead of identifying express text that supports it, the United States argues (at 10) that the provisions in Section 7604 that address the government's role "must be interpreted to include [that] right to dismiss." That is not how statutory interpretation works. Policy arguments or an official's preferences about what power they should have "cannot create an ambiguity when the words on the page are clear." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 370 (2018) (rejecting the Director of the Patent Office's view that a statute granted him "a wholly unmentioned 'partial institution' power" to "select only some challenged claims for decision"). A court's "duty is to give effect to the text that 535 actual legislators (plus one President) enacted into law." *Id.*

That aside, the United States's view that Section 7604 secretly grants it this expansive power cannot be squared with the statutory text. At bottom, its view is (at 13) that the section "expressly envision[s] that the United States could preclude citizen-enforcement actions" because

its provisions provide the government with a clear, specified role in Section 7604 proceedings. That overreading of the statute gets things backwards: Yes, the political branches consciously and carefully addressed the government's role in this provision. No, that does not mean courts should read this provision to grant the government *more* authority than the provision's text does.

Section 7604 specifies the conditions under which government action could preclude a person from initiating a lawsuit. Before suing under Section 7604(a)(1), plaintiffs must give sixty-days' notice of the violation to the polluter and the EPA Administrator (and the relevant state). *See* 42 U.S.C. § 7604(b)(1)(A). This gives the government time to act and remove the need for the person to sue. *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989).[7] Government action during that period precludes a person from being able to sue after the notice period only where there is action by EPA or a state to "commence[]" and "diligently prosecut[e] a civil action . . . to require compliance with the" pollution standard being violated. 42 U.S.C. § 7604(b)(1)(B).[8] The upshot is that the Act is structured to preclude a person from suing only if the government is already bringing the polluter into compliance with the relevant requirements—that is, the text's focus is on ensuring air pollution standards are met and people are protected.

If EPA or the State does not enforce the same standards before the notice period expires, Section 7604 expressly authorizes citizens to file an enforcement action. It also specifies how the

---

[7] It also gives the polluter an opportunity to bring itself into compliance and avoid the suit.

[8] The text of the Act is plainly focused on two things: (1) giving these governments an ability to sue *first* and thereby preclude a person from suing separately under Section 7604 and (2) specifying the relationship between the federal government and the person suing under Section 7604 after he sues. That does not mean that other actions to bring the polluter into compliance cannot, as a practical matter, affect a person's ability to sue under Section 7604(a) through doctrines such as standing or mootness. *See, e.g., Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008). But those practical effects flow from established legal doctrines, not from *implying* powers that do not exist in the text of the Clean Air Act.

federal government may join if it wishes to influence the outcome of that person's suit. The person suing must serve his complaint on the EPA Administrator and the Attorney General. *See* 42 U.S.C. § 7604(c)(3). As discussed, the EPA Administrator may intervene as a matter of right at any time. *See id.* § 7604(c)(2). And the person may not resolve the suit through a consent judgment without providing the EPA Administrator and the Attorney General at least 45 days of notice, to allow either comments on the proposed judgment or for intervention at that time. *See id.* § 7604(c)(3).

Notably absent from the text is any mechanism for the government to dismiss a suit brought under Section 7604(a). The statutory context confirms as much. Congress considered amending the Clean Air Act to provide the United States with similar authority to what it seeks here. In 1990, an amendment was proposed that would have allowed "the Administrator" to "substitute himself as the plaintiff with regard to any claim for civil penalties. Upon such substitution, the citizen plaintiffs' claims for civil penalties shall abate." Nickles (and Others) Amendment No. 1373 § 609(a)(3) (Mar. 26, 1990), reprinted in 4 Comm. on Env't and Pub. Works, 103d Cong., Legislative History of the Clean Air Act Amendments of 1990, at 6406, 6427 (1998). This amendment was *narrower* than what the United States argues for here, in that the United States's authority to dismiss a suit would have been limited to a claim for civil penalties and not for a claim seeking injunctive relief. Even so, the amendment failed. *See Cook v. Gralike*, 531 U.S. 510, 521 (2001) (noting that "[t]he fact that the proposal [of an amendment] was made suggests that its proponents thought it necessary"—that is, was not in the text already "and the fact that it was rejected . . . suggests that we should give weight to the" rejection).

All of this leads to one inevitable conclusion: Section 7604 exists to allow a person being harmed from unlawful air pollution to sue when the government does not act to stop that pollution. That is what it means for the government to have "primary enforcement authority" under the Act,

*Env't Conservation Org.*, 529 F.3d at 528. The statute places the government in the role of the first (primary) mover, letting it decide whether it wants to address a violation before a person can sue and, in doing so, preclude that suit. But if the government "cannot or will not" move at all, the provision's clear function is to allow people to do *something* about their injuries from air pollution. *Gwaltney*, 484 U.S. at 62; *see also Stringer v. Town of Jonesboro*, 986 F.3d 502, 506 (5th Cir. 2021) ("Enforcement is primarily the work of government regulators. But Congress also empowered private citizens to bring suit . . . ." (cleaned up)).

There is no way to read these provisions to suggest that Congress, having gone out of its way to preserve people's ability to sue to *stop* unlawful pollution when the government has not, also implicitly authorized the government to dismiss those very suits at its whim because it would prefer that the unlawful pollution *continue*.

**B. Precedent does not support the United States's view.**

No court has agreed with the United States's position; instead, courts have rejected its logic. In *City of Green Forest*, the Eighth Circuit addressed a polluter's argument that "the EPA's decision *not to* commence an action against it is binding upon the" people who sued under the Clean Water Act's (CWA) equivalent of Section 7604(a). *EPA v. City of Green Forest*, 921 F.2d 1394, 1405 (8th Cir. 1990). That "novel proposition" didn't "detain [the court] long," because it "flies in the face of the clear language of the citizens' action provision of the CWA, as well as the legislative history, which make clear that agency inaction is precisely the circumstance in which private action is appropriate." *Id.*

The United States cherry picks quotes from *Gwaltney* to claim (at 14) that courts "have recognized" its view. There, the Supreme Court addressed whether the Clean Water Act provision largely paralleling Section 7604 authorizes people to sue not only to address ongoing unlawful pollution, but to address past violations. *See* 484 U.S. at 59. The text of the statute answered that

question: These suits address harm occurring "in the present or the future, not in the past." *Id.* The Court also noted that this reading avoided a situation where the Administrator acted to resolve violations during a certain time period by declining to seek civil penalties in exchange for the polluter installing stringent control technology, only to allow a person to upset that compromise years later by seeking civil penalties for violations in that same time period. *See id.* at 60–61. But *Gwaltney* did not endorse the United States's view that it has unfettered discretion to dismiss a person's suit. The opposite is true. It endorsed the idea that these suits are proper if "agencies fail to exercise their enforcement responsibility." *Id.* at 60 (cleaned up).

The other cases the United States cites (at 14–15) are similarly off-point. Each arose in a context where a government acted to require abatement of unlawful pollution, not one where the government acted to shield the polluter from liability. *See Env't Conservation Org.*, 529 F.3d at 523–24 (compliance order, settlement negotiation, enforcement action filing, consent decree); *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 466 (6th Cir. 2004) (enforcement action filing, consent decree); *EPA v. City of Green Forest*, 921 F.2d 1394, 1397 (8th Cir. 1990) (enforcement action filing, consent decree); *Karr v. Hefner*, 475 F.3d 1192, 1194–95 (10th Cir. 2007) (enforcement action filing, consent decree); *Supporters to Oppose Pollution, Inc. v. Heritage Grp.*, 973 F.2d 1320, 1322 (7th Cir. 1992) (enforcement action filing, order for corrective action and fines).

**C. The United States's remaining arguments lack merit.**

The United States has various additional atmospheric arguments, none of which can justify overriding the statutory text.

*First*, it points out (at 12) that it exercises discretion when deciding whether and how to pursue those who violate the Clean Air Act. True enough. But a citizen suit when the government does not pursue a violator does not interfere with that discretion. *Heckler*, on which the United States relies, shows as much. There, the Supreme Court held the Administrative Procedure Act

exception to reviewability for action committed to agency discretion "include[s] agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Heckler v. Chaney*, 470 U.S. 821, 838 (1985). In doing so, it explained that these refusals can turn on different factors, such as "whether a violation has occurred," whether the agency has the resources to devote to the proceeding, whether doing so "best fits the agency's overall policies," and whether the agency "is likely to succeed." *Id.* at 831. These factors shape the government's choice about how to allocate its own limited resources. But when a person sues under Section 7604(a), they are using their own resources, not the federal government's. Their suit does not affect the government's discretion about whether to initiate enforcement proceedings.[9]

This takes care of the United States's citation (at 11) to *Dubois v. Thomas*, 820 F.2d 943, 949 (8th Cir. 1987), which contradicts the United States's arguments here. There, the court held, referencing *Heckler*, that a person cannot sue the EPA Administrator under the Clean Water Act provision that parallels Section 7604(a)(2) to challenge a failure to initiate an enforcement proceeding. *See id.* at 945–46, 948–49; *see also* 42 U.S.C. § 7604(a)(2) (allowing suit "against the Administrator" for "failure . . . to perform any act or duty under this chapter which is not discretionary"). Such a suit would allow the plaintiff "access to enforcement power of the federal government," where the proper step was instead "to supplement that power by bringing actions directly against violators." *Dubois*, 820 F.2d at 949. As *Dubois* recognized, there is no conflict between enforcement discretion and a suit under Section 7604(a)(1) or (3) like this one.

---

[9] The United States cites (at 18, 22) to portions of In re *Aiken Cnty.*, 725 F.3d 255, 261–66 (D.C. Cir. 2013), that failed to secure a majority. *See id.* at 261 n.2 (noting that then-"Judge Kavanaugh alone joins Part III"). Even that dicta does not support the United States's view, as it discusses the view that "Congress may not mandate that the President prosecute a certain kind of offense or offender." *Id.* at 263. Nothing in Section 7604(a) mandates that the President do so.

*Second*, and relatedly, the United States says (at 12) that it is entitled to dismissal of NAACP's claims because it wants to set "the desired level of deterrence" under the Clean Air Act. But, in authorizing state enforcement and citizen suits, Congress rejected the view that the federal government alone should set the level of deterrence. Rather, Congress's authorization of standalone citizen suits—brought only in circumstances where the government has declined to act—reflects its judgment for the need for an additional "quantum of deterrence" beyond what the government alone might provide. *See Laidlaw*, 528 U.S. at 186–87; *supra* at 6, 16, 19.

Moreover, the government's argument for *less* deterrence (that is, *more* violations of) federal law is troubling on its own terms. There is no legitimate public interest in facilitating violations of law. *Cf. United States v. Nixon*, 418 U.S. 683, 696 (1974) ("So long as [a] regulation remains in force, the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and enforce it."); *Curry v. Regents of the Univ. of Minn.,* 167 F.3d 420, 422 (8th Cir. 1999) (denying intervention to groups with no "constitutional or legal right" to continue unlawful activity). But that is what accepting the United States's view would cause, and not just in the environmental context: The U.S. Code is filled with provisions that parallel Section 7604—that is, provisions that give a federal agency the first shot at addressing a violation of a federal law but allow a person to sue on his own if the government does not act (or does not act within time limits). *See, e.g.*, 18 U.S.C. §1514A(b)(1) (Sarbanes Oxley Act whistleblower retaliation protections). And under the government's theory, it has an implicit right to intervene in any of these and dismiss the suit simply because it would prefer less deterrence.

*Third*, the United States says (at 15) that it has "determined" that relief here is not "consistent with federal policy and the public interest." But the Clean Air Act tells the EPA Administrator how to make his views known in this Court. He may intervene (presumably as a

Case 3:26-cv-00806 Document 37 Page 35 of 45 Date Filed: 10/16/2026

plaintiff, as the United States takes pains not to say xAI is *complying* with the Clean Air Act) and, in relevant briefing, oppose those forms of relief he does support (for example, the United States appears to leave open injunctive relief to install the pollution controls the Act requires). This Court can then give those views appropriate weight when exercising its role under Section 7604's remedy provisions, such as when shaping injunctive relief. *See* 42 U.S.C. § 7604(a) (authorizing the district court "to enforce [the] emission standard or limitation, or . . . order" being violated or "apply any appropriate civil penalties"); *see also id.* § 7604(c)(3) (laying out exactly this process to ensure the federal government can offer its views on any consent judgment). What Congress did not do is give the United States the power to dismiss an injured party's claims.

As to the specific policy the United States mentions, it appears to be of two minds. It discusses national security but then claims (at 9) that its reasons are irrelevant to whether the Court should dismiss the case. Regardless, the statutory text precludes the United States's argument. Congress gave the Executive Branch authority to grant exemptions (including for national security reasons) in other parts of the Act, but chose not to do so in Section 7604. The provision applying the Act to federal facilities, for example, authorizes the President to "exempt" any federal emission from some (but not all) requirements "if he determines it to be in the paramount interest of the United States to do so." 42 U.S.C. § 7418(b) (not authorizing an exemption from the new source performance standards in Section 7411 and authorizing exemptions from the hazardous air pollutants program only under the Section 7412(i)(4) procedures). The hazardous air pollutants program authorizes the President to "exempt any stationary source from compliance" after determining "that the technology to implement such standard is not available and that it is in the national security interests of the United States." *Id.* § 7412(i)(4).

Congress knows "exactly how to" authorize an Executive Branch actor to exempt a source from the Act's requirements. *Iancu*, 584 U.S. at 364–65. Its choice not to authorize the EPA Administrator to dismiss a Section 7604(a) suit "requires respect, not disregard." *Wis. Cent.*, 585 U.S. at 279. The United States cannot by litigation create exemptions that render Congress's legislative choices superfluous. *United States ex rel. Conyers*, 108 F.4th 351, 357 (5th Cir. 2024); *see also Enbridge Energy, LP v. Nessel*, 146 S. Ct. 1074, 1082–83 (2026) (declining to read in additional equitable exceptions into a statute containing "[a]n explicit listing of exceptions" that "already reflect equitable considerations" (cleaned up)).

To the extent this Court views the substance of the United States's references to national security relevant, it should seek extra briefing on the issue and allow the development of a record beyond the United States's improperly submitted declaration. From what we do know, the United States's assertion (at 9) that the turbines at issue here are "the power that supports Grok" makes little sense. xAI has stated that it will begin removing turbines from the site as soon as August. *See* Dkt. No. 61 (Defs.'PI Br.) at 1. If those turbines were critical to the United States, one would think xAI would not be taking those actions.

Moreover, there's reason to question the declarant's statement that "preserving xAI's current data center capacity" powered by the plant "is a matter of paramount national security." Dkt. No. 58-01 (Stanley Decl.) ¶ 8. Grok's operations in support of the Department of War ("Grok for Government") began *before* the Southaven Colossus Gas Plant was constructed, *see Announcing xAI for Government, xAI* (July 14, 2025), https://x.ai/news/government, and, since entering into the Grok for Government partnership, xAI has made billions selling off its excess data center capacity. As an example, on the very same day NAACP moved for a preliminary injunction, xAI announced its plans to rent out "compute" power, including from Colossus 1, to

Anthropic for $1.25 billion a month, power that could have been used to support its "Grok for Government" efforts.[10] Nothing in the declaration explains why xAI cannot satisfy its obligations using this excess compute power, which would not be impacted by the relief Plaintiffs seek here.

