No. 26-60806

# In the United States Court of Appeals for the Fifth Circuit

NAACP and NAACP MISSISSIPPI STATE CONFERENCE,

*Plaintiffs/Appellees*,

*and*

UNITED STATES OF AMERICA, acting on behalf of Lee M. Zeldin as Administrator of the U.S. Environmental Protection Agency,

*Movant/Appellant*,

v.

X.AI CORP. and MZX TECH LLC,

*Defendants*.

*On Appeal from the United States District Court for the Northern District of Mississippi*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN OPPOSITION TO THE UNITED STATES' MOTION FOR A STAY PENDING APPEAL AND IN SUPPORT OF PLAINTIFFS/APPELLEES**

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 29.2, I hereby certify that I am aware of no persons or entities, besides those listed in the party briefs, that have a financial interest in the outcome of this litigation. In addition, I hereby certify that I am aware of no persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: October 16, 2026

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

Page

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ................ i

CORPORATE DISCLOSURE STATEMENT ................................................ ii

TABLE OF CONTENTS .......................................................................... iii

TABLE OF AUTHORITIES ..................................................................... iv

INTEREST OF *AMICUS CURIAE* .............................................................. 1

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 4

I. Private Enforcement of Public Laws Proliferated at the Founding Without Constitutional Objection. ...................................................... 4

II. Vigorous Private Enforcement Continued Throughout the Nineteenth Century, Though Informers Eventually Fell Out of Favor When They Grew Less Effective. ............................................ 8

CONCLUSION ........................................................................................... 12

CERTIFICATE OF SERVICE ..................................................................... 1A

CERTIFICATE OF COMPLIANCE ............................................................. 2A

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bolles v. Outing Co.*,
175 U.S. 262 (1899) .......... 11

*Eastman v. Curtis*,
1 Conn. 323 (1815) .......... 9

*Huntington v. Attrill*,
146 U.S. 657 (1892) .......... 11

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
453 U.S. 1 (1981) .......... 1

*Stewart v. Balt. & Ohio R.R. Co.*,
168 U.S. 445 (1897) .......... 11

*Tex. & Pac. Ry. Co. v. Cox*,
145 U.S. 593 (1892) .......... 11

*The Pocket Veto Case*,
279 U.S. 655 (1929) .......... 4

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 1

*United States v. 1,960 Bags of Coffee*,
12 U.S. (8 Cranch) 398 (1814) .......... 8

*United States v. Planter*,
27 F. Cas. 544 (D. Mo. 1852) .......... 9

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

STATUTES AND LEGISLATIVE MATERIALS

Act of Aug. 4, 1790, ch. 35, 1 Stat. 145 .......... 7

Act of Mar. 22, 1794, ch. 11, 1 Stat. 347 .......... 6

Act of Mar. 2, 1831, ch. 66, 4 Stat. 472 .......... 8

Act of Apr. 6, 1880, ch. 47, 21 Stat. 71 .......... 9

Act of Feb. 11, 1895, ch. 80, 28 Stat. 651 .......... 9

H.R. Misc. Doc. No. 43-72 (1874) .......... 10

Steamboat Act of 1838, ch. 191, 5 Stat. 304 .......... 8

BOOKS, ARTICLES, AND OTHER AUTHORITIES

Nitisha Baronia, Jared Lucky & Diego A. Zambrano, *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131 (2026) .......... 3-5, 7, 8

Geoffrey Gilbert, *The Law of Evidence* (1756) .......... 10

William Hawkins, *A Treatise of the Pleas of the Crown* (Thomas Leach ed., 6th ed. 1787) .......... 4

Letter from George Washington to Edmund Randolph (Mar. 1, 1791), *in* 7 *The Papers of George Washington* (Jack D. Warren, Jr. ed., 1988) .......... 6-8

Letter from Alexander Hamilton to Richard Harison (Apr. 26, 1791), *in* 8 *The Papers of Alexander Hamilton* (Harold C. Syrett ed., 1965) .......... 7