## III. The constitutional avoidance canon does not support interpreting the Clean Air Act to grant the United States a unilateral right to dismiss.

The United States attempts to support its atextual reading of the Clean Air Act with an argument that its reading "avoid[s] serious constitutional questions." U.S. Br. at 17–23. But that's "not how the canon of constitutional avoidance works." *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018). It at most permits a court to "choos[e] between competing *plausible* interpretations of a statutory text" but does not "give a court authority to rewrite a statute as it pleases." *Id.* Without any textual hook for the United States's claimed dismissal right, *see supra* § II, constitutional avoidance can play no role. Regardless, citizen suits pose no constitutional problem, *infra* § III.A, and the United States's arguments to the contrary lack merit, *infra* § III.B.

### A. Section 7604 does not raise constitutional concerns.

The United States is wrong that allowing people to sue under the Clean Air Act to abate pollution that is harming them violates the Vesting and Take Care Clauses of Article II, which provide that "[t]he executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1 & § 3. Every court that has addressed

---

[10] *New Compute Partnership with Anthropic*, xAI (May 6, 2026), https://x.ai/news/anthropic-compute-partnership; SpaceX, Registration Statement (Form S-1) (May 20, 2026), https://perma.cc/GMF2-5W7U, at 13. xAI is also renting its excess compute power to Google ($920 million a month) and Reflection AI ($150 million a month). *See* SpaceX, Registration Statement Amendment No. 2 Free Writing Prospectus (Form S-1) (June 3, 2026), https://perma.cc/TVT6-GS7G; Carmen Arroyo & Rachel Metz, *SpaceX Inks Multibillion-Dollar Computing Deal with Reflection AI*, Yahoo! Finance (June 22, 2026), https://finance.yahoo.com/technology/ai/articles/spacex-inks-multibillion-dollar-computing-150509579.html.

Article II challenges to similar private rights of action has rejected them, both in the environmental context[11] and elsewhere.[12] This Court should not be the first to hold otherwise.

The United States does not engage with any of that caselaw, but it nonetheless maintains that NAACP's interpretation of the Clean Air Act is inconsistent with Article II because it authorizes private parties to exercise Executive power. U.S. Br. at 23. The United States does not contend that enforcing federal law *always* must be an exercise of Executive authority. Rather, it concedes that, consistent with Article II, "Congress has the power to authorize private parties who have suffered Article III injury to sue to enforce certain federal statutes." U.S. Br. at 22. With good reason: While a "regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law" might raise Article II concerns, *TransUnion v. Ramirez*, 594 U.S. 413, 429 (2021), Article II "does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) (en banc); *see Davis v. Passman*, 442 U.S. 228, 241 (1979) ("[I]t is entirely appropriate for Congress, in creating [federal] rights and obligations, to determine in addition, who may enforce them and in what manner."). Congress can also allow "private parties to enforce the law through civil litigation." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357,

---

[11] *See, e.g.*, *Student Pub. Int. Rsch. Grp. of N.J. v. Monsanto*, 600 F. Supp. 1474, 1478–79 (D.N.J. 1985) (Clean Water Act); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 623–25 (D. Md. 1987) (Clean Water Act); *Natural Res. Def. Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 815–17 (N.D. Ill. 1988) (Clean Water Act); *Water Keeper All. v. Smithfield Foods*, 2001 WL 1715730, at *5 (E.D.N.C. Sept. 20, 2001) (Clean Water Act); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1065 (Clean Air Act); *Sierra Club v. Franklin Cnty. Power of Ill.*, 2006 WL 8455938, at *9–10 (S.D. Ill. 2006) (Clean Air Act); *Atl. States Legal Found. v. Buffalo Envelope*, 823 F. Supp. 1065, 1074–76 (W.D.N.Y. 1993) (Emergency Planning and Community Right-to-Know Act).

[12] *Capitol Records v. Alaujan*, 626 F. Supp. 2d 152, 154 (D.D.C. 2009) (Copyright Act); *Campaign Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 256 (D.D.C. 2021) (Federal Election Campaign Act).

367 (2025). Congress has exercised this authority to create private rights of action to supplement government enforcement actions in "almost every area of public law," from civil rights to antitrust. *See* Nitisha Baronia, et al., *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131, 140–44 (2026) (hereinafter "*Private Enforcement*"); *accord* U.S. Br. at 22–23.

The Clean Air Act citizen suit provision thus does not infringe on Article II because it authorizes private parties to seek redress on their own behalf, not on behalf of the federal government. While the "central purpose" of such provisions may be to permit "citizens to abate pollution when the government cannot or will not command compliance," *Gwaltney*, 484 U.S. at 62, a citizen plaintiff "commence[s] a civil action on his own behalf," 42 U.S.C. § 7604(a), not on behalf of the government. *See also Conservation Law Found. of New England, Inc. v. Browner*, 840 F. Supp. 171, 175 (D. Mass. 1993). Even where the federal government has brought suit, a private plaintiff may "intervene as a matter of right," 42 U.S.C. § 7604(b)(1), which further reflects that citizen actions assert an interest distinct from that of the government. Likewise, the provision authorizes citizen suits *against* the federal government, both when the government pollutes, *id.* § 7604(a)(1), or fails to perform a nondiscretionary duty, *id.* § 7604(a)(2), underscoring that Congress did not conceive of such suits as being *on behalf* of the federal government. Accepting the government's understanding of the provision would require viewing these suits too as on the government's behalf, which not only would be incoherent, but also would prevent the government from being held accountable for its own violations. Finally, it makes little sense to view suits under this provision as being on the federal government's behalf where the set of "person[s]" who "may commence a civil action" under the provision includes other governmental actors, like "States[s]" and "municipalit[ies]." 42 U.S.C. §§ 7602(e), 7604(a); *see U.S. Dep't of Energy v.*

*Ohio*, 503 U.S. 607, 616 (1992). Adopting the government's argument thus would threaten States' ability to pursue violations of the Act they detect. *Contra* U.S. Br. at 21.

Citizen suits, unlike actions brought by the federal government, do not vindicate some general public interest in environmental enforcement, but instead serve to address a concrete harm to the plaintiff. Citizen suit "provisions apply only to persons who can claim some sort of injury." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16–17 (1981); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 129 (1998) (Stevens, J., concurring) (reasoning that "EPCRA's citizen-suit provision" does not "impinge[] on the power of the Executive" where the plaintiff does not "merely possess[] the 'undifferentiated public interest' in seeing EPCRA enforced" but instead alleges "a particularized injury"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 347 (2016) (Thomas, J., concurring) ("The separation-of-powers concerns underlying our public-rights decisions are not implicated when private individuals sue to redress violations of their own private rights."). To that end, Congress provided, in the analogous Clean Water Act citizen suit provision, that inherent in the word "citizen" is a "person or persons having an interest which is or may be adversely affected." *See also* 33 U.S.C. § 1365(g); U.S. Br. at 4 n.1 (conceding CWA authority is "'persuasive' here"). And when it comes to remedies, a citizen plaintiff is limited to relief—whether injunctions or civil penalties—that "redress" the plaintiff's "injuries by abating current violations and preventing future ones." *Laidlaw*, 528 U.S. at 187. The Clean Air Act's private right of action thus furthers the public interest only in the indirect way that other kinds of private suits do: The "adjudication of private rights" both "redress[es] injuries *and* deter[s] harmful behavior." *Private Enforcement*, *supra*, at 150 (describing deterrent effect of tort law).[13]

---

[13] The United States emphasizes the Sixth Circuit's observation that citizen suit plaintiffs "seek relief not on their own behalf but on behalf of society as a whole." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004). But that decision did not engage with the Act's recognition

There is yet another reason that citizen suits should be understood to be private actions to secure particularized relief, and not merely relief on behalf of the general public: "[M]odern environmental statutes" are based on the common-law nuisance actions, which permitted private plaintiffs to bring suit only when they were harmed directly. *Cox v. City of Dallas*, 256 F.3d 281, 289, 291 (5th Cir. 2001); *Riley*, 252 F.3d at 753 (a "historical perspective provides us with a helpful bridge into the workings of the statute itself"). Nuisances could be private nuisances or public nuisances, where the former occurred upon a "nontrespassory invasion of another's interest in the private use and enjoyment of land," and the latter involved an "unreasonable interference with a right common to the general public." *Cox*, 256 F.3d at 289. Pollution could give rise to both kinds of nuisance, and in either case, a private plaintiff could maintain suit on his own behalf.

Pollution long has given rise to claims of private nuisance. Blackstone recognized pollution as an exemplar cause of "nuisance to one's lands," describing, for example, the operation of a "smelting house for lead" resulting in "vapor and smoke" that harmed property and livestock. 3 William Blackstone, *Commentaries* *217. The Second Restatement of Torts likewise drew upon cases where pollution, smoke, dust, and odors gave rise to claims of private nuisance. Restatement (Second) of Torts § 821D cmts. b, c, and Reporter's Note. It recognized that pollution should give rise to private nuisance liability when it actively interfered with the use of land (for example, by destroying crops), plaintiff's health, or merely interfered with the "pleasure, comfort and enjoyment that a person normally derives from the occupancy of land." *Id.*

Importantly, even where pollution also caused a public nuisance—that is, where it caused an "unreasonable interference with a right common to the general public"—private plaintiffs could

---

that citizen suits are on the private plaintiff's "own behalf" and instead relies on a case that predated *Laidlaw*'s rejection of the theory that citizen suits do not require "'personalized' remedies." *See id.* (citing *Orange Env't v. Cnty. of Orange*, 923 F. Supp. 529, 539 (S.D.N.Y. 1996)).

still bring suit, under either of two theories. First, the pollution giving rise to the public could independently give rise to a private nuisance claim when, "in addition to interfering with the public right," the nuisance also fit the definition of a private nuisance—that is, it "interferes with the use and enjoyment of the plaintiff's land." *See Cox*, 256 F.3d at 289. In those circumstances, the pollution "is a private nuisance as well as a public one." Restatement (Second) of Torts § 821C cmt. e. Second, the common law relaxed the general principle that no private "action lies for a public or common nuisance, but an *indictment* only," if the private plaintiff could establish that he "suffers some extraordinary damage." 3 William Blackstone, *Commentaries* *219–20; *see also* Restatement (Second) of Torts § 821C(1) & cmt. b. (recognizing private action "for a public nuisance" where the plaintiff "suffered harm of a kind different from that suffered by other members of the public"). Where a private plaintiff established that pollution interfered with the use and enjoyment of his land, he thus "can maintain an action not only on the basis of the private nuisance itself, but also . . . on the basis of the particular harm from the public nuisance." Restatement (Second) of Torts § 821C cmt. e. And, regardless of any harm to a plaintiff's property, he could maintain suit under this theory when the "public nuisance causes personal injury to the plaintiff." *Id.* § 821C cmt. d.[14]

Accordingly, the common law of nuisance reflected the same structured approach to litigating public harms that Congress would later adopt in the Clean Air Act: A "single act" might give rise to both "a private wrong and a public wrong," and a "private suit brought by the individual vindicate[s] the private wrong, and the public prosecution brought by the sovereign vindicate[s] the public wrong." *Ellingburg v. United States*, 607 U.S. 163, 179–80 (2026) (Thomas, J.,

[14] Plaintiffs' complaint alleges that the challenged pollution harms them in precisely the same ways that would have given rise to such common law nuisance claims: by physically harming them and interfering with their use and enjoyment of their land. Dkt. No. 1 ¶¶ 37–39, 42.

concurring) (describing common law); *Spokeo*, 578 U.S. at 345 (Thomas, J., concurring) (describing nuisance). Just as under common law nuisance, when a private plaintiff sues under the Clean Air Act, he brings a claim on his own behalf, not on behalf of the public.

These features of citizen suits—that they are on behalf of people, not the government, to secure relief to redress particular harms to those plaintiffs—place them on even firmer constitutional ground than qui tam suits, which the en banc Fifth Circuit has already upheld from Article II challenge, *Riley*, 252 F.3d at 751, 753–57; *see United States ex rel. Montcrief v. Peripheral Vascular Assocs.*, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring) (recognizing that *Riley* resolves whether there are "constitutional flaws in the FCA's *qui tam* device"); *United States ex rel. Gentry v. Encompass Health Rehab. Hosp.*, 157 F.4th 758, 766–67 (5th Cir. 2025) (Ho., J., concurring) (similar). Qui tam suits, unlike citizen suits, are brought "in the name of the Government" and seek to vindicate "an injury in fact suffered by the United States." *Vt. Agency of Natural Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 769–71 (2000). Such qui tam provisions "raise the most direct constitutional questions," *Private Enforcement*, *supra*, at 181, but even they do not "violate the constitutional separation of powers doctrine under the Take Care and Appointments Clauses of Article II." *Riley*, 252 F.3d at 751; *see generally* U.S. Br., No. 25-10842, *U.S. ex rel. Taylor v. Healthcare Assocs. of Tex.* (5th Cir. Mar. 23, 2026), Dkt. No. 91 (maintaining that qui tam provisions are consistent with Article II). Because citizen suits are not brought in the government's name, they do not even raise constitutional questions in the first place.

**B. The United States's contrary arguments lack merit.**

The United States's primary argument is that the provisions authorizing citizen suits permit plaintiffs "to seek civil penalties to the United States," which is a "quintessentially executive power." U.S. Br. at 19–20 & n.5, 23 (quoting *Seila Law v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020)). It contrasts that form of relief with "compensatory monetary relief." *Id.* at 23;

*see also id* at 20 n.5 (emphasizing that qui tam suits allow plaintiffs to "share in any monetary recovery"). The United States's argument fails on two levels.

First, the United States's argument is admittedly incomplete, where it recognizes that the citizen suit provision authorizes, and Plaintiffs have sought, "not just civil penalties but also injunctive relief." U.S. Br. at 21. There is no ground to argue that seeking this kind of injunctive relief intrudes on any Executive Branch prerogative. *Compare id.* at 21. At common law, plaintiffs were entitled to a "judgment . . . to have the nuisance abated." *See* 3 William Blackstone, *Commentaries* *221. And plaintiffs continued to secure that relief, including in cases where personalized "injury [was] occasioned by a public nuisance," leading up to the enactment of the Clean Air Act. *See Soap Corp. of Am. v. Reynolds*, 178 F.2d 503, 504–07 (5th Cir. 1949) (in case relating to "foul and obnoxious vapors . . . causing plaintiffs irreparable damage in their persons and property," plaintiffs "may, in the one action, restrain the source of the damage" rather than bring "successive suits for recurring damages"). Accordingly, even if the United States were correct that a suit seeking civil penalties must be subject to Executive control, that would supply no basis for the need for government control over suits seeking injunctive relief.