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

Letter from Richard Harison to Alexander Hamilton (May 24, 1791), *in* 8 *The Papers of Alexander Hamilton* (Harold C. Syrett ed., 1965).... 7

Jared Lucky & Diego A. Zambrano, *Common Informers and Government by Lawsuit*, Stan. L. Rev. (forthcoming 2027) https://law.stanford.edu/wp-content/uploads/2026/08/COMMON-INFORMERS-AND-GOVERNMENT-BY-LAWSUIT.pdf............... 2, 3, 8-11

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940* (2013) .................................... 9

James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469 (2023)......................................................... 5, 6

1 *Report of the Commissioners Appointed to Revise the General Statutes of the Commonwealth* (1835) ............................................... 11

Thomas Starkie, *A Practical Treatise of the Law of Evidence* (3d ed. 1842)........................................................................................ 11

*United States Court*, Van Buren Free Press, May 17, 1870, https://www.loc.gov/resource/sn84022991/1870-05-17/ed-1/?sp=2&q=informer&r=-0.179%2C0.05%2C0.845%2C0.35%2C0&st=pdf# ........................................................................ 9

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution. CAC has a strong interest in ensuring meaningful access to the courts, in accordance with constitutional text and history, and therefore has an interest in this case.

## INTRODUCTION

As the Supreme Court has made clear, "citizen-suit provisions apply only to persons who can claim some sort of injury." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981). In this case, Plaintiffs claim injuries to their members from Defendants' construction and operation of a massive power plant near their homes. Specifically, Plaintiffs invoke the Clean Air Act's citizen-suit provision to remedy harms that the plant is causing to their members' health and enjoyment of their properties. Plaintiffs therefore are not exercising "executive power" in any sense of that term. Nor are they "*unharmed*" individuals patrolling for violations of federal law. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Rather, Plaintiffs here are pursuing relief for their *own* particularized injuries.

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties consent to its filing.

That alone should dispose of the United States' constitutional objection to this suit—though the Court should not reach the merits of that objection in this posture, *see* Appellees Br. 13-14 (explaining that the government's arguments for dismissal are not properly before the Court). Yet even if this Court were to accept the United States' characterization of this suit as an attempt by Plaintiffs to act as private attorneys general, there would still be no Article II problem. "*Unharmed*" individuals, like those referenced in dictum in *TransUnion*, have played a significant role in the enforcement of public laws since our nation's Founding. That model of enforcement continued—indeed, proliferated—throughout the nineteenth century, as Americans "liquidated" the meaning of the Constitution. And no one ever objected on Article II grounds.

Private enforcement actions in the eighteenth and nineteenth centuries were known as "informer's suits" or "penal actions." They authorized "uninjured parties to enforce general compliance with regulatory law" by bringing a lawsuit against violators to "collect a statutory penalty—or sometimes a portion of the penalty, called a 'moiety.'" Jared Lucky & Diego A. Zambrano, *Common Informers and Government by Lawsuit*, Stan. L. Rev. (forthcoming 2027) (manuscript at 5-6) https://law.stanford.edu/wp-content/uploads/2026/08/COMMON-INFORMERS-AND-GOVERNMENT-BY-LAWSUIT.pdf [hereinafter *Common Informers*] (quotation marks omitted); *see id.* at 6 (clarifying that "penal statutes" were not

criminal in the modern sense). Qui tam suits were one form of pleading through which an informer could bring an action on a penal statute, but most contemporaneous legal observers agreed that, at least where a penal statute gave the entire penalty to the informer, the claim could be filed in the informer's name alone rather than as a qui tam suit on behalf of the government. *Id.* at 27-28.

Significantly, when the Constitution was drafted, default rules gave executive officials practically no control over penal actions once an informer commenced suit—even in qui tam actions pursued in the name of the United States. *See* Nitisha Baronia, Jared Lucky & Diego A. Zambrano, *Private Enforcement at the Founding and Article II*, 114 Calif. L. Rev. 131, 137-38 (2026) [hereinafter *Private Enforcement*]. Yet there is simply no record of Article II objections being raised by Congress, jurists, or early presidential administrations.