The United States maintains it is irrelevant that Plaintiffs also seek injunctive relief because the statute should be interpreted to authorize it to dismiss even private suits seeking "injunctive relief." U.S. Br. at 21. But even if the United States's argument that it must have some say over a Section 7604(a) claim seeking civil penalties is accepted, that would not give it any interest in—or basis to dismiss—claims seeking injunctive relief. Interpreting the act to allow the United States to dismiss only those claims over which it has an interest would eliminate the "constitutional doubts" the United States raises. U.S. Br. at 17. The United States's argument otherwise departs from historical practice, where it was accepted that the government could move to terminate only

Case: 26-10892 Doc: 92 Filed: 03/10/2026 Page: 368 of 436 PageID #: 2378

the portion of the action in which the government had an interest. *Private Enforcement*, *supra*, at 155–56, 168, 173–74 (detailing practice in England and early American practice).

Second, and more fundamentally, the United States is wrong that when private parties seek civil penalties they are exercising Executive power. To start, the United States's position here is an about-face from what it said just last year where it correctly recognized that citizen suits are, for Article II purposes, directly analogous to private suits under provisions allowing for compensatory relief. United States Br. 13–16, No. 24-13581, *United States ex rel. Clarissa Zafirov v. Fla. Med. Assocs.* (11th Cir. Jan. 6, 2025), Dkt. 39 (arguing that individuals bringing "private suits under . . . the Clean Water Act" "are not exercising Executive power"); *see also* United States Br. 12, No. 17-20545, *Environment Texas Citizen Lobby, Inc. v. Exxon Mobil Corp.* (5th Cir. Jan. 17, 2023), Dkt. No. 299 ("That limited—but important—role for citizen suits in protecting private interests [by seeking forward-looking relief] fully aligns with traditional understandings of the separation of powers."). Indeed, the United States defended citizen suits in even greater detail twenty-five years ago: "A citizen suit is a private action brought to redress harm to the plaintiff," which is "no different from any other lawsuit, such as an action brought in tort or in contract." Br. of United States as Intervenor Defending the Constitutionality of 33 U.S.C. § 1365, at 7–8, *N. Carolina Shellfish Growers Ass'n & N. Carolina Coastal Fed'n v. Holly Ridge*, No. 7:01-cv-36 (E.D.N.C. Aug. 15, 2001), Dkt. No. 33. That was also true of suits seeking "penalties" payable to the "federal treasury," because a citizen may obtain relief only if the "relief sought would deter further harmful violations of the law, thereby redressing harm to them." *Id.* at 11–12. And it is no matter that such relief also "serve[s] public goals in the course of advancing a private interest," because that dynamic is "pervasive throughout the law." *Id.* at 11. The upshot was clear: "There is nothing constitutionally suspect about these arrangements." *Id.* at 13.

The United States had it right before. The premise of the United States's new argument—that civil penalties, unlike compensatory relief, do not redress "any specific injury to the citizen-plaintiff," U.S. Br. at 23—is unsupportable. As the United States acknowledges (at 19 n.4), the Supreme Court rejected that claim in *Laidlaw*: Penalties, like injunctive relief, provide "a form of redress" for "future injury" because they can "effectively abate[]" harmful conduct "and prevent[] its recurrence." 528 U.S. at 185–87. Penalties for past violations that do not abate ongoing harm or prevent future harm serve only "vindication of the rule of law" and an "undifferentiated public interest," *Steel Co.*, 523 U.S. at 106 (cleaned up)—that is, the stuff of Executive enforcement. But when plaintiffs pursue civil penalties to remedy particularized concrete harm, as they do here, they are not standing in the shoes of the government. *Laidlaw*, 528 U.S. at 185–187.

The United States has hardly any support for the contrary conclusion, citing only non-binding concurrences and dissents from the Supreme Court and Fifth Circuit, *see* U.S. Br. at 19-20, and the Supreme Court's decision in *Seila Law*, U.S. Br. at 19, 23. The former are of no help because they conflict with the binding decision in *Laidlaw*, *see* U.S. Br. at 19 n.4. And the latter's observation that the power "to seek daunting monetary penalties against private parties on behalf of the United States" is a "quintessentially executive power," *Seila Law*, 591 U.S. at 219, cannot be read to say that every suit seeking penalties is an exercise of Executive power. In *Seila*, the entity that could seek penalties was an "independent administrative agency" designed to pursue the public interest broadly, by "'implement[ing] and enforc[ing]' a large body of financial consumer protection laws." *Id.* at 203, 206 (quoting 12 U.S.C. § 5511(a)); *see also Trump v. Slaughter*, 2026 WL 1855612, at *17 (U.S. June 29, 2026) (discussing "in-house adjudications" and "fil[ing] civil suits on behalf of the United States"). Those monetary penalties would not address any particularized harm to the agency bringing suit, but the public interest more generally,

and so of course would be exercising only a "quintessentially executive power." *Seila Law*, 591 U.S. at 219. But that does not in any way undermine the Supreme Court's recognition that private parties can use such penalties to seek personalized relief: abating "the threat of future injury" to them. *Laidlaw*, 528 U.S. at 185–87.

That leaves the United States's claim that there is no historical evidence showing that the Founders would have accepted that private parties could seek civil penalties. U.S. Br. at 20 & n.5.[15] But there is such evidence, in the form of early American legislatures going beyond common law nuisance by allowing parties to seek penalties for nuisances on behalf of the public. *See Private Enforcement*, *supra*, at 164–65. Moreover, there is evidence that private parties could seek equitable relief to abate nuisances, and there is no meaningful distinction about achieving that end through the deterrent effect of civil penalties, as opposed to a direct action for abatement, *see supra* at 27, 31, 33. That evidence, on top of all the historical evidence demonstrating the Founder's comfort with private parties seeking penalties in the qui tam context, shows that private parties can seek civil penalties without running afoul of Article II. *See Riley*, 252 F.3d at 752–53.

In the end, even if private suits for civil penalties are necessarily on behalf of the Executive, the United States maintains sufficient control to avoid any constitutional difficulty without granting it the dismissal right it seeks. *Contra* U.S. Br. at 20 & n.5. The Supreme Court previously emphasized that the United States "retains the power to foreclose a citizen suit by undertaking its own action," and that, if it "opposes a particular citizen suit, the statute allows" it to "'intervene as a matter of right' and bring [its] views to the attention of the court." *Laidlaw*, 528 U.S. at 188 n.4; *see* 42 U.S.C. § 7604(c)(2). Beyond that, the United States also could intervene as a defendant

---

[15] Given all the historical support discussed above, the United States wisely does not make the broader claim that there is no history or tradition of private individuals bringing suit to remedy particularized environmental harm. *See supra* at 28–30.

under Rule 24(b)(2) or file a statement of interest under 28 U.S.C. § 517. These mechanisms all would allow the government to assert its interests in the litigation and do so without it providing xAI blanket immunity for the ongoing harm its violations of the Act are imposing on communities.

The United States cannot square its claim that Article II requires more—that it be given the authority to take over *and dismiss* the action, U.S. Br. at 20 & n.5—with history showing that granting the "President a free-floating authority to annul private suits . . . that had been duly authorized by statute" would have been a "striking departure from English tradition." *Private Enforcement*, *supra*, at 158; *see also id.* at 155 ("[B]oth the *nolle prosequi* and the pardon were inapplicable against the Founding Era suits most directly relevant to modern private enforcement . . . ."); *see also supra* at 19–21 & n.9 (explaining why Section 7604(a) does not interfere with presidential control over prosecutorial decisionmaking, *contra* U.S. Br. at 18).

This Court should reject the Article II concerns the United States raises.

**CONCLUSION**

For these reasons, this Court should deny the United States's motion to dismiss the complaint.

Dated: July 10, 2026

Respectfully submitted,

/s/ Carroll Rhodes

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

/s/ Elias L. Quinn

Elias L. Quinn (CO Bar No. 42159)
(Pro Hac Vice) – Lead Counsel
Mary Rock (IL Bar No. 6332240)
(Pro Hac Vice)
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
(Pro Hac Vice)
Rebecca Ramirez (TX Bar No. 24126749)
(Pro Hac Vice)
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

/s/ Benjamin Grillot

Benjamin Grillot (DC Bar. No. 982114)
(Pro Hac Vice) – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit M

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **NAACP and NAACP MISSISSIPPI STATE CONFERENCE**<br><br>**Plaintiffs,**<br>**v.**<br><br>**X.AI CORP. and MZX TECH LLC**<br><br>**Defendants.** | **No. 3:26-cv-00074-DMB-JMV** |

**PLAINTIFFS' REBUTTAL MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

ARGUMENT ........ 1

I. The Colossus Gas Plant's unpermitted pollution harms frontline communities as a matter of law and a matter of fact. ........ 2

A. Recognizing more pollution—at any level—means more harm, Congress required Clean Air Act permits "notwithstanding" regional air quality. ........ 2

B. The science is settled: Colossus Gas Plant's pollution is harmful. ........ 3

II. Plaintiffs have established a likelihood of success on the merits of their claims. ........ 4

A. Defendants have failed their burden to establish a permitting exemption. ........ 4

B. MDEQ's two paragraph letter did not overwrite the Clean Air Act's substantive protections or excuse Defendants' violations. ........ 6

III. An injunction barring xAI's operation of unpermitted turbines is appropriate. ........ 8

A. xAI gained a competitive edge by breaking the law. Its profits from that conduct are no reason it should avoid compliance with the Clean Air Act. ........ 8

B. xAI's bond demand aims to escape any requirement for timely compliance. ........ 9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Dep't Envt'l Conserv.,* 540 U.S. 461 (2004) .......... 7

*Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res.*, 299 F.3d 1007 (9th Cir. 2002) .......... 7

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633 (N.D. Ala. 2014) .......... 9

*Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167 (2000) .......... 3

*Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440 (9th Cir 1984) .......... 2

*HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue*, 296 So. 3d 668 (Miss. 2020) .......... 7

*Pound v. Airosol Co.*, 498 F.3d 1089 (10th Cir. 2007) .......... 6

*Retractable Techs., Inc. v. Occupational & Med. Innovations, LTD.*, No. 6:08-cv-120, 2010 WL 3199624 (E.D. Tex. Aug. 11, 2010) .......... 9

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996) .......... 3, 7

*Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918 (7th Cir. 2008) .......... 5

*Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010) .......... 2

*Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) .......... 3

*United States v. Ameren Missouri*, 421 F. Supp. 3d 729 (E.D. Mo. 2019) .......... 3

*United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106 (D. Minn. 2010) .......... 8

*Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532 (2d Cir. 2004) .......... 7

*Windsurfing Int'l Inc. v. AMF, Inc.*,
782 F.2d 995 (Fed. Cir. 1986)....8

**Statutes**

42 U.S.C. § 7470(1) ....2

42 U.S.C. § 7470(4) ....5

42 U.S.C. § 7475....5

42 U.S.C. § 7604(d) ....9

**Federal Rules and Regulations**

40 C.F.R. § 52.21(b)(11)....5

62 Fed. Reg. 38652 (July 18, 1997)....3

71 Fed. Reg. 61144 (Oct. 17, 2006)....3

78 Fed. Reg. 3086 (Jan. 15, 2013) ....3

91 Fed. Reg. 1910 (2026) ....5

**State Rules and Regulations**

11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D(5) (2013) ....5

**Other Authorities**

Amended Space Exploration Technologies Corp., SEC Form S-1, June 3, 2026 ....8

H.R. Rep. 95-294, National Academy of Sciences, Summary of Proceedings:
Conference on Health Effects of Air Pollution (Nov. 1973) ....2

The Colossus Gas Plant spans city blocks, sports smokestacks three stories tall, and can generate enough power to serve a million homes. Without submitting a permit application that described its plans or assessed its pollution, xAI installed the Plant's first turbines in August 2025. The company's construction did not slow with NAACP's Notice of Intent detailing xAI's Clean Air Act violations, nor with the filing of the complaint in this case, nor even the submission of NAACP's motion for a preliminary injunction. Instead, the facility metastasized, growing from 18 to 27 to 33 to, now, 60 unpermitted gas turbines. xAI built at such a clip that its disclosures to the State couldn't keep up; its updates were out of date before they were submitted. Dkt. No. 49 at 1–2. And as the Plant rose in their midst, Memphis area communities were left to piece together the pollution threat for themselves, to requisition satellite images and seek expert counsel.

The Clean Air Act's substantive requirements ensure new pollution sources implement state-of-the-art pollution controls. More than that, though, the permitting process grants communities the dignity of transparency, of assessing and disclosing a pollution threat before it is built in their backyard. xAI's conduct failed on both counts. Now, day in and day out, the Colossus Gas Plant's pollution increases NAACP members' risks of heart disease, lung disease, and even premature death. The company provides no convincing reason why NAACP's request for preliminary relief to protect nearby members' health and welfare should be denied.

## ARGUMENT

In its brief opposing NAACP's Motion for a Preliminary Injunction (Dkt. No. 94), xAI does not meaningfully challenge the scope of its Colossus Gas Plant's pollution or that its pollution comes without a permit. Rather, xAI claims (1) its pollution is not harmful, (2) its Plant should be exempted or excused from permitting requirements, and (3) that, even if it is violating the law, the company is too profitable to be stopped. None of these arguments warrant denying the preliminary injunction NAACP seeks.

## I. The Colossus Gas Plant's unpermitted pollution harms frontline communities as a matter of law and a matter of fact.

In its Opposition Brief, xAI presses an antiquated theory that the Colossus Gas Plant's pollution cannot harm nearby communities because, they say, the region's air quality is relatively good. Following modern public health science, Congress rejected that notion generations ago.

### A. Recognizing more pollution—at any level—means more harm, Congress required Clean Air Act permits "notwithstanding" regional air quality.

Under the Clean Air Act, the National Ambient Air Quality Standards (NAAQS) serve as an air quality benchmark for various programs. But they do not serve as a limit below which air quality protections are no longer necessary or effective.

xAI suggests in its Opposition Brief (at 8–13) the Colossus Gas Plant cannot harm Plaintiffs' members because it claims the region's air quality is in attainment with the NAAQS. But the statute is explicit: operators must permit their facilities and implement pollution protections "***notwithstanding*** attainment and maintenance of all national ambient air quality standards." 42 U.S.C. § 7470(1) (emphasis added). This provision, passed 50 years ago as a part of the 1977 Clean Air Act Amendments, was crafted as a specific rejection of the argument xAI presses here. As Congress recognized then,

> The idea that the national primary standards are adequate to protect the health of the public has been belied. . . . '[I]t is impossible at this time to establish an ambient air concentration for any pollutant—other than zero—below which it is certain that no human beings will be adversely affected.'

H.R. Rep. 95-294 at 112 (quoting National Academy of Sciences, Summary of Proceedings: Conference on Health Effects of Air Pollution (Nov. 1973)).[1]

---

[1] *Cf. Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1011 (8th Cir. 2010) (merely setting ambient air quality goals "failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS"); *Hawaiian Elec. Co. v. EPA*, 723 F.2d 1440, 1447(9th Cir 1984) (recognizing that "NAAQS alone were insufficient to protect public health").