Similarly, when informer provisions eventually fell out of favor toward the end of the nineteenth century, it was not because anyone came to view them as unconstitutional usurpations of executive authority. Rather, a confluence of factors simply reduced their efficacy. *Common Informers*, *supra*, at 32-33. And critically, at that point, rather than turning exclusively to government enforcement of public laws, lawmakers turned to remedial statutes that redressed private injuries—like the Clean Air Act—in lieu of penal ones. *Id.* at 42-43.

This "[l]ong settled and established practice" should be given "great weight" in this Court's analysis of the interplay between citizen suits and Article II. *The Pocket Veto Case*, 279 U.S. 655, 689 (1929). Far from an innovation of the twentieth century, citizen suits are part of a continuous, unbroken tradition of private individuals participating in enforcement of laws that advance the public welfare. The United States' constitutional objection to this suit is impossible to square with the fact that informer's statutes—which looked much more like private persons acting as public prosecutors than the Clean Air Act—were prolific, yet never questioned on Article II grounds, throughout the nation's history.

## ARGUMENT

### I. Private Enforcement of Public Laws Proliferated at the Founding Without Constitutional Objection.

Penal statutes originated in England, where Parliament enacted hundreds of laws between the fourteenth and eighteenth centuries authorizing uninjured private litigants to enforce public laws, both civil and criminal. *See* 2 William Hawkins, *A Treatise of the Pleas of the Crown* 376-99 (Thomas Leach ed., 6th ed. 1787).

Colonists brought penal laws across the Atlantic, enacting reams of statutes with informer provisions in their colonial assemblies. *Private Enforcement*, *supra*, at 158-59. After independence, state legislatures, the primary training ground for delegates to the Constitutional Convention, drew from these deep wells of tradition

in relying heavily on informers to enforce new fiscal and regulatory statutes. *See id.* at 163-66.

In the decades after the Convention, Congress and state legislatures enacted a plethora of new statutes with informer provisions. Indeed, every state in the union enacted penal statutes during this period. *See id.* at 166 n.207 (collecting state statutes). And between 1789 and 1820, Congress deployed penal statutes to implement nearly every one of its enumerated powers: to make war; raise a military; grant copyrights and patents; regulate immigration; establish post offices; lay and collect taxes; coin money; and regulate commerce. *See id.* at 173 n.252 (collecting federal statutes). In some of the most heated debates regarding these federal statutes—those involving the Slave Trade Act of 1794—objectors in Congress expressed no concerns that the Act's informer provision infringed on Article II. *See* James E. Pfander, *Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement in a Partisan World*, 92 Fordham L. Rev. 469, 491 (2023).

During this period, courts also regularly adjudicated suits by informers without expressing concern that such actions infringed on Article II, even though informers initiated and terminated these suits with limited oversight from the executive branch. Perhaps the most significant federal-court informer's actions were brought under the Slave Trade Act discussed above, which imposed penalties on the operators of ships that transported enslaved people: one half of the recovery to the

United States, and the other to the "use of him or her who shall sue for and prosecute the same." Act of Mar. 22, 1794, ch. 11, § 2, 1 Stat. 347, 349.

The Providence Society, a private association of antislavery activists, brought the first suit under the Act in federal court—without consultation with the federal government, which was moving too slowly for the abolitionists. *See* Pfander, *supra*, at 481-82. The case proceeded to trial, where a jury ruled for the defendant. *See id.* Several years later, another anti-slavery association sued under the Act's informer provision in federal court and succeeded in recovering $16,000. *Id.* at 483-84.

Concerns about private infringement on executive authority did not come up in either of these suits, even though the anti-slavery associations exercised complete enforcement discretion: they investigated alleged traders, chose which ones to sue, pursued their own legal theories, and settled cases entirely on their own. *Id.* at 481-83, 491. The cases were litigated vigorously to judgments on the merits, yet constitutional questions simply were never pressed.