**B. The science is settled: Colossus Gas Plant's unpermitted pollution is harmful.**

The scientific consensus that drove Congress to adopt the PSD permitting program 50 years ago has not wavered. As Dr. Suh explained in her declaration (and EPA has concluded over,[2] and over,[3] and over[4] again), "any incremental increase in ambient $PM_{2.5}$ concentrations, including those associated with the Colossus Gas Plant, carries quantifiable public health consequences, regardless of whether the area remains in compliance with the NAAQS." Dkt. 51-46 (Public Health Review) ¶ 32 at 9-10; *see also United States v. Ameren Missouri*, 421 F. Supp. 3d 729, 774 (E.D. Mo. 2019) ("any incremental increase in $PM_{2.5}$ exposure produces an incremental increased risk of mortality and other health effects in the population exposed to" that pollution). Similarly, the scientific consensus indicates that "any increase in ambient $NO_2$ concentrations is harmful to health." Dkt. No. 51-46 ¶ 44 at 12.

Defendants (at 12) deride the standing witness' "worries" over their health as "speculative." But as Dr. Suh explains, these neighbors of the facility are right to be worried: the Colossus Gas Plant is dangerous. Unpermitted air pollution foisted on frontline community members by the Colossus Gas Plant increases their risks of heart disease, lung disease, and even premature death. *See* Dkt. No. 51-46 ¶¶ 22–25. And there is no question that such harms—and the related fears of community members—establish cognizable, traceable, and redressable harms.[5]

---

[2] *See* 78 Fed. Reg. 3086, 3148 (Jan. 15, 2013) (EPA recognizes that "there is no discernible population level threshold below which effects would not occur").

[3] *See* 71 Fed. Reg. 61144, 61158 (Oct. 17, 2006) (noting most new studies "have been unable to detect threshold levels" below which exposure to $PM_{2.5}$ pollution did not cause harm).

[4] *See* 62 Fed. Reg. 38652, 38670 (July 18, 1997) ("[T]he level or even existence of population thresholds below which no effects occur cannot be reliably determined by an examination of the results from the available studies.").

[5] The Supreme Court has recognized "reasonable concerns" as basis for an injury. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 183 (2000); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 558 (5th Cir. 1996) ("the fairly traceable element does not

Finally, xAI says (at 13) that NAACP "delay[ed]" filing this lawsuit challenging its illegal conduct. Since xAI never filed a permit application or submitted a plan for its unpermitted Gas Plant, citizens have been forced to build the case through painstaking investigation. xAI says (at 14) that NAACP "dragged its feet" in bringing this case. But the first time the company said anything about the amount of pollution its Gas Plant could emit was after this litigation was filed. *See* Dkt. No. 51-36 (May 15, 2026 Disclosure) at 4–7. xAI's claim of "undue delay" seeks to blame NAACP for the company's own lack of transparency.

## II. Plaintiffs have established a likelihood of success on the merits of their claims.

### A. Defendants have failed their burden to establish a permitting exemption.

Defendants' arguments for an exemption to the PSD program's plain permitting requirements lack a foothold in the Clean Air Act's text.

**"Mobile Source"**: Defendants assert that their 3-story, hundred-ton, required-a-crane-to-install turbines are "mobile" sources, and so the entire Colossus Gas Plant is exempt from the Act's permitting requirements for stationary sources. True, Mississippi's State Implementation Plan for the Clean Air Act's PSD permitting program does not independently provide a definition for 'mobile source.' But, as xAI admits (at 4), the State's SIP incorporates federal PSD regulations. Those federal regulations *do* define "mobile source" for PSD purposes. Dkt. No. 52 (NAACP's PI Brief) at 18. Rather than address those applicable definitions, xAI relies on a dictionary

---

require that the plaintiffs 'show to a scientific certainty that [the] defendant's effluent, and [the] defendant's effluent alone, caused the precise harm suffered by the plaintiffs.'"). Other than contesting whether its pollution causes harm, xAI does not contest that "the standing requirements of Article III can be satisfied" by an association acting "solely as the representative of its members," *Students for Fair Admissions v. Harvard*, 600 U.S. 181, 199 (2023), nor that NAACP satisfies the three-part test for such associational standing here. *Cf.* Dkt. No. 52 at 9–10. xAI does argue Clean Air Act does not provide a cause of action for associations to sue, but that argument lacks merit. *See* Dkt. No. 90 (NAACP MTD Opp Br.) at 14–18.

definition (at 17) to say "mobile" means anything that "can move or be moved," but the law—and EPA—recognize the difference: "The source is 'stationary' because the combustion turbine is not self-propelled or intended to be propelled while performing its function. Combustion turbines may, however, be mounted on a vehicle (or trailer) for portability and still be considered stationary." 91 Fed. Reg. 1910, 1914 (2026).

**"Temporary Use"**: Mississippi's Clean Air Act regulations use the word "temporary" twice; neither use has anything to do with gas turbines, emissions sources, or permitting exemptions. Where the State's implementation plan *does* discuss facilities "located only temporarily at a site," it is to ensure that such sources *nonetheless* obtain permits so that their construction and operations are regulated *wherever* the source is located. 11 Pt. 2 Ch. 2 Miss. Code R. 2.1 D(5) (2013). There is no basis for exempting "temporary" facilities from stationary source permitting in state or federal regulations, and Defendants do not claim there is.

**"Begin Actual Construction"**: The PSD permitting program is a "preconstruction" requirement that aims to "prevent" deterioration of air quality. 42 U.S.C. §§ 7470(4), 7475. To better implement the "preconstruction" aspect of the program, applicable regulations flesh out what it means to "begin actual construction" on a major source without the requisite permits and controls. 40 C.F.R. § 52.21(b)(11); *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 930 (7th Cir. 2008). Naturally, the phrase contemplates steps taken before the end of construction like laying "foundations," "pipework," and "storage structures" and other installations "of a permanent nature"; it could not be a "preconstruction" requirement if the obligations arose only after the facility was up and running. *Id.* So, under the regulations, certain pre-operational construction efforts trigger permitting obligations, which in turn establish emissions limitations.

xAI flips this sensible structure on its head. According to the company, it has not yet—indeed *cannot ever*—"begin actual construction" on their now-operating and polluting power plant. According to xAI, the company's unenforceable statement that the turbines are not "permanent" is enough to evade stationary source obligations. And even if their plan holds true, such an exemption would be no small matter when it comes to public health. The emissions limitations established in the PSD permits could force emissions reductions by as much as 90%. *See* Dkt. No. 52 at 17. So, on Defendants' theory, operators could install an uncontrolled turbine and emit 10-years-worth of pollution in one year without consequence, as long as they proclaim their (unenforceable) intention to wrap it up thereafter. But the Clean Air Act imposes objective standards and "strict liability upon owners and operators who violate the Act." *Pound v. Airosol Co.*, 498 F.3d 1089, 1097 (10th Cir. 2007). This Court should not allow xAI to escape compliance with only a say-so, nor squeeze a decades' worth of pollution into "temporary" operation.

xAI does not meaningfully contest the scale of the Colossus Gas Plant's potential emissions—but neither does the company give any reason why, under its theory, it could not double or triple the Plant's size. According to xAI's reading, a rotating fleet of "impermanent" turbines would be perpetually exempt from CAA requirements, and there is no limiting principle for its purported exemption that would give any meaning to the permitting requirements to confine their pollution to the emissions limitations established by the Clean Air Act.

### B. MDEQ's two paragraph letter did not overwrite the Clean Air Act's substantive protections or excuse Defendants' violations.

Unable to provide a basis for an exemption in the text of the law or the precedent implementing it, xAI pivots to procedural arguments. First, the company claims (at 16–20) that, because MDEQ said it, it must be valid. Next, xAI argues (at 22–26) that because MDEQ said it,

they should not be blamed for believing it. Finally, xAI insists (at 26–29) the citizen suit provision of the Clean Air Act violates the Constitution. None of these arguments hold water.

MDEQ's letter agreeing with xAI that the company's turbines are exempted from permitting is not dispositive, nor even persuasive. As described further in NAACP's Memorandum in Opposition to xAI's Motion to Dismiss, MDEQ's letter—like xAI's briefs—never wrestles with the applicable definition of "mobile source," never provides a citation for its "temporary" exemption, and ignores the fact that EPA confirmed in 2025 (and again in 2026) that portable gas turbines like these are still stationary sources. *See* Dkt. No. 90 (NAACP MTD Opp Br.) at 18–24. Rather than defend the letter's scant reasoning, xAI insists on the sanctity of the result because it was printed on MDEQ letterhead. But a regulator's failure to follow the law is no safe harbor. A court's review of a state agency's permitting decision is not limited to "the insubstantial question whether the state permitting authority . . . uttered the key words." *Ala. Dep't Envt'l Conserv.,* 540 U.S. 461, 489 (2004).[6] And courts regularly consider citizen suits where plaintiffs allege state authorities failed to implement the law's objective requirements. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 566 (5th Cir. 1996).[7]

With its last effort, xAI argues (at 26–29) that the Clean Air Act's citizen suit provision is itself unconstitutional. Every court to confront that argument has rejected it, and with good reason: Article II allows Congress to authorize private parties to sue on their own behalf for violations of federal law, and the Clean Air Act's text and common-law antecedents show that's exactly what a citizen suit is. *See* Dkt. No. 90 (NAACP MTD Opp. Br.) 26–35.

---

[6] *Accord HWCC-Tunica, Inc. v. Mississippi Dep't of Revenue*, 296 So. 3d 668, 677 (Miss. 2020) (agency interpretations of statutes should not "receive deferential treatment," and the interpretations and opinions of administrative agencies are not controlling on courts").

[7] *See also Weiler v. Chatham Forest Products, Inc.*, 392 F.3d 532, 538 (2d Cir. 2004); *Ass'n to Protect Hammersley, Eld, & Totten Inlets v. Taylor Res*., 299 F.3d 1007, 1011–12 (9th Cir. 2002)

## III. An injunction barring xAI's operation of unpermitted turbines is appropriate.

xAI's facility is polluting illegally. That pollution harms the Black and other frontline communities surrounding the facility. The Colossus Gas Plant's operation should be enjoined.

### A. xAI gained a competitive edge by breaking the law. Its profits from that conduct are no reason it should avoid compliance with the Clean Air Act.

xAI argues (at 30) that an injunction would cause the company to "suffer permanent competitive damage." But the market advantage xAI enjoys now was gained by skirting the permitting requirements of the Clean Air Act.

In recent filings with the SEC, SpaceX—corporate parent to both Defendants—touted its ability to bring the Colossus 2 data center online in 91 days when "an industry benchmark for a 100 megawatt" center is "approximately two years."[8] The company's "significant improvement in cost efficiency" over competitors was made possible by sidestepping permitting review times and avoiding pollution control costs. SpaceX then leased the Colossus 1 and 2 data centers to another artificial intelligence company for more than a *billion dollars* a month.[9] Since the Colossus 2 data center is powered exclusively by the Colossus Gas Plant, the deal would not have been possible without xAI's operation of this unpermitted and illegal source of power.

xAI's market advantage was achieved at the expense of other tech companies who follow the law and paid for by withdrawals from the health and welfare of frontline communities. Thus, the "competitive damage" Defendants fear is in fact the indelible cost of doing business in accordance with the law, and should not weigh on the equities of an injunction. *Accord Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to

---

[8] Amended Space Exploration Technologies Corp., SEC Form S-1 at 8 ("SpaceX S-1"), June 3, 2026 https://perma.cc/NLN6-NYUC; *accord United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1113 (D. Minn. 2010) ("the [Clean Air Act] permitting process takes up to two years").

[9] SpaceX S-1 at 13.

build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Retractable Techs., Inc. v. Occupational & Med. Innovs*, 2010 WL 3199624, at *5 (E.D. Tex. Aug. 11, 2010) (a company's "financial position as a result of its infringement is irrelevant to the Court's injunction analysis").

**B. xAI's bond demand aims to escape any requirement for timely compliance.**

xAI's bond demand essentially insists the company's profits are too big for it to be stopped—no matter how brazen its violations. The company (at 2) claims that its artificial intelligence installations around Memphis make up "perhaps the largest private investment in Mississippi's history." Any bond big enough to cover a number like that would be prohibitive, essentially immunizing the company from preliminary relief in citizen suits. *Cf. Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 297 F.R.D. 633, 635 (N.D. Ala. 2014) (noting "[a] bond in the amount of $780,000,000 would, of course, be prohibitive in any case"). But, in keeping with its public interest purpose, the Clean Air Act's citizen suit provision states a court "may" require a bond to secure a preliminary injunction, not that it "shall" or "must." 42 U.S.C. § 7604(d); *see also* Dkt. No. 52 (PI Brief) at 26 (discussing bonds in public interest litigation).

Without an injunction, Defendants will learn all the wrong lessons at its Colossus Gas Plant. SpaceX has already announced plans to "rapidly bring gigawatt-scale data centers online"—and it highlighted the Colossus 1 and 2 data centers as examples of its success. SpaceX S-1 (*supra* n.8) at 168-69. Even more concerning: SpaceX disclosed an $805-million purchase agreement to acquire more "turbines for AI infrastructure." *Id.* at F-61. If profits excuse pollution, this will not be the last time NAACP members and others in the Memphis area are forced to breathe the pollution from unpermitted turbines in their homes, at their jobs, or in their churches.