Like Congress and the courts, early presidential administrations also never raised Article II concerns about informer's actions, despite carefully considering them. That is perhaps most apparent from the Washington administration's handling of a qui tam action against a New York customs inspector named Samuel Dodge. *See* Letter from George Washington to Edmund Randolph (Mar. 1, 1791), *in* 7 *The Papers of George Washington* 493-95 & n.1 (Jack D. Warren, Jr. ed., 1988) (editorial

note) [hereinafter *Washington's Papers*]. The action was brought by a relator suing in the name of the United States under a 1790 customs act, which awarded half of any penalty to the United States and divided the other half between the relator and local treasury officials. Act of Aug. 4, 1790, ch. 35, § 69, 1 Stat. 145, 177. After being indicted under the Act for allowing a vessel to unload molasses in the dark, Dodge appealed to Washington for a pardon, "maintain[ing] that he had been entirely ignorant" of applicable regulations, "which had gone into effect only a few days before the incident." *Washington's Papers*, *supra*, at 493-95 & n.1.

Unsure how the division of the statutory penalty between the United States and a private litigant would affect the presidential pardon power, Washington sought Hamilton's advice. Hamilton in turn requested the assistance of Richard Harison, a respected lawyer and Auditor of the Treasury Department. Letter from Alexander Hamilton to Richard Harison (Apr. 26, 1791), *in* 8 *The Papers of Alexander Hamilton* 312-14 (Harold C. Syrett ed., 1965). Harison concluded that Washington could remit only the United States' portion of the penalty, as any pardon would be a "mere nullity" with respect to the portion awarded to the relator. Letter from Richard Harison to Alexander Hamilton (May 24, 1791), *in* 8 *The Papers of Alexander Hamilton*, *supra*, at 352-54. Adopting this determination, Washington required payment of the portion of the penalty owed to the private litigant as a condition for

any pardon. *See Private Enforcement*, *supra*, at 174 & n.258 (citing 7 *Washington's Papers*, *supra*, at 493-95 & n.1).

The Washington administration did not object that its lack of power to displace the private portion of Dodge's penalty infringed on executive power. Washington understood that, as in England, private qui tam awards were treated as statutory property rights—conditional rights which vested at the time of "the commission of the offence." *United States v. 1,960 Bags of Coffee*, 12 U.S. (8 Cranch) 398, 405 (1814). Accordingly, in the suit against Dodge, the informer's rights had already vested, and Washington could not extinguish those rights, even though "Dodge's violation was purely technical, and a public prosecutor would never have proceeded against him." *Private Enforcement*, *supra*, at 174.

## II. Vigorous Private Enforcement Continued Throughout the Nineteenth Century, Though Informers Eventually Fell Out of Favor When They Grew Less Effective.

As in the Founding era, informers remained "an indispensable legislative tool" throughout the nineteenth century in what remained "a decentralized and litigation-centric system of government." *Common Informers*, *supra*, at 12. Congress passed at least forty-seven penal statutes between 1800 and 1900. *See id.* App. A. These statutes deputized informers against a wide range of public ills—from traditional areas of penal enforcement like naval-timber poaching, *see* Act of Mar. 2, 1831, ch. 66, § 3, 4 Stat. 472, 472, to cutting-edge new regulatory schemes, like the Steamboat

Act of 1838, ch. 191, § 2, 5 Stat. 304, 304. Notably, both Congress and the states also relied on informers to enforce early environmental-protection schemes. *See, e.g.*, Act of Apr. 6, 1880, ch. 47, § 5, 21 Stat. 71, 71 (authorizing informer suits to further "the preservation of shad and herring in the Potomac River"); Act of Feb. 11, 1895, ch. 80, § 5, 28 Stat. 651, 652 (authorizing informers to sue for "injur[ies]" to "any tree, bush, or shrubbery that may be growing" in Gettysburg National Park); *Eastman v. Curtis*, 1 Conn. 323, 323 & n.a (1815) (referencing informer provision of Connecticut's law prohibiting "bush-seines," a type of fishing net, in certain rivers).