Dated: July 15, 2026

Respectfully submitted,

*/s/ Carroll Rhodes*

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

*/s/ Elias L. Quinn*

Elias L. Quinn (CO Bar No. 42159)
*(Pro Hac Vice)* – Lead Counsel
Mary Rock (IL Bar No. 6332240)
*(Pro Hac Vice)*
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
*(Pro Hac Vice)*
Rebecca Ramirez (TX Bar No. 24126749)
*(Pro Hac Vice)*
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

*/s/ Benjamin Grillot*

Benjamin Grillot (DC Bar. No. 982114)
*(Pro Hac Vice)* – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
*(Pro Hac Vice)*
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*

# Exhibit N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiffs,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**REPLY MEMORANDUM IN SUPPORT OF THE UNITED STATES' AMENDED MOTION FOR INTERVENTION AND DISMISSAL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. Consistent with Article II, the United States' right to intervene in this Clean Air Act enforcement action includes a right to dismiss the entire action. ........ 1

  A. The Clean Air Act supports the United States' interpretation ........ 2

  B. Constitutional avoidance favors the United States' interpretation ........ 8

II. The United States may dismiss this entire case pursuant to Rule 41 ........ 16

CONCLUSION ........ 16

# TABLE OF AUTHORITIES

**Cases** Pages(s)

*Atl. States Legal Found., Inc. v. Eastman Kodak Co.*,
933 F.2d 124 (2d Cir. 1991) ........ 5

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........ 6

*Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*,
652 F. Supp. 620 (D. Md. 1987) ........ 10

*Clark v. Martinez*,
543 U.S. 371 (2005) ........ 14

*Confiscation Cases*,
74 U.S. 454 (1868) ........ 13

*Cox v. City of Dallas*,
256 F.3d 281 (5th Cir. 2001) ........ 11

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) ........ 9

*Env't Conservation Org. v. City of Dallas*,
529 F.3d 519 (5th Cir. 2008) ........ 11

*Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*,
123 F.4th 309 (5th Cir. 2024) ........ 4, 9

*EPA v. City of Green Forest*,
921 F.2d 1394 (8th Cir. 1990) ........ 5, 7

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) ........ 9, 10

*Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*,
146 F.4th 1080 ........ 1

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*,
484 U.S. 49 (1987) ........ 2, 4, 6

*Henrikson v. Guzik*,
249 F.3d 395 (5th Cir. 2001) ........ 4

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) .......... 6

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 8, 9

*Lockett v. EPA*,
319 F.3d 678 (5th Cir. 2003) .......... 6

*Lozano v. Montoya Alvarez*,
572 U.S. 1 (2014) .......... 2

*Negusie v. Holder*,
555 U.S. 511 (2009) .......... 3

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) .......... 11

*S. River Watershed All., Inc. v. Dekalb Cnty.*,
69 F.4th 809 (11th Cir. 2023) .......... 4

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 8, 9

*Sierra Club v. EPA*,
60 F.4th 1008 (6th Cir. 2023) .......... 11

*Sierra Club v. Tenn. Valley Auth.*,
430 F.3d 1337 (11th Cir. 2005) .......... 13

*Sierra v. City of Hallandale Beach*,
996 F.3d 1110 (11th Cir. 2021) .......... 12

*SPIRG of N.J., Inc. v. Monsanto Co.*,
600 F. Supp. 1474 (D.N.J. 1985) .......... 10

*Taylor v. U.S. ex rel. U.S. Drug Enf't Admin.*,
2015 WL 5971188 (N.D. Miss. Oct. 14, 2015) .......... 8

*Torres v. Lynch*,
578 U.S. 452 (2016) .......... 3

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 7

*Trump v. Slaughter,* 609 U.S. —,
2026 WL 1855612 (June 29, 2026) .................... 14, 15

*United States v. Am. Elec. Power Serv. Corp.*,
137 F. Supp. 2d 1060 (S.D. Ohio 2001) .................... 10

*United States v. Hansen*,
599 U.S. 762 (2023) .................... 8, 9

*United States v. Telluride Co.*,
146 F.3d 1241 (10th Cir. 1998) .................... 11

*Wisconsin Cent. Ltd. v. United States*,
585 U.S. 274 (2018) .................... 3

**Statutes**

18 U.S.C. § 1514A(b) .................... 4

18 U.S.C. § 1514A(c) .................... 4

42 U.S.C. § 7412(i)(4) .................... 5

42 U.S.C. § 7418(b) .................... 5

42 U.S.C. § 7604 .................... 3

42 U.S.C. § 7604(a) .................... 13

42 U.S.C. § 7604(a)(1) .................... 13

42 U.S.C. § 7604(a)(2) .................... 13

42 U.S.C. § 7604(b)(1)(B) .................... 5

42 U.S.C. § 7604(c)(2) .................... 2, 5, 14

42 U.S.C. § 7604(e) .................... 11

42 U.S.C. § 7604(g) .................... 8, 12

Pub. L. No. 99-562, § 3, 100 Stat. 3153 (1986) .................... 3

**Rules**

Fed. R. Civ. P. 41 .................... 16

Fed. R. Civ. P. 41(a)(1)(A) .......... 16

**Other Authorities**

S. Rep. No. 91-1196 (1970) .......... 11

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 96 (2012) .......... 2

Nitisha Baronia, et al., *Private Enforcement at the Founding & Article II*, 114 Calif. L. Rev. 131 (2026) .......... 10, 12

**Constitutional Provisions**

U.S. Const. art. II, § 1 Cl. 1 .......... 15

U.S. Const. art. II, § 1 Cl. 3 .......... 15

## INTRODUCTION

The United States, acting on behalf of the Administrator of the Environmental Protection Agency (EPA), Lee M. Zeldin (together, the "United States"), intervenes as of right in this Clean Air Act citizen suit to dismiss it. The dispositive factor is that the Clean Air Act, consistent with Article II of the Constitution, does not license private attorneys general to substitute their enforcement decisions for those of the Executive Branch.

The NAACP opposes the United States' intervention and dismissal motion on the ground that the Clean Air Act entitles it to enforce the statute's federal permitting regime—and exact monetary penalties from private parties, payable solely to the United States Treasury—over the United States' opposition. Dkt. No. 92 at 1-2 ("NAACP Mem."). For the reasons discussed here and in our motion, the Court should reject the NAACP's argument and grant dismissal.

## ARGUMENT

### I. Consistent with Article II, the United States' right to intervene in this Clean Air Act enforcement action includes a right to dismiss the entire action.

"Citizen suits" are "enforcement actions." *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 146 F.4th 1080, 1091 (11th Cir. 2025) (Pryor, C.J., concurring). The United States, in its Amended Memorandum in Support of Intervention and Dismissal, explained why the Clean Air Act does not authorize private enforcers to seek relief that federal enforcers choose to forgo. Any other interpretation would render the federal government's express intervention right meaningless in cases where it determines that a civil enforcement action is against public policy. Dkt. No. 86 at 10-17 ("U.S. Am. Mem."). Stripping the Executive Branch of its preclusive discretion not to enforce the statute would also raise serious questions about the citizen-suit provision's consistency with Article II. *Id.* at 17-23. While the NAACP disagrees, it misconstrues the Clean Air Act and the nature of Article II.

**A. The Clean Air Act supports the United States' interpretation.**

The Clean Air Act's structure, allocation of enforcement authority, and purpose make clear that environmental regulation and enforcement is primarily left to the federal government. Yet, the NAACP attempts at best to ignore the Act's text and interpreting decisional law. NAACP Mem. at 14-15. The NAACP also attacks the United States' reasons for disagreeing with its attempted enforcement of federal law. *Id.* at 22-24; *see also Gwaltney*, 484 U.S. at 61 (stating citizens may not seek relief that government enforcers deliberately choose "to forgo"). NAACP's arguments are unavailing. Statutory text and structure, along with the pertinent precedent, confirm that private citizens' decisions about when and how to enforce the Clean Air Act cannot override those of federal enforcers.

**1.** The NAACP's lead textual argument is that that the citizen-suit provision does not expressly state that the United States may dismiss a citizen suit. *Id.* at 14-18. That is not dispositive. "[T]he principle that what a text does not provide is unprovided[ ]must sometimes be reconciled with the principle that a text does not include not only what is express *but also what is implicit*." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 96 (2012) (emphasis added). For example, courts routinely construe statutes of limitations to contain implicit equitable-tolling exemptions because it is "part of the established backdrop of American law." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014). So too here. Further, the NAACP does not dispute that the federal government's unconditional permission to "intervene" under 42 U.S.C. § 7604(c)(2) must necessarily encompass other procedural rights inherent in litigating a matter—for example, filing briefs and motions and appealing from adverse decisions. *See* NAACP Mem.; U.S. Am. Mem. at 10. And it offers no textual reason to distinguish those other procedural rights from the right to dismiss.

For similar reasons, the NAACP unpersuasively contrasts the citizen-suit provision with the False Claims Act provision allowing the United States to dismiss relators' qui tam actions. NAACP Mem. at 14-15. The NAACP invokes (at 15) the rebuttable presumption that variations in statutory language ordinarily convey different meanings. But nothing mandates that disparate parts of the U.S. Code use identical language across all statutes to do similar things. *See Negusie v. Holder*, 555 U.S. 511, 518-19 (2009) (rejecting a comparison between two statutes enacted for different purposes); *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (the variation presumption has force where "the same Congress" enacted the statutes "to handle much the same task").

Here, the presumption of consistent usage "readily yields" because the Clean Air Act's environmental-enforcement scheme is "unrelated" to the False Claims Act's fraud-enforcement scheme. *Torres v. Lynch*, 578 U.S. 452, 471-73 (2016) (statute required disregarding crime's jurisdictional elements in deportation proceedings, despite "omission of [such] statutory language," although an "unrelated law" "expressly" included a similar instruction). And while the NAACP says (at 15) that the False Claims Act shows "Congress knows" how to make the dismissal right express, the 1986 Congress that enacted that statute's dismissal provision was plainly not the same as the 1970 Congress that authorized federal intervention in citizen suits. *See* Pub. L. No. 99-562, § 3, 100 Stat. 3153, 3155 (1986); 42 U.S.C. § 7604. Nor was it the same as the 1990 Congress that amended the citizen-suit provision.

"The question, then, is not: Could Congress have indicated (or even did Congress elsewhere indicate) in more crystalline fashion" that the United States' right to intervene in a citizen enforcement action includes a right to dismiss? *Torres*, 578 U.S. at 472-73. The question is whether the citizen-suit intervention right is correctly read to include the dismissal right. *Id.* Our

Amended Memorandum (at 10-14) details why, in the context of Clean Air Act enforcement, the right to deny "support" and "consent" for the enforcement action must be implicit in the federal-intervention provision. *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 123 F.4th 309, 343 (5th Cir. 2024) (en banc) (Davis, J., concurring); *id.* at 375 n.32 (Jones, J., dissenting). "[P]ermitting citizen suits" to "second-guess" the federal government's (and state governments') balancing of the public interest in enforcement decisions is "improper." *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 825 (11th Cir. 2023). *But see* NAACP Mem. at 21 (doing precisely that).[1]

Our contention here is not a "[p]olicy argument." NAACP Mem. at 15. Considering "context" and statutory "structure" is "important." *Henrikson v. Guzik*, 249 F.3d 395, 398 (5th Cir. 2001). The United States' interpretation respects the statute's careful allocation of enforcement authority and effectuates the procedural constraints that prevent "intrusive," overzealous private enforcement. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987); *see* U.S. Am. Mem. at 4 n.1, 13-14. Because the United States' interpretation is specific to the Clean Air Act, accepting it would not mean that the government has an implicit right to intervene and dismiss private actions under any other federal statute. The NAACP's contrary assertion (at 21) grossly mischaracterizes the United States' position. It also overstates other federal statutes' similarities to the Clean Air Act.[2]

---

[1] As in its motion-to-strike briefing (Dkt. No. 83), the NAACP illogically insists that if the United States opposes a citizen suit, intervening as a defendant allows the government "sufficient control." NAACP Mem. at 34. But if the United States determines that *no* civil enforcement is warranted, violations or not, it is unclear why it would subject itself to the citizen's litigation.

[2] The one supposedly analogous statute that the NAACP cites—the Sarbanes Oxley Act—allows citizens to seek obviously individualized remedies (e.g., compensatory damages) to redress obviously individualized harms ("discharge or discrimination"). 18 U.S.C. § 1514A(b), (c).

The NAACP cites three contextual features that purportedly support its interpretation. None do. The first is the diligent-prosecution bar; according to the NAACP, so long as government enforcers do not preclude the citizen's planned suit within 60 days of receiving notice, the citizen has unfettered discretion to sue. NAACP Mem. at 16-17. But governmental actors' "preeminent role" in enforcement does not shift to citizens merely because they wait out the 60-day clock. *EPA v. City of Green Forest*, 921 F.2d 1394, 1404 (8th Cir. 1990) (federal enforcement decision "subsequent" to the citizen suit precluded the suit); *cf. Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 127 (2d Cir. 1991) ("disagree[ing]" that New York "forfeited the right to preclude citizen enforcement . . . in failing to bring an enforcement proceeding during the sixty-day statutory notice period"). Reinforcing the point, Congress made explicit that the federal intervention right exists "at any time" (without permitting citizens may intervene in government actions "at any time"). 42 U.S.C. § 7604(b)(1)(B), (c)(2). And the statute expressly preserves the United States' ability to influence the outcome of citizen suits after the 60-day notice period. NAACP Mem. at 17 (conceding that citizens "may not resolve" their suits through consent judgments without allowing federal review).

Second, despite the Clean Air Act's clear assignment of primary enforcement authority, the NAACP confusingly stretches narrow exemptions to enforcement to suggest these are the only means for dismissal. NAACP Mem. at 22-23. This argument conflates two distinct questions: One is when the statute requires "compliance" with its standards. 42 U.S.C. §§ 7412(*i*)(4), 7418(b) (exemption provisions). The other is what actors have preeminent enforcement discretion to decide what, if anything, should be done about alleged noncompliance. The United States' intervention concerns the second question, not the first. Whether or not xAI has complied with the statute, the United States has intervened to dismiss this enforcement action

consistent with its "significant" "prosecutorial discretion not to take enforcement actions against" (alleged) "violators of a federal law." *In re Aiken Cnty.*, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J.); *see* U.S. Am. Mem. at 8-9.

Finally, NAACP utilizes a highly disfavored approach to statutory interpretation. NAACP Mem. at 17. The NAACP's surmise about why one amendment was offered and why Congress "declined to adopt [the] new legislation" is "particularly dangerous" "speculation" that the Supreme Court has repeatedly disfavored. *Bostock v. Clayton County*, 590 U.S. 644, 670 (2020). It is also plausible that Congress rejected the amendment as unnecessary. The government's statutory intervention right includes the dismissal right, consistent with how citizen suits were never intended to "supplant" governmental enforcement discretion. *Gwaltney*, 484 U.S. at 60.

**2.** A consensus of jurists—from the Supreme Court, the Fifth Circuit, and other courts—have repeatedly confirmed that citizen-suit plaintiffs cannot override federal enforcement discretion. U.S. Am. Mem. at 14-17. Yet, the NAACP insists that "courts have rejected [the] logic" of the United States' interpretation. NAACP Mem. at 18-21. Not so.

The NAACP cites no authority supporting the notion that citizen-suit provisions cede preclusive enforcement authority to third parties. The NAACP misreads decisional law to apply only to suits that "address past violations." NAACP Mem. At 18-19. But the Fifth Circuit does not share the NAACP's interpretation of *Gwaltney*: To the contrary, *Gwaltney* "made it clear" that citizen suits must "not supplant government action" even where citizens wish to enforce "ongoing violations" allegedly unaddressed by government action. *Lockett v. EPA*, 319 F.3d 678, 689 (5th Cir. 2003).

The NAACP also contests the United States' reliance on *Green Forest*. That case, the NAACP says (at 18), rejected the notion that EPA's decision "not to commence an action" against a defendant bound the citizens' ability to pursue one. But *Green Forest* concerned the government's decision to enforce against different defendants than the one the citizens chose. 921 F.2d at 1397, 1405. It did not address, as here, an Executive decision to affirmatively withhold consent for private enforcement.[3]

**3.** As the United States has already explained, it would be improper to probe the government's determination that civil enforcement in this case disserves the public interest and threatens national security. U.S. Am. Mem. at 9. Turning from the statute and precedent, the NAACP challenges the United States' determination that enforcement in this case would impair national interests. NAACP Mem. at 23-24. It invites the Court to require "extra briefing" on the United States' reasons for dismissal and to "question" the facts in the declaration of Cameron Stanley, the Department of War's Chief Digital and Artificial Intelligence Officer (CDAO). *Id.* This Court should decline to do so.