Penal statutes were not just laws on the books; informers continued to act on them. *See, e.g.*, *United States v. Planter*, 27 F. Cas. 544, 545 (D. Mo. 1852) ("Eleven libels were filed against steam ferry boards for this term, by informers."); *United States Court*, Van Buren Free Press, May 17, 1870, https://www.loc.gov/resource/sn84022991/1870-05-17/ed-1/?sp=2&q=informer&r=-0.179%2C0.05%2C0.845%2C0.35%2C0&st=pdf# (reporting ten actions brought by informers in the local federal court). This is no surprise. Before the federal income tax in 1913, financial constraints made a large federal workforce of salaried regulators untenable. *Common Informers*, *supra*, at 20. Many federal workers were themselves paid on a bounty basis, *see* Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940*, at 1-4 (2013),

and there were fewer than eighty federal district attorneys for the entire country throughout the nineteenth century, *Common Informers*, *supra*, at 20. Informers thus continued to fill a critical gap in public law enforcement.

Beginning in the 1870s, penal statutes started to fall out of favor, but not because Congress had some "sudden epiphanies about Article II." *Id.* at 35. Rather a confluence of factors led lawmakers to determine that informers had grown increasingly ineffective, or even counterproductive.

First, informers sparked backlash. Though they had always been unpopular—the point was to enlist mercenaries to enforce regulatory law against community opposition—"that very project aroused so much hostility that law abiding citizens began to reject informers more broadly, even in traditional informer strongholds." *Id.* This was especially true in customs and revenue enforcement, where graft and overreach led the New York Chamber of Commerce to report to Congress that "the demoralizing system of rewarding informers by moieties … too commonly serve[s] as a trap for honest importers and an encouragement to corruption, oppression, and private bribery." H.R. Misc. Doc. No. 43-72 (1874).

Second, changes in the laws of witness competency undermined informer provisions in the mid-1800s. Up to that point, common-law rules had barred interested witnesses from testifying, but informers were frequently exempted from that rule on the ground of public necessity. *See* Geoffrey Gilbert, *The Law of*

*Evidence* 131-33 (1756). As time wore on, jurists began to reject the idea that informers were disinterested and competent witnesses. *See, e.g.*, 1 Thomas Starkie, *A Practical Treatise of the Law of Evidence* 157 (3d ed. 1842); *Common Informers*, *supra*, at 38 (citing an 1810 digest of American cases). Informers thus lost their comparative advantage over injured parties in giving testimony. *See* 1 *Report of the Commissioners Appointed to Revise the General Statutes of the Commonwealth* 211 (1835) (citing this legal development as the ground for proposing elimination of several Massachusetts informer's provisions).

Third, the canon requiring strict construction of penal statutes gained prominence at the same time that public opinion began to turn against informer's provisions. Defendants repeatedly deployed the canon in the Supreme Court around the end of the nineteenth century. *See, e.g.*, *Stewart v. Balt. & Ohio R.R. Co.*, 168 U.S. 445, 448-50 (1897); *Tex. & Pac. Ry. Co. v. Cox*, 145 U.S. 593, 604 (1892); *Huntington v. Attrill*, 146 U.S. 657, 664-67 (1892). In contrast to penal statutes, remedial ones were liberally construed in favor of the injured party. *See Bolles v. Outing Co.*, 175 U.S. 262, 265 (1899). Thus, rather than drafting penal statutes, legislators began drafting remedial ones, which—like the Clean Air Act—harness injured parties to seek remedies for their own harms. *See Common Informers*, *supra*, at 45.

In short, informer's statutes—which looked much more like private individuals acting as public prosecutors than the Clean Air Act—were prolific throughout the nation's history, yet were never questioned on Article II grounds. The United States' constitutional objection to this suit cannot be reconciled with this history.

## CONCLUSION

For the foregoing reasons, this Court should deny the government's motion.

Respectfully submitted,

Dated: October 16, 2026

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on October 16, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 16th day of October, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod
*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 2,598 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

Executed this 16th day of October, 2026.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*