In any event, courts (and the NAACP) "cannot substitute [their] own assessment for the Executive's predictive judgments" on what "serve[s] national security interests." *Trump v. Hawaii*, 585 U.S. 667, 707-08 (2018). Plus, while the NAACP predicts (at 23-24) that its requested relief will not "impact[]" the Department's operations because xAI may "rent out" "excess compute power," CDAO Stanley averred that *any* "limitations in energy supply" would "severely impact[]" the Department's operations, Dkt. No. 85-1 ¶¶ 9-10.

---

[3] The NAACP distinguishes the United States' other cited cases (*see* U.S. Am. Mem. at 14-15) as either involving a federal enforcement decision to induce statutory compliance or a different type of Clean Air Act citizen suit than this one. NAACP Mem. at 19-20. The factual differences between those cases and this one are irrelevant. Each case confirmed the legal proposition that citizens' enforcement prerogatives cannot override those of the government.

Finally, this Court should disregard NAACP's suggestion without explanation that the declaration was improperly submitted. NAACP Mem. at 23. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Taylor v. U.S. ex rel. U.S. Drug Enf't Admin.*, 2015 WL 5971188, at *8 (N.D. Miss. Oct. 14, 2015) (Brown, J.) (cleaned up).

**B. Constitutional avoidance favors the United States' interpretation.**

The United States' interpretation avoids conflict between the citizen-suit provision and the Executive Branch's preclusive Article II enforcement discretion. U.S. Am. Mem. at 17-23. Deciding to punish unlawful conduct by seeking civil penalties payable to the Treasury on behalf of the United States is "a quintessentially executive power." *Seila Law v. CFPB*, 591 U.S. 197, 219 (2020), and permitting the NAACP to seek civil penalties payable to the United States on terms to which the United States objects raises serious concerns under Article II.

The NAACP argues that there is no serious Article II problem in allowing private citizens to bring a Clean Air Act suit for civil penalties, payable entirely to the United States, if the United States wishes instead to dismiss the suit. NAACP Mem. at 32-35; *see* 42 U.S.C. § 7604(g). It is wrong.

**1.** The NAACP first accuses the United States of misunderstanding how constitutional avoidance works. NAACP Mem. at 24. Avoidance, the NAACP says, is only relevant where there are competing interpretations fairly supported by the text. *Id.* But the United States has plainly shown that its reading of the statute is "at least 'fairly possible'—so the canon of constitutional avoidance would still counsel [the Court] to adopt it." *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)); *see* U.S. Am. Mem. at 17. Indeed, even though the United States need not show that its reading is "the best one" for

avoidance to apply, *Hansen*, 599 U.S. at 781, the United States' interpretation is the only reasonable construction of the citizen-suit provision given the serious Article II considerations at play.

**2.** While the United States need only establish the citizen suit intervention rights to include dismissal, the NAACP's primarily argues that the Clean Air Act's citizen-suit provision is constitutional. NAACP Mem. at 24-25. This is incorrect. The United States need only establish—and has established—that interpreting the citizen-suit provision to authorize dismissal avoids "serious constitutional doubts." *Jennings*, 583 U.S. at 286.

**a.** The NAACP unpersuasively starts by citing out-of-circuit district courts that upheld citizen-suit provisions' constitutionality. NAACP at n.11. Yet, none asked the question that the United States' intervention presents—whether Article II questions regarding Clean Air Act citizen suits are at least "serious." *Jennings*, 583 U.S. at 286. Even if the NAACP's cited cases are relevant to that question, half predated *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000). So they had no opportunity to consider the fundamental Article II questions identified by Justices Kennedy, Scalia, and Thomas. *See* U.S. Am. Mem. at 17-18. All predated Justice Alito's 2015 opinion amplifying the concerns. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). None had the chance (or reason, unlike this Court) to consider the concerns expressed by half of the en banc Fifth Circuit in *ExxonMobil*. *See* U.S. Am. Mem. at 18-19. All concerned citizen-enforcement actions to which the Executive acquiesced or supported, without finding the actions contrary to national interests. *Cf. id.* at 19 n.3. Finally, all predated recent Supreme Court cases—like *Seila Law*—confirming

that deciding whether to pursue civil penalties solely payable to the United States for violations of federal law is a core Executive power.[4]

The NAACP next misreads *Laidlaw* as "binding" on the Article II question. NAACP Mem. at 33-34. *Laidlaw* resolved a question of Article III standing to seek civil penalties, and this Court should not extend *Laidlaw*'s Article III holding to Article II. U.S. Am. Mem. at 19 n.4. Insofar as the *Laidlaw* majority considered Justice Scalia's concerns about civil penalties "overdrawn," it relied on the key federal-consent factor that, once again, is absent here. 528 U.S. at n.4. The United States "endorsed" the *Laidlaw* "suit from the outset." *Id.*

If any persuasive value to the NAACP's cited cases remains, none considered the lack of historic evidence showing a Founding-era acceptance of citizen suits for penalties payable solely to governments. *See* U.S. Am. Mem. at 20-21. The cases thus don't help the NAACP.

**b.** While the NAACP's cited cases omit any historic analysis, the NAACP proffers a faulty one of its own. NAACP Mem. at 28-30, 34-35. It argues that a citizen suit for civil penalties resembles a common-law nuisance action. *Id.* at 28-30. The NAACP also relies heavily on a law review article positing that, around the time of the Founding, allowing private parties to "seek penalties for nuisances on behalf of the public" was accepted. *Id.* at 34 (citing Nitisha Baronia, et al., *Private Enforcement at the Founding & Article II*, 114 Calif. L. Rev. 131 (2026) (hereinafter *Private Enforcement*)). The NAACP mischaracterizes the history of private environmental enforcement.

---

[4] *E.g.*, *SPIRG of N.J., Inc. v. Monsanto Co.*, 600 F. Supp. 1474, 1478 (D.N.J. 1985) (U.S. amicus supporting plaintiffs); *Chesapeake Bay Found., Inc. v. Bethlehem Steel Corp.*, 652 F. Supp. 620, 625 (D. Md. 1987) (citing *SPIRG*); *United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060 (S.D. Ohio 2001) (U.S. pursuing own enforcement). The United States' prior briefing in citizen suits that it did not oppose (*see* NAACP Mem. at 32) is similarly irrelevant.

Case 3:26-cv-00306-DMB-JMV Doc #: 102 Filed: 10/24/26 17 of 23 PageID #: 3107

First, the NAACP's attempted analogy to a common-law nuisance suit does not work. Even taking the NAACP's premise that nuisance law informed the Clean Air Act's development, it does not follow that Clean Air Act emission-control standards and the means of enforcing them are analogous to nuisance standards and remedies. "The contrast between the defined standards of the Clean Air Act and an ill-defined omnibus tort . . . could not be more stark." *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 302 (4th Cir. 2010). Congress itself recognized that citizen suits enforcing those standards, unlike nuisance actions, enable private actors to secure societal benefits that go beyond redressing citizen-enforcers' harms. Nuisance suits are not a "substitute" for citizen suits because "[t]he two kinds of lawsuits have different goals and seek different remedies." *Sierra Club v. EPA*, 60 F.4th 1008, 1020 (6th Cir. 2023); *see* 42 U.S.C. § 7604(e) (describing "common law" actions as "other rights"); S. Rep. No. 91-1196, at 65 (1970) (citizen-suit provision does not "provide for damage or nuisance actions").

To understand the differences, this Court need not look further than *Cox v. City of Dallas*, cited by the NAACP (at 28). There, the Fifth Circuit explained that a "basic remed[y] . . . available in nuisance actions" is "damages" recoverable by the plaintiff. *Cox v. City of Dallas*, 256 F.3d 281, 291 (5th Cir. 2001) (citing Restatement (Second) of Torts § 821B cmt. *i* (1979)). For reasons the United States has already explained, the NAACP is wrong that compensatory damages are analogous to civil penalties that are payable solely to the United States Treasury. U.S. Am. Mem. at 20, 22-23. Such penalties are necessarily remedies that accrue "the public's interest, not an interest specific to [the NAACP] or its members." *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008); *see also United States v. Telluride Co.*, 146 F.3d 1241, 1246 & n.6 (10th Cir. 1998) (the ordinary meaning of "penalty" is "a sanction or punishment imposed for violating a public law which goes beyond compensation" or "making the

Case: 26-60306 Document: 10 Page: 406 Date Filed: 10/16/2026

plaintiff whole"); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1133 (11th Cir. 2021) (Newsom, J., concurring) ("a fine to be paid into the treasury" "accrues to the public"). The fact that some personal interest may motivate the citizen to sue does not automatically mean the civil penalties statutorily authorized are "limited" to vindicating those personalized interests. NAACP Mem. at 27.

While the NAACP separately analogizes to Founding-era laws that enabled private parties to seek penalties payable to governments, like qui tam actions, that analogy is at least equally dubious. The NAACP does not cite a single historical analogue for private enforcement of nuisance law, or environmental law, generally, where monetary fines achievable were payable *solely* to the government. *Compare* 42 U.S.C. § 7604(g). Qui tam actions, consistent with history and tradition, enabled private plaintiffs to share in monetary recovery. U.S. Am Mem. at 20 n.5. The same was true for Founding-era environmental laws that enabled private citizens to "seek penalties . . . on behalf of the public," NAACP Mem. at 34, like Massachusetts' "restraints on roving livestock," "fishing and hunting regulations," and "limits on dirty industries," *Private Enforcement*, *supra*, at 160-61, 164-65 (citing, for example, 1692 Mass. Acts 59-60—an act to prevent "[c]ommon [n]uisances" from slaughterhouses and similar establishments, with one-third of the penalties payable to the citizen informer).[5] Other Founding-era states' laws on both environmental and nonenvironmental subjects similarly allowed "private damages awards" or included "qui tam provisions." *Private Enforcement*, *supra*, at 165 & n.207 (examples); *see also* An Act Concerning Public Roads §§ IX, XII (Oct. 1785), *in* 12 William Hening, Statutes at

[5] See also *Private Enforcement*, *supra*, at 160-61 nn.173-183, citing other examples such as 1757 Mass. Acts 27-28 (a four-shilling-per-animal penalty for cattle on beaches, with "one moiety thereof to be to the informer"), 1765 Mass. Acts 741-42 (fishing regulations, allowing the citizen informer "one half of the forefeiture"), and 1739 Mass. Acts 988-89 (ten-pound fine for illegally taking deer, one moiety to "him or them who shall inform and sue for the same").

Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the year 1619, at 179 (1823) (Virginia law "deemed a nuisance" the blocking of roads and streams, with "one moiety" of "penalties" "to the informer").

The NAACP discards these distinctions as not "meaningful." NAACP Mem. at 34. While the NAACP declines to say precisely why, its assertion appears premised on the view that the Clean Air Act authorizes citizens to sue exclusively on "their own behalf." *Id.* at 26-27. But the fact that citizens may sue in their own names rather than the United States' name does not cure the Article II concern. The penalties ultimately obtainable are for the "benefit of the United States," meaning enforcement actions to obtain them are subject to the United States' direction. *Confiscation Cases*, 74 U.S. 454, 457 (1868).

Relatedly, the NAACP argues that all Clean Air Act citizen suits must be exclusively on citizens' own behalf because some can be brought against the federal government. NAACP Mem. at 26. But the statutory text shows that section 7604(a)(2) citizen suits against the federal government are different in kind from citizen suits that exact public fines from private parties payable to the government. The statute "except[s]" those actions from civil penalties' availability. 42 U.S.C. § 7604(a). Similarly, section 7604(a)(1)'s authorization of certain suits against the federal government "does not necessarily carry over to the grant of power to federal district courts to impose civil penalties in citizen suits under the [A]ct." *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1356 (11th Cir. 2005).[6]

---

[6] The NAACP also expresses concern about how the United States' interpretation would affect states' enforcement powers. NAACP Mem. at 27. That slippery-slope argument need not be taken serious. The NAACP does not dispute that history supports cooperative federalism.

**c.** Unable to muster historical support for its arguments regarding civil penalties, the NAACP pivots to arguing that there is at least historical support for private citizens seeking injunctions to abate environmental harms. NAACP Mem. at 31-32. That is irrelevant. Even if the NAACP is right that private citizens may seek Clean Air Act compliance injunctions consistent with tradition and Article II, *see Trump v. Slaughter*, 2026 WL 1855612, at *17 (describing federal law's enforcement through "injunctions" as an Executive function), any past tradition of private abatement injunctions does not magically erase the Article II concern with citizen suits for penalties.

The NAACP also contends that if avoidance favors interpreting the Clean Air Act to authorize the United States' dismissal of citizen suits for penalties, the statute should not be read to authorize dismissal of citizen suits that also seek injunctions. NAACP Mem. at 31-32. But the federal-intervention right—the source of the dismissal right—is not contingent on the type of relief citizens seek. 42 U.S.C. § 7604(c)(2). And thus, the dismissal right cannot be contingent on the types of relief sought in any particular citizen suit. The NAACP's contrary position "fundamentally" "misconceives" the avoidance canon because it "would render [the] statute a chameleon," with "its meaning subject to change depending on the presence or absence of constitutional concerns in each individual case." *Clark v. Martinez*, 543 U.S. 371, 381-82 (2005).

**d.** The NAACP's remaining two arguments do not defeat the need for avoidance. First, the NAACP argues that citizen suits are on "firmer constitutional ground than qui tam suits," which "'raise the most direct constitutional questions.'" NAACP Mem. at 30 (citation omitted). That NAACP's suggestion of serious constitutional questions with qui tam suits is hard to reconcile with the NAACP's simultaneous assertion that the "Founders' comfort" (*id.* at 34) with qui tam actions supports citizen suits' constitutionality. The NAACP also concedes (at 30) that the

en banc Fifth Circuit rejected an Article II challenge to the False Claims Act. No binding precedent settles the serious Article II question as to the Clean Air Act or similar statutes.

Second, the NAACP disputes that deciding to seek penalties payable solely to the United States to induce compliance with federal law is inherently an exercise of Executive power. NAACP Mem. at 32-34. It acknowledges the Supreme Court's repeated and unequivocal statements that "seek[ing] daunting monetary penalties against private parties on behalf of the United States" is "quintessentially executive power." *Id.* at 33 (quoting *Seila Law*). But, as the NAACP sees it, what the Supreme Court *meant to say* is that the power to pursue such penalties is "quintessentially executive" when exercised by administrative agencies for past, rather than ongoing or future, violations of federal law. *Id.* at 33-34.

This argument need not distract the Court long. Civil penalties payable *entirely* to the United States do not cease to serve "the public interest more generally" (*id.* at 33) when citizens pursue them; they go to the same federal Treasury. As for the NAACP's contention that pursuing such penalties becomes not "quintessentially executive" for ongoing or future alleged violations, the Supreme Court has "long ago abandoned" the NAACP's assumption that an Executive power can be "only *partly* executive." *Slaughter*, 2026 WL 1855612, at *14. If deciding whether to pursue civil penalties payable solely to the United States is "quintessentially executive" in any sense (it is), Article II vests the authority to faithfully exercise that pursuit entirely in the President, regardless of when the alleged violations occur, such that private persons cannot maintain such a suit for penalties if the United States would prefer to dismiss it. U.S. Const. art. II, § 1, cl. 1 & § 3. Pure Executive powers are not vested in the President only after private actors choose to stop their allegedly unlawful conduct.

**II. The United States may dismiss this entire case pursuant to Rule 41.**

For the reasons explained above, the United States maintains statutory litigating authority to dismiss this action in full. Fed. R. Civ. P. 41 ("Rule") extends the United States' dismissal authority as the Rule is "subject . . . to any applicable federal statute," Fed. R. Civ. P. 41(a)(1)(A), such as the Clean Air Act. None of the cases NAACP cite in their response disprove the statutory text of the Rule – not a single case cited is analogous to the United States intervening and dismissing an entire action pursuant to an "applicable federal statute" and the U.S. Constitution.

**CONCLUSION**

This Court should grant the United States' requested intervention and dismiss this case.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Environment and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Environment and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

July 24, 2026

# Exhibit O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and MISSISSIPPI STATE CONFERENCE OF THE NAACP** — **PLAINTIFFS**

**V.** — **NO. 3:26-CV-74-DMB-JMV**

**X.AI CORP.; and MZX TECH LLC** — **DEFENDANTS**

**NOTICE**

TAKE NOTICE that a proceeding in this case has been CONTINUED:

---

Type of Proceeding

**EVIDENTIARY HEARING ON MOTION FOR A PRELIMINARY INJUNCTION [51]**
**SET FOR AUGUST 24, 2026**
**BEFORE CHIEF U. S. DISTRICT JUDGE DEBRA M. BROWN**
**IS CONTINUED UNTIL FURTHER NOTICE.**

---

DANIEL B. MCHUGH, Clerk of Court

By: /s/LaToya L. Davis
LaToya L. Davis, Courtroom Deputy

Date: August 21, 2026

Electronic notice only to:
All Counsel of Record

Questions should be directed to Judge_Brown@msnd.uscourts.gov

# Exhibit P

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiffs,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**THE UNITED STATES'**
**MOTION FOR ENTRY OF WRITTEN ORDER NO LATER THAN SEPTEMBER 10 ON THE UNITED STATES' AMENDED MOTION TO INTERVENE AND DISMISS**

The United States moves this Court to enter a written order on the United States' Amended Motion to Intervene and Dismiss no later than September 10, 2026. The United States filed an initial Motion to Intervene and Dismiss on June 15, and an operative Amended Motion to Intervene and Dismiss on July 7, but has not been granted intervention as of statutory right. This Court has three times now either denied or otherwise prevented the United States from attending conferences where its interests and rights are affected. In the most recent conference, this Court informed the parties that it intends to deny the United States' motion to intervene. Accordingly, the United States moves for entry of a written order no later than September 10, 2026, on the United States' Amended Motion to Intervene and Dismiss to ensure its legal and procedural rights are protected and to ensure timely appeal if necessary. Plaintiffs take no position on the United States' request at this time, and Defendants consent to this motion.

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General
U.S. Department of Justice

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Energy and Natural Resources Division

JOHN K. ADAMS
Deputy Associate Attorney General
U.S. Department of Justice

ROBERT N. STANDER
Deputy Assistant Attorney General
Energy and Natural Resources Division

JUSTIN D. HEMINGER
Acting Deputy Assistant Attorney General
Energy and Natural Resources Division

MICHAEL WEISBUCH
Senior Counsel to the Associate Attorney General

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
KYLE GLYNN
Attorney
D.C. Bar No. 90005572
U.S. Department of Justice
Energy and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365 (Darlington)
Andrew.Darlington2@usdoj.gov
(202) 598-9568 (Glynn)
Kyle.Glynn@usdoj.gov

*Counsel for the United States*

September 2, 2026

# Exhibit Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

| | |
|---|---|
| NAACP and NAACP MISSISSIPPI STATE CONFERENCE,<br><br>Plaintiffs,<br>v.<br><br>X.AI and MZX TECH LLC,<br><br>Defendants. | Case No. 3:26-cv-00074-DMB-JMV |

**<u>NOTICE OF APPEAL</u>**

Pursuant to Rule 3(c) of the Federal Rules of Appellate Procedure, the United States, acting on behalf of Lee M. Zeldin as Administrator of the U.S. Environmental Protection Agency (together, the "United States"), hereby appeal to the United States Court of Appeals for the Fifth Circuit from this Court's August 24, 2026, constructive Order denying the United States' amended motion for intervention and dismissal. Dkt. 116 (transcript of constructive oral Order); Dkt. 114 (Aug. 24 minute entry); Dkt. 117, 118 (motion requesting written Order by Sept. 10); Dkt. 85 (amended motion to intervene); *see In re Fort Worth Chamber of Com.*, 100 F.4th 528, 532 (5th Cir. 2024) ("district court's failure to timely rule" constituted "effective denial" and appealable order).

Respectfully submitted,

/s/ Andrew M. Darlington
ANDREW M. DARLINGTON, Lead Counsel
Counsel to the Assistant Attorney General
Florida Bar No. 1018895
U.S. Department of Justice
Energy and Natural Resources Division
950 Pennsylvania Ave. NW
Washington, D.C. 20530
(202) 532-3365
Andrew.Darlington2@usdoj.gov

September 18, 2026

*Counsel for the United States*

# Exhibit R

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

**NAACP and NAACP MISSISSIPPI STATE CONFERENCE**

**Plaintiffs,**

**v.**

**X.AI CORP. and MZX TECH LLC**

**Defendants.**

**No. 3:26-cv-00074-DMB-JMV**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO UNITED STATES' MOTION TO STAY ALL PROCEEDINGS PENDING APPEAL**

Case: 3:26-cv-00074-DMB-JMV Doc #: 129 Filed: 09/28/26 2 of 16 PageID #: 3246

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

HISTORY AND PROCEDURE ..........................................................................................2

ARGUMENT ................................................................................................................4

I. This Court still has jurisdiction over the United States' intervention, and it should resolve the United States' role in the first instance. ..............................................5

A. The United States' notice of appeal is premature. A stay at this juncture will waste judicial resources. ..........................................................................5

B. The United States cannot establish this Court's ongoing consideration constitutes an "effective denial" of its Motion for Intervention. ................................6

II. The United States' request for a stay of all proceedings should be denied. .......................8

CONCLUSION ............................................................................................................13

## INTRODUCTION

The Colossus Gas Plant's unpermitted air pollution threatens the health and welfare of NAACP's nearby members and other fenceline communities. Staying all proceedings before this Court will force the communities to endure increased risks of disease and premature death with each passing day. Though it now professes an interest in any Preliminary Injunction hearing held by this Court, the United States never acknowledges the ongoing harm discussed on nearly every page of the preliminary injunction briefing. Instead, claiming concern that it will not be allowed to participate in a hearing that has not been scheduled, the United States seeks to stay all district court proceedings while it appeals an order that has not been issued. *See* Dkt. No. 124. As it stands, the United States has nothing to appeal and the Fifth Circuit has nothing to review.

The issue plaguing the United States' intervention effort is *how* the Government could participate in this case, not *whether* the United States can participate at all. As NAACP has already noted: "The United States can likely establish *some* basis on which it may participate in this case to *some* extent." Dkt. No. 83 at 6. But the United States has created a procedural morass by failing to follow basic legal principles at every step. Now its effort to bypass the District Court entirely threatens further delay at the community's expense.

In its Motion to Strike the United States' intervention papers, NAACP expressed its preference to resolve the nature of and basis for the United States' participation *before* the Government was admitted into this case. *See id*. But the Court could also resolve the matter *afterward*. For example, though the United States' filings cannot support its purported "Plaintiff" status, the Court could consider granting the United States' motion to intervene conditioned on

the Government's realignment as a defendant.[1] Then, prior to any PI hearing, the Court could set appropriate limitations on the United States' participation to match its limited interests.[2]

In light of the United States' latest maneuvers, resolving *whether* the United States can participate in this case and then turning to the question of *how* would obviate any need for the Government's requested stay and serve the interests of judicial efficiency. Whatever its role, though, the United States' requested stay of all proceedings would irreparably harm NAACP members and other frontline communities exposed to the Colossus Gas Plant's illegal pollution. The United States' Motion should be denied.

**HISTORY AND PROCEDURE**

The United States' effort to enter and participate in this case has been confusing from the beginning and riddled with procedural missteps throughout.

On February 13, 2026, NAACP notified the United States of their intent to sue xAI and MZX Tech ("xAI") for violations of the Clean Air Act at its unpermitted Colossus Gas Plant. On April 14, NAACP filed the Complaint. *See* Dkt. No. 1. Just three weeks later, on May 6, NAACP

---

[1] *See* Dkt. 83 at 5-6 (discussing party alignment). Such an approach may best serve judicial efficiency in light of the United States' hollow appeal effort. Granting the United States' motion to intervene in the near-term—even subject to conditions to follow—should close any lingering question whether the United States has brewed itself an appealable order. *See*, *e.g.*, *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 378–79 (1987) (holding in a case where a party was granted permissive intervention subject to conditions that, because it, "during post-trial review, can challenge the limitations on its participation," the order granting limited participation was not immediately appealable).

[2] Courts may condition intervention "on such terms as will be consistent with the fair, prompt conduct" of the litigation. *United States v. S. Fla. Water Mgmt. Dist.*, 922 F.2d 704, 710 (11th Cir. 1991); *see also* Fed. R. Civ. P. 24, 1966 Advisory Committee Notes (noting that intervenors as of right "may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.").

filed a motion for a preliminary injunction because xAI's illegal power plant causes irreparable harm to its members with each day of operation. *See* Dkt. Nos. 20 (Motion) & 21 (Memo).[3]

On May 26, this Court set a hearing on NAACP's Motion for Preliminary Injunction for August 24, 2026. *See* Dkt. No. 42.

On June 15, the United States filed a "Motion for Intervention and Dismissal." Dkt. Nos. 58 (Motion) & 59 (Memo). Though the Government sought intervention "as a Plaintiff," it did not file a complaint or articulate a claim against xAI for the Court's adjudication. It did not address whether the Colossus Gas Plant violates the law or increases NAACP members' risk of disease and death. And it did not file a proposed response to NAACP's Motion for a Preliminary Injunction. Rather, the United States insisted, based on its assessment of "federal policy and public interest," that "*no* relief" should be ordered against xAI. Dkt. No. 59 at 15.

On July 1, NAACP moved to strike the United States' motion as it failed to satisfy the fundamental requirement of adversity[4] and indeed basic Federal Rules of Civil Procedure. *See* Dkt. Nos. 82. However, NAACP acknowledged that the United States could likely establish some basis on which it may participate in this case and identified *four* ways that the United States could correct its filings to participate in this case. *See* Dkt. No. 83 at 5–6.

On July 7, without seeking leave of the Court, the United States filed amended papers but did not correct their fundamental flaws. *See* Dkt. Nos. 85 (Motion) & 86 (Memo). The

---

[3] NAACP's Preliminary Injunction papers were later amended with this Court's leave to account for the increase in harmful emissions at the Colossus Gas Plant. *See* Dkt. Nos. 50 (Court's Order), 51 (Plaintiffs' Amended Motion), & 52 (Plaintiffs' Amended Memo).

[4] As another court recently noted, "more than a century" of Supreme Court precedent establishes "beyond cavil that adverseness between litigants is a constitutional minimum that must be satisfied in every federal case seeking judicial determination." *Trump v. IRS*, No. 26-20609 slip op. at 14-15 (S.D. Fla. July 13, 2026) (discussing *Lord v. Veazie*, 49 U.S. 251, 255 (1850), and *Muskrat v. United States*, 219 U.S. 346, 349 (1911)).

Government's amended papers identified no claim against xAI and failed to follow the Federal Rules' requirements for intervention. And the Government remained silent on the topics of xAI's liability under the Clean Air Act and the harm that its unpermitted Colossus Gas Plant operations have caused—and continue to cause—NAACP's members. *See id*. This motion was fully briefed on July 24, 2026. Dkt. 102.

On July 15, NAACP filed their Rebuttal Memorandum in Support of its Motion for a Preliminary Injunction, concluding the briefing on that motion. *See* Dkt. No. 97.

On August 20, this Court advised the parties that the Preliminary Injunction hearing scheduled for August 24 would be postponed. The United States had not sought a written order or participation in the Preliminary Injunction hearing at any time in anticipation of that hearing.

On September 2, the United States manufactured its own deadline for this Court, seeking "entry of a written order" on its Motion for Intervention and Dismissal by September 10, 2026. *See* Dkt. No. 117. In its motion, the United States announced its interest in participating in any hearing on NAACP's Motion for a Preliminary Injunction for the first time.

On September 18, with its Motion for Intervention still pending, the United States noticed its appeal. Dkt. No. 123.

On September 21, the United States filed this request to stay all proceedings in the district court—including any hearing on the Preliminary Injunction Motion—while it pursues the appeal of a decision this Court has yet to issue.

**ARGUMENT**

The United States hopes to take advantage of confusion of its own making. It failed to satisfy basic requirements for its participation in this case and now complains it is prejudiced by delay. It refused to address the substance of NAACP's Motion for a Preliminary Injunction but

now insists it must be allowed to participate in a hearing on it. The Government's continued gamesmanship prejudices NAACP members who are facing new pollution and new health risks with each passing day.

## I. This Court still has jurisdiction over the United States' intervention, and it should resolve the United States' role in the first instance.

With its notice of appeal docketed, the Government claims "[t]his Court now lacks jurisdiction over" the matter of its intervention, "which has been transferred to the Fifth Circuit." *See* Dkt. No. 125 at 4. The United States is wrong. The Government's motion for a written order did not "construct" an appealable ruling from silence, and its premature notice of appeal does not deprive this Court of jurisdiction. This Court can—and should—proceed to resolve the question of the United States' intervention in the first instance.[5]

### A. The United States' notice of appeal is premature. A stay at this juncture will waste judicial resources.

The United States' notice of appeal precedes any order from this Court settling its intervention or describing its role in this case. Although the Federal Rules of Appellate Procedure allow for premature notices of appeal in certain, limited instances, *see* Fed. R. App. P. 4(a)(2), even where a premature notice may suffice, appellate jurisdiction awaits the district court's ruling. "A premature notice of appeal does not ripen until judgment is entered. . . . [I]t permits a premature notice of appeal from [a] bench ruling to relate forward to judgment and serve as an effective notice of appeal" from the appealable judgment, once it is entered. *FirsTier Mortg. Co. v. Inv. Mortg. Ins. Co.*, 498 U.S. 269, 275 (1991); *see also Outlaw v. Airtech Air Conditioning &*

---

[5] As this court has not yet resolved the United States' Motion for Intervention, the caselaw and argument mustered by xAI in support of the United States' request for a stay (Dkt. No. 127 at 4–5) is inapposite.

*Heating, Inc.,* 412 F.3d 156, 159–60 (D.C. Cir. 2005).[6] The Court of Appeals should not entertain the United States' appeal unless and until this Court has resolved the question of its intervention in the first instance. Thus, a stay of all proceedings—including this Court's resolution of the United States' pending Motion for Intervention—will undermine the United States' ability to obtain the appellate review on which it asks this Court to wait.

On the other hand, even if the United States' notice of appeal effectively transferred jurisdiction on the issue of its intervention to the Fifth Circuit, the Fifth Circuit is likely to treat any order from this Court on the United States' intervention "as an indicative ruling." *See* Fed. R. Civ. P. 62.1(a), (c) (allowing remands to the district court to enter a decision on a motion if the district court has indicated the motion "raises a substantial issue"); Fed. R. App. P. 12.1(b) (same); *see also Moore v. Tangipahoa Par. Sch. Bd.*, 836 F.3d 503, 504 (5th Cir. 2016) (treating as an indicative ruling the district court's statement that it would determine whether a conflict of interest existed if the case were remanded, when a notice of appeal divested the district court's jurisdiction). Far from prejudicing the parties, an order from this Court regarding the United States' intervention would support all parties' interests in the case's swift and certain resolution.

### B. The United States cannot establish this Court's ongoing consideration constitutes an "effective denial" of its Motion for Intervention.

Where, as here, a "motion to intervene has not yet been granted or denied," a would-be intervenor generally has "no standing to take an appeal or appear as a party." *Toronto-Dominion Bank v. Cent. Nat. Bank & Tr. Co*., 753 F.2d 66, 68 (8th Cir. 1985). Having not yet been granted

---

[6] This rule, crafted "to protect the unskilled litigant who files a notice of appeal from a decision that he reasonably but mistakenly believes to be [an appealable] judgment," does not create appellate jurisdiction where it would not otherwise exist. *See FirsTier*, 498 U.S. at 276. Rather it allows a premature notice of appeal to satisfy the requirement for a timely notice "if immediately followed by the entry of judgment." *Id*.

or denied intervention, the United States attempts to "construct" its own appealable order by claiming the fact this Court did not rule on its preferred timeline constituted an "effective denial" of its intervention. But a constructive denial exists only where a delay in ruling "has the same effect on the interventor's interest as would an outright denial." *Ams. United for Separation of Church and State v. City of Grand Rapids*, 922 F.2d 303, 306 (6th Cir. 1990). As such, construing a district court's actions to be an "effective denial is contextual," and warranted only where there is a "legitimate basis for urgency." *In re Fort Worth Chamber of Commerce*, 100 F. 4th 528, 535 (5th Cir. 2024).

Here, the United States cannot describe such a basis for urgency. The Government suggests that, absent intervention, it may not be able to participate in a hearing on NAACP's Motion for a preliminary injunction. But that argument fails for two reasons.

**First**, that hearing has not been scheduled. Thus, there is no clock by which the United States can measure its purported prejudice and there remains time for the Court to resolve the United States' role in advance of such a hearing. *Cf. In re Fort Worth Chamber of Commerce*, 100 F. 4th at 535 ("the Final Rule's fast-closing window for compliance demanded faster review of the motion for a preliminary injunction").

**Second**, there is no reason to assume the United States will be entirely excluded from participating in a Preliminary Injunction hearing at this point. The Court may still grant the United States' intervention request.[7] And if the Court denied the United States' intervention request, it could still allow the Government to correct its errors or reformulate its request to participate and refile. In fact, this Court indicated it was still considering that very possibility at

[7] In the event its intervention is granted, the United States' participation in any preliminary injunction hearing should be limited commensurate with the limited attention it gave the issues in its filings: addressing the equities of NAACP's requested injunction.

the most recent status conference, as reflected in the transcript cited by the United States. *See* Dkt. No. 116 at 12:25–13:4.

Ultimately, the United States provides no reason this Court's ongoing consideration of its intervention prejudices its interests *now* or could be construed as a "constructive" denial. A party "cannot simply say they need an expedited ruling and then appeal by claiming effective denial when they don't get it on their preferred timeline." *In re Fort Worth*, 100 F. 4th at 535. The United States' notice of appeal in this case is a procedural misadventure. And staying all proceedings before this Court—including the Court's order resolving United States' intervention—is more likely to frustrate the judicial process than to facilitate it.

**II. The United States' request for a stay of all proceedings should be denied.**

Because this Court can still structure the United States' participation without delaying proceedings, the Court should deny the United States' requested stay. But if this Court evaluates the United States' stay request on its own terms, it still fails.

The United States' request (joined by xAI) starts in the wrong place: by asking the Court to disregard the familiar four-step framework for stays pending appeal from *Nken v. Holder*, 556 U.S. 418 (2009), and to apply a *Landis*-like standard instead. Dkt No. 125 at 4 (citing *Esquivel v. Mullin*, Slip. Op. No., 2026 WL 2322821 (W.D. Tex. Aug. 10, 2026); Dkt. No. 127 at 2-3. But it is far from certain that *Landis* applies here: While the *Landis* framework plainly applies where there is a request to "stay one case pending *another case's* disposition," *Fox Corp. v. Arroyo v Rodriguez*, 2026 WL 1734870, at *2 (S.D. Tex. June 16, 2026) (emphasis added), courts are divided over whether *Nken* instead must apply when "determin[ing] whether to grant stay of

proceedings pending interlocutory appeal" in the same case. *Kuang v. U.S. Dep't of Def.*, 2019 WL 1597495, at *2 (N.D. Cal. Apr. 15, 2019).[8]

The Fifth Circuit, for its part, has applied the *Nken* framework when considering analogous requests to stay district court proceedings pending interlocutory review, further undermining xAI's claim (Dkt. No. 127 at 2-3) that *Landis* must apply to all such requests to stay proceedings. *Earl v. Boeing*, 21 F.4th 895, 898 (5th Cir. 2021) (evaluating stay of district court proceedings pending interlocutory class certification appeal); *Mi Familia Vota v. Ogg*, 2022 WL 23042551, at *1 (5th Cir. Oct. 7, 2022) (evaluating stay of proceedings pending interlocutory sovereign immunity appeal). Accordingly, this Court should be wary of accepting the United States' invitation to disregard *Nken*, particularly where its ultimate aim is to forestall this court from granting a preliminary injunction, a stay of which would be governed by *Nken*. *See United States v. Texas*, 97 F.4th 268, 272 (5th Cir. 2024); *see also id.* at 306-07 (Oldham, J., dissenting) (applying *Nken* to reach different result).

In any event, the Court should not dwell on this threshold question long, because the United States' request fails whether considered under *Nken* or *Landis*. Under *Nken*, a court should consider four factors (which include but expand on those listed in *Landis*): (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

---

[8] xAI obscured this uncertainty by cutting off the key part the quote from *Fox Corp.*—that *Landis* applies most plainly to requests to "stay one case pending *another case's* disposition." 2026 WL 1734870, at *2; *see* Dkt. No. 127 at 2-3.

***Likelihood of success on appeal***: As the Court has not issued an order resolving its intervention and the United States has no basis for "constructing" one, the Fifth Circuit has nothing to review, and the Government's appeal is unlikely to succeed. Even if the Court of Appeals were to take up the question of the United States' intervention, it would find a muddled intervention request that shirks Federal Rules and ducks constitutional minimums and likely will not succeed.

***No injury to the United States absent a stay***: The United States premises its request for a stay on the notion that it will otherwise be excluded from all participation in this case. But as explained above, the nature of the United States' participation remains a matter pending before this Court and is one the Court can and should resolve before the case proceeds.[9]

The United States also suggests a stay is necessary to protect Department of War operations. *See* Dkt. No. 125 at 8. Its argument is inconsistent with the factual record—xAI has *excess* compute capacity at data centers not powered by the illegal turbines that it rents to competitors for more than a billion dollars a month. *See* Dkt. 92 at 23-24. In any event, the injury articulated presumes (1) this Court has already ordered xAI to immediately cease operation of its unpermitted turbines, *and* (2) xAI cannot service its Government contracts with its excess computing capacity. Should those circumstances arise, the United States can request a stay at that time.

[9] To the extent the United States alleges prejudice from its unsettled intervention status, it is a self-inflicted wound. The United States could have solved the quandary of its participation and presented its arguments to the Court at any time in any number of ways—even outside of its muddled intervention attempt. It could have re-filed as an intervenor-defendant, submitted an amicus, pursued limited party status under 28 U.S.C. § 2403, or even filed a notice of interest pursuant to 28 U.S.C. § 517.

Lastly, the United States claims that the case should be stayed "[d]ue to the grave constitutional doubts [it] exposes." Dkt. No. 125 at 9–10. The Government's arguments there retread its Motion for Dismissal. Though its request for dismissal shares a brief with its request to intervene, resolving the Government's intervention request is a necessary predicate for any decision on its Motion for Dismissal. The Government has not asked for an expedited ruling on the Motion for Dismissal, and denial of a Motion for Dismissal is not immediately appealable. *Thomas ex rel. D.M.T. v. Sch. Bd. St. Martin Par.*, 756 F.3d 380, 383 (5th Cir. 2014) (denial of motion to dismiss "ordinarily does not constitute an immediately appealable order"). Thus, these arguments do not support the Government's request for a stay here, and resolving any "doubts" the United States may have regarding the constitutionality of the Clean Air Act's Citizen Suit Provision remains squarely within the District Court's jurisdiction.

***No injury to xAI absent a stay***: Echoing the United States, xAI complains that, without a stay, the company will be "exposed to catastrophic financial, operational, and business harms." Dkt. No. 127 at 4. But, as with the United States' Department of War concerns, this injury presumes an injunction has been ordered: xAI is complaining about the "injury" of losing the Preliminary Injunction motion, not the injury of this Court's continued consideration of motions pending for its resolution. The financial catastrophe xAI fears is nothing but the natural consequence of its illegal conduct—*i.e.*, consequences it may face if this Court determines the company violated the Clean Air Act, that compliance with the law is an indelible cost of doing business, and that xAI must cease its operation of unpermitted turbines which are threatening the health and welfare of fenceline communities day in and day out. *See* Dkt. No. 97 at 8–9. Of course, the possibility that a court will enjoin unlawful conduct is not an "injury" that warrants staying all proceedings.

xAI also argues (Dkt. No. 127 at 3) that the proceedings will be duplicated or confused if this Court proceeds to resolve the pending motions and the Fifth Circuit later determines those decisions should have come in a different order or to a different end. Having the Fifth Circuit resolve this case in the first instance may seem more efficient to xAI, but it frustrates the ordinary course of justice and the invaluable role of district courts in administering it. *See*, *e.g.*, *Lone Star Nat. Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 427 (5th Cir. 2013) ("[W]e decline to decide these complex issues as they are better addressed by the district court in the first instance."); *La. Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 749-50 (5th Cir. 2012) (concluding that the district court should determine in the first instance a complex question of law).

***Substantial injury of a stay to NAACP Members*****:** The Colossus Gas Plant is far and away the largest industrial source of $NO_x$ in the 11-county Memphis Metropolitan Statistical Area, with the undisputed potential to emit thousands of tons of dangerous pollutants per year. Dkt. Nos. 51-43 at ¶ 51; 52 at 8; 94-4 at 7 tbl.1. With xAI running its now 59-turbine Colossus Gas Plant, regulators have issued ozone action alerts for 26 days through September 2026, compared to just 10 days in all of 2025. xAI's own air quality modeling for its permitted turbines shows significant impacts to surrounding air quality stemming from emissions significantly lower than those from the Colossus Gas Plant. Dkt. No. 52 at 10; Dkt. No. 51-17 (Trinity Modeling Report) at 28 (internal pagination 1-2).

NAACP members are suffering directly, every day, from the health impacts of these unpermitted turbines. *See* NAACP Member Declarations, Dkt. Nos. 51-37 through 51-42; *see also* Dkt. No. 52 at 21–23. As Dr. Suh explains in uncontested testimony, even short-term increases in exposure to these pollutants elevate risks of heart disease, lung disease, and

premature death. *See* Dkt. Nos. 51–46 (Suh Decl.) ¶¶ 16-20, 61-68; Dkt. Nos. 51–50 (Suh. Suppl. Decl.) ¶¶ 3, 11. In reasonable fear of those effects, NAACP members have spent months skipping time outdoors and limiting visits from family members to avoid harmful exposure to xAI's unlawful pollution. Dkt. Nos. 51-3–51-42.

***Denying the stay serves the public interest.*** Congress enacted the Clean Air Act to "enhance the quality of the Nation's air resources" and to "promote the public health and welfare" of its citizens. 42 U.S.C. § 7401. Denying the Government's stay request and allowing this case to proceed is the best way to serve that public interest. A stay of all proceedings—including this Court's resolution of the United States' motion for intervention—would only delay justice and allow xAI's unpermitted turbines to continue to emit illegal pollution that puts the health of frontline communities at risk.

Further, the United States' stay tactic here, if successful, would set a dangerous precedent, allowing litigants to short circuit the orderly course of litigation. Litigants would be encouraged—at the first indication that a lower court might not rule in their favor—to (1) notice an appeal of the "constructive denial" of a deadline it manufactured for the Court; and then (2) claim they have unilaterally robbed the district court of jurisdiction over their motion in order to obtain a stay of "all proceedings" in the district court.

This Court retains jurisdiction over the quandary of the United States' participation, and there is no reason to suspend its consideration of pending motions with a stay of all proceedings. Whatever the United States' role in this case, staying all proceedings would further endanger NAACP members living under the illegal air pollution of xAI's Colossus Gas Plant.

## CONCLUSION

For the foregoing reasons, the United States' stay request should be denied.

Dated: September 28, 2026

Respectfully submitted,

/s/ Carroll Rhodes

Carroll Rhodes (MS Bar No. 5314)
MISSISSIPPI STATE CONFERENCE
OF THE NAACP
119 Downing St
Hazlehurst, MS 39083
crhode@bellsouth.net
Phone: 601-894-4323

/s/ Elias L. Quinn

Elias L. Quinn (CO Bar No. 42159)
(Pro Hac Vice) – Lead Counsel
Mary Rock (IL Bar No. 6332240)
(Pro Hac Vice)
EARTHJUSTICE
D.C. Regional Office
1250 I Street, 4th Floor
Washington, DC 20005
mrock@earthjustice.org
equinn@earthjustice.org
Phone: 202-667-4500

Lauren Godshall (LA Bar No. 31465)
(Pro Hac Vice)
Rebecca Ramirez (TX Bar No. 24126749)
(Pro Hac Vice)
EARTHJUSTICE
Gulf Regional Office
845 Texas Ave., Suite 200
Houston, TX 77002
lgodshall@earthjustice.org
rramirez@earthjustice.org
Phone: 773-828-0836

/s/ Benjamin Grillot

Benjamin Grillot (DC Bar. No. 982114)
(Pro Hac Vice) – Lead Counsel
SOUTHERN ENVIRONMENTAL LAW CENTER
500 New Jersey Ave., Suite 600
Washington, DC 20001
bgrillot@selc.org
Phone: 202-828-8382

Patrick Anderson (GA Bar No. 226260)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
panderson@selc.org
Phone: 404-521-9900

Elizabeth Putfark (VA Bar No. 100358)
(Pro Hac Vice)
SOUTHERN ENVIRONMENTAL LAW CENTER
120 Garrett Street, Suite 400
Charlottesville, VA 22902
eputfark@selc.org
Phone: 434-977-4090

*Counsel for Plaintiffs